UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALE S.A.,<br><br>                Petitioner,<br><br>-against-<br><br>BSG RESOURCES LIMITED,<br><br>                Respondent. | Case No. 19-cv-3619 |

**PETITION FOR RECOGNITION AND ENFORCEMENT OF
A FOREIGN ARBITRATION AWARD**

      Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201-208, Petitioner Vale S.A. ("Vale" or "Petitioner"), by its attorneys, Cleary Gottlieb Steen & Hamilton LLP, hereby respectfully petitions the Court for an Order confirming, recognizing, and enforcing the final arbitration award (the "Final Award" or "Award") entered on April 4, 2019 by a duly constituted arbitral tribunal (the "Tribunal") in *Vale S.A. v. BSG Resources Limited*, an arbitration seated in London, the United Kingdom (the "LCIA Arbitration"), and conducted pursuant to the London Court of International Arbitration's ("LCIA") Rules of Arbitration (the "LCIA Rules").

      In the Final Award, the Tribunal awarded Vale $1,246,580,846, plus pre-award interest calculated to be $773,454,952.42 and post-award interest accruing at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment, as well as costs and fees, as described in more detail in paragraph 40 of this Petition.  A certified copy of the Final Award

sought to be enforced is attached as Exhibit A to the Declaration of Jonathan I. Blackman, dated April 23, 2019, which is submitted with this Petition (the "Blackman Declaration").

The arbitration was conducted and the Final Award was rendered pursuant to the arbitration provisions in the Joint Venture Framework Agreement, dated April 30, 2010, between Petitioner and Respondent BSG Resources Limited ("BSGR" or "Respondent") (the "Framework Agreement"), as well as the Shareholders' Agreement between Vale, BSGR, and BSGR Resources (Guinea) Limited ("BSGR Guernsey"), also dated April 30, 2010 (the "Shareholders' Agreement," and collectively with the Framework Agreement, the "Joint Venture Agreements"). The Joint Venture Agreements are attached as Exhibits B and C to the Blackman Declaration.

## THE PARTIES

1.  Petitioner Vale is a public limited company (*Pr. Sociedade Anónima*) registered under the laws of Brazil, with its principal office at Praia de Botafogo, 186, Rio de Janeiro, D5 22250-145, Brazil. Its principal lines of business are mining and related logistics. Vale's securities are traded on the stock exchanges of São Paolo, New York, Madrid, as well as on Euronext, and are included in the Índice Bovespa benchmark index of the São Paolo Stock Exchange.

2.  Respondent BSGR is a company registered under the laws of Guernsey, registration number 46565, with its registered office at West Wing, Frances House, Sir William Place, St. Peter Port, Guernsey, GY1 1GX. BSGR's business was in mining operations in Africa and Eastern Europe, and also in power generation and oil and gas exploration and production. BSGR is now in administration, having put itself into administration in secret, by an order dated March 6, 2018 of the Royal Court of Guernsey, although on information and belief it has not sought to have that administration recognized in any other jurisdiction. BSGR is wholly owned

by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein, whose beneficiaries are Beny Steinmetz and members of his family.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 9 U.S.C. § 203, as it relates to a foreign arbitration award falling under the New York Convention, implemented at 9 U.S.C. §§ 201-208.

4. This Court has *quasi in rem* jurisdiction to hear the petition and enforce the Final Award because BSGR maintains property in New York that includes, *inter alia*, at least one New York bank account, a property interest in a pending $10 billion claim filed in New York against a New York resident, and real property held by an agent of the Respondent. This Court also has personal jurisdiction over BSGR under N.Y. C.P.L.R. § 302(a)(4) because of Respondent's contacts with the state of New York related to this action, including, *inter alia*, its use of a bank account in the state to receive a substantial portion of the payment fraudulently received from Petitioner, as set forth in the Final Award, its use of this District's courts to pursue claims related to the subject matter of the LCIA Arbitration, and its holding and use of property in the district through its agent that relates to the subject matter of LCIA Arbitration. Alternatively, this Court has jurisdiction over BSGR under Fed. R. Civ. P. 4(k)(2) because this petition arises under federal law and – if Respondent is not subject to jurisdiction in any state's courts of general jurisdiction – exercising jurisdiction would be consistent with the United States Constitution and laws, given the many relevant connections Respondent has had with the United States.

5.     Venue is proper in this District under 9 U.S.C. § 204 because, save for the arbitration agreement, Petitioner would have been able to bring an action or proceeding with respect to the controversy between the parties in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim, occurred, or a substantial part of property that is the subject of this action is situated in this District, and under 28 U.S.C. § 1391(b)(3) because Respondent is subject to this Court's personal jurisdiction.

## BACKGROUND

I.     **Background to the Dispute Between Vale and BSGR**

6.     The LCIA Arbitration arose out of a joint venture entered into between Vale and BSGR in April 2010 to develop an iron ore mining concession in the east of Guinea, believed to be part of the largest untapped deposit of iron ore in the world.  Blackman Decl., Ex. A (Final Award) ¶ 5.  BSGR had obtained rights to the mining concessions known as Blocks 1 and 2 of the Simandou iron ore deposit and the Zogota iron ore deposit in December 2008 from the Government of Guinea, then under the rule of President Lansana Conté.  *Id.*

7.     After receiving the rights to Simandou Blocks 1 and 2, BSGR approached Vale to sell it an interest in these mining concessions, as BSGR needed a partner that could both invest capital and offer technical expertise for the development of the concessions.  *Id.* ¶ 6.  In March 2010, BSGR and Vale began negotiating a joint venture.  Vale conducted substantial due diligence to understand how BSGR obtained its mining concessions and to assure itself that BSGR had not engaged in any corrupt activities in that regard.  Because a key purpose for this process was ensuring compliance with the U.S. Foreign Corrupt Practices Act ("FCPA"), Vale employed U.S. counsel based in Washington D.C. and New York to conduct this due diligence.

8. During due diligence, Vale required BSGR (and its namesake, Beny Steinmetz) to certify that it did not engage in bribery and to disclose, *inter alia*, the identities of any intermediaries it used in its efforts to obtain the mining rights, any material contracts regarding its rights in Simandou, and any government officials with whom it had financial relationships. BSGR and Steinmetz repeatedly represented and warranted to Vale that BSGR had lawfully obtained its mining rights in Guinea, that it had not used any undisclosed consultants or intermediaries, and that it had disclosed all material documents and information.

9. BSGR and Steinmetz made these certifications and representations in interviews with BSGR's principals in Rio de Janeiro and London, including while Vale's counsel from Clifford Chance in Washington D.C. were present on the telephone, as well as in written representations sent via e-mail to Vale's U.S. counsel in Washington, D.C. and New York.

10. On April 30, 2010, after receiving these assurances, representations, and warranties that BSGR had followed proper procedures in obtaining its rights, Vale entered into a joint venture with BSGR (the "VBG Joint Venture") to develop the mining concession. The VBG Joint Venture was governed by the Joint Venture Agreements.

11. Immediately upon executing the Joint Venture Agreements, Vale paid $500 million in upfront consideration to BSGR's bank account at JPMorgan Chase Bank, N.A. in New York,[1] and subsequently invested approximately $750 million more in developing the mining concessions. Blackman Decl., Ex. A (Final Award) ¶ 10.

12. In October 2012, a committee (the "Technical Committee") organized by the Government of Guinea (now led by a different presidential administration than the one that had

---

[1] BSGR continued to make use of U.S. bank accounts held by the VBG Joint Venture to make and receive payments related to its mining operations in Guinea during the life of the joint venture.

granted BSGR its mining concession) notified BSGR that it was evaluating the manner in which BSGR had obtained its rights. *Id.* ¶ 286. The Technical Committee explained that it was investigating credible allegations that BSGR had acquired the rights to Simandou Blocks 1 and 2 in 2008 through bribery of Guinean government officials, including Mamadie Touré, the wife of the late President Lansana Conté, both directly and through intermediaries such as BSGR's agent Frédéric Cilins. Vale cooperated with the Technical Committee's investigation, and urged BSGR to do the same; BSGR – which was the only party in a position to provide the information the Technical Committee sought, since it predated Vale's involvement – refused to cooperate and refused to attend the hearing held by the Technical Committee on December 16, 2013.

13. During the Technical Committee's investigation, Frédéric Cilins, BSGR's agent, *id.* ¶ 419, traveled to the United States to visit Mme Touré in an attempt to convince her to destroy certain documents that were incriminating for BSGR, *id.* ¶ 290. Cilins was arrested in Florida in April 2013 and then transferred to New York, where he pleaded guilty in the Southern District of New York to obstructing a U.S. federal criminal investigation into BSGR's bribery scheme.[2] The FBI audio recordings of their communications included Cilins's statements to Mme Touré that he had been sent by Steinmetz. *Id.* ¶¶ 419.9; 574.7.

14. On April 17, 2014, the Government of Guinea revoked the mining concessions after determining that BSGR had engaged in bribery and corruption. *Id.* ¶ 7.

## II. The Initiation of the LCIA Arbitration

15. Pursuant to the arbitration agreements in the Framework Agreement and the Shareholders' Agreement, Vale filed its Request for Arbitration with the LCIA on April 28,

---

[2] Unbeknownst to Cilins, Mme Touré had become a cooperator with the FBI, which taped their conversations. Cilins was sentenced on July 25, 2014 to 24 months in prison, three years of supervised release, and fined $75,000. Judgment, *United States v. Cilins*, No. 13-cr-315 (WHP) (S.D.N.Y. July 29, 2014), ECF No. 71.

2014, seeking the return of the $500 million it paid to BSGR, along with approximately $750 million it spent to develop the mining concessions, and rescission of the Joint Venture Agreements.  Blackman Decl., Ex. A (Final Award) ¶ 26.

16. Section 16.10 of the Framework Agreement and Section 17.10 of the Shareholders' Agreement provide that any dispute, controversy or claim arising out of or in connection with the Joint Venture Agreements is to be arbitrated in London under the LCIA Rules.

17. In full, Section 16.10 of the Framework Agreement provides:

<u>16.10 Governing Law; Arbitration</u>

a) This Agreement is governed by English law. The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.

b) Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "LCIA Rules"), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court. The seat or place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction. Any request for arbitration

shall be served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

c) In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceeding sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

d) By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

e) The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

f) To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit,

from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

g) Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

h) BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

18. The arbitration clause in Section 17.10 of the Shareholders' Agreement is substantially identical to that in Section 16.10 of the Framework Agreement, except for provisions concerning multiparty arbitration and joinder, which were not relevant for the purposes of the arbitration proceedings. *See* Blackman Decl., Ex. A (Final Award) ¶ 25; Ex. B (Shareholders' Agreement) § 17.10.

19. In accordance with the arbitration clauses in the Joint Venture Agreements, each of the parties nominated one arbitrator, who jointly selected a chairperson. Vale nominated as its party arbitrator Sir David Williams QC, and BSGR nominated Michael Hwang SC (together, the

"Co-Arbitrators"). Blackman Decl., Ex. A (Final Award) ¶ 26. The Co-Arbitrators in turn nominated Judge Charles Brower, formerly a member of the Iran-U.S. Claims Tribunal and a judge at the International Court of Justice, as the Chairman of the Tribunal. *Id.* ¶ 27.

### III. BSGR's Efforts to Disrupt the LCIA Arbitration[3]

20. During the course of the arbitration, BSGR employed a strategy of obstruction and delay. It made repeated requests to stay the proceedings, *id.* ¶¶ 29, 36, 73-81, 100; did not comply with document production orders, *id.* ¶¶ 48, 50-51, 54-55, 131; made multiple efforts to remove the arbitrators (including its own party-appointed arbitrator), *id.* ¶¶ 65, 100, 112, 133; and failed to lodge its share of payments required by the LCIA for the costs of the arbitration, *id.* ¶¶ 144, 158-59.

21. In May 2016, just three months before the merits hearing had been scheduled to start in August 2016, BSGR challenged all three members of the arbitral tribunal on a number of grounds, alleging bias, unfairness, and inappropriate delegation of their duties. *Id.* ¶¶ 65-67. An independent Division of the LCIA Court,[4] chaired by Peter Rees, QC, rejected four of BSGR's five grounds for its challenge, including both grounds applicable to the Co-Arbitrators, but upheld the challenge to Judge Brower on the basis that there were circumstances giving rise to justifiable doubts about his independence or impartiality based on certain anonymized comments he had made at an arbitration conference. *Id.* ¶ 82.

22. BSGR objected when the Co-Arbitrators proposed to use the Parties' original list of candidates to select Professor William Park as the new Chairman of the Tribunal. *Id.* ¶¶ 87-

---

[3] The procedural history of the five-year arbitration is summarized at length in paragraphs 26 to 171 of the Final Award.

[4] The LCIA Court is a body composed of a distinguished group of arbitration practitioners that officially carries out certain functions under the LCIA Rules, including appointing and where appropriate revoking the appointment of arbitrators.

> 89. On August 17, 2016, the LCIA Court formally revoked the appointment of Judge Brower and appointed Professor Dr. Filip De Ly as the new Chairman of the Tribunal. *Id.* ¶ 96. BSGR has never challenged the appointment of Chairman De Ly.

23. BSGR then filed a second challenge to the Co-Arbitrators before the LCIA Court and a stay application to the Arbitral Tribunal on August 23, 2016, just six days before the merits hearing had been scheduled to begin on August 29, 2016. *Id.* ¶ 100.[5]

24. At the same time, BSGR initiated proceedings before the English High Court seeking to remove the Co-Arbitrators on the same grounds the LCIA Court had previously rejected in connection with BSGR's first challenge (the "High Court Challenge"). *Id.* ¶ 112.

25. In connection with the High Court Challenge, BSGR also sought disclosure orders against the Co-Arbitrators before the English High Court, as well as a petition in the United States District Court for the District of Columbia for an order pursuant to 28 U.S.C. § 1782 compelling discovery in aid of a foreign judicial proceeding. *See In re Application Pursuant to 28 U.S.C. § 1782 of BSG Res. Ltd.*, No. 16-mc-02552-BAH (D.D.C. Dec. 20, 2016).

26. All of BSGR's attempts to remove the Co-Arbitrators were unsuccessful. The LCIA Court dismissed BSGR's second challenge to the Co-Arbitrators in December 2016. Blackman Decl., Ex. A (Final Award) ¶ 120. In February 2017, the English High Court dismissed both the disclosure application and substantive challenge. *See P v. Q* [2017] EWHC 148 (Comm) (rejecting BSGR's disclosure application); *P v. Q* [2017] EWHC 194 (Comm) (rejecting BSGR's substantive challenge). The English High Court characterized BSGR's challenge as "totally without merit," and noted that BSGR's application "mischaracterized the nature of some of the underlying proceedings in a way which was seriously misleading." *Id.*

---

[5] In total, BSGR made *four* separate applications to stay the arbitration on October 20, 2014, Blackman Decl., Ex. A (Final Award) ¶ 29, May 20, 2015, *id.* ¶ 36, August 23, 2016, *id.* ¶ 100, and March 30, 2018, *id.* ¶ 156.

BSGR's application to the U.K. Court of Appeal for permission to appeal the disclosure judgment and its application was summarily dismissed. *BSG Resources Ltd. v. Vale S.A. and Ors* [2017] A3/2017/0298 (Court of Appeal, Civil Division). BSGR subsequently voluntarily dismissed its § 1782 petition in the District Court for the District of Columbia.

27. By repeatedly challenging the Arbitrators, BSGR succeeded in postponing the Merits Hearing, which had been scheduled to begin on August 29, 2016. In its place, on September 2016, the newly reconstituted Tribunal held an "Educatory Hearing" for the new Chairman of the Tribunal. Blackman Decl., Ex. A (Final Award) ¶¶ 14, 101-11. BSGR refused to attend the Educatory Hearing, even though one of its purposes was to address the numerous procedural applications that BSGR had made, including its requests that the Tribunal revisit its prior procedural orders and that the new Chairman of the Tribunal be precluded from reviewing the existing evidentiary record of the Arbitration pending that process. *Id.* ¶¶ 103-11. On January 31, 2017, BSGR announced that it also would not attend the re-scheduled Merits Hearing. *Id.* ¶ 130.

28. The Tribunal finally held the Merits Hearing from February 20, 2017 to February 22, 2017. Vale attended and presented its fact and expert witnesses for cross-examination from the Tribunal. *Id.* ¶ 139. Although the Tribunal invited BSGR to attend the Merits Hearing, *id.* ¶ 132, and gave notice of the hearing to BSGR, *id.* ¶ 138, BSGR decided not to attend nor to produce its witnesses for cross examination, *id.* ¶ 140.

29. Although BSGR and its counsel did not attend either the Educatory or Merits hearing, counsel for BSGR continued to correspond with the Tribunal during the course of both hearings, including after the Merits Hearing had concluded. *See generally*, *id.* ¶¶ 140-61. At

the Tribunal's direction, BSGR was provided with daily transcripts from the Educatory and Merits Hearing so that it could follow the proceedings. *Id.* ¶¶ 107, 140.

30. In short, BSGR took every opportunity, and has made every attempt, to delay, frustrate, and derail the arbitration, reflecting BSGR's desire to do all that it could to prevent the Tribunal from being able to finally adjudicate the claims Vale had brought against it, although it ultimately failed in this effort.

**IV.   BSGR's Legal Proceedings Ancillary to the Arbitration**

31. In parallel with BSGR's efforts to delay a hearing on the merits of Vale's case, it also filed several actions in various jurisdictions seeking to blame third parties for the revocation of its mining rights.

32. First, on September 8, 2014, over four months after Vale had initiated the LCIA arbitration, BSGR filed an arbitration against the Republic of Guinea before the International Centre of Settlement of Investment Disputes ("ICSID"), claiming that Guinea had violated its purported rights under Guinean and international law. Blackman Decl., Ex. A (Final Award) ¶ 29. Notably, BSGR thereafter made an unsuccessful application to remove all three arbitrators (again including its own party-nominated arbitrator) in its ICSID arbitration. *Id.* ¶ 119. Recent press reports suggest that BSGR and the Republic of Guinea may be in advanced settlement discussions to resolve the ICSID arbitration, under circumstances that remain obscure, although these discussions have no bearing on the Final Award or this Petition to enforce it. *See id.* ¶ 1001.

33. Second, and relevant to jurisdiction over BSGR for purposes of the instant Petition, on April 14, 2017, BSGR and two subsidiaries filed a complaint in the District Court for the Southern District of New York against George Soros, a New York resident, and related

entities, also residents of New York, for tortious interference with contract, conspiracy, fraud, misrepresentation, defamation, and prima facie tort. Compl., *BSG Res. (Guinea) Ltd. v. Soros*, No. 17-cv-2726-JFK-OTW (S.D.N.Y. Apr. 14, 2017), ECF No. 1. BSGR alleged that Soros was responsible for the revocation of its Guinean mining concession that led to the LCIA Arbitration, and demanded at least $10 billion in damages. *Id.* On November 29, 2017, Judge Keenan granted defendants' motion to stay the action pending the outcome of the ICSID arbitration. Op. & Order, *Soros*, No. 17-cv-2726-JFK-OTW (S.D.N.Y. Nov. 29, 2017), ECF No. 136.

## V. The Final Award

34. The Tribunal issued its 281-page Final Award on April 4, 2019, holding BSGR liable on each of Vale's claims, and awarding Vale $1,246,580,846 in damages, as well as pre- and post-award interest, costs, and legal fees. *See* Blackman Decl., Ex. A (Final Award) ¶ 1005.

35. The Tribunal found BSGR liable for fraudulent misrepresentations, and awarded Vale all asserted damages based on this claim. The Tribunal found that BSGR made a litany of false statements to Vale, including through Vale's U.S. counsel, during the due diligence process. The Tribunal held that BSGR's misrepresentations included:

(i) BSGR failed to disclose all of its consultants and agents, including (a) an entity called Pentler, and its principals, Frédéric Cilins, Michael Noy, and Avraham Lev Ran, who bribed Mme Touré, the fourth wife of the President of Guinea, *id.* ¶¶ 398-430); (b) Ghassan Boutros, who BSGR paid for a sham transaction involving the supposed purchase of machinery that was actually a disguised payment to Mme Touré, *id.* ¶¶ 430-60; and (c) Guinea's former Economy and Finance Minister, Ibrahima Kassory Fofana, who met with the Guinean Minister of Mines to discuss BSGR's application to obtain the mining concessions, *id.* ¶¶ 461-66. BSGR also failed to disclose its agreements with these consultants and agents. *Id.* ¶¶ 470-94.

(ii)     BSGR falsely represented to Vale that it had disclosed all documents related to the shareholder structure of certain subsidiaries, while withholding key documents that "clearly fell within this due diligence request." *Id.* ¶¶ 495-515.

(iii)    BSGR falsely represented to Vale that it had disclosed all relevant pending disputes, when it was aware of two pending disputes with individuals in Guinea. *Id.* ¶¶ 526-40.

(iv)    BSGR misleadingly described its role in the Government of Guinea's decision to withdraw mining rights of Rio Tinto plc, which had previously held the concession for Simandou Blocks 1 & 2. BSGR's involvement in this decision had included Steinmetz meeting with the President of Guinea and Mme Touré to discuss the revocation of Rio Tinto's rights, and Fofana (one of BSGR's undisclosed consultants) lobbying government officials on BSGR's behalf. *Id.* ¶¶ 555-69.

(v)     BSGR falsely represented to Vale that it had no financial relationships with government officials or their spouses and that it had not made any payments to government officials in connection with obtaining the mining rights. In fact, BSGR entered into multiple contracts with and made several payments through U.S. wires to Mme Touré and a company she owned called Matinda & Co. Mme Touré had also been indirectly granted shares in BSGR Guinea, a subsidiary of BSGR, by being issued shares in Pentler. *Id.* ¶¶ 570-578.

(vi)    Finally, BSGR falsely represented to Vale that it had not engaged in bribery or corruption, including in due diligence questionnaires and a written anti-bribery certification from Steinmetz himself that BSGR had not engaged in any bribery or corruption. The Tribunal found that BSGR was liable for statements made by Steinmetz as its agent (and not a mere "external advisor" as he had asserted). *Id.* ¶¶ 700, 712.

36.     The Tribunal found that BSGR had bribed Mme Touré by devising a structure through which Pentler was interposed between BSGR and Mme Touré so that Mme Touré could

be issued shares in BSGR Guinea. *Id.* ¶¶ 579-637. Specifically, the Tribunal found that there was "cogent evidence" that BSGR "set up an intermediary that could then effect payments to Mme Touré in accordance with BSGR's wishes," *id.* ¶ 604; that Mme Touré "had exercised influence on President Conté in his decision-making" and "assisted in influencing President Conté's decision to revoke Rio Tinto's [mining] rights and give them to BSGR," *id.* ¶¶ 629, 631; and that BSGR "*knew* that the offer of shares . . . was for the purpose of securing . . . Mme Touré's assistance in influencing President Conté," *id.* ¶ 637 (emphasis in original).

37. The Tribunal found that BSGR made payments to former Guinean Minister of Mines Mahmoud Thiam, including money used for the purchase of 771 Duell Road in Millbrook, NY (located in Dutchess County, within the Southern District of New York). *Id.* ¶ 651.[6]

38. The Tribunal found that these misrepresentations in the aggregate established a pattern of conduct designed to hide the roles that Pentler and Mme Touré played in procuring the mining rights, that BSGR intended that Vale should act in reliance on these false and misleading representations, and that Vale acted in reliance on these misrepresentations and suffered losses as a result. *Id.* ¶¶ 713-42.

39. The Tribunal held in the alternative that it would find BSGR liable for breaches of warranties and frustration of contract. *Id.* ¶¶ 756-845.

40. Having found BSGR liable for fraudulent misrepresentations, breaches of warranties, and frustration, the Tribunal awarded Vale:

(i) damages of $1,246,580,846 (the "Damages");

---

[6] Thiam was convicted at trial in the District Court for the Southern District of New York on charges that he accepted $8,500,000 "from senior officers of a Chinese conglomerate in exchange for his assistance in securing mining rights for the conglomerate in Guinea", and sentenced by Judge Cote to seven years' imprisonment and three years of supervised release. Blackman Decl., Ex. A (Final Award) ¶ 652; Judgment, *United States v. Thiam*, No. 17-cr-47-DLC (S.D.N.Y. Aug. 28, 2017), ECF No. 136.

(ii)    pre-award interest on the Damages at a rate of LIBOR USD 3-month plus 7%;

(iii)   GBP 1,413,565.42 representing the costs of the arbitration that Vale paid on BSGR's behalf (the "Arbitration Costs");

(iv)    $16,000,000 for Vale's legal fees and related expenses (the "Legal Costs"); and

(v)     post-award interest on the Damages, the Arbitration Costs and the Legal Costs at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment.[7]

Blackman Decl., Ex. A (Final Award) ¶¶ 996-1005. The precise amounts of interest awarded in the Final Award were calculated as of April 16, 2019 by Oxera Consulting Ltd., an economics consultancy firm. This report is the basis of the pre-award and post-award interest calculations in Petitioner's Prayer for Relief and is attached to the Blackman Declaration as Exhibit D.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully petitions the Court for an Order:

a.   Confirming, recognizing, and enforcing the Final Award pursuant to 9 U.S.C. § 207;

b.   Entering judgment against Respondent in respect of:

   i.   $1,246,580,846.00 representing damages (the "Damages") pursuant to the Final Award ¶ 1005.2;

   ii.  $773,454,952.42 representing pre-award interest on the Damages pursuant to the Final Award ¶ 1005.3, in respect of:

       a.  an initial consideration of $500,000,000, amounting to $350,479,673.33 (i.e., 3,261 days at a rate of LIBOR USD 3-month plus 7%, accrued from April 30, 2010 to April 4, 2019);

---

[7] On April 18, 2019, Vale filed an application for an order under section 66(1) of the English Arbitration Act 1996 granting permission to enforce the Final Award in the English High Court in London.

      b. promissory notes of a total value of $581,197,104, amounting to $326,674,950.99 (i.e., at a rate of LIBOR USD 3-month plus 7%, accrued from the dates set out by reference in the Final Award ¶ 1005.3.2, to April 4, 2019);

      c. the costs of a feasibility study of $85,365,652, amounting to $49,707,064.29 (i.e., 2,681 days at a rate of LIBOR USD 3-month plus 7%, accrued from December 1, 2011 to April 4, 2019); and

      d. Vale's internal costs of $80,018,090, amounting to $46,593,263.81 (i.e., 2,681 days at a rate of LIBOR USD 3-month plus 7%, accrued from December 1, 2011 to April 4, 2019).

iii. $16,000,000.00 representing Vale's costs of legal representation and related costs (including experts fees), pursuant to the Final Award ¶ 1005.5 (the "Legal Costs");

iv. GBP 1,413,565.42 representing Vale's costs of arbitration, less certain deposits made by BSGR and costs to be borne by Vale, pursuant to the Final Award ¶ 1005.5 (the "Arbitration Costs");

v. Post-award compound interest on the Damages and interest on the Damages, amounting to $5,109,768.09 accrued as of the April 16, 2019 valuation date (i.e., 12 days at a rate of LIBOR USD 3-month plus 5%, accruing from April 4, 2019) and subject to future annual rests for compounding, pursuant to the Final Award ¶ 1005.5; and

vi. Post-award compound interest on the Legal Costs, amounting to $40,472.69 accrued as of the April 16, 2019 valuation date (i.e., 12 days at a rate of LIBOR USD 3-month plus 5%, accruing from April 4, 2019) and

      subject to future annual rests for compounding, pursuant to the Final Award ¶ 1005.5;[8]

c. Granting post-judgment interest following recognition and enforcement of the Final Award;

d. Awarding Petitioner the costs of these recognition and enforcement proceedings and reasonable attorneys' fees incurred by Petitioner; and

e. Any and all such other just and equitable remedies which the Court deems appropriate.

Dated: April 23, 2019
       New York, New York

                                            Respectfully submitted,

                                            /s/ Jonathan I. Blackman
                                            Jonathan I. Blackman
                                            (jblackman@cgsh.com)
                                            Jeffrey A. Rosenthal
                                            (jrosenthal@cgsh.com)
                                            Emily J. Balter
                                            (ebalter@cgsh.com)
                                            Samuel L. Levander
                                            (slevander@cgsh.com)

                                            CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                            One Liberty Plaza
                                            New York, New York  10006
                                            T: 212-225-2000
                                            F: 212-225-3999

                                            *Counsel for Petitioner Vale S.A.*

---

[8] The Tribunal also ordered BSGR to pay post-award interest on the Arbitration Costs at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment.  However, Vale is not seeking to recover these sums (which amount to approximately $4,700 as of April 16, 2019) at this time, as it intends to make an application to the Tribunal under Article 27.1 of the LCIA Rules to amend the Final Award's reference to USD interest on the GBP-denominated Arbitration Costs.  Vale reserves all rights with respect to post-award interest of the Arbitration Costs.