# Exhibit C

**CONFORMED COPY**

BSG RESOURCES LIMITED

- and -

VALE S.A.

- and -

BSG RESOURCES (GUINEA) LIMITED

---

SHAREHOLDERS' AGREEMENT

relating to

BSG RESOURCES (GUINEA) LIMITED

---

Dated: 30 April 2010

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

## TABLE OF CONTENTS

Page

Section 1.   Definitions; Interpretation ................................................................1

Section 2.   Effectiveness ...............................................................................2

Section 3.   Business of BSGR Guinea..................................................................2

Section 4.   The Board ...................................................................................3

Section 5.   Conduct of Business .......................................................................5

Section 6.   Information Rights..........................................................................8

Section 7.   Share Transfers .............................................................................8

Section 8.   Options......................................................................................18

Section 9.   Consequences of Transfers ..............................................................21

Section 10.   Realization of Investment ..............................................................23

Section 11.   Termination................................................................................24

Section 12.   Dispute Resolution.......................................................................24

Section 13.   Status of the Agreement.................................................................24

Section 14.   Confidentiality ...........................................................................25

Section 15.   Force Majeure ............................................................................27

Section 16.   Covenants .................................................................................27

Section 17.   Miscellaneous ............................................................................27

Schedule 1 – Defined Terms............................................................................36

Schedule 2 - Form of Deed Poll of Adherence .......................................................42

Schedule 3 - Bribery Compliance Provisions ........................................................44

Schedule 4 – ABL Solution ............................................................................48

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

<u>SHAREHOLDERS' AGREEMENT</u>

THIS SHAREHOLDERS' AGREEMENT (this "**Agreement**") is made on 30 April 2010

BETWEEN:

(1)     BSG RESOURCES LIMITED, a company registered under the laws of Guernsey with registered number 46565, with its principal office in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX ("**BSGR**");

(2)     VALE S.A., a company registered under the laws of Brazil, with its principal office in Av. Graça Aranha, 26, 20.030-900, Rio de Janeiro, RJ, Brazil ("**Vale**" and, together with BSGR, the "**Parties**"); and

(3)     BSG RESOURCES (GUINEA) LIMITED, a company registered under the laws of Guernsey with registered number 50001, with its principal office in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX ("**BSGR Guinea**" or the "**Company**").

<u>RECITALS</u>

(A)     BSGR and Vale are parties to the framework agreement dated as of 30 April 2010 (the "**Framework Agreement**").

(B)     In accordance with Section 4.2 of the Framework Agreement, the Parties have agreed to enter into this Agreement to regulate their respective holdings in, and governance of, the Company and the conduct of the business affairs of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein, the Parties agree as follows:

**Section 1.     Definitions; Interpretation**.

1.1     <u>Definitions.</u> Capitalized terms not otherwise defined in this Agreement shall have the meaning set forth in Schedule 1.

1.2     <u>Sections and Schedules.</u> Except where the context otherwise requires, references to Sections and Schedules are to Sections of, or Schedules to, this Agreement. The Schedules form part of this Agreement.

1.3     <u>Headings.</u> Headings are inserted for convenience only and shall not affect the construction of this Agreement or the Schedules hereto.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

1.4    Other Provisions Relative to Terms.  In this Agreement, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class or examples of acts, matters or things. Words importing the singular shall include the plural and vice versa and words importing any gender shall include all other genders and references to persons shall include individuals, firms, corporations, other bodies corporate, partnerships, unincorporated associations, employee representative bodies, governments, states and agencies of a state. A reference to any other document in this Agreement is a reference to that other document as amended, varied or supplemented (other than in breach of this Agreement) at any time. References in this Agreement to statutory provisions shall be construed as references to those provisions as respectively amended, consolidated, extended or re-enacted from time to time and any orders, regulations, instruments or other subordinate legislation made from time to time under the statute concerned.  References to a "day" shall mean a period of 24 hours running from midnight to midnight.  References to a liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument.  Reference to a party being liable to another party, or to liability, includes, but is not limited to, any liability in equity, contract or tort (including negligence).  References to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall in respect of any jurisdiction other than England be deemed to mean what most nearly approximates in that jurisdiction to the English legal term and to any English statute shall be construed so as to mean equivalent or analogous laws of any other jurisdiction.

1.5    Agreed Form.  A reference in this Agreement to a document in the "**agreed form**" is a reference to a document in a form approved and for the purposes of identification initialed by or on behalf of Vale and BSGR.

## Section 2.    Effectiveness

This Agreement shall become effective immediately on Completion and with no further action being required on the part of any of the Parties.

## Section 3.    Business of BSGR Guinea

3.1    Business of BSGR Guinea. Subject always to the terms of this Agreement and the Framework Agreement, each of BSGR and Vale agrees to promote the best interests of the Company and pursue the development of the Project, with the aim of maximizing production on an economically viable basis, profits and distributions to Shareholders, consistent with the Business Plan and the maintenance of the Dividend Reserve Amount. Each of BSGR and Vale shall, and shall procure that its Affiliates shall, co-operate in good faith to promote the success of BSGR Guinea and develop the Project in the most efficient and expeditious manner possible, **provided that** nothing in this Section 3.1 shall require any Party to (i) breach any contract to which it is currently a party, (ii) do anything that would make any such Party or any member of that Party's Group breach any Applicable Law, (iii) incur any liability (including in tort) or (iv) take any action which in its reasonable view would be materially detrimental to the interests of its Group.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited

3.2    Local Knowledge and Expertise. Subject always to the terms of this Agreement and the Framework Agreement, without prejudice to Section 3.1, BSGR shall ensure that the BSGR Guinea Group benefits from its local knowledge and expertise (including, without limitation, its standing and contacts in relation to Governmental Entities) as it relates to Guinea, Liberia and the business of the BSGR Guinea Group.

3.3    Dividends. BSGR Guinea shall distribute out of its distributable profits (but, for the avoidance of doubt, not including any amount constituting part of the capital of BSGR Guinea save as referred to in Section 6.4(b) of the Framework Agreement) for any given financial year by way of annual dividends to its Shareholders the maximum amount permissible after taking account of the need to reserve within the BSGR Guinea Group the Dividend Reserve Amount and in accordance with Applicable Law, subject always to Section 6.4(b) of the Framework Agreement and Section 9.1(f) and 9.2 of this Agreement.

**Section 4.    The Board**

4.1    Board Composition. As of Completion and for so long as this Agreement remains in force, the Parties agree to procure that the Board consists of five Directors, of which (i) two shall be appointed by BSGR (the "**BSGR Directors**"), and (ii) three shall be appointed by Vale (the "**Vale Directors**"). Without prejudice to Section 4.3, each Vale Director shall be appointed as an alternate for each of the other Vale Directors and can vote on behalf of the others such that the vote of the Vale Directors shall always constitute not less than three-fifths of the votes cast or capable of being cast at any meeting of the Board. The chairman of the Board shall be nominated by Vale.

4.2    Appointment and Removal of Directors. Any BSGR Directors may be proposed for appointment or removal by a notice in writing to the Company executed by BSGR, and the Parties shall take such steps as may be necessary to ensure such appointment or removal is made. Any Vale Directors may be proposed for appointment or removal by a notice in writing to the Company executed by Vale, and the Parties shall take such steps as may be necessary to ensure such appointment or removal is made. Each Party, acting reasonably, shall be entitled to demand the removal of any Director in the event of proven fraud, breach of FCPA regulations or analogous local laws or actions leading to a material disrepute of the BSGR Guinea Group and the Parties shall take such steps as may be necessary to ensure such removal is made.

4.3    Alternate Directors. Any Director may, by notice to the Company in writing, appoint any person willing to act as such Director's alternate as an alternate director (the "**Alternate Director**") and remove from office any Alternate Director so appointed by such Director. Any Alternate Director may attend Board meetings in addition to the appointing Director but may only speak or vote if such appointing Director is not present. For the avoidance of doubt, if an Alternate Director attends a Board meeting in the absence of the appointing Director, such Alternate Director shall be permitted to speak and vote thereat as if such Alternate Director were each Director he/she represents as an Alternate Director.

4.4    Notice and Quorum. Without prejudice to Section 4.3, notice of all meetings of the Board must be given to all Directors and any Alternate Directors as provided for in the Articles. Subject to Section 4.5, no business can be transacted at meetings of the Board unless a majority of the

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Directors is present, such majority to include at least one BSGR Director or his Alternate Director. If such quorum is not present within an hour of the time appointed for the meeting or ceases to be present, the Director(s) present shall adjourn the meeting to a specified time and place not less than 7 days after the date of the meeting. Written notice of the adjourned meeting shall be given to all Directors. The quorum at such adjourned meeting shall be a majority of the Board howsoever composed. The Board shall meet monthly or, with the consent of the Parties, less frequently (but no less than 4 times a year).

4.5     <u>Matters concerning certain Ancillary Agreements.</u> Subject always to Section 15, in the event BSGR, acting reasonably, forms the view that there is *prima facie* evidence that Vale or any of its Affiliates, as the case may be, is responsible for a material breach of the terms of any agreement with, or commitment to, the BSGR Guinea Group which Vale or any of its Affiliates is a party to, which breach is detrimental to the commercial interests of the BSGR Guinea Group and which is not remedied in accordance with the timing for remedy of breaches under the relevant agreement or commitment, any BSGR Director may demand that a Board meeting be convened upon 15 Business Days notice to the Board to determine the best course of action to be taken in accordance with the terms of such agreement or commitment and this Section 4.5 with respect to any such alleged breach acting in accordance with fiduciary duties and having regard to the overall relationship with Vale and all of the applicable circumstances. The Board meeting so convened shall be validly constituted with the presence of at least two Directors, **provided that** the Vale Directors shall be entitled only to participate, but not to vote. If the Board reasonably and in accordance with its fiduciary duties determines that such a breach has occurred and is continuing or unremedied, then the Board shall serve a notice to Vale, with respect to the dispute resolution procedures contained in the relevant agreement or commitment and otherwise take such actions as are reasonably necessary to enforce the rights of the relevant member of the BSGR Guinea Group in accordance with the terms of the relevant agreement or commitment.

4.6     <u>Expenses.</u> The Company shall reimburse all reasonable out of pocket expenses of the Directors and any Alternate Directors properly incurred in the performance of their duties. A Shareholder shall be responsible for and shall indemnify the Company from and against any losses, claims or expenses which may be incurred by the other Shareholders or the Company in connection with the removal from office of its nominated Director in accordance with Section 4.2 as well as from and against any losses, claims or expenses which may be incurred by the other Shareholders or the Company in connection with the removal of any Alternate Director by a Director appointed by such Shareholder.

4.7     <u>Appointment and Removal of Officers.</u> Vale shall be entitled to nominate the chief executive officer (the "**CEO**"), the chief financial officer (the "**CFO**") and the chief operating officer (the "**COO**") of the Company by submitting a notice in writing to the Company and their appointment shall be subject to the approval by a majority of the Board **provided, however** that Vale shall consult in good faith with BSGR in advance of making any such nominations of the CEO, CFO and COO and shall provide BSGR with reasonable details relating to the background and qualifications of such nominees.

4.8     <u>Compensation of Officers.</u> The compensation of the CEO, CFO and COO shall be determined by the Board in line with Vale's internal compensation related policies from time to time and the Compliance Program.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

4.9    Compliance with Compliance Program. Each of the Parties, in accordance with their respective powers under this Agreement, and the Company shall take all necessary and reasonable steps to ensure that all decisions of any member of the BSGR Guinea Group relating to the appointment, hiring and/or compensation of employees shall be made in accordance with the Compliance Program.

4.10    BSGR Guinea Group Governance. Without prejudice to Section 17.8 of this Agreement, each Party shall exercise all voting and other rights and powers vested in or available to it, respectively, to procure that, with effect on and from Completion, the respective governance rights and restrictions reflected in this Agreement in relation to BSGR Guinea are applied to the governance of each other member of the BSGR Guinea Group mutatis mutandis.

## Section 5.    Conduct of Business

5.1    Exclusive Management. Other than as provided in Sections 5.2 and 5.3, subject to the authority of the Board and having regard to the Compliance Program, Vale shall be responsible for the day-to-day management and control in respect of the day-to-day business and activities of the BSGR Guinea Group consistent with the Business Plan.

5.2    General Undertakings. Each of the Parties agrees to exercise its respective rights hereunder, also as a Shareholder in the Company, so far as it lawfully can, to ensure that BSGR Guinea and each company in the BSGR Guinea Group performs and complies with all its obligations under this Agreement and complies with the restrictions imposed upon it under the Articles and:

(a)    each member of the BSGR Guinea Group acts in a manner consistent with the terms of this Agreement;

(b)    insurance cover for each member of the BSGR Guinea Group shall be maintained at all times with reputable insurance companies against all such risks and liabilities in such manner and amounts, and on such terms and conditions, as shall accord with good commercial practice, having regard to the businesses and assets of the relevant member of the BSGR Guinea Group;

(c)    the Company will keep and procure that all other members of the BSGR Guinea Group will keep proper accounting records and in them make true and complete entries of all dealings and transactions in relation to its and their businesses; and

(d)    the businesses of the Company and the other members of the BSGR Guinea Group shall be managed in compliance, in all material respects, with all Applicable Law and the members of the BSGR Guinea Group shall maintain all licenses, consents and authorizations of any nature whatsoever (public or private) which are necessary to carry on the businesses of the members of the BSGR Guinea Group from time to time.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

5.3    <u>BSGR's Minority Rights.</u> The written consent of BSGR, which may not be unreasonably withheld or delayed, must be obtained in relation to the following matters:

(a)    any amendment to the Articles (or the articles or equivalent constitutional document of any member of the BSGR Guinea Group), unless such amendment is required to comply with Applicable Law or the provisions of this Agreement or the Framework Agreement;

(b)    any material amendment to or departure from the Business Plan;

(c)    decreasing or increasing the amount of the Company's issued share capital (except where in accordance with this Agreement or the Framework Agreement), granting (or committing to grant) any option or other equity interest over or in the Company's share capital, redeeming or purchasing any Shares or effecting any other reorganization of the Company's share capital (including any sub-division or consolidation of share capital or the issue of any new class of shares or the alteration of the rights attached to any such class of shares);

(d)    the taking of any action with a view to commencing winding up, administration or receivership proceedings (or any analogous proceedings in any jurisdiction) in respect of the Company or any of its subsidiaries;

(e)    any transactions or any agreements, in each case, between the Company or any of its subsidiaries and Vale or any of its Affiliates save for (i) transactions or agreements, in each case, in the ordinary course of business on arm's length commercial terms substantially consistent with the carrying on of the business of the BSGR Guinea Group as envisaged in the Business Plan or (ii) the entering into any agreement contemplated by the Framework Agreement consistent in all material respects with the terms set out in the relevant term sheet annexed thereto save that the acceptance by any member of the BSGR Guinea Group of a minimum price offered by Vale or any of its Affiliates under the Off-take Agreement shall require the prior written consent of BSGR (which may not be unreasonably withheld or delayed);

(f)    any acquisition or disposal of securities or assets of the Company or any subsidiary of the Company (including, by way of merger, spin-off, contribution in kind or other transaction), whether by a single transaction or a series of related transactions or the entry by the Company or any subsidiary of the Company into any joint-venture, partnership or alliance, save in each case for transactions on arm's length commercial terms substantially consistent with or as envisaged in the Business Plan;

(g)    other than pursuant to the Vale Loan, the undertaking of Indebtedness or the creation of any Security Interest (other than a title transfer or

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited

retention arrangement in respect of assets acquired or leased in the ordinary course of business) by any member of the BSGR Guinea Group except for arrangements with a party other than Vale or any of its Affiliates that prohibit the direct or indirect assignment or transfer of such party's rights or interest thereunder to Vale or any of its Affiliates;

(h)   unless required by Applicable Law, any change in the method of accounting or the accounting reference date of the Company, or any subsidiary of the Company, that has a material adverse effect on the ability of such company to pay dividends save to the extent any such change is in order to align the method of accounting or the accounting reference date of the Company or any subsidiary of the Company to those of the Vale Group; and

(i)   the making of any application for an IPO.

Prior to any alteration to the Company's share capital or interest therein pursuant to Section 5.3(c), the Parties shall discuss in good faith the alterations, if any, which should be made to this Agreement and/or the Framework Agreement to take account of the alteration to the Company's share capital or interest therein, including without limitation in relation to the 9% Option and the 15% Option.

5.4     <u>BSGR Restrictive Covenant</u>. BSGR acknowledges that the Off-take Term Sheet sets out the terms of the sale and purchase agreement that the Parties intend will in due course be entered into between Vale International S.A. and ProjectCo for the entire output of iron ore produced from the Concession Areas for the entire duration of the operation of the mines in the Concession Areas, subject to the right to terminate such agreement in accordance with Section 5.4(d) of the Framework Agreement.  This sale and purchase agreement will provide that, except in very limited circumstances, ProjectCo will have no right to market any part of such iron ore output or discuss pricing, quantities or other sale terms relating thereto with any third party without first obtaining the prior written consent of Vale International S.A.  In respect of the period prior to the BSGR Subscription Trigger Date, BSGR undertakes to procure that similarly neither it nor any of its Affiliates will market any part of such iron ore output or discuss pricing, quantities or other sale terms relating thereto with any third party without first obtaining the prior written consent of Vale and that they will promptly refer all bids, offers and enquiries received by any of them from prospective purchasers of such output to Vale.  With effect on and from the BSGR Subscription Trigger Date, BSGR undertakes to procure that neither it nor any of its Affiliates will disclose to any other person the pricing, quantities or other sale terms contained in the Off-take Term Sheet or the Off-take Agreement, as the case may be, without first obtaining the prior written consent of Vale.

5.5     <u>Dividend Payments</u>. Each of the Parties hereby irrevocably agrees and instructs that the Company shall and shall procure that each other member of the BSGR Guinea Group shall comply with and give effect to the provisions of this Agreement and the Framework Agreement relating to the payment of dividends and/or other distributions.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

## Section 6.      Information Rights

6.1      Information Rights. Without prejudice to the provisions of the Framework Agreement, the Company shall:

    (a)      provide BSGR, Vale, the BSGR Directors and any BSGR Alternate Director (as nearly as reasonably practicable at the same time as the same are provided to the other Directors) with such materials as are prepared for the Board in advance of each Board meeting;

    (b)      provide to BSGR and Vale a copy of the annual accounts or equivalent document prepared in accordance with Applicable Law for the Company as soon as possible following their release by the Company's auditors and in any case within ninety (90) days of the end of each financial year, or, if earlier, when delivered to the Directors;

    (c)      in the period between Completion and the completion of the Feasibility Study provide to BSGR and Vale quarterly updates on the progress of the Feasibility Study; and

    (d)      provide to BSGR and Vale all such other materials as BSGR or Vale may reasonably request within fourteen (14) days of such request.

6.2      Books and Records. The Company shall maintain, in a manner customary and consistent with good industry practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Company) in which the Company shall enter fully and accurately, amongst other things, each financial transaction with respect to the operations of each member of the BSGR Guinea Group. Each Shareholder or its authorized representative shall have the right to inspect, examine and copy such books, records and accounts at the Company's office during reasonable business hours. The books, records and accounts of the BSGR Guinea Group shall be kept in accordance with generally accepted accounting practices and procedures in the jurisdictions in which each member of the BSGR Guinea Group operates, and the BSGR Guinea Group shall report their operations for tax purposes on such basis. The Company shall retain as the regular accountant and auditor for the Company any internationally recognized accounting firm designated by the Board and, to the extent required by Applicable Law, approved by the Shareholders in a general meeting.

## Section 7.      Share Transfers

7.1      Lock-up. Subject to Section 9.1, neither BSGR nor Vale shall (and they shall each procure that none of their respective Affiliates shall) transfer any Securities until the second anniversary of the Date of First Commercial Production.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

7.2     Right of First Refusal. Subject to Section 9.1, following the expiry of the "*lock-up*" period set out in Section 7.1, either Party shall be entitled to transfer all, but not less than all, its Securities to any third party, **provided that**:

    (a)    the Party proposing to transfer its Securities (the "**Selling Party**") has received a written *bona fide* offer for its Securities (the "**Securities for Sale**"), which contains all material terms and conditions (including price) (the "**Offer**") and the Selling Party proposes to accept the Offer and transfer the Securities for Sale to such third party on the terms set forth in the Offer;

    (b)    the Selling Party shall first offer to transfer the Securities for Sale to the other Party by serving a notice in writing (the "**ROFR Transfer Notice**") to the other Party and the Company, offering to sell such Securities on the same terms and conditions as those contained in the Offer;

    (c)    the ROFR Transfer Notice shall (i) state that the Selling Party has received an Offer and include a copy thereof, (ii) specify the relevant economic terms and conditions of the Offer, including (1) the price per Security at which such Transfer is proposed to be made, (2) the identity of the third party making the Offer (the "**Prospective Buyer**"), which such Prospective Buyer cannot be a Sanctions Target, and (3) all other material terms and conditions of the Offer, and (iii) state that the Selling Party is willing to accept the Offer and transfer the Securities for Sale to the Prospective Buyer on the terms set forth in the Offer;

    (d)    at any time within 60 days from the date that the other Party receives the ROFR Transfer Notice or, if later, 15 Business Days after the provision of such information as shall have been reasonably requested by the other Party to help establish that the Offer is a *bona fide* offer from a third party on arm's length terms (the "**ROFR Period**"), the other Party shall be entitled to deliver to the Selling Party and the Company notice (a "**ROFR Commitment**") of its unconditional and irrevocable commitment to purchase the Securities for Sale on the same terms and conditions as those contained in the Offer (provided that where the consideration in the Offer is in the form of non-cash consideration, the ROFR Commitment shall be for an equivalent cash amount (the "**Equivalent Cash Amount**")).  For the purposes of determining the Equivalent Cash Amount for the purposes of the ROFR Commitment the non-cash consideration shall be valued as follows: (i) publicly traded securities shall be valued at the average of their closing prices (as reported in the Financial Times or such other newspaper or report as the Parties may agree in good faith) for the five trading days immediately prior to the delivery of the ROFR Commitment and (ii) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Parties. In the absence of such a determination (or in the event of any disagreement as to the value of

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

publicly traded securities for this purposes) within ten (10) days from the date of receipt of a ROFR Transfer Notice, the non-cash consideration shall be valued at the fair market value thereof as determined by an Investment Bank, which is independent of both Parties (where independent has the same meaning as in the defined term "Independent Valuer"), selected by agreement between the Parties within the next following ten (10) day period or, in the absence of such agreement, as selected by the President of the Australasian Institute of Mining and Metallurgy at the request of either Party and the determination of such Investment Bank shall be made within fifteen (15) Business Days of its appointment and shall be final and binding on the Parties, except in the case of manifest error;

(e)     if the other Party delivers a ROFR Commitment to the Selling Party and the Company within the ROFR Period, then completion of the Transfer between the Parties shall occur within the following 30 days on the terms set out in the ROFR Transfer Notice (substituting for any non-cash consideration the Equivalent Cash Amount);

(f)     if the other Party does not deliver a ROFR Commitment to the Selling Party and the Company within the ROFR Period, then the Selling Party shall be entitled to transfer the Securities for Sale pursuant to the Offer and within the term specified therein or if none is specified 120 days; **provided however** that any such transfer to a Sanctions Target shall be null and void and without effect;

(g)     each of the Parties shall have the right to request from the other information that it reasonably requests regarding any Prospective Buyer; and

(h)     no Party shall have the right to effect any proposed Transfer pursuant to this Section 7.2 or any other Transfer if any other Party notifies it that it has reasonably determined that such Transfer would expose it to a material risk of violation under the FCPA or Sanctions Laws and Regulations as a result of the Transfer and provides details of the reasons for such determination,

**provided, however, that**

(i)     either Party shall, during the ROFR Period relating to a proposed Transfer by the other Party, have the right, at its sole discretion and in alternative to serving a ROFR Commitment, to serve a notice for the sale of all, but not less than all, of the Securities it holds to the Prospective Buyer on the same terms and conditions as those contained in the Offer in relation to the Securities for Sale (a "**Tag Commitment**");

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited

(j)   if the other Party (the "**Tag Party**") delivers a Tag Commitment to the Selling Party and the Company within the ROFR Period, then the Tag Party shall be deemed to have appointed the Selling Party as its agent to execute the Transfer of the Tag Party's Securities and the Selling Party shall be entitled to transfer the Securities for Sale and the Tag Party's Securities, subject to the Tag Commitment, as provided for in the Offer;

(k)   until the completion of the BSGR Subscription, no transfer by BSGR pursuant to this Section 7.2 shall be valid if the recipient of the Securities (i) is or has in the preceding 12 months been a customer of any member of the BSGR Guinea Group or the Vale Group or (ii) is a steel producing company;

(l)   Deferred Shares shall not be eligible for Transfer other than under Section 7.4; and

(m)   Vale shall not be entitled to serve a notice in respect of a Tag Commitment so long as BSGR Guinea is Controlled by Vale;

**provided, further**, that if the Selling Party does not complete the Transfer of (i) the Securities for Sale pursuant to the Offer or (ii) where the Tag Party has exercised its right under paragraph (i) above, the Securities for Sale and the Tag Party's Securities, subject to the Tag Commitment, as provided for in the Offer, within 120 days of the expiration of the ROFR Period, the procedure provided under this Section 7.2 shall be repeated before any Transfer takes place.

7.3   Vale Loan.

(a)

(i)   Concurrent with a Transfer by BSGR or any of its Affiliates of its holding of Securities pursuant to Section 7.2 or Section 9.1 and as a condition to such Transfer, either:

(1)   the Relevant Proportion of the Vale Loan shall be novated in accordance with paragraph (a)(ii) of this Section 7.3; or

(2)   the Vale Loan shall be amended in accordance with paragraph (a)(iii) of this Section 7.3,

as Vale shall, in its sole discretion, determine and notify to BSGR and/or its relevant Affiliates prior to the end of the ROFR Period or within 15 Business Days of being notified by BSGR of a proposed Transfer pursuant to Section 9.1, as the case may be.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(ii)    If Vale gives notice that the Relevant Proportion of the Vale Loan is to be novated pursuant to paragraph (a)(i)(1) of this Section 7.3:

(1)    by way of consideration for the novation, BSGR shall pay or procure the payment to the lender under the Vale Loan (or to such other member of Vale's Group as Vale may nominate) an amount in USD equal to the portion of the total outstanding principal of the Vale Loan (which, for the avoidance of doubt, shall include any outstanding capitalised interest that has been added to such principal) (such amount being the "**Outstanding Principal**") as at the date of payment that corresponds to the proportion which the Securities held by BSGR or any of its Affiliates that are the subject of the Transfer bears to the outstanding issued share capital of BSGR Guinea (such proportion being the "**Relevant Proportion**"), provided that if (A) the person making the payment of the amount equal to the Relevant Proportion of the Outstanding Principal is required by Applicable Law to make any deduction, reduction or withholding from such payment; or (B) Vale or any member of the Vale Group will be or has been subject to Tax (as defined in the Framework Agreement) in respect of such payment, then the sum due from the person making the payment shall be increased to the extent necessary to ensure that Vale (or the relevant member of the Vale Group) receives and retains a net sum equal to the sum it would have received had no such deduction, retention or withholding been made and/or the payment had not been subject to Tax;

(2)    upon receipt of such payment, Vale shall or, if Vale is not the lender under the Vale Loan, Vale shall procure that such lender shall, enter into a novation agreement to novate the Relevant Proportion of the Vale Loan to the transferee of such Securities, provided that the form of such novation agreement (including any amendments to the existing terms of the Vale Loan) shall be agreed between Vale, acting reasonably and in good faith, the Company (acting for itself and on behalf of each of the other borrowers under the Vale Loan) and such transferee prior to the date of such Transfer. For the avoidance of doubt, following such novation, the position of each of Vale and such transferee under their respective portions of the Vale Loan shall be equivalent, subject only to the fact that their respective funding

obligations going forward and their respective rights in relation to payment of interest and principal in respect of the Outstanding Principal shall be in the same proportion that the Securities held by each of them bears to the outstanding issued share capital of BSGR Guinea after completion of the Transfer;

(3)   BSGR shall reimburse Vale for the reasonable costs (including those of its legal counsel in each relevant jurisdiction) incurred by Vale (and, if different, the member of the Vale Group that is the lender under the Vale Loan) in negotiating and entering into the novation agreement referred to in paragraph (a)(ii)(2) above; and

(4)   to the extent that an obligation (other than under or pursuant to the novation agreement referred to in paragraph (a)(ii)(2) above) from ProjectCo or any borrower or borrowers arises in favour of BSGR (or any person making any of the payments referred to above on BSGR's behalf) as a result of any of the payments referred to in paragraph (a)(ii)(1) above, BSGR agrees to procure that any such obligation shall be irrevocably surrendered and released without compensation to the reasonable satisfaction of Vale;

(iii)   If Vale gives notice that the Vale Loan is to be amended pursuant to paragraph (a)(i)(2) of this Section 7.3, the Parties agree that the terms for repayment of the Vale Loan shall change such that an amount equal to 100% of the difference between the Permissible Dividend Amount and the Dividend Reserve Amount from time to time shall be paid to the lender in satisfaction of an equivalent amount of the aggregate principal amount together with any capitalized interest outstanding under the Vale Loan until the Vale Loan is fully repaid. In the event that the Vale Loan is amended in accordance with this Section 7.3(a)(iii) then Vale may at its sole discretion notify the borrowers under the Vale Loan and the transferee of the relevant Securities that no further drawings shall be made under the Vale Loan. Vale (acting reasonably and in good faith), the Company (acting for itself and on behalf of the other borrowers under the Vale Loan) and such transferee shall agree the terms of a new debt financing for the BSGR Guinea Group going forward. For the avoidance of doubt, unless otherwise agreed between Vale and the transferee, the position of each of Vale and such transferee under their respective portions (if any) of the new

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

debt financing shall be equivalent, subject only to the fact that their respective rights in relation to payment of interest and principal shall be in the same proportion that the Securities held by each of them bears to the outstanding issued share capital of BSGR Guinea after completion of the Transfer;

(b)

    (i)    in the event of a direct or indirect change of Control of BSGR, either:

        (1)    the BSGR Proportion of the Vale Loan shall be novated in accordance with paragraph (b)(ii) of this Section 7.3; or

        (2)    the Vale Loan shall be amended in accordance paragraph (b)(iii) of this Section 7.3,

as Vale shall, in its sole discretion, determine and notify to BSGR and/or its relevant Affiliates within 15 Business Days of being notified by BSGR of the change of Control of BSGR and the identity of the person Controlling BSGR.

    (ii)    If Vale gives notice that the BSGR Proportion of the Vale Loan is to be novated pursuant to paragraph (b)(i) of this Section 7.3:

        (1)    by way of consideration for the novation, BSGR shall, upon execution of the novation agreement referred to in paragraph (b)(ii)(2) below, pay or procure the payment to the lender under the Vale Loan (or to such other member of the Vale Group as Vale may nominate) an amount in USD equal to the sum of:

            (A)    the portion of the total Outstanding Principal as at the date of payment which corresponds to the proportion that the Securities held by BSGR or any of its Affiliates at the time of such change of Control bears to the outstanding issued share capital of BSGR Guinea (such portion being the "**BSGR Proportion**"); and

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(B)     interest at the Default Rate (as defined in the Framework Agreement) on the BSGR Proportion from but excluding the date of the change of Control to and including the date of actual payment, such amount to be calculated and accrued on a daily basis,

provided that if (A) the person making such payment is required by Applicable Law to make any deduction, reduction or withholding from such payment; or (B) Vale or any member of the Vale Group will be or has been subject to Tax (as defined in the Framework Agreement) in respect of such payment, then the sum due from the person making the payment shall be increased to the extent necessary to ensure that Vale (or the relevant member of the Vale Group) receives and retains a net sum equal to the sum it would have received had no such deduction, retention or withholding been made and/or the payment had not been subject to Tax;

(2)     upon receipt of such payment, Vale shall or, if Vale is not the lender under the Vale Loan, Vale shall procure that such lender shall, enter into a novation agreement to novate the BSGR Proportion of the Vale Loan to BSGR, provided that the form of such novation agreement (including any amendments to the existing terms of the Vale Loan) shall be agreed between Vale, the Company (acting for itself and on behalf of each of the other borrowers under the Vale Loan) and BSGR all acting reasonably and in good faith, as soon as reasonably practicable after such change of Control. For the avoidance of doubt, following such novation, the position of each of Vale and BSGR under their respective portions of the Vale Loan shall be equivalent, subject only to the fact that their respective funding obligations going forward and their respective rights in relation to payment of interest and principal in respect of the Outstanding Principal shall be in the same proportion that the Securities held by each of them bears to the outstanding issued share capital of BSGR Guinea at the time of the change of Control);

(3)     BSGR shall reimburse Vale for the reasonable costs (including those of its legal counsel in each relevant jurisdiction) incurred by Vale (and, if different,  the

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

member of the Vale Group that is the lender under the Vale Loan) in negotiating and entering into the novation agreement referred to in paragraph (b)(ii)(2) above; and

(4)  to the extent that an obligation (other than under or pursuant to the novation agreement referred to in paragraph (b)(ii)(2) above) from ProjectCo or any borrower or borrowers arises in favour of BSGR (or any party making any of the payments referred to above on BSGR's behalf) as a result of any of the payments referred to in paragraph (b)(ii)(1) above, BSGR agrees to procure that any such obligation shall be irrevocably surrendered and released without compensation to the reasonable satisfaction of Vale;

(iii)  If Vale gives notice that the Vale Loan is to be amended pursuant to paragraph (b)(i)(2) of this Section 7.3, the Parties agree that the terms for repayment of the Vale Loan shall change such that an amount equal to 100% of the difference between the Permissible Dividend Amount and the Dividend Reserve Amount from time to time shall be paid to the lender in satisfaction of an equivalent amount of the aggregate principal amount together with any capitalized interest outstanding under the Vale Loan until the Vale Loan is fully repaid. In the event that the Vale Loan is amended in accordance with this Section 7.3(a)(iii) then Vale may at its sole discretion notify the borrowers under the Vale Loan and the transferee of the relevant Securities that no further drawings shall be made under the Vale Loan. Vale (acting reasonably and in good faith), the Company (acting for itself and on behalf of the other borrowers under the Vale Loan) and such transferee shall agree the terms of a new debt financing for the BSGR Guinea Group going forward. For the avoidance of doubt, unless otherwise agreed between Vale and the transferee, the position of each of Vale and such transferee under their respective portions of the new debt financing shall be equivalent, subject only to the fact that their respective rights in relation to payment of interest and principal shall be in the same proportion that the Securities held by each of them bears to the outstanding issued share capital of BSGR Guinea after completion of the Transfer;

(c)  any payment to be made to Vale (or to the member of the Vale Group nominated by Vale) pursuant to Sections 7.3 (a) or (b) shall be made to the bank account that Vale (or such member of the Vale Group) shall have notified to BSGR for the purpose of the relevant payment;

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(d) any payment under Sections 7.3 (a) or (b) shall be made in immediately available cleared funds in USD by electronic transfer of funds for value on the due date for payment. Receipt of the amount due shall be an effective discharge of the relevant payment obligation; and

(e) if any sum due for payment in accordance with Sections 7.3 (a) or (b) is not paid on the due date for payment, the person in default shall pay Default Interest on that sum from but excluding the due date to and including the date of actual payment, such amount to be calculated and accrued on a daily basis.

7.4 <u>Permitted Transfers.</u> The following are the only exceptions to Sections 7.1 and 7.2:

(a) a Transfer of all, but not less than all, of the Securities of a Party to any of its Affiliates;

(b) a Transfer to any other Party to this Agreement; and

(c) a Transfer to facilitate/implement an IPO as agreed to by the Parties,

(d) **provided however** that:

 (i) whenever a transferee ceases to be an Affiliate of the transferring Party, then such Party shall buy the transferred Securities back or procure the transfer of those Securities to another Affiliate; or

 (ii) if, after a Transfer under Section 7.4(a) above, the Company establishes that such Transfer or the holding of Securities by such Affiliate is giving rise to an adverse legal or regulatory effect on any part of the Company's Group, then the transferring Party shall buy the transferred Securities back or procure the transfer of those Securities to another Affiliate in order to remedy the situation.

7.5 <u>Deed of Adherence.</u> Subject always to Section 7.7, any Transfer permitted by this Agreement is in each case conditional on the transferee (unless they are already a party to this Agreement) entering into a deed (a "**Deed of Adherence**") agreeing to be a party to this Agreement and to be bound by the terms of this Agreement substantially in the form of the draft contained in Schedule 2, and if such transferee shall so agree and enter into such Deed of Adherence each party hereto shall recognize the transferee as being entitled to the rights conferred on a party as a "Shareholder" by this Agreement except that a transferee who acquires all the Shares in the Company need not sign such Deed of Adherence.

7.6 <u>ABL Solution.</u> The Parties agree to give effect to the provisions of Schedule 4 in accordance with its terms.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

7.7    Vale's Designated Subsidiary. For such time as Vale's Designated Subsidiary holds Securities, Vale shall procure compliance by Vale's Designated Subsidiary with the terms of this Agreement as if Vale's Designated Subsidiary were a party hereto as Vale *mutatis mutandis* and, accordingly:

> (a)    references to "its Securities" or "the Securities of a Party" in relation to Vale shall be read and construed as the Securities held by Vale's Designated Subsidiary at such time; and
>
> (b)    Vale's Designated Subsidiary shall be entitled to the rights conferred by this Agreement on Vale as a "Shareholder" (provided that such rights shall be exercised by Vale or Vale's Designated Subsidiary on a mutually exclusive basis),

**provided however** that if Vale's Designated Subsidiary ceases to be an Affiliate of Vale then Vale shall buy all of the Securities then held by Vale's Designated Subsidiary or procure the transfer of those Securities to itself or one of its Affiliates and, if such Securities are purchased or transferred to an Affiliate, such Affiliate shall be required to sign a Deed of Adherence.  For the avoidance of doubt, Vale's Designated Subsidiary shall not be required to sign a Deed of Adherence.

**Section 8.      Options**

8.1    Terms of the Options. Vale shall have options to purchase from BSGR:

> (a)    a number of Securities representing 9% of the Company's issued share capital as at the date of the exercise of the option (the "**9% Option**"), **provided that** if Vale decides to exercise the 9% Option, it shall deliver a notice in writing to BSGR indicating its desire to exercise the 9% Option (the "**9% Notice**") within 90 days from the date of payment of the Second Deferred Consideration or the last instalment of such Second Deferred Consideration, as applicable pursuant to the Framework Agreement; and
>
> (b)    a number of Securities representing 15% of the Company's issued share capital as at the date of the exercise of the option (the "**15% Option**" and, together with the 9% Option, the "**Options**"), **provided that** if Vale decides to exercise the 15% Option, it shall deliver a notice in writing to BSGR indicating its desire to exercise the 15% Option (the "**15% Notice**") within 6 months of the second anniversary of the Date of First Commercial Production,

provided, further, that each of the Options may be exercised one time and in whole only for a price equal to the Fair Market Value of the Transfer Securities.

8.2    Determination of Fair Market Value. In the event Vale elects to exercise either of the Options:

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited

(a)     the Parties shall meet as soon as practicable with a view to reaching a common determination of the Fair Market Value of the Transfer Securities within ten (10) Business Days of the notice to exercise the relevant Option, which common determination shall be final and binding upon the Parties;

(b)     if the Parties fail to reach a common determination as provided by Section 8.2(a) above, then each of BSGR and Vale shall within the following ten (10) Business Days appoint a non-conflicted Investment Bank with instructions that each such Investment Bank shall independently determine the Fair Market Value of the Transfer Securities within twenty (20) Business Days of their respective appointment and each Party shall give notice to the other Party of its selection of Investment Bank within two (2) Business Days of such selection. If either Party fails to notify the other Party of its respective selection pursuant to this Section 8.2(b), then the Investment Bank selected by whichever of the Party did notify the other of its selection shall be the sole valuer and its determination shall be final and binding upon the Parties, except in the case of manifest error. Where each Party has appointed an Investment Bank, each Party shall provide to the other a copy of its Investment Bank's determination of Fair Market Value of the Transfer Securities within five (5) Business Days of receiving such determination. If the Investment Banks' determinations differ by an amount lower than ten percent (10%) of the higher of such determinations (which is calculated by subtracting the lower determination from the higher determination and dividing the result by the higher determination and expressing the product of such calculation as a percentage), then the median of the two Fair Market Values of the Transfer Securities shall be final and binding upon the Parties. When an Investment Bank's determination is a range, the mid point shall be deemed to be the Fair Market Value determined by such Investment Bank for the purpose of this Section. If the Investment Banks' determinations differ by an amount equal to or higher than ten percent (10%) of the higher of such determinations then the Parties jointly shall within ten (10) Business Days appoint and instruct an Independent Valuer to determine the Fair Market Value of the Transfer Securities.  In the event that the Parties cannot agree or fail to appoint an Independent Valuer within the time period referred to above, then either Party may request the President of the Australasian Institute of Mining and Metallurgy to appoint the Independent Valuer. The Independent Valuer shall be instructed to (i) undertake an assessment of the values determined by each of the first two Investment Banks based upon its own skills and experience in iron ore development projects similar in nature to the Project; and (ii) make its own determination of Fair Market Value. The Independent Valuer shall make its determination within fifteen (15) Business Days of its appointment, and the definitive determination binding upon the Parties shall be whichever of the determinations of Fair

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Market Value made by the first two Investment Banks is closest to the determination of the Independent Valuer and such determination shall be final and binding on the Parties, except in the case of manifest error. In the event that the determination of Fair Market Value by the Independent Valuer is the midpoint of the determinations of Fair Market Value of the first two Investment Banks, then the Fair Market Value determined by the Independent Valuer shall be final and binding on the Parties, except in the case of manifest error; and

(c)   If a determination of Fair Market Value is required to be made pursuant to Section 8.2(b), the Company shall promptly provide the Investment Banks or the Independent Valuer, as applicable, with such access, information and materials which the Investment Banks reasonably consider necessary or desirable for the carrying out of their respective valuations pursuant to Section 8.2(b); **provided that** the Investment Banks or the Independent Valuer, as applicable, shall enter into a confidentiality agreement with the Company on such terms as the Company may reasonably require.

8.3    Definition of Fair Market Value. For the purposes of Section 8.2, "**Fair Market Value**" of the Transfer Securities means either (i) the amount agreed upon by the Parties pursuant to Section 8.2(a) or (ii) the amount determined under Section 8.2(b), that a willing but not forced buyer would pay, and a willing but not forced seller would accept, for the Transfer Securities when they are both acting freely, carefully and with complete knowledge of the Transfer Securities and all other relevant facts, determined as at the relevant date in accordance with the applicable standards prescribed by the Australasian Institute of Mining and Metallurgy for the valuation of interests in iron ore projects and following the procedure set out in Section 8.2 based on the following assumptions: (i) a reasonable time is available in which to obtain a sale of the Transfer Securities in the open market; (ii) without limiting the valuation methodologies to be utilized, having regard to: (a) the estimated discounted future cash flows calculated, unless agreed otherwise by the Parties, using a discount rate that references the average of the weighted average cost of capital of international  mining companies of a comparable nature taking into account, amongst other things, country risk and industry risk (calculated by reference to publicly available information), adjusted appropriately for the level of risk associated with the Company as at the date of valuation; and (b) other recent similar acquisitions concluded under comparable terms and conditions and on an arm's length basis for iron ore deposits, resources and reserves, and considering the quality and quantity of the deposits, resources and reserves, development scenarios (including the potential for increasing production) and inherent risks, mining type, location, proximity to and availability of infrastructure and ownership structure of the assets; (iii) the development of the Project will be undertaken in accordance with the Business Plan; (iv) the assumptions set out in the Feasibility Study (if any) approved by Vale under the Framework Agreement with respect to the Project, to the extent they remain appropriate based on the best information available as at the date of valuation and (v) the value of the relevant Transfer Securities is that proportion of the fair market value of the entire issued share capital of the Company that such Transfer Securities bear to the then total issued share capital of the Company (with no premium or discount for the size of the seller's shareholding or for the rights or restrictions applying to the Securities under this Agreement or the Articles) taking into account

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

the amount of the Vale Loan outstanding at the time the determination of Fair Market Value is made, **provided, however, that**

(a)    the Fair Market Value of the Transfer Securities under the 9% Option shall not be lower than $450 million, regardless of any lower determination following the procedure set out in Section 8.2(b); and

(b)    the Fair Market Value of the Transfer Securities under the 15% Option shall not be lower than $750 million, regardless of any lower determination following the procedure set out in Section 8.2(b).

8.4    Completion of the Options. Either Option shall be completed, and the Transfer of the relevant Securities executed, within twenty (20) Business Days of the final determination of the Fair Market Value of the Securities to be sold according to Section 8.2. On completion, Vale shall pay to BSGR the Fair Market Value and, simultaneously, BSGR shall deliver to Vale certificates for the relevant Securities, together with share transfer forms, duly and validly executed by BSGR and sufficient to vest in Vale good title to the Securities free and clear of all Encumbrances.

8.5.    Non transferability of Options. Vale shall not be permitted to sell, transfer, pledge or assign either of the Options, which shall only be exercisable by Vale or any corporate successor of Vale by merger, consolidation or otherwise; **provided, however** that Vale shall be permitted to sell, transfer, pledge or assign either of the 9% Option and 15% Option in accordance with subsections (a) through (d) of Section 7.4. Any attempted assignment, transfer, pledge or other disposition of either of the Options contrary to the provisions hereof shall be null and void and without effect.

## Section 9.    Consequences of Transfers

9.1    BSGR Subscription. If there is a failure to complete or approve the Feasibility Study in accordance with the terms of the Framework Agreement in circumstances giving rise to the BSGR Subscription, Vale shall have the right to sell, in whole or in part, the Securities it holds in the Company, with effect on and from the Business Day next following the BSGR Subscription Trigger Date to any third party and if Vale intends to transfer any of its Securities to any third party, then the following provisions shall apply with immediate effect (but without prejudice to the BSGR Subscription and completion thereof in accordance with Section 5.4 of the Framework Agreement):

(a)    Vale shall first offer such Securities to BSGR by serving a notice in writing (the "**ROFO Transfer Notice**") to BSGR and the Company offering for sale such Securities (the "**Securities on Offer**");

(b)    at any time within 45 days from the date that BSGR receives the ROFO Transfer Notice (the "**Offer Period**"), BSGR shall be entitled to deliver to Vale and the Company notice of its unconditional and irrevocable commitment to purchase all of the Securities on Offer for cash, specifying the cash price offered and any other material terms and

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

conditions (a "**ROFO Commitment**"). Such ROFO Commitment will remain in full force and effect until the earlier of its acceptance by Vale and 15 days following the expiration of the Offer Period;

(c)    if BSGR delivers a ROFO Commitment to Vale and the Company within the Offer Period, then (i) if Vale accepts the ROFO Commitment, completion of the Transfer between the Parties shall occur within the following 45 days, or (ii) if Vale rejects the ROFO Commitment, Vale shall be entitled for 180 days from such rejection to transfer the Securities on Offer to any other party on terms and conditions which are the same as, or more favorable for Vale than, those contained in the ROFO Commitment; and

(d)    if BSGR does not deliver a ROFO Commitment to Vale and the Company within the Offer Period, then Vale shall be entitled for 180 days from the end of such period to transfer the Securities on Offer to any other party on terms and conditions as it thinks fit,

**provided, however, that** if Vale does not complete the Transfer of the Securities on Offer under Section 9.1(c)(ii) or 9.1(d) above within the relevant 180 day period, the procedure provided under this Section 9.1 shall be repeated before any Transfer takes place,

(e)    Vale's funding obligation with respect to the Project pursuant to the Framework Agreement and the Vale Loan shall immediately and automatically terminate notwithstanding any provision to the contrary in any such agreement such that Vale shall have no further funding obligations pursuant to the Framework Agreement or the Vale Loan;

(f)    the terms for repayment of the Vale Loan shall change such that an amount equal to 100% of the difference between the Permissible Dividend Amount and the Dividend Reserve Amount from time to time shall be paid to the lender in satisfaction of an equivalent amount of the aggregate principal amount together with any capitalized interest outstanding under the Vale Loan until the Vale Loan is fully repaid,

**provided, further, that**:

(g)    BSGR shall have the right to sell the Securities it holds in the Company from time to time, in whole or in part, to any third party and if BSGR wishes to sell all of its Securities and has found a *bona fide* third party purchaser and agrees arm's length commercial terms for the sale for cash to such purchaser of all the Company's Securities then, on receipt of written notification of such fact, Vale will be required to accept the corresponding offer from such a purchaser at the same price per Security and on the same terms and conditions as agreed with BSGR; and

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited

(h)    subject to paragraph (g) above, no transfer of any Securities may be made by BSGR to any third party unless the person acquiring them has made an offer to Vale to acquire the same percentage of its Securities as is being transferred by BSGR at the same price per Security and on the same terms and conditions as has been offered to BSGR, in which event the provisions of Section 7.2(i) to (l) shall apply *mutatis mutandis*.

9.2    <u>New Governance and Consequential Amendments.</u> The Parties agree that promptly after completion of the BSGR Subscription they shall meet in order to agree the necessary amendments to this Agreement to reflect the new shareholding structure and they shall do so with the intent of reflecting, taking into consideration their respective shareholdings after completion of the BSGR Subscription, substantially the same balance in terms of rights and obligations between the Parties as the majority and minority investor as is reflected as of Completion hereunder, provided, for the avoidance of doubt, that (i) Vale shall enjoy substantially the same minority protections granted to BSGR as of Completion pursuant to Section 5.3; (ii) BSGR shall be entitled to appoint additional BSGR directors so as to comprise the majority of the Board and Vale shall procure the resignation of one of the Vale Directors so as to constitute the minority of the Board consistent with Section 4.1 *mutatis mutandis*; (iii) BSGR shall be entitled to exercise the nomination rights under Section 4.7 after consultation with Vale as therein provided and be responsible for the day-to-day management of the BSGR Guinea Group as provided for and subject to the provisos set out in Sections 4 and 5; (iv) BSGR shall be free to sell any Securities to any party subject only to Vale's right under Section 9.1(h) and in accordance with Section 7.3 above and (v) the provisions of Section 9.1 shall not be affected; provided, however, that neither the shareholders of the Company nor any member of the BSGR Guinea Group shall, without the prior written consent of Vale, propose, give effect to, enter into or implement any transaction, policy, agreement or course of conduct which would, or is likely on the balance of probabilities to, materially and adversely affect the ability of the borrower or borrowers under the Vale Loan to effect repayments of the interest on and/or outstanding principal of the Vale Loan in accordance with the terms of this Agreement and the Framework Agreement. The above restriction shall not prevent BSGR Guinea Group from taking on Indebtedness as permitted by Section 5.3(g), provided that the Vale Loan shall rank senior as to both principal and interest to any such new Indebtedness.  For the avoidance of doubt, any veto right which may arise in respect of Section 5.3(a) (but only to the extent reasonably required in order to increase the authorized share capital of the Company and permit the equity issue contemplated by this provision) and (c) in each case in favor of Vale shall not operate to prevent the Company from issuing equity securities on a pre-emptive basis pro rata to each shareholder's respective shareholding in the Company and on arm's length commercial terms.

**Section 10.    Realization of Investment**

The Parties agree to consider the merits and timing of an initial public offering by the Company (or any successor of the Company) on an internationally recognized stock exchange market (**"IPO"**).

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**Section 11.    Termination**

11.1    <u>Term.</u> Subject as otherwise provided herein, this Agreement shall continue in full force and effect without limit in point of time unless and until:

        (a)     all Securities are held by a single entity;

        (b)     the Parties agree in writing to terminate this Agreement; or

        (c)     the Company is wound-up or otherwise liquidated or dissolved,

whichever is the earliest to occur, at which time this Agreement shall expire with immediate effect in accordance with Section 11.2.

11.2    <u>Survival.</u> In relation to a Party which ceases to be the legal or beneficial holder of any Securities in a manner permitted by or consistent with this Agreement (other than by virtue of a Transfer in accordance with Section 7.4 or an assignment not requiring consent pursuant to Section 17.4) (a "**Leaving Party**") or in relation to all Parties upon termination of this Agreement in accordance with Section 11.1, this Agreement shall cease to have effect save:

        (a)     in respect of Section 1 (Definitions and Interpretation), this Section 11 (Termination), Section 17.1 (Costs), Section 17.2 (Notices), Section 17.4 (Assignment), and Section 17.10 (Governing Law; Arbitration); and

        (b)     in respect of (a) a Leaving Party, any liability of that Leaving Party which at the time of cessation has accrued to another Party or which may accrue in respect of any act or omission occurring prior to cessation, or (b) a termination event, any liability of any Party which at the time of that termination event has accrued to another Party or which may accrue in respect of any act or omission occurring prior to that termination event.

**Section 12.    Dispute Resolution**

In the event that either Party, acting reasonably, forms the view that the other Party has caused a material breach of the terms of any of the Ancillary Agreements or a breach of this Agreement or the Framework Agreement, then the Party that forms such a view shall serve notice of the alleged breach on the other Party and both Parties shall work together in good faith to resolve any such alleged breach within 30 Business Days of such notice and if any such alleged breach is not so resolved, then a senior executive of each Party shall in good faith attempt to resolve any such alleged breach within the following 20 Business Days of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 12, then such matter will be referred to arbitration in accordance with Section 17.10.

**Section 13.    Status of the Agreement**

13.1    <u>Company's Undertaking.</u> The Company undertakes with each of the Parties to be bound by and comply with the terms and conditions of this Agreement insofar as the same relate to the

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Company and to act in all respects as contemplated by this Agreement provided always that the Company is excluded from obligations to the extent they would constitute unlawful fetters on its powers.

13.2    Parties' Undertakings. The Parties undertake with each other, also as Shareholders, to exercise their powers in relation to the Company so as to ensure that the Company fully and promptly observes, performs and complies with its obligations under this Agreement. In addition, each Party agrees with the other that, subject to any fiduciary or other obligation imposed by virtue of the office of Director, it will:

> (a)    exercise all voting and other rights and powers vested in or available to it, respectively, to procure the convening of all meetings, the passing of all resolutions and the taking of all steps necessary or desirable to give effect to, and comply with, this Agreement; and

> (b)    not exercise any rights conferred on it by the Articles in a manner inconsistent with its obligations under this Agreement,

**provided, however, that** in the event of any conflict, ambiguity or discrepancy between the provisions of this Agreement and the Articles or other constitutional documents of any member of the BSGR Guinea Group, Section 17.8 shall apply.

## Section 14.    Confidentiality

14.1    Confidentiality Obligation. For the purposes of this Section 14:

> (a)    "**Confidential Information**" means:

>> (i)    (in relation to the obligations of Vale) any information received or held by Vale (or any of its Representatives) relating to BSGR, the BSGR Group or the BSGR Guinea Group; or

>> (ii)    (in relation to the obligations of BSGR) any information received or held by BSGR (or any of its Representatives) relating to the BSGR Guinea Group, Vale or the Vale Group;

>> (iii)    (in relation to the obligations of the BSGR Guinea Group) any information received or held by the BSGR Guinea Group (or any of its Representatives) relating to any of BSGR, the BSGR Group, Vale or the Vale Group; and

>> (iv)    information relating to the provisions of, negotiations leading to, and any claim or potential claim under this Agreement and the other agreements contemplated herein,

and includes written information and information transferred or obtained orally, visually, electronically or by any other means; and

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(b)    "**Representatives**" means: in relation to any of BSGR, the BSGR Group, Vale, the Vale Group, BSGR Guinea and the BSGR Guinea Group, their respective directors, officers, employees, agents, advisers, lending banks, financiers, accountants and consultants.

Without limiting any other confidentiality obligations of the Parties or the Company or any of their respective Affiliates in this Agreement, the Framework Agreement or the Ancillary Agreements, each Party shall (and shall ensure that each of its Representatives shall) maintain Confidential Information in confidence and not disclose Confidential Information to any person except (i) as permitted under Sections 14.2 or 14.3 (ii) as the other Party approves in writing.

14.2    Exceptions. Section 14.1 shall not prevent disclosure by a Party or BSGR Guinea or their respective Affiliates and Representatives to the extent such Party, BSGR Guinea or their respective Affiliates or Representatives can demonstrate that such:

(a)    disclosure (i) is required by law, or by the rules, regulations or requirements of any stock exchange or any regulatory or other supervisory body or Governmental Entity or authority (including tax authority) having applicable jurisdiction or (ii) is used in connection with accounting, financial and other reporting requirements of the Parties or the Company (**provided that,** to the extent practicable and not prohibited by Applicable Law, the disclosing Party or BSGR Guinea shall first inform the other Party or BSGR Guinea, as the case may be, of its intention to disclose such information and take into account the reasonable comments of the other Party or the BSGR Guinea Group, as the case may be);

(b)    subject to Applicable Law, disclosure is of Confidential Information which was lawfully in the possession of that Party, or the BSGR Guinea Group, as the case may be or any of its Representatives (in either case as evidenced by written records) without any obligation of secrecy prior to its being received or held;

(c)    subject to Applicable Law, disclosure is of Confidential Information which has previously become publicly available other than through the actions of that Party or BSGR Guinea (or that of its Affiliates or Representatives) in breach of this Agreement; or

(d)    subject to Applicable Law, disclosure is required for the purpose of any arbitral, judicial or regulatory proceedings arising out of this Agreement (or any other Ancillary Agreement).

14.3    Disclosure to Representatives. Each Party and BSGR Guinea may disclose Confidential Information to its respective Affiliates or Representatives, and undertakes that it (and its Affiliates) shall only disclose Confidential Information to its Affiliates or Representatives if: (i) it is reasonably required for purposes connected with this Agreement or the Project and only if its Affiliates or Representatives are informed of the confidential nature of the Confidential

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Information; or (ii) such Affiliates or Representatives agree to comply with the confidentiality obligations contained in this Section 14 as if a party hereto.

**Section 15.    Force Majeure**

15.1    Force Majeure. The Parties agree that if a Force Majeure Event occurs, the provisions of Section 12.6 of the Framework Agreement shall apply to this Agreement *mutatis mutandis* with respect to the suspension of the payment of dividends or other distributions by the Company or any of its subsidiaries and of the obligations of the Parties as well as those of the Company or any of its subsidiaries hereunder which are not capable of performance as a result of such Force Majeure Event.

**Section 16.    Covenants**

16.1    No Bribery. Neither the Company nor any of the Parties know or have reason to believe that the Company or any other member of the BSGR Guinea Group or any of their respective Agents will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:

(a)    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party;

(b)    securing an improper advantage;

(c)    corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party; or

(d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).

16.2    Covenant. The Parties and the Company shall comply with their respective obligations as set out in Schedule 3 to this Agreement.

**Section 17.    Miscellaneous**

17.1    Costs. Each of the Parties shall pay its own costs and expenses in relation to the preparation and signing of this Agreement and to the implementation of the transactions contemplated by this Agreement.

17.2    Notices.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(a)   *Address of notices.*   Any notice or other communication to be given hereunder shall refer to this Agreement and shall either be delivered by hand or sent by first class post, airmail or facsimile transmission (**provided that**, in the case of facsimile transmission, confirmation of its error-free transmission has been received by the sender's facsimile machine) as follows:

if to **BSGR**:

| | |
|---|---|
| Address: | West Wing, Frances House, Sir William Place, St Peter Port, Guernsey (GY1 1GX) |
| Fax No: | +44.1487.812020 |

Addressed for the attention of:  David Clark

With a copy to:

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**

| | |
|---|---|
| Address: | 40 Bank Street, Canary Wharf, London (E14 5DS) |
| Fax No: | +44.20.7072.7070 |

Addressed for the attention of:  Michael Hatchard and Michal Berkner

if to **Vale**:

| | |
|---|---|
| Address: | Rua Sapucaí, 383 - 7th floor, Belo Horizonte-MG Brazil 30150-904 |
| Fax No: | +55 31 3279-5598 |

Addressed for the attention of:  Eduardo Ledsham

With a copy to:

**Vale**

| | |
|---|---|
| Address: | Av. Graça Aranha, 26 - 15th floor - Rio de Janeiro-RJ Brazil 20030-900 |
| Fax No: | +55 21 3814-9921 |

Addressed for the attention of:  General Counsel

**Clifford Chance LLP**

| | |
|---|---|
| Address: | 10 Upper Bank Street, London (E14 5JJ) |
| Fax No: | +44.20.7006.5555 |

Addressed for the attention of:  Anthony Oldfield and David Pudge

if to **the Company**:

| | |
|---|---|
| Address: | West Wing, Frances House, Sir William Place, St Peter Port, Guernsey (GY1 1GX) |

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Fax No:        +44.1487.812020
Addressed for the attention of:  David Clark

(b)    *Deemed served*.  All notices given in accordance with this Section 17.2 shall be deemed to have been served as follows:

(i)    if delivered by hand, when left at the address listed at 17.2(a) (as applicable);

(ii)   if sent by air mail, six (6) Business Days after it was posted;

(iii)  if communicated by facsimile when confirmation of its error-free transmission has been recorded, by the sender's facsimile machine;

**provided, however, that** where, in the case of delivery by hand or transmission by facsimile, such delivery or transmission occurs after 6 p.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, for notices to BSGR, shall be by reference to London time and for notices to BSGR Guinea, shall be by reference to Guernsey time) on a Business Day or at any time on a day which is not a Business Day, service shall be deemed to occur at 9 a.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, for notices to BSGR, shall be by reference to Guernsey time and for notices to BSGR Guinea, shall be by reference to Guernsey time) on the next following Business Day.

17.3   Entire Agreement.

(a)    Without prejudice to the Framework Agreement and the Ancillary Agreements, this Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of any other Party which is not expressly set out herein or therein or in the BSGR ABL Certificate **provided that** this Section 17.3(a) shall not exclude any liability for fraudulent misrepresentation.

(b)    Without prejudice to the Framework Agreement, the Ancillary Agreements and the BSGR ABL Certificate, this Agreement supersedes any or all prior agreements, understandings, arrangements, promises, representations, warranties and/or contracts of any form or nature whatsoever, whether oral or in writing and whether explicit or implicit, which may have been entered into prior to the date hereof between the Parties or on their behalf as to the subject matter of this Agreement, including, without limitation, the Memorandum of Understanding dated 19 March 2010.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

17.4    Assignment.  This Agreement shall be binding on and inure to the benefit of the Parties and their successors and permitted assigns.  Except as expressly provided in this Agreement, neither Party may assign or transfer all or any part of its rights or obligations under this Agreement nor any benefit arising under or out of this Agreement without the prior written consent of the other Party (which shall not be unreasonably denied or withheld) except that each Party may assign or transfer all or any part of its rights, obligations and/or benefits to a member of its Group without the prior written consent of the other Party subject to Sections 7.4 and 7.7; **provided that** each Party shall remain liable for its obligations under this Agreement notwithstanding any such assignment and, save where such assignment is to Vale's Designated Subsidiary, any such assignee shall be required to sign a Deed of Adherence.

17.5    Waiver of Rights.  No waiver by a Party of a failure or failures by any other Party to perform any provision of this Agreement shall operate or be construed as a waiver in respect of any other or further failure whether of a like or different character.  No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy under this Agreement or at law.

17.6    Amendments.  This Agreement may be amended only by an instrument in writing signed by duly authorized representatives of each of the Parties.

17.7    Invalidity.  If any of the provisions of this Agreement is or becomes invalid, illegal or unenforceable under the laws of any jurisdiction:

      (a)    the validity, legality or enforceability of the remaining provisions of this Agreement in that jurisdiction shall not in any way be affected or impaired; and

      (b)    the validity, legality or enforceability of such provision or the remaining provisions of this Agreement under the laws of any other jurisdiction shall not in any way be affected or impaired.  Notwithstanding the foregoing, the Parties shall thereupon negotiate in good faith in order to agree the terms of a mutually satisfactory provision, achieving so nearly as possible the same commercial effect, to be substituted for the provision so found to be void or unenforceable.

17.8    Conflict With Constitutional Documents.  If there is any conflict or inconsistency between the provisions of this Agreement and the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group company, subject to Applicable Law, this Agreement shall prevail as between the Parties and be applied in priority.  The Parties shall exercise all voting and other rights and powers available to them so as to give effect to the provisions of this Agreement. If requested to do so by any Party, the relevant Party shall procure that the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group Company are amended or the relevant provisions of such are waived, suspended or disqualified so as to accord with and give effect to the provisions of this Agreement, subject to Applicable Law.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

17.9    No Partnership or Agency. Nothing in this Agreement (or any of the arrangements contemplated hereby) shall be deemed to constitute a partnership between the Parties nor, save as may be expressly set out herein, constitute any Party as the agent of any other Party for any purpose.  In addition, no Party shall enter into contracts with third parties as agent for the Company or for the other Party nor shall any Party describe itself as agent as aforesaid or in any way hold itself out as being an agent as aforesaid.

17.10   Governing Law; Arbitration

(a)     This Agreement is governed by English law.  The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.

(b)     Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "**LCIA Rules**"), which Rules are deemed to be incorporated by reference into this Section 17.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party-nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court.  The seat or place of arbitration shall be London, England.  The language to be used in the arbitral proceedings shall be English.  The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction.  Any request for arbitration to arbitrate shall be served on the other party pursuant to the notice provision in Section 17.2 of this Agreement.

(c)     If there is more than one claimant party and/or more than one respondent party, the claimant parties shall together appoint one arbitrator and/or the respondent parties shall together appoint one arbitrator, and such parties shall be treated as a single claimant or a single respondent (as the case may be) for the purposes of article 8 of the LCIA Rules.

(d)     In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 17.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

arbitration proceedings or proposed arbitration proceedings involving the Parties.    An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay.  Unless the parties to the proceedings sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings.    In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 17.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

(e)   Upon the request of a party to a dispute or any party to this Agreement which itself wishes to be joined in any reference to arbitration proceedings in relation to a dispute, the arbitral tribunal may join any party to this Agreement to any reference to arbitration proceedings in relation to that dispute and may make a single, final award determining all the disputes between them. Each of the parties to this Agreement hereby consents to be joined to any reference to arbitration proceedings in relation to any dispute at the request of a party to that dispute, and to accept the joinder of a party requesting to be joined pursuant to this Section 17.10.

(f)   By agreeing to arbitration in accordance with this Section 17.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award.  The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

(g)   The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

(h)   To the extent that any Party hereto (including assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives, to the extent permitted by law, such sovereign immunity.

(i) Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st Floor, 9 Cloak, London, ECYR 2RV as its authorized agent for service of process in England of the kind described in Section 17.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(j) BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 17.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

17.11 Further Assurances. Upon request, each Party shall from time to time take such actions and execute such further documents as may be deemed reasonably necessary by any Party to carry out, evidence and confirm their rights and the intended purpose of this Agreement. Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by any Party, such obligation shall, subject to Applicable Laws and the requirement to comply with any fiduciary duties applicable to the directors (or equivalent officers) of such other person, be construed as requiring the Party concerned to exercise all rights and powers of control over the affairs of any other person which that Party is able to exercise (whether directly or indirectly) in order to procure performance of that obligation. Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by the Board or any individual member of the Board, such obligation shall be construed, subject to Applicable Law, as requiring the Parties or (as the case may be) the Party that designated the relevant member of the Board to take all necessary steps in order to procure performance of such obligation.

17.12 Contracts (Rights of Third Parties) Act 1999. The Contracts (Rights of Third Parties) Act 1999 shall not apply to this Agreement and unless specifically provided herein, no person other than the Parties to this Agreement shall have any rights under it nor shall it be enforceable by any person other than the Parties to it. Where, pursuant to the terms of this Agreement, a third party has been expressly granted rights under the Contracts (Rights of Third Parties) Act 1999, the consent of such third party shall not be required for the variation of this Agreement or the waiver of any provision in it.

17.13   <u>Remedies.</u> Unless otherwise stated in this Agreement or the Framework Agreement, each Party's only remedy in respect of a breach of any provision of this Agreement or any misrepresentation (other than fraudulent misrepresentation) in connection with the subject matter of this Agreement is in damages or a claim for injunctive or equitable relief.  Accordingly, neither Party shall have any right to terminate or rescind this Agreement in the event of a breach of this Agreement or negligent or innocent misrepresentation by the other Party, provided that this Section 17.13 shall not exclude any liability for fraudulent misrepresentation.


17.14   <u>Effect of Completion.</u> Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

17.15   <u>Counterparts.</u>  This Agreement may be entered into in any number of counterparts and by the Parties on separate counterparts, each of which when so executed and delivered shall be an original, but all counterparts shall together constitute one and the same instrument.

*[The remainder of this page is intentionally left blank]*

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**AS WITNESS** this Agreement has been signed by the duly authorized representatives of the Parties the day and year first before written.

**BSG RESOURCES LIMITED**

By: David Clark

---

    Name: David Clark
    Title: Director

**VALE S.A.**

By: Roger Agnelli

---

    Name: Roger Agnelli
    Title: CEO of Vale S.A.

By: Carlos Martins

---

    Name: Carlos Martins
    Title: Executive Director

**BSG RESOURCES (GUINEA) LIMITED**

By: David Clark

---

    Name: David Clark
    Title: Director

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**SCHEDULE 1**

# DEFINED TERMS

**9% Notice** has the meaning given in Section 8.1(a).

**9% Option** has the meaning given in Section 8.1(a).

**15% Notice** has the meaning given in Section 8.1(b).

**15% Option** has the meaning given in Section 8.1(b).

**ABL Certificates** has the meaning given in Schedule 4.

**Additional Consideration** has the meaning given to it in the Framework Agreement.

**Affiliate** has the meaning given to it in the Framework Agreement.

**Agents** means with respect to an entity its directors, officers, employees and any other persons for whose acts it may be vicariously liable; and anyone acting on its behalf.

**Agreement** has the meaning given in the Preamble.

**Alternate Director** has the meaning given in Section 4.3.

**Ancillary Agreements** has the meaning given to it in the Framework Agreement.

**Anti-Bribery Laws** means the US Foreign Corrupt Practices Act, 15 U.S.C. §78-dd-1, et seq., as amended (the "**FCPA**") and any anti-bribery law, anti-corruption law, conflict of interest law, or any other applicable law, rule or regulation of similar purpose and effect applicable to the Parties hereto or the BSGR Guinea Group.

**Applicable Law** has the meaning given to it in the Framework Agreement.

**Articles** means the Articles of Incorporation of BSGR Guinea, as amended from time to time.

**Board** means the board of directors of BSGR Guinea.

**BSGR ABL Certificate** means the ABL Certificate executed by BSGR.

**BSGR** has the meaning given in the Preamble.

**BSGR Advisory Company** means any and each of BSGR Treasury Services Limited, Resources Advisory Services Limited and Onyx Financial Advisors Limited.

**BSGR Directors** has the meaning given in Section 4.1.

**BSGR Guinea** has the meaning given in the Preamble.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**BSGR Guinea Group** means BSGR Guinea together with its subsidiaries.

**BSGR Proportion** has the meaning given in 7.3(b).

**BSGR Subscription** has the meaning given to it in the Framework Agreement.

**BSGR Subscription Trigger Date** has the meaning given to it in the Framework Agreement.

**Business Day** has the meaning given to it in the Framework Agreement.

**Business Plan** means the business plan in the agreed form in relation to the business of the BSGR Guinea Group (or any successor business plan which is consistent with the Feasibility Study, it being understood that Vale shall discuss with BSGR in good faith the preparation of any such successor business plan) and includes any amendments thereto which may be agreed between the Parties from time to time.

**CEO** has the meaning given in Section 4.7.

**CFO** has the meaning given in Section 4.7.

**Company** has the meaning given in the Preamble.

**Completion** means completion of the share sale provided for in the Framework Agreement.

**Compliance Program** means the BSG Resources (Guinea) Anti-Bribery Compliance Program to be provided by Vale to be consistent in all material respects with the summary in the agreed form.

**Concession Areas** has the meaning given to it in the Framework Agreement.

**Confidential Information** has the meaning given in Section 14.1(a).

**Constitutional Documents** has the meaning given to it in the Framework Agreement.

**Control** means in respect of an entity, the capacity (other than through the exercise of minority rights under Section 5.3 of this Agreement or similar rights under any amendment to this Agreement entered into pursuant to Section 9.2 of this Agreement) to direct or cause the direction of the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by agreement, as trustee or executor, or otherwise, and the terms Controlling and Controlled by shall be construed accordingly.

**COO** has the meaning given in Section 4.7.

**Date of First Commercial Production** has the meaning given to it in the Framework Agreement.

**Deed of Adherence** has the meaning given in Section 7.5.

**Deferred Shares** means the deferred shares in BSGR Guinea provided with the rights set out in the agreed form Deferred Shares document.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**Director** means a member of the board of directors of BSGR Guinea from time to time.

**Dividend Reserve Amount** means an amount equal to:

(a)    the aggregate amount of the forecast ongoing working capital requirements for each member of the BSGR Guinea Group in the following 12-month period consistent with the Business Plan; plus

(b)    the aggregate amount of any expenses relating to financing arrangements forecast to be incurred by any member of the BSGR Guinea Group in the following 12-month period (including any amounts of interest on the Vale Loan scheduled for payment during such period but excluding any amounts of principal on the Vale Loan scheduled for payment or repayment during such period); plus

(c)    such amount as is required to be reinvested in the BSGR Guinea Group in order to maintain capital expenditure of a type which is customary for a comparable mining company at an equivalent stage in its development.

**Encumbrance** has the meaning given to it in the Framework Agreement.

**equity interest** means any shares or other equity interests including any options over, warrants in respect of or securities convertible into, exchangeable for or otherwise conferring the right to purchase, subscribe for or acquire such shares or other equity interests and "equity security" shall be construed accordingly.

**Equivalent Cash Amount** has the meaning given in Section 7.2(d).

**Fair Market Value** has the meaning given in Section 8.3.

**FCPA** has the meaning given in the definition of Anti-Bribery laws.

**Feasibility Study** has the meaning given to it in the Framework Agreement.

**Framework Agreement** has the meaning given in Recital (A).

**Force Majeure Event** has the meaning given to it in Section 12.6 of the Framework Agreement.

**Government Authority** (i) a Governmental Entity; (ii) an instrumentality, board, commission, court, or agency, whether civilian or military, of any Governmental Entity, however constituted; (ii) an association, organization, business or enterprise which is owned or controlled by a Governmental Entity; or (iv) a political party.

**Government Entity** means (i) a national government, political subdivision thereof, or local jurisdiction therein; (ii) an instrumentality, board, commission, court, or agency, whether civilian or military, of any of the above, however constituted; (iii) a government-owned/government-controlled association, organization, business or enterprise; or (iv) a political party.

**Government Official** means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of a Government Authority; (ii) a

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organization (including, without limitation, World Bank, United Nations, International Monetary Fund and OECD).

**Group** means in respect of an entity, that entity and its Affiliates from time to time.

**Indebtedness** has the meaning given in the Framework Agreement.

**Independent Valuer** means either (i) an Investment Bank which is independent of both Parties; or (ii) a person or firm, independent of both Parties, having recognised and significant expertise in the valuation of iron ore mines and related assets, infrastructure and facilities both in Africa and internationally. For the purposes of this definition, an Investment Bank, person or firm shall be deemed to be "independent" if such person has not had an advisory relationship within the preceding 24 month period with either of the Parties.

**Investment Bank** means a primary international investment bank that: (i) has its foreign currency long term rating assessed by at least one of the ratings agencies below at a minimum of: (a) Standard & Poor's – "A-"; (b) Moody's – "A3"; and (c) Fitch Ratings – "A"; and (ii) is ranked in the top ten investment banks in the league table issued by Thomson Financial or, in its absence, a reputable international database manager, considering concluded mergers and acquisitions transactions worldwide in the mining sector in the two years prior to the Investment Bank's appointment, or (iii) such other appropriately experienced and reputable person approved by the other Party prior to that person's appointment.

**IPO** has the meaning given in Section 10.

**issued share capital** or any equivalent expression means with respect to the Company the aggregate number of Shares outstanding from time to time, excluding Deferred Shares.

**LCIA Rules** has the meaning given in Section 17.10(b).

**Leaving Party** has the meaning given in Section 11.2.

**OECD Convention** has the meaning given to it in Schedule 3.

**Offer** has the meaning given in Section 7.2(a).

**Offer Period** has the meaning given in Section 9.1(b).

**Off-take Agreement** has the meaning given to it in the Framework Agreement.

**Off-take Term Sheet** has the meaning given to it in the Framework Agreement.

**Options** has the meaning given in Section 8.1(b).

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**Ordinary Shares** means ordinary shares of $1.00 each in the capital of BSGR Guinea.

**Parties** has the meaning given in the Preamble.

**Permissible Dividend Amount** has the meaning given to it in the Framework Agreement.

**Project** has the meaning given to it in the Framework Agreement.

**ProjectCo** means BSG Resources (Guinea) S.à r.l., a company registered under the laws of the Republic of Guinea.

**Prospective Buyer** has the meaning given in Section 7.2(c).

**Representatives** has the meaning given in 14.1(b).

**Relevant Proportion** has the meaning given in Section 7.3.

**ROFO Commitment** has the meaning given in Section 9.1(b).

**ROFO Transfer Notice** has the meaning given in Section 9.1(a).

**ROFR Commitment** has the meaning given in Section 7.2(d).

**ROFR Period** has the meaning given in Section 7.2(d).

**ROFR Transfer Notice** has the meaning given in Section 7.2(b).

**Sanctions Laws and Regulations** means any of the Trading With the Enemy Act, the International Emergency Economic Powers Act, the United Nations Participation Act, or the Syria Accountability and Lebanese Sovereignty Act, all as amended, of the United States or regulations of the United States Treasury Department Office of Foreign Assets Controls ("**OFAC**"), or any export control law or regulation applicable to United States-origin goods, or any enabling legislation or executive order relating to any of the above, as collectively interpreted and applied by the United States Government at the prevailing point in time.

**Sanctions Target** means (a) any country or portion thereof comprehensively targeted as such under Sanctions Laws and Regulations (currently, Cuba, Iran, Myanmar and Sudan); or (b) any person or entity on OFAC's Specially Designated Nationals and Blocked Persons List, or other person or entity that because of its activities, domicile or ownership is an object of prohibitions or restrictions under Sanctions Laws and Regulations.

**Securities** means any equity securities in BSGR Guinea in issue from time to time, excluding Deferred Shares.

**Securities for Sale** has the meaning given in Section 7.2(a).

**Securities on Offer** has the meaning given in Section 9.1(a).

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**Security Interest** means any mortgage, encumbrance, pledge, charge, lien or other security interest, whether fixed or floating, contingent or absolute or perfected or unperfected, including a conditional sale contract and any similar arrangement.

**Selling Party** has the meaning given in 7.2(a).

**Shareholder** means a holder of Shares of BSGR Guinea from time to time.

**Shares** means the ordinary shares of BSGR Guinea in issue from time to time.

**Simandou Concession Area** has the meaning given to it in the Framework Agreement.

**subsidiary** or **subsidiaries** means, in relation to a company (the holding company), any other company or companies in which the holding company (or persons acting on its behalf) for the time being directly or indirectly holds or controls either: (a) a majority of the voting rights exercisable at general meetings of the members of that company on all, or substantially all, matters; or (b) the right to appoint or remove directors having a majority of the voting rights exercisable at meetings of the board of directors of that company on all, or substantially all, matters.

**Tag Commitment** has the meaning given in Section 7.2(i).

**Tag Party** has the meaning given in Section 7.2(j).

**Transfer** means any sale, assignment, transfer, distribution or other disposition of Securities or of a participation, including the grant of an irrevocable option or put in respect of such Securities, or other right therein, whether voluntarily or by operation of law; and the verb "**transfer**" shall be construed accordingly.

**Transfer Securities** means the Securities subject to the 9% Option or the 15% Option, as applicable.

**United States or US** means the contiguous United States of America, including the District of Columbia, the states of Alaska and Hawaii, and all off-shore U.S. territories and possessions, such as Puerto Rico.

**USD or $** means the currency of the United States.

**Vale** has the meaning given in the Preamble.

**Vale's Designated Subsidiary** means any wholly-owned subsidiary of Vale designated by Vale to purchase the Sale Shares pursuant to Section 2.2 of the Framework Agreement.

**Vale Directors** has the meaning given in Section 4.1.

**Vale Loan** has the meaning given to it in the Framework Agreement.

**Vale Loan Term Sheet** has the meaning given to it in the Framework Agreement.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

SCHEDULE 2

## FORM OF DEED POLL OF ADHERENCE

**THIS DEED POLL OF ADHERENCE** is made by Deed Poll the ___    day of _____ 20[●][●]

**BY** [*insert name*], a company registered in [*insert jurisdiction of registration*] registered no. [*insert registered number*], whose registered office is at [*insert address of registered office*] (the "**New Shareholder**")  in favour of the persons whose names are set out in the schedule to this Deed Poll and for the benefit of every other person who becomes a party to the Shareholders' Agreement (as subsequently defined) after the date of this Deed Poll (the "**Beneficiaries**") and is **SUPPLEMENTAL** to a shareholders' agreement relating to BSG Resources (Guinea) Limited (the "**Company**") dated 30 April 2010 made by (1) BSG Resources Limited; (2) Vale S.A.; and (3) the Company (the "**Shareholders' Agreement**").

## WHEREAS:

(A)     In relation to the Shareholders' Agreement, to which [●] (the "**Transferor**") is a party [by virtue of a deed poll of adherence dated (●)], the Transferor has agreed to sell and transfer to the New Shareholder [*insert number and class of shares*] shares (the "**Shares**") conditional upon the New Shareholder entering into this Deed Poll of Adherence.

(B)     The New Shareholder wishes to acquire those Shares subject to such condition and to enter into this Deed Poll of Adherence pursuant to Section 7.5 (Deed of Adherence) of the Shareholders' Agreement.

(C)     Words and expressions defined in the Shareholders' Agreement shall have the same meaning when used in this Deed Poll.

## THIS DEED POLL WITNESSETH:

1.      In accordance with Section 7.5 (Deed of Adherence) of the Shareholders' Agreement, the New Shareholder hereby undertakes to and covenants with and for the benefit of all the parties to the Shareholders' Agreement from time to time (including any person who enters into a Deed Poll of Adherence pursuant to the Shareholders' Agreement, whether before or after this Deed Poll is entered into) to perform, comply with and be bound by all the provisions of, and to perform all the obligations in, the Shareholders' Agreement insofar as they remain to be observed and performed, as if the New Shareholder had been an original party to the Shareholders' Agreement in place of the Transferor.

2.      The New Shareholder hereby agrees to hold the Shares with the benefit of the rights, and subject to the obligations and restrictions, set out in the Shareholders' Agreement and the Articles.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

3.    The details of the New Shareholder for the purposes of Section 17.2 (Notices) of the Shareholders' Agreement are set out below:

Address:                                   [*insert address*]
Fax No:                                    [*insert fax number*]
Addressed for the attention of:            [*insert name*].

4.    Except as expressly varied by this Deed Poll, the Shareholders' Agreement shall continue in full force and effect.

5.    The Contract (Rights of Third Parties) Act 1999 shall not apply to this Deed Poll of Adherence and, accordingly, other than the Beneficiaries, no person shall have any rights under it nor shall it be enforceable by any person other than the Beneficiaries.

6.    The interpretation provisions and the provisions of Sections 17.1 (Costs), 17.2 (Notices), 17.3 (Entire Agreement), 17.5 (Waiver of Rights), 17.6 (Amendments), 17.7 (Invalidity), 17.10 (Governing Law; Arbitration) and 17.11 (Further Assurances) of the Shareholders' Agreement shall apply, *mutatis mutandis*, to this Deed Poll as if those provisions had been set out expressly in this Deed Poll, which shall take effect from the date set out above.

**IN WITNESS** whereof this Deed Poll of Adherence has been duly executed and delivered as a deed poll upon the day and year first written above.

**EXECUTED** and **DELIVERED** as a **DEED** by      )
[*insert company name*]                               )

## SCHEDULE

**[*Insert list of parties to the Shareholders' Agreement including those who have executed earlier deed polls of adherence.*]**

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

**SCHEDULE 3**

## BRIBERY COMPLIANCE PROVISIONS

(a)     The Parties shall require, and take no action to impair or impede that, the Company and each other member of the BSGR Guinea Group will remain in full compliance with Anti-Bribery Laws and with Applicable Sanctions Laws and Regulations.

(b)     The Parties shall use all reasonable efforts to ensure that no member of their respective Groups and none of their directors, officers, employees nor anyone acting on their behalf (whether as an agent, in an advisory capacity or otherwise) shall, directly or indirectly, take any action or engage in any activity to promote the business activities and interests of, or to secure an advantage for, or act, or purport to act or hold themselves out as acting on behalf of, the BSGR Guinea Group and/or the Project with respect to any Government Authority or Government Official, without having obtained the prior approval of the Board (and the Board shall consider any such request for approval in accordance with the Compliance Program); and the relevant Party shall be liable for any breach of this paragraph (b) of this Schedule 3 by it or a member of its Group or any director, officer, employee or any other person acting on behalf of it or any member of its Group.

(c)     Neither BSGR nor any BSGR Advisory Company nor any member of BSGR's Group will directly or indirectly use the proceeds of the sale of the Sale Shares (as defined in the Framework Agreement) and the Company will not directly or indirectly use the proceeds of the subscription for the Ordinary Shares or the Deferred Shares pursuant to the Framework Agreement, or in either case lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, for the purpose of financing or facilitating illicit activities, including any activity that is prohibited under Applicable Sanctions Laws (as defined in the Framework Agreement).

(d)     In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, (i) the Parties shall use all reasonable efforts to ensure that no BSGR Guinea Group company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "**OECD Convention**") or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject; (ii) BSGR shall use all reasonable efforts to ensure that no BSGR Advisory Company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any BSGR Advisory Company or any of its Agents is subject and (iii) Vale shall use all reasonable efforts to ensure that none of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any Agent of Vale is subject.

(e)     The Parties shall require the Company to, and to procure that each other member of the BSGR Guinea Group will, adopt and in good faith implement and enforce the Compliance Program.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(f)      The Parties shall comply with the Compliance Program in regard to all of their activities related to any member of the BSGR Guinea Group or its business and will also require anyone acting on their behalf in relation to the Company or its business to also comply with the Compliance Program in such regard.

(g)      The Parties shall procure that the Company shall have established, and shall at and from Completion be maintaining and duly administering, an internal control system comprising policies, processes and such other features as are necessary or advisable to help ensure: (i) the BSGR Guinea Group's effective and efficient operation by enabling it to manage significant business, operational, financial, compliance and other risks to achieving each relevant company's objectives; (ii) the quality of the internal and external reporting of each member of the BSGR Guinea Group; and (iii) compliance by each member of the BSGR Guinea Group with Anti-Bribery Laws.

(h)      The Parties shall require, and take no action to impair or impede that, the Company will, and will procure that each other member of the BSGR Guinea Group will, make and keep books, records and accounts which in reasonable detail accurately and fairly reflect the transactions and dispositions of it and its subsidiaries (if any) assets, and will, at and from Completion, adopt and apply a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization and are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and/or International Accounting Standards to maintain accountability of such assets; (ii) access to assets is permitted only in accordance with management's general or specific authorization; and (iii) the recorded accountability for assets is compared with existing assets at reasonable levels and appropriate action is taken with respect to any differences.

(i)      Prior to Completion and annually thereafter, each minority Party shall provide a certification in the form attached at Exhibit A to the Board.

(j)      The Parties and their Agents shall have the right independently to inspect at all reasonable times, the books, records and accounts of any member of the BSGR Guinea Group. The Parties shall procure the cooperation of Company and the Company shall procure the cooperation of its auditors and each other member of the BSGR Guinea Group in relation to any such books and records review.  Any costs incurred shall be borne by the Party requesting the examination, unless any material or substantial defect is found through such examination evidencing breach of this Agreement in which case the Party so breaching this Agreement shall bear the costs of the examination.

(k)      If a Party becomes aware of any breach of any of the obligations contained in or referred to herein that Party shall promptly inform the Board.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

## Exhibit A

I hereby certify that, in regard to all of their activities related to the Company or its Subsidiaries or their respective businesses, [Name of Minority Shareholder] and its subsidiaries:

1.    have complied and will comply with the prohibitions of Anti-Bribery Laws[1], any applicable rule, or regulation of any locality, or any other law, rule or regulation of similar purpose and effect;

2.    do not know or have reason to believe that [Name of Minority Shareholder] (or its subsidiaries and affiliates) or its directors, employees, or any person acting on their behalf, have paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official[2] while knowing or having reason to believe that any portion of such exchange is for the purpose of:

   1.1.1    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSG Resources (Guinea) Limited, [Name of Minority Shareholder] or any other person in obtaining or retaining business, or directing business to any third party;

   1.1.2    securing an improper advantage;

   1.1.3    corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist BSG Resources (Guinea) Limited, [Name of Minority Shareholder] or any other person in obtaining or retaining business, or directing business to any third party; or

   1.1.4    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).

I further certify that I have reviewed [Name of Minority Shareholder]'s adherence to the BSG Resources (Guinea) Limited Compliance Program for the preceding year and have noted no violations other than as reported below.

---

[1] "**Anti-Bribery Laws**" has the same meaning as set forth in Schedule 1 to the Shareholders Agreement relating to BSG Resources (Guinea) Limited dated 30 April 2010.

[2] "**Government Official**" means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court, or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organization, business or enterprise; or (d) a political party (collectively, "**Government Authority**"); (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organization (e.g., World Bank, United Nations, International Monetary Fund, OECD).

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

| Date of Violation | Provision of the program that was Violated | Description of Violation | Resolution |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

I agree to immediately notify BSG Resources (Guinea) Limited if subsequent developments cause the certifications and information reported hereinafter to be no longer accurate or complete.

Signature                                              Date

_____          _____

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

<div align="right"><strong>SCHEDULE 4</strong></div>

<div align="center"><strong>ABL SOLUTION</strong></div>

Capitalised terms used in this Schedule and which are not otherwise defined in this Agreement or the Framework Agreement shall have the following meanings:

**ABL Breach** means a breach (whether by way of act, omission or otherwise) of the ABL Provisions.

**ABL Certificates** shall mean the certificate dated 30 April 2010 executed by BSGR and the certificate dated 9 April 2010 executed by an external adviser to BSGR/the Balda Foundation respectively, or either of such certificates.

**ABL Provisions** shall mean, as the case may be, any and all covenants, warranties, undertakings and certifications relating to Anti-Bribery Laws contained in this Agreement, the Framework Agreement and the Ancillary Agreements (including, without limitation, (i) with respect to this Agreement, Section 4.9, Section 5.2 (but only to the extent that a claim thereunder relates to a breach of Anti-Bribery Laws), Section 16.2, Schedule 3 and Exhibit A to Schedule 3, (ii) with respect to the Framework Agreement, Sections 3.4 to 3.7 (inclusive) and Section 8.3 (but only to the extent that a claim thereunder relates to a breach of Anti-Bribery Laws) of Schedule 4 and the ABL Certificates.

**BSGR Person** means BSGR, each of its Affiliates (including in relation to the period prior to Completion, the BSGR Guinea Group), each BSGR Advisory Company, each of their respective Agents and each of the BSGR Principals, or any of them.

**Material ABL Breach** shall mean an un-remedied breach of the ABL Provisions which causes Vale reasonably and in good faith (after taking advice from external counsel) either (i) to consider that it can no longer rely on the accuracy, veracity or correctness of the ABL Provisions or (ii) to determine that such breach potentially exposes Vale or any other member of the Vale Group to liability under the Anti-Bribery Laws.

1.     **ABL Breach**

  1.1     <u>Investigations of Potential ABL Breach.</u>  If Vale acting reasonably and in good faith identifies or becomes aware of a credible allegation or evidence indicating a potential ABL Breach by, on behalf of or attributable to a BSGR Person and Vale reasonably and in good faith believes (after taking advice from external legal counsel) that the making of any or all of the payments referred to in (a) to (c) below would be likely to expose Vale or any member of the Vale Group (including, for the avoidance of doubt, any member of the BSGR Guinea Group) to liability for violation of the Anti-Bribery Laws (a "**BSGR Event**") then Vale shall be entitled to notify BSGR and the Company that it has determined that a BSGR Event has occurred (a "**BSGR Event Notice**").

  In the event (and with effect from the date) that Vale serves a BSGR Event Notice:

         (a)     Vale and each of its Affiliates shall be relieved from and accordingly shall not be required to satisfy any payment or other obligations under the Framework Agreement, this Agreement or the Ancillary Agreements,

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

including, without limitation, (i) the obligations to pay the First Deferred Consideration, the Second Deferred Consideration and/or the Additional Consideration pursuant to Section 3 of the Framework Agreement; (ii) the obligation to fund the Feasibility Study pursuant to Section 6.1 of the Framework Agreement; and (iii) any obligations of the lender under the Vale Loan to provide funding pursuant to the terms of the Vale Loan (together the "**Vale Obligations**"), but excluding any payment or other obligations under the Off-Take Agreement, or any other agreement as contemplated in Section 5.8 of the Framework Agreement, in relation to shipments that have already been delivered by BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) in accordance with the terms of the Off-Take Agreement save for a Restricted Off-take Payment. For these purposes, "**Restricted Off-take Payment**" means any payment or other obligations under the terms of the Off-take Agreement (or any other agreement as contemplated in Section 5.8 of the Framework Agreement) the satisfaction of which Vale in good faith believes (after taking advice from external legal counsel) would be likely to expose Vale or any member of the Vale Group (including, for the avoidance of doubt, any member of the BSGR Guinea Group) to liability for violation of the Anti-Bribery Laws;

(b)   ProjectCo and each other member of the BSGR Guinea Group (where relevant) shall be temporarily relieved from making and shall not make any payment to any BSGR Person under the Royalties Agreement or any Ancillary Agreement (the "**Royalty Payments**"); and

(c)   BSGR Guinea shall be temporarily prohibited and relieved from making and shall not make any payments of dividends or other distributions to its shareholders (the "**Distribution Payments**" and collectively with the Vale Obligations and the Royalty Payments, the "**Payment Obligations**");

provided, that all Payment Obligations that would otherwise become due and payable to BSGR or Vale (as the case may be) and all Restricted Off-take Payments that would have otherwise become due and payable to BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) during any period of suspension following delivery of a BSGR Event Notice by Vale shall be deposited in an interest-bearing account (the "**Holding Account**") on the day such Payment Obligation or Restricted Off-take Payment, as the case may be, would have otherwise fallen due and shall be held in the Holding Account pending the outcome of the response procedures described below and then automatically released to the person or persons entitled thereto upon determination of such procedures.

1.2   Response Procedures.  BSGR shall have 60 days from the date of service of the BSGR Event Notice (the "**Response Period**") either (i) to demonstrate to Vale that the BSGR Event is not an actual ABL Breach by, on behalf of or attributable to a BSGR Person or (ii) where possible and legally permissible, to cure or remedy any such breach (the "**Response Actions**").  BSGR shall have the right, subject to Applicable Laws, to

request that Vale provide reasonable assistance in relation to curing or remedying any such ABL Breach provided always that neither Vale nor any of its Affiliates shall be required to (i) breach any contract to which it is currently a party, (ii) do anything which would make Vale or any of its Affiliates breach any Applicable Law, (iii) incur any liability (including in tort), nor (iv) take any action, do anything or refrain from taking any action which in the opinion of Vale acting in good faith would likely be prejudicial or detrimental to the best interests of Vale or the Vale Group or the BSGR Guinea Group.

Vale shall have 30 days from the end of the Response Period to review the Response Actions (the "**Review Period**") and consider all of the relevant circumstances. During the Review Period, Vale shall have the right to request that BSGR provide such reasonable assistance and co-operation, including the disclosure of relevant information, in relation to the review being undertaken by Vale provided always that no BSGR Person shall be required to (i) breach any contract to which it is currently a party, (ii) do anything that would make any BSGR Person breach any Applicable Law, (iii) incur any liability (including in tort), nor (iv) take any action, do anything or refrain from taking any action that in the opinion of BSGR acting in good faith would likely be prejudicial or detrimental to the best interests of any such BSGR Person.

Within 5 Business Days of the end of the Review Period, Vale shall serve notice on BSGR (the "**Vale Response Notice**") notifying BSGR and the Company that either (a) the provisions in paragraph 1.1 above relating to the suspension of the Payment Obligations and the Restricted Off-take Payments shall no longer apply and following such notification all suspended Payment Obligations that would have been due and payable to BSGR or Vale (as the case may be) and all Restricted Off-take Payments that would have been due and payable to BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) during the suspension period shall be paid promptly (and, in any event, within 10 Business Days of a relevant Vale Response Notice) in accordance with the terms of the relevant agreement together with the actual interest accrued thereon in the Holding Account but after deducting any withholdings and any tax thereon, or (b) that Vale reasonably and in good faith considers (after taking advice from external counsel) the BSGR Event to constitute a Material ABL Breach by, on behalf of or attributable to a BSGR Person.

If Vale considers the BSGR Event to be a Material ABL Breach then, without prejudice to any other available remedies, Vale may notify BSGR and the Company that it wishes to transfer all (but not less than all) of the Securities held by it or any of its Affiliates (a "**Breach Sale Notice**").

In the event that the BSGR Event constitutes an uncured or unremedied ABL Breach which is not a Material ABL Breach, such breach shall be dealt with in accordance with the terms of the relevant agreement or certificate to which such breach relates.

1.3   <u>Material ABL Breach by BSGR.</u>   In the event (and with effect from the date that) Vale serves a Breach Sale Notice pursuant to paragraph 1.2 above, then:

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(a)     the obligations to discharge the Payment Obligations and the Restricted Off-take Payments shall remain suspended pending the completion of such a transfer. Upon completion of such a transfer: (i) all Payment Obligations, other than the Vale Obligations, that would have been due and payable to BSGR or Vale (as the case may be) and all Restricted Off-take Payments that would have been due and payable to BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) during the suspension period shall be paid promptly (and, in any event, within 10 Business Days of such a transfer) in accordance with the terms of the relevant agreement together with the actual interest accrued thereon in the Holding Account but after deducting any withholdings and any tax thereon; and (ii) the Vale Obligations shall terminate upon completion of such a transfer and any amounts in the Holding Account representing Vale Obligations together with the actual interest accrued thereon in the Holding Account but after deducting any withholdings or any tax thereon shall be automatically released and paid to Vale upon such completion;

(b)     the lock-up in Section 7.1 of this Agreement to the extent applicable to Vale and any of its Affiliates shall immediately and automatically cease to apply and Vale and each of its Affiliates shall be entitled to transfer its Securities, subject to (i) paragraph 1.3(c) below, (ii) to any third party purchaser of such Securities agreeing to enter into a Deed of Adherence, and (iii) to BSGR's right to exercise a right of first refusal with respect to any transfer pursuant to this paragraph 1.3 in accordance with the terms set out in Section 7.2(a) to 7.2(h) of this Agreement which shall apply *mutatis mutandis* in respect of any such transfer, provided always that BSGR shall not be entitled to serve a notice pursuant to Section 7.2(i) in relation to a transfer of Securities pursuant to a Breach Sale Notice; and

(c)     for the avoidance of doubt, if at the time at which a Breach Sale Notice is delivered Vale has not paid in full the Second Deferred Consideration to BSGR in accordance with the terms of the Framework Agreement then (i) the BSGR Subscription shall take place immediately prior to any transfer of Securities by Vale and its Affiliates pursuant to paragraph 1.3(b) above and (ii) Vale and its Affiliates will only have the right to sell Ordinary Shares representing the Acquired Ownership Interest at the relevant time. The provisions of Section 9 of this Agreement shall apply *mutatis mutandis* to any BSGR Subscription contemplated by this paragraph 1.3(c) provided always that the BSGR Subscription shall occur only once and the rights under Section 9.1(g) and (h) of this Agreement shall not apply.

Notwithstanding anything else contained in this paragraph 1.3, in the event that Vale delivers a Breach Sale Notice, but does not enter into definitive documentation for the transfer of all (but not less than all) of the Securities held by it or any of its Affiliates within 12 months from the date of such Breach Sale Notice, then such Breach Sale Notice shall automatically lapse but without prejudice to the continuing right of Vale and/or its Affiliates to effect a transfer in

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

accordance with paragraphs 1.3(b) and (c) above and (i) the ABL Breach on which such Breach Sale Notice was predicated shall be dealt with in accordance with the terms of the relevant agreement or certificate to which such ABL Breach relates, (ii) the provisions in paragraph 1.1 above relating to the suspension of the Payment Obligations and the Restricted Off-take Payments referred to therein shall no longer apply with immediate effect, and (iii) promptly (and, in any event, within 10 Business Days) following the date on which such Breach Sale Notice has lapsed all suspended Payment Obligations that would have been due to BSGR or Vale (as the case may be) and all Restricted Off-take Payments that would have been payable to BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) during the suspension period shall be paid to BSGR, Vale or BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable), (as the case may be), in accordance with the terms of the relevant agreement, together with the actual interest accrued in the Holding Account thereon from the date such Payment Obligations or Restricted Off-take Payments would have been due and payable to BSGR, Vale or BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) (as the case may be) but after deducting any withholdings or any tax thereon.

1.4     Conviction/Settlement.

(a)     For so long as Vale or any of its Affiliates is a shareholder in any member of the BSGR Guinea Group, if a BSGR Person is convicted of a violation of the Anti-Bribery Laws in relation to an actual or potential ABL Breach or settles a civil or criminal charge or admits to civil or criminal misconduct relating to an actual or potential ABL Breach and Vale acting reasonably and in good faith considers (after taking advice from external legal counsel) that such conviction, settlement or misconduct constitutes a Material ABL Breach, then, without prejudice to any other available rights or remedies, Vale has the right to notify BSGR that it wishes to sell all (but not less than all) of the Securities held by it and any of its Affiliates (a "**Conviction Sale Notice**").

In the event that Vale delivers a Conviction Sale Notice to BSGR, then:

(i)     the obligations to discharge the Payment Obligations and the Restricted Off-take Payments shall be or, if Vale has previously served a BSGR Event Notice, shall continue to be suspended and shall be deposited in the Holding Account in each case as contemplated in paragraph 1.1 above pending the earlier to occur of (i) the completion of a transfer pursuant to paragraph 1.4(a)(ii); (ii) the completion of a transfer pursuant to paragraph 1.4(b)(i); or (iii) the completion of the dissolution of the BSGR Guinea Group as contemplated in paragraph 1.4(b)(ii). Upon completion of a transfer pursuant to 1.4(a)(ii) or paragraph 1.4(b)(i) or completion of the dissolution of the BSGR Guinea Group pursuant to paragraph 1.4(b)(ii): (i) all Payment Obligations, other than the

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

Vale Obligations, that would have been due and payable to BSGR or Vale, as the case may be, and all Restricted Off-take Payments that would have been due and payable to BSGR Guinea (or any other member of the BSGR Guinea Group, as applicable) during the suspension period shall be paid promptly (and, in any event, within 10 Business Days of such transfer or dissolution) in accordance with the terms of the relevant agreement, together with the actual interest accrued thereon in the Holding Account but after deducting any withholdings and any tax thereon; and (ii) the Vale Obligations shall terminate and any amounts in the Holding Account representing Vale Obligations together with the actual interest accrued thereon in the Holding Account but after deducting any withholdings or any tax thereon shall be automatically released and paid to Vale; and

(ii) the lock-up in Section 7.1 of this Agreement to the extent applicable to Vale or any of its Affiliates shall immediately and automatically cease to apply and Vale and its Affiliates shall be entitled to transfer their Securities, subject to (i) paragraph 1.4(d) and (ii) to any third party purchaser agreeing to enter into a Deed of Adherence; provided, however that BSGR shall not be entitled to exercise a right of first refusal with respect to any transfer pursuant to this paragraph 1.4.

(b) If Vale and its Affiliates are unable to transfer all (but not less than all) of the Securities held by any of them in accordance with paragraph 1.4(a)(ii) on commercially reasonable terms within 180 days of delivery of the Conviction Sale Notice (the "**ABL Sale Period**") having used commercially reasonable efforts to effect such a transfer, then Vale shall be entitled at its option and acting in its sole discretion by giving notice to BSGR and the Company (i) to acquire all (but not less than all) of the Securities held by BSGR and/or its Affiliates pursuant to paragraph 1.4(b)(i) below (an "**ABL Purchase Notice**") or (ii) to require the dissolution of the BSGR Guinea Group in accordance with paragraph 1.4(b)(ii) below (a "**Dissolution Notice**").

(i) If Vale delivers an ABL Purchase Notice then it shall be entitled to purchase all (but not less than all) of the Securities held by BSGR and/or its Affiliates (the "**Purchase Notice Securities**") in accordance with the following provisions:

(1) Vale's right to acquire the Purchase Notice Securities may be exercised one time and in respect of all the Purchase Notice Securities only for a cash price equal to the Fair Market Value of the Purchase Notice Securities;

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(2)    the Fair Market Value of the Purchase Notice Securities to be acquired pursuant to the ABL Purchase Notice shall be determined in accordance with Section 8.2 and Section 8.3 (excluding sub-paragraphs (a) and (b) of the proviso in Section 8.3) of this Agreement (provided that any Investment Banks or Independent Valuer appointed in accordance with Section 8.2(b) shall take into account the circumstances giving rise to the triggering of the ABL Purchase Notice and the impact of such circumstances on the business of the BSGR Guinea Group, if applicable); and

(3)    the transfer of the Purchase Notice Securities shall be completed in accordance with Section 8.4 of this Agreement *mutatis mutandis* provided, however, that the Fair Market Value to be paid by Vale for the Purchase Notice Securities shall not be paid to BSGR and/or its Affiliates but shall be dealt with in accordance with paragraph 1.4(c) below.

(ii)    If Vale delivers a Dissolution Notice, then the BSGR Guinea Group shall be dissolved in accordance with the following provisions:

(1)    Vale and BSGR shall each propose to the other an independent Investment Bank (independence being determined as set out in the definition of Independent Valuer *mutatis mutandis*) (the "**Auction Bank**") to conduct an auction sale of the BSGR Guinea Group as a whole or of its component parts or of its or their respective assets and liabilities (the "**Auction Sale**") with the intent of achieving a sale on terms which in the opinion of the Auction Bank represent the most favourable terms for the Parties offered by any potential purchaser(s), any such determination shall be final and binding on the Parties in the absence of manifest error.  If within ten (10) Business Days following the delivery of the Dissolution Notice, Vale and BSGR have not agreed, following discussions undertaken in good faith, on the identity of the Auction Bank, either Party may request the President of the Australasian Institute of Mining and Metallurgy to appoint the Auction Bank and the Auction Bank shall commence the Auction Sale as soon as practicable after such appointment.  The Parties shall and shall procure, so far as they are able to do so, that the members of the BSGR Guinea Group shall provide the Auction Bank with such information and assistance as it may reasonably require to effect the Auction Sale (subject, where relevant, to the Auction Bank, executing confidentiality agreements in customary form);

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

(2)     if, within 12 months of the commencement of the Auction Sale described in paragraph 1.4(b)(ii)(1) above, any member of the BSGR Guinea Group remains unsold, Vale shall be entitled to require that any such company be placed into liquidation or equivalent procedure (and the Parties shall use all reasonable efforts to procure that this is effected) and any proceeds of such liquidation or equivalent procedure (net of any fees or expenses) shall be paid to Vale and BSGR (or their respective Affiliates) in proportion to their or their Affiliates' respective shareholdings in BSGR Guinea subject, in the case of BSGR (or any of its Affiliates), to paragraph 1.4(b)(ii)(3); and

(3)     subject to paragraph 1.4(d), neither Vale nor BSGR nor any of their respective Affiliates shall be prohibited from participating in the Auction Sale, and the proceeds of the Auction Sale (net of any fees or expenses) shall be paid to Vale and BSGR (or their respective Affiliates) in proportion to their or their Affiliates respective shareholdings in BSGR Guinea provided however that the *pro rata* share of proceeds of the Auction Sale payable to BSGR or any of its Affiliates shall be dealt with in accordance with paragraph 1.4(c).

(c)     (i)     If at the time of delivery of the ABL Purchase Notice or the Dissolution Notice there are any Qualifying Claims (as defined in paragraph 1.4(c)(iv)) then the Relevant Proceeds shall not be paid to BSGR or its Affiliates but shall instead be paid into a separately designated interest bearing deposit account (the "**Escrow Account**") which shall be opened by Law Debenture Trust Company plc or such other third party trustee or escrow agent as Vale shall, acting reasonably and in good faith, approve (the "**Escrow Agent**").  To the extent that the pro rata share of proceeds to which BSGR and/or its Affiliates are entitled exceed the amount of the Relevant Proceeds, the surplus shall be paid to BSGR and/or its Affiliates as the case may be.  The Escrow Agent shall be appointed jointly by Vale and BSGR (who shall each bear one-half of the fees and expenses of the Escrow Agent and any tax thereon) on such terms and conditions proposed by the Escrow Agent as shall be approved by the Parties acting reasonably and in good faith provided always that if within ten (10) Business Days such terms and conditions have not been approved by BSGR, the Escrow Agent shall be appointed on such terms and conditions as Vale may approve acting reasonably and in good faith and such appointment shall be made within twenty (20) Business Days following the delivery of the ABL Purchase Notice or the Dissolution Notice (as the case may be).  Vale shall hereby be

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

authorised on behalf of BSGR to execute the agreement with the Escrow Agent if, following the expiry of such twenty (20) Business Day period, BSGR has not executed such agreement. At the time of establishing the Escrow Account, Vale acting in good faith shall notify the Escrow Agent of all Qualifying Claims as at that date and where any such claim is for a fixed and determined amount, the amount of such claim.

"**Relevant Proceeds**" means (i) where some or all of the Qualifying Claims are in respect of or are for damages in an unquantified amount, all of the proceeds due to be paid to BSGR or any of its Affiliates under paragraphs 1.4(b)(i) and (ii) above, or (ii) where (and only where) all of the Qualifying Claims are for a fixed and determined monetary amount, such portion of the proceeds which are payable to BSGR and/or its Affiliates under paragraphs 1.4(b)(i) and (ii) above as is equal to the aggregate amount of the Qualifying Claims.

(ii) The agreement with the Escrow Agent shall provide that the money in the Escrow Account and any interest thereon shall be used to satisfy (in whole or in part) any liability of BSGR or any of its Affiliates for, under or in respect of any Qualifying Claim made in writing at or prior to the time of appointment of the Escrow Agent and any such liability to satisfy a Qualifying Claim shall be evidenced by either Party providing to the Escrow Agent:

(a) a copy of a duly executed agreement between the Parties evidencing the full and final settlement of a Qualifying Claim and setting the amount of the liability (if any) payable by BSGR to Vale in relation thereto; or

(b) evidence of a final and binding determination of liability by the arbitrators pursuant to Section 17 of this Agreement or Section 16 of the Framework Agreement or any relevant section of any Ancillary Agreement or any other relevant court of law or judicial or quasi-judicial body having jurisdiction in respect of the relevant Qualifying Claim.

In the event that any Qualifying Claim is settled without liability or the Parties have received a final and binding determination of dismissal or no liability from any such arbitrators or court of law or judicial or quasi-judicial body, a copy of such settlement, dismissal or determination shall be provided to the Escrow Agent by either of the Parties acting in good faith.

(iii) Once all Qualifying Claims (if any) notified to the Escrow Agent in accordance with paragraph 1.4(c)(i) above have been settled with no liability on the part of BSGR or any of its Affiliates or satisfied in full by the release of all amounts required from the Escrow Account, Vale and BSGR shall jointly notify the Escrow

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited, Vale S.A. and BSG Resources (Guinea) Limited

:

Agent and require it to pay any remaining balance on the Escrow Account after deduction of fees, expenses and withholdings and any tax thereon to BSGR.  In the event that all Qualifying Claims have been settled with no liability or satisfied in full by the release of all amounts required from the Escrow Account and Vale has failed to deliver such joint notification within ten (10) Business Days of the settlement or satisfaction of the last outstanding Qualifying Claim, BSGR acting in good faith shall be entitled to provide written evidence of such settlement or satisfaction to the Escrow Agent and that all amounts required to be paid to Vale have been released to Vale from the Escrow Account and thereafter to instruct the Escrow Agent to pay any remaining balance on the Escrow Account to BSGR.

(iv)     A "**Qualifying Claim**" shall mean any claim by Vale against BSGR or a BSGR Person for breach of the ABL Provisions and/or any other provision of this Agreement, the Framework Agreement or any Ancillary Agreement in respect of which Vale has received an opinion from an internationally recognised external legal counsel which confirms that, based on the facts presented to it, such counsel believes there to be reasonable grounds for Vale to advance such claim and, where relevant, such opinion shall set out the amount being sought in relation to any Qualifying Claim which is a claim for a fixed and determined monetary amount.

(v)      Each Party undertakes to the other to take and to procure that each of its Affiliates shall take all such actions and execute all such documents and/or instruments as may be reasonably necessary or appropriate to give effect to the escrow arrangements contemplated in this Schedule 4.

(d)     For the avoidance of doubt, if Vale elects to pursue its remedies in accordance with this paragraph 1.4 before Vale has paid in full the Second Deferred Consideration to BSGR in accordance with the terms of the Framework Agreement then (i) the BSGR Subscription shall take place immediately prior to the later to occur of the completion of the transfer by Vale and any of its Affiliates of its Securities; the completion of the Auction Sale or the completion of the liquidation or equivalent process, each as contemplated above in this paragraph 1.4 and (ii) Vale and its Affiliates will only have the right pursuant to paragraph 1.4(a)(i) to sell Ordinary Shares or to receive a share of the proceeds of the Auction Sale or the liquidation or equivalent process representing the Acquired Ownership Interest at the relevant time.  The provisions of Section 9 of this Agreement shall apply *mutatis mutandis* to any BSGR Subscription contemplated in this paragraph 1.4(d) provided always that the BSGR Subscription shall occur only once.

1.5     Non-exclusive rights. Vale's rights and remedies under paragraph 1.1 to paragraph 1.4 above are cumulative and are not exclusive of any other rights or remedies provided

by law or equity in relation to the fact, matter of circumstances giving rise to an ABL Breach, including, without limitation, the right to make a claim for breach of this Agreement, the Framework Agreement, the Ancillary Agreements or the ABL Certificates (as the case may be) but subject always to Section 17.3 of this Agreement.

1.6     Breach by BSGR Guinea or any member of the BSGR Guinea Group.   For the avoidance of doubt, if circumstances arise indicating a potential ABL Breach or an actual or potential breach of the Compliance Program by any member of the BSGR Guinea Group or an Agent thereof, the Parties shall, so far as they are able to do so, procure that such matter shall be dealt with in accordance with the Compliance Program (including the provisions therein relating to the suspension/dismissal of relevant employees).

1.7     Further Assurance.  Without prejudice to the generality of Section 17.11 of this Agreement and save as otherwise expressly set out in this Agreement or this Schedule 4, each of the Parties undertakes to the other to take and to procure that each of its Affiliates and each member of the BSGR Guinea Group shall take (in each case acting in good faith) all action and execute all documents and/or instruments as may be reasonably necessary or appropriate to give effect to the matters set out in this Schedule 4.

This page is part of the Shareholders' Agreement entered into as of 30 April 2010 by and between BSG Resources Limited. Vale S.A. and BSG Resources (Guinea) Limited