UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALE S.A.,

                Petitioner,

     -against-                         Case No. 19-cv-3619

BSG RESOURCES LIMITED,

                Respondent.

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR
RECOGNITION AND ENFORCEMENT OF A FOREIGN ARBITRATION AWARD**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jonathan I. Blackman
Jeffrey A. Rosenthal
Emily J. Balter
Samuel L. Levander

One Liberty Plaza
New York, New York
Tel: (212) 225-2000
Fax: (212) 225-3999

*Counsel for Petitioner Vale S.A.*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS.................................................................... 2

I.    Background to the Dispute Between Vale and BSGR ............................. 2

II.   The Initiation Of The LCIA Arbitration................................................. 5

III.  BSGR's Efforts to Disrupt the LCIA Arbitration ................................. 8

IV.  BSGR's Legal Proceedings Ancillary to the Arbitration ........................ 11

V.    The Final Award ................................................................................ 12

ARGUMENT..................................................................................... 15

I.    This Court Has Jurisdiction To Enforce The Final Award....................... 15

    A.   This Court Has Subject Matter Jurisdiction ....................................... 15

    B.   This Court Has Personal Jurisdiction................................................. 16

        1.   Quasi in rem jurisdiction.................................................... 16

        2.   N.Y. C.P.L.R. § 302 and Federal Rule of Civil Procedure 4(k)(2)...................................................................... 17

II.   The FAA Requires Recognition and Enforcement of the Final Award ......... 20

CONCLUSION.................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Rules and Statutes**

9 U.S.C. § 203 ................................................................................................................ 15

9 U.S.C. § 207 ................................................................................................................ 20

Fed. R. Civ. P. 4(k)(2) ............................................................................................ 17-18, 19

N.Y. Convention art. V(1) ...................................................................................... 21-22, 24

N.Y. Convention art. V(2) ............................................................................................. 22

N.Y. C.P.L.R. § 302 ................................................................................................... 17-18

**Cases**

*ABKCO Indus., Inc. v. Apple Films,*
39 N.Y.2d 670 (1976) ..................................................................................................... 17

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.,*
850 F.3d 58 (2d Cir. 2017) ........................................................................................ 15, 20

*CME Media Enters. B.V. v. Zelezny,*
No. 01 CIV. 1733 (DC), 2001 WL 1035138 (S.D.N.Y. Sept. 10, 2001) ........................... 16

*Crescendo Mar. Co. v. Bank of Commc'ns Co.,*
No. 15 Civ. 4481(JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) ............................ 16, 23

*Dardana Ltd. v. Yuganskneftegaz,*
317 F.3d 202 (2d Cir. 2003) ........................................................................ 17-18, 19-20

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Rep.,*
582 F.3d 393 (2d Cir. 2009) ........................................................................................... 16

*Geotech Lizenz AG v. Evergreen Sys., Inc.,*
697 F. Supp. 1248 (E.D.N.Y. 1988) ................................................................................. 23

*HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V.,*
No. 04 CIV. 6884 (NRB), 2005 WL 1036127 (S.D.N.Y. May 4, 2005) ............................ 17

**Page(s)**

*Hotel 71 Mezz Lender LLC v. Falor,*
14 N.Y.3d 303 (2010) .................................................................... 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
827 F.3d 223 (2d Cir. 2016) ........................................................... 17

*Jiangsu Changlong Chems., Co. v. Burlington Bio-Medical & Sci. Corp.,*
399 F. Supp. 2d 165 (E.D.N.Y. 2005)............................................. 21

*Loucks v. Standard Oil Co. of N.Y.,*
224 N.Y. 99 (1918) (Cardozo, *J.*) .................................................. 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985)..................................................................... 20-21

*Moore v. Nassau Cty. Dep't of Pub. Transp.,*
78 Misc. 2d 1066 (N.Y. Sup. Ct. 1974) .......................................... 17

*Overseas Cosmos, Inc. and NR Vessel Corp.,* No. 97 Civ. 5898(DC), 1997 WL 757041
(S.D.N.Y. Dec. 8, 1997)................................................................. 23

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier
(RAKTA),*
508 F.2d 969 (2d Cir. 1974) ........................................................ 20-21

*Peterson v. Islamic Rep. of Iran,*
No. 10 CIV. 4518 KBF, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013)............................ 18

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
388 U.S. 395 (1967)....................................................................... 24

*Telenor Mobile Commc'ns A.S. v. Storm LLC,*
584 F.3d 396 (2d Cir. 2009) ...................................................... 21, 24-25

*World-Wide Volkswagen Corp. v. Woodson,*
444 U.S. 286 (1980)..................................................................... 18-19

*Yiwu Bochi Imp. & Exp. Co. v. Wilson Star Corp.,* 18 Cv. 11997(RMB), 2019 WL
1613299 (S.D.N.Y. Feb. 4, 2019) ................................................. 23

**Page(s)**

*Yukos Capital S.A.R.L. v. OAO Samaraneftegaz,*
963 F. Supp. 2d 289 (S.D.N.Y. 2013)..................................................................... 23

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,*
126 F.3d 15 (2d Cir. 1997) ..................................................................... 20, 21

**Other Authorities**

*BSG Resources Ltd v Vale S.A. and Ors*
[2017] A3/2017/0298 (Court of Appeal, Civil Division)................................... 10

Compl., *BSG Res. (Guinea) Ltd. v. Soros*, No. 17-cv-2726-JFK-OTW (S.D.N.Y. Apr. 14,
2017), ECF No. 1 ............................................................................................... 12

Compl., *United States v. Cilins*, No. 13-cr-315 (S.D.N.Y. Apr. 15, 2013), ECF No. 1 ..... 19

Compl., *United States v. Real Property*, No. 14-cv-01428 (M.D. Fl. Nov. 21, 2014),
ECF No. 1 ........................................................................................................... 19

*In re Application Pursuant to 28 U.S.C. § 1782 of BSG Resources Ltd.,* Case No. 16-mc-
02552-BAH (D.D.C. Dec. 20, 2016) ................................................................ 9-10

Jesse Drucker, *Bribe Cases, a Jared Kushner Partner and Potential Conflicts*, N.Y.
TIMES, Apr. 26, 2017, https://www.nytimes.com/2017/04/26/us/politics/jared-kushner-
beny-steinmetz.html............................................................................................ 17

Judgment, *United States v. Cilins*, No. 13-cr-315 (WHP) (S.D.N.Y. July 29, 2014),
ECF No. 71 ......................................................................................................... 5

Judgment, *United States v. Thiam*, No. 17-cr-47-DLC (S.D.N.Y. Aug. 28, 2017),
ECF No. 136 ....................................................................................................... 14

Stipulated Settlement Between United States and Mamadie Touré, *United States v. Real
Property*, No. 14-cv-01428-TJC-PDB (M.D. Fl. Feb. 1, 2016), ECF No. 36................... 19

Op. & Order, *BSG Res. (Guinea) Ltd. v. Soros*, No. 17-cv-2726-JFK-OTW (S.D.N.Y.
Nov. 29, 2017), ECF No. 136............................................................................ 12

*P v Q and Ors* [2017] EWHC 148 (Comm) ...................................................... 10

*P v Q and Ors* [2017] EWHC 194 (Comm) ...................................................... 10

Petitioner Vale S.A. ("Vale" or "Petitioner") respectfully submits this Memorandum of Law in support of its Petition for Recognition and Enforcement of a Foreign Arbitration Award against Respondent BSG Resources Limited ("BSGR" or "Respondent") pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201-208.

## PRELIMINARY STATEMENT

In April 2014, Vale instituted an arbitration against BSGR before the London Court of International Arbitration (the "LCIA Arbitration" or the "Arbitration") seeking to recover over $1 billion in damages Vale has suffered due to BSGR's bribery, corruption, and fraud.  Vale's claims in the LCIA Arbitration arose from BSGR's scheme to gain valuable mining rights through bribery of Guinean government officials and BSGR's fraud and breaches of representations and warranties in later inducing Vale to invest more than $1 billion in the mining concession that, unbeknownst to Vale at the time, BSGR had corruptly obtained.  BSGR's namesake, Beny Steinmetz, along with one of its top executives, were arrested in Israel for their part in this scheme, and another of its agents, Frédéric Cilins, has been convicted of obstruction of justice in the Southern District of New York for his role in trying to cover it up.  BSGR has gone to extraordinary lengths – including bringing claims in numerous forums, including the U.S. courts – both to conceal what it did and to forestall the day of reckoning in the arbitration Vale brought more than five years ago to recover the losses it suffered as a result of BSGR's conduct.

On April 4, 2019, a tribunal of three well-respected international arbitrators (the "Tribunal"), unanimously issued a well-reasoned and thorough 281-page final award (the "Final Award" or the "Award"), Blackman Decl., Ex. A, against BSGR, finding that BSGR had induced Vale, through false statements, representations, and warranties, to enter into a joint

venture with BSGR to develop mining rights in Guinea.  The Tribunal awarded Vale $1.246 billion in damages, plus pre- and post- award interest and costs in damages, totaling more than $2 billion.  Among its findings of fraud, the Tribunal found that BSGR had engaged in bribery and corruption in relation to, *inter alia*, benefits granted to the fourth wife of the President of Guinea to secure the mining rights in question, and that it hid its corrupt practices from Vale through false statements and by taking advantage of opaque business structures.

Vale now seeks to confirm and enforce the Final Award in the summary proceeding provided under Section 207 of the Federal Arbitration Act ("FAA").  This Court should confirm and enforce the Final Award because all requirements for recognition and enforcement have been satisfied and none of the narrow grounds for refusing recognition or enforcement set forth in the New York Convention apply here.

## STATEMENT OF FACTS

### I.   Background to the Dispute Between Vale and BSGR

The LCIA Arbitration arose out of a joint venture entered into between Vale and BSGR in April 2010 to develop an iron ore mining concession in the east of Guinea, believed to be part of the largest untapped deposit of iron ore in the world.  Blackman Decl., Ex. A (Final Award) ¶ 5.  BSGR had obtained rights to the mining concessions known as Blocks 1 and 2 of the Simandou iron ore deposit and the Zogota iron ore deposit in December 2008 from the Government of Guinea, then under the rule of President Lansana Conté.  *Id.*

After receiving the rights to Simandou Blocks 1 and 2, BSGR approached Vale to sell it an interest in these mining concessions, as BSGR needed a partner that could both invest capital and offer technical expertise for the development of the concessions.  *Id.* ¶ 6.  In March 2010, BSGR and Vale began negotiating a joint venture.  During the negotiations, Vale took steps to protect itself in dealing with a company that was not familiar to it in a part of the world known

for corruption.  Vale conducted substantial due diligence to understand how BSGR obtained its mining concessions and to assure itself that BSGR had not engaged in any corrupt activities in that regard.  Because a key purpose for this process was ensuring compliance with the U.S. Foreign Corrupt Practices Act ("FCPA"), Vale employed U.S. counsel based in Washington D.C. and New York to conduct this due diligence.

This diligence was designed not only to identify any direct evidence of bribery in BSGR's obtaining the mining rights to Simandou, but also to uncover any information that might point to the possible existence of bribery and corruption, such as the use of third-party "fixers" or the payment of exorbitant commissions to consultants.  During due diligence, Vale required BSGR (and its namesake, Beny Steinmetz) to certify that it did not engage in bribery and to disclose, *inter alia*, the identities of any intermediaries it used in its efforts to obtain the mining rights, any material contracts regarding its rights in Simandou, and any government officials with whom it had financial relationships.  BSGR and Steinmetz repeatedly represented and warranted to Vale that BSGR had lawfully obtained its mining rights in Guinea, that it had not used any undisclosed consultants or intermediaries, and that it had disclosed all material documents and information.

BSGR and Steinmetz made these certifications and representations in interviews with BSGR's principals in Rio de Janeiro and London, including while Vale's counsel from Clifford Chance in Washington, D.C. were present on the telephone, as well as in written representations sent via e-mail to Vale's U.S. counsel in Washington, D.C. and New York.

On April 30, 2010, after receiving these assurances, representations, and warranties that BSGR had followed proper procedures in obtaining its rights, Vale entered into a joint venture with BSGR (the "VBG Joint Venture") to develop the mining concession.  The VBG Joint

Venture was governed by (i) a Joint Venture Framework Agreement, dated April 30, 2010 (the "Framework Agreement"), Blackman Decl., Ex. B, and (ii) a Shareholders' Agreement, dated April 30, 2010 (the "Shareholders' Agreement"), Blackman Decl., Ex. C (together, the "Joint Venture Agreements").

Immediately upon executing the Joint Venture Agreements, Vale paid $500 million in upfront consideration to BSGR's bank account at JPMorgan Chase Bank, N.A. in New York.[1]  It subsequently invested approximately $750 million more in developing the mining concessions. Blackman Decl., Ex. A (Final Award) ¶ 10.

In October 2012, a committee (the "Technical Committee") organized by the Government of Guinea (now led by a different presidential administration than the one that had granted BSGR its mining concession) notified BSGR that it was evaluating the manner in which BSGR had obtained its rights.  *Id.* ¶ 286.  The Technical Committee explained that it was investigating credible allegations that BSGR had acquired the rights to Simandou Blocks 1 and 2 in 2008 through bribery of Guinean government officials, including Mamadie Touré, the wife of the late President Lansana Conté, both directly and through intermediaries such as BSGR's agent Frédéric Cilins.  Vale cooperated with the Technical Committee's investigation, and urged BSGR to do the same.  However, BSGR – which was the only party in a position to provide the information the Technical Committee sought, since it predated Vale's involvement – refused to cooperate and refused to attend the hearing held by the Technical Committee on December 16, 2013.

During the Technical Committee's investigation, Frédéric Cilins, BSGR's agent, *id.* ¶ 419, traveled to the United States to visit Mme Touré in an attempt to convince her to destroy

---

[1]       BSGR continued to make use of U.S. bank accounts held by the VBG Joint Venture to make and receive payments related to its mining operations in Guinea during the life of the VBG Joint Venture.

certain documents that were incriminating for BSGR, *id.* ¶ 290.  Cilins was arrested in Florida in April 2013 and then transferred to New York, where he pleaded guilty in the Southern District of New York to obstructing a U.S. federal criminal investigation into BSGR's bribery scheme.[2] The FBI audio recordings of their communications included Cilins's statements to Mme Touré that he had been sent by Steinmetz.  *Id.* ¶¶ 419.9, 574.7.

On April 17, 2014, the Government of Guinea revoked the mining concessions after determining that BSGR had engaged in bribery and corruption.  *Id.* ¶ 7.

## II.     The Initiation Of The LCIA Arbitration

Pursuant to the arbitration agreements in the Framework Agreement and the Shareholders' Agreement, Vale filed its Request for Arbitration with the LCIA on April 28, 2014, seeking the return of the $500 million it paid to BSGR, along with approximately $750 million it spent to develop the mining concessions, and rescission of the Joint Venture Agreements.  Blackman Decl., Ex. A (Final Award) ¶ 26.

Section 16.10 of the Framework Agreement and Section 17.10 of the Shareholders' Agreement provide that any dispute, controversy or claim arising out of or in connection with the Joint Venture Agreements is to be arbitrated in London under the LCIA Rules.  In full, Section 16.10 of the Framework Agreement, Blackman Decl., Ex. B, provides:

> 16.10 Governing Law; Arbitration
>
> a) This Agreement is governed by English law. The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and

---

[2]     Unbeknownst to Cilins, Mme. Touré had become a cooperator with the FBI, which taped their conversations.  Cilins was sentenced on July 25, 2014 to 24 months in prison, three years of supervised release, and fined $75,000.  Judgment, *United States v. Cilins*, No. 13-cr-315 (WHP) (S.D.N.Y. July 29, 2014), ECF No. 71.

determined only in accordance with English law.

b) Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "LCIA Rules"), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court. The seat or place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction. Any request for arbitration shall be served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

c) In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceeding sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree

otherwise.

d) By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

e) The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

f) To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

g) Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

h) BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent

-7-

in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

The arbitration clause in Section 17.10 of the Shareholders' Agreement is substantially identical to that in Section 16.10 of the Framework Agreement, except for provisions concerning multiparty arbitration and joinder, which were not relevant for the purposes of the arbitration proceedings. *See* Blackman Decl., Ex. C (Shareholders' Agreement) § 17.10; *see also* Blackman Decl., Ex. A (Final Award) ¶ 25.

In accordance with the arbitration clauses in the Joint Venture Agreements, each of the parties nominated one arbitrator, who jointly selected a chairperson. Vale nominated as its party arbitrator Sir David Williams QC, and BSGR nominated Michael Hwang SC (together, the "Co-Arbitrators"). Blackman Decl., Ex. A (Final Award) ¶ 26. The Co-Arbitrators in turn nominated Judge Charles Brower, formerly a member of the Iran-U.S. Claims Tribunal and a judge at the International Court of Justice, as the Chairman of the Tribunal. *See id.* ¶ 27.

### III.   BSGR's Efforts to Disrupt the LCIA Arbitration[3]

During the course of the arbitration, BSGR employed a strategy of obstruction and delay. It made repeated requests to stay the proceedings, Blackman Decl., Ex. A (Final Award) ¶¶ 29, 36, 73-81, 100; did not comply with document production orders, *id.* ¶¶ 48, 50-51, 54-55, 131; made multiple efforts to remove the arbitrators (including its own party-appointed arbitrator), *id.* ¶¶ 65, 100, 112, 133; and failed to lodge its share of payments required by the LCIA for the costs of the arbitration, *id.* ¶¶ 144, 158-59.

For example, in May 2016, just three months before the merits hearing had been

---

[3]      The procedural history of the five-year arbitration is summarized at length in paragraphs 26 to 171 of the Final Award. *See* Blackman Decl., Ex. A (Final Award) ¶¶ 26-171.

scheduled to start in August 2016, BSGR challenged all three members of the arbitral tribunal on a number of grounds, alleging bias, unfairness, and inappropriate delegation of their duties. *Id.* ¶¶ 65-67. An independent Division of the LCIA Court,[4] chaired by Peter Rees QC, rejected four of BSGR's five grounds for its challenge, including both grounds applicable to the Co-Arbitrators, but upheld the challenge to Judge Brower on the basis that there were circumstances giving rise to justifiable doubts about his independence or impartiality based on certain anonymized comments he had made at an arbitration conference. *Id.* ¶ 82.

BSGR objected when the Co-Arbitrators proposed to use the Parties' original list of candidates to select Professor William Park as the new Chairman of the Tribunal. *Id.* ¶¶ 87-89. On August 17, 2016, the LCIA Court formally revoked the appointment of Judge Brower and appointed Professor Dr. Filip De Ly as the new Chairman of the Tribunal. *Id.* ¶ 96. BSGR has never challenged the appointment of Chairman De Ly. BSGR then filed a second challenge to the Co-Arbitrators before the LCIA Court and a stay application to the Arbitral Tribunal on August 23, 2016, just six days before the merits hearing had been scheduled to begin on August 29, 2016. *Id.* ¶ 100.[5]

At the same time, BSGR initiated proceedings before the English High Court seeking to remove the Co-Arbitrators on the same grounds the LCIA Court had previously rejected in connection with BSGR's first challenge (the "High Court Challenge"). *Id.* ¶ 112. In connection with the High Court Challenge, BSGR also sought disclosure orders against the Co-Arbitrators before the English High Court, as well as a petition in the United States District Court for the

---

[4]     The LCIA Court is a body composed of a distinguished group of arbitration practitioners that officially carries out certain functions under the LCIA Rules, including appointing and where appropriate revoking the appointment of arbitrators.

[5]     In total, BSGR made *four* separate applications to stay the arbitration on October 20, 2014, May 20, 2015, August 23, 2016, and March 30, 2018. Blackman Decl., Ex. A (Final Award) ¶¶ 29, 36, 100, 156.

District of Columbia for an order compelling discovery in aid of a foreign judicial proceeding. *See In re Application Pursuant to 28 U.S.C. § 1782 of BSG Resources Ltd.*, Case No. 16-mc-02552-BAH (D.D.C. Dec. 20, 2016).

*All* of BSGR's attempts to remove the Co-Arbitrators were unsuccessful. The LCIA Court dismissed BSGR's second challenge to the Co-Arbitrators in December 2016. Blackman Decl., Ex. A (Final Award) ¶ 120. In February 2017, the English High Court dismissed both the disclosure application and substantive challenge. *See P v Q and Ors* [2017] EWHC 148 (Comm) (rejecting BSGR's disclosure application); *P v Q and Ors* [2017] EWHC 194 (Comm) (rejecting BSGR's substantive challenge). The English High Court characterized BSGR's challenge as "totally without merit," and noted that BSGR's application "mischaracterized the nature of some of the underlying proceedings in a way which was seriously misleading." *Id.* BSGR's application to the U.K. Court of Appeal for permission to appeal the disclosure judgment and its application was then summarily dismissed, *BSG Resources Ltd v Vale S.A. and Ors* [2017] A3/2017/0298 (Court of Appeal, Civil Division), after which BSGR voluntarily dismissed its § 1782 petition.

By repeatedly challenging the Arbitrators, BSGR succeeded in postponing the merits hearing, which had originally been scheduled to begin on August 29, 2016. In its place, on September 2016, the newly reconstituted Tribunal held an educatory hearing (the "Educatory Hearing") for the new Chairman of the Tribunal. Blackman Decl., Ex. A (Final Award) ¶¶ 14, 101-11. BSGR refused to attend the Educatory Hearing, even though one of its purposes was to address the numerous procedural applications that BSGR had made, including its requests that the Tribunal revisit its prior procedural orders and its extraordinary demand that the new Chairman of the Tribunal be precluded from reviewing the existing evidentiary record of the

Arbitration pending that process.  *Id.* ¶¶ 103-11.  On January 31, 2017, BSGR announced to Vale and the Tribunal that it also would not attend the re-scheduled merits hearing.  *Id.* ¶ 130.

The Tribunal finally held the merits hearing from February 20, 2017 to February 22, 2017 (the "Merits Hearing").  Vale attended and presented its fact and expert witnesses for cross-examination from the Tribunal.  *Id.* ¶ 139.  Although the Tribunal invited BSGR to attend the Merits Hearing, *id.* ¶ 132, and gave notice of the hearing to BSGR, *id.* ¶ 138, BSGR made a deliberate decision not to attend or to produce its witnesses for cross examination, *id.* ¶ 140.  Nonetheless, counsel for BSGR continued to correspond with the Tribunal during the course of both hearings, including after the Merits Hearing had concluded, *see generally*, *id.* ¶¶ 140-61, and at the Tribunal's direction, BSGR was provided with daily transcripts from the Educatory and Merits Hearing so that it could follow the proceedings.  *Id.* ¶¶ 107, 140.

In short, BSGR took every opportunity, and has made every attempt, to delay, frustrate, and derail the arbitration, reflecting BSGR's desire to do all that it could to prevent the Tribunal from being able to finally adjudicate the claims Vale had brought against it, although it ultimately failed in this effort.

## IV.    BSGR's Legal Proceedings Ancillary to the Arbitration

In parallel with BSGR's efforts to delay a hearing on the merits of Vale's case, it also filed several proceedings in various jurisdictions seeking to blame third parties for the revocation of its mining rights.

First, on September 8, 2014, over four months after Vale had initiated the LCIA arbitration, BSGR filed an arbitration against the Republic of Guinea before the International Centre of Settlement of Investment Disputes ("ICSID"), claiming that Guinea had violated its purported rights under Guinean and international law.  *Id.* ¶ 29.  Recent press reports suggest that BSGR and the Republic of Guinea may be in discussions to resolve the ICSID arbitration, under

circumstances that remain obscure, although these discussions have no bearing on the Final

Award or this Petition to enforce it.  *See id.* ¶ 1001.

Second, and relevant to jurisdiction over BSGR for purposes of the instant Petition, on

April 14, 2017, BSGR and two subsidiaries filed a complaint in the District Court for the

Southern District of New York against George Soros, a New York resident, and related entities,

also residents of New York, for tortious interference with contract, conspiracy, fraud,

misrepresentation, defamation, and prima facie tort.  Compl., *BSG Res. (Guinea) Ltd. v. Soros*,

No. 17-cv-2726-JFK-OTW (S.D.N.Y. Apr. 14, 2017), ECF No. 1.  BSGR alleged that Soros was

responsible for the revocation of its Guinean mining concession that led to the LCIA Arbitration,

and demanded at least $10 billion in damages.  *Id.*  On November 29, 2017, Judge Keenan

granted defendants' motion to stay the action pending the outcome of the ICSID arbitration.  Op.

& Order, *Soros*, No. 17-cv-2726-JFK-OTW (S.D.N.Y. Nov. 29, 2017), ECF No. 136.

**V.      The Final Award**

The Tribunal issued its 281-page Final Award on April 4, 2019, holding BSGR liable on

each of Vale's claims, and awarding Vale $1,246,580,846 in damages, as well as pre- and post-

award interest, costs, and legal fees.  Blackman Decl., Ex. A (Final Award) ¶ 1005.

The Tribunal found BSGR liable for fraudulent misrepresentations, and awarded Vale all

asserted damages based on this claim.  The Tribunal found that BSGR made a litany of false

statements to Vale, including through Vale's U.S. counsel, during the due diligence process.

The Tribunal held that BSGR's misrepresentations included:

(i)      BSGR failed to disclose all of its consultants and agents, including (a) an entity
         called Pentler, and its principals, Frédéric Cilins, Michael Noy, and Avraham Lev
         Ran, who bribed Mme Touré, the fourth wife of the President of Guinea, Blackman
         Decl., Ex. A (Final Award) ¶¶ 398-430; (b) Ghassan Boutros, who BSGR paid for
         a sham transaction involving the supposed purchase of machinery that was actually

a disguised payment to Mme Touré, *id.* ¶¶ 430-60; and (c) Guinea's former Economy and Finance Minister, Ibrahima Kassory Fofana, who met with the Guinean Minister of Mines to discuss BSGR's application to obtain the mining concessions, *id.* ¶¶ 461-66.  BSGR also failed to disclose its agreements with these consultants and agents. *Id.* ¶¶ 470-94.

(ii)     BSGR falsely represented to Vale that it had disclosed all documents related to the shareholder structure of certain subsidiaries, while withholding key documents that "clearly fell within this due diligence request." *Id.* ¶¶ 495-515.

(iii)    BSGR falsely represented to Vale that it had disclosed all relevant pending disputes, when it was aware of two pending disputes with individuals in Guinea. *Id.* ¶¶ 526-40.

(iv)     BSGR misleadingly described its role in the Government of Guinea's decision to withdraw mining rights of Rio Tinto plc, which had previously held the concession for Simandou Blocks 1 & 2.  BSGR's involvement in this decision had included Steinmetz meeting with the President of Guinea and Mme Touré to discuss the revocation of Rio Tinto's rights, and Fofana (one of BSGR's undisclosed consultants) lobbying government officials on BSGR's behalf. *Id.* ¶¶ 555-69.

(v)      BSGR falsely represented to Vale that it had no financial relationships with government officials or their spouses and that it had not made any payments to government officials in connection with obtaining the mining rights.  In fact, BSGR entered into multiple contracts with and made several payments through U.S. wires to Mme Touré and a company she owned called Matinda & Co.  Mme Touré had also been indirectly granted shares in BSGR Guinea, a subsidiary of BSGR, by being issued shares in Pentler. *Id.* ¶¶ 570-578.

(vi)     Finally, BSGR falsely represented to Vale that it had not engaged in bribery or corruption, including in due diligence questionnaires and a written anti-bribery certification from Steinmetz himself that BSGR had not engaged in any bribery or corruption.  The Tribunal found that BSGR was liable for statements made by

-13-

Steinmetz as its agent (and not a mere "external advisor" as he had asserted).  *Id.*
¶¶ 700, 712.

The Tribunal found that BSGR had bribed Mme Touré by devising a structure through
which Pentler was interposed between BSGR and Mme Touré so that Mme Touré could be
issued shares in BSGR Guinea.  *Id.* ¶¶ 579-637.  Specifically, the Tribunal found that there was
"cogent evidence" that BSGR "set up an intermediary that could then effect payments to Mme
Touré in accordance with BSGR's wishes," including payments made to Mme Touré; that Mme
Touré "had exercised influence on President Conté in his decision-making" and "assisted in
influencing President Conté's decision to revoke Rio Tinto's [mining] rights and give them to
BSGR"; and that BSGR "*knew* that the offer of shares [to her] . . . was for the purpose of
securing Mme Touré's assistance in influencing President Conté."  *Id.* ¶¶ 604, 629, 631, 637.

The Tribunal also found that BSGR made payments to former Guinean Minister of Mines
Mahmoud Thiam, including money used for the purchase of 771 Duell Road in Millbrook, NY
(located in Dutchess County, within the Southern District of New York).  *Id.* ¶ 651.[6]

The Tribunal found that these misrepresentations in the aggregate established a pattern of
conduct designed to hide the roles that Pentler and Mme Touré played in procuring the mining
rights, that BSGR intended that Vale should act in reliance on these false and misleading
representations, and that Vale acted in reliance on these misrepresentations and suffered loss as a
result.  *Id.* ¶¶ 713-42.  In the alternative, it held that it would find BSGR liable for breaches of
warranties and frustration of contract.  *Id.* ¶¶ 756-845.

Having found BSGR liable for fraudulent misrepresentations, breaches of warranties, and

---

[6]      Thiam was convicted in 2017 in this Court on charges that he accepted $8,500,000 from senior officers of a
Chinese conglomerate in exchange for his assistance in securing mining rights for the conglomerate in Guinea, and
sentenced by Judge Cote to seven years' imprisonment and three years of supervised release.  *Id.* ¶ 652; Judgment,
*United States v. Thiam*, No. 17-cr-47-DLC (S.D.N.Y. Aug. 28, 2017), ECF No. 136.

frustration, the Tribunal awarded Vale:

(i)     damages of $1,246,580,846 (the "<u>Damages</u>");

(ii)    pre-award interest on the Damages at a rate of LIBOR USD 3-month plus 7%;

(iii)   GBP 1,413,565.42 representing the costs of the arbitration that Vale paid on BSGR's behalf (the "<u>Arbitration Costs</u>");

(iv)    $16,000,000 for Vale's legal fees and related expenses (the "<u>Legal Costs</u>"); and

(v)     post-award interest on the Damages, the Arbitration Costs and the Legal Costs at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment.

<u>**ARGUMENT**</u>

**I.    This Court Has Jurisdiction To Enforce The Final Award**

A.    <u>This Court Has Subject Matter Jurisdiction</u>

Recognition and enforcement of the Final Award is governed by the New York Convention, which is codified in the FAA at 9 U.S.C. §§ 201-208.  The "New York Convention applies to arbitral awards 'made' in a foreign country that a party seeks to enforce in the United States (known as foreign arbitral awards)." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70-71 (2d Cir. 2017) (quoting Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration § 1-1(i),(k),(o) (Am. Law Inst., Tentative Draft No. 2, 2012)).  The Final Award was made in the United Kingdom and is therefore a foreign arbitral award governed by the New York Convention.  *See id.* (an award is "made" in the country of the "arbitral seat").

The FAA states that "[t]he district courts of the United States . . . shall have original jurisdiction" over any "action or proceeding falling under the New York Convention."  9 U.S.C. § 203.  Because this petition falls under the New York Convention, this Court has subject matter jurisdiction over this dispute.

B.     This Court Has Personal Jurisdiction

In an action to recognize and enforce an arbitral award, personal jurisdiction may arise from "the respondent's residence, his conduct, his consent, the location of his property or otherwise." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Rep.*, 582 F.3d 393, 397 (2d Cir. 2009) (citation omitted).  Here, there are several bases that permit this Court to exercise jurisdiction over BSGR.

1.  *Quasi in rem jurisdiction*

Because "minimal contacts are not required for a court to exercise jurisdiction over assets to permit a party to collect on an arbitration award," this Court has jurisdiction to grant Vale's Petition through its *quasi in rem* jurisdiction over BSGR's assets in this District.  *CME Media Enters. B.V. v. Zelezny*, No. 01 CIV. 1733 (DC), 2001 WL 1035138, at *4 (S.D.N.Y. Sept. 10, 2001); *Crescendo Mar. Co. v. Bank of Commc'ns Co.*, No. 15 Civ. 4481(JFK), 2016 WL 750351, at *5 n.2 (S.D.N.Y. Feb. 22, 2016) (holding that "*quasi in rem* jurisdiction provides an independent basis on which to hear [a] petition" to recognize and enforce an arbitral award). Here, this Court has quasi in rem jurisdiction to hear the petition and enforce the Final Award because BSGR maintains property in New York that includes, *inter alia*, at least one New York bank account, a property interest in a pending $10 billion claim in New York against a New York resident, and in the form of real property held by an agent of the Respondent.

At least as of the date of the Joint Venture Agreements, BSGR maintained a bank account at JPM Morgan Chase Bank, N.A. New York.  *See CME Media Enters.*, 2001 WL 1035138, at *3 (finding that there is "quasi in rem jurisdiction because respondent maintains property, specifically, [a bank account containing a balance of $0.05], in this District").  In fact, BSGR designated this account as "BSGR's Bank Account" in the Framework Agreement – the account through which it would receive "[a]ny payment to be made to BSGR pursuant to [the Framework

Agreement] by Vale."  Blackman Decl., Ex. B (Framework Agreement) ¶ 12.1; p. 38.

Additionally, as has been widely reported, BSGR's agent and namesake, Beny Steinmetz, holds,

himself or through intermediaries, substantial real property in New York.[7]

Furthermore, BSGR has a substantial interest in property located in New York in the

form of its $10 billion claim against George Soros, a New York resident, currently pending

before this very Court.  *See Loucks v. Standard Oil Co. of N.Y.*, 224 N.Y. 99, 110 (1918)

(Cardozo, *J.*) ("A right of action is property."); *ABKCO Indus., Inc. v. Apple Films*, 39 N.Y.2d

670, 675 (1976) (situs of an intangible contract rights in a licensing agreement "is in New York

where there is to be found the other party to the [l]icensing [a]greement, . . . upon whom rests the

obligation of performance."); *accord Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 316

(2010) ("Where the asset being pursued [for attachment] is a claim that the judgment debtor has

against the garnishee, the garnishee's New York presence enables suit on the claim to be brought

in New York and thus . . . gives the claim a New York situs.") (citation omitted).[8]

   2.  *N.Y. C.P.L.R. § 302 and Federal Rule of Civil Procedure 4(k)(2)*

Additional bases for jurisdiction also exist under either New York's long arm statute,

N.Y. C.P.L.R. § 302, or Federal Rule of Civil Procedure 4(k)(2), which permits a party not

subject to personal jurisdiction in any particular state to be subject to personal jurisdiction in an

action based on federal law in any district court based on its contacts with the United States as a

---

[7]    *See, e.g.*, Jesse Drucker, *Bribe Cases, a Jared Kushner Partner and Potential Conflicts*, N.Y. TIMES, Apr.
26, 2017, https://www.nytimes.com/2017/04/26/us/politics/jared-kushner-beny-steinmetz.html.

[8]    *See also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 241 (2d Cir.
2016) ("[A] claim for money damages – a 'chose in action' – is 'a constitutionally recognized property
interest . . . .'") (quoting *Phillips Petroleum v. Shutts*, 472 U.S. 797, 807 (1985)); *Moore v. Nassau Cty. Dep't of
Pub. Transp.*, 78 Misc. 2d 1066, 1070-71, (N.Y. Sup. Ct. 1974) ("The case law in New York unanimously holds that
choses in action for personal injuries are personal property."); *HBC Hamburg Bulk Carriers GMBH & Co. KG v.
Proteinas y Oleicos S.A. de C.V.*, No. 04 CIV. 6884 (NRB), 2005 WL 1036127, at *3 n. 6 (S.D.N.Y. May 4, 2005)
("In addition to tangible property, service of quasi in rem process can also be used to reach a variety of intangible
property, such as bank accounts, accounts receivable, and other debts owed to the defendant.") (quoting 29 Moore's
Federal Practice, § 705.04[2][c] (Matthew Bender 3d ed.)).

whole.  *See Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) (vacating district

court's dismissal for lack of personal jurisdiction and directing district court to reconsider

whether it had jurisdiction under Fed. R. Civ. P. 4(k)(2)).

Personal jurisdiction under New York's long arm statute, N.Y. C.P.L.R. § 302(a)(4), is

present because BSGR is a "non-domiciliary" which, through its "agent[s]," "owns, uses or

possesses any real property situated within the state."  Specifically, as noted above, Beny

Steinmetz – an agent of BSGR – maintains property in New York.  Further, BSGR has

repeatedly and purposefully had contacts with the United States and availed itself of forums in

the United States, including New York.  For instance:

- As noted above, BSGR designated an account at JPMorgan Chase Bank, N.A. in
  New York to be "BSGR's Bank Account" – the account to which Vale would
  make "any payment" to BSGR pursuant to the Framework Agreement for
  forwarding to other accounts held by BSGR.  Vale's payments into this account
  include the initial $500 million in consideration that BSGR fraudulently received
  from Vale upon signing the Joint Venture Agreements and which forms a
  substantial portion of the Tribunal's damages award that Vale seeks to recover in
  this action.[9]

- As noted above, BSGR has brought a US$10 billion claim in this Court against
  George Soros to allege that he was responsible for the same revocation of the
  Simandou mining concession that led this Arbitration.  Also, in connection with
  this Arbitration, BSGR sought out a U.S. forum to pursue an order compelling
  discovery in aid of a foreign judicial proceeding under 28 U.S.C. § 1782.  An
  entity like BSGR, which repeatedly elects to file lawsuits in this District and in

---

[9]    *Peterson v. Islamic Rep. of Iran*, No. 10 CIV. 4518 KBF, 2013 WL 1155576, at *14 (S.D.N.Y. Mar. 13,
2013) (use of correspondent bank sufficient to find jurisdiction under New York law when "complaints alleging a
foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of
dealing'. . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a
stable and fungible currency, and the predictable jurisdictional and commercial law of the United States" and there
was relatedness between the use of the correspondent bank and the claim at issue) (internal citations omitted).

the United States – especially on issues related to the subject matter of the proceedings that yielded the Final Award – cannot plausibly argue that it could not "anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

- BSGR has used its agent, Frédéric Cilins, to bribe and silence Mamadie Touré in the United States to ensure that it received and kept its mining concession at Simandou.  Mr. Cilins's activities on behalf of BSGR in the United States were such that not only was he arrested in Florida but the U.S. Department of Justice also established venue in the Southern District of New York to support Mr. Cilins's guilty plea in this District.

- BSGR's modus operandi has been to facilitate real estate purchases in the United States by the subjects of its corrupt payments, including Mamadie Touré in Florida[10] and Mahmoud Thiam in New York, *see* Blackman Decl., Ex. A (Final Award) ¶ 651.

- BSGR was able to enter into the Joint Venture with Vale only after making misrepresentations about the means by which it acquired its mining rights to Vale's U.S. counsel in Washington D.C. and New York.

- As shown in its designation of a New York account as "BSGR's Bank Account" in the Framework Agreement, BSGR routinely uses U.S. wires and made dollar-denominated payments.  After entering into the joint venture, BSGR continued to use a U.S. bank account held by the VBG Joint Venture.  In addition, the U.S. government charged BSGR's agent for using U.S. wires to make payments to Mamadie Touré in order to keep BSGR's corrupt activities and the subject of its misrepresentations from coming to light.[11]

Taken together, these contacts are more than sufficient to establish personal jurisdiction

---

[10]     *See* Stipulated Settlement Between United States and Mamadie Touré, *United States v. Real Property*, No. 14-cv-01428-TJC-PDB (M.D. Fl. Feb. 1, 2016), ECF No. 36; Compl.¶ 19, *Real Property*, No. 14-cv-01428 (M.D. Fl. Nov. 21, 2014), ECF No. 1.

[11]     Compl.¶¶ 8, 14, *United States v. Cilins,* No. 13-cr-315 (S.D.N.Y. Apr. 15, 2013), ECF No. 1.

over BSGR, whether under the New York long arm statute or under Rule 4(k)(2). *See Dardana*, 317 F.3d at 207 (jurisdiction under Rule 4(k)(2) is proper "so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment") (citation omitted).

**II.      The FAA Requires Recognition and Enforcement of the Final Award**

The FAA provides that, within three years of the issuance of an arbitral award, a party to a foreign arbitration may apply "for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207. The FAA further mandates that "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." *Id.*

The Second Circuit has clarified that in the case of a foreign arbitral award, as is relevant here, the "proper term for the single-step process in which a federal district court engages" is "[e]nforcement," not "confirmation." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 74 (2d Cir. 2017); *see also id.* at 79 ("[C]onfirmation of a foreign arbitral award prior to enforcement is unnecessary under the New York Convention and Chapter 2 of the FAA."). It is "evident," however, that "the term 'confirm' as used in Section 207 is the equivalent of 'recognition and enforcement' as used in the New York Convention for the purposes of foreign arbitral awards." *Id.* at 72. Thus, "when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award *only* on the grounds explicitly set forth in Article V of the Convention." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (emphasis added).

An action to confirm – or to recognize and enforce – an arbitration award "is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Id.* at 23. Given the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), and the New York

Convention's "general pro-enforcement bias," *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974), the "procedure for obtaining enforcement of a foreign [arbitral] award is straightforward," *Jiangsu Changlong Chems., Co. v. Burlington Bio-Medical & Sci. Corp.*, 399 F. Supp. 2d 165, 168 (E.D.N.Y. 2005), and the burden facing any party opposing enforcement is a "heavy" one, *Telenor Mobile Commc'ns A.S. v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009).

"The party seeking enforcement need only submit an authentic copy of the award, the agreement to arbitrate and, if the award is in a language other than English, a duly certified translation." *Jiangsu Changlong Chemicals*, 399 F. Supp. 2d at 168 (citing N.Y. Convention, art. IV). Then, "[u]pon submission of these materials, a party resisting confirmation bears the burden of showing that one of the circumstances warranting denial of enforcement, as set forth in the [New York] Convention, is present." *Id.*; *see also Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 19.

Article V of the New York Convention "provides the exclusive grounds for refusing confirmation under the Convention." *Id.* at 20. Thus, recognition and enforcement may be refused by a court only if the party opposing enforcement proves:

    a) The parties to the agreement . . . were . . . under some incapacity, or the said agreement is not valid . . .;

    b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;

    c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . .;

    d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ; or

    e) The award has not yet become binding on the parties, or has been set

aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

N.Y. Convention art. V(1).  Article V(2) also allows enforcement to be refused if "[t]he subject matter of the difference is not capable of settlement by arbitration," or if "recognition or enforcement of the award would be contrary to the public policy" of the country in which enforcement or recognition is sought.  *Id.* art. V(2).

In this case, Petitioner has satisfied the requirements for obtaining recognition and enforcement of the Final Award by submitting an authentic copy of the Final Award and the applicable agreements to arbitrate, both in the original English language, as attachments to its Petition.

None of the aforementioned narrow exceptions to enforcement applies here.  BSGR has never previously challenged the validity of the arbitration agreements.  *Id.* art. V(1)(a).  Nor is there any question that the Final Award is final and binding and that it addresses a dispute contemplated by the terms of the broadly-worded arbitration clauses in the Joint Venture Agreements.  *Id.* art. V(1)(c); *id.* art. V(1)(e); *see* Blackman Decl., Ex. B (Framework Agreement) § 16.10 (subjecting to arbitration "[a]ny dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement" and noting that the award "shall be final and binding on the parties to the arbitration"); Blackman Decl., Ex. C (Shareholders' Agreement) § 17.10 (same).

BSGR also cannot establish that it was not given proper notice to appoint the tribunal members or was otherwise deprived of an opportunity to present its case.  N.Y. Convention art. V(1)(b).  While BSGR *did* seek to delay, frustrate, or otherwise derail the arbitration in order to avoid a final resolution of Vale's claims, it actively participated in the proceedings from the start.

Indeed, even after BSGR made a tactical decision to boycott both the Educatory Hearing and

Merits Hearing, it continued to participate in the LCIA Arbitration through correspondence with

the Tribunal, both *during the boycotted hearings* (for which it received daily transcripts at the

end of each hearing day via email, *see* Blackman Decl., Ex. A (Final Award) ¶¶ 107, 140, and

after the hearings had concluded.

In any event, a party's tactical refusal to attend a hearing is not among the narrow

grounds recognized to permit a court to refuse enforcement of a foreign arbitral award.  Courts

regularly enforce arbitral awards notwithstanding a respondent's default and they uniformly deny

Article V(1)(b) defenses in cases where, as here, the respondent was "apprised of every step of

the arbitration process" and its "failure to participate was a decision that was reached only after

[it] had full knowledge of the peril at which it acted."  *Geotech Lizenz AG v. Evergreen Sys.,

Inc.*, 697 F. Supp. 1248, 1253 (E.D.N.Y. 1988).[12]  In this case, the Final Award contains a 145-

paragraph "Procedural History" that painstakingly recounts the steps the Tribunal took to

accommodate BSGR and provide it with opportunities to cure its defaults.  *See, e.g.*, Blackman

Decl., Ex. A (Final Award) ¶¶ 103-107, 117-119, 132.  Further, notwithstanding BSGR's failure

to appear at the hearings, the Tribunal made clear that it did not take Vale's representations "as

granted" and instead considered that evidence "against the evidence in writing produced by

BSGR in its factual exhibits, its witness statements and its expert report."  *Id.* ¶ 171.  In these

circumstances, where the Tribunal unquestionably respected an obstructionist party's due

---

[12]      *See also Arbitration between Overseas Cosmos, Inc. and NR Vessel Corp.*, No. 97 Civ. 5898(DC), 1997
WL 757041, at *4 (S.D.N.Y. Dec. 8, 1997) (denying Article V(1)(b) defense where "[r]espondent's alleged lack of
participation in the arbitration proceeding, even if true, could only be interpreted as intentional"); *Yukos Capital
S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 294-98 (S.D.N.Y. 2013) (applying U.S. due process
standards to enforce award where respondent alleged it had not received notice of the arbitration and where a foreign
court had found notices to be inadequate); *Yiwu Bochi Imp. & Exp. Co. v. Wilson Star Corp.*, 18 Cv. 11997(RMB),
2019 WL 1613299 (S.D.N.Y. Feb. 4, 2019) (enforcing award where respondent failed to participate in arbitration);
*see also Crescendo Maritime Co. v. Bank of Commc'ns Co.*, 15 Civ. 4481 (JFK), 2016 WL 750351, at *3 (S.D.N.Y.
Feb. 22, 2016) (enforcing award where respondent refused to participate in the hearing).

process rights, there can be no basis for non-enforcement under Article V(1)(b).

BSGR also cannot establish that the composition of the Tribunal or arbitral procedure was improper.  *See* N.Y. Convention art. V(1)(d).  Although BSGR challenged two members of the Tribunal – including the co-arbitrator that *it* had itself appointed – in its efforts to disrupt the proceedings, the Tribunal was properly composed in accord with the parties' agreements.  The two co-arbitrators that BSGR had challenged, Dr. Michael Hwang, SC, and Sir David A.R. Williams, QC, were both directly nominated by the parties, consistent with the plain language of the arbitration agreements.  *See* Blackman Decl., Ex. B (Framework Agreement) § 16.10(b); Ex. C (Shareholders' Agreement) § 17.10(b).  Ultimately, BSGR's efforts to remove the co-arbitrators were twice rejected by an independent Division of the LCIA Court, Blackman Decl., Ex. A (Final Award) ¶¶ 82, 120, and separately denied as meritless by the English High Court, *id.* ¶ 133.[13]

Finally, neither of the two grounds for refusing annulment under Article V(2) can apply here.  The subject matter of the dispute – claims of fraudulent misrepresentation, breach of warranties, and frustration in the context of a joint venture agreement – is certainly one that can be subject to arbitration.  *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) (compelling arbitration of fraudulent inducement claim).  The last potential defense that BSGR can raise – the "public policy" exception to enforcement – cannot apply here, especially given that this limitation "must be 'construed very narrowly'" by courts to avoid "undermin[ing] the underlying scheme of the FAA and the New York Convention."  *See Telenor*

---

[13]     The first Tribunal chairperson, Judge Charles Brower, was removed after the LCIA Division found that he had made statements at an arbitration conference that gave rise to an appearance of partiality.  Blackman Decl., Ex. A (Final Award) ¶ 82.  Ultimately, Judge Brower was replaced by the LCIA Court with Professor Dr. Filip De Ly, pursuant to Articles 5.5 and 11 of the LCIA Rules.  *Id.* ¶ 96.  BSGR has not taken issue with Professor Dr. De Ly's appointment and therefore cannot contend that it is a basis for non-enforcement of the Final Award.

*Mobile Commc'ns A.S. v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009) (citation omitted).

## CONCLUSION

For the foregoing reasons, Petitioner Vale respectfully requests that the Court recognize and enforce the Final Award in its entirety, together with such other and further relief as the Court deems just and proper, and enter judgment against Respondent BSGR accordingly.

Dated: April 23, 2019
      New York, New York

                                     Respectfully submitted,

                                     /s/ Jonathan I. Blackman
                                     Jonathan I. Blackman
                                     (jblackman@cgsh.com)
                                     Jeffrey A. Rosenthal
                                     (jrosenthal@cgsh.com)
                                     Emily J. Balter
                                     (ebalter@cgsh.com)
                                     Samuel L. Levander
                                     (slevander@cgsh.com)

                                     CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                     One Liberty Plaza
                                     New York, New York  10006
                                     T: 212-225-2000
                                     F: 212-225-3999

                                     *Counsel for Petitioner Vale S.A.*