**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VALE S.A.

     Petitioner,

  v.

BSG RESOURCES LIMITED,

     Respondent.

Case No. 19-cv-3619-VSB

Hon. Vernon S. Broderick

### DECLARATION OF FREDERICK D. HYMAN IN SUPPORT OF BSG RESOURCES LIMITED'S CROSS-MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO ADJOURN THE DECISION ON ENFORCEMENT OF THE AWARD

I, Frederick D. Hyman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am an attorney duly admitted to practice before this Court, and I am a partner of the law firm Duane Morris LLP, counsel for BSG Resources Limited ("BSGR"). I respectfully submit this declaration in connection with BSGR's Cross-Motion to Dismiss or, in the Alternative, to Adjourn the Decision on the Enforcement of the Award.

2.  Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Arbitration Claim Form that Vale filed with the High Court of Justice, Business and Property Courts of England and Wales Commercial Court (QBD) (the "English High Court") on April 18, 2019, requesting that the court entry of an order enforcing the final arbitration award in the arbitration captioned *Vale S.A. v. BSG Resources Limited*, LCIA Arbitration No. 142683 (the "Award").

3.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Enforcement Order issued by the English High Court on May 9, 2019, enforcing the Award.

4.     Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Arbitration Claim Form that BSGR filed with the English High Court on May 10, 2019, challenging the Award on the basis of serious procedural irregularities.

5.     Attached hereto as <u>Exhibit D</u> is a true and correct copy of the application that BSGR filed with the English High Court on May 23, 2019, seeking to set aside the Award based on the substantive challenge attached as Exhibit C.

6.     Attached hereto as <u>Exhibit E</u> is a true and correct copy of the Chapter 15 Petition for Recognition of a Foreign Proceeding that BSGR filed in the Southern District of New York on June 3, 2019, initiating the proceeding captioned *In re BSG Resources Limited*, Case No. 19-11845 (the "Bankruptcy Proceeding").

7.     Attached hereto as <u>Exhibit F</u> is a true and correct copy of the Ex Parte Application for Temporary Restraining Order and Relief Pursuant to Sections 1519 and 105(A) of the Bankruptcy Code that BSGR filed on June 3, 2019 in the Bankruptcy Proceeding.

8.     Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Declaration of Malcolm Cohen that BSGR filed in the Bankruptcy Proceeding in support of its Chapter 15 petition and application for a temporary restraining order.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 4, 2019 in New York, New York.

<u>/s/ Frederick D. Hyman</u>
Frederick D. Hyman

DUANE MORRIS LLP
1540 Broadway
New York, NY 10036-4086
RHyman@duanemorris.com
T: (212) 692-1063
F: (212) 208-2969

# EXHIBIT A



# Claim form
## (arbitration)

**In the High Court of Justice**
**Business and Property Courts of England**
**and Wales**
**Commercial Court (QBD)**

*for court use only*

| | |
|---|---|
| Claim No. | |
| Issue date | |

18 Apr 2019

CL-2019-000269

## In an arbitration claim between

Claimant
Vale S.A.
c/o Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London EC2Y 5AU

SEAL

Defendant(s)
BSG Resources Limited
West Wing
Frances House
Sir William Place
St Peter Port
Guernsey
GY1 1GX

## In the matter of an arbitration between

Claimant
Vale S.A.

Respondent(s)  *Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

BSG Resources Limited, respondents in the arbitration and defendant in these proceedings
West Wing, Frances House, Sir William Place, St Peter Port, Guernsey GY1 1GX

Defendant's
name and
address

BSG Resources Limited
West Wing
Frances House
Sir William Place
St Peter Port
Guernsey
GY1 1GX

[ ] This claim will be heard on:

at        am/pm

[ x ] This claim is made without notice.

**N8** Claim form (arbitration)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

| Claim No. | |
|---|---|

## Remedy claimed and grounds on which claim is made

1.  The Claimant and Defendant entered into a Joint Venture Framework Agreement (the "**Framework Agreement**") and a Shareholders' Agreement on 30 April 2010 (collectively, the "**Agreements**").

2.  Section 16.10 of the Framework Agreement contained an arbitration agreement referring all disputes to arbitration in London, England, in accordance with the LCIA Rules 1998.

3.  By a request for arbitration dated 28 April 2014, the Claimant initiated arbitration proceedings (LCIA Case No. 142683) against the Defendant seeking recovery of sums owed in connection with the Agreements, costs and interest.

4.  The Defendant denied the Claimant's claims and counterclaimed against the Claimant for alleged breaches of the Agreements.

5.  The seat of the arbitration was and is in London, England. Both parties participated fully in all aspects of the arbitration proceedings up to the merits hearing and an associated preparatory hearing, both of which BSGR declined to attend. BSGR continued to participate by way of correspondence only, up to the date of the Award (as defined below).

6.  The tribunal made a final award in favour of the Claimant dated 4 April 2019 (the "**Award**").

7.  Pursuant to the Award, the tribunal ordered the Defendant to pay the Claimant as follows:

    a.  damages of US$ 1,246,580,846 (the "**Damages**");

    b.  pre-award interest on the Damages at a rate of LIBOR USD 3-month plus 7%;

    c.  GBP 1,413,565.42 representing the costs of the arbitration that the Defendant had failed to pay and the Claimant had paid instead;

    d.  US$ 16,000,000 in respect of the Claimant's legal fees; and

    e.  post-award interest at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment.

8.  The Defendant has failed to comply with the terms of the Award in full or at all. The sums specified at paragraph 7 above remain outstanding, with interest continuing to accrue.

9.  The Claimant seeks permission to enforce the Award in the same manner as a judgment or order of the High Court to the same effect, pursuant to section 66(1) of the Arbitration Act 1996, excluding the post-award interest awarded on the costs of the arbitration in the Award pending the correction of the currency of the rate of interest awarded on the costs of the arbitration. It reserves the right later, in its discretion, to seek to enter judgment in terms of the Award pursuant to section 66(2) of the Arbitration Act 1996.

10. If permission is granted to the Claimant under section 66(1) of the Arbitration Act 1996, the Claimant reserves the right in due course to apply for such further relief as may be required.

11. The grounds of the Claimant's claim and application are set out in further detail in the first witness statement of Mr Jonathan Patrick Knox Kelly dated [DATE].

| Claim No. | |
|---|---|

The Claimant seeks an order for costs against

 BSG Resources Limited as further set out in the attached witness statement and draft order.

Statement of truth
*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the Claimant to sign this statement

Full name  Mr _Jonathan Patrick Knox Kelly_____

Name of Claimant's solicitor's firm __Cleary Gottlieb Steen & Hamilton LLP____

Signed _____  position or office held  _Partner_____
    *(Claimant)(Claimant's solicitor)           (if signing on behalf of firm or company)

*delete as appropriate

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London EC2Y 5AU
Email: jkelly@cgsh.com

Claimant's or claimant's solicitor's address
to which documents should be sent if
different from overleaf. If you are prepared
to accept service by DX, fax or e-mail, please
add details.

# EXHIBIT B



**Claim No CL-2019-000269**

CL-2019-000269

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**BEFORE: THE HON. MR JUSTICE BRYAN**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN AN ARBITRATION CLAIM**

**BETWEEN:**

**VALE S.A.**

**Claimant**

-   **and**   -

**BSG RESOURCES LIMITED**

**Defendant**

---

**ORDER**

---

**UPON** the application of the Claimant without notice to the Defendant by way of Arbitration Claim Form issued on 18 April 2019.

**AND UPON READING** the first witness statement of Jonathan Patrick Knox Kelly dated 18 April 2019.

**AND UPON READING** the Final Award of the arbitrators Sir David A.R. Williams, QC, Dr Michael Hwang, SC and Professor Filip De Ly dated 4 April 2019 (the "**Award**")

**IT IS ORDERED AND DECLARED THAT:**

1. The Claimant has permission under section 66(1) of the Arbitration Act 1996 to enforce the Award in the same manner as a judgment or order of the High Court to the same effect, excluding the post-award interest awarded on the costs of the arbitration in the Award pending the correction of the currency of the rate of interest awarded on the costs of the arbitration.

2. Permission having been granted under section 66(1) as aforesaid, the Claimant may later request that judgment be entered in terms of the Award under section 66(2) of the Arbitration Act 1996.

3. The Defendant has the right, pursuant to CPR 62.18(9)(a), within 14 days after service of this Order to apply to set it aside.

4. Pursuant to the provisions of CPR 62.18(9)(b), the Award must not be enforced until after the end of the 14-day period referred to in paragraph 3 above, or if an application is made by the Defendant within that period to set aside this Order, until after that application has been finally disposed of.

5. The Defendant shall pay the Claimant's costs of the Application and, in the event that judgment is in due course entered by the Claimant in terms of the Award pursuant to section 66(2) of the Arbitration Act 1996, the costs of entering such judgment.


Dated this 9th day of May 2019

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
COMMERCIAL COURT (QBD)**

**BEFORE: THE HON. MR JUSTICE
BRYAN**

**IN THE MATTER OF THE
ARBITRATION ACT 1996
IN AN ARBITRATION CLAIM**

**BETWEEN:**

**VALE S.A.**

**Claimant**

**- AND –**

**BSG RESOURCES LIMITED**

**Defendant**

_____

**ORDER**

_____

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London
EC2Y 5AU
Tel: 020 7614 2200
Fax: 020 7600 1698
Solicitors for the Claimant

# EXHIBIT C



# Claim form
## (arbitration)

In the High Court of Justice
Business and Property Courts of England and Wales
Commercial Court (QBD)

| | *for court use only* |
|---|---|
| Claim No. | |
| Issue date | |

## In an arbitration claim between

Claimant

BSG Resources Limited (In Administration) of West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX

Defendants

1) Vale S.A. of Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil

2) Filip De Ly of Law Faculty, Erasmus University, PO Box 1738, NL-3000 DR Rotterdam, The Netherlands

3) David A.R. Williams QC of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG

4) Michael Hwang S.C. of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG

## In the matter of an arbitration between

Claimant

Vale S.A. of Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil

Respondent

BSG Resources Limited (In Administration) of West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX

*Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

See above. The Second to Fourth Defendants are the co-arbitrators in the arbitration (the Second Defendant is the Chairman).

| Defendants' names and addresses | As above |
|---|---|

☐ This claim will be heard on:

at        am/pm

☐ This claim is made without notice.

N8 Claim form (arbitration)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

| Claim No. | |
|-----------|---|

Remedy claimed and grounds on which claim is made.

See attached Annex.

| Claim No. | |
|---|---|

The claimant seeks an order for costs against the Defendants.

Statement of truth
The Claimant believes that that facts stated in these particulars of claim are true.
I am duly authorised by the Claimant to sign this statement.

Full name:  KAREL DAELE

Name of claimant's legal representative's firm:  MISHCON DE REYA LLP...

Signed _____                    position or office held:  PARTNER
      Claimant's legal representatives

Mishcon de Reya LLP
Africa House
70 Kingsway
London
WC2B 6AH

Tel: 02033217000
Ref: 40252.8/James Libson / Karel Daele

Claimant's or claimant's solicitor's address
to which documents should be sent if
different from overleaf. If you are prepared
to accept service by DX, fax or e-mail, please
add details.

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**IN THE MATTER OF AN ARBITRATION CLAIM**

**BETWEEN:**

**BSG RESOURCES LIMITED (in administration)**

<u>**Claimant**</u>

**and**

**(1) VALE S.A.**
**(2) FILIP DE LY**
**(3) DAVID A.R. WILLIAMS**
**(4) MICHAEL HWANG**

<u>**Defendants**</u>

_____

**ANNEX TO ARBITRATION CLAIM FORM**

_____

**Introduction**

1.      This is an application by BSG Resources Limited (in administration) ("BSGR") in relation to an arbitration award dated 4 April 2019 made by Professor Filip De Ly (Chairman), Sir David A.R. Williams QC and Dr Michael Hwang SC, in LCIA arbitration number 142683 (the "**Award**").[1]

2.      This application is brought under ss.68 and 24 of the Arbitration Act 1996 (the "**Act**"):

        (1)      challenging the Award on the grounds of serious irregularity affecting the Tribunal, the proceedings or the Award;

        (2)      for an order (in respect of all issues):

---

[1] Documents referred to in this Annex are cross-referenced to Exhibit KND2 to the Second Witness Statement of Karel Norbert Daele, which is being filed in support of this application.

(a) setting the Award aside in whole or in part, or

(b) declaring the Award to be of no effect in whole or in part, or

(c) alternatively, in respect of the Tribunal's failure to deal with an issue pursuant to s.68(2)(d), remitting the Award to the Tribunal, in whole or in part, for reconsideration.

3. The grounds of serious irregularity relied on by BSGR are:

(1) A pattern of conduct giving rise to apparent bias under s.68(2)(a), s.24(a) and d(i) of the Act by the Tribunal (or the co-arbitrators).

(2) Failure to conduct the proceedings fairly and impartially as between the parties, giving each party a reasonable opportunity of putting its case and dealing with that of its opponent, or to adopt procedures so as to provide a fair means for the resolution of the matters falling to be determined, under s.68(2)(a) and s.33 of the Act.

(3) Failure to deal with an issue, namely that once the Tribunal found that the joint venture agreements had been frustrated, damages were limited to recovery of Vale's initial payment to BSGR, under s.68(2)(d).

**Pattern of Apparent Bias**

4. There exist grounds from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal did not fairly determine the issues on the basis of the evidence and arguments adduced before them, giving rise to apparent bias.

5. The arbitral proceedings consisted of three phases: the proceedings with (i) the original Tribunal comprised of The Honourable Charles N Brower, Sir David A.R. Williams, QC and Dr Michael Hwang SC (1 August 2014 – 4 August 2016); (ii) the truncated Tribunal consisting of Mr Williams and Mr Hwang (4 August 2016 – 17 August 2016); and (iii) the reconstituted Tribunal comprised of Professor Filip De Ly, Mr Williams and Mr Hwang (17 August 2016 – 4 April 2019). These phases are connected not only by the co-arbitrators, but also by a

pattern of apparent bias that ran through each of the three phrases. Whilst the Tribunal has discretionary powers when it comes to procedural decisions, when looking at them not in isolation but together a pattern of conduct appears, from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

6. The full history of the conduct of this arbitration is set out in the second witness statement of Mr Daele, and BSGR relies on the full pattern of conduct that is described in that statement.

7. BSGR relies specifically on the following matters, which are developed in turn below:

(1) The Tribunal's refusal to admit the ICSID hearing transcripts and the post-hearing briefs (together referred to as the "**ICSID Material**") into the record despite the Tribunal's initial ruling that the ICSID evidence was relevant and its availability to the Tribunal a matter of fairness. Indeed, it was because the Tribunal considered that the ICSID evidence was relevant and a matter of fairness that the Tribunal ordered BSGR to produce monthly reports on the status of the ICSID proceedings[2] and disclose to the LCIA Tribunal all documents produced in the ICSID case.[3] In decisions dated 6 September 2017 (PO 24), 26 November 2017 (PO 25), 25 October 2018 (PO 27) and in the Award, the Tribunal did a U-turn, claiming that the ICSID evidence was irrelevant with respect to the issues it had to decide in this case.

(2) The Tribunal's refusal to reschedule the final hearing at a time when BSGR's counsel of choice (who had represented BSGR from the outset of the arbitration) was available. In this regard, the Tribunal's unreasonable rush to schedule the hearing compares unfavourably with the Tribunal's two-year delay in rendering the Award.

(3) The Tribunal's failure to reconsider, properly or at all, the earlier decisions taken largely by the previous Chairman, who was removed by the LCIA for apparent bias. The co-arbitrators had spent very limited time on those decisions. They were very largely decisions of the previous Chairman and the arbitral secretary, and their standing should have been reconsidered and re-determined by the Tribunal.

---

[2] KND2/1402-1405, Email from Tribunal to the Parties dated 9 December 2014; KND2/1405-1422, Decision of the Tribunal dated 16 December 2014.
[3] KND2/1469-1474, Record Sharing Decision dated 28 June 2015.

(4)     The co-arbitrators' refusal to reproduce the original appointment procedure for the appointment of a new Chairman to replace the previous Chairman who had been removed for apparent bias. They attempted to maintain the final hearing dates and push forward with the appointment of Professor Park with only a few weeks to go before the final hearing, which was wholly unjustified and unfair in a highly complex arbitration. The LCIA intervened, exercising its power under LCIA Rules Article 11.1 and appointed the new Chairman, with the result that the contractually agreed, original appointment procedure was not followed.

<u>(1) The Tribunal's refusal to consider and to admit the ICSID hearing transcripts and the post-hearing briefs into the record</u>

### *The Consensus that the Bribery Issue was central and the LCIA would need the full body of evidence on it from ICSID*

8.      Throughout the LCIA proceedings, there had been consensus among the Parties and the Tribunal that the ICSID record was relevant to determine what was referred to as the "**Bribery Issue**", namely the allegations of bribery and corruption underlying Vale's claims against BSGR. The Tribunal repeated in various decisions that it needed the "full body of evidence" from both proceedings (ICSID and LCIA) to ensure "fairness, efficiency and consistency" in its conduct of the proceedings.

9.      **First**, in the First Stay Decision dated 16 December 2014, the Tribunal denied BSGR's application for a stay of the LCIA arbitration pending the decision in the related ICSID proceedings.[4] Only in the latter was the full evidence regarding the Bribery Issue, which was at the centre of the LCIA case, to be heard, since it was only in the ICSID proceedings that Guinea was a party (and would have to call witnesses, including those said to have been implicated in bribes). The Tribunal denied the application (on the basis that it was too early to tell how the ICSID case would develop) but expressly confirmed the relevance of the ICSID evidence[5]:

---

[4] KND2/1386-1401, BSGR's Application for Stay dated 20 October 2014; KND2/2455-2482, Vale's Observations on BSGR's Stay Application dated 3 November 2014; KND2/2483-2499, BSGR's Reply on Stay Application dated 10 November 2014; KND2/2500-2516, Vale's Rejoinder on Stay Application dated 17 November 2014.
[5] KND2/1405-1422, First Stay Decision dated 16 December 2014.

(1) The Tribunal stated (even at this early stage of the proceedings) that the Bribery Issue was at the heart of the LCIA arbitration:

*"based on the Parties' arguments and the limited evidence offered in this proceeding to date, that **the Bribery Issue will serve as a central focus in both arbitrations**"*[6] (emphasis added)

(2) The Tribunal said it would need to see the "**full body of evidence from all sources**" to be "*in a position to determine if Vale's claims may stand even assuming Guinea's evidence is somehow defective and unreliable*"[7].

(3) It directed BSGR to file monthly reports on the status of the ICSID proceedings[8]. The Tribunal chased BSGR when it was late in submitting an update.[9]

(4) And it required the parties to reach an agreement on the sharing of information between the LCIA and ICSID Tribunal[10]. On 30 April 2015, the Tribunal reminded the parties to come to an agreement to "*share documents between this arbitration and the ICSID arbitration.*"[11]

10. This decision was (i) an express recognition by the Tribunal of the central relevance of the ICSID evidence to the LCIA arbitration and Vale's claim; and (ii) a basis on which BSGR's application for a stay was refused, because the Tribunal would have the full record from both proceedings placed before it by means of record sharing.

11. Vale, for its part, also expressly recognised that the ICSID evidence was relevant to the LCIA action. It acknowledged the "*factual overlap between the LCIA and ICSID arbitrations*"[12]. It asserted that the Tribunal should have access to the:

---

[6] KND2/1416, First Stay Decision, para. 37.
[7] KND2/1416-1417, First Stay Decision, para. 40.
[8] KND2/1419-1420, First Stay Decision para. 50.
[9] KND2/2517-2518, Procedural Order No. 9 dated 23 November 2015, para. 5.
[10] KND2/1419, First Stay Decision, para. 49.
[11] KND2/1430-1441, Tribunal's Decision on Claimant's Request Concerning U.S. Discovery dated 30 April 2015, para 28f.
[12] KND2/1445-1449, Letter from Vale to the Tribunal dated 8 May 2015.

*"**full body of evidence from all sources** in order to determine the claims before them"*[13]

And that:

*"As the Tribunal recognizes, **the mutual exchange of evidence and submissions filed in the two proceedings is therefore necessary to ensure fairness, efficiency and consistency** by allowing the respective tribunal and parties to compare materials produced or submitted in the other arbitration."*[14]

12.     **Second**, the renewed Second Stay Application (dated 20 May 2015) was dismissed for effectively the same reasons[15]. The Tribunal again emphasised the importance of sharing the evidence of both proceedings:

> *"**full disclosure of documents from the two proceedings** would minimize the risk of **inconsistent decisions**."*[16]

13.     **Third,** on 28 June 2015, the Tribunal issued the "Record Sharing Decision". It ordered that BSGR would disclose, on an ongoing basis, all documents from the ICSID proceedings to Vale and the LCIA Tribunal within seven days of the documents being filed or the evidence becoming available in the ICSID case.[17] All documents that were filed in the ICSID proceedings were relevant, the Tribunal did not make a distinction. As to the LCIA record, the Parties were allowed to share documents with Guinea and the ICSID Tribunal with the exception of third party witness statements and documents for which BSGR claimed confidentiality.

14.     Furthermore, Vale relied in the LCIA proceedings on the witness statements of Messrs Souaré, Nabé and Kanté, which Guinea had filed in the ICSID proceedings.[18] This was in

---

[13] Ibid.
[14] Ibid.
[15] KND2/1478-1490, Second Stay Decision dated 24 July 2015.
[16] KND2/1464-1465, Email from the Tribunal to the Parties dated 23 May 2015.
[17] KND2/1469-1474, Record Sharing Decision dated 28 June 2015.
[18] KND2/2519-3009, Vale's Statement of Reply dated 24 March 2016, which was filed together with the witness statements of Messrs Souaré, Nabé and Kanté. Their witness statements specifically allow them to be used in the ICSID and LCIA proceedings.

recognition of the relevance of the ICSID evidence, yet, as noted below, the Tribunal later refused to admit the cross examination of those same witnesses.

15. **Fourth**, in a decision on document production dated 18 March 2016 (referred to as the "**Third Document Production Decision**") the Tribunal repeated (i) that the Bribery Issue was a central focus of the LCIA proceeding, and (ii) the LCIA Tribunal would need to have a full record of the evidence going to that issue in order to be able to fairly determine it:

> "The Tribunal points out that all of its document production rulings have taken into account **the "Bribery Issue" lying at the centre of the dispute**. It is within that context that the Tribunal has set out the relevant parameters for what it deems relevant and material. That the scope of documents either Party must produce may be wider than in other arbitrations is a by-product of the Tribunal's aim to resolve the dispute in the **fairest manner possible** and **based on a full record of evidence**."[19] (emphasis added)

16. **Fifth**, consistent with the decisions referred to above, on 20 January 2017 the Tribunal (this time with the new Chairman in place after Judge Brower was removed for apparent bias) granted Vale its request to introduce further exhibits which it said would "further expose **BSGR's bribery and corruption, are directly relevant to the issues raised by both parties throughout the proceedings.**"[20] (emphasis added).

### The Tribunal's U-turn – Refusal to Admit the ICSID Material

17. On 9 June 2017 BSGR asked the Tribunal to reopen the record to add transcripts from the ICSID final hearing (the "**ICSID Transcripts**") and certain other related materials.

18. The ICSID Transcripts were directly relevant to the Bribery Issue and would support BSGR's defence against the allegations of corruption and bribery. BSGR explained in its letter of 9 June 2017 that the "cross examination [of key Guinean witnesses] provided key evidence that supported BSGR's claim that it obtained its rights lawfully." It said that the ICSID Tribunal "heard from three witnesses who were not heard before the LCIA Tribunal. In respect of the witnesses which the LCIA Tribunal did hear, their evidence at times departed from the evidence they provided to the

---

[19] KND2/1878-1889.
[20] KND2/2290-2301, Email from the Tribunal to the Parties dated 20 January 2017.

*LCIA Tribunal."* BSGR provided a detailed explanation as to the relevance of the ICSID Transcripts in the LCIA proceedings.[21]

19. On 6 September 2017[22], almost three months after BSGR's request, the Tribunal took a decision. Instead of deciding it, it "stayed" the request. It said, in a baffling formulation of words, that:

> *"if and to the extent necessary or proper, the Arbitral Tribunal will reopen the proceedings, alternatively will deal with the issue of the ICSID hearing transcript in any other appropriate way or award."*

20. In light of the previous decisions as regards the importance of the ICSID evidence to the LCIA proceedings and the Bribery Issue which was "at the centre of the dispute", this decision was:

   (1) A failure by the Tribunal to decide the request, and an abdication of its duty to do so. It was not open to the Tribunal to "stay" the request. If the Tribunal did not decide the point until the Award (as it appeared to be suggesting), it would never have the opportunity of considering the material.

   (2) Completely inconsistent with the consensus (across all three phases of the arbitration) of the parties and the Tribunal that (i) the ICSID evidence was highly relevant and central to the Bribery Issues (that, according to the Tribunal, lay "at the centre of the dispute") to be decided in the LCIA case; and (ii) it was vital that the Tribunal had access to the full body of evidence on the Bribery Issue to ensure fairness, efficiency and consistency.

   (3) A failure to give reasons for its decision. There was no analysis of the competing arguments (expressed by the parties in extensive correspondence[23]) as to why the ICSID Transcripts should or should not be admitted to the record.

---

[21] KND2/2356-2365, Letter from BSGR to the Tribunal dated 9 June 2017.
[22] KND2/2426-2428, Procedural Order No. 24 dated 6 September 2017.
[23] KND2/2371-2397, Letter from Vale dated 16 June 2017; Letter from BSGR dated 23 June 2017; Letter from Vale dated 27 June 2017; Letter from BSGR dated 30 June 2017; Letter from Vale dated 4 July 2017; Letter from BSGR dated 14 July 2017; Letter from BSGR dated 27 July 2017.

(4)     An inadequate, inconsistent and confusing formulation of words, designed it appears to allow the Tribunal to refuse to decide the request. Had the Tribunal acted fairly and confined itself to the evidence and submissions before it, the only reasonable response (and the only one that could be expected from any reasonable tribunal) would have been to accept the ICSID Transcripts (and allow each party a submission on them if they wished).

(5)     Thoroughly objectionable and unfair. This was only 3 months after the proceedings had been closed and there was no reason why the ICSID Transcripts could not have been admitted (particularly given that Vale's own evidence relating to the Bribery Issue, for which it applied to add to the record after the proceedings had been closed, was admitted).

21.     BSGR renewed its request that the Tribunal admits the ICSID Transcripts pointing out the inherent unfairness in the Tribunal's decision.[24] BSGR, in an attempt to find a route through, asked the Tribunal to look at the ICSID Transcripts *de bene esse*[25]. It would be plain to the Tribunal from doing so (i) the relevance of the ICSID Transcripts and (ii) the weight that could be attached to them. The Tribunal refused to accede even to that request. On 26 November 2017[26] the Tribunal said *"this is not the appropriate time for a final decision on the Respondent's requests"* and repeated its strange formulation (as per PO 24 above in para 7(1)). There was no explanation as to why this was *"not the appropriate time"* and it is difficult to conceive of why, as the Tribunal was in the midst of its deliberations.

22.     On 12 June 2018, BSGR sought also to put the post-hearing briefs from ICSID before the LCIA Tribunal.[27] This request was not addressed by the Tribunal until 25 October 2018, just under six months before the Award was made.[28] The Tribunal "stayed" the request again and repeated its bizarre formulation (as per PO 24 above 7(1).

23.     BSGR's application to add the ICSID Transcripts was after the Tribunal had closed the proceedings (on 3 March 2017) but that was no bar to its inclusion:

---

[24] KND2/2429-2430, Letter from BSGR to the Tribunal dated 18 October 2017.
[25] Ibid.
[26] KND2/2432-2434, Procedural Order No. 25 dated 26 November 2017.
[27] KND2/3010-3167, BSGR Post-Hearing Brief dated 12 June 2018.
[28] KND2/2444-2447, Procedural Order No. 27 dated 25 October 2018.

(1)    the Tribunal said in terms that new evidence could be accepted right up to the date of the Award (see PO 23 dated 3 March 2017, para. 13, and Award para. 165: *"Hence, new evidence could be accepted up until the rendering of the Award"*[29]);

(2)    the Tribunal had, shortly before (after the record had closed), admitted to the record further evidence produced by Vale on the Bribery Issue (to which BSGR did not object)[30];

(3)    the ICSID Transcripts only became available after the LCIA final hearing, because the ICSID hearing had taken place shortly afterwards (and the Tribunal had refused to wait until it was complete); and

(4)    the Tribunal did not render its Award for almost 2 years later, which was ample time for it to take the ICSID Transcripts and materials into account (and allow the parties to make a written submission on it, if it so wished).

### *The Tribunal's Inconsistent and Unfair Post-Facto Explanation in the Award*

24.    In the Award, the Tribunal said that it had determined not to allow the ICSID Material. Its reasons for doing so are incredible, and it was a decision that, by reason of its flawed decision making, no reasonable tribunal could reach:

(1)    The Tribunal said that the ICSID Transcripts were *"irrelevant"* (para. 167.2 and 167.3)[31]. That is incomprehensible when set against the record of decisions by the Tribunal as set out above. Those decisions were predicated on the relevance of the ICSID evidence and the desire for this Tribunal to have before it the full record from the ICSID proceedings in order ensure fairness, efficiency and consistency on the Bribery Issue "at the centre of the dispute".

(2)    The Tribunal said it could not know what weight could be given to the ICSID Transcripts (para. 167.1)[32]. That was equally astonishing. The LCIA Tribunal had

---

[29] KND2/2351, Procedural Order No. 23 dated 3 March 2017 [13]; KND2/48-49, Award [165].
[30] KND2/2366-2370, Letter from vale to the Tribunal dated 26 May 2017.
[31] KND2/49-50.
[32] KND2/49.

admitted into the record all the preceding materials from the ICSID proceedings (which it had <u>required</u> BSGR to provide within 7 days of production in the ICSID proceedings). That included witness statements from the very witnesses who had been cross-examined on the ICSID Transcripts. The Tribunal had the witnesses' written evidence (of Messrs Souaré, Nabé and Kanté) but refused to look at the challenge to that evidence put in cross-examination. The Tribunal had the means to know what weight could be given to it by looking at that material, but refused to do so.

(3)     The ICSID Material was plainly of central relevance to the LCIA proceedings, had the Tribunal considered it. For example:

(a)     The ICSID Material demonstrates that BSGR was neither directly nor indirectly (through Mme Touré or anyone else) involved in the withdrawal of Rio Tinto's rights[33], directly contrary to the LCIA Tribunal's finding that BSGR was involved[34].

(b)     The ICSID Material demonstrates that the decisions to grant BSGR the permits in Blocks 1 and 2 were legal and legitimate.[35] There was no credible evidence of undue influence exercised by President Conté or Mamadie

---

[33] KND2/1239, Nabé/8/193/16-25 ("*Q: My question is: the reason to withdraw Blocks 1 and 2, is it because of a desire to grant Blocks 1 and 2 to BSGR? A: The determination to grant it to BSGR was simply an accelerator. Q: Had it not been for BSGR's application for permits for Blocks 1 and 2, was the decision anyway taken to withdraw Blocks 1 and 2? A: Yes. There was already a decree in July 2008, as early as July 2008.*"); KND2/1363, Nabé/8/187/12-18 ("*Q. The decision to withdraw the two blocks from Rio Tinto, was it legitimate? A. Yes, I consider it to have been legitimate. Q. Was it legal? A. Yes, all the more so that it was legitimate. So it was sort of consequently legal because it was legitimate. That's inherent in the process.*"); KND2/828-829, Souaré/6/62 to 6/63/3 ("*They never retroceded. Q. So this is a breach of the Mining Code? A. It could be understood that way.*"); KND2/824, Souaré 6/58/22-24 ("*generally speaking we can say that Rio Tinto did not yield total satisfaction in the eyes of the government.*"); KND2/908, Souaré/6/142/8-24 ("*Q. …you said that the Council of Ministers ordered the Minister of Mines to apply the law and withdraw the Rio Tinto concession on Blocks 1 and 2. The essential point, which decided was the source of the decision, was the decision of Rio Tinto to freeze its mining projects at Simandou because of the drop in the iron ore prices. A. Yes, that's right. Q. So… A. Yes, it played that role. But it was the ultimate drop that tilted the balance. So far, you understand tht there was a fight between the giant and the junior around Simandou. The State was not only virtuous, but also for fear of the legal and financial consequences, refrained so far from withdrawing the blocks from Rio Tinto to given them to BSGR. But once the giant had sinned, through this announcement, it was the little detail that tilted the balance.*"); KND2/3023-3037 and 3054-3060, BSGR's Post-Hearing Brief, in particular paras. 29-57 and 104-117.
[34] Award paras. 569; para 631 – 634;
[35] KND2/1363, Nabé/8/187/12-18; Nabé/8/185/18-20 ("*Q: The decision to grant Blocks 1 and 2 to BSGR, was this decision taken by the Council of Ministers, yes or no?. A: Yes*"); KND2/1371, Nabé/8/195/1-3 ("*Q: This reflects the consensus of the council? A: This is without doubt: take it away from Rio Tinto and given to BSGR.*"); KND2/1363, Nabé/8/187/19-25.

Toure (or any other). In this light, the LCIA Tribunal could not have found that BSGR was granted the permits in Simandou Blocks 1 and 2 through corruption and bribery[36].

(c)     The ICSID Material confirms that there was no evidence that Pentler or any of the people involved with Pentler had an influence on the granting of any of the exploration rights to BSGR.[37] <u>This is of direct relevance to the LCIA Tribunal conclusion that</u> BSGR through the help of Pentler obtained the Mining Rights in Guinea.[38]

(d)     Mr Souaré had given contradictory statements in his evidence.[39] The LCIA Tribunal accepted the witness testimony of Mr Souaré[40] when, had it seen the ICSID Material, it should not have done so.

<hr>

[36] See e.g. Award, paras. 562-569; 629; 634; 637.

[37] KND2/865, Souaré/6/99/24 (*"Pentler? No, I don't know that company."*); KND2/918, Souaré/6/152/17-20 (*"Q. Do you know whether Ismaël Daou or [Aboubacar Bah] at one point paid any bribes to Guinean officials? A. Well, I don't even know these people, I didn't even know them."*); and KND2/865, Souaré/6/99/14-18 (*"Q. In everything that we've mentioned this morning, do you know somebody by the name of Ismaël Daou? A. No. Q. Do you know somebody by the name of Aboubacar Bah? A. No."*)

[38] Award paras 429-430.

[39] KND2/788, Souaré/6/22/6-10 (*"I was telling you that the first directive was: "Well, Mr Minister, here you have people who are interested in your sector. Please make that task easier, facilitate that task. That is perfectly normal."*); KND2/939, Souaré/6/173/1-7 (*"A: He sees operators, he trusts them, and he calls the minister and he says 'please facilitate things for them'. So far there was nothing to indicate that this was improper or illegal, because that day he did not say specifically that such-and-such zone is to be attributed that is already granted to another company."*); KND2/855, Souaré/6/89/10-11 (*"[…] because I wasn't asked, the President didn't ask me to give a permit to BSGR, he said help."*); Schedule/593-594, BSGR's Post-Hearing Brief, para. 88.

[40] Award para. 628.1

(e) Likewise, Mr Nabé had given contradictory statements.[41] The Tribunal accepted witness testimony from Mr Nabé[42], when it ought not to have done so in the light of Mr Nabé's oral evidence.

(4) The Tribunal made specific reference in its Award to other evidence of witnesses who had not appeared or been cross-examined before it (e.g. of Mme Touré – see para. 262; Mr Noy paras. 182, 184, 185; Mr Struik para. 223, 225, 231) and was apparently well able to determine the weight of that evidence. The weakness of this reasoning (and its patent inconsistency) can only be viewed by a fair minded and informed observer as conduct which gives rise to a real possibility that this Tribunal was biased.

(5) The Tribunal said that BSGR had not *"specifically indicated what precise evidence"* from the ICSID proceedings that it sought to submit and *"without any sufficient precision as to what material was relevant and why"* (para. 167.2). That was incorrect and disingenuous. On 9 June 2017 (and in further exchanges with Vale between 16 June – 27 July 2017[43]) BSGR had explained the relevance of the ICSID Transcripts in detail (and invited the Tribunal to allow the parties to file further submissions on the relevance of the ICSID Transcripts[44]). It was also plain and obvious that the ICSID Transcripts went to the Bribery Issue. At no stage prior to the Award did the Tribunal ask BSGR to be more specific as to what matters it intended to rely on and

---

[41] KND2/1369, Nabé/8/193/16-25 ("*Q: My question is: the reason to withdraw Blocks 1 and 2, is it because of a desire to grant Blocks 1 and 2 to BSGR? A: The determination to grant it to BSGR was simply an accelerator. Q: Had it not been for BSGR's application for permits for Blocks 1 and 2, was the decision anyway taken to withdraw Blocks 1 and 2? A: Yes. There was already a decree in July 2008, as early as July 2008.*"); while Nabé testified in the LCIA hearing that he was summoned to a meeting with the President in 2008 where he was told to "hurry up" and grant the permits for Simandou Blocks 1 and 2 to BSGR (Award para 564); in the ICSID hearing he could not remember that he had been instructed by the President to grant BGSR the mining permits: KND2/1320, Nabé/8/144/6-9 ("*Q: The President told Nabé to grant Blocks 1 and 2 to BSGR. Nabé said that he understood. Do you agree with this description of events? A: I don't recall the details as described here*"); Nabé/8/144/16-19 ("*A: I stand by what I said. I do not recall that Mr Avidan was there during a meeting where I was with the President, nor do I recall that the President himself talked about BSGR*").

[42] Award para. 628.5 see in contrast KND2/894, Souaré/6/128/5-8; KND2/3010-3167, BSGR's Post-Hearing Brief, para. 114; KND2/1320, Nabé/8/144/6-9 ("*Q: The President told Nabé to grant Blocks 1 and 2 to BSGR. Nabé said that he understood. Do you agree with this description of events? A: I don't recall the details as described here*"); KND2/1320, Nabé/8/144/16-19 ("*A: I stand by what I said. I do not recall that Mr Avidan was there during a meeting where I was with the President, nor do I recall that the President himself talked about BSGR*").

[43] KND2/2371-2397, Letter from Vale dated 16 June 2017; Letter from BSGR dated 23 June 2017; Letter from Vale dated 27 June 2017; Letter from BSGR dated 30 June 2017; Letter from Vale dated 4 July 2017; Letter from BSGR dated 14 July 2017; Letter from BSGR dated 27 July 2017.

[44] KND2/2356-2365, BSGR's letter dated 9 June 2017.

its relevance; that, submits BSGR, is because the relevance of the ICSID Transcripts was obvious to the Tribunal.

(6) Finally, the Tribunal said that the ICSID Transcripts were *"highly unlikely to change the conclusions of the Tribunal"* in the Award and the evidence would have *"no bearing on the relief to be awarded"*. As to that:

(a) it was impossible for the Tribunal to form that view without seeing the evidence – this was evidence which went directly to the Bribery Issue "at the centre of the dispute";

(b) the Tribunal's Award makes specific and damning findings of bribery and corruption against BSGR, on matters which it well knew were the subject of the ICSID proceedings (including the evidence given on the ICSID Transcripts), and it is inconceivable that this material "had no bearing" on those matters;

(c) the findings of bribery and corruption were central to its conclusions that BSGR had dishonest knowledge for the purposes of the fraudulent misrepresentation claim and had acted in breach of warranty; and

(d) it was a gross breach of due process to exclude obviously (or even potentially) relevant evidence going to findings as serious as the ones this Tribunal made. No Tribunal acting reasonably would take that course, and the Tribunal's attempt to explain it away is thoroughly unconvincing.

25. In those circumstances, a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased. The Chairman of the original Tribunal, Judge Brower, had been removed because of his prejudgment (in the eyes of a fair-minded observer) of matters going to the Bribery Issue, including as to whether Mme Touré was the

wife of President Conte[45]. The Tribunal refused to admit evidence going to those very same matters.

## (2) The Tribunal refused to reschedule the final hearing and thereby deprived BSGR of its counsel of choice

26.     In early September 2016, the reconstituted Tribunal (which had refused to stay the proceedings while a challenge against the co-arbitrators was pending[46]) looked to fix the final hearing. The final hearing (listed for August and September 2016) was vacated following the removal of the Chairman, Judge Brower, on 4 August 2016 (though not without considerable effort by the co-arbitrators to maintain the final hearing dates in circumstances where that was obviously unfeasible, on which see further below).

27.     On 30 August 2016 and 6 September 2016, BSGR said that its counsel, David Wolfson QC was not available for a three-week hearing before May 2017, and provided detail of his prior commitments.[47] Mr Wolfson had been BSGR's counsel from the outset (more than 2 years earlier). The removal of Judge Brower was, of course, no fault of BSGR's and the re-listing of the final hearing ought not to penalise it because of Judge Brower's apparent bias.

28.     At what became a so-called "educatory hearing" taking place in 5-8 September 2016, Vale's counsel made various slurs on Mr Wolfson's availability and his integrity, including an assertion that *"that's not how any lawyer I know at that level conducts herself* (sic)*"*. Mr Wolfson responded personally to the Tribunal by letter (on 12 September 2016[48]). He said he had allowed himself 30 days preparation for this complex 3 week trial (worth in excess of US$ 1 billion), which was unexceptional. Vale responded with further vitriol on the same day.

29.     Remarkably, the Tribunal refused to list the final hearing so that Mr Wolfson could attend. On 17 October 2016 (just 10 days after BSGR had requested the removal of the co-arbitrators under s 24), in Procedural Order No. 17[49], it said *"the Arbitral Tribunal is insufficiently convinced"* that Mr Wolfson was unavailable until May 2016. That was not a decision that any reasonable Tribunal could make. The Tribunal went on to list the final

---

[45] KND2/1938-2004, Decision from the LCIA Division dated 4 August 2016, para. 318.
[46] KND2/2173-2175, Procedural Order No. 16 dated 29 August 2016.
[47] KND2/2161-2162; 2182-2194.
[48] KND2/2241-2243, Letter from David Wolfson QC dated 12 September 2016.
[49] KND2/2256-2275.

hearing for February and April 2017 for dates that Mr Wolfson could not make. The latter period was only shortly before Mr Wolfson was available.

30.     There was (and still is) no basis on which to disbelieve Mr Wolfson and to decline BSGR's request to schedule the merits hearing a short time later. He had personally given details of his availability. As experienced and busy senior counsel, having held the dates for August and September 2016 in his diary (which were vacated), and with several other complex matters in his diary (which were explained to the Tribunal), it was not unexpected that Mr Wolfson would be next available for a trial of this magnitude in May 2017.

31.     The Tribunal's unreasonable refusal to schedule the final hearing when Mr Wolfson was available was a serious situation for BSGR.

32.     Mr Wolfson had been involved from the outset and in all decisions in the case. Vale were represented by senior lawyers who had likewise acted for it from the outset. Proceeding when BSGR's chosen and longstanding counsel was unavailable, in circumstances where this was brought about because of the Chairman's apparent bias (and through no fault of BSGR) would be unfair and unjust.

33.     In order to keep its counsel of choice, BSGR tried to find a solution.  On 9 November 2016[50] it suggested that the final hearing be split with the first week held in April 2017 (on dates that the Tribunal had proposed) and the second and potential third week after the dates fixed for the ICSID hearing (which was due to start on 10 May 2017 for 2 to 3 weeks and in which BSGR's counsel would be engaged). This proposal was outright rejected on 7 December 2016.[51]

34.     On 26 January 2017 (when the s. 24 removal proceedings against the co-arbitrators were still pending), less than a month before the provisionally scheduled final hearing, the Tribunal finally confirmed the final hearing dates and reiterated that it remained *"not convinced"* about Mr Wolfson's unavailability.[52] That was a thoroughly objectionable decision and without any reasonable basis.

---

[50] KND2/2276-2278.
[51] KND2/2279-2282, Procedural Order No. 18 dated 7 December 2017.
[52] KND2/2306-2336.

35. While it is accepted that a tribunal should conduct proceedings in an efficient manner and without unnecessary delays, the desire for efficiency cannot override the Tribunal's duty of fairness and equality in the proceedings. There was no reason why the Tribunal could not have re-scheduled the hearing by a matter of a few months (at most). The rush to fix a hearing is to be contrasted with the 2 years which it then took the Tribunal to produce its Award.

36. A reasonable tribunal would not have taken a decision to proceed with a final hearing which BSGR's counsel could not attend. A fair minded and informed observer could not help but conclude that there was a real possibility this was done for ulterior reasons, because the evidence and submissions could not in any rational sense, justify it. BSGR was placed in an invidious position and forced to take the decision not to attend the final hearing.[53]

**(3) The Tribunal's failure to reconsider, properly or at all, the earlier decisions taken by the previous Chairman, who was removed by the LCIA for apparent bias**

37. As noted above, Judge Brower was removed as Chairman on 4 August 2016 by the LCIA for apparent bias. Article 27(4) of the Act required the reconstituted Tribunal to determine whether and to what extent the previous decisions of the original Tribunal (and infected by the apparent bias) should stand.

38. The co-arbitrators had spent very limited time on those decisions. They were decisions taken largely by Judge Brower, with his arbitral secretary Mr Daly, and they should have been re-determined by the reconstituted Tribunal. That was particularly the case as the Chairman was removed for apparent bias and the co-arbitrators had (they admitted and averred in their responses to the LCIA challenges) been in full agreement with all of the controversial decisions he had proposed[54].

39. It was not until 26 January 2017 (almost 6 months after Judge Brower was removed and just weeks before the final hearing was to start) that the Tribunal decided on the section 27(4) issues in relation to the most important and controversial decisions adopted when Judge Brower was Chairman. The Tribunal said that those decisions "*do not raise issues as to a serious irregularity affecting the Tribunal or the proceedings which may cause substantial injustice to either*

---

[53] KND2/2337, BSGR's letter to the Tribunal dated 31 January 2017.
[54] KND2/1920-1926, Co-arbitrators' comments on BSGR's challenge dated 20 June 2016.

*of the Parties in the arbitration"*[55]. It was impossible for it to know that without opening those decisions and re-deciding them. These decisions included extremely extensive disclosure orders by which BSGR was required to obtain documents from third parties and BSGR's solicitors, Mishcon de Reya LLP, required to provide certifications drafted by Vale. The Tribunal said that the decision was "*state of the art*" and "*balanced*" when it was anything but[56]. This is to be viewed against the background that (i) the co-arbitrators signed off on the decisions taken by the previous Chairman (in respect of which they had very little active input indeed); (ii) the co-arbitrators had a vested interest in not overturning decisions which they had signed off (with little active input); and (iii) the co-arbitrators were still subject to challenge proceedings in the Commercial Court brought by BSGR. Under these circumstances, a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

### (4) The co-arbitrators' refusal to reproduce the original appointment procedure for the appointment of the Chairman after Judge Brower was removed for apparent bias

40.     In summary, and as developed in the second witness statement of Mr Daele[57]:

    (1)    The co-arbitrators pushed forward with the appointment of Professor Park with only a few weeks to go before the final hearing. This was unreasonable and unjustified. It was never going to be possible to proceed with the final hearing, and the appointment of Professor Park was sought only by circumventing the parties' original appointment procedure for the Chairman.

    (2)    It took the LCIA to intervene, exercising its power under LCIA Rules Article 11.1, and notwithstanding the LCIA's earlier decision that the original appointment procedure should be followed by the co-arbitrators.

    (3)    The new Chairman was appointed by the LCIA on 17 August 2016. At the time of his appointment, the co-arbitrators were still maintaining that the final hearing should still start on 29 August 2016, just over a week later.

---

[55] KND2/2306-2336, Procedural Order No 19 dated 26 January 2017.
[56] Daele 2, para 96(c)(i) and (ii)
[57] Daele 2, para 72

(4)    In the circumstances of Judge Brower's removal (and the exceptional nature of it), the co-arbitrators should have provided for a period of reflection, and at least a stay until the new Chairman was in place. They did not do so. Instead, the co-arbitrators pursued the appointment of a new Chairman at break-neck speed with the stated aim of their being ready to start at the hearing fixed for 29 August 2016.

Conclusion on Pattern of Apparent Bias

41.    The above matters (and those set out in the Second Witness Statement of Mr Daele) together gave rise to a pattern of conduct from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

**Failure to Conduct Fair Proceedings**

42.    There was a failure by the Tribunal to comply with its duty under s.33 of the Act to "*act fairly and impartially as between the parties, giving each party a reasonable opportunity of putting his case and dealing with that of his opponent*" or to "*adopt procedures suitable to the circumstances of the particular case… so as to provide a fair means for the resolution of the matters falling to be determined.*"

43.    BSGR relies on the same grounds as set out in Ground 1 above in relation to apparent bias. If the Court concludes that there was no apparent bias, it is invited to find that there was, by reason of those matters, a breach of the Tribunal's duty under s.33 in that:

(1)    The Tribunal did not act fairly and impartially between the parties.

(2)    The Tribunal did not give each party a reasonable opportunity of putting its case, in particular it did not give BSGR a reasonable opportunity of adducing full evidence on the Bribery Issue from the ICSID proceedings in a manner which was inconsistent and unfair.

(3)    The Tribunal did not adopt procedures which provided a fair means for resolution of the dispute. On the contrary, it fixed a final hearing at which BSGR's counsel could not attend (following removal of the Chairman of the original Tribunal for apparent bias) and refused to admit relevant and material evidence without explanation, and

when the explanation came (in the Award) it was inconsistent and unjustifiable on any rational basis.

**Failure to Deal with the Frustration Damages Issue**

44.     BSGR argued that if the Tribunal found frustration, any remedy should be limited to the initial sum paid by Vale to BSGR under the joint venture agreement. See BSGR's Statement of Rejoinder, para. 525.[58]

45.     The Tribunal referred in terms to BSGR's argument in the Award, at para. 335, noting:

> *"BSGR argues that any remedy under this head should be limited to the consideration paid directly to BSGR under the joint venture agreement."*[59]

46.     The footnote to para. 335 (footnote 246) refers to BSGR's Statement of Rejoinder on the point.

47.     Having recognised that this issue arose, the Tribunal then failed to deal with it.

48.     At para. 982 of the Award, the Tribunal refused to order any remedy for frustration, on the basis that it found that Vale had elected for deceit damages (and that this excluded any remedy for frustration). However, it failed to deal with BSGR's argument that, having found frustration, the only remedy that could be ordered was limited to the initial sum paid by Vale to BSGR.

49.     That was a failure to deal with an issue, pursuant to s.68(2)(d) of the Act.

**Substantial Injustice**

50.     The serious irregularities identified above led to substantial injustice to BSGR in that:

---

[58] BSGR's Statement of Rejoinder.
[59] KND2/92.

(1)     The proceedings were conducted and the Award rendered by a Tribunal which had the appearance of bias. BSGR will say this is sufficient in itself to amount to substantial injustice.

(2)     The failure by the Tribunal to conduct the proceedings fairly (contrary to s.33 of the Act), including by its failure to admit relevant evidence and to hold a final hearing which BSGR's counsel could not attend, led to an Award which (at the least) may have been different had the Tribunal acted fairly between the parties.

(3)     Had the Tribunal dealt with the Frustration Damages Issue, at the very least that might realistically have led to a different result, including a very substantial reduction in the damages award (and/or costs award). It could have reduced the damages award to the initial sum paid by Vale to BSGR, namely US$ 500 million.

**Relief Sought**

51.     By reason of the matters set out above, namely serious irregularity giving rise to substantial injustice, BSGR seeks an order setting aside the Award and/or declaring it to be of no effect (s.68(3)(b) and (c) of the Act).

52.     As regards the first and second ground of challenge, that follows from a finding of apparent bias or a failure to conduct the proceedings fairly. That could not be cured by remitting the Award to the Tribunal.

53.     For the third ground of challenge (even if apparent bias / failure to conduct the proceedings fairly is not made out), there is a complete loss of confidence in the Tribunal being able to determine these matters (having determined them once against BSGR) and the Award should not be remitted to them. It is a discrete question of law which could be determined by a new Tribunal. The present circumstances are highly unusual and outweigh the presumption of remittal in respect of s.68(2)(d).

**Exhaustion of Remedies before the LCIA Tribunal**

54.     Section 70(2) of the Act requires that a claimant exhaust any available remedies before the Tribunal. There are no such remedies available nor any process of review in respect of which these grounds could be pursued before the Tribunal or the LCIA.

**Extension of Time to Bring This Challenge**

55.     By an Order dated 17 April 2019, BSGR was granted an extension of time to 10 May 2019 in which to bring this challenge.[60]

---

[60] KND2/3168-3169.

# EXHIBIT D

# Application Notice

- You must complete Parts A **and** B, **and** Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | High Court of Justice Business and Property Courts of England and Wales Commercial Court (QBD) |
|---|---|
| **Claim No.** | CL-2019-000269 |
| **Warrant no.** (if applicable) | |
| **Claimant** (including ref.) | VALE S.A. |
| **Defendant** (including ref.) | BSG RESOURCES LIMITED (in administration) |
| **Date** | 23 May 2019 |

### You should provide this information for listing the application

Time estimate           (hours)           (mins)

To be listed / determined with sections 68 and 24 claim (CL-2019-000262)

Is this agreed by all parties?   Yes [ ]   No [x]

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

## Part A

**1. Where there is more than one claimant or defendant, specify which claimant or defendant**

The Defendant

**2. State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)**

intends to apply for an order a draft of which is attached that

the Order of Mr Justice Bryan dated 9 May 2019 be set aside pursuant to CPR 62.18(9)(a) and/or stayed pending the final outcome of the Defendant's application to challenge the award dated 4 April 2019.

**3. Briefly set out why you are seeking the order. Identify any rule or statutory provision**

Because the Defendant has brought an application under sections 68 and 24 of the Arbitration Act 1996 (the "**Act**") (i) challenging the award dated 4 April 2019 (the "**Award**") on the grounds of serious irregularity affecting the Tribunal, the proceedings or the Award; and (ii) for an order setting the Award aside in whole or in part, or declaring the Award to be of no effect in whole or in part, or remitting the Award to the Tribunal, in whole or in part, for reconsideration; and, for the reasons set out in the Defendant's application under sections 68 and 24 of the Act, the Award should not be enforced and/or enforcement should be stayed pending the final outcome of that application.

The court office at Admiralty and Commercial Registry, Rolls Building, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL is open from 10am to 4.30pm Monday to Friday. When corresponding with the court please address forms or letters to the Clerk to the Commercial Court and quote the claim number.

N244 (CC) – w3   Application Notice (4.99)
This form is reproduced from www.hmcourts-service.gov.uk/ and is subject to Crown copyright protection.

*Printed on behalf of The Court Service*

## Part B

The Defendant wishes to rely on (i) the attached Arbitration Claim Form and the Second witness statement of Karel Norbert Daele dated 10 May 2019; and (ii) evidence in Part C, in support of this application

**Signed**  *Mishcon de Reya LLP.*

Applicant's legal representative

Address to which documents about this claim should be sent (including reference if appropriate)[4]

| 4. If you are not already a party to the proceedings, you muct provide an address for service of documents | Mishcon de Reya LLP<br>Africa House<br>70 Kingsway<br>London | | if applicable | |
|---|---|---|---|---|
| | | | Tel no. | 020 3321 7000 |
| | | | fax no. | 020 7404 5982 |
| | | | DX no. | 37954 Kingsway |
| | Postcode | WC2B 6AH | e-mail | |

# Part C

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

The defendant wishes to rely on the following evidence in support of this application:

1. On 4 April 2019, the tribunal issued its Award in arbitration proceedings (LCIA Case No. 142683).

2. Pursuant to the Award, the tribunal ordered the Defendant to pay the Claimant as follows:
   a. damages of US$ 1,246,580,846;
   b. pre-award interest on the Damages at a rate of LIBOR USD 3-month plus 7%;
   c. GBP 1,413,565.42 representing the costs of the arbitration that the Defendant had failed to pay and the Claimant had paid instead;
   d. US$ 16,000,000 in respect of the Claimant's legal fees; and
   e. post-award interest at a rate of LIBOR USD 3-month plus 5% from the date of the award until full payment.

3. On 16 April 2019, the Defendant made a pre-action application for a short extension of time of eight days by which to bring its application to challenge the Award.

4. By the Order of Mr Justice Teare dated 17 April 2019, the date for the Defendant's challenge was extended to 10 May 2019. The Order of Mr Justice Teare was subsequently amended under an application of the Defendant pursuant to CPR 40.12 (1).

5. On 10 May 2019, the Defendant filed its challenge to the Award in arbitration claim number CL-2019-000262. Copies of the Arbitration Claim Form and accompanying evidence is relied on in support of this application. The challenge is made principally on the basis that the Tribunal was infected by apparent bias and/or failed to comply with its general duty (under section 33 of the Act) which constitutes a serious irregularity under section 68(2)(a). The primary relief sought by the Defendant in its challenge is that the Award be set aside and/or declared to be of no effect (s 68(3)(b) and (c) of the Act).

6. By email of 20:28 on 10 May 2019, the Defendant was served with the Order of the Hon. Mr Justice Bryan dated 9 May 2019 which permits the Claimant under section 66(1) of the Act to enforce the Award (the **"Enforcement Order"**).

7. In light of the Defendant's challenge which, if successful, would see the Award be set aside and or declared to be of no effect, the Defendant is applying pursuant to CPR 62.18(9)(a) that the Enforcement Order be set aside, and/or stayed pending the final outcome of the Defendant's challenge.

8. The Defendant is not extending any reasons that the Enforcement Order be set aside (and/or stayed) beyond the existence of and reasons set out in its section 68 challenge referred to above. On that basis, it is submitted that this application be case managed and determined alongside the section 68 challenge under CL-2019-000262.

9. Pursuant to CPR 62.18(9)(a) and paragraph 4 of the Enforcement Order, the Award must not be enforced until after the present application to set aside the Enforcement Order has been finally disposed of. For completeness and/or only if it becomes necessary, the Defendant further seeks by this application a stay of the Enforcement Order pending the final outcome of

the Defendant's challenge to the Award.

10. Pursuant to CPR 32.12(2)(a), Mr Daele has consented to his Second Witness Statement filed under CL-2019-000262 to be used in these proceedings.

**Statement of Truth**

*~~(I believe)~~(The applicant believes)* that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name......TYRONE REES-DAVIES.....................................................

Name of Applicant's legal representative

..........MISHCON DE REYA LLP.............................................

**Signed**

Applicant's legal representative

**Date**    23/05/2019.

# EXHIBIT E

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| Southern District of New York |
| Case number (*If known*): 19-_____ Chapter 15 |

☐ Check if this is an amended filing

## Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

| | |
| --- | --- |
| 1. **Debtor's name** | BSG Resources Limited (in administration) |

2. **Debtor's unique identifier**

**For non-individual debtors:**

☐ Federal Employer Identification Number (EIN)   ___ ___ – ___ ___ ___ ___ ___ ___ ___

☐ Other _____. Describe identifier _____.

**For individual debtors:**

☐ Social Security number:   xxx – xx– ____ ____ ____ ____

☐ Individual Taxpayer Identification number (ITIN):  **9** xx – xx – ____ ____ ____ ____

☐ Other _____. Describe identifier _____.

| | |
| --- | --- |
| 3. **Name of foreign representative(s)** | William Callewaert and Malcom Cohen, as Joint Administrators |
| 4. **Foreign proceeding in which appointment of the foreign representative(s) occurred** | In the Matter of BSG Resources Limited and In the Matter of Part XXI of the Companies (Guernsey) Law, 2008 (The Royal Court of Guernsey (Ordinary Division)) |

5. **Nature of the foreign proceeding**

*Check one:*

☑ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

6. **Evidence of the foreign proceeding**

☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☐ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.

_____
_____

7. **Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

☑ Yes

Debtor    __BSG Resources Limited (in administration)__    Case number *(if known)* 19-_____
Name

---

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i)   all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)  all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii) all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

---

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Guernsey
_____

**Debtor's registered office:**

West Wing, Frances House
_____
Number      Street

St. William Place
_____
P.O. Box

St. Peter Port GY1 1GX
_____
City          State/Province/Region    ZIP/Postal Code

Guernsey
_____
Country

**Individual debtor's habitual residence:**

_____
Number      Street

_____
P.O. Box

_____
City          State/Province/Region    ZIP/Postal Code

_____
Country

**Address of foreign representative(s):**

Rue du Pré
_____
Number      Street

_____
P.O. Box

St. Peter Port GY1 3QG
_____
City          State/Province/Region    ZIP/Postal Code

Guernsey
_____
Country

---

**10. Debtor's website** (URL)

http://www.bsgresources.com/
_____

---

**11. Type of debtor**

*Check one:*

☑ Non-individual (*check one*):

   ☑ Corporation.  Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ☐ Partnership

   ☐ Other.  Specify: _____

☐ Individual

---

Debtor  __BSG Resources Limited (in administration)__                    Case number (if known) 19-_____
         Name

---

**12. Why is venue proper in *this* district?**

Check one:

☑ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

_____

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

_____

---

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ _W. C_____                            William Callewaert
   Signature of foreign representative          Printed name

Executed on __6/3/2019__                     ACTING AS AGENT ONLY AND STRICTLY
        MM / DD / YYYY                     WITHOUT PERSONAL LIABILITY

✗ _____                           Malcolm Cohen
   Signature of foreign representative          Printed name

Executed on __6/3/2019__                     Acting as agent only and
        MM / DD / YYYY                     strictly without personal
                         liability

---

**14. Signature of attorney**

✗ _____                     Date __6/3/2019__
   Signature of Attorney for foreign representative        MM / DD / YYYY

Frederick D. Hyman
Printed name

Duane Morris LLP
Firm name

1540 Broadway
Number        Street

New York                           NY        10036
City                               State     ZIP Code

(212) 692-1000                     RHyman@duanemorris.com
Contact phone                      Email address

2553832                            NY
Bar number                         State

---

*IN CAMERA*

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**IN THE MATTER OF BSG RESOURCES LIMITED**

**AND**

**IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008**

*CERTIFIED TRUE COPY*

*SAM DINGLE*
*21/3/18*

**OGIER (GUERNSEY) LLP
REDWOOD HOUSE
ST JULIAN'S AVENUE
ST PETER PORT
GUERNSEY, GY1 1WA**

---

**COURT ORDER**

---

**UPON** the Application dated 27th February 2018 (the "**Application**") of BSG RESOURCES LIMITED (the "**Company**"), whose registered office is at West Wing, Frances House, St William Place, St Peter Port, Guernsey GY1 1GX and whose address for service is at Ogier, Redwood House, St Julian's Avenue, St Peter Port;

**AND WHEREAS** the Application was heard *in camera* by J.R. Finch OBE, Judge of the Royal Court, on 6 March 2018 and an administration order was made in relation to the Company and William Callewaert and Malcolm Cohen were appointed as joint administrators of the Company (the "**Joint Administrators**") as set out in the Court Order dated 6 March 2018, a copy of which is attached hereto;

**AND WHEREAS** William Callewaert was present in Court on 6 March 2018 and the Court administered the oath of Joint Administrator with the power to act alone in respect of him, but Malcolm Cohen was not present in Court on that day and did not have the oath of joint administrator administered to him;

**THE COURT ADMINISTERED** this day the oath of Joint Administrator with the power to act alone to the said MALCOLM COHEN.

Dated this 21st day of March 2018

............................................

**J. R. Finch OBE
Judge of the Royal Court**

*__IN CAMERA__*

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**IN THE MATTER OF BSG RESOURCES LIMITED**

**AND**

**IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008**

---

**COURT ORDER**

---

**UPON** the Application dated 27th February 2018 (the "**Application**") of BSG RESOURCES LIMITED (the "**Company**"), whose registered office is at West Wing, Frances House, St William Place, St Peter Port, Guernsey GY1 1GX and whose address for service is at Ogier, Redwood House, St Julian's Avenue, St Peter Port;

**AND UPON** reading the First Affidavit of Peter Harold Driver sworn on 27 February 2018;

**AND UPON** confirmation that administration proceedings under part XXI of The Companies (Guernsey) Law, 2008 (the "**Companies Law**") are "proceedings" within the meaning of Article 2(a), and any administrators appointed in those proceedings (being administrators of the Company) shall be deemed foreign representatives within the meaning of Article 2(d), of the UNCITRAL Model Law on Cross Border Insolvency;

**AND UPON** hearing Advocate M. C. Newman for the Applicant;

**IT IS ORDERED THAT:**

1       The hearing of this matter be *in camera* and the Court file be sealed;

2       Notwithstanding that the matter is heard *in camera* and the Court file is sealed, the fact of any orders made and copies of any Act of Court in this matter can be disclosed to third parties by the Joint Administrators (as such term is defined in paragraph 5 of this Order) as they see fit;

3      The hearing of this Application shall take place before a judge sitting alone pursuant to section 13(1) of The Royal Court (Reform) (Guernsey) Law, 2008;

4      An administration order be made in relation to the Company pursuant to section 374(1) of the Companies Law for the purpose of the survival of the Company, and the whole or any part of its undertaking, as a going concern;

5      Pursuant to sections 374(2) and 383(3) of the Companies Law, William Callewaert of BDO Limited, Rue du Pré, St Peter Port, Guernsey GY1 3QG and Malcolm Cohen of BDO LLP of 55 Baker Street, London W1U 7EU be appointed and sworn in as joint administrators (the **"Joint Administrators"**) of the Company to manage the affairs, business and property of the Company;

6      The Joint Administrators have the power for each to act alone or jointly together and with all of the powers set out at schedule 1 to the Companies Law;

7      The Joint Administrators' remuneration and all fees and expenses properly incurred by the Joint Administrators be payable in priority to all other claims from the assets of the Company pursuant to section 383(1) of the Companies Law;

8      Pursuant to section 383(2) of the Companies Law, the Joint Administrators' remuneration in relation to the administration of the Company be fixed in accordance with the schedule of hourly rates and the description of tasks and estimates of fees specified in the Driver Affidavit;

9      The costs of and incidental to this Application be paid from the Company's assets as a cost of the administration of the Company pursuant to section 383(1) of the Companies Law; and

10     The Joint Administrators shall report to the creditors of the Company giving detailed information to the creditors regarding the progress of the administration at least once every six months from the date hereof.

**AND THE COURT ADMINISTERED** the oath of Joint Administrator with the power to act alone to the said WILLIAM CALLEWAERT, the said MALCOLM COHEN not being present to be sworn into office at a later date.

...............................................

**J. R. Finch OBE**
**Judge of the Royal Court**

6th MARCH, 2018.



# EXHIBIT F

DUANE MORRIS LLP
Frederick D. Hyman (NY 2553832)
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
RHyman@duanemorris.com

-and-

Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Ste. 1600
Wilmington, Delaware 19801
Telephone: (302) 657-4952
JPHitchings@duanemorris.com

*Attorneys for William Callewaert and Malcolm Cohen*
*in their capacity as Joint Administrators and Foreign Representatives*
*for the Debtor BSG Resources Limited (in administration)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (_____) |
| Debtor in a Foreign Proceeding. | |

---

### *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND RELIEF PURSUANT TO SECTIONS 1519 AND 105(A) OF THE BANKRUPTCY CODE

William Callewaert and Malcolm Cohen (together, the "Joint Administrators"), in their capacity as court-appointed joint administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Part XXI of the Companies (Guernsey) Law, 2008, pending before the Royal Court of Guernsey (Ordinary Division) (the "Guernsey Administration"), by and though their undersigned counsel, respectfully make this application (the "Application"), pursuant to Rule 65 of the Federal Rules of Civil Procedure made applicable to this proceeding through Rule 7065 of the Federal Rules of Bankruptcy Procedure and sections 105(a), 1507, and 1519 of

title 11 of the United States Code (the "Bankruptcy Code"), for (i) immediate entry, on an *ex parte* basis, of a temporary restraining order, substantially in the form attached hereto as **Exhibit A**, staying execution against the assets of the Debtor, applying section 362 of the Bankruptcy Code in this Chapter 15 case on a provisional basis, and scheduling a hearing on the Joint Administrators' request for a preliminary injunction; and (ii) if the Joint Administrator's request for recognition of the Guernsey Administration has not been adjudicated prior to the hearing on the Joint Administrators' request for a preliminary injunction, entry of a preliminary injunction order, substantially in the form attached hereto as **Exhibit B**, extending the relief in the temporary restraining order until disposition of the Debtor's *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified Petition").   In support of this Application, the Joint Administrators rely upon the *Declaration of the Malcolm Cohen* (the "Cohen Declaration"), which has been filed concurrently herewith, and respectfully state as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

2.      This case has been properly commenced pursuant to Section 1504 of the Bankruptcy Code by filing the Verified Petition for recognition of Guernsey Administration pending against the Debtor in Royal Court of Guernsey (Ordinary Division) (the "Guernsey Court") pursuant to Part XXI of the Companies (Guernsey) Law, 2008.

3.      Venue is proper pursuant to 28 U.S.C. § 1410.

4.      The statutory bases for relief are sections 105(a), 1507, 1519, and 1521 of the Bankruptcy Code.

DM3\5776992.3

**Relief Requested**

5.    By this Motion, the Joint Administrators seek entry of (i) an *ex-parte* temporary restraining order and stay of execution against the Debtor's assets in the United States and application of section 362 of the Bankruptcy Code in this Chapter 15 Case on an interim basis pursuant to sections 1519(a)(1), 1519(a)(3), and 105(a) of the Bankruptcy Code, (ii) if the Joint Administrators' request for recognition of the Guernsey Administration has not been adjudicated prior thereto, after notice and a hearing, an order granting a preliminary injunction until disposition of the Verified Petition, and (iii) such other and further relief as the Court deems just and proper.

**Background**

## I.    The Debtor's Business

### A.    Corporate Structure

6.    The Debtor is a non-cellular limited liability company incorporated in Guernsey. Cohen Declaration at ¶ 8.  A chart showing the Debtor's corporate organization is annexed to the Verified Petition as Exhibit B.

7.    The Debtor is engaged, through certain subsidiaries and associates, in activities related to the exploration, development, extraction, refinement and marketing of natural resource products, including diamonds and power generation.   Cohen Declaration at ¶ 9. The Debtor previously also actively engaged in the iron ore and ferronickel sectors. *Id.*

8.    The Debtor's business and trading is limited to advisory and technical services provided to a number of its subsidiaries Cohen Declaration at ¶ 10. The business and trading interests of the Debtor's subsidiaries can be categorized as follows:

a.    Diamond operation held through a subsidiary, Octea Limited (incorporated and registered in Guernsey) with mining operations in the Republic of Sierra Leone (the "Octea Diamond Operation").  The Octea Diamond Operation is operating under the supervision of its board and an observer to the board

3

appointed by the Joint Administrators. However, it is not presently producing cash flows which are available to the Debtor.

b.   A minority interest in a power generation operation held through a subsidiary, West African Power Limited (incorporated and registered in Guernsey), in the Federal Republic of Nigeria (the "<u>West African Power Operation</u>"). The Debtor does not have effective control of the underlying operating company which is a minority interest and the subject of dispute with the co-investor, Forte Oil plc. The disputes relate to the funding of West African Power Operation and the right to representation of West African Power Limited on the board of the Nigerian operating subsidiary. West African Power Limited, in consultation with the Debtor, is currently exploring options to resolve the dispute and to monetize the Debtor's indirect investment. Accordingly, the Debtor is not receiving any current cash flows from the West African Power Operation.

c.   Iron ore operation held through a subsidiary, BSG Resources (Guinea) Limited (incorporated and registered in Guernsey) (the "<u>Guinea Iron Ore Mining Operation</u>"). As described in detail below, the Debtor's Guinea Iron Ore Mining Operation has ceased.

*Id.*

**B.     The Debtor's Guinean Mining Operations**

9.     The Guinean Iron Ore Mining Operation relates to its interests in world-class iron ore deposits in the Republic of Guinea and comprise the following:

a.   An iron ore mining concession granted to BSG Resources (Guinea) SARL ("<u>BSGR Guinea</u>") on March 19, 2010 over an area in Simandou South, near the village of Zogota (the "<u>Zogota Mining Concession</u>");

b.   A mining and infrastructure agreement dated December 16, 2009 entered into by two subsidiaries of the Debtor, BSGR Guinea and VBG-Vale BSGR Ltd. (n/k/a BSG Resources (Guinea) Limited) ("<u>VBG</u>"), with the Republic of Guinea regarding the rights and obligations arising from the Zogota Mining Concession ("<u>Basic Agreement</u>"); and

c.   A prospecting permit granted to BSGR Guinea over an area referred to as "Simandou Blocks 1 and 2" granted on December 9, 2008 ("<u>Blocks 1 and 2 Permit</u>").

Cohen Declaration at ¶ 11.

4

10.     In 2010, the Debtor entered into a joint venture with the Brazilian mining company Vale S.A. ("Vale") in relation to the development of the three rights and concessions described above (the "Mining Rights").  Cohen Declaration at ¶ 12. The joint venture, VBG, is referred to above. *Id.*

11.     In 2011, Alpha Condé was elected President of the Republic of Guinea. Cohen Declaration at ¶ 13. Following President Condé's election, the Debtor, BSGR Guinea and VBG faced obstruction in developing the Mining Rights. *Id.*  In 2012, the Debtor was informed that President Condé had set up a committee aimed at investigating how certain mining rights in Guinea (including the Mining Rights) had been obtained (the "Guinea Review Committee"). *Id.* Throughout the review process, the Debtor complained about the lack of due process and apparent prejudice being shown to it by the Guinea Review Committee. *Id.* The Debtor denied – and continues to deny – the allegations made against it by the Guinea Review Committee. *Id.*

12.     In response to an allegation of corruption made by the Guinea Review Committee against the Debtor and a wider group of its affiliates, the Debtor's board initiated a review using an independent professional accountancy firm to verify the accuracy of its internal controls, processes and payment procedures, including confirmation that payments made by the Debtor and its affiliates in connection with the Mining Rights were proportionate and of an appropriate business nature. Cohen Declaration at ¶ 14. According to the Debtor's board, this review has not revealed any matters that support the allegations of wrongdoing by the Guinea Review Committee. *Id.*

13.     However, in March 2014, the Guinea Review Committee recommended to the Strategy Committee of the Government of Guinea (the "Strategy Committee") that the Mining

Rights be cancelled and expropriated, and the companies within the Debtor's control be prevented from being re-awarded the Mining Rights (the "Notification"). Cohen Declaration at ¶ 15.

14.     In April 2014, the Government of Guinea accepted the recommendations of the Strategy Committee to strip BSGR Guinea and VBG of the Mining Rights and to exclude the Debtor, BSGR Guinea and VBG from participating in the tender process to reallocate the Mining Rights. Cohen Declaration at ¶ 16.

15.     As a result of the Guinea Review Committee's recommendations and the actions of the Guinean government, the Debtor's Guinean mining operations have ceased. Cohen Declaration at ¶ 17.  Whether such operations will recommence is currently uncertain. *Id.*

16.     The Debtor had asserted, prior to the appointment of the Joint Administrators, that the basis of the Guinea Review Committee's recommendation was not legitimate. Cohen Declaration at ¶ 18.  The Debtor had also asserted that the decisions of the Guinea government were importuned, influenced, motivated and ultimately controlled by certain illegal conduct of George Soros and certain co-conspirators, which assertion is the basis of the Soros Claim (as defined and further described below). *Id.*

C.     **Litigation Following the Expropriation of the Debtor's Guinean Mining Interests**

1.     **The Guinea ICSID Proceeding**

17.     In August 2014, the Debtor initiated an arbitration proceeding with the International Centre for Settlement of Investment Disputes ("ICSID") against the Republic of Guinea. Cohen Declaration at ¶ 19.  In May 2015, the Debtor repurchased Vale's shares in VBG. *Id.*  VBG was thereafter renamed BSG Resources (Guinea) Limited. *Id.* On October 13, 2015, VBG also issued an ICSID claim against the Republic of Guinea in respect of the Mining Rights. *Id.* Subsequently, the two ICSID claims against the Republic of Guinea were consolidated and an Amended

6

Statement of Claim was issued on behalf of the Debtor, VBG and BSGR Guinea on February 29, 2016 (generally, the "Guinea ICSID Proceeding"). *Id.* Through the Guinea ICSID Proceeding, the Debtor and its subsidiaries are seeking the restitution of the Mining Rights, as well as damages arising out of the unlawful revocation and expropriation of the Mining Rights. *Id.*

18.     A hearing in the Guinea ICSID Proceeding was held in Paris, France between May 22 and June 2, 2017. Cohen Declaration at ¶ 20.  The briefing of the Guinea ICSID Proceeding was concluded in July 2018.

19.     In February 2019, a non-binding agreement was signed by the Debtor and two of its subsidiaries and the Government of Guinea to set out certain provisional matters which the parties would seek to progress as a means to resolve the Guinea ICSID Proceeding on a consensual basis. Cohen Declaration at ¶ 21. If such a consensual resolution is ultimately reached, it is anticipated that it will include the release of all of the Debtor's claims to the Simandou and Zogota licenses in return for the grant by the Government of Guinea of a new license over the Zogota deposits, to be exploited by a third party, with the Debtor to be entitled to participate in the revenues from this license, as well as a mutual withdrawal of allegations made by each party in the Guinea ICSID Proceeding.  *Id.* Work is proceeding towards the progression of the non-binding agreement into a formal, binding contractual arrangement. *Id.* While that work is on-going, the Guinea ICSID Proceeding is currently suspended (although may be recommenced by either party in the event that the negotiations between the parties do not result in consensual settlement). *Id.*

## 2.     The Vale LCIA Proceeding

20.     Separately, on April 28, 2014, prior to the Debtor's purchase of Vale's VBG Shares, Vale filed a Request for Arbitration against the Debtor in the London Court of International Arbitration (the "LCIA") seeking to recoup its investment in VBG which was allegedly lost as a

7

result of the expropriation actions of the Guinean government (generally, the "Vale LCIA Proceeding"). Cohen Declaration at ¶ 22.

21.    Years later, on April 4, 2019, the LCIA tribunal entered an award in favor of Vale and against the Debtor in the amount of $1,246,580,846 plus pre- and post-award interest (the "LCIA Award"). Cohen Declaration at ¶ 23. A copy of the LCIA Award is annexed to the Verified Petition as Exhibit C.

22.    The Debtor filed a timely challenge under Section 68 of the English Arbitration Act 1996 (the "UK Arbitration Challenge") to the LCIA Award with the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD) on May 10, 2019. Cohen Declaration at ¶ 23.  The UK Arbitration Challenge is made on the basis that the LCIA tribunal was infected by apparent bias and/or failed to comply with its general duty to conduct the proceedings fairly and impartially which constitutes a "serious irregularity" under English law. *Id.* The primary relief sought by the Debtor in the UK Arbitration Challenge is that the LCIA Award be set aside and/or declared to be of no effect.  *Id.*

23.    Vale has obtained an order from the English High Court dated May 9, 2019 to enforce the LCIA Award in England and Wales (the "UK Enforcement Order"). Cohen Declaration at ¶ 25. However, the UK Enforcement Order has since been stayed by virtue of an application made by the Debtor to the English High Court on May 23, 2019 to set aside the UK Enforcement Order (the "Set Aside Application").  *Id.* The Set Aside Application was made on the basis that the Debtor has separately issued the UK Arbitration Challenge the effect of which, if successful, would be to set aside or annul the LCIA Award. *Id.* Vale is automatically stayed from enforcing the LCIA Award in England and Wales pending final determination of the Set Aside Application. *Id.*

8

24.     Notwithstanding the UK Arbitration Challenge and the stay issued in connection with the Set Aside Application, on April 23, 2019, Vale filed a *Petition for Recognition and Enforcement of a Foreign Arbitration Award* (the "Vale Enforcement Petition") in the United States District Court for the Southern District of New York (the "District Court"). Cohen Declaration at ¶ 26. That action is docketed in the District Court as *Vale S.A. v. BSG Resources Limited*, Case No. 19-cv-3619-VSB. *Id.* Through the Vale Enforcement Petition, Vale is seeking recognition of the LCIA Award by the District Court, together with entry of judgment against the Debtor in an amount equal to the LCIA Award plus interest and costs. *Id.*

### 3.     The Soros Claim – the Debtor's Only U.S. Asset

25.     The Debtor's only asset in the United States is a contingent litigation interest against George Soros and certain entities he controls. Cohen Declaration at ¶ 27. As described further herein and in the Verified Petition and TRO Application, recognition of the Guernsey Administration is necessary in order to protect and preserve the Debtor's interest in this asset. *Id.*

26.     On April 14, 2017, the Debtor, VBG (n/k/a BSG Resources (Guinea) Limited), and BSGR Guinea filed a complaint in the District Court against George Soros and Open Society Foundations, which was later amended to include as defendants Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund (collectively, the "Soros Defendants") asserting claims for illegal interference with contract, fraud, defamation and other matters relating to the Soros Defendants' involvement in the Guinean government's expropriation of the Debtor's Mining Interests (generally, the "Soros Claim"). Cohen Declaration at ¶ 28.

27.     By the Soros Claim, the Debtor and its co-plaintiffs seek to recover over $10 billion in damages arising from wrongful conduct of the Soros Defendants. Cohen Declaration at ¶ 29.

9

28.     The Soros Claim is docketed in the District Court as *BSG Resources Limited v. Soros*, Case No. 17-cv-02726-JFK-OTW (S.D.N.Y. Apr. 14, 2017). Cohen Declaration at ¶ 30. The Soros Claim, including discovery, is presently stayed pending the outcome of the Guinea ICSID Proceeding. *Id.* A status conference is scheduled before the District Court on July 18, 2019 to determine the next steps in the litigation, including providing an update on the Guinea ICSID Proceeding and the possible recommencement of discovery.  *Id.*

29.     The Joint Administrators have been informed that the Soros Claim is pledged as collateral to secure the Debtor's obligations under a certain Litigation Funding Agreement dated as of November 2017 (the "Funding Agreement") between Litigation Solutions Limited ("LSL") and the Debtor, VBG, and BSGR Guinea. Cohen Declaration at ¶ 31. Pursuant to a certain Security Agreement between these parties, the Debtor has pledged and granted LSL a security interest over a portion of any recoveries on the Soros Claim.  *Id.*  The continued effectiveness of the Funding Agreement is critical to the Debtor's restructuring efforts. *Id.*  Without the proceeds from LSL, the Debtor would not have the resources to fund the costs necessary to pursue the Soros Claim. *Id.*

**D.     Standard Chartered Bank Assignment**

30.     In addition to Vale and LSL, the Debtor has one additional alleged creditor that may have an interest in, or be affected by, this Chapter 15 Case. Together with certain of its affiliates, the Debtor is a party to a certain Implementation Agreement (as amended from time to time, the "SC Agreement") with Standard Chartered Bank ("Standard Chartered"). Cohen Declaration at ¶ 32. The SC Agreement relates to the restructuring of a $92,000,000 amortizing term loan facility extended by Standard Chartered to certain of the Debtor's affiliates. *Id.* Under the terms of the SC Agreement, Standard Chartered purports to have taken an assignment of any proceeds (including, in summary, receivables, dividends from subsidiaries or the proceeds from

any claims) that may be paid to the Debtor now or in the future as security for such amounts as may be owed by the Debtor to Standard Chartered under the SC Agreement. *Id.* at ¶ 33.

### E.   Events Giving Rise to the Guernsey Administration

31.   The events giving rise to the Guernsey Administration are described above. In summary, by February 2018, the Debtor's board determined that the Debtor was insolvent or likely to become insolvent, satisfying the requirements of the laws of Guernsey in respect of the making of an administration order against the Debtor by the Guernsey Court. Cohen Declaration at ¶ 34. This determination was based mainly on the expropriation of the Debtor's Guinean mining interests and the potential for an adverse judgment in the Vale LCIA Proceeding. *Id.*

## II.   Commencement of the Guernsey Administration

32.   On or about February 27, 2018, the Debtor, acting by its directors at that time, submitted an *Application by the Company for an Administration Order* to the Guernsey Court pursuant to Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration Application"). Cohen Declaration at ¶ 35. The Guernsey Administration Application was supported by the *Affidavit of Peter Harold Driver in Support of Company's Application for an Administration Order* (the "Driver Affidavit") which was submitted to the Guernsey Court under seal by Peter Harold Driver, a director of the Debtor.[1] *Id.* Inasmuch as the Guernsey Administration Application and the Driver Affidavit contained confidential information and were submitted to the Guernsey Court under seal, the Guernsey Administration Application was heard *in camera* by the Guernsey Court on March 6, 2018. *Id.* On the same date, the Guernsey Court entered a *Court*

---

[1] A copy of the Driver Affidavit, together with its supporting exhibits has been submitted to this Court under seal in support of this Chapter 15 Case and the First Day Motions.

DM3\5776992.3

*Order* commencing the Guernsey Administration and, among other things, appointing the Joint Administrators.[2] *Id.*; *see also,* Verified Petition, Exhibit A.

33.    The Guernsey Administration is on-going. Cohen Declaration at ¶ 36. The statutory purpose of the Guernsey Administration as set forth in the Guernsey Administration Order is the survival of the Debtor and the whole or any part of its undertaking as a going concern. *Id.; see also,* Exhibit A. The Joint Administrators' role is to fulfil this purpose. *Id.* In order to achieve this, the Joint Administrators have been working closely with the Debtor's management and advisors to preserve and ultimately monetize the Debtor's valuable assets – including the Soros Claim and the Guinea ICSID Proceeding – and to defend against asserted liabilities (*e.g.,* the Vale LCIA Proceeding). *Id.; see also* Progress Reports of BSG Resources Limited – In Administration dated September 5, 2018 and March 7, 2019 annexed to the Verified Petition as Exhibits D and E.

34.    The Joint Administrators have been advised of the definition of a "foreign proceeding" under Bankruptcy Code section 101(23) and are not aware of any other "foreign proceeding" within the meaning of Bankruptcy Code section 101(23) with respect to the Debtor. Cohen Declaration at ¶ 37.

## III.    Center of Main Interests of the Debtor

35.    The center of main interests, or "COMI" for the Debtor is in Guernsey.  The Debtor is organized under Guernsey law and has its registered office in Guernsey. Cohen Declaration at ¶ 38.

36.    Further, although the Guernsey Administration has the effect of suspending the management powers of the Debtor's directors and officers, the Debtor's main office and its

---

[2] Shortly thereafter, the Guernsey Court issued a *Court Order* dated March 21, 2018, whereby it confirmed that it has administered to each of the Joint Administrators the affirmation of Joint Administrator, each with the power to act alone.  The March 6 and March 21, 2018 orders are collectively referred to as the "Guernsey Administration Order". Cohen Declaration at ¶ 4.

DM3\5776992.3

chairman are resident in Guernsey. Cohen Declaration at ¶ 39. Also, the Debtor's central decision-making function prior to its entry into the Guernsey Administration, both long-range and day-to-day, took place in Guernsey. *Id.* Since the commencement of the Guernsey Administration, the Debtor's decision-making function has been carried out by the Joint Administrators, one of which is resident in Guernsey. *Id.* Because the other Joint Administrator is resident in London, England, some of the Debtor's decision-making function may occur jointly in London and/or via telephone to Guernsey. *Id.* In any event, the Debtor's accounting function, as well as all of its corporate books and records, including documents of title, are located in Guernsey. *Id.*

37.     Accordingly, pursuant to Bankruptcy Code section 1516(c), the Debtor is entitled to the presumption that its COMI is Guernsey.

38.     Given the magnitude of the LCIA Arbitration Award and its evident intent to aggressively pursue enforcement of the award notwithstanding the pendency of the UK Enforcement Order and the Set Aside Application, the Debtor fears that, absent a restraining order, the District Court may enter an order granting recognition of the LCIA Arbitration Award and Vale may attempt to try to seize, freeze, or otherwise enjoin or encumber the Debtor's assets in the United States or attempt to interfere in the Debtor's prosecution of the Soros Claim. Such a result would severely impair the Debtor's ability to successfully restructure through the Guernsey Administration. Given the likelihood of irreparable harm to the Debtor without a restraining order, the Debtor requires immediate relief on an emergency basis.

## Argument

### I.     The Relief Requested Is Authorized by Sections 1519 and 105

39.     Upon this Court's final recognition of the Guernsey Administration as a "foreign main proceeding," the automatic stay provided by section 362 of the Bankruptcy Code will immediately apply with respect to all of the Debtor's property that is within the territorial

jurisdiction of the United States. *See* 11 U.S.C. § 1520(a)(1). However, unlike in a typical

corporate reorganization case under Chapter 11 of the Bankruptcy Code, in an ancillary proceeding

commenced under Chapter 15, no automatic stay protects the Debtor's assets and operations in the

United States during the period between the petition date and the date on which the Court enters

an order recognizing the Guernsey Administration as a foreign proceeding.

40.     Therefore, to prevent any irreparable harm during the "interim period" between

commencement of a Chapter 15 proceeding and entry of an order recognizing the foreign

proceeding, section 1519(a) of the Bankruptcy Code authorizes courts to grant "relief of a

provisional nature" from the time of filing a petition for recognition until the court rules on the

petition, where such relief is "urgently needed to protect the assets of the debtor or the interests of

the creditors," including "staying execution against the debtor's assets." 11 U.S.C. § 1519(a)(1).

Pursuant to section 1519(a)(3) of the Bankruptcy Code, courts are authorized to grant, on a

provisional basis, the relief available under section 1521(a)(7) of the Bankruptcy Code, which in

turn provides for any relief available to a trustee in a case under the Bankruptcy Code, subject to

certain statutory exceptions not relevant here.[3] *See* 11 U.S.C. §§ 1519(a)(3), 1521(a)(7).[4]

41.     Courts commonly grant provisional relief to protect a debtor's assets until a

recognition hearing, and such relief often includes enjoining the prosecution of litigation against a

debtor in order to protect and preserve the Debtor's reorganization efforts. *See, e.g., In re Qimonda

AG*, No. 09-14766-RGM, 2009 Bankr. LEXIS 2330 (Bankr. E.D. Va. July 16, 2009) (enjoining

---

[3] Section 1521 provides that the court may grant appropriate relief, including "any additional relief that may be
available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724 (a)." 11 U.S.C.
§ 1521(a)(7).

[4] Section 362 of the Bankruptcy Code provides relief to a trustee by, among other things, enjoining creditor actions
against debtors and their property, and is an essential feature of the Bankruptcy Code. Further, section 105(a) of the
Bankruptcy Code allows courts to "issue any order . . . necessary or appropriate to carry out the provisions of [title

14

litigation pending in the United States against Debtor in order to afford the debtor the opportunity to resolve all claims against it through its insolvency proceedings); *see also In re Caledonian Bank Ltd.*, No. 1510324 (MG) (Bankr. S.D.N.Y. Feb. 16, 2015) (granting a stay of execution against the debtor's assets because, absent such relief, the Debtor would "suffer irreparable harm to the value of its business, assets, and property"); *In re Tibanne Co. Ltd.*, No. 15-10355 (REG) (Bankr. S.D.N.Y. Feb. 13, 2015) (granting injunction and finding that an attack on the debtor's assets in the United States would cause harm to the debtor's efforts to liquidate); *In re Sifco S.A.*, No. 14-11179 (REG) (Bankr. S.D.N.Y. May 7, 2014) (finding a material risk that creditors or other parties in interest would attempt to control or possess the debtor's assets existed absent an injunction).

## II.    The Debtor's Circumstances Satisfy the Standards for Injunctive Relief

42.    Relief under section 1519 is available where the foreign representative can satisfy the applicable standard for injunctive relief.  11 U.S.C. § 1519(e).  To obtain injunctive relief, the movant must make a showing of (1) a likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) a balance of the hardships tipping in their favor; and (4) non-disservice of the public interest by issuance of a preliminary injunction.  *Secured Worldwide LLC v. Kinney*, No. 15 CIV. 1761 CM, 2015 WL 1514738, at *10 (S.D.N.Y. Apr. 1, 2015) (citing 11]."  Therefore, the Court may apply section 362 of the Bankruptcy Code in this Chapter 15 Case as the protections afforded by that section constitute "relief that may be available to a trustee."  11 U.S.C. §§ 1519(a)(3) and 1521(a)(7).  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008)).  The Debtor's circumstances satisfy the requirements for injunctive relief.

### A.    The Joint Administrators Have a Likelihood of Success on the Merits

43.    To demonstrate a likelihood of success on the merits, the Joint Administrators must demonstrate that (i) the Guernsey Administration is a foreign proceeding within the meaning of section 101(23) of the Bankruptcy Code and (ii) the Guernsey Administration is pending in the

15

country where the Debtor has its center of main interests.  *See* 11 U.S.C. § 1517(b) (identifying the criteria for recognition).

44.     Section 101(23) defines "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country . . . under a law relating to insolvency or adjustment of a debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 103(23).  The Guernsey Administration fits squarely within this definition.  The Guernsey Administration was filed pursuant to Part XXI of the Companies (Guernsey) Law, 2008 — Guernsey's counterpart to the United States Bankruptcy Code.

45.     The Guernsey Administration is also pending in the country where the Debtor has its center of main interests.  The Bankruptcy Code provides that a foreign proceeding for which Chapter 15 recognition is sought must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of main interests.  11 U.S.C. §§ 1517(b)(1), 1502(4).  Although "center of main interests" is not defined in the Bankruptcy Code, courts in the U.S. have generally found the center of main interests to be where the debtor conducts the administration of its interests on a regular basis and is, therefore, ascertainable by third parties.  *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 136 (2d Cir. 2013) ("[t]he relevant principle . . . is that COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties"); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37 (Bankr. S.D.N.Y. 2008); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008); *In re SphinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).  In the absence of

evidence to the contrary, the debtor's registered office is presumed to be the center of its main interests.  11 U.S.C. § 1516(c).

46.     In the instant case, the Debtor's registered office is located in Guernsey.  Accordingly, in the absence of evidence to the contrary, its center of main interests is presumed under the Bankruptcy Code to be in Guernsey.  Even in the absence of this presumption, however, it is axiomatic that Guernsey is the Debtor's center of main interests.  The Debtor's office and its chairman are resident in Guernsey.  Also, the Debtor's central decision-making function prior to its entry into the Guernsey Administration, both long-range and day-to-day, took place in Guernsey.  Since the commencement of the Guernsey Administration, the Debtor's decision-making function has been carried out by the Joint Administrators, one of which is resident in Guernsey. Because the other Joint Administrator is resident in London, England, some of the Debtor's decision-making function may occur jointly in London and/or via telephone to Guernsey.  In any event, the Debtor's  accounting function, as well as all of its corporate books and records, including documents of title, are located in Guernsey.

47.     Based on the foregoing, it is clear that the Debtor's center of main interests is in Guernsey, the Guernsey Administration is a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code and the Debtor will be entitled to the relief requested upon entry of the order for relief.  Thus, the Joint Administrators are  highly likely to succeed on the merits.

**B.     The Debtor Will Suffer Irreparable Harm Absent the Provisional Relief Requested**

48.     The Debtor will face irreparable harm if the Court does not grant the provisional relief requested.  The Debtor's viability as a business depends, in large part, upon its ability to prosecute without interference the Soros Claim and to recover the proceeds therefrom.   As explained above and in the Verified Petition and the Cohen Declaration, any third-party attempt to

17

encumber or interfere with the Soros Claim will severely impair the Debtor's reorganization efforts.

49.     If the Debtor is unable to protect and preserve its interests in the Soros Claim, it certainly will not be able to undergo a successful restructuring, thereby thwarting the purpose of the Guernsey Administration and Chapter 15 of the Bankruptcy Code to the detriment of all of the Debtor's stakeholders.  Accordingly, provisional relief is required and justified to prevent such irreparable harm.

### C.     Balancing the Hardships Favors the Debtor

50.     The balancing of the hardships tips decidedly in favor of the Debtor.  Injunctive relief on a provisional basis will help preserve the Debtor's business and its estate for all stakeholders.  Absent the requested relief, the Debtor's principal asset may become severely impaired, threatening the recoveries of all stakeholders.  Parties seeking to act against the Debtor's assets in the United States, in turn, will have little or no harm as they will be able to participate on equal footing with other unsecured creditors in the reorganization of the Debtor on an equitable basis pursuant to Part XXI of the Companies (Guernsey) Law, 2008.

### D.     The Relief Requested is in the Public Interest

51.     Finally, the relief requested is in the public interest.  Protecting the Debtor's assets within the United States will assist the Guernsey Court in its efforts to oversee an equitable reorganization under Part XXI of the Companies (Guernsey) Law, 2008.

52.     In the context of a bankruptcy proceeding, the public interest is "in promoting a successful reorganization."  *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993); *Rehabworks, Inc. v. Lee (In re Integrated Health Servs., Inc.)*, 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests.").  In the instant case, a successful reorganization hinges on

preservation of the Debtor's litigation asset. Moreover, granting the requested relief furthers the cooperation between courts of the United States and foreign courts—one of the core purposes of Chapter 15. *See* 11. U.S.C. § 1501(a) ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of . . . cooperation between courts of the United States . . . and the courts and other competent authorities of foreign countries involved in cross-border insolvency cases.").

### Notice

53.     The Joint Administrators propose to serve copies of the order in accordance with the notice procedures set forth in the proposed order attached hereto as **Exhibit A**. The Joint Administrators further propose to provide copies of the Application upon request by any party in interest to:

> Duane Morris LLP
> Attn: Frederick D. Hyman and Jarret P. Hitchings
> 1540 Broadway
> New York, New York 10036
> Telephone: (212) 692-1000
> RHyman@duanemorris.com
> JPHitchings@duanemorris.com

### No Prior Request

54.     No prior request for the relief requested herein has been made to this or any other court.

### Waiver of Federal Rule of Civil Procedure 65(c)

55.     Bankruptcy Rule 7065 provides that "a temporary restraining order or preliminary injunction may be issued on the application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." To the extent Rule 65 of the Federal Rules of Civil Procedure applies, the Joint Administrators believe that the security requirements imposed by Rule 65(c) are

DM3\5776992.3

unwarranted under the circumstances and, accordingly, respectfully requests a waiver of such requirements pursuant to Bankruptcy Rule 7065.

WHEREFORE, the Joint Administrators respectfully request that the Court (i) enter the proposed order to show cause with temporary restraining order, substantially in the form attached hereto as **Exhibit A**, staying execution against the assets of the Debtor, applying section 362 of the Bankruptcy Code in this Chapter 15 Case on a provisional basis, and scheduling a hearing on the Joint Administrators' request for a preliminary injunction; (ii) enter a preliminary injunction order, substantially in the form attached hereto as **Exhibit B**, extending the relief granted in the temporary restraining order until disposition of the Petition, if the Joint Administrators' request for recognition of the Guernsey Administration has not been adjudicated prior thereto; and (iii) grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: June 3, 2019

DUANE MORRIS LLP

*/s/ Frederick D. Hyman*
Frederick D. Hyman (NY 2553832)
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
RHyman@duanemorris.com

-and-

Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Ste. 1600
Wilmington, Delaware 19801
Telephone: (302) 657-4952
JPHitchings@duanemorris.com

*Attorneys for William Callewaert and Malcolm Cohen in their capacity as Joint Administrators and Foreign Representatives for the Debtor BSG Resources Limited (in administration)*

## EXHIBIT A

**Proposed Order to Show Cause**

DM3\5776992.3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (_____) |
| Debtor in a Foreign Proceeding. | |

## ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER

William Callewaert and Malcolm Cohen (together, the "Joint Administrators") are the Court-appointed Joint Administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Guernsey's Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration"). The Joint Administrators are authorized to serve as the foreign representative of the Debtor as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code").

On June 3, 2019, the Joint Administrators commenced this Chapter 15 case (the "Chapter 15 Case") by filing, on behalf of the Debtor and pursuant to sections 1504 and 1515 of the Bankruptcy Code, the *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified Petition") along with the Official Form 401 (*Chapter 15 Petition for Recognition of a Foreign Proceeding*); the *Application for an Order (I) Scheduling Recognition Hearing, (II) Specifying Deadline for Filing Objections and (III) Specifying Form and Manner of Notice* (the "Notice Application"); and an *Ex Parte Application for Temporary Restraining Order and Relief Pursuant to Sections 1519 and 105(a) of the Bankruptcy Code* (the "Application for Provisional Relief" and, collectively with the Verified Petition and Notice Application, the "First Day Motions").

The Joint Administrators have also filed a memorandum of law (the "Memorandum of Law") and a *Declaration of Malcolm Cohen* (the "Cohen Declaration") in support of the First Day Motions.

By its Application for Provisional Relief, the Joint Administrators requested entry, on an *ex parte* basis, of a temporary restraining order staying execution against the assets of the Debtor, and applying section 362 of the Bankruptcy Code in this Chapter 15 Case on a provisional basis pending the earlier of (i) adjudication of the Joint Administrators' request for recognition of the Guernsey Administration or (ii) after notice and a hearing, entry of an order granting a preliminary injunction extending the provisional relief in the temporary restraining order until disposition of the Verified Petition.

The Court has considered and reviewed the Application for Provisional Relief, the Verified Petition, and the Cohen Declaration and all related documents filed contemporaneously therewith. Based on the foregoing,

**THE COURT FINDS AND CONCLUDES AS FOLLOWS:**

a)      The Joint Administrators have demonstrated a substantial likelihood of success on the merits that the Debtor is the subject of a pending foreign main proceeding and the Joint Administrators are the foreign representative of the Debtor;

b)      The Joint Administrators have demonstrated that, without a stay of execution against the Debtor's assets and the protections of section 362 of the Bankruptcy Code, there is a material risk that the Debtor will suffer irreparable harm to the value of its business, assets, and property as a result of potential enforcement and collection efforts of claimants pending the disposition of the Verified Petition;

c)      No injury will result to any party that is greater than the harm to the Debtor in the absence of the requested relief;

2

d)    The interests of the public will be served by this Court's granting of the relief requested by the Joint Administrators;

e)    Due to the nature of the relief requested, the Court finds that no security is required under Rule 65(c) of the Federal Rules of Civil Procedure to the extent applicable in these cases by Rule 7065 of the Federal Rules of Bankruptcy Procedure;

f)    It would not be feasible, prior to entry of this Order, for the Joint Administrators to serve prior notice of the Application for Provisional Relief on all parties-in-interest, and giving such prior notice would create the risk that creditors would rush to take actions that would undermine or defeat the purposes of the relief that the Joint Administrators seek.

g)    This Court has jurisdiction over this matter pursuant to 28 U.S.C §§ 157 and 1334 and section 1501 of the Bankruptcy Code;

h)    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and

i)    Venue is proper in this District pursuant to 28 U.S.C. § 1410.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Joint Administrators' application is **GRANTED** as of _____;

2.    All parties-in-interest shall show cause before the Honorable _____,
United States Bankruptcy Judge for the Southern District of New York, at a hearing at _____
on _____ (the "Hearing"), at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004, Courtroom #_____ as to why an order should not be entered:

      i.    establishing the Joint Administrators as the "foreign representative" of the Debtor as defined in section 101(24) of the Bankruptcy Code;

      ii.    enjoining all persons and entities subject to this Court's jurisdiction from taking or continuing to take any act to seize, attach, possess, execute upon,

3

exercise control over and/or enforce liens against any assets of the Debtor located in the territorial jurisdiction of the United States; and

iii.      directing that the automatic stay set forth in section 362 of the Bankruptcy Code shall be applicable, within the territorial boundaries of the United States, to the Debtor and its assets.

3.      Subject to paragraph 4 below, pending the Hearing:

i.      the Joint Administrators are established, on an interim basis, as the "foreign representative" of the Debtor as defined in section 101(24) of the Bankruptcy Code;

ii.      Pursuant to sections 1519(a)(1) and 105(a) of the Bankruptcy Code, all persons and entities are enjoined from seizing, attaching, possessing, executing, and/or enforcing liens against the assets of the Debtor; and

iii.      Pursuant to sections 1519(a)(3) and 105(a) of the Bankruptcy Code, the automatic stay pursuant to section 362 of the Bankruptcy Code is applicable in this Chapter 15 Case within the territorial jurisdiction of the United States; *provided, however*, that the automatic stay shall not enjoin a police or regulatory act of a governmental unit to the extent provided in Section 362(b)(4) of the Bankruptcy Code.

4.      Pursuant to Federal Rule 65(b)(4), any party in interest may make a motion seeking relief from or modifying this Order on no less than two (2) business days' notice to the Joint Administrators' United States counsel, by filing a motion seeking an order of this Court dissolving or modifying the injunction entered in this proceeding.

4

5.      Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the security

provisions of Rule 65(c) of the Federal Rules of Civil Procedure are waived.

6.      Notice of entry of this Order and of the Hearing shall be served within two business

days of its entry by United States mail first-class postage prepaid, by electronic mail or by fax on

all parties against whom relief is sought, or their counsel, if applicable, including such parties as

set forth in the List Pursuant to Bankruptcy Rule 1007(a)(4) filed concurrently herewith.

7.      Service in accordance with this Order shall constitute adequate and sufficient

service and notice.

8.      Responses or objections to the Joint Administrators' request for a preliminary

injunction shall be (i) made in writing and shall set forth the basis therefor, and such responses or

objections, if filed by an attorney, must be filed in accordance with General Order M-399 and the

Court's Current Guidelines for Electronic Filing (copies of which may be viewed on the Court's

website at www.nysb.uscourts.gov), and by all other parties in interest in hard copy filed with the

Office of the Clerk of the Court, One Bowling Green, New York, New York, with a hard copy to

be sent to the chambers of the Honorable _____, United States Bankruptcy

Judge and (ii) served by electronic mail and United States mail upon Duane Morris LLP, Attn:

Frederick D. Hyman and Jarret P. Hitchings, 1540 Broadway, New York, New York 10036,

counsel to the Joint Administrators, so as to be received on or before _____ at

_____, prevailing Eastern Time.

9.      This Court shall retain jurisdiction with respect to all matters relating to the

interpretation or implementation of this Order.


Dated: _____, 2019          _____

                                            United States Bankruptcy Judge

DM3\5776992.3

# <u>EXHIBIT B</u>

**Proposed  Preliminary Injunction Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (_____) |
| Debtor in a Foreign Proceeding. | |

## ORDER GRANTING PRELIMINARY INJUNCTION

William Callewaert and Malcolm Cohen (together, the "Joint Administrators") are the Court-appointed Joint Administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Guernsey's Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration"). The Joint Administrators are authorized to serve as the foreign representative of the Debtor as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code").

On June 3, 2019, the Joint Administrators commenced this Chapter 15 case (the "Chapter 15 Case") by filing, on behalf of the Debtor and pursuant to sections 1504 and 1515 of the Bankruptcy Code, the *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified Petition") along with the Official Form 401 (*Chapter 15 Petition for Recognition of a Foreign Proceeding*); the *Application for an Order (I) Scheduling Recognition Hearing, (II) Specifying Deadline for Filing Objections and (III) Specifying Form and Manner of Notice* (the "Notice Application"); and an *Ex Parte Application for Temporary Restraining Order and Relief Pursuant to Sections 1519 and 105(a) of the Bankruptcy Code* (the "Application for Provisional Relief" and, collectively with the Verified Petition and Notice Application, the "First Day Motions").

The Joint Administrators have also filed a memorandum of law (the "Memorandum of Law") and a *Declaration of Malcolm Cohen* (the "Cohen Declaration") in support of the First Day Motions.

By its Application for Provisional Relief, the Joint Administrators requested entry, on an *ex parte* basis, of an order to show cause with temporary restraining order staying execution against the assets of the Debtor and applying section 362 of the Bankruptcy Code in this Chapter 15 case on a provisional basis pending either the adjudication of the Joint Administrators' request for recognition of the Guernsey Administration or a hearing on the Joint Administrators' request for a preliminary injunction, and granting such other relief as the Court sees just and proper.

The Court has considered and reviewed the Application for Provisional Relief, the Verified Petition, the Cohen Declaration and all related documents filed contemporaneously therewith. Based on the foregoing,

**THE COURT FINDS AND CONCLUDES AS FOLLOWS**:

a)      The Joint Administrators have demonstrated a substantial likelihood of success on the merits that the Debtor is the subject of a pending foreign main proceeding and the Joint Administrators are the foreign representative of the Debtor;

b)      The Joint Administrators have demonstrated that, without a stay of execution against the Debtor's assets and the protections of section 362 of the Bankruptcy Code, there is a material risk that the Debtor will suffer irreparable harm to the value of its business, assets, and property as a result of potential enforcement and collection efforts of claimants pending the disposition of the Verified Petition;

c)      No injury will result to any party that is greater than the harm to the Debtor in the absence of the requested relief;

2

d)      The interests of the public will be served by this Court's granting the relief requested by the Joint Administrators;

e)      Due to the nature of the relief requested, no security is required under Rule 65(c) of the Federal Rules of Civil Procedure to the extent applicable in these cases by Rule 7065 of the Federal Rules of Bankruptcy Procedure;

f)      This Court has jurisdiction over this matter pursuant to 28 U.S.C § 1334;

g)      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and

h)      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.      The Joint Administrators' application is **GRANTED.**

2.      Until such a time as an order adjudicating the Joint Administrators' request for recognition of the Guernsey Administration is entered, or as otherwise ordered by this Court:

i.      the Joint Administrators are established as the "foreign representative" of the Debtor as defined in section 101(24) of the Bankruptcy Code;

ii.      Pursuant to sections 1519(a)(1) and 105(a) of the Bankruptcy Code, all persons and entities are enjoined from seizing, attaching, possessing, executing, and/or enforcing liens against the assets, businesses operations or processes of the Debtor; and

iii.      Pursuant to sections 1519(a)(3) and 105(a) of the Bankruptcy Code, the automatic stay pursuant to section 362 of the Bankruptcy Code is applicable in this Chapter 15 case within the territorial jurisdiction of the United States; *provided, however*, that the automatic stall shall not enjoin a police or regulatory act of a governmental unit to the extent provided in Section 362(b)(4) of the Bankruptcy Code.

3

3.      Notice of this Order shall be served within two business days of its entry by United States mail first-class postage prepaid, by electronic mail or by fax on all parties against whom relief is sought, or their counsel, if applicable, including such parties as set forth in the List Pursuant to Bankruptcy Rule 1007(a)(4) previously filed by the Debtor.

4.      Service in accordance with this Order shall constitute adequate and sufficient service and notice.

5.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: _____, 2019              _____
                                              United States Bankruptcy Judge

DM3\5776992.3

# EXHIBIT G

DUANE MORRIS LLP
Frederick D. Hyman (NY 2553832)
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
RHyman@duanemorris.com

-and-

Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Ste. 1600
Wilmington, Delaware 19801
Telephone: (302) 657-4952
JPHitchings@duanemorris.com

*Attorneys for William Callewaert and Malcolm Cohen*
*in their capacity as Joint Administrators and Foreign Representatives*
*for the Debtor BSG Resources Limited (in administration)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (_____) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF MALCOLM COHEN IN SUPPORT OF (I) VERIFIED**
**CHAPTER 15 PETITION FOR RECOGNITION OF FOREIGN**
**MAIN PROCEEDING AND RELATED RELIEF, (II) APPLICATION TO**
**APPROVE NOTICE PROCEDURES AND (III) *EX PARTE* APPLICATION**
**FOR TEMPORARY RESTRAINING ORDER AND RELIEF**
**PURSUANT TO SECTIONS 1519 AND 105(A) OF THE BANKRUPTCY CODE**

I, Malcolm Cohen, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

as follows:

1.      I am a partner at BDO LLP (together with its affiliates, "BDO").  I am an individual

over the age of eighteen and, if called upon, could testify to all matters set forth in this Declaration.

2.      I hold a Bachelor of Science degree in accounting and finance from the London School of Economics and Political Science. I am a Fellow of the Institute of Chartered Accountants in England and Wales and have thirty-seven years of international insolvency and restructuring experience.

3.      Along with William Callewaert, a Business Advisory Director at BDO, I am one of the joint administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration"), pending before the Royal Court of Guernsey (Ordinary Division) (the "Guernsey Court"). Guernsey is one of three crown dependencies located off the coast of Great Britain.[1]

4.      On March 6, 2018, upon an application made by the Debtor acting by its directors at that time, the Guernsey Court issued a *Court Order* commencing the Guernsey Administration and, among other things, appointing Mr. Callewaert and me as Joint Administrators of the Debtor. Shortly thereafter, the Guernsey Court issued a *Court Order* dated March 21, 2018, whereby it confirmed that it has administered to me and Mr. Callewaert the affirmation of Joint Administrator, each with the power to act alone.  The March 6 and March 21, 2018 orders are collectively referred to as the "Guernsey Administration Order" and are annexed to the Verified Petition (defined below) as **Exhibit A**.  In my capacity as Joint Administrator,  I am authorized to file a petition for recognition of the Guernsey Administration as a foreign proceeding (this "Chapter 15 Case") with the United States Bankruptcy Court for the Southern District of New York (this "Court").

5.      I submit this declaration (the "Declaration") in support of (a) the *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified

---

[1] The other two being Jersey and the Isle of Man.

Petition");[2] (b) the application (the "Notice Application") for entry of an order (i) scheduling a hearing on the relief requested in the Verified Petition (the "Recognition Hearing"), (ii) setting a deadline by which all objections to recognition of the Chapter 15 Case must be filed and (iii) approving the form of notice of the Recognition Hearing and the manner of service; and (c) pursuant to Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure and Rule 9077-1(a) of the Local Bankruptcy Rules of the United States District Court for the Southern District of New York, the *ex parte* application for a temporary restraining order (the "TRO Application").  I have caused the Verified Petition, Notice Application and TRO Application to be contemporaneously filed with this Court.

6.      In my capacity as Joint Administrator of the Debtor, I, either directly, or through my Joint Administrator or through members of my staff working under my supervision and control, am familiar with the Debtor's history, operations, assets, financial condition, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information and analysis prepared for me by staff working for the Joint Administrators on the Guernsey Administration, information supplied to me or verified by members of the Debtor's management or professionals retained by the Debtor both prior to and since my appointment, my review of relevant documents, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

7.      In particular, I have relied upon the *Affidavit of Peter Harold Driver in Support of Company's Application for an Administration Order* (the "Driver Affidavit") which was submitted to the Guernsey Court under seal by Peter Harold Driver, a director of the Debtor, in support of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Verified Petition.

DM3\5777010.8

the Guernsey Administration Application (defined below). Certain disclosures made in the Driver Affidavit were considered to be commercially sensitive and remain so at this time. The Driver Affidavit and the exhibits thereto were therefore filed under seal before the Guernsey Court in order to maintain their confidentiality. All references which I make herein to the Driver Affidavit do not include the confidential content which is held subject to the seal of the Guernsey Court. To the extent the Driver Affidavit contains additional information germane to these proceedings, the Driver Affidavit itself is being filed under seal in this Court with the permission of the Guernsey Court in order to maintain the confidentiality over the commercially sensitive content.

<strong>Background</strong>

**I.      The Debtor's Business**

      **A.      Corporate Structure**

8.      The Debtor is a non-cellular limited liability company incorporated in Guernsey. Driver Affidavit at ¶ 5. A chart showing the Debtor's corporate organization is annexed to the Verified Petition as **Exhibit B**.

9.      The Debtor is engaged, through certain subsidiaries and associates, in activities related to the exploration, development, extraction, refinement and marketing of natural resource products, including diamonds and power generation. Driver Affidavit at ¶ 7. The Debtor previously also actively engaged in the iron ore and ferronickel sectors. *Id.*

10.     The Debtor's business and trading is limited to advisory and technical services provided to a number of its subsidiaries. The business and trading interests of the Debtor's subsidiaries can be categorized as follows:

         a.      Diamond operation held through a subsidiary, Octea Limited (incorporated and registered in Guernsey) with mining operations in the Republic of Sierra Leone (the "Octea Diamond Operation"). The Octea Diamond Operation is operating under the supervision of its board and an observer to the board

4

appointed by the Joint Administrators.  However, it is not presently producing cash flows which are available to the Debtor.

b.    A minority interest in a power generation operation held through a subsidiary, West African Power Limited (incorporated and registered in Guernsey), in the Federal Republic of Nigeria (the "West African Power Operation").  The Debtor does not have effective control of the underlying operating company which is a minority interest and the subject of dispute with the co-investor, Forte Oil plc. The disputes relate to the funding of West African Power Operation and the right to representation of West African Power Limited on the board of the Nigerian operating subsidiary. West African Power Limited, in consultation with the Debtor, is currently exploring options to resolve the dispute and to monetize the Debtor's indirect investment. Accordingly, the Debtor is not receiving any current cash flows from the West African Power Operation.

c.    Iron ore operation held through a subsidiary, BSG Resources (Guinea) Limited (incorporated and registered in Guernsey) (the "Guinean Iron Ore Mining Operation").  As described in detail in Section B below, the Debtor's Guinean Iron Ore Mining Operation has ceased.

Driver Affidavit at ¶ 8.

## B.    The Debtor's Guinean Mining Operations

11.    The Guinean Iron Ore Mining Operation relates to its interests in world-class iron ore deposits in the Republic of Guinea and comprise the following:

a.    An iron ore mining concession granted to BSG Resources (Guinea) SARL ("BSGR Guinea") on March 19, 2010 over an area in Simandou South, near the village of Zogota (the "Zogota Mining Concession");

b.    A mining and infrastructure agreement dated December 16, 2009 entered into by two subsidiaries of the Debtor, BSGR Guinea and VBG-Vale BSGR Ltd. (n/k/a BSG Resources (Guinea) Limited) ("VBG"), with the Republic of Guinea regarding the rights and obligations arising from the Zogota Mining Concession ("Basic Agreement"); and

c.    A prospecting permit granted to BSGR Guinea over an area referred to as "Simandou Blocks 1 and 2" granted on December 9, 2008 ("Blocks 1 and 2 Permit").

Driver Affidavit at ¶¶ 12.1-12.3.

12.      In 2010, the Debtor entered into a joint venture with the Brazilian mining company Vale S.A. ("Vale") in relation to the development of the three rights and concessions described above (the "Mining Rights").  Driver Affidavit at ¶ 13. The joint venture, VBG, is referred to above.

13.      In 2011, Alpha Condé was elected President of the Republic of Guinea. Following President Condé's election, the Debtor, BSGR Guinea and VBG faced obstruction in developing the Mining Rights. Driver Affidavit at ¶ 14. In 2012, the Debtor was informed that President Condé had set up a committee aimed at investigating how certain mining rights in Guinea (including the Mining Rights) had been obtained (the "Guinea Review Committee"). *Id.* Throughout the review process, the Debtor complained about the lack of due process and apparent prejudice being shown to it by the Guinea Review Committee. *Id.* The Debtor denied – and continues to deny – the allegations made against it by the Guinea Review Committee. *Id.*

14.      In response to an allegation of corruption made by the Guinea Review Committee against the Debtor and a wider group of its affiliates, the Debtor's board initiated a review using an independent professional accountancy firm to verify the accuracy of its internal controls, processes and payment procedures, including confirmation that payments made by the Debtor and its affiliates in connection with the Mining Rights were proportionate and of an appropriate business nature. Driver Affidavit at ¶ 15. According to the Debtor's board, this review has not revealed any matters that support the allegations of wrongdoing by the Guinea Review Committee. *Id.*

15.      However, in March 2014, the Guinea Review Committee recommended to the Strategy Committee of the Government of Guinea (the "Strategy Committee") that the Mining

Rights be cancelled and expropriated, and the companies within the Debtor's control be prevented from being re-awarded the Mining Rights (the "<u>Notification</u>"). Driver Affidavit at ¶ 16.

16.     In April 2014, the Government of Guinea accepted the recommendations of the Strategy Committee to strip BSGR Guinea and VBG of the Mining Rights and to exclude the Debtor, BSGR Guinea and VBG from participating in the tender process to reallocate the Mining Rights. Driver Affidavit at ¶ 17.

17.     As a result of the Guinea Review Committee's recommendations and the actions of the Guinean government, the Debtor's Guinean mining operations have ceased. Driver Affidavit at ¶ 24. Whether such operations will recommence is currently uncertain. *Id.*

18.     The Debtor had asserted, prior to the appointment of the Joint Administrators, that the basis of the Guinea Review Committee's recommendation was not legitimate. Driver Affidavit at ¶ 18. The Debtor had also asserted that the decisions of the Guinea government were importuned, influenced, motivated and ultimately controlled by certain illegal conduct of George Soros and certain co-conspirators, which assertion is the basis of the Soros Claim (as defined and further described below). *Id.*

C.    **Litigation Following the Expropriation of the Debtor's Guinean Mining Interests**

1.    **The Guinea ICSID Proceeding**

19.     In August 2014, the Debtor initiated an arbitration proceeding with the International Centre for Settlement of Investment Disputes ("<u>ICSID</u>") against the Republic of Guinea. Driver Affidavit at ¶ 19. In May 2015, the Debtor repurchased Vale's shares in VBG. Driver Affidavit at ¶ 20. VBG was thereafter renamed BSG Resources (Guinea) Limited. *Id.* On October 13, 2015, VBG also issued an ICSID claim against the Republic of Guinea in respect of the Mining Rights. *Id.* Subsequently, the two ICSID claims against the Republic of Guinea were consolidated and an

Amended Statement of Claim was issued on behalf of the Debtor, VBG and BSGR Guinea on February 29, 2016 (generally, the "Guinea ICSID Proceeding"). *Id.* Through the Guinea ICSID Proceeding, the Debtor and its subsidiaries are seeking the restitution of the Mining Rights, as well as damages arising out of the unlawful revocation and expropriation of the Mining Rights. *Id.*

20.     A hearing in the Guinea ICSID Proceeding was held in Paris, France between May 22 and June 2, 2017. Driver Affidavit at ¶ 21.  The briefing of the Guinea ICSID Proceeding was concluded in July 2018.

21.     In February 2019, a non-binding agreement was signed by the Debtor and two of its subsidiaries and the Government of Guinea to set out certain provisional matters which the parties would seek to progress as a means to resolve the Guinea ICSID Proceeding on a consensual basis. If such a consensual resolution is ultimately reached, it is anticipated that it will include the release of all of the Debtor's claims to the Simandou and Zogota licenses in return for the grant by the Government of Guinea of a new license over the Zogota deposits, to be exploited by a third party, with the Debtor to be entitled to participate in the revenues from this license, as well as a mutual withdrawal of allegations made by each party in the Guinea ICSID Proceeding.  Work is proceeding towards the progression of the non-binding agreement into a formal, binding contractual arrangement. While that work is on-going, the Guinea ICSID Proceeding is currently suspended (although may be recommenced by either party in the event that the negotiations between the parties do not result in consensual settlement).

### 2.     The Vale LCIA Proceeding

22.     Separately, on April 28, 2014, prior to the Debtor's purchase of Vale's VBG Shares, Vale filed a Request for Arbitration against the Debtor in the London Court of International Arbitration (the "LCIA") seeking to recoup its investment in VBG which was allegedly lost as a

8

result of the expropriation actions of the Guinean government (generally, the "Vale LCIA Proceeding"). Driver Affidavit at ¶ 22.

23.     Years later, on April 4, 2019, the LCIA tribunal entered an award in favor of Vale and against the Debtor in the amount of $1,246,580,846 plus pre- and post-award interest (the "LCIA Award"). A copy of the LCIA Award is annexed to the Verified Petition as **Exhibit C**.

24.     The Debtor filed a timely challenge under Section 68 of the English Arbitration Act 1996 (the "UK Arbitration Challenge") to the LCIA Award with the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD) on May 10, 2019. The UK Arbitration Challenge is made on the basis that the LCIA tribunal was infected by apparent bias and/or failed to comply with its general duty to conduct the proceedings fairly and impartially which constitutes a "serious irregularity" under English law. The primary relief sought by the Debtor in the UK Arbitration Challenge is that the LCIA Award be set aside and/or declared to be of no effect.

25.     Vale has obtained an order from the English High Court dated May 9, 2019 to enforce the LCIA Award in England and Wales (the "UK Enforcement Order"). However, the UK Enforcement Order has since been stayed by virtue of an application made by the Debtor to the English High Court on May 23, 2019 to set aside the UK Enforcement Order (the "Set Aside Application").  The Set Aside Application was made on the basis that the Debtor has separately issued the UK Arbitration Challenge the effect of which, if successful, would be to set aside or annul the LCIA Award. Vale is automatically stayed from enforcing the LCIA Award in England and Wales pending final determination of the Set Aside Application.

26.     Notwithstanding the UK Arbitration Challenge and the stay issued in connection with the Set Aside Application, on April 23, 2019, Vale filed a *Petition for Recognition and*

DM3\5777010.8

*Enforcement of a Foreign Arbitration Award* (the "Vale Enforcement Petition") in the United

States District Court for the Southern District of New York (the "District Court"). That action is

docketed in the District Court as *Vale S.A. v. BSG Resources Limited*, Case No. 19-cv-3619-VSB.

Through the Vale Enforcement Petition, Vale is seeking recognition of the LCIA Award by the

District Court, together with entry of judgment against the Debtor in an amount equal to the LCIA

Award plus interest and costs.

### 3.   The Soros Claim – the Debtor's Only U.S. Asset

27.   The Debtor's only asset in the United States is a contingent litigation interest

against George Soros and certain entities he controls. As described further herein and in the

Verified Petition and TRO Application, recognition of the Guernsey Administration is necessary

in order to protect and preserve the Debtor's interest in this asset.

28.   On April 14, 2017, the Debtor, VBG (n/k/a BSG Resources (Guinea) Limited), and

BSGR Guinea filed a complaint in the District Court against George Soros and Open Society

Foundations, which was later amended to include as defendants Open Society Institute, Foundation

to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International,

Inc., Open Society Policy Center, and Open Society Fund (collectively, the "Soros Defendants")

asserting claims for illegal interference with contract, fraud, defamation and other matters relating

to the Soros Defendants' involvement in the Guinean government's expropriation of the Debtor's

Mining Interests (generally, the "Soros Claim"). Driver Affidavit at ¶¶ 39-40.

29.   By the Soros Claim, the Debtor and its co-plaintiffs seek to recover over $10 billion

in damages arising from wrongful conduct of the Soros Defendants.

30.   The Soros Claim is docketed in the District Court as *BSG Resources Limited v.*

*Soros*, Case No. 17-cv-02726-JFK-OTW (S.D.N.Y. Apr. 14, 2017). *Id.* at ¶ 30. The Soros Claim,

including discovery, is presently stayed pending the outcome of the Guinea ICSID Proceeding.

Driver Affidavit at ¶ 40. A status conference is scheduled before the District Court on July 18, 2019 to determine the next steps in the litigation, including providing an update on the Guinea ICSID Proceeding and the possible recommencement of discovery.

31.     The Joint Administrators have been informed that the Soros Claim is pledged as collateral to secure the Debtor's obligations under a certain Litigation Funding Agreement dated as of November 2017 (the "Funding Agreement") between Litigation Solutions Limited ("LSL") and the Debtor, VBG, and BSGR Guinea. Driver Affidavit at ¶ 34. Pursuant to a certain Security Agreement between these parties, the Debtor has pledged and granted LSL a security interest over a portion of any recoveries on the Soros Claim.  *Id.*  The continued effectiveness of the Funding Agreement is critical to the Debtor's restructuring efforts.  Without the proceeds from LSL, the Debtor would not have the resources to fund the costs necessary to pursue the Soros Claim.

### D.      Standard Chartered Bank Assignment

32.     In addition to Vale and LSL, the Debtor has one additional alleged creditor that may have an interest in, or be affected by, this Chapter 15 Case. Together with certain of its affiliates, the Debtor is a party to a certain Implementation Agreement (as amended from time to time, the "SC Agreement") with Standard Chartered Bank ("Standard Chartered"). Driver Affidavit at ¶ 32. The SC Agreement relates to the restructuring of a $92,000,000 amortizing term loan facility extended by Standard Chartered to certain of the Debtor's affiliates. *Id.* Under the terms of the SC Agreement, Standard Chartered purports to have taken an assignment of any proceeds (including, in summary, receivables, dividends from subsidiaries or the proceeds from any claims) that may be paid to the Debtor now or in the future as security for such amounts as may be owed by the Debtor to Standard Chartered under the SC Agreement. *Id.*  at ¶ 33.

E.       **Events Giving Rise to the Guernsey Administration**

33.       The events giving rise to the Guernsey Administration are outlined in paragraphs 11 to 26, above.

34.       In summary, by February 2018, the Debtor's board determined that the Debtor was insolvent or likely to become insolvent, satisfying the requirements of the laws of Guernsey in respect of the making of an administration order against the Debtor by the Guernsey Court. This determination was based mainly on the expropriation of the Debtor's Guinean mining interests and the potential for an adverse judgment in the Vale LCIA Proceeding.

II.      **Commencement of the Guernsey Administration**

35.       On or about February 27, 2018, the Debtor, acting by its directors at that time, submitted an *Application by the Company for an Administration Order* to the Guernsey Court pursuant to Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration Application"). The Guernsey Administration Application was supported by the Driver Affidavit. Inasmuch as the Guernsey Administration Application and the Driver Affidavit contained confidential information and were submitted to the Guernsey Court under seal, the Guernsey Administration Application was heard *in camera* by the Guernsey Court on March 6, 2018. The Guernsey Court entered the Guernsey Administration Order on the same date.

36.       The Guernsey Administration is on-going. The statutory purpose of the Guernsey Administration as set forth in the Guernsey Administration Order is the survival of the Debtor and the whole or any part of its undertaking as a going concern. The Joint Administrators' role is to fulfil this purpose. In order to achieve this, the Joint Administrators have been working closely with the Debtor's management and advisors to preserve and ultimately monetize the Debtor's valuable assets – including the Soros Claim and the Guinea ICSID Proceeding – and to defend against asserted liabilities (*e.g.*, the Vale LCIA Proceeding). *See* Progress Reports of BSG

12

Resources Limited – In Administration dated September 5, 2018 and March 7, 2019 annexed to the Verified Petition as **Exhibits D** and **E**.

37.    I have been advised by counsel of the definition of a "foreign proceeding" under Bankruptcy Code section 101(23).  To the best of my knowledge, I am not aware of any other "foreign proceeding" within the meaning of Bankruptcy Code section 101(23) with respect to the Debtor.

**III.    Center of Main Interests of the Debtor**

38.    The center of main interests, or "COMI" for the Debtor is in Guernsey.  The Debtor is organized under Guernsey law and has its registered office in Guernsey.

39.    Further, although the Guernsey Administration has the effect of suspending the management powers of the Debtor's directors and officers, the Debtor's main office and its chairman are resident in Guernsey.  Also, the Debtor's central decision-making function prior to its entry into the Guernsey Administration, both long-range and day-to-day, took place in Guernsey.  Since the commencement of the Guernsey Administration, the Debtor's decision-making function has been carried out by the Joint Administrators, one of which is resident in Guernsey. Because the other Joint Administrator is resident in London, England, some of the Debtor's decision-making function may occur jointly in London and/or via telephone to Guernsey. In any event, the Debtor's accounting function, as well as all of its corporate books and records, including documents of title, are located in Guernsey.

40.    Accordingly, I submit that, pursuant to Bankruptcy Code section 1516(c), the Debtor is entitled to the presumption that its COMI is Guernsey.

DM3\5777010.8

**Relief Sought**

## I.    Verified Petition

41.    With this Declaration, the Joint Administrators have filed the Verified Petition

seeking entry of an order providing the following relief:

      a.    recognition pursuant to section 1517 of the Bankruptcy Code of the Guernsey Administration as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code;

      b.    recognition that Joint Administrators are the "foreign representatives" on a final basis (as defined in section 101(24) of the Bankruptcy Code);

      c.    through the extension of relief automatically available pursuant to section 1520 of the Bankruptcy Code, an order expressly barring, enjoining, and staying, pursuant to section 362 of the Bankruptcy Code, any action to interfere with the Debtor's assets located in the United States, specifically including but not limited to the Soros Claim;

      d.    the extension of any provisional relief granted under section 1519(a) of the Bankruptcy Code pursuant to section 1521(a)(6); and

      e.    such other and further relief as is appropriate under the circumstances pursuant to sections 105(a) and 1507 of the Bankruptcy Code.

42.    To the extent the relief requested herein exceeds the relief available to the Debtor

pursuant to section 1520 of the Bankruptcy Code, the Joint Administrators request this relief

pursuant to sections 1507 and 1521(a)(1) and (2).

43.    In the event the Court were to determine the Guernsey Administration is not a

foreign main proceeding, the Joint Administrators request that the Court nevertheless grant the

relief requested above pursuant to sections 1521 and 1507 of the Bankruptcy Code.

## II.    Application for Order Setting Hearing and Providing for Notice Procedures

44.    With this Declaration, the Joint Administrators have also filed an application

requesting an order (i) scheduling the Recognition Hearing to consider the relief requested in the

Verified Petition, (ii) setting a deadline by which all objections to the Verified Petition must be

DM3\5777010.8

filed and (iii) approving the form and manner of notice of the hearing on the Verified Petition as described in the Notice Application.

45.     By the Notice Application, the Joint Administrators propose to provide notice of this Chapter 15 Case and the Recognition Hearing upon certain Chapter 15 Notice Parties (as that term is defined in the Notice Application) which include Standard Chartered, LSL, Vale and the Soros Defendants.  As proposed in the Notice Application, all such parties would receive notice of the Recognition Hearing.

46.     It is my belief that service of the notice of the Recognition Hearing in the manner proposed in the Notice Application will provide the Debtor's various parties-in-interest due and sufficient notice of the Recognition Hearing and objection deadline.

### III.     *Ex Parte* Application for Temporary Restraining Order

47.     In order to further the purpose of the Guernsey Administration, pursuant to the TRO Application filed contemporaneously herewith, the Joint Administrators are seeking immediate entry, on an *ex parte* basis, of a temporary restraining order and other relief to avoid disruption and irreparable harm to the Debtor's foreign restructuring efforts that could result from creditors and other parties taking action against the Debtor's assets in the United States pending the Recognition Hearing.

48.     As described above and in the TRO Application, it is incumbent that the Debtor be able to prosecute the Soros Claim without interference from Vale. Through the Vale Enforcement Petition, Vale is prematurely attempting to enforce a foreign arbitration award that is the subject of a current, pending challenge before a foreign court of competent jurisdiction.  Moreover, to the extent Vale is allowed to reduce the LCIA Award to a judgment in the United States, that judgment may directly impair the Debtor's ability to meaningfully prosecute the Soros Claim and may ultimately seek to encumber any proceeds that the Debtor might obtain in connection therewith.

15

49.     Such interference and impairment will significantly reduce the ability of the Debtor, through the Joint Administrators, to achieve a successful outcome of the Guernsey Administration, including satisfying its stated purpose as the survival of the Debtor and the whole or any part of its undertaking as a going concern. In addition, the cost and expense of responding to and defending against the Vale Enforcement Action will almost certainly dilute any recovery or distribution that might be obtained by the Debtor's other creditors and will cause unnecessary distraction to the Joint Administrators, diverting their attention from their restructuring efforts in the Guernsey Administration. If allowed to proceed, the Vale Enforcement Action may allow Vale to defeat the priorities of Guernsey and United States insolvency law to the impairment of the asserted secured claims of Standard Chartered and LSL which will, in any event, need to be resolved in the Guernsey Administration. To the extent that Vale has alleged that the Debtor owns other assets in the United States in addition to the Soros Claim, such as a bank account or real estate, the Joint Administrators have investigated the presence of such assets and have been informed that no such assets exist.

50.     Under the circumstances and as set forth in the TRO Application, the Joint Administrators respectfully submit that the relief is necessary to prevent imminent harm to the Debtor and that prior notice is impractical under the circumstances.

51.     As notice and an opportunity to be heard will be afforded any party affected by such relief at the preliminary injunction hearing (and/or the Recognition Hearing), such other parties will be minimally, if at all, harmed by the entry of a temporary restraining order now.

52.     Accordingly, for the reasons described more fully in the TRO Application, the Joint Administrators respectfully submit that good and sufficient cause exists for the immediate provisional relief requested in the TRO Application.

16

53.    No previous request for the relief sought in the TRO Application has been made to this Court or any other court.

[*Signature Page Follows*]

DM3\5777010.8

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 3, 2019

_____

Malcolm Cohen

*Joint Administrator and Foreign Representative*
*for the Debtor BSG Resources Limited*
*(in administration)*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 4, 2019, the foregoing document was served on the following counsel of record for Plaintiff via electronic notification through the Court's e-filing system:

Emily Justine Balter
Cleary Gottlieb Steen & Hamilton LLP (NYC)
One Liberty Plaza
New York, NY 10006
Email: ebalter@cgsh.com

Jeffrey A. Rosenthal
Cleary Gottlieb
One Liberty Plaza
New York, NY 10006
Email: jrosenthal@cgsh.com

Samuel Loewenson Levander
Cleary Gottlieb Steen & Hamilton LLP (NYC)
One Liberty Plaza
New York, NY 10006
Email: slevander@cgsh.com

Jonathan I. Blackman
Cleary Gottlieb
One Liberty Plaza
New York, NY 10006
212-225-2000
Email: maofiling@cgsh.com

/s/ Frederick D. Hyman
Frederick D. Hyman