# Exhibit D

A  **IPCO (Nigeria) Ltd v Nigerian National Petroleum Corp.**
[2005] EWHC 726 (Comm)

Queen's Bench Division (Commercial Court).
Gross J.

B  Judgment delivered 27 April 2005.

C  *Arbitration - Enforcement - Public policy - Application to adjourn enforcement of award - Provision of security - Nigerian arbitration between Nigerian parties leading to New York Convention award - Defendant applied to set aside award and for stay of execution in Nigeria - Order enforcing award defective in point of form - Whether order enforcing award should be set aside - Whether enforcement should be adjourned on terms - Civil Procedure Rules 1998, r. 62.18(10) - Arbitration Act 1996, s. 103(2)(f), (3), (5).*

D  These were applications (i) by the defendant ('NNPC') pursuant to s. 103(2)(f) and 103(3) of the Arbitration Act 1996 to set aside an order enforcing a New York Convention award of Nigerian arbitrators; (ii) alternatively, by NNPC to adjourn enforcement of the order, pursuant to s.103(5) of the Act; (iii) by the claimant ('IPCO'), pursuant to s.103(5) of the Act, for security, in the event that NNPC failing on its first application but succeeded on its adjournment

E  application.

F  Both IPCO and NNPC were Nigerian entities. By a 1994 contract, IPCO, a turnkey contractor specialising in the construction of onshore and offshore oil and gas facilities, agreed to undertake works for the design and construction for NNPC of a petroleum export terminal in the Port Harcourt area of Nigeria and known as the Bonny Export Terminal (BET) project. The contract was to be governed by and construed in accordance with Nigerian law. The contract provided for arbitration in Lagos, in accordance with the Nigerian Arbitration and Conciliation Act 1990 ('ACA'). The total consideration for IPCO's services was a little over US$250 million and it was anticipated that both phases of the BET project (design and construction) would take up to 24 months. In the

G  event, disputes between IPCO and NNPC arose out of or in connection with the contract after the BET project took some 22 months longer to complete than provided for in the contract. The matter proceeded to arbitration and the arbitrators made an award in favour of IPCO in the sum of over $152 million. NNPC had commenced proceedings before the Federal High Court in Lagos to

H  set aside the award and for a stay of execution..

NNPC submitted that the order should be set aside on three grounds. First, the order was defective in that it failed to comply with the requirements of CPR, r. 62.18(10). Secondly, the award had been suspended in Nigeria by virtue of the

application before the Nigerian courts to set it aside. Thirdly, the enforcement of the award in the UK would be contrary to public policy.

*Held*, adjourning the order for enforcement on terms:

1. The order was defective in point of form because contrary to CPR r.62.18(10)(b) it did not contain a statement that the award was not to be enforced until after any application to set aside made by NNPC within the relevant 14 day period had finally been disposed of. The proportionate sanction was to penalise C in respect of the costs thrown away by N in dealing with the premature enforcement proceedings but not to set aside the order.

2. Section 103(2)(f) was only applicable when there had been an order or decision suspending the award by the court in the country of origin of the award. Section 103(2)(f) was not triggered automatically by a challenge brought before the court in the country of origin.

3. There was not the glimmer of an argument that enforcement of the award would offend against English public policy under s. 103(3).

4. NNPC's application before the Nigerian court did have a realistic prospect of success in various respects. In particular there was a measure of concern as to whether IPCO's recovery had been very substantially duplicated. However the NNPC application faced formidable hurdles, not least in moving from well-founded criticism of the tribunal (if such was established) to making good a case of misconduct within s. 30 of the ACA. The award was, in those respects, neither manifestly valid nor manifestly invalid. In all the circumstances, proper deference had to be shown to the pending Nigerian proceedings.

5. Even if NNPC's application in Nigeria was successful, it was common ground that an amount of some US$13 million was indisputably due to IPCO. Moreover success for NNPC on the duplication point was likely to leave IPCO with an award of in excess of US$50 million.

6. Practical justice would best be done by adjourning the enforcement of the order on terms, inter alia, requiring NNPC to pay the US$13 million indisputably due to IPCO and to provide appropriate security in London (and thus free of any domestic constraints) in an amount of US$50 million.

The following cases were referred to in the judgment:

*Baker Marina v Danos* [2001] 7 NWLR 337.
*Deutsche Schachtbau- und Tiefbohrgesellschaft mbH v Ras Al-Khaimah National Oil
Co (DST v Rakoil)* [1987] 2 Ll Rep 246.

A  *Ras Pal Gazi v Federal Capital Development* [2001] 10 NWLR 559.
*Soleh Boneh International Ltd v Government of Uganda* [1993] 2 Ll Rep 208.
*Taylor Woodrow v Etina-Werk* [1993] 1 NSCC 415.
*Yukos Oil Co v Dardana Ltd* [2002] EWCA Civ 543; [2002] CLC 1120.

B  Ricky Diwan (instructed by Osborne Clarke) for the claimant.

Sam Wordsworth (instructed by Hunton & Williams) for the defendant.

JUDGMENT

C  **Gross J: Introduction**

1. On 29 November, 2004, David Steel J ordered, ex parte, that the Defendant ('NNPC') pay the sterling equivalent of US$152,195,171 and Naira 5,000,000 awarded to the Claimant ('IPCO') by an arbitration award of a distinguished panel of Nigerian arbitrators, dated Lagos 28th October, 2004, together with interest to date ('the order', 'the award' and 'the arbitrators' or 'the tribunal' respectively).

D

2. There are now before the Court the following applications:

E  (i) An application by NNPC, to set aside the order, pursuant to ss. 103(2)(f) and 103(3) of the Arbitration Act 1996 ('the Act') ('the application to set aside');

(ii) In the alternative, an application by NNPC that the enforcement of the order be adjourned, pursuant to s. 103(5) of the Act ('the application to adjourn');

F  (iii) An application by IPCO, pursuant to s. 103(5) of the Act, in substance that, in the event of NNPC failing on (i) but succeeding on (ii) above, then NNPC should provide security in the sum of US$50 million (or such other sum as the Court thinks fit), failing which IPCO be permitted to enforce the award as a Judgment of the Court ('the application for security').

G  3. In a nutshell, the background is as follows. Both IPCO and NNPC are Nigerian entities. By a contract dated 14 March 1994 ('the contract'), IPCO, a turnkey contractor specialising in the construction of onshore and offshore oil and gas facilities, agreed to undertake works for the design and construction for NNPC of a petroleum export terminal, in the Port Harcourt area of Nigeria and known as the Bonny Export Terminal Project ('the BET Project'). The contract was to be governed

H  by and construed in accordance with Nigerian Law. Clause 65 of the contract provided for arbitration in Lagos, in accordance with the Nigerian Arbitration and Conciliation Act 1990 ('the ACA'). The total consideration for IPCO's services was a little over US$250 million and it was anticipated that both phases of the BET Project (i.e. design and thereafter construction) would take up to 24 months. In the event,

disputes between IPCO and NNPC arose out of or in connection with the contract; the casus belli was the fact that the BET Project took some 22 months longer to complete than provided for in the contract. Ultimately, the matter proceeded to arbitration before the arbitrators, who produced the award, now the subject of the applications before this Court.

4. On 15 November 2004, therefore pre-dating the order (of David Steel J), NNPC commenced proceedings before the Federal High Court in Lagos to set aside the award and for a stay of execution. NNPC's applications in the Nigerian proceedings have since been amended and expanded upon. There is also before the Federal High Court in Lagos a notice of preliminary objection, filed by IPCO, alleging that NNPC's application to set aside the award is itself frivolous, vexatious, an abuse of process and calculated to delay enforcement of the award. The Nigerian proceedings are currently pending.

5. At the conclusion of the hearing, I indicated to the parties my decision on the various applications before me. I further indicated that I would give my reasons later. I now do so. I wish at the same time to acknowledge the very considerable assistance given to the court by Mr Wordsworth, for NNPC and Mr Diwan, for IPCO.

**The framework**

6. The framework for the recognition and enforcement of a New York Convention Award is found in ss. 100 and following of the Act. Section 100 provides, insofar as material, as follows:

> '(1) In this Part a "New York Convention award" means an award made, in pursuance of an arbitration agreement, in the territory of a state (other than the United Kingdom) which is a party to the New York Convention.
>
> (4) In this section "the New York Convention" means the Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted by the United Nations Conference on International Commercial Arbitration on 10th June 1958.'

7. As Nigeria is a state specified by Order in Council under s.100(3) of the Act as being a party to the New York Convention, there can be no doubt (and it was not in dispute before me) that the award is a New York Convention Award.

8. Section 103 of the Act contains the exclusive and exhaustive grounds on which enforcement of a New York Convention Award may be refused. Insofar as material:

> '(1) Recognition or enforcement of a New York Convention award shall not be refused except in the following cases.

A

(2) Recognition or enforcement of the award may be refused if the person against whom it is invoked proves –

(f) that the award has … been …suspended by a competent authority of the country in which, or under the law of which, it was made.

B

(3) Recognition or enforcement of the award may also be refused … if it would be contrary to public policy to recognise or enforce the award.'

9. Section 103(5) of the Act provides as follows:

C

'Where an application for the setting aside or suspension of the award has been made to such a competent authority as is mentioned in subsection (2)(f), the court before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the recognition or enforcement of the award.

D

It may also on the application of the party claiming recognition or enforcement of the award order the other party to give suitable security.'

10. By the provisions of s. 103 as set out above, the Act carries into English Law the substance of Arts. V.1(e), V.2(b) and VI of the New York Convention.

E

11. For present purposes, the relevant principles can be shortly stated. First, there can be no realistic doubt that s. 103 of the Act embodies a pre-disposition to favour enforcement of New York Convention Awards, reflecting the underlying purpose of the New York Convention itself; indeed, even when a ground for refusing enforcement is established, the court retains a discretion to enforce the award: *Mustill & Boyd, Commercial Arbitration*, 2nd edition, 2001 Companion, at p. 87.

F

12. Secondly, s. 103(2)(f) is only applicable when there has been an order or decision suspending the award by the court in the country of origin of the award ('the country of origin'). Section 103(2)(f) is not triggered automatically by a challenge brought before the court in the country of origin. This conclusion flows from the wording of s. 103(2)(f) itself, it is supported by leading commentators (Van den Berg, *The New York Convention of 1958* (1981), at p. 352, Fouchard, Gaillard, Goldman on *International Commercial Arbitration* (1999), at pp. 980-1) and it is consistent with the provisions of s. 103(5) of the Act – which would be otiose, or at least curious, if an application to the court in the country of origin automatically resulted in the award being suspended.

G

H

13. Thirdly, considerations of public policy, if relied upon to resist enforcement of an award, should be approached with extreme caution: *DST v Rakoil* [1987] 2 Ll Rep 246, at p. 254. The reference to public policy in s. 103(3) was not intended to furnish an open-ended escape route for refusing enforcement of New York Convention awards. Instead, the public policy exception in s. 103(3) is confined to the public

policy of England (as the country in which enforcement is sought) in maintaining the fair and orderly administration of justice: *Mustill & Boyd*, at pp. 91-2.

14. Fourthly, s. 103(5) 'achieves a compromise between two equally legitimate concerns': *Fouchard*, at p. 981. On the one hand, enforcement should not be frustrated merely by the making of an application in the country of origin; on the other hand, pending proceedings in the country of origin should not necessarily be pre-empted by rapid enforcement of the award in another jurisdiction. Pro-enforcement assumptions are sometimes outweighed by the respect due to the courts exercising jurisdiction in the country of origin – the venue chosen by the parties for their arbitration: *Mustill & Boyd*, at p. 90.

15. Fifthly, the Act does not furnish a threshold test in respect of the grant of an adjournment and the power to order the provision of security in the exercise of the court's discretion under s.103(5). In my judgment, it would be wrong to read a fetter into this understandably wide discretion (echoing, as it does, Art. VI of the New York Convention). Ordinarily, a number of considerations are likely to be relevant: (i) whether the application before the court in the country of origin is brought bona fide and not simply by way of delaying tactics; (ii) whether the application before the court in the country of origin has at least a real (i.e., realistic) prospect of success (the test in this jurisdiction for resisting summary judgment); (iii) the extent of the delay occasioned by an adjournment and any resulting prejudice. Beyond such matters, it is probably unwise to generalise; all must depend on the circumstances of the individual case. As it seems to me, the right approach is that of a sliding scale, in any event embodied in the decision of the Court of Appeal in *Soleh Boneh v Uganda Government* [1993] 2 Ll Rep 208 in the context of the question of security:

> '… two important factors must be considered on such an application, although I do not mean to say that there may not be others. The first is the strength of the argument that the award is invalid, as perceived on a brief consideration by the Court which is asked to enforce the award while proceedings to set it aside are pending elsewhere. If the award is manifestly invalid, there should be an adjournment and no order for security; if it is manifestly valid, there should either be an order for immediate enforcement, or else an order for substantial security. In between there will be various degrees of plausibility in the argument for invalidity; and the Judge must be guided by his preliminary conclusion on the point.
>
> The second point is that the Court must consider the ease or difficulty of enforcement of the award, and whether it will be rendered more difficult…if enforcement is delayed. If that is likely to occur, the case for security is stronger; if, on the other hand, there are and always will be insufficient assets within the jurisdiction, the case for security must necessarily be weakened.'

A  Per Staughton LJ, at p. 212. See too: *Fouchard*, at p. 982; *Dardana v Yukos* [2002] EWCA Civ 543; [2002] CLC 1120 (CA).

B  16. Sixthly, it is pertinent to underline that the New York Convention contains no nationality condition (unlike the Geneva Convention of 1927) and is thus applicable, as here, when an award is made abroad in an arbitration between parties of the same nationality: *Van den Berg*, at pp. 15-19. While primarily the New York Convention was undoubtedly intended to facilitate international arbitration rather than the enforcement in a foreign country of a domestic arbitration award, the benefits of the New York Convention are available to a party seeking enforcement in the latter case also. Such cases are necessarily rare but it would be wrong to introduce a nationality

C  condition into the New York Convention by the backdoor. So, for example, the fact of a party's nationality would (by itself) be irrelevant to the availability of a ground for resisting enforcement under s. 103(2) or (3) of the Act. All that said, in the exercise of the discretion under s. 103(5) of the Act, the fact that the arbitration was domestic in the country of origin, must generally be likely to enhance the deference due to the court exercising supervisory jurisdiction in that country. Comity and common sense

D  are likely to require no less; pre-empting the decision on a challenge to an award before the court exercising supervisory jurisdiction in the country of origin would be a strong thing in a case where all parties were domiciled or incorporated in that country.

E  **The application to set aside**

17. NNPC submitted that the order should be set aside on three grounds. First, the order was defective in that it failed to comply with the requirements of CPR, r. 62.18(10). Secondly, the award had been suspended in Nigeria by virtue of the application before the Nigerian courts to set it aside. Thirdly, the enforcement of the

F  award in this country would be contrary to public policy. As it seemed to me, these grounds were self-standing and should be ruled upon regardless of the fate of the application to adjourn. I therefore consider them first and take them in turn. I can do so briefly, as, with respect, they lack substance.

G  (1) *Defective order*

18. NNPC submitted that the order should be set aside on the ground that it failed to comply with the requirements of CPR, r. 62.18(10), which provides as follows:

   'The order must contain a statement of –

H
   (a) the right to make an application to set the order aside; and

   (b) the restriction on enforcement under rule 62.18(9)(b)'.

In turn, CPR, r. 62.18(9) provides:

'Within 14 days after service of the order…

(a) the defendant may apply to set aside the order; and

(b) the award must not be enforced until after –

(i) the end of that period; or

(ii) any application made by the defendant within that period has finally been disposed of.'

19. The order provided both that NNPC had the right to make an application to set aside the order within 14 days and that no enforcement was to occur until 14 days following the date thereof. Contrary, however, to CPR, r. 62.18(10)(b), the order did not contain a statement that the award was not to be enforced until after any application made by NNPC within the 14 day period had finally been disposed of. In the event, IPCO commenced enforcement proceedings after the 14 day period and NNPC was embarrassed and put to expense until IPCO discontinued the enforcement proceedings on about 31 January 2005.

20. Plainly the order was defective in point of form. Plainly too, some prejudice to NNPC had resulted from IPCO's actions in wrongly commencing enforcement proceedings before the present applications had been disposed of. As it seemed to me, however, no useful purpose would be served by setting aside the order on this ground; if IPCO was otherwise entitled to succeed it would simply begin again, with the result that additional costs would be incurred. Moreover, while such an outcome might some times be unavoidable or appropriate, in the present case it would be disproportionate to the gravity of the formal defect in the order. In all the circumstances, the proportionate solution was to penalise IPCO in respect of the costs thrown away by NNPC in dealing with the premature enforcement proceedings but to decline to set aside the order. I ruled accordingly.

(2) *Suspension of the award*

21. As foreshadowed, NNPC contended that by virtue of its application to the Federal High Court in Lagos to set aside the award, the award had been 'suspended'; accordingly, s. 103(2)(f) of the Act was applicable and NNPC was entitled on this ground to have the order set aside. For the reasons already set out, this ground is misconceived; s. 103(2)(f) is not triggered merely by an application before the court in the country of origin. Realistically, Mr. Wordsworth did not press this point.

(3) *Public policy*

A    22. Under this heading, NNPC's case turns on s. 14 of the Nigerian NNPC Act 1977 ('the NNPC Act'), which provides as follows:

B    'In any action or suit against … [NNPC] no execution or attachment or process in the nature thereof shall be issued against … [NNPC] but any sums of money which may, by the judgment of the court, be awarded against … [NNPC] shall, subject to any directions given by the court where notice of appeal has been given by … [NNPC], be paid from the general reserve fund of … [NNPC].'

C    As it was expressed in argument, the intention was not to grant NNPC an immunity from satisfying the judgment; but, given NNPC's importance to the Nigerian economy, to permit an orderly process of satisfaction.

    23. Seeking to build on this foundation, NNPC's submission proceeded as follows: (i) s. 14 confers on NNPC protection against execution or attachment; (ii) s. 14 applies to the enforcement of arbitration awards, as well as judgments; (iii) the enforcement of the award in Nigeria would accordingly be subject to the restrictions flowing from
D    s. 14; (iv) in the light of (i)–(iii) above, it would be contrary to English public policy to permit the enforcement of the award here, thereby circumventing those restrictions: s. 103(3) of the Act is relied upon.

E    24. Once again, Mr. Wordsworth, while not abandoning the position, rightly did not press it in oral argument. No underlying illegality is or could be suggested. As discussed earlier, the relevant public policy is English public policy. Even assuming (while in no way deciding) the correctness of (i)–(iii) above, there is not the glimmer of an argument that enforcement of the award here would offend against English public policy. In my judgment, English public policy is not engaged; if that be wrong, English public policy would, if anything, favour the enforcement of arbitration awards;
F    to assent to this NNPC argument would be to confer on NNPC an immunity from enforcement which it does not enjoy under the *State Immunity Act* 1976. Not least, if NNPC's argument was well-founded, it would follow that even if no challenge to the award was pending in Nigeria, then, for this reason alone, enforcement of the award should not be permitted in this country; plainly, any such contention is untenable. I
G    say no more of it.

**The applications to adjourn and for security**

(1) *Introduction*

H    25. Having rejected NNPC's application to set aside the order, I turn to consider NNPC's application to adjourn its enforcement and IPCO's application that NNPC should provide security. It is convenient to take these two latter applications together. It is further convenient to begin with a brief consideration of the strength of NNPC's case in the Nigerian proceedings to set aside the award (*Soleh Boneh*, supra). To

do so, it is first necessary to summarise the relevant bases of challenge to Nigerian arbitration awards under Nigerian law.

26. These are to be found in the (Nigerian) ACA. In summary, an award may be challenged only on the grounds provided in the ACA (s. 34); see, *Ras Pal Gazi v Federal Capital Development* [2001] 10 NWLR 559. Here, as will be seen, the grounds invoked go to the award allegedly containing a decision on matters beyond the scope of the submission to arbitration (s. 29(2)) and various allegations of misconduct on the part of the arbitrators (s. 30(1)). It may further be noted that an award must be reasoned (s. 26(3)). Although I was told that the ACA was based on the UNCITRAL Model Law, it is clear, from the Nigerian authorities to which I was referred, that much debate is concerned with grounds of challenge reflecting what might be termed the older English tradition, for instance, error of law on the face of the award: see, *Baker Marina v Danos* [2001] 7 NWLR 337.

27. Both parties relied on written expert evidence on Nigerian law, NNPC from (retired) Justice Hunponu-Wusu and IPCO from Mr Fagbohunlu, a barrister called to the Nigerian Bar; neither party applied to adduce oral evidence from either of these expert witnesses. The experts disagreed as to whether 'misconduct' (in s. 30 ACA) was a term of wide import. Save in that regard, they were substantially agreed as to the relevant principles and, in particular, that the categories of 'misconduct' are not closed. That said, they disagreed vigorously over the application of ss. 29 and 30 of the ACA to the facts and as to whether the facts disclosed any good grounds for setting the award aside.

28. With regard to s. 30 and misconduct, for my part I would venture the following working summary (which is in no way intended to be exhaustive):

(i) The Nigerian court is here exercising a limited supervisory rather than appellate jurisdiction.

(ii) The rationale was, with respect, engagingly expressed by Oguntade JCA, in *Baker Marina* (supra), at p. 355, as follows:

> 'When parties make a submission [to arbitration] they do so for a number of reasons. These include simplicity of the arbitral process, the speed, and sometimes an understanding or technical knowledge of the subject-matter. It is usually not because it was believed the arbitrator could not make an error of law. The parties' submission is therefore for better or for worse as in the marriage vow.'

(iii) An award cannot be set aside for misconduct simply because the arbitrators have made an error of fact or law. An error of law on the face of the award will, however, amount to misconduct. To constitute an error of law on the face of the award, the error must be such that can be found in the award or in a document actually incorporated with it, or in some legal proposition which is the basis of the award and which is

A   erroneous: *Baker Marina* (supra), at p. 353; see too, *Taylor Woodrow v Etina-Werk* [1993] 1 NSCC 415. Plainly, the jurisdiction is not intended to permit a disappointed party to re-run the arbitration.

B   (iv) On questions of construction, an arbitration award cannot be set aside for misconduct simply because the court would have come to a different view.

C   29. While, as foreshadowed, to the eyes of an English lawyer much of this is familiar territory from the 'old' English law on arbitration, the application of these principles in a Nigerian setting is a matter on which a decision of the Nigerian court would inevitably be valuable. Moreover questions of degree may arise, for example, as to the detail of reasoning to be expected of an essentially domestic Nigerian award; on matters such as this, nuanced decisions, founded in experience of Nigerian practice may well be desirable – thus again emphasising the respect due to any consideration of the dispute by the Nigerian court.

D   30. Against that background I come to the NNPC case before the Nigerian courts. Its ambit is best summarised by reference to the principal headings of complaint contained in Justice Wusu's two reports: (1) Under s. 29 ACA: by awarding interest at 14%, the arbitrators went beyond the scope of the submission to arbitration. (2) Under s. 30 ACA: the arbitrators misconducted themselves: (i) in their treatment of IPCO's claim for finance charges; (ii) in materially misconstruing cl. 79 of the contract,
E   dealing with force majeure; (iii) in permitting duplication or multiple recovery of IPCO's damages; (iv) in failing to give appropriate or adequate reasons for their conclusions; (iv) by reason of (i)–(iii) above, in arriving at a grossly exaggerated quantum which, given its size, rendered enforcement contrary to public policy. I shall briefly consider these complaints in turn; before doing so, however, it is necessary to refer to another matter which emerged at the hearing before me.

F   (2) *Amount indisputably due*

    31. In the course of the hearing, NNPC accepted that a sum of a little over US$13 million was indisputably due to IPCO, even if NNPC succeeded in full in the Nigerian
G   proceedings. No or no good reason was advanced as to why this sum had not been paid to IPCO. Plainly, this feature of the case should be reflected in any exercise of my discretion to adjourn.

    (3) *The award of interest at 14%*

H   32. As I understood the NNPC submission, its sole basis was that in awarding interest at the rate of 14%, the tribunal exceeded its jurisdiction and the award could, to this extent, be set aside. The argument appears to be not that the tribunal erred as to the rate (which, on the face of it, would not give rise to any challenge under ss. 29 or 30 of the ACA) but that the tribunal had no jurisdiction to award post-award

interest at 14% because it had not been specifically pleaded. With great respect, this submission bristles with difficulty.

33. While ultimately, should NNPC pursue this argument, it will of course be for the Nigerian court to rule upon it, in my judgment it must be overwhelmingly unlikely that the claim for interest was outside the scope of the arbitration. Various contentions as to Nigerian law were relied upon by NNPC before me but it is unnecessary to consider those. For present purposes, it suffices to say that IPCO's Notice of Arbitration, dated 26 February 2003 claimed interest on the principal sum. Furthermore, as appears from para. 21.1 of the award, IPCO pleaded a claim for 'interest … at such a rate and for such a period as determined by the Tribunal'. Against this background, the notion that the absence of a reference to the specific rate of interest ultimately awarded discloses a *jurisdictional* objection is manifestly implausible. But matters do not end there. The award goes on to record (at para. 21.2) NNPC's opposition to the claim for interest; but the arguments deployed do not go to the jurisdiction of the tribunal. In any event, NNPC, in its submissions to me, did not complain of the award of any interest; only the award of interest at 14% (which the tribunal regarded as an appropriate commercial rate). Further and in any event, if the tribunal did exceed its jurisdiction in this regard, the argument as to interest has no bearing on the principal amount of US$152 million odd awarded by the tribunal. For my part, therefore, I viewed this contention of NNPC as lacking substance in the context of an application to adjourn enforcement of the award.

(4) *Finance Charges*

34. Under this heading, the tribunal awarded IPCO some US$34.5 million, the amount claimed. As its title suggests, the claim related to the funding charges said to have been incurred by IPCO arising out of variations, delay and the increased costs of materials and services occasioned by inflation and exchange rate fluctuations over the delay period ('variations', 'prolongation' and 'escalation' respectively). The treatment of this claim in the award has given rise to a number of allegations of misconduct. First, in calculating finance charges in respect of escalation as a percentage of US$22,998,113 – the sum claimed for escalation – given that the tribunal only ultimately awarded US$618,116 in respect of escalation. Secondly, in awarding finance charges on prolongation costs, which already included a 25% mark up. Thirdly, in ignoring cl. 67.3 of the contract, to which I shall return. Fourthly, in that the finance charges are too remote as a matter of Nigerian law. Fifthly, by reason of duplication of damages. Sixthly, in that the tribunal failed to give any or adequate reasons for its decision.

35. I take the final two charges (duplication and inadequate reasons) first. These form part and parcel of two separate complaints and I defer dealing with them until I come to those complaints.

36. As to the first charge, wrongly calculating the finance charges on the basis of the *claimed* rather than the *awarded* figure for escalation, it appears soundly based as a matter of fact. It is worth something in the order of a $6 million reduction in the award. To my mind, NNPC has at least a real prospect of success in alleging 'misconduct' in this regard; it appears to be a simple case of procedural error, calling for redress. There is at least an arguable case that the Nigerian doctrine of misconduct extends thus far.

37. Next, I think that there is likewise factual mileage in respect of NNPC's second charge. As it seems to me, IPCO is seeking to recover its additional financing costs; at least at first blush, it did not incur financing costs in respect of the 25% profit mark up. While there may well be argument here as to whether the tribunal has gone wrong in a manner which permits redress under the ACA, I could not say that this complaint does not have at least a real prospect of success. From the award's approach to the figures, it is not easy to say what a reduction in this regard would be worth; but on no view would it be de minimis and it would not be unrealistic to contemplate a reduction of up to US$4 million.

38. I am less impressed, with respect, with the third and fourth charges. So far as concerns cl. 67.3 of the contract, it provides as follows:

'67 *Default of owner*

67.3 In the event of such termination [i.e. termination by IPCO of its employment under the contract by reason of NNPC's default] the OWNER [i.e. NNPC] shall be liable to pay the CONTRACTOR [i.e. IPCO] the payments specified in clause 86 hereof. In no case shall the OWNER be liable for indirect and consequential damage.'

To begin with, it must be questionable whether cl. 67.3 is applicable in a situation where it is common ground that there has been no termination of the contract. In any event, it is to be recollected that NNPC complains of misconduct. If regard is had to para. 20 of the award, it does not appear that NNPC advanced any argument in respect of cl. 67.3 of the contract or remoteness as a matter of Nigerian law. If so, it is difficult to see how it could be misconduct for the tribunal to fail to take into account points of this nature, which were not argued.

39. In all the circumstances, it seems to me that NNPC has a real prospect of success in attacking the tribunal's conclusions on financing charges in an amount of (very roughly) between US$6 million and US$10 million. Unless account is taken of the broader issues of duplication and reasons (to which I return), NNPC does not have a real prospect of success of reducing the tribunal's award by the full amount of the finance charges awarded.

(5) *Force Majeure*

40. Clause 79 of the contract provided:

'79 *Force Majeure*

Neither party shall be considered in default in performance of his obligations under the CONTRACT to the extent that performance of such obligations is delayed by Force Majeure…

79.3 … in the event of termination of the CONTRACT or part thereof under this Clause … The OWNER shall pay all payments due to the CONTRACTOR arising from FORCE Majeure…'

41. In three instances (award, paras. 17.13, 17.15 and 17.16), the tribunal, basing itself on cl. 79 of the contract, held that IPCO was entitled to damages for prolongation of the completion date. NNPC submits that the payment provisions under cl. 79.3 were only applicable if there had been a termination of the contract. Supported by the evidence of Justice Wusu, NNPC contends that in reaching its conclusion, the tribunal fell into error, constituting material misconstruction of the contract and/or error of law and, in either event, amounting to misconduct. In a nutshell, IPCO retorts that the tribunal was correct in its approach to the issue of force majeure but, even if it was wrong, the award does not disclose any basis for challenge within s. 30, ACA. The mere fact, if it be the fact, that the court would have reached a different conclusion on the true construction of cl. 79, does not give rise to a ground for setting aside the award: *Baker Marina* (supra).

42. In my judgment, NNPC has at least a real prospect of success in submitting that the tribunal erred in its construction of cl. 79.3. It does seem curious that, without termination of the contract, an event of force majeure gives rise to an obligation on the part of NNPC to pay IPCO. If NNPC is right so far, then, without underestimating the difficulties which may remain, I would be reluctant to conclude that it has no real prospect of demonstrating an error of law on the face of the award. The tribunal's approach to the construction of cl. 79.3 is apparent from the award; all that needs to be looked at (outside the award) are the terms of cl. 79.3 itself.

43. In my judgment, therefore, NNPC has a real prospect of success on this issue. More difficult is assessing its impact in terms of quantum. As is apparent from the award, the tribunal did not quantify the impact of each period of delay attributable to force majeure; nor did the tribunal address the overall causative consequences (if any) of the force majeure events it found. I return to considerations of this nature when considering the argument as to the tribunal's reasons.

A  (6) *Duplication of damages*

44. This is a topic of the first importance; if NNPC has a realistic prospect of success here, then it is arguably worth something in the order of US$88 million.

B  45. The matter arises in this way. Much of the US$152 million odd awarded by the tribunal to IPCO was comprised as follows: US$58.5 million in respect of variations; US$53.5 million in respect of prolongation; US$34.5 million in respect of financing charges. The battle lines here are clearly drawn. NNPC's complaint may be simply stated: the tribunal has duplicated the award of damages. That is apparent on the face of the award and amounts to misconduct. IPCO was not entitled to be paid for

C  the additional works *and* for the delay *and* for the financing. Even assuming that IPCO may have been entitled to recover in respect of one of these matters, it was not entitled to recover in respect of all three. It was being paid twice or three times over for the same thing. IPCO's response was equally simple. The variations amounted to the additional works done; the award for prolongation compensated IPCO for the time it took; the finance charges reflected the increased financing cost. There was no

D  duplication; but even if there was, there has been no error of law on the face of the award entitling NNPC to have the award set aside.

46. As a matter of first impression, I confess to having had considerable sympathy with IPCO's stance. There is no necessary duplication in awarding separately the cost

E  of the works, compensation for the additional time and recovery of the additional financing costs. Moreover, even if the tribunal did err in these respects, there is undoubted scope for IPCO to argue that the error was not one of law and, if it was, that it was not misconduct as alleged or at all. But on closer reflection, there is or may be rather more force in the NNPC complaint than first met the eye.

F  47. As appears from the award (para. 11.2.3), IPCO claimed the cost of the variations at the rates specified in cl. 52 of the contract. Clause 52 necessarily leads on to cl. 55, where the contract price is dealt with. Sub-clauses 55.1 and 55.16 make it plain that the contract price included administration, supervision, payment for contractor's equipment, overhead costs and profit. Putting the matter shortly, if that be right, then it

G  is difficult to see the room for awarding on top of such recovery further compensation for prolongation, let alone prolongation plus a 25% mark up and finance charges. In essence, the width of the terms dealing with contract price, suggests that there is or might be duplication if additional sums are awarded for prolongation and financing costs. By way of example, the award (in para. 17.17.1(3)) shows that some US$12.8 million of IPCO's prolongation claim related to equipment; yet if cl. 55 of the contract

H  was applied to price the variations, it would appear already to have been paid for the equipment involved in undertaking the works.

48. Accordingly, in the light of the definitions in the contract, there is a puzzle as to how the tribunal came to award IPCO cumulative amounts in respect of variations, prolongation and finance charges. In my judgment, there is a sufficient puzzle for

NNPC to have a real prospect of success in arguing duplication. There remains of course the formidable hurdle of moving from establishing a factual error (if such can be made good) to establishing misconduct within s. 30. But I do not think that NNPC's case is so weak in that regard that it would be right to discount it or to pre-empt its consideration before the Nigerian court. If this be right, then NNPC has a realistic prospect of reducing the award by up to some US$88 million on the ground of duplication alone: i.e. the award would stand in respect of the US$58.5 million for variations but would be set aside in respect of the additional US$88 million for prolongation costs and finance charges. Of course, intermediate solutions are likewise possible.

(7) *Inadequate reasons*

49. As it seemed to me, the nub of this complaint was twofold. First, that the tribunal in respect of the many individual but substantial items with which it dealt comprising the variations, while summarising the rival arguments, gave very little by way of reasons for preferring IPCO's case to that of NNPC. Secondly, that the tribunal did not address how each of the variations had an impact on the overall time for completion of the project. Such criticisms require close scrutiny. All too easily, they can be exploited in an attempt to re-open the tribunal's findings of fact. No arbitration tribunal should be criticised for succinctness; nor is any tribunal required to set out every point raised before it, still less at length.

50. Had this matter stood alone, I am inclined to think that I would have been largely unsympathetic. It does not, however, do so; this criticism of the award is linked to the argument as to duplication of damages. I also accept that there may be force in the second of the principal criticisms; it is not easy on the face of the award to assess the causative impact of individual variations on the overall time for completion of the project. By way of example, this is a matter to which reference has already been made when dealing with the argument on force majeure. In all the circumstances, this too is an aspect of the case on which I would draw back from seeking to pre-empt the decision of the Nigerian court.

(8) *Public policy*

51. I can take this point summarily. The NNPC argument was that the tribunal's errors (amounting to misconduct) led to an award so exaggerated in size that its enforcement, against a state company, would be contrary to public policy. With respect, this complaint appears to lack substance. Were it soundly based, a mere error of fact, if sufficiently large, could result in the setting aside of an award. That cannot be right and I say no more of this topic.

(9) *Decision*

52. Pulling the threads together:

A  (i) There was no suggestion that NNPC's application to the Nigerian Court was other than bona fide. Nor had there been any delay in the initiation of that application; as already remarked, it preceded the applications in this court.

B  (ii) In the various respects already outlined, the NNPC application does have a realistic prospect of success. In particular, there is a measure of concern as to whether IPCO's recovery has been very substantially duplicated. However, as also underlined, the NNPC application faces formidable hurdles, not least in moving from well-founded criticism of the tribunal (if such is established) to making good a case of misconduct within s. 30 of the ACA. Employing the terminology of *Soleh Boneh*, the award is, at least to the extent discussed, neither manifestly valid nor manifestly invalid.

C

(iii) In all the circumstances, proper deference, going beyond lip service, must be shown to the pending Nigerian proceedings.

D  (iv) Even if NNPC's application in Nigeria is successful, it is common ground that an amount of some US$13 million is indisputably due to IPCO. Moreover, as it seems to me (see above), success for NNPC on the duplication point is, by its nature, likely to leave IPCO with an award of in excess of US$50 million.

E  (v) Given the size of the award, it may be inferred that any delay in enforcement is likely to prejudice IPCO. Very few commercial entities would not be prejudiced by delay in the availability of US$152 million. It must be right to seek to minimise any such prejudice, so far as it is practicable and appropriate to do so.

F  (vi) With specific regard to security, I accept on the evidence both that there is provision in Nigerian legal proceedings for ordering NNPC to furnish security and that NNPC, given its trading activities, is likely to have assets in London. On the other hand, there is in my judgment, a risk of enforcement in Nigeria becoming more complex by reason of the domestic application of s. 14 of the NNPC Act (on one view as to its true construction and scope).

G  (vii) So far as concerns IPCO and on the evidence of its financial status, were immediate enforcement ordered without the provision of cross-security, there would be a very substantial risk that the moneys thus paid out would be irrecoverable – even if NNPC succeeded in setting the award aside before the Nigerian court.

H  53. Balancing all these factors in the exercise of my discretion, I was neither attracted (i) to proceeding with the immediate enforcement of the order (even if accompanied by a condition that IPCO provide cross-security), thereby pre-empting the decision of the Nigerian court, nor (ii) to merely adjourning the enforcement of the order, thus giving too little weight to the importance of enforcement and the arithmetical realities in the Nigerian proceedings. Instead, I was amply satisfied that practical justice would best be done by adjourning the enforcement of the order on terms, inter alia, requiring NNPC to pay the US$13 million indisputably due to IPCO and to provide appropriate

security in London (and thus free of any domestic constraints) in an amount of US$50 million. The detail of those terms and the consequence that IPCO should have permission to enforce the order in the event of NNPC failing to satisfy them, have already been set out in the order drawn up following the conclusion of the hearing.

(*Order accordingly*)

-----------------