# Exhibit E

# REPORT ON THE ARBITRATION BILL

**Chairman**
**The Rt Hon Lord Justice Saville**

**February 1996**

———————————————————

## MEMBERS OF THE COMMITTEE

The Rt Hon. Lord Justice Saville (Chairman)
Professor J. M. Hunter (Deputy Chairman)
Miss C. R. Allen (Secretary)
Mr P. Bovey
Mr A. W. S. Bunch
Mr S. C. Boyd Q.C.
Dr K. G. Chrystie
Lord Dervaird
Mr J. B. Garrett
Professor R. M. Goode C.B.E., Q.C., F.B.A.
Mr B. Harris
Mrs J. Howe
Mrs P. Kirby-Johnson
Mr R. A. MacCrindle Q.C.
Mr A. I. Marriott
Mr K. S. Rokison Q.C.
Mr D. Sarre
Mr J. H. M. Sims
Professor D. R. Thomas
Professor J. Uff Q.C.
Mr V. V. Veeder Q.C.

The DAC has been greatly assisted by the invaluable work done by Mr T. T. Landau of counsel.

———————————————————

# CHAPTER 1

# INTRODUCTION

1.   In its Report of June 1989, the Departmental Advisory Committee on Arbitration Law (the DAC), under the chairmanship of Lord Justice Mustill (now Lord Mustill) recommended against England, Wales and Northern Ireland adopting the UNCITRAL Model Law on International Commercial Arbitration. Instead, the DAC recommended that there should be a new and improved Arbitration Act for England, Wales and Northern Ireland, with the following features (Paragraph 108):

"(1) It should comprise a statement in statutory form of the more important principles of the English law of arbitration, statutory and (to the extent practicable) common law.

(2) It should be limited to those principles whose existence and effect are uncontroversial.

(3) It should be set out in a logical order, and expressed in language which is sufficiently clear and free from technicalities to be readily comprehensible to the layman.

(4) It should in general apply to domestic and international arbitrations alike, although there may have to be exceptions to take account of treaty obligations.

(5) It should not be limited to the subject-matter of the Model Law.

(6) It should embody such of our proposals for legislation as have by then been enacted: see paragraph 100 [of the 1989 Report].

(7) Consideration should be given to ensuring that any such new statute should, so far as possible, have the same structure and language as the Model Law, so as to enhance its accessibility to those who are familiar with the Model Law."

2.   In an Interim Report in April 1995, the DAC stated as follows:

"The original interpretation of [paragraph 108 of the 1989 Report] led to the draft Bill which was circulated in February 1994. Although undoubtedly a highly skilful piece of work, it now appears that this draft Bill did not carry into effect what most users in fact wanted. In the light of the responses, the view of the DAC is that a new Bill should still be grounded on the objectives set out in [paragraph 108 of the 1989 Report], but that, reinterpreted, what is called for is much more along the lines of a restatement of the law, in clear and 'user-friendly' language, following, as far as possible, the structure and spirit of the Model Law, rather than simply a classic exercise in consolidation."

3.   The DAC's proposals in the Interim Report led to a new draft Bill which was circulated for public consultation in July 1995. This draft was very much the product of a fresh start. Indeed, it will be noted that whereas the February 1994 draft had the following long-title:

"To consolidate, with amendments, the Arbitration Act 1950, the Arbitration Act 1975, the Arbitration Act 1979 and related enactments"

this was altered for the July 1995 draft, and now begins:

"An Act to restate and improve the law relating to arbitration pursuant to an arbitration agreement . . . "

4.   The DAC remained of the view, for the reasons given in the Mustill Report, that the solution was not the wholesale adoption of the Model Law. However, at every stage in preparing a new draft Bill, very close regard was paid to the Model Law, and it will be seen that both the structure and the content of the July draft Bill, and the final draft, owe much to this model.

5.   The task of the Committee has been made far easier by the extraordinary quantity and quality of responses we

received both to the draft Bill published in February 1994 and to the draft Bill which was published in July 1995. A large number of people put substantial time and effort into responding to both drafts and putting forward suggestions, and we are very grateful to all of them. Indeed, both these consultation exercises have proved invaluable: the former showed that a new approach was required, while the latter showed that our April 1995 proposals seemed to be on the right track. Both sets of responses also contained carefully considered suggestions, many of which have been incorporated in the Bill. It should be emphasized that those suggestions which have not been adopted were only put on one side after lengthy consideration.

6.   Among those who responded were a large number of institutions who offer arbitration services (such as the ICC) or who provide rules and administration for arbitrations concerning their members (such as the commodity associations). Both domestically and internationally institutions such as these play a very significant role in the field of arbitration. It seemed to us that the Bill should specifically recognize this, and that it should safeguard their spheres of operation. Consequently, there are many references to such institutions in the Bill, and, indeed, Clause 74 gives them what we believe to be a necessary degree of immunity from suit.

7.   Given the extremely favourable response, the July 1995 draft was taken forward, with certain modifications, to form the basis of the final draft, which is explained in this Report.

8.   As well as containing a guide to the provisions of the final draft, this Report also contains supplementary recommendations (in Chapter 6) on certain matters that have come to light since publication of the final draft, and since its second reading in the House of Lords.

---

# CHAPTER 2

## PART I OF THE BILL

9.   The title to this Part is *Arbitration Pursuant to an Arbitration Agreement*. It is in this Part that we have attempted to restate within a logical structure the basic principles of our law of arbitration, as it relates to arbitration under an agreement to adopt this form of dispute resolution. The Bill does not purport to provide an exhaustive code on the subject of arbitration. It would simply not be practicable to attempt to codify the huge body of case law that has built up over the centuries, and there would be a risk of fossilising the common law (which has the great advantage of being able to adapt to changing circumstances) had we attempted to do so. Rather, we have sought to include what we consider to be the more important common law principles, whilst preserving all others, in so far as they are consistent with the provisions of the Bill (see Clause 81).

10.   A small number of key areas, however, have not been included, precisely because they are unsettled, and because they are better left to the common law to evolve. One such example concerns privacy and confidentiality in arbitrations, which deserves special mention here.

11.   Privacy and confidentiality have long been assumed as general principles in English commercial arbitration, subject to important exceptions. It is only recently that the English courts have been required to examine both the legal basis for such principles and the breadth of certain of these exceptions, without seriously questioning the existence of the general principles themselves (see *e.g. The Eastern Saga* [1988] 2 Lloyd's Rep. 373, 379 (Leggatt L.J.); *Dolling-Baker v. Merrett* [1990] 1 W.L.R. 1205, 1213 (Parker L.J.); *Hassneh v. Mew* [1993] 2 Lloyd's Rep. 243 (Colman J.); *Hyundai Engineering v. Active* (unreported, 9 March 1994, Phillips J.); *Ins Company v. Lloyd's Syndicate* [1995] 2 Lloyd's Rep. 272 (Colman J.); *London & Leeds Estates Limited v. Parisbas Limited (No. 2)* (1995) E.G. 134 (Mance J.)).

12.   In practice, there is also no doubt whatever that users of commercial arbitration in England place much importance on privacy and confidentiality as essential features of English arbitration (*e.g.* see survey of users amongst the "Fortune 500" U.S. corporations conducted for the LCIA by the London Business School in 1992). Indeed, as Sir Patrick Neill Q.C. stated in his 1995 "Bernstein" Lecture, it would be difficult to conceive of any greater threat to the success of English arbitration than the removal of the general principles of confidentiality and

privacy.

13. Last year's decision of the High Court of Australia in *Esso/BHP v. Plowman* (see [1995] 11 *Arbitration International* 234) reinforced many people's interest in seeking to codify the relevant English legal principles in the draft Arbitration Bill. The implied term as the contractual basis for such principles was not in doubt under English law, and the English Courts were upholding these principles in strong and unequivocal terms. However, the Australian decision was to the effect that, as a matter of Australian law, this contractual approach was unsustainable as regards confidentiality. This has troubled users of commercial arbitration far outside Australia. The first response has been for arbitral institutions to amend their arbitration rules to provide expressly for confidentiality and privacy. The new WIPO Rules have sought to achieve this and we understand that both the ICC and the LCIA are currently amending their respective rules to similar effect.

14. In England, the second response was to consider placing these general principles on a firm statutory basis in the Arbitration Bill. This task was initially undertaken by the DAC mid-1995, and perhaps surprisingly, it soon proved controversial and difficult.

15. Whilst none could reasonably dispute the desirability of placing these general principles beyond all doubt on a firm statutory basis, applicable to all English arbitrations within the scope of the Bill (irrespective of the substantive law applicable to the arbitration agreement), grave difficulties arose over the myriad exceptions to these principles—which are necessarily required for such a statutory provision. There is of course no statutory guidance to confidentiality in the UNCITRAL Model Law whatever; and indeed, in a different context, Lord Mustill has recently warned against an attempt to give in the abstract an accurate exposition of confidentiality at large (see *In re D (Adoption Reports: Confidentiality)* [1995] 3 W.L.R. 483, 496D: "To give an accurate exposition of confidentiality at large would require a much more wide-ranging survey of the law and practice than has been necessary for a decision on the narrow issue raised by the appeal, and cannot in my opinion safely be attempted in the abstract").

16. For English arbitration, the exceptions to confidentiality are manifestly legion and unsettled in part; and equally, there are important exceptions to privacy (*e.g.* in *The Lena Goldfields Case* (1930), the arbitration tribunal in London opened the hearing to the press (but not the public) in order to defend the proceedings against malicious charges made by one of the parties, the USSR). As to the former, the award may become public in legal proceedings under the Arbitration Acts 1950–1979 or abroad under the 1958 New York Convention; the conduct of the arbitration may also become public if subjected to judicial scrutiny within or without England; and most importantly, several non-parties have legitimate interests in being informed as to the content of a pending arbitration, even short of an award: *e.g.* parent company, insurer, P+I Club, guarantor, partner, beneficiary, licensor and licensee, debenture-holder, creditors' committee etc., and of course even the arbitral institution itself (such as the ICC Court members approving the draft award). Whilst non-parties to the arbitration agreement and proceedings, none of these are officious strangers to the arbitration. Further, any provisions as to privacy and confidentiality would have to deal with the duty of a company to make disclosure of, *e.g.*, arbitration proceedings and actual or potential awards which have an effect on the company's financial position. The further Australian decision in *Commonwealth of Australia v. Cockatoo Dockyard Pty Ltd* (1995) 36 N.S.W.L.R. 662 suggests that the public interest may also demand transparency as an exception to confidentiality: "Can it be seriously suggested that [the parties'] private agreement can, endorsed by a procedural direction of an arbitrator, exclude from the public domain matters of legitimate concern . . . ", *per* Kirby J. This decision raises fresh complications, particularly for statutory corporations. We are of the view that it would be extremely harmful to English arbitration if any statutory statement of general principles in this area impeded the commercial good-sense of current practices in English arbitration.

17. Given these exceptions and qualifications, the formulation of any statutory principles would be likely to create new impediments to the practice of English arbitration and, in particular, to add to English litigation on the issue. Far from solving a difficulty, the DAC was firmly of the view that it would create new ones. Indeed, even if acceptable statutory guidelines could be formulated, there would remain the difficulty of fixing and enforcing sanctions for non-compliance. The position is not wholly satisfactory. However, none doubt at English law the existence of the general principles of confidentiality and privacy (though there is not unanimity as to their desirability). Where desirable, institutional rules can stipulate for these general principles, even where the arbitration agreement is not governed by English law. As to English law itself, whilst the breadth and existence of certain exceptions remains disputed, these can be resolved by the English courts on a pragmatic case-by-case basis. In due course, if the whole matter were ever to become judicially resolved, it would remain possible to add a statutory provision by way of amendment to the Bill. For these reasons, the DAC is of the view that no attempt should be made to codify English law on the privacy and confidentiality of English arbitration in the Bill. We would, however, draw attention to our supplementary recommendations on this topic in Chapter 6 below.

## Clause 1    General Principles

18.  The DAC was persuaded by the significant number of submissions which called for an introductory clause setting out basic principles. This Clause sets out three general principles. The first of these reflects what we believe to be the object of arbitration. We have not sought to define arbitration, since this poses difficulties that we discussed in our April 1995 Interim Report, and in the end we were not persuaded that an attempted definition would serve any useful purpose. We do, however, see value in setting out the object of arbitration. Fairness, impartiality and the avoidance of unnecessary delay or expense are all aspects of justice *i.e.* all requirements of a dispute resolution system based on obtaining a binding decision from a third party on the matters at issue. To our minds it is useful to stipulate that all the provisions of the Bill must be read with this object of arbitration in mind.

19.  The second principle is that of party autonomy. This reflects the basis of the Model Law and indeed much of our own present law. An arbitration under an arbitration agreement is a consensual process. The parties have agreed to resolve their disputes by their own chosen means. Unless the public interest otherwise dictates, this has two main consequences. Firstly, the parties should be held to their agreement and secondly, it should in the first instance be for the parties to decide how their arbitration should be conducted. In some cases, of course, the public interest will make inroads on complete party autonomy, in much the same way as there are limitations on freedom of contract. Some matters are simply not susceptible of this form of dispute resolution (*e.g.* certain cases concerning status or many family matters) while other considerations (such as consumer protection) may require the imposition of different rights and obligations. Again, as appears from the mandatory provisions of the Bill, there are some rules that cannot be overridden by parties who have agreed to use arbitration. In general the mandatory provisions are there in order to support and assist the arbitral process and the stated object of arbitration.

20.  So far as the third principle is concerned this reflects article 5 of the Model Law. This article provides as follows:

"In matters governed by this Law, no court shall intervene except where so provided in this Law."

21.  As was pointed out in the Mustill Report (pp. 50–52) there would be difficulties in importing this article as it stands. However, there is no doubt that our law has been subject to international criticism that the courts intervene more than they should in the arbitral process, thereby tending to frustrate the choice the parties have made to use arbitration rather than litigation as the means for resolving their disputes.

22.  Nowadays the courts are much less inclined to intervene in the arbitral process than used to be the case. The limitation on the right of appeal to the courts from awards brought into effect by the Arbitration Act 1979, and changing attitudes generally, have meant that the courts nowadays generally only intervene in order to support rather than displace the arbitral process. We are very much in favour of this modern approach and it seems to us that it should be enshrined as a principle in the Bill.

## Clause 2    Scope of Application of Provisions

23.  International arbitrations can give rise to complex problems in the conflict of laws. A possible solution to some of these problems would have been to provide that all arbitrations conducted in England and Wales or in Northern Ireland should be subject to the provisions of the Bill, regardless of the parties' express or implied choice of some other system of law. We have not adopted this solution, which appears to us contrary to the basic principle that the parties should be free to agree how their disputes should be resolved. There appear to us to be no reasons of public policy to prevent the parties conducting an arbitration here under an agreement governed by foreign law or in accordance with a foreign procedural law. Clause 4(5) also follows the same basic principle. Of course, cases may well arise where considerations of our own concepts of public policy would lead to the refusal of the court here to enforce an arbitration award. This, however, is covered by Clause 66(3).

24.  The rules of the conflict of laws as they apply to arbitration are complex, and to some extent still in a state of development by the courts. It therefore seems to us inappropriate to attempt to codify the relevant principles, beyond the simple statements set out in clause 2(1). Thus, as Clause 2(2) provides, matters referable to the arbitration agreement are governed by the law of England and Wales or of Northern Ireland, as the case may be, where that is the law applicable to the arbitration agreement, and matters of procedure are governed by that law where the seat of the arbitration is in England and Wales or in Northern Ireland: "seat" is defined in Clause 3. Beyond that we have not attempted to state the relevant rules of the conflict of laws, nor to embark on the issues of characterisation by which they are invoked.

25.  Subsection (3) concerns the powers of the court to support the arbitration by staying proceedings brought in breach of an agreement to arbitrate, by compelling the attendance of witnesses, by granting those forms of interim relief which are set out in Clause 44, and by enforcing the award at common law by summary procedure. Such powers should obviously be available regardless of whether the seat of the arbitration is in England and Wales or in Northern Ireland, and regardless of what law is applicable to the arbitration agreement or the arbitral proceedings. Since we have used the expression "whatever the law applicable . . . ", it follows that Clause 2(3) is in no way restricted by Clause 2(1). It will be noted that in extending the power of the court to grant interim relief in support of arbitrations to arbitrations having a foreign seat we have given effect to our recommendation that section 25 of the Civil Jurisdiction and Judgments Act 1982 should be extended to arbitration proceedings. It should be appreciated that Rules of Court will have to be amended to give proper effect to the extension of the court's jurisdiction in Clause 2(3) (*i.e.* so as to allow service out of the jurisdiction in cases where it is necessary). Subsection (4) enables the court to refuse to exercise its power in such cases, where the fact that the arbitration has a foreign seat makes it inappropriate to exercise that power.

## Clause 3    The Seat of the Arbitration

26.  The definition of "seat of the arbitration" is required by Clause 2, and as part of the definition of "domestic arbitration" in Clause 85. The concept of the "seat" as the juridical seat of the arbitration is known to English law but may be unfamiliar to some users of arbitration. Usually it will be the place where the arbitration is actually conducted: but this is not necessarily so, particularly if different parts of the proceedings are held in different countries.

27.  In accordance with the principle of party autonomy, Clause 3 provides that the seat may be designated by the parties themselves or in some other manner authorised by them. Failing that it must be determined objectively having regard to the parties' agreement and all other relevant circumstances. English law does not at present recognise the concept of an arbitration which has no seat, and we do not recommend that it should do so. The powers of the court where the seat is in England and Wales or in Northern Ireland are limited to those necessary to carry into effect the principles enshrined in Clause 1. Where the seat is elsewhere, the court's powers are further limited by Clause 2(4). The process of consultation identified no need for an arbitration which was "delocalised" to a greater extent than this.

## Clause 4    Mandatory and Non-mandatory Provisions

28.  This provision is designed to make clear that the Bill has certain provisions that cannot be overridden by the parties; and for ease of reference these are listed in Schedule 1 to the Bill. The Clause also makes clear that the other provisions of this Part can be changed or substituted by the parties, and exist as "fall-back" rules that will apply if the parties do not make any such change or substitution, or do not provide for the particular matter in question. In this way, in the absence of any other contrary agreement, gaps in an arbitration agreement will be filled.

29.  Subsection (5). Although we believe that the choice of a foreign law would anyway have the effect set out in this provision, it seemed for the sake of clarity to be useful to state this expressly, so as to remind all concerned that a choice of a foreign law does amount to an agreement of the parties to which due regard should be paid.

30.  It should be made clear that the phrase "mandatory" is not used in either of the two senses that it is used, for example, in Articles 3 and 7 of the Rome Convention (see Goode, *Commercial Law* (2nd ed.) at 1118): the mandatory provisions of Part 1 of the Bill are only mandatory in so far as the provisions of Part 1 apply (*i.e.* by virtue of Clause 2). The mandatory provisions would have no application if Part 1 does not apply.

## Clause 5    Agreements to be in Writing

*(a) Arbitration Agreements*

31.  Article 7 of the Model Law requires the arbitration agreement to be in writing. We have not followed the precise wording of this article, for the reasons given in the Mustill Report (p. 52), though we have incorporated much of that article in the Bill.

32.  The requirement for the arbitration agreement to be in writing is the position at present under section 32 of the

Arbitration Act 1950 and section 7 of the Arbitration Act 1975. If an arbitration agreement is not in writing then it is not completely ineffective, since the common law recognises such agreements and is saved by Clause 81(2)(a).

33.  We remain of the view expressed in the Consultative Paper issued with the draft Clauses published in July 1995, that there should be a requirement for writing. An arbitration agreement has the important effect of contracting out of the right to go to the court, *i.e.* it deprives the parties of that basic right. To our minds an agreement of such importance should be in some written form. Furthermore the need for such form should help to reduce disputes as to whether or not an arbitration agreement was made and as to its terms.

34.  We have, however, provided a very wide meaning to the words "in writing". Indeed this meaning is wider than that found in the Model Law, but in our view, is consonant with Article II.2 of the English text of the New York Convention. The non-exhaustive definition in the English text ("shall include") may differ in this respect from the French and Spanish texts, but the English text is equally authentic under Article XVI of the New York Convention itself, and also accords with the Russian authentic text ("rk.xftn"); see also the 1989 Report of the Swiss Institute of Comparative Law on Jurisdictional Problems in International Commercial Arbitration (by Adam Samuel), at pages 81 to 85. It seems to us that English law as it stands more than justifies this wide meaning; see, for example, *Zambia Steel v. James Clark* [1986] 2 Lloyd's Rep. 225. In view of rapidly evolving methods of recording we have made clear that "writing" includes recording by any means.

### (b) Other Agreements

35.  These we have also made subject to a "writing" requirement. Had we not done so, we could envisage disputes over whether, for example, something the parties had agreed to during the conduct of the arbitration amounted to a variation of the arbitration agreement and required writing, or could be characterised as something else. By introducing some formality with respect to all agreements, the possibility of subsequent disputes (*e.g.* at the enforcement stage) is greatly diminished. Indeed it seemed to us that with the extremely broad definition we have given to writing, the advantages of requiring some record of what was agreed with regard to any aspect of an arbitration outweighed the disadvantages of requiring a specific form for an effective agreement.

### (c) Further Points

36.  Subsection 5(3). This is designed to cover, amongst other things, extremely common situations such as salvage operations, where parties make an oral agreement which incorporates by reference the terms of a written form of agreement (*e.g.* Lloyd's Open Form), which contains an arbitration clause. Whilst greatly extending the definition of "writing", the DAC is of the view that given the frequency and importance of such activity, it was essential that it be provided for in the Bill. The reference could be to a written agreement containing an arbitration clause, or to a set of written arbitration rules, or to an individual written arbitration agreement. This provision would also cover agreement by conduct. For example, party A may agree to buy from party B a quantity of goods on certain terms and conditions (which include an arbitration clause) which are set out in writing and sent to party B, with a request that he sign and return the order form. If, which is by no means uncommon, party B fails to sign the order form, or send any document in response to the order, but manufactures and delivers the goods in accordance with the contract to party A, who pays for them in accordance with the contract, this could constitute an agreement "otherwise than in writing by reference to terms which are in writing . . . ", and could therefore include an effective arbitration agreement. The provision therefore seeks to meet the criticisms that have been made of article 7(2) of the Model Law in this regard (see, *e.g.* the Sixth Goff Lecture, delivered by Neil Kaplan Q.C. in Hong Kong in November 1995, (1996) 12 *Arb. Int.* 35). A written agreement made by reference to separate written terms would, of course, be caught by Clause 5(2).

37.  Subsection 5(4). There has been some concern that a writing requirement with respect to every agreement might unduly constrain the parties' freedom and flexibility with respect to, for example, minor matters of procedure during a hearing. This subsection seeks to avoid this. An agreement will be evidenced in writing if recorded by, amongst others, a third party with the authority of the parties to the agreement. Given that this third party could of course be the tribunal, the parties are free during a hearing to make whatever arrangements or changes to the agreed procedure they wish, as long as these are recorded by the tribunal. The DAC is of the view that this presents no serious hindrance to the parties' flexibility, and has the merit of reducing the risk of disputes

later on as to what exactly was agreed. Clearly, this subsection also has a wider effect, allowing for the recording of an oral agreement at any stage.

38.  Subsection 5(5). This provision is based on article 7(2) of the Model Law, but with certain important changes. The DAC has been careful to emphasize that for there to be an effective arbitration agreement for the purposes of this Part, it is not enough for one party to allege in a written submission that there is an arbitration agreement, in circumstances where the other party simply fails to respond at all. If this were enough, an unfair obligation would be placed on any party (including a stranger to the proceedings in question) to take the active step of serving a written submission in order to deny this allegation. Therefore, in order to satisfy this subsection, there must be a failure to deny an allegation by a party who has submitted a response submission.

39.  It has been suggested that the term "written submissions" is too narrow, and that this should be replaced by "documents". The DAC does not agree with this, given that this would include the most informal of letters. It may well be unjust, for example, for one party to be able to point to one sentence in one letter in a long exchange with another party, in which there is an allegation that there exists an arbitration clause, and where this has not been denied.

40.  Reference should also be made to subsection 23(4). Whilst any agreement as to an arbitration must be in writing, the DAC is of the view that it is impracticable to impose a writing requirement on an agreement to terminate an arbitration. Parties may well simply walk away from proceedings, or allow the proceedings to lapse, and it could be extremely unfair if one party were allowed to rely upon an absence of writing at some future stage. Where a claimant allows an arbitration to lapse, Clause 41(3) may be utilised.

## The Arbitration Agreement

## Clause 6    Definition of Arbitration Agreement

41.  The first subsection reflects article 7(1) of the Model Law and provides a more informative definition than that in section 32 of the 1950 Act. We have used the word "disputes" but this is defined in Clause 82 as including "differences" since there is some authority for the proposition that the latter term is wider than the former; see *Sykes v. Fine Fare Ltd* [1967] 1 Lloyd's Rep. 53.

42.  The second subsection reflects article 7(2) of the Model Law. In English law there is at present some conflicting authority on the question as to what is required for the effective incorporation of an arbitration clause by reference. Some of those responding to the July 1995 draft Clauses made critical comments of the views of Sir John Megaw in *Aughton v. M F Kent Services* [1991] 57 B.L.R. 1 (a construction contract case) and suggested that we should take the opportunity of making clear that the law was as stated in the charterparty cases and as summarised by Ralph Gibson L.J. in *Aughton*. (Similar disquiet has been expressed about decisions following *Aughton*, such as *Ben Barrett v. Henry Boot Management Ltd* [1995] Constr. Ind. Law Letter 1026). It seemed to us, however, that although we are of the view that the approach of Ralph Gibson L.J. should prevail in all cases, this was really a matter for the court to decide. The wording we have used certainly leaves room for the adoption of the charterparty rules in all cases, since it refers to references to a document containing an arbitration clause as well as a reference to the arbitration clause itself. Thus the wording is not confined to cases where there is specific reference to the arbitration clause, which Sir John Megaw (but not Ralph Gibson L.J.) considered was a requirement for effective incorporation by reference.

## Clause 7    Separability of Arbitration Agreement

43.  This Clause sets out the principle of separability which is already part of English law (see *Harbour Assurance v. Kansa* [1993] Q.B. 701), which is also to be found in article 16(1) of the Model Law, and which is regarded internationally as highly desirable. However, it seems to us that the doctrine of separability is quite distinct from the question of the degree to which the tribunal is entitled to rule on its own jurisdiction, so that, unlike the Model Law, we have dealt with the latter elsewhere in the Bill (Clause 30).

44. In the draft Clauses published in July 1995 we inserted a provision to make clear that the doctrine of separability did not affect the question whether an assignment of rights under the substantive agreement carried with it the right or obligation to submit to arbitration in accordance with the arbitration agreement. This is now omitted as being unnecessary, since we have re-drafted subsection (1) in order to follow the relevant part of article 16 of the Model Law more closely, and to make clear that the doctrine of separability is confined to the effect of invalidity etc of the main contract on the arbitration agreement, rather than being, as it was in the July 1995 draft,

8

a free-standing principle. Similarly, in being so restricted, this Clause is not intended to have any impact on the incorporation of an arbitration clause from one document or contract into another (which is addressed in Clause 6(2)).

45. A number of those responding to our drafts expressed the wish for the Bill to lay down rules relating to assignment, *e.g.* that the assignment of rights under the substantive agreement should be subject to any right or obligation to submit to arbitration in accordance with the arbitration agreement unless either of these agreements provided otherwise. Indeed we included such a provision in the illustrative draft published in April 1995. However, on further consideration, we concluded that it would not be appropriate to seek to lay down any such rules.

46. There were two principal reasons for reaching this view.

i. In the first place, under English law the assignability of a contractual right is governed by the proper law of that right, while the effectiveness of the assignment is governed by the proper law of the assignment. However, where the law governing the substantive agreement (or the arbitration agreement) is not English law, different rules may well apply and there is an added problem in that those rules (under the foreign law in question) may be categorised as either substantive or procedural in nature. The Bill would therefore have to address such problems whilst simultaneously not interfering with substantive rights and obligations. We were not persuaded that it would be either practicable or of any real use to attempt to devise general rules which would deal satisfactorily with this matter.

ii. In the second place, English law distinguishes between legal and equitable assignments, so that any rules we devised would have to take this into account. In our view, an attempt to devise rules relating to assignments where no foreign law elements are involved is more the subject of reform of the law of assignment generally than of a Bill relating exclusively to arbitration.

47. Finally, it should be noted that the substantive agreement of which the arbitration agreement forms part need not itself be in writing for the Bill to apply, provided of course that the arbitration agreement itself is in writing. This should be clarified as we suggest in our supplementary recommendations in Chapter 6 below.

## Clause 8   Whether Agreement discharged by Death of a Party

48. This Clause sets out the present statutory position. The common law was that an arbitration agreement was discharged by the death of a party. That rule was altered by the Arbitration Act 1934 as re-enacted by section 2 of the Arbitration Act 1950. We have avoided using the technical expression "right of action" which is to be found in section 2(3) of the 1950 Act and which could perhaps give rise to problems for the reasons given in the consultative paper published with the draft Clauses in July 1995. In line with party autonomy, we have provided that the parties can agree that death shall have the effect of discharging the arbitration agreement.

49. This Clause deals only with the arbitration agreement. The effect of the death of a party on the appointment of an arbitrator (also to be found in section 2 of the 1950 Act) is now dealt with in that part of the Bill concerned with the arbitral tribunal (see Clause 26(2)).

## Stay of Legal Proceedings

## Clause 9   Stay of Legal Proceedings

50. We have proposed a number of changes to the present statutory position (section 4(1) of the 1950 Act and section 1 of the 1975 Act), having in mind article 8 of the Model Law, our treaty obligations, and other considerations.

51. We have made it clear that a stay can be sought of a counterclaim as well as a claim. The existing legislation could be said not to cover counterclaims, since it required the party seeking a stay first to enter an "appearance" which a defendant to counterclaim could not do. Indeed, "appearance" is no longer the appropriate expression in the High Court in any event, and never was the appropriate expression in the county court. We have also made clear that an application can be made to stay part of legal proceedings, where other parts are not subject to an agreement to arbitrate.

52. Further, the Clause provides that an application is only to be made by a party against whom legal proceedings

are brought (as opposed to any other party).

53. We have provided that an application may be made for a stay even where the matter cannot be referred to arbitration immediately, because the parties have agreed first to use other dispute resolution procedures. This reflects *dicta* of Lord Mustill *Channel Tunnel v. Balfour Beatty* [1993] A.C. 334.

54. In this Clause we have made a stay mandatory unless the court is satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed. This is the language of the Model Law and of course of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, presently to be found in the Arbitration Act 1975.

55. The Arbitration Act 1975 contained a further ground for refusing a stay, namely where the Court was satisfied that "there was not in fact any dispute between the parties with regard to the matter agreed to be referred". These words do not appear in the New York Convention and in our view are confusing and unnecessary, for the reasons given in *Hayter v. Nelson* [1990] 2 Lloyd's Rep. 265.

56. In Part II of the Bill these provisions are altered in cases of "domestic arbitration agreements" as there defined.

57. We have included a provision (subsection (5)) that where the court refuses to stay the legal proceedings, any term making an award a condition precedent to the bringing of legal proceedings (known as a *Scott v. Avery* clause) will cease to have effect. This avoids a situation where the arbitration clause is unworkable, yet no legal proceedings can be successfully brought. Whilst one respondent suggested that this may go too far, it appears to be a matter of basic justice that a situation in which a party can neither arbitrate nor litigate must be avoided.

## Clause 10   Reference of Interpleader Issue to Arbitration

58. This Clause is based on section 5 of the 1950 Act. We have however taken the opportunity of making a stay mandatory so as to comply with the New York Convention, as well as trying to express the provision in simpler, clearer terms. The Clause is required because "interpleader" arises where one party claiming no right himself in the subject matter, is facing conflicting claims from other parties and does not know to which of them he should account. English law allows such a party to bring those in contention before the court which may order the latter to fight out the question between themselves. If they have agreed to arbitrate the matter then Clause 9 would not itself operate, since the party seeking interpleader relief would not be making a claim which he had agreed to arbitrate.

59. We have not defined "interpleader", although some suggested that we should, given that this is a legal term of art, which goes far beyond arbitration contexts.

## Clause 11   Retention of Security where Admiralty Proceedings Stayed

60. This Clause is not intended to do more than re-enact the present statutory position as found in section 26 of the Civil Jurisdiction and Judgments Act 1982.

61. Clauses 9 to 11 are, of course, mandatory.

## Commencement of Arbitral Proceedings

## Clause 12   Power of Court to Extend Time for Beginning Arbitral Proceedings, etc.

62. We have proposed a number of changes to the existing law.

63. The major change concerns the test that the court must apply before extending the time.

64. The power of the court to extend a contractual time limit which would otherwise bar the claim first appeared in our law in section 16(6) of the Arbitration Act 1934, which was re-enacted in section 27 of the Arbitration Act 1950.

65. From paragraph 33 of the Report of the MacKinnon Committee presented to Parliament in March 1927 it can

be seen that the reason for suggesting that the court should have power to extend the time was that the vast majority of submissions to arbitration are contained in printed forms of contract, which cannot be carefully examined in the transaction of business and alteration of which it would be difficult for most people to secure. The Committee concluded that it might be sound policy to create a power to modify unconscionable provisions as regards common forms of submission in printed forms. It is also clear from paragraph 34 of the Report that the Committee had in mind cases where the time limit was very short, *i.e.* measured in days. The Committee suggested that the test should be whether the time limit created an "unreasonable hardship".

66. As can be seen from the Notes on Clauses to the 1934 Act, it was later felt that since the justification for giving the power was presumably either ignorance of the existence of the provision in the contract, or the acceptance of the provision through undue pressure by the other party, which could be the case whether or not the contract was in a common form, the power should not be limited to such forms.

67. Section 27 of the 1950 Act, with its test of undue hardship, seems to many to have been interpreted by the courts in a way hardly envisaged by those who suggested the power in the first place. Indeed that interpretation seems to have changed over the years: see the discussion in Mustill and Boyd, *Commercial Arbitration* (2nd ed.), pp. 201–215. Some responses indicated dissatisfaction with the way the Courts were using Clause 27 to interfere with the bargain that the parties had made. The present legal position would seem to owe much to a time, now some 20 years ago, when the courts were flirting with the idea that they enjoyed some general power of supervisory jurisdiction over arbitrations.

68. The justification for time limits is that they enable commercial concerns (and indeed others) to draw a line beneath transactions at a much earlier stage than ordinary limitation provisions would allow. It should be mentioned, however, that other responses suggested that the position presently reached by the courts should be maintained.

69. The present Committee re-examined section 27 in the light of the underlying philosophy of the Bill, namely that of party autonomy. This underlying philosophy seems to have been generally welcomed in this country and abroad and of course it fits with the general international understanding of arbitration. Party autonomy means, among other things, that any power given to the court to override the bargain that the parties have made must be fully justified. The idea that the court has some general supervisory jurisdiction over arbitrations has been abandoned.

70. It seemed to us in today's climate that there were three cases where the power could be justified in the context of agreed time limits to bring a claim. These are, firstly, where the circumstances are such as were outside the reasonable contemplation of the parties when they agreed the provision in question and that it would be fair to extend the time, secondly, where the conduct of one party made it unjust to hold the other to the time limit, and thirdly, where the respective bargaining position of the parties was such that it would again be unfair to hold one of them to the time limit.

71. The third of these cases seems to us to reflect the thinking of the MacKinnon Committee, while the other two have developed through the courts' interpretation of section 27. However this third category is really an aspect of what nowadays would be called "consumer protection". This part of the Bill is not concerned with consumer protection, for which provision is made elsewhere and in respect of which there is a growing body of European law.

72. In these circumstances it seemed to us to be appropriate to set out in this part of the Bill the first and second of the cases we have described. Apart from anything else, this will give the courts the opportunity to reconsider how to proceed in the light of the philosophy underlying the Bill as a whole, namely that of party autonomy. As the MacKinnon Committee itself intimated, great care must be taken before interfering with the bargain that the parties have made.

73. It was suggested to the DAC that the principal matter to be taken into account by the court should be the length of the contractual period in question. The DAC is of the view that this is only one of several relevant matters, another factor being, for example, the contemplation of the parties. For this reason, the DAC concluded that a simple test of "substantial injustice", without more, would not suffice.

74. There are some other changes.

i.   Firstly, Clause 12(1)(b) contains a reference to other dispute resolution procedures. We understand that there is an increasing use of provisions which call for mediation and other alternative dispute resolution procedures to

precede recourse to arbitration, so that we thought it proper to add this to the other step covered by the Clause, namely to begin arbitral proceedings. We do not intend to widen the scope of the Clause beyond this, so that unless the step in question is one of the two kinds described, the Clause will not operate. Thus this represents only a small but we think logical extension to the present law.

ii.   Secondly, it is made a pre-condition that the party concerned first exhausts any available arbitral process for obtaining an extension of time. In the view of the Committee it would be a rare case indeed where the court extended the time in circumstances where there was such a process which had not resulted in an extension, for it would in the ordinary case be difficult if not impossible to persuade the court that it would be just to extend the time or unjust not to do so, where by an arbitral process to which *ex hypothesi* the applying party had agreed, the opposite conclusion had been reached.

iii.  Thirdly, we have made any appeal from a decision of the court under this Clause subject to the leave of that court. It seems to us that there should be this limitation, and that in the absence of some important question of principle, leave should not generally be granted. We take the same view in respect of the other cases in the Bill where we propose that an appeal requires the leave of the court.

iv.   Fourthly, whereas the existing statutory provision refers to terms of an agreement that provide that claims shall be "barred", this has been extended to read "barred, or the claimant's right extinguished".

75.  For obvious reasons, this Clause is mandatory.

## Clauses 13 and 14   Application of Limitation Acts and Commencement of Arbitral Proceedings

76.  The first of these provisions is designed to restate the present law. The reference to the Foreign Limitation Periods Act 1984 avoids (subject to the provisions of that Act) the imposition of an English limitation period where an applicable foreign law imposes a different period. The second provision reflects to a degree article 21 of the Model Law, but sets out the various cases, including one not presently covered by the law. It will be noted that we have used the word "matter" rather than the word "disputes". This is to reflect the fact that a dispute is not the same as a claim; *cf.* Mustill and Boyd, *op.cit.* at p. 29 and *Commission for the New Towns v. Crudens* (1995) C.I.L.L. 1035. The neutral word "matter" will cover both, so that an arbitration clause which refers to claims will be covered as well as one which refers to disputes.

77.  Clause 13 is a mandatory provision.

## The Arbitral Tribunal

## Clause 15   The Arbitral Tribunal

78.  Article 10(1) of the Model Law provides that the parties are free to determine the number of arbitrators. We have included a like provision.

79.  Article 10(2) of the Model Law stipulates that failing such determination, the number of arbitrators shall be three. This we have not adopted, preferring the existing English rule that in the absence of agreement the default number shall be one. The employment of three arbitrators is likely to be three times the cost of employing one, and it seems right that this extra burden should be available if the parties so choose, but not imposed on them. The provision for a sole arbitrator also accords both with common practice in this country, and the balance of responses the DAC received. The Model Law default does not, of course, cater for the situation where there are more than two parties to the arbitration.

## Clause 16   Procedure for the Appointment of Arbitrators

80.  Again we have had the Model Law (article 11) very much in mind in drafting these provisions, though we have attempted to cater for more cases and also for the fact that under our law, there can be either an umpire or a chairman. We should note that this has caused some confusion abroad, particularly in the United States, where what we would describe as a "chairman" is called an "umpire". In Clauses 20 and 21 we set out the differences between these two which (in the absence of agreement between the parties) is the present position under English law.

81.  The time limits we have imposed for appointments we consider to be fair and reasonable. They can be extended by the Court under Clause 79, but the power of the court in this regard is limited as set out in that Clause. In the ordinary case we would not expect the court to allow a departure from the Clause 16 time limits.

82.  It might be noted that periods of 28 days, rather than 30 days (as in the Model Law) have been used throughout the Bill, in order to reduce the likelihood of a deadline expiring on a weekend.

## Clause 17    Power in Case of Default to Appoint Sole Arbitrator

83.  This Clause is intended to replace the present rules concerning the appointment of a sole arbitrator where the other party is in default (section 7(b) of the 1950 Act). It only applies to a two party case. We have stipulated that the party in default must not only appoint his arbitrator within the specified period but also inform the other party that he has done so. This in our view is a significant improvement on the present law, where the defaulting party was under no obligation to say that he had made an appointment. This was calculated to cause unnecessary delay, confusion and expense.

84.  Some of those responding objected to this Clause. The DAC, however, remains of the view that this provision is an example of the Court supporting the arbitral process, and reducing the opportunities available for a recalcitrant party. The DAC is advised that section 7(b) of the 1950 Act is used a great deal, and that its very existence constitutes a deterrent to those contemplating dilatory tactics. The alternative would be to simply provide for recourse to court. This would be overly burdensome in most cases, and is available, in any event, under the provisions of the Bill.

85.  It has been suggested that the Bill should set out grounds upon which the court should exercise its discretion in Clause 17(3). The DAC is of the view, however, that this is best left for the courts to develop, given the specific circumstances of each case, and in the light of the overall philosophy of the Bill.

86.  One respondent queried the use of the word "refuses" in Clause 17(1). The advantage of this is that if a party does actually refuse to appoint an arbitrator, rather than simply failing to do so, the non-defaulting party need not wait for the expiration of the relevant time period within which the defaulting party may make such an appointment, but could use the mechanism in Clause 17 straight away.

## Clause 18    Failure of Appointment Procedure

87.  Again we have had the Model Law in mind when drafting this provision, The starting point is any agreement the parties may have made to deal with a failure of the appointment procedure. In the absence of any such agreement, the court is given the power to make appointments. This is a classic case of the court supporting and helping to carry through the arbitration process.

88.  It will be noted that we have given the court power to revoke any appointments already made. This is to cover the case where unless the court took this step it might be suggested thereafter that the parties had not been fairly treated, since one had his own choice arbitrator while the other had an arbitrator imposed on him by the court in circumstances that were no fault of his own. This situation in fact arose in France in the *Dutco* case, where an award was invalidated for this reason.

89.  The Model Law stipulates that there shall be no appeal from a decision of the court. We have not gone as far as this, since there may well be questions of important general principle which would benefit from authoritative appellate guidance.

## Clause 19    Court to have regard to Agreed Qualifications

90.  This comes from article 11(5) of the Model Law, which itself seeks to preserve as much of the parties' agreement as possible.

## Clauses 20 and 21    Chairman and Umpire

91.  The parties are, of course, free to make what arrangements they like about the functions and powers of Chairmen or Umpires. We have set out what we believe to be the position under English law in the absence of any such agreement. As we understand the current position, in the absence of an agreement between the parties, an umpire can neither take part nor attend an arbitration until the arbitrators have disagreed.

92.  A cause of delay and expense often exists under our umpire system where the umpire does not attend the proceedings and it is only at an advanced stage (when the arbitrators disagree) that he takes over, for much that has gone on may have to be repeated before him. Equally, the time and expense of an umpire may be wasted if he attends but the arbitrators are able to agree on everything. We have decided that it would be preferable to stipulate that (in the absence of agreement between the parties) the umpire should attend the proceedings (as opposed to taking part in the proceedings) and be supplied with the same documents and materials as the other arbitrators. We hope, however, that common sense will prevail and that the parties will make specific agreement over this question, tailored to the circumstances of the particular case.

93.  Subsection 21(4) caused some concern amongst a few respondents, but this subsection simply reflects what is understood to be the current position.

94.  We should record that we considered whether the peculiarly English concept of an umpire should be swept away in favour of the more generally used chaired tribunal. As we have pointed out above, in the United States what we would describe as a chairman is called an umpire. In the end we decided not to recommend this, and to continue to provide default provisions for those who wanted to continue to use this form of arbitral tribunal.

## Clause 22    Decision-making where no Chairman or Umpire

95.  We decided to include this situation for the sake of completeness, though the default provision can only work if there is unanimity or a majority. If there is neither, then it would appear that the arbitration agreement cannot operate, unless the parties can agree, or have agreed, what is to happen.

## Clause 23    Revocation of Arbitrator's Authority

96.  Statutory provisions making it impossible unilaterally to revoke the authority of an arbitrator have existed since 1833. The present Clause is designed to reflect the current position, save that we have imposed a writing requirement and thought it helpful to make express reference to arbitral institutions etc. These of course only have such powers as the parties have agreed they shall have, so that strictly this provision is not necessary, but we consider that an express reference makes for clarity.

97.  Some of those responding suggested that the parties' right to agree to revoke an arbitral appointment should be limited (e.g. that court approval should be required in every case). The DAC has not adopted these suggestions since any tribunal is properly regarded as the parties' tribunal and to do so would derogate from the principle of party autonomy.

98.  It will be seen that various terms are used in the Bill with respect to the termination of an arbitral appointment, such as "removal" and "revocation of authority". Different terms have been adopted simply as a matter of correct English usage. The difference in terms is not intended to be of any legal significance.

99.  Subsection 23(4). Whilst any agreement as to an arbitration must be in writing, as defined earlier, the DAC is of the view that it is impracticable to impose a writing requirement on an agreement to terminate an arbitration. Parties may well simply walk away from proceedings, or allow the proceedings to lapse, and it could be extremely unfair if one party were allowed to rely upon an absence of writing at some future stage. Where a Claimant allows an arbitration to lapse, Clause 41(3) may be utilised.

## Clause 24    Power of Court to Remove Arbitrator

100. We have set out the cases where the court can remove an arbitrator.

101. The Model Law (article 12) specifies justifiable doubts as to the independence (as well as impartiality) of an arbitrator as grounds for his removal. We have considered this carefully, but despite efforts to do so, no-one has persuaded us that, in consensual arbitrations, this is either required or desirable. It seems to us that lack of independence, unless it gives rise to justifiable doubts about the impartiality of the arbitrator, is of no significance. The latter is, of course, the first of our grounds for removal. If lack of independence were to be included, then this could only be justified if it covered cases where the lack of independence did not give rise to justifiable doubts about impartiality, for otherwise there would be no point including lack of independence as a separate ground.

102. We can see no good reason for including "non-partiality" lack of independence as a ground for removal and good reasons for not doing so. We do not follow what is meant to be covered by a lack of independence which

does not lead to the appearance of partiality. Furthermore, the inclusion of independence would give rise to endless arguments, as it has, for example, in Sweden and the United States, where almost any connection (however remote) has been put forward to challenge the "independence" of an arbitrator. For example, it is often the case that one member of a barristers' Chambers appears as counsel before an arbitrator who comes from the same Chambers. Is that to be regarded, without more, as a lack of independence justifying the removal of the arbitrator? We are quite certain that this would not be the case in English law. Indeed the Chairman has so decided in a case in Chambers in the Commercial Court. We would also draw attention to the article "Barristers' Independence and Disclosure" by Kendall in (1992) 8 *Arb. Int.* 287. We would further note in passing that even the oath taken by those appointed to the International Court of Justice; and indeed to our own High Court, refers only to impartiality.

103.Further, there may well be situations in which parties desire their arbitrators to have familiarity with a specific field, rather than being entirely independent.

104.We should emphasise that we intend to lose nothing of significance by omitting reference to independence. Lack of this quality may well give rise to justifiable doubts about impartiality, which is covered, but if it does not, then we cannot at present see anything of significance that we have omitted by not using this term.

105.We have included, as grounds for removal, the refusal or failure of an arbitrator properly to conduct the proceedings, as well as failing to use all reasonable despatch in conducting the proceedings or making an award, where the result has caused or will cause substantial injustice to the applicant. We trust that the courts will not allow the first of these matters to be abused by those intent on disrupting the arbitral process. To this end we have included a provision allowing the tribunal to continue while an application is made. There is also Clause 73 which effectively requires a party to "put up or shut up" if a challenge is to be made.

106.We have every confidence that the courts will carry through the intent of this part of the Bill, which is that it should only be available where the conduct of the arbitrator is such as to go so beyond anything that could reasonably be defended that substantial injustice has resulted or will result. The provision is not intended to allow the court to substitute its own view as to how the arbitral proceedings should be conducted. Thus the choice by an arbitrator of a particular procedure, unless it breaches the duty laid on arbitrators by Clause 33, should on no view justify the removal of an arbitrator, even if the court would not itself have adopted that procedure. In short, this ground only exists to cover what we hope will be the very rare case where an arbitrator so conducts the proceedings that it can fairly be said that instead of carrying through the object of arbitration as stated in the Bill, he is in effect frustrating that object. Only if the court confines itself in this way can this power of removal be justified as a measure supporting rather than subverting the arbitral process.

107.We have also made the exhaustion of any arbitral process for challenging an arbitrator a pre-condition to the right to apply to the court. Again it will be a very rare case indeed where the court will remove an arbitrator notwithstanding that that process has reached a different conclusion.

108.If an arbitrator is removed by the court, we have given the court power to make orders in respect of his remuneration. We would expect this power to be exercised where the behaviour of the arbitrator is inexcusable to the extent that this should be marked by depriving him of all or some of his fees and expenses. This subsection is also the subject of a supplementary recommendation in Chapter 6 below.

109.As a matter of justice, we have stipulated that an arbitrator is entitled to be heard on any application for his removal.

110.This is a mandatory provision. It seems to us that an agreement to contract out of the cases we specify would really be tantamount to an agreement to a dispute resolution procedure that is contrary to the basic principles set out in Clause 1.

## Clause 25   Resignation of Arbitrator

111.In theory it could be said that an arbitrator cannot unilaterally resign if this conflicts with the express or implied terms of his engagement. However, as a matter of practical politics an arbitrator who refuses to go on cannot be made to do so, though of course he may incur a liability for breach of his agreement to act.

112.In this Clause we have given an arbitrator who resigns the right to go to the court to seek relief from any liability incurred through resigning and to make orders relating to his remuneration and expenses, unless the consequences of resignation have been agreed with the parties (*e.g.* by virtue of having adopted institutional

15

rules).

113.We have chosen the words of subsection (1) with care so that the agreement referred to is confined to an agreement as to the consequences of resignation. A simple agreement not to resign (or only to resign in certain circumstances) with no agreement as to what will happen if this promise is broken is not within the subsection. This has to be so since otherwise (by virtue of subsection (2)), subsections (3) and (4) would never or hardly ever operate, for the arbitrator will not be under any liability or at risk as to his fees or expenses unless he is in breach by resigning.

114.In the July draft we suggested a provision which would have entitled the court to grant relief in all circumstances including those where the arbitrator had made an agreement as to the consequences of his resignation. However, as the result of a response that we received we have concluded that where the parties have agreed with an arbitrator on the consequences it would be wrong to give the court a power to adjust the position.

115.The reason we propose this is that circumstances may well arise in which it would be just to grant such relief to a resigning arbitrator. For example, the arbitrator may (reasonably) not be prepared to adopt a procedure agreed by the parties (*i.e.* under Clause 34) during the course of an arbitration, taking the view that his duty under Clause 33 conflicts with their suggestions (the relationship between the duty of arbitrators in Clause 33 and the freedom of the parties in Clause 34, is discussed in more detail below). Again, an arbitration may drag on for far longer than could reasonably have been expected when the appointment was accepted, resulting in an unfair burden on the arbitrator. In circumstances where the court was persuaded that it was reasonable for the arbitrator to resign, it seems only right that the court should be able to grant appropriate relief.

## Clause 26   Death of Arbitrator or Person Appointing Him

116.This Clause complements Clause 8 and is included for the same reason. Clause 26(1) is mandatory—it is difficult to see how parties could agree otherwise.

## Clause 27   Filling of Vacancy, etc.

117.This Clause reflects article 15 of the Model Law, but also deals with certain other important ancillary matters. It should be noted that we do not propose to re-enact the power given to the court under section 25 of the Arbitration Act 1950 to fill a vacancy created by its removal of an arbitrator. It seems to us that (in the absence of agreement between the parties) it is preferable for the original appointment procedure to be used, for otherwise (as in the *Dutco* case mentioned above) it might be argued that the parties were not being treated equally.

118.We have given the tribunal the right (when reconstituted) to determine to what extent the previous proceedings should stand, though we have also made clear that this does not affect any right a party may have to challenge what has happened.

119.Further, we have provided in Clause 27(5) that the fact of an arbitrator ceasing to hold office will not affect any appointment made by him (whether alone or jointly) of another arbitrator, unless the parties have otherwise agreed pursuant to Clause 27(1)(c).

## Clause 28   Joint and Several Liability of Parties to Arbitrators for Fees and Expenses

120.Arbitration proceedings necessarily involve the incurring of expenditure. The arbitrators have to be paid, and the parties incur expense in presenting their cases to the tribunal. The issue of costs involves at least three quite discrete elements:

i.    As a matter of general contract law, arbitrators, experts, institutions and any other payees whatsoever are entitled to be paid what has been agreed with them by any of the parties. Therefore, for example, if a party appoints an arbitrator for an agreed fee, as a matter of general contract law (rather than anything in this Bill), that arbitrator is entitled to that fee.

ii.   It is generally accepted that all parties are jointly and severally liable for the fees of an arbitrator. This is an issue as to the entitlement of arbitrators, and as such is quite distinct from the third element.

iii.  As in court litigation, when one party is successful, that party should normally recover at least a proportion of his costs. This issue, being where the burden of costs should lie, is an issue as between the parties.

121. The Bill contains provisions as to costs and fees in two separate parts: the joint and several liability owed by the parties to the arbitrators (the second element) is addressed in this clause, whilst the third element (*i.e.* the responsibility for costs as between the parties) is addressed in Clauses 59–65. The first element, being a matter of general contract law, is not specifically addressed by either set of provisions, but is preserved in both. It is extremely important to distinguish between these provisions.

122. Clause 28 is concerned with the rights of the arbitrators in respect of fees and expenses. As subsection (5) makes clear, and as explained above, this provision is not concerned with which of the parties should (as between themselves) bear these costs as the result of the arbitration, which is dealt with later in the Bill, nor with any contractual right an arbitrator may have in respect of fees and expenses.

123. As we understand the present law, the parties are jointly and severally liable to the arbitrator for his fees and expenses. The present position seems to be that if these are agreed by one party, the other party becomes liable, even if he played no part in making that agreement; and circumstances may arise in which that party is unable to obtain a reduction of the amount by taxation. It seems to us that whilst arbitrators should be protected by this joint and several liability of the parties, a potentially unfair result must be avoided: a party who never agreed to the appointment by another party of an exceptionally expensive arbitrator should not be held jointly and severally liable for that arbitrator's exceptional fee. To this end, we have stipulated, in Clause 28(1), that a party's joint and several liability to an arbitrator only extends to "reasonable fees". Of course, if a party has agreed an exceptional fee with an arbitrator, that party may still be pursued by that arbitrator, under general contract law, which is preserved in Clause 28(5).

124. We have proposed a mechanism to allow a party to go to the court if any question arises as to the reasonableness of the arbitrator's charges. The court is empowered to adjust fees and expenses even after they have been paid, since circumstances may well arise in which a question about the level of fees and expenses only arises after payment has been made. For example, a large advance payment may be made at a time when it is considered that the arbitration will take a long time, but this does not turn out to be the case. However, the court must be satisfied that it is reasonable in the circumstances to order repayment. Thus an applicant who delays in making an application is likely to receive short shrift from the court, nor is the court likely to order repayment where the arbitrator has in good faith acted in such a way that it would be unjust to order repayment. It seems to us that it is necessary to set out expressly in the Bill that the power of the court extends to dealing with fees and expenses already paid, since otherwise there could be an argument that this power is confined to fees and expenses yet to be paid.

125. These provisions are extended by subsection (6) to include an arbitrator who has ceased to act and an umpire who has not replaced the other arbitrators. An arbitrator may cease to act through the operation of Clauses 23 to 26, or if an umpire takes over following a disagreement.

126. The liability in Clause 28(1) is to "the parties". It seems to us to follow that a person who has not participated at all, and in respect of whom it is determined that the arbitral tribunal has no jurisdiction, would not be a "party" for the purposes of this clause (*cf.* Clause 72). More difficult questions may well arise in respect of persons who have participated, for there the doctrine of *Kompetenz-Kompetenz* (Clauses 30 and 31) may have to be weighed against the proposition that a party can hardly be under any liability in respect of the fees and expenses of the tribunal which he has successfully established should not have been acting at all on the merits of the dispute.

127. It is to be noted that arbitrators' fees and expenses include, by virtue of Clause 37(2), the fees and expenses of tribunal appointed experts, etc.

128. It seems that the present joint and several liability of the parties to an arbitrator for his fees may rest on some implied contract said to exist between them. Be this as it may, such an implied contract (in so far as it related to fees and expenses) would not survive by virtue of Clause 81 of this Bill, because this only saves rules of law which are consistent with Part I. Any implied contract imposing a liability for more than reasonable fees and expenses would clearly be inconsistent with Clause 28(1). Furthermore, since Clause 28(1) gives a statutory right there remains no good reason for any implied contractual right. As stated above, any specific contract would, however, of course be preserved by Clause 28(5).

129. Contrary to some suggestions made to us, it seems to us that rights of contribution between the parties in relation to their statutory liability under Clause 28(1) can best be left to the ordinary rules which relate to joint and several liability generally.

130. Clause 28 is made mandatory, since otherwise the parties could by agreement between themselves deprive the arbitrators of what seems to us to be a very necessary protection.

## Clause 29    Immunity of Arbitrators

131.Although the general view seems to be that arbitrators have some immunity under the present law, this is not entirely free from doubt. We were firmly of the view that arbitrators should have a degree of immunity, and most (though not all) the responses we received expressed the same view.

132.The reasons for providing immunity are the same as those that apply to judges in our courts. Arbitration and litigation share this in common, that both provide a means of dispute resolution which depends upon a binding decision by an impartial third party. It is generally considered that an immunity is necessary to enable that third party properly to perform an impartial decision making function. Furthermore, we feel strongly that unless a degree of immunity is afforded, the finality of the arbitral process could well be undermined. The prospect of a losing party attempting to re-arbitrate the issues on the basis that a competent arbitrator would have decided them in favour of that party is one that we would view with dismay. The Bill provides in our view adequate safeguards to deal with cases where the arbitral process has gone wrong.

133.This is a mandatory provision. Given the need and reason for immunity, it seems to us to follow that as a matter of public policy, this should be so.

134.The immunity does not, of course, extend to cases where it is shown that the arbitrator has acted in bad faith. Our law is well acquainted with this expression and although we considered other terms, we concluded that *there* were unlikely to be any difficulties in practice in using this test: see, for example, *Melton Medes Ltd v. Securities and Investment Board* [1995] 3 All E.R.

135.Subsection 29(3). There was a concern that if a provision such as this was not included, Clause 25, when read together with Clause 29, could be said to preclude a claim against an arbitrator for resigning in breach of contract and similarly a defence (based on resignation) to a claim by an arbitrator for his fees, unless "*bad faith*" is proved.

136.Since the publication of the final draft of the Bill, we have concluded that the court should be given power to remove or modify the immunity as it sees fit when it removes an arbitrator. We consider this further in Chapter 6 below.

## Jurisdiction of the Arbitral Tribunal

## Clause 30    Competence of Tribunal to Rule on its own Jurisdiction

137.This Clause states what is called the doctrine of "*Kompetenz-Kompetenz*". This is an internationally recognized doctrine, which is also recognized by our own law (*e.g. Christopher Brown v. Genossenschaft Osterreichlischer Waldbesitzer* [1954] 1 Q.B. 8), though this has not always been the case.

138.The great advantage of this doctrine is that it avoids delays and difficulties when a question is raised as to the jurisdiction of the tribunal. Clearly the tribunal cannot be the final arbiter of a question of jurisdiction, for this would provide a classic case of pulling oneself up by one's own bootstraps, but to deprive a tribunal of a power (subject to court review) to rule on jurisdiction would mean that a recalcitrant party could delay valid arbitration proceedings indefinitely by making spurious challenges to its jurisdiction.

139.The Clause and the following Clause are based on article 16 of the Model Law, but unlike that model we have not made this provision mandatory so that the parties, if they wish, can agree that the tribunal shall not have this power. We have also spelt out what we mean by "substantive jurisdiction".

## Clause 31    Objection to Substantive Jurisdiction of Tribunal

140.In this Clause we set out how a challenge to the jurisdiction can be made, and the circumstances in which it must be made (following article 16 of the Model Law). This reflects much of the Model Law but we have, for example, refrained from using expressions like "submission of the statement of defence" since this might give the impression, which we are anxious to dispel, that every arbitration requires some formal pleading or the like.

141.The Clause, in effect, sets out three ways in which the matter may proceed.

i.     The first is that the tribunal may make an award on the question of jurisdiction. If it does so then that award

18

may be challenged by a party under Clause 67.

ii.    The second way is for the tribunal to deal with the question of jurisdiction in its award on the merits. Again on the jurisdiction aspect the award may be challenged under Clause 67.

We have provided these two methods because, depending on the circumstances, the one or the other may be the better course to take, bearing in mind the duty (in Clause 33) to adopt procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense.

iii.   The third way of proceeding is for an application to be made to the court before any award (pursuant to Clause 32). Again this third course is designed to achieve the same objective (albeit in limited circumstances). For example, cases arise where a party starts an arbitration but the other party, without taking part, raises an objection to the jurisdiction of the tribunal. In such circumstances, it might very well be cheaper and quicker for the party wishing to arbitrate to go directly to the court to seek a favourable ruling on jurisdiction rather than seeking an award from the tribunal. Such an approach would be very much the exception, and, to this end, Clause 32 is narrowly drawn. In this connection it must be remembered that a party who chooses not to take any part in an arbitration cannot in justice be required to take any positive steps to challenge the jurisdiction, for to do otherwise would be to assume against that party (before the point has been decided) that the tribunal has jurisdiction. We return to this topic when considering Clause 72.

142.Article 16(3) of the Model Law provides that the arbitral tribunal may rule on a plea as to jurisdiction either as a preliminary question or in an award on the merits. The DAC is of the view that it is unnecessary to introduce a new concept of a "preliminary ruling", which is somehow different from an award. Clause 31(4) therefore only refers to awards. This has the advantage that awards on jurisdiction will have the benefit of those provisions on awards generally (*e.g.* costs, lien, reasons, additional awards, etc.), and, if appropriate, may be enforced in the same way as any other award.

143.A challenge to jurisdiction may well involve questions of fact as well as questions of law. Since the arbitral tribunal cannot rule finally on its own jurisdiction, it follows that both its findings of fact and its holdings of law may be challenged. The regime for challenging such awards is set out in Clause 67.

144.Clause 31(1) replaces the requirement set out in article 16(2) of the Model Law (that a challenge to the overall jurisdiction of the tribunal must be raised no later than the submission of a statement of defence) with a requirement that such an objection be raised no later than the time a party takes the first step in the proceedings to contest the merits of any matter in relation to which he challenges the tribunal's jurisdiction. This allows for alternative procedures where there is no "statement of defence" as such.

145.Clause 31 is a mandatory provision. Under Clause 30, of course, the parties can agree that the tribunal shall not have power to rule on its own jurisdiction, but while this means (as subsection (4) points out) that the tribunal cannot then make an award on jurisdiction, the compulsory nature of Clause 31 means that the objection must be raised as there stipulated. It seems to us that this is highly desirable by way of support for the object of arbitration as set out in Clause 1.

146.It has been suggested to the DAC that there should be a mechanism whereby an objecting party, or even a non-objecting party, could require the tribunal forthwith to make an award as to jurisdiction, rather than merely incorporating a ruling in an award on the merits. The DAC disagrees with this. Unless the parties agree otherwise, the choice as to which course to take will be left with the tribunal, who will decide what is to be done consistent with their duty under Clause 33 (see below). Indeed, in some cases it may be simply impracticable to rule on jurisdiction, before determining merits. If, however, the parties agree which course is to be taken, and if, of course, their agreement is effective (*i.e.* it does not require the tribunal to breach its mandatory duty under Clause 33) then the provision under discussion requires the tribunal to take the course chosen by the parties.

## Clause 32   Determination of Preliminary Point of Jurisdiction

147.In this Clause we have set out the procedure for the third of the possible ways of dealing with a challenge to the jurisdiction. As stated above, this Clause provides for exceptional cases only: it is not intended to detract from the basic rule as set out in Clause 30. Hence the restrictions in Clause 32(2), and the procedure in Clause 32(3). It will be noted that we have required either the agreement of the parties, or that the court is satisfied that this is, in effect, the proper course to take. It is anticipated that the courts will take care to prevent this exceptional provision from becoming the normal route for challenging jurisdiction. Since this Clause concerns a power exercisable by the court in relation to the jurisdiction of the tribunal, it is in our view important enough to be made mandatory.

148. Under this Clause the tribunal may continue the arbitral proceedings and make an award whilst the application to the Court is pending. Thus a recalcitrant party will not be able to mount spurious challenges as a means of delaying the arbitral process. Under subsection (5) of the preceding Clause the tribunal can, of course (and must if the parties agree) stay the arbitral proceedings whilst an application is made. Which course the tribunal takes (where it has power to choose) will of course depend once again on what it sees its Clause 33 duty to be.

149. The right of appeal from court rulings is limited in the way set out in the Clause.

## The Arbitral Proceedings

## Clause 33    General Duty of the Tribunal

150. This is one of the central proposals in our Bill (grounded on article 18 of the Model Law). It is a mandatory provision, since, as is explained below, we fail to see how a proceeding which departed from the stipulated duties could properly be described as an arbitration. We endeavour to set out, in the simplest, clearest terms we have been able to devise, how the tribunal should approach and deal with its task, which is to do full justice to the parties. In the following Clauses we set out in detail the powers available to the tribunal for this purpose.

151. It has been suggested that the generality of Clause 33 may be problematic: that it may be an invitation to recalcitrant parties to launch challenges, or that vagueness will give rise to arguments. The advantage of arbitration is that it offers a dispute resolution system which can be tailored to the particular dispute to an extent which litigation finds it difficult to do. Thus depending on the nature of the dispute, there will be numerous ways in which the arbitration can be conducted. It is quite impossible to list all the possible variants and to set out what may or may not be done. Indeed any attempt to do so would defeat one of the main purposes of the Bill, which is to encourage arbitral tribunals not slavishly to follow court or other set procedures. It follows that the only limits can be those set out in the present clause. It is to be hoped that the Courts will take a dim view of those who try to attack awards because of suggested breaches of this clause which have no real substance. At the same time, it can hardly be suggested that awards should not be open to attack when the tribunal has not acted in accordance with the principles stated.

152. It has further been suggested that this part of the Bill will cause the demise of the amateur arbitrator. If by this is meant the demise of people who purport to act as arbitrators but who are either unable or unwilling (or both) to conduct the proceedings in accordance with what most would regard as self-evident rules of justice, then we indeed hope that this will be one of the results. But since these rules of justice are generally accepted in our democratic society, and are not merely theoretical considerations that concern lawyers alone, we can see no reason why the Bill should discourage anyone who is ready willing and able to apply them. Indeed we consider that the Bill will encourage and support all such people.

153. Sometimes the parties to an arbitration employ lawyers who seek, in effect, to bully a non-legal arbitrator into taking a course of action which is against his better instincts, by seeking to blind him with legal "science" to get their way. Again, in some circles it is thought that somehow the procedures in an arbitration should be modelled on court procedures, and that to adopt other methods would be "misconduct" (an expression that the Bill does not use) on the part of the arbitrator. This part of the Bill is designed to prevent such bullying and to explode the theory that an arbitration has always to follow court procedures. If an arbitrator is satisfied that the way he wants to proceed fulfils his duty under this Clause and that the powers he wants to exercise are available to him under the following Clauses, then he should have the courage of his own convictions and proceed accordingly, unless the parties are agreed that he should adopt some other course.

## The Relationship Between Clauses 1(b), 33 and 34(1)

154. It has been suggested to us there could be a conflict between:

i.    the mandatory duty cast on arbitrators by Clause 33 and

ii.    the principle of party autonomy in Clause 1(b) and the proviso in Clause 34(1).

As we explain below, the DAC does not consider that there is any inconsistency between these two principles.

155. Under the principle of party autonomy, the parties are free to agree upon anything to do with the arbitration, subject only to such safeguards as are necessary in the public interest (Clause 1(b)). The mandatory provisions set

out those matters which have effect notwithstanding any agreement to the contrary: see Clause 4. It seems to us that the public interest dictates that Clause 33 must be mandatory, *i.e.* that the parties cannot effectively agree to dispense with the duty laid on arbitrators under Clause 33. In other words, they cannot effectively agree that the arbitrators can act unfairly, or that the arbitrators can be partial, or that the arbitrators can decide that the parties (or one of them) should not have a reasonable opportunity of putting his case or answering that of his opponent, or indeed that the arbitrators can adopt procedures that are unsuitable for the particular circumstances of the case or are unnecessarily slow or expensive, so that the means for resolving the matters to be determined is unfair. It is, of course, extremely unlikely in the nature of things that the parties would wish deliberately to make such bizarre agreements, but were this to happen, then it seems to us that such agreements should be ineffective for the purposes of this Bill, *i.e.* not binding on the parties or the tribunal.

156. However, a situation could well arise in practice in cases where the parties are agreed on a method of proceeding which they consider complies with the first of the general principles set out in Clause 1 (and which therefore the tribunal could adopt consistently with its duty under Clause 33) but the tribunal takes a different view, or where they are agreed in their opposition to a method of proceeding which the tribunal considers should be adopted in order to perform its Clause 33 duty.

157. In our view it is neither desirable nor practicable to stipulate that the tribunal can override the agreement of the parties. It is not desirable, because the type of arbitration we are discussing is a consensual process which depends on the agreement of the parties who are surely entitled (if they can agree) to have the final say on how they wish their dispute to be resolved. It is not practicable, since there is no way in which the parties can be forced to adopt a method of proceeding if they are agreed that this is not the way they wish to proceed. The latter is the case even if it could be established that their agreement was ineffective since it undermined or prevented performance of the duty made mandatory by Clause 33.

158. A party would be unable to enforce an ineffective agreement against the other parties, nor would such an agreement bind the tribunal, but the problem under discussion only exists while the parties are *in fact* at one, whether or not their agreement is legally effective.

159. In circumstances such as these, the tribunal (assuming it has failed to persuade the parties to take a different course) has the choice of adopting the course preferred by the parties or of resigning. Indeed, resignation would be the only course if the parties were in agreement in rejecting the method preferred by the tribunal, and no other way of proceeding was agreed by them or considered suitable by the tribunal.

160. We have stipulated elsewhere in the Bill that the immunity we propose for arbitrators does not extend to any liability they may be under for resigning (Clause 29) though under Clause 25 they may seek relief in respect of such liability from the court. The reason for the limitation on immunity is that cases may arise where the resignation of the arbitrator is wholly indefensible and has caused great delay and loss. In our view Clause 25 would suffice to protect arbitrators who resigned because they reasonably believed that the agreement of the parties prevented them from properly performing their Clause 33 duty. Furthermore, arbitrators could always stipulate for a right to resign in such circumstances as a term of their appointment.

161. If, on the other hand, the tribunal adopted a method of proceeding agreed by the parties, it seems to us that none of the parties could afterwards validly complain that the tribunal had failed in its Clause 33 duty, since the tribunal would only have done what the parties had asked it to do. Again, the fact that as between the parties such an agreement may have been ineffective as undermining or preventing performance of the Clause 33 duties seems to us to be wholly irrelevant. It could of course be said that the tribunal had breached its Clause 33 duty, but this would have no practical consequences since the parties themselves would have brought about this state of affairs, and would therefore be unable to seek any relief in respect of it.

162. Some people have expressed concern that there is a danger that lawyers will agree between themselves a method of proceeding which the tribunal consider to be unnecessarily long or expensive. However, if a tribunal considered, for example, that lawyers were trying either deliberately to "churn" the case for their own private advantage or were simply but misguidedly seeking to adopt unnecessary procedures, etc., the obvious solution would be to ask them to confirm that their respective clients had been made aware of the views of the tribunal but were nevertheless in agreement that the course proposed by their lawyers should be adopted. At the end of the day, however, the fact remains that the only sanction the arbitrators have is to resign.

163. In summary, therefore, we consider that the duty of the arbitrators under Clause 33 and the right of the parties to agree how the arbitration should be conducted do fit together. Under Clause 33 the tribunal have the specified duties. Under Clause 34 therefore, the tribunal must decide all procedural and evidential matters, subject to the right of the parties to agree any matter. If the parties reach an agreement on how to proceed which clashes with the

duty of the tribunal or which the tribunal reasonably considers does so, then the arbitrators can either resign and have the protection of Clause 25, or can adopt what the parties want and will not afterwards be liable to the parties for doing so.

## Further Points

164.In this Clause we have provided that the tribunal shall give each party a "reasonable opportunity" of putting his case and dealing with that of his opponent. Article 18 of the Model Law uses the expression "full opportunity".

165.We prefer the word "reasonable" because it removes any suggestion that a party is entitled to take as long as he likes, however objectively unreasonable this may be. We are sure that this was not intended by those who framed the Model Law, for it would entail that a party is entitled to an unreasonable time, which justice can hardly require. Indeed the contrary is the case, for an unreasonable time would *ex hypothesi* mean unnecessary delay and expense, things which produce injustice and which accordingly would offend the first principle of Clause 1, as well as Clauses 33 and 40.

## Clause 34    Procedural and Evidential Matters

166.We trust that the matters we have listed in this Clause (which are partly drawn from articles 19, 20, 22, 23 an 24 of the Model Law) are largely self-evident. We have produced a non-exhaustive checklist because we think it will be helpful both to arbitrating parties and to their arbitrators. We cannot emphasise too strongly that one of the strengths of the arbitral process is that it is able much more easily than any court system to adapt its procedures to suit the particular case. Hence we have spelt this out as a duty under the preceding Clause. The list of powers helps the tribunal (and indeed the parties) to choose how best to proceed, untrammelled by technical or formalistic rules.

167.Some of those responding suggested that we should include a special code to deal with the arbitration of small claims. We have not adopted this suggestion for the very reason we have just stated. Any such code would have to have detailed rules, arbitrary monetary or other limits and other complicated provisions. In our view, proper adherence to the duties in Clause 33 will achieve the same result. A small claim will simply not need all the expensive procedural and other paraphernalia which might be required for the resolution of some huge and complicated international dispute.

168.Furthermore, we consider that associations and institutions concerned with specific areas of trade, etc. can play a very significant part in formulating rules and procedures for arbitrating disputes concerning their members. Such bodies have the detailed knowledge and experience required to enable them properly to address this task, in relation both to small claims and otherwise. We feel strongly that it would be wrong for a Bill of the present kind to seek to lay down a rigid structure for any kind of case; and that different methods must be developed to suit different circumstances, by arbitral tribunals as well as those who have the necessary practical knowledge of those circumstances. Finally, of course, the Bill in no way impinges upon small claims procedures developed for use through the court system.

169.Subsection (a). Whilst article 20(1) of the Model law states that, in the absence of the agreement of the parties, "the place of arbitration shall be determined by the arbitral tribunal having regard to the circumstances of the case, including the convenience of the parties", subsection 34(2)(a) does not state that the tribunal should have the convenience of the parties in mind, given that this is a consideration that is really subsumed under the general duty of the Tribunal in Clause 33, and, further, because the DAC was of the view that like considerations apply to other parts of Clause 34, such as subsection (b), even though the Model Law does not appear to reflect this. Unlike the Model Law, subsection (a) also refers to "when", as well as "where".

170.Subsection (f) makes it clear that arbitrators are not necessarily bound by the technical rules of evidence. In his 1993 Freshfields Lecture ((1994) *Arbitration International* Vol. 10, p. 1), Lord Steyn questioned why the technical rules of evidence should apply to arbitration, even if (as he doubted) there was authority for this. This provision clarifies the position. It is to be noted that Clause 34(2)(f) helps to put an end to any arguments that it is a question of law whether there is material to support a finding of fact.

171.Subsection (g). Some anxiety was expressed at the power to act inquisitorially, to be found in subsection (g), on grounds that arbitrators are unused to such powers and might, albeit in good faith, abuse them.

172.We do not share this view. Once again it seems to us that provided the tribunal in exercising its powers follows its simple duty as set out in Clause 33 (and subsection (2) of this Clause tells the tribunal that this is what

they must do) then in suitable cases an inquisitorial approach to all or some of the matters involved may well be the best way of proceeding. Clause 33, however, remains a control, such that, for example, if an arbitrator takes the initiative in procuring evidence, he must give all parties a reasonable opportunity of commenting on it.

173. A number of arbitrators who responded to our July 1995 draft suggested that the tribunal should be entitled to have the last word *i.e.* should be given the power to override the agreement of the parties to follow a different course. The interrelationship of the tribunal's duties and party autonomy has already been discussed above. As is clear from that discussion, we disagree with this view for the following reasons:

i.   To give the tribunal such a power would be contrary to article 19 of the Model Law. It would also be contrary to the present position under English law.

ii.  To allow the tribunal to override the agreement of the parties would to our minds constitute an indefensible inroad into the principle of party autonomy, upon which the Bill is based.

iii. It is difficult to see how such a power could be backed by any effective sanction. If the parties agree not to adopt the course ordered by the tribunal, there is nothing the tribunal can do except resign.

iv.  It seems to us that the problem is more apparent than real. In most cases the parties rely on the tribunal to decide how to conduct the case and do not sit down and agree between themselves how it is to be done. In order to reflect what actually happens in practice we have accordingly reversed the way many of the other Clauses begin and stated that it is for the tribunal to decide all procedural and evidential matters, subject to the right of the parties to agree any matter. In our view, however, since arbitration is the parties' own chosen method of dispute resolution, we cannot see why they should be deprived of the right to decide what form the arbitration should take.

174. As we have made clear above, it is of course open to those who frame rules for arbitration which the parties incorporate into their agreement, to stipulate that the tribunal is to have the last word, and likewise arbitrators can stipulate this as a term of their agreement to act, though once again there would be no means, apart from persuasion or the threat of resignation, of enforcing such a stipulation if the parties later jointly took a different view.

175. It has been suggested that there could be a conflict between the proviso in Clause 34(1) and Clause 40. This is said to arise, for example, where the parties have agreed a procedural or evidential matter which they are entitled to do under Clause 34(1), but the tribunal are intent on taking a different course. Does the parties' agreement override their duty under Clause 40?

The DAC considers that no such conflict exists:

i.   The parties are free to agree on all procedural and evidential matters, pursuant to Clause 34(1).

ii.  However, any such agreement will only be effective, if it is consistent with Clause 33, being a mandatory provision.

iii. Any such agreement made pursuant to Clause 34(1), and consistent with Clause 33, will define the scope of Clause 40—*i.e.* the parties will have agreed on how the arbitration is to be conducted, or, in the words of Clause 40, what is to constitute the "proper and expeditious conduct of the arbitral proceedings". The determinations of the tribunal should follow that agreement (which would not be the case if such an agreement was inconsistent with Clause 33) and *ex hypothesi* the parties should be obliged to comply.

iv.  If there are matters on which the parties have not agreed, then the tribunal will fill the gap under Clause 34(1) and Clause 40(1) will again operate without conflict.

176. It has also been suggested that the Bill should include a provision that the arbitrator should encourage the parties to use other forms of ADR when this was considered appropriate. This suggestion has not been adopted, since the Bill is concerned with arbitration where the parties have chosen this rather than any other form of dispute resolution.

## Clause 35   Consolidation of Proceedings and Concurrent Hearings

177. This Clause makes clear that the parties may agree to consolidate their arbitration with other arbitral proceedings or to hold concurrent hearings.

178. During the consultation exercises, the DAC received submissions calling for a provision that would empower

either a tribunal or the court (or indeed both) to order consolidation or concurrent hearings. These were considered extremely carefully by the committee.

179.The problem arises in cases where a number of parties are involved. For example, in a construction project a main contractor may make a number of sub-contracts each of which contains an arbitration clause. A dispute arises in which a claim is made against one sub-contractor who seeks to blame another. In court, of course, there is power to order consolidation or concurrent hearings, as well as procedures for allowing additional parties to be joined. In arbitrations, however, this power does not exist. The reason it does not exist is that this form of dispute resolution depends on the agreement of the contracting parties that their disputes will be arbitrated by a private tribunal, not litigated in the public courts. It follows that unless the parties otherwise agree, only their own disputes arising out of their own agreement can be referred to that agreed tribunal.

180.In our view it would amount to a negation of the principle of party autonomy to give the tribunal or the court power to order consolidation or concurrent hearings. Indeed it would to our minds go far towards frustrating the agreement of the parties to have their own tribunal for their own disputes. Further difficulties could well arise, such as the disclosure of documents from one arbitration to another. Accordingly we would be opposed to giving the tribunal or the court this power. However, if the parties agree to invest the tribunal with such a power, then we would have no objection.

181.Having said this, the DAC appreciates the common sense behind the suggestion. We are persuaded, however, that the problem is best solved by obtaining the agreement of the parties. Thus those who are in charge of drafting standard forms of contract, or who offer terms for arbitration services which the parties can incorporate into their agreements, (especially those institutions and associations which are concerned with situations in which there are likely to be numerous contracts and sub-contracts) could include suitable clauses permitting the tribunal to consolidate or order concurrent hearings in appropriate cases. For example, the London Maritime Arbitrators Association Rules have within them a provision along these lines. In order to encourage this, we have made clear in this Clause that with the agreement of the parties, there is nothing wrong with adopting such procedures.

182.It will be noted that whereas Clause 39 uses the expression "[t]he parties are free to agree that the tribunal shall have power to order . . . ", Clause 35 simple states that "[t]he parties are free to agree . . . " This difference is easily explained. In both cases the parties are free to endow the tribunal with the power in question. This is implicit in Clause 35(1) by virtue of Clause 35(2). Under Clause 35(1), the parties may agree between themselves to consolidate two arbitrations, or to have concurrent hearings, before a tribunal has been appointed. This could, of course, have a bearing on how the tribunal is to be appointed in such a situation. Indeed the parties may agree on institutional rules that provide for this. However, an equivalent arrangement is difficult to imagine in the context of Clause 39. Overall, the difference in wording is not intended to impede the parties' freedom to agree what they like, when they like, in either case.

## Clause 36   Legal or Other Representation

183.It seems to us that this reflects a basic right, though of course the parties are free to dispense with it if they wish.

184.In the draft produced in July we used the phrase "a lawyer or other person of his choice". We have changed this, because we felt that it might give the impression that a party could stubbornly insist on a particular lawyer or other person, in circumstances where that individual could not attend for a long time, thus giving a recalcitrant party a good means of delaying the arbitral process. This should not happen. "A lawyer or other person chosen by him" does not give this impression: if a party's first choice is not available, his second choice will still be "a lawyer or other person chosen by him". The right to be represented exists but must not be abused. Furthermore the right must be read with the first principle of Clause 1, as well as Clauses 33 and 40. If this is done then we trust that attempts to abuse the right will fail.

185.It has been suggested to the DAC that there should be some provision requiring a party to give advance notice to all other parties if he intends to be represented at a hearing. Whilst in some ways an attractive proposal, this would be difficult to stipulate as a statutory provision, given that it may be impossible in some circumstances, or simply unnecessary in others. Further, different sanctions may be appropriate depending on the particular case. It is clearly desirable that, as a general rule, such notice be given. If it is not, one sanction may be for the tribunal to adjourn a hearing at the defaulting party's cost. In the end, however, this must be a matter for the tribunal's discretion in each particular case.

186.It has been suggested that this Clause provides an opportunity of extending by statute the privilege enjoyed by

24

legal advisers to non-legal advisers or representatives. We have not adopted this suggestion. It seems to us that it would be necessary to define with great precision which non-legal advisers or representatives are to be included (*e.g.* what relationship they must have to the arbitration and its conduct), and the precise classes of privilege which should be extended to them. Further, any such provision would necessarily have an impact on the position beyond arbitration. In short, it seems to us that this question cannot be confined to arbitrations and raises matters of general principle far beyond those of our remit.

## Clause 37    Power to Appoint Experts, Legal Advisers or Assessors

187. This to our minds would be a useful power in certain cases. We trust that the provisions we suggest are self-evident. Of course, the power can only be exercised if in the circumstances of the particular case its exercise falls within the scope of the duty of the tribunal set out in Clause 33.

188. Subsection (2) is made mandatory, to avoid the risk of the parties agreeing otherwise and thus disabling the tribunal from recovering from the parties expenses properly incurred.

## Clause 38    General Powers Exercisable by the Tribunal

189. These provisions represent a significant re-drawing of the relationship between arbitration and the court. Wherever a power could properly be exercised by a tribunal rather than the court, provision has been made for this, thereby reducing the need to incur the expense and inconvenience of making applications to court during arbitral proceedings.

190. The first of the powers in this Clause is one which enables the tribunal to order security for costs. The power presently given to the court to order security for costs in arbitrations is removed in its entirety.

191. This is a major change from the present position where only the court can order security for costs. The theory which lay behind the present law is that it is the duty of an arbitral tribunal to decide the substantive merits of the dispute referred to it and that it would not be performing this duty if it stayed or struck out the proceedings pending the provision of security: see for example, *Re Unione Stearinerie Lanza and Weiner* [1917] 2 K.B. 558.

192. We do not subscribe to this theory, which Parliament has already abandoned in the context of striking out a claim for want of prosecution. In our view, when the parties agree to arbitrate, they are agreeing that their dispute will be resolved by this means. To our minds (in the absence of express stipulations to the contrary) this does not mean that the dispute is necessarily to be decided on its substantive merits. It is in truth an agreement that it will be resolved by the application of the agreed arbitral process. If one party then fails to comply with that process, then it seems to us that it is entirely within what the parties have agreed that the tribunal can resolve the dispute on this ground.

193. Apart from this, the proposition that the court should involve itself in such matters as deciding whether a claimant in an arbitration should provide security for costs has received universal condemnation in the context of international arbitrations. It is no exaggeration to say that the recent decision of the House of Lords in *S.A. Coppee Lavalin NV v. Ken-Ren Chemicals and Fertilisers* [1994] 2 W.L.R. 631 was greeted with dismay by those in the international arbitration community who have at heart the desire to promote our country as a world centre for arbitration. We share those concerns.

194. It has been suggested to the DAC that the court should retain a power to order security for costs that may be incurred up to the appointment of the tribunal. We have not been persuaded, however, that this is really necessary.

195. It has been pointed out that in some cases an application for security before an arbitral tribunal might involve disclosing to that tribunal the fact that an offer of settlement had been or was about to be made. Under the court system, such disclosure can be made to a court other than that which will try the merits of the case.

196. We are not disturbed by this. It seems to us that a tribunal, properly performing its duty under Clause 33, could and should not be influenced by such matters, if the case proceeds to a hearing on the merits, nor do we accept that the disclosure of such information could somehow disqualify the tribunal from acting.

197. Clause 38(3) has been the subject of significant criticism since the Bill was introduced. In the light of this, we have concluded that it must be redrawn. Chapter 6, to which reference should be made, contains a full discussion of the problems with this provision as currently drafted, and our recommendations for its amendment.

198.Whilst the sanction in court for a failure to provide security for costs is normally a stay of the action, this is inappropriate in arbitration: if an arbitrator stayed proceedings, the arbitration would come to a halt without there necessarily being an award which could be challenged (*e.g.* if a party seeks to continue the proceedings). We have therefore included a specific sanction with respect to a failure to provide security for costs, which is to be found in Clause 41(6). This provision also follows the practice of the English Commercial Court, which changed from the old practice of ordering a stay of proceedings if security was not provided. The disadvantage of the latter course was that it left the proceedings dormant but alive, so that years later they could be revived by the provision of security.

199.Clause 38 provides the tribunal with other powers in relation to the arbitration proceedings. We trust that these are self-explanatory.

## Clause 39    Power to Make Provisional Awards

200.In the July 1995 draft Clauses, this power did not require the agreement of the parties. As the result of responses, we have concluded on further consideration that this is necessary.

201.In *The Kostas Melas* [1981] 1 Lloyd's Rep. 18 at 26, Goff J., as he then was, made clear that it was no part of an arbitrator's function to make temporary or provisional financial arrangements between the parties. Furthermore, as can be demonstrated by the abundance of court cases dealing with this subject (in the context of applications for summary judgment, interim payments, *Mareva* injunctions and the like) enormous care has to be taken to avoid turning what can be a useful judicial tool into an instrument of injustice. We should add that we received responses from a number of practising arbitrators to the effect that they would be unhappy with such powers, and saw no need for them. We should note in passing that the July 1995 draft would arguably (and inadvertently) have allowed arbitrators to order *ex parte Mareva* or even *Anton Piller* relief. These draconian powers are best left to be applied by the courts, and the provisions of the Bill with respect to such powers have been adjusted accordingly.

202.There is a sharp distinction to be drawn between making provisional or temporary arrangements, which are subject to reversal when the underlying merits are finally decided by the tribunal; and dealing severally with different issues or questions at different times and in different awards, which we cover in Clause 47. It is for this reason that in this provision we draw attention to that Clause.

203.These considerations have led us firmly to conclude that it would only be desirable to give arbitral tribunals power to make such provisional orders where the parties have so agreed. Such agreements, of course, will have to be drafted with some care for the reasons we have stated. Subject to the safeguards of the parties' agreement and the arbitrators' duties (Clause 33), we envisage that this enlargement of the traditional jurisdiction of arbitrators could serve a very useful purpose, for example in trades and industries where cash flow is of particular importance.

## Clause 40    General Duty of the Parties

204.This is a mandatory provision, since it would seem that an ability to contract out of it would be a negation of the arbitral process.

205.We were asked what the sanction would be for non-compliance. The answer lies in other Clauses of the Bill. These not only give the tribunal powers in relation to recalcitrant parties (*e.g.* Clause 41), but stipulate time limits for taking certain steps (*e.g.* applications to the court, etc.) and (in Clause 73) making clear that undue delay will result in the loss of rights.

## Clause 41    Powers of Tribunal in Case of Party's Default

206.The first part of this Clause sets out the present law (section 13A of the 1950 Act, which was inserted by section 102 of the Courts and Legal Services Act 1990) giving the arbitral tribunal power to strike out for want of prosecution.

207.The second part makes clear that in the circumstances stipulated, a tribunal may proceed *ex parte*, though we have forborne from using this expression (or indeed any other legal Latin words or phrases) in the Bill. The Clause has its roots in article 25 of the Model Law.

208.It is a basic rule of justice that a court or tribunal should give all parties an opportunity to put their case and

answer that of their opponents. That is why this appears in Clause 33 of the Bill. Equally, however, and for reasons already mentioned, that opportunity should, again for reasons of justice, be limited to a reasonable one. If for no good reason such an opportunity is not taken by a party then to our minds it is only fair to the other party that the tribunal should be able to proceed as we have set out in this Clause.

209.The last part of this Clause sets out a system of peremptory orders. It will be noted that a peremptory order must be "to the same effect" as the preceding order which was disobeyed (subsection (5)). It could be quite unfair for an arbitrator to be able to make any type of peremptory order, on any matter, regardless of its connection with the default in question.

210.For the reasons mentioned earlier, subsection (6) provides that where a party fails to comply with a peremptory order to provide security for costs, the tribunal may make an award dismissing the claim, thereby following the practice of the English Commercial Court, and avoiding the danger that the proceedings are halted indefinitely, without there being anything to challenge before the court.

211.So far as failure to comply with other peremptory orders is concerned, we have provided a range of remedies. They do not include a power simply to make an award against the defaulting party. The reason for this is that (unlike a failure to comply with a peremptory order to provide security) it seems to us that this is too draconian a remedy, and that the alternatives we have provided very much better fit the justice of the matter.

## Powers of Court in Relation to Arbitral Proceedings

## Clause 42    Enforcement of Peremptory Orders of Tribunal

212.Although in Clause 41 we have provided the tribunal with powers in relation to peremptory orders, it seemed to us that the court should have power to order compliance with such orders, though (unless both parties have agreed) these can only be invoked with the permission of the tribunal. In our view there may well be circumstances where in the interests of justice, the fact that the court has sanctions which in the nature of things cannot be given to arbitrators (*e.g.* committal to prison for contempt) will assist the proper functioning of the arbitral process. This Clause is a good example of the support the court can give to that process. Subsection (3) requires that any other available recourse within the arbitral process be first exhausted.

## Clause 43    Securing the Attendance of Witnesses

213.This Clause (which corresponds to article 27 of the Model Law, and is derived from section 12(4) and (5) of the 1950 Act) is also designed to provide court support for the arbitral process. It will be noted, in particular, that the agreement of the parties or the permission of the tribunal is required. The reason for this is to make sure that this procedure is not used to override any procedural method adopted by the tribunal, or agreed by the parties, for the arbitration. Thus, for example, if the tribunal has decided that there shall be no oral evidence, then (unless all parties agree otherwise) this procedure cannot be used to get round that decision.

## Clause 44    Court Powers Exercisable in Support of Arbitral Proceedings

214.This provision corresponds in part to article 9 of the Model Law. As part of the redefinition of the relationship between arbitration and the court, which was mentioned above, the powers we have given the court are intended to be used when the tribunal cannot act or act effectively, as subsection (5) makes clear. It is under this Clause that the court has power to order *Mareva* or *Anton Piller* relief (*i.e.* urgent protective measures to preserve assets or evidence) so as to help the arbitral process to operate effectively. Equally, there may be instances where a party seeks an order that will have an effect on a third party, which only the court could grant. For the same reason the court is given the other powers listed.

215.In order to prevent any suggestion that the court might be used to interfere with or usurp the arbitral process, or indeed any attempt to do so, we have stipulated that except in cases of urgency with regard to the preservation of assets or evidence, the court can only act with the agreement of the parties or the permission of the tribunal. We have excepted cases of urgency, since these often arise before the tribunal has been properly constituted or when in the nature of things it cannot act quickly or effectively enough.

216.Furthermore, under subsection (6) the court, after making an order, can in effect hand over to the tribunal the task of deciding whether or not that order should cease to have effect. This is a novel provision, but follows from

the philosophy behind these provisions: if a given power could possibly be exercised by a tribunal, then it should be, and parties should not be allowed to make unilateral applications to the court. If, however, a given power could be exercised by the tribunal, but not as effectively, in circumstances where, for example, speed is necessary, then the court should be able to step in.

## Clause 45   Determination of Preliminary Point of Law

217. This Clause preserves what used to be the old Consultative Case procedure, though its availability is limited as we have set out, in order not to interfere with the arbitral process. The Clause is based on section 2 of the 1979 Act, with certain important changes.

218. It seems to us that with the limitations we have provided, this procedure can have its uses. For example, an important point of law may arise which is of great general interest and potentially the subject of a large number of arbitrations. This not infrequently happens when some major event occurs, as, for example, the closure of the Suez Canal or the United States embargo on the export of soya beans. It may well be considered by those concerned that in such special circumstances it would be cheaper and better for all to obtain a definitive answer from the court at an early stage.

219. However, under subsection (1), unless the parties agree, the court must now be satisfied that determination of the given question of law will substantially affect the rights of one or more of the parties. This last point is a departure from the 1979 Act, section 1 of which makes this precondition in relation to an appeal in respect of questions of law arising out of the award, but section 2 of which does not impose it in relation to the determination of a preliminary point of law.

220. Further, unless the parties agree, the court will now have to be satisfied of the matters set out in subsection (2) before considering an application, so that the procedure can only be used (even with the permission of the tribunal) in cases where its adoption will produce a substantial saving in costs to the parties or one of them. The condition in section 2(2) of the 1979 Act, which requires that the question of law be one in respect of which leave to appeal would be likely to be given under section 1(3)(b) of that Act, is not repeated.

221. It has been suggested to the DAC that the right to refer to the court under this Clause be removed from all non-domestic arbitrations, unless the parties otherwise agree. For the reasons given above as to the value of this provision, and for the reasons given below with respect to preserving the right of appeal in Clause 69, we were not persuaded by this.

## The Award

## Clause 46   Rules Applicable to Substance of Dispute

222. This Clause reflects much, though not all, of article 28 of the Model Law. We have not, for example, directed the tribunal to "take into account the usages of the trade applicable to the transaction". If the applicable law allows this to be done, then the provision is not necessary; while if it does not, then it could be said that such a direction overrides that law, which to our minds would be incorrect.

223. Subsection (1)(b) recognizes that the parties may agree that their dispute is not to be decided in accordance with a recognised system of law but under what in this country are often called "equity clauses", or arbitration "ex aequo et bono", or "amiable composition", *i.e.* general considerations of justice and fairness, etc. It will be noted that we have avoided using this description in the Bill, just as we have avoided using the Latin and French expressions found in the Model Law. There appears to be no good reason to prevent parties from agreeing to equity clauses. However, it is to be noted that in agreeing that a dispute shall be resolved in this way, the parties are in effect excluding any right to appeal to the court (there being no "question of law" to appeal).

224. Subsection (2) does, in effect, adopt the rule found in article 28 of the Model Law, thereby avoiding the problems of *renvoi*.

225. Subsection (3) caters for the situation where there is no choice or agreement. This again is the language of the Model Law. In such circumstances the tribunal must decide what conflicts of law rules are applicable, and use those rules in order to determine the applicable law. It cannot simply make up rules for this purpose. It has been suggested to the DAC that more guidance be given as to the choice of a proper law, but it appears to us that

flexibility is desirable, that it is not our remit to lay down principles in this highly complex area, and that to do so would necessitate a departure from the Model Law wording.

## Clause 47    Awards on Different Issues, etc.

226. We regard this as a very important provision. Some disputes are very complex, raising a large number of complicated issues which, if they are all addressed and dealt with at one hearing, would necessarily take a very long time and be very expensive. Disputes concerning large scale construction contracts are a good example, though there are many other cases.

227. In recent years both the Commercial Court and the Official Referees Court in England (which deal with large cases) have adopted a different approach. The judge plays much more of a managerial role, suggesting and indeed directing ways in which time and money can be saved. One of the ways is to select issues for early determination, not necessarily on the basis that they will be *legally* determinative of the entire litigation, but where they may well be *commercially* determinative, in the sense that a decision is likely to help the parties to resolve their other differences themselves without the need to spend time and money on using lawyers to fight them out. This has a further advantage. Cases fought to the bitter end often result in a permanent loss of goodwill between the warring factions, thus impeding or preventing future profitable relationships between them. The result is often in truth a loss to all the parties, whether or not they were the "winners" in the litigation.

228. In court therefore, the old idea that a party is entitled to a full trial of everything at once has now largely disappeared: see, for example, the decision of the House of Lords in *Ashmore v. Corporation of Lloyd's* [1992] 2 Lloyd's Rep. 1. Furthermore, this method of approach is reflected in the views expressed by Lord Woolf in his current consideration of how to improve our system of civil justice. The same reasoning, of course, applies to arbitrations.

229. As we have said earlier, arbitration enjoys an advantage over litigation, since the arbitral tribunal is appointed to deal with the particular dispute that has arisen, and is thus in a better position to tailor the procedure to suit the particular circumstances of that dispute. Furthermore, an arbitral tribunal is often able, for the same reason, to move much quicker than the court.

230. For these reasons, we have tried to make clear in this Clause that the tribunal is empowered to proceed in this way. This is an aspect of the duty cast upon the tribunal to adopt procedures suitable to the circumstances of the particular case, which is set out in Clause 33(1)(a). We would encourage arbitrators to adopt this approach in any case where it appears that time and money will be saved by doing so, and where such an approach would not be at the expense of any of the other requirements of justice.

231. In this connection we would draw attention to the decision of Goff J. (now Lord Goff) in *The Kostas Melas, op. cit.* As we observed when considering Clause 39, the function of arbitrators is not to make temporary financial adjustments between the parties pending the resolution of the dispute, unless this is what they have agreed the arbitrators can do. As this case shows, there is a clear distinction between such arrangements and the right to make a permanent binding decision after considering the arguments, even though the later resolution of other issues (if this becomes necessary) may overall produce a different result.

232. We should emphasize that in this Clause we are not intending to give arbitral tribunals greater or different powers from those they presently have, but to emphasise how their powers should, in suitable cases, be exercised.

233. It might also be noted that we have been careful to avoid use of the term "interim award", which has become a confusing term, and in its most common use, arguably a misnomer.

## Clause 48    Remedies

234. We trust that the matters addressed in this Clause are self-evident. We have excluded specific performance of land contracts, so as not to change the law in this regard, but clarified the power of arbitrators to award injunctive relief. Given that the parties are free to agree on the remedies that a tribunal may order, there is nothing to restrict such remedies to those available at Court.

## Clause 49    Interest

235. The responses we received demonstrated to us that there was a general desire to give arbitral tribunals a

general power to award compound interest.

236.There is no doubt that the absence of such a power adds to the delays (and thus the expense) of arbitrations and causes injustice, for it is often in a party's interest to delay the proceedings and the honouring of an award, since the interest eventually payable is less than can be made by holding on to funds which should be paid over to the other party, who of course is losing out by a like amount.

237.Some of those responding were fearful that arbitrators would abuse this power, and may, for example, award compound interest on a punitive rather than compensatory basis. We do not share those fears. To our minds any competent arbitrator seeking to fulfil the duties laid on him by the Bill will have no more difficulty in making decisions about compound interest than he will in deciding in any other context what fairness and justice require. Anyone who has such difficulties demonstrates, in our view, that he is really not fit to act as an arbitrator. In such a case, the award and the arbitrator will be susceptible of challenge.

238.Clause 84 and 111 allow for transitional measures. In the context of this Clause, we understand that these may prove necessary in relation to the enforcement of awards through the county courts, who we are told are not presently equipped to calculate compound interest payable from the date of the award.

## Clause 50    Extension of Time for Making Award

239.This Clause re-enacts the existing law, though with two qualifications:

i.    arbitral procedures for obtaining an extension must be exhausted before recourse to the court; and

ii.    the court must be satisfied that substantial injustice would be done if the time were not extended.

It seems to us that these qualifications are needed so as to ensure that the court's power is supportive rather than disruptive of the arbitral process. For the same reason, it seems to us that it would be a rare case indeed where the court extended the time notwithstanding that this had not been done through an available arbitral process.

## Clause 51    Settlement

240.This Clause reflects article 30 of the Model Law. It enables an agreed settlement of the dispute to be given the status of an arbitral award, which could then be enforced as such.

241.Concern has been expressed that this provision (taken from article 30 of the Model Law) might be used by the parties either to obtain an award in respect of matters which are simply not arbitrable (*e.g.* matters which under our law cannot be settled by agreement between the parties), or to mislead third parties (*e.g.* the tax authorities). It was suggested that any agreed award should have to state on its face that it is such.

242.Dealing first with deception, in our view there is no material difference between Clause 51 and our present law: *cf.* p. 59 of the Mustill Report. As that Report observes, article 30 and our present law recognise the right of the tribunal to refuse to make an award on agreed terms if it contains an objectionable feature, *e.g.* is structured to mislead third parties. Clause 51 preserves that right. Thus unless the tribunal is itself prepared to be a party to an attempted deception, we consider the risk that misleading awards will be made to be very small. If the tribunal is prepared to conspire with the parties, then nothing we could put in Clause 51 is likely to deter it. Furthermore, the whole of Clause 51 is based upon the assumption that there is a dispute between the parties which has been referred to arbitration and then settled. Nothing in the Clause would assist parties to mislead others where there was no genuine dispute or genuine reference or genuine settlement. The Clause would simply not apply to such a situation.

243.So far as arbitrability is concerned, this is a question that goes beyond agreed awards. We discuss this question when considering Clause 66 (see also the supplementary recommendations in Chapter 6 below).

244.We are not persuaded that we should require that any agreed award should state that it is such. Both under this Clause and Clause 52 the parties are free to agree on the form the award should take. In our view this is not only the position under the Model Law but also the position under our present law. A requirement that an agreed award should state that it is such would have to be made a mandatory provision to be effective. We are not aware of any problems arising under our present law and are reluctant to impose this formal requirement. Moreover, it would of course be open to the tribunal to record the agreement in the award if they thought it was appropriate to do so. However, at the enforcement stage we agree that the Court should be informed if the award is an agreed award, if

this is not apparent from the award itself. We return to this point when considering Clause 66 below (see also Chapter 6).

## Clause 52    Form of Award

245.This Clause follows closely article 31 of the Model Law. There are, however, two matters worthy of particular note.

246.In the first place, as in the Model Law, we have required the tribunal to give reasons, unless the award is an agreed award or the parties have agreed that reasons need not be given.

247.To our minds, it is a basic rule of justice that those charged with making a binding decision affecting the rights and obligations of others should (unless those others agree) explain the reasons for making that decision. This was also the view of the majority of those who commented on this.

248.It was suggested that having to give reasons would be likely to add to the cost of arbitrations and encourage applications for leave to appeal to the court.

249.We do not agree. The need for reasons is that which we have explained above and has nothing to do with the question whether or not a court should hear an appeal from an award. Further, we have introduced stricter conditions for the bringing of appeals in any event. As to cost, it is always open to the parties to agree to dispense with reasons if they wish to do so, though in the case of domestic arbitrations this can only be done after the dispute has arisen: see Clauses 69(1) and 87.

250.The second noteworthy point is that we have used the word "seat" instead of the Model Law phrase "place of arbitration". We consider that the Model Law uses this phrase to mean the seat (there being no obvious legal reason to stipulate the geographical place where the award was made), and since we have used this word earlier in the Bill (see Clauses 2 and 3) it would in our view only cause confusion not to use it here. Of course the seat is only of importance in international arbitrations or where the question arises as to the enforcement of an award abroad. Therefore, in a purely domestic arbitration, if an arbitrator were to fail to state the "seat", or to state this incorrectly, it is extremely unlikely that the award could be challenged under Clause 68(2)(h), given that such a failure would be unlikely to result in "substantial injustice".

251.Subsection (3) provides that the award shall be in writing and signed by all the arbitrators or, alternatively, by all those assenting to the award. An earlier draft of this subsection had only stipulated that all arbitrators assenting to an award sign it. It was pointed out to the DAC, however, that (for whatever reason) some dissenting arbitrators may not wish to be identified as such, and that the provision should therefore be amended to provide for this.

252.It has been suggested to the DAC that there should be a provision allowing for somebody to sign on behalf of an arbitrator. This could invoke complicated principles of agency, and, overall, is better left to be resolved in each particular case.

## Clause 53    Place Where Award is Treated as Made

253.This Clause is designed to avoid disputes over where an award is made and (in cases where Part I of the Bill applies to the arbitration in question) it reverses the decision (although not the result) of the House of Lords in *Hiscox v. Outhwaite* [1992] 1 A.C. 562.

## Clause 54    Date of Award

254.We trust this provision is self-explanatory.

## Clause 55    Notification of Award

255.This provision we also trust is self-explanatory. The obligation on the tribunal to notify the parties by service on them of copies of the award is important, given that certain time limits in the Bill for, *e.g.* challenging the award, run from the date of the award (which, under Clause 54, in the absence of any other agreement, is the date upon which it is signed). Time periods, of course, can be extended: see Clause 79. We have required the award to be notified to the "parties" so as to prevent one party from obtaining the award and sitting on it without informing the other party until the expiry of time limits for appeal etc, which we are aware has happened in practice.

256. Clause 55(3) provides that nothing in this section affects the power to withhold an award in the case of non-payment. However, it should be noted that the duty to notify all parties would of course revive once the tribunal's "lien" has been satisfied.

## Clause 56 Power to Withhold Award in Case of Non-payment

257. These provisions enable a party to seek the assistance of the court if he considers that the arbitrators are asking too much for the release of their award, though it is important to note from subsection (4) that there is no recourse if there is already arbitral machinery for an appeal or review of the fees or expenses demanded.

258. Subsection (8) makes clear that this Clause does not affect the right to challenge fees and expenses under Clause 28, *i.e.* that paying them to get the award does not lose this right. The reason for this provision is that it may be important for a party to obtain the award quickly, rather than going to the court for an order about fees and expenses before getting the award.

259. Unlike section 19 of the 1950 Act, this provision gives the court a discretion to specify that a lesser amount than that claimed by the arbitrators be paid into court, in order to have the award released. If this were not so, an arbitrator could demand an extortionate amount, in effect preventing a party from taking advantage of the mechanism provided for here.

260. For obvious reasons, this provision is mandatory.

## Clause 57 Correction of Award or Additional Award

261. This Clause reflects article 33 of the Model Law. In our view this is a useful provision, since it enables the arbitral process to correct itself, rather than requiring applications to the court. In order to avoid delay, we have stipulated time limits for seeking corrections, etc.

## Clause 58 Effect of Award

262. This provision in effect simply restates the existing law.

263. It has been suggested that what is described as the other side of subsection (1) should be spelt out in the Bill, *i.e.* that whatever the parties may or may not agree, the award is of no substantive or evidential effect against any one who is neither a party nor claiming through or under a party.

264. Such a provision would, of course, have to be mandatory. It would have to confine itself to cases exclusively concerned with the laws of this country, for otherwise it could impinge on other applicable laws which have a different rule. Even where the situation was wholly domestic, it would also have to deal with all those cases (*e.g.* insurers) who are not parties to the arbitration but whose rights and obligations may well be affected by awards (agreed or otherwise) in one way or another. In our view it would be very difficult to construct an acceptable provision and we are not persuaded that it is needed.

## Costs of the Arbitration

**Clause 59 Costs of the Arbitration**

**Clause 60 Agreement to Pay Costs in Any Event**

**Clause 61 Award of Costs**

**Clause 62 Effect of Agreement or Award about Costs**

**Clause 63 The Recoverable Costs of the Arbitration**

**Clause 64 Recoverable Fees and Expenses of Arbitrators**

32

## Clause 65    Power to Limit Recoverable Costs

265. In these Clauses we have attempted to provide a code dealing with how the costs or an arbitration should be attributed between the parties. The question of the right of the arbitrators to fees and expenses is dealt with earlier in that part of the Bill concerned with the arbitral tribunal: see Clause 28.

266. Clause 59 defines costs.

267. Clause 60 is a mandatory provision preventing effective agreements to pay the whole or part of the costs in any event unless made after the dispute has arisen. The Clause is based on section 18(3) of the Arbitration Act 1950. The Committee are of the view that public policy continues to dictate that such a provision should remain.

268. Clause 62 empowers the arbitrators to make an award in relation to costs. Subsection (2) sets out the general principle to be applied, which is the same principle that is applicable in court.

269. It has been suggested that arbitral tribunals should not be fettered in this way, but to our minds it is helpful to state the principle, especially for those who may not be lawyers and who otherwise might not know how to proceed. Furthermore, it seems to us that there is no reason why the general principle should not apply to arbitrations: it certainly does under the present law. The parties are, of course, free to agree on other principles, subject to Clause 60.

270. Clauses 63 and 64 are we hope more or less self-explanatory. Clearly there has to be a special regime for the fees and expenses of the arbitrators, for otherwise they would be left with the power to decide for themselves whether or not they had overcharged!

271. Clause 64(4) preserves any contractual right an arbitrator may have to payment of his fees and expenses. If a party has agreed these, then it would in our view be wrong to allow the court to adjust the amount, *i.e.* to rewrite that agreement.

272. Clause 65 contains a new proposal. It gives the tribunal power to limit in advance the amount of recoverable costs. We consider that such a power, properly used, could prove to be extremely valuable as an aid to reducing unnecessary expenditure. It also represents a facet of the duty of the tribunal as set out in Clause 33. The Clause enables the tribunal to put a ceiling on the costs, so that while a party can continue to spend as much as it likes on an arbitration it will not be able to recover more than the ceiling limit from the other party. This will have the added virtue of discouraging those who wish to use their financial muscle to intimidate their opponents into giving up through fear that by going on they might be subject to a costs order which they could not sustain.

### Powers of the Court in Relation to Award

## Clause 66    Enforcement of the Award

273. This reflects article 35 of the Model Law. Enforcement through the court provides the classic case of using the court to support the arbitral process. Subsection (3)(a) is intended to state the present law: see Mustill & Boyd, *Commercial Arbitration* (2nd (ed.) at p. 546. Subsection (3)(b) is intended to cover cases where public policy would not recognise the validity of an award, for example awards purporting to decide matters which our law does not accept can be resolved by this means. For obvious reasons, this provision is mandatory.

274. Reference should be made to Chapter 6, where certain supplementary recommendations are made with respect to this Clause.

## Clause 67    Challenging the Award: Substantive Jurisdiction

275. Jurisdiction has already been considered in the context of that part of the Bill dealing with the jurisdiction of the arbitral tribunal: see Clauses 30 to 32.

276. Clause 31 allows the tribunal (where it has power to rule on its own jurisdiction) to make a "jurisdiction" award, either on its own, or as part of its award on the merits. Clause 67 provides the mechanism for challenging the jurisdiction rulings in such awards, and is a mandatory provision. It also provides a mechanism for challenges to the jurisdiction by someone who has taken no part in the arbitral proceedings. We deal with such persons

below, when considering Clause 72.

277.To avoid the possibility of challenges to the jurisdiction causing unnecessary delay, the rights given by this Clause are subject to qualifications, which explains the reference in subsection (1) to three other sections. In addition, subsection (2) means that a challenge to jurisdiction does not stop the tribunal from proceeding with other aspects of the arbitration while the application is pending.

## Clause 68    Challenging the Award: Serious Irregularity

278.We have drawn a distinction in the Bill between challenges in respect of substantive jurisdiction (*i.e.* those matters listed in Clause 30) and challenges in respect of what we have called "serious irregularity". We appreciate that cases may arise it which it might be difficult to decide into which category a particular set of circumstances should be placed, but since the time limits etc for both Clause 67 and Clause 68 are the same, this should cause no procedural difficulties. We are firmly of the view, however, that it is useful to have two categories.

279.The reason for this is that where jurisdiction is concerned, there can be no question of applying a test of "substantial injustice" or the like. An award of a tribunal purporting to decide the rights or obligations of a person who has not given that tribunal jurisdiction so to act simply cannot stand, though of course, if the party concerned has taken part in the arbitration, there is nothing wrong in requiring him to act without delay in challenging the award.

280.Irregularities stand on a different footing. Here we consider that it is appropriate, indeed essential, that these have to pass the test of causing "substantial injustice" before the court can act. The court does not have a general supervisory jurisdiction over arbitrations. We have listed the specific cases where a challenge can be made under this Clause. The test of "substantial injustice" is intended to be a applied by way of support for the arbitral process, not by way of interference with that process. Thus it is only in those cases where it can be said that what has happened is so far removed from what could reasonably be expected of the arbitral process that we would expect the court to take action. The test is not what would have happened had the matter been litigated. To apply such a test would be to ignore the fact that the parties have agreed to arbitrate, not litigate. Having chosen arbitration, the parties cannot validly complain of substantial injustice unless what has happened simply cannot on any view be defended as an acceptable consequence of that choice. In short, Clause 68 is really designed as a long stop, only available in extreme cases where the tribunal has gone so wrong in its conduct of the arbitration that justice calls out for it to be corrected.

281.By way of example, there have been cases under our present law where the court has remitted awards to an arbitral tribunal because the lawyers acting for one party failed (or decided not to) put a particular point to the tribunal: see, for example *Indian Oil Corporation v. Coastal (Bermuda) Ltd* [1990] 2 Lloyd's Rep. 407; *King v. Thomas McKenna* [1991] 2 Q.B. 480; *Breakbulk Marine v. Dateline* 19 March 1992, unreported (jurisdiction recognised but not exercised).

282.The responses we received were critical of such decisions, on the grounds that they really did amount to an interference in the arbitral process agreed by the parties. We agree. The Clause we propose is designed not to permit such interference, by setting out a closed list of irregularities (which it will not be open to the court to extend), and instead reflecting the internationally accepted view that the court should be able to correct serious failure to comply with the "due process" of arbitral proceedings: *cf.* article 34 of the Model Law.

283.This Clause is, of course, mandatory.

## Clause 69    Appeal on Point of Law

284.We received a number of responses calling for the abolition of any right of appeal on the substantive issues in the arbitration. These were based on the proposition that by agreeing to arbitrate their dispute, the parties were agreeing to abide by the decision of their chosen tribunal, not by the decision of the court, so that whether or not a court would reach the same conclusion was simply irrelevant. To substitute the decision of the court on the substantive issues would be wholly to subvert the agreement the parties had made.

285.This proposition is accepted in many countries. We have considered it carefully, but we are not persuaded that we should recommend that the right of appeal should be abolished. It seems to us, that with the safeguards we propose, a limited right of appeal is consistent with the fact that the parties have chosen to arbitrate rather than litigate. For example, many arbitration agreements contain an express choice of the law to govern the rights and obligations arising out of the bargain made subject to that agreement. It can be said with force that in such

circumstances, the parties have agreed that that law will be properly applied by the arbitral tribunal, with the consequence that if the tribunal fail to do this, it is not reaching the result contemplated by the arbitration agreement.

286. In these circumstances what we propose is a right to apply to the court to decide a point of law arising out of an award. This right is limited, however, in several ways.

i.     The point of law must substantially affect the rights of one or more of the parties. This limitation exists, of course, in our present law.

ii.    The point of law must be one that was raised before the tribunal. The responses showed that in some cases applications for leave to appeal have been made and granted on the basis that an examination of the reasons for the award shows an error on a point of law that was not raised or debated in the arbitration. This method of proceeding has echoes of the old and long discarded common law rules relating to error of law on the face of the award, and is in our view a retrograde step. In our view the right to appeal should be limited us we suggest.

iii.   There have been attempts, both before and after the enactment of the Arbitration Act 1979, to dress up questions of fact as questions of law and by that means to seek an appeal on the tribunal's decision on the facts. Generally these attempts have been resisted by the courts, but to make the position clear, we propose to state expressly that consideration by the court of the suggested question of law is made on the basis of the findings of fact in the award.

iv.    We have attempted to express in this Clause the limits put on the right to appeal by the House of Lords in *Pioneer Shipping Ltd v. BTP Tioxide Ltd (The Nema)* [1982] A.C. 724.

287. With respect to the last point, we think it is very important to do this. Many of those abroad who do not have ready access to our case law were unaware that the Arbitration Act 1979 had been construed by the House of Lords in a way that very much limited the right of appeal, and which was not evident from the words of the Act themselves.

288. The test we propose is whether, in the ordinary case, the court is satisfied that the decision of the tribunal is obviously wrong. The right of appeal is only available for such cases, for the reasons discussed above. Where the matter is one of general public importance, the test is less onerous, but the decision must still be open to serious doubt.

289. We propose a further test, namely whether, despite the agreement of the parties to resolve the matter by arbitration, it is just and proper in all the circumstances for the court to determine the question.

290. We have been asked why we suggest this addition. The reason is that we think it desirable that this factor should be specifically addressed by the court when it is considering an application. It seems to us to be the basis on which the House of Lords acted as it did in *The Nema, op. cit.*. The court should be satisfied that justice dictates that there should be an appeal; and in considering what justice requires, the fact that the parties have agreed to arbitrate rather than litigate is an important and powerful factor.

291. It will be noted that we have included a provision that the court should determine an application without a hearing unless it appears to the court that a hearing is required. This again reflects what was said in *The Nema, op. cit.* about the tendency for applications for leave being turned into long and expensive court hearings. In our view, the tests for leave (*i.e.* obviously wrong or open to serious doubt) are such that in most cases the court will be able to decide whether to allow or reject the application on written material alone.

292. Finally, a question has been raised as to whether an agreement in advance of the proceedings (*i.e.* contained in an arbitration clause mor in the underlying contract) would satisfy Clause 69(2)(a). The Clause is intended to encompass such agreements, and in our view it plainly does so since the word agreement is not qualified. However, such an agreement will not automatically allow an appeal unless it complies with the other conditions set out in Clause 69 and 70.

## Clause 70   Challenge or Appeal: Supplementary Provisions

## Clause 71   Challenge or Appeal: Effect of Order of the Court

293. These provisions contain time-limits and other matters in relation to challenges to the award and applications and appeals. Some of these provisions are mandatory.

294.The time limit in Clause 70(3) runs from the date of the award, or, where applicable, the date when a party was notified of the result of any arbitral process of appeal or review. It has been suggested that difficulties might arise if an award is held back by the arbitrators, pending payment by the parties (*i.e.* under Clause 56). It is possible that the time limit in Clause 70(3) will have expired by the time an award is released. However, the DAC is of the view that the date of the award is the only incontrovertible date from which the time period should run. Any other starting point would result in great uncertainty (*e.g.* as to the exact point at which an award is "released" or "delivered"). Further, any difficulties arising from specific circumstances can be easily remedied by way of an extension of time under Clause 79.

## Miscellaneous

## Clause 72    Saving for Rights of Person who Takes no Part in Proceedings

295.To our minds this is a vital provision. A person who disputes that an arbitral tribunal has jurisdiction cannot be required to take part in the arbitration proceedings or to take positive steps to defend his position, for any such requirement would beg the question whether or not his objection has any substance and thus be likely to lead to gross injustice. Such a person must be entitled, if he wishes, simply to ignore the arbitral process, though of course (if his objection is not well-founded) he runs the risk of an enforceable award being made against him. Those who do decide to take part in the arbitral proceedings in order to challenge the jurisdiction are, of course, in a different category, for then, having made that choice, such people can fairly and properly be required to abide by the time limits etc. that we have proposed.

296.This is a mandatory provision.

## Clause 73    Loss of Right to Object

297.Recalcitrant parties or those who have had an award made against them often seek to delay proceedings or to avoid honouring the award by raising points on jurisdiction, etc. which they have been saving up for this purpose or which they could and should have discovered and raised at an earlier stage. Article 4 of the Model Law contains some provisions designed to combat this sort of behaviour (which does the efficiency of arbitration as a form of dispute resolution no good) and we have attempted to address the same point in this Clause. In particular, unlike the Model Law, we have required a party to arbitration proceedings who has taken part or continued to take part without raising the objection in due time, to show that at that stage he neither knew nor could with reasonable diligence have discovered the grounds for his objection (the latter being an important modification to the Model Law, without which one would have to demonstrate actual knowledge, which may be virtually impossible to do). It seems to us that this is preferable to requiring the innocent party to prove the opposite, which for obvious reasons it might be difficult or impossible to do.

298.For the reasons explained when considering Clause 72, the provision under discussion cannot, of course, be applied to a party who has chosen to play no part at all in the arbitral proceedings.

## Clause 74    Immunity of Arbitral Institutions, etc.

299.In this mandatory provision we have provided institutions and individuals who appoint arbitrators with a degree of immunity.

300.The reason for this proposal is that without such an immunity, there is in our view a real risk that attempts will be made to hold institutions or individuals responsible for the consequences of their exercise of the power they may be given to appoint or nominate arbitrators, or for what their appointed or nominate arbitrators then do or fail to do. This would provide a means of reopening matters that were referred to arbitration, something that might be encouraged if arbitrators were given immunity (as we have also proposed in Clause 29) but nothing was said about such institutions or individuals.

301.There is an additional point of great importance. Many organisations that provide arbitration services, including Trade Associations as well as bodies whose sole function it is to provide arbitration services, do not in the nature of things have deep pockets. Indeed much of the work is done by volunteers simply in order to promote and help this form of dispute resolution. Such organisations could find it difficult if not impossible to finance the cost of defending legal proceedings or even the cost of insurance against such cost. In our view the benefits which these organisations (and indeed individuals) have on arbitration generally fully justify giving them a measure of

protection so that their good work can continue.

## Clause 75   Charge to Secure Payment of Solicitors' Costs

302.This is a technical provision designed to maintain the present position.

## Supplementary

## Clause 76   Service of Notices, etc.

303.The subject matter of this Clause was touched on in the MacKinnon Report which led to the Arbitration Act 1934, but at that time no action was taken.

304.In this Clause we have attempted to do three things.

i.     We have stipulated that the parties can agree on how service of notices and other documents can be done.

ii.    We have made clear that in the absence of agreement, service by *any* effective means will suffice.

iii.   We have provided in subsection (4) an option which can best be described as a "fail-safe" method, which a party may employ if he wishes, for example if he is not sure that other methods will be effective. We should emphasise that this fail-safe method is not a compulsory or preferred method for service, but merely a means which, if employed, will be treated as effective.

305.These provisions do not apply in respect of service in court proceedings, for the obvious reason that such service must comply with the rules of the court concerned.

## Clause 77   Powers of Court in Relation to Service of Documents

306.In this Clause we have given the court powers to support the arbitral process so that it is not delayed or frustrated through difficulties over service. In the nature of human affairs, it is sadly the case that potential respondents to arbitration proceedings quite often go to considerable lengths to avoid service and thus to achieve this state of affairs, by making normal methods difficult or even impossible to use effectively. This Clause should, in appropriate cases, help to deal with such cases.

## Clause 78   Reckoning Periods of Time

307.In our view it would be of great assistance to set out a code to deal with the reckoning of time, thus avoiding the need to refer to other sources. Hence this provision.

## Clause 79   Power of Court to Extend Time Limits Relating to Arbitral Proceedings

308.Here we propose that the court should have a general right to extend time limits, except time limits for starting an arbitration, which is dealt with specifically in Clause 12. We propose that the wording of the Clause be clarified as set out in Chapter 6 below.

309.This power is limited in the ways set out in this Clause. In particular, no extension will be granted unless a substantial injustice would otherwise be done and any arbitral process for obtaining an extension must first be exhausted. As we have said in other contexts, it would be a rare case indeed where we would expect the court to grant an extension where such has not been obtained through that process. With these limitations we take the view that this provision can properly be described as supporting the arbitral process.

## Clause 80   Notice and other Requirements in Connection with Legal Proceedings

310.Legal proceedings must of course be subject to the rules of the court concerned. We have made clear, therefore, that where the Bill provides for notice of legal proceedings to be given to others, this is a reference to such rules as the court concerned may make; and is not a separate requirement over and above those rules.

**Clause 81    Saving for Certain Matters governed by Common Law**

311.As we have stated earlier, and as was stated in the Mustill Report, it would be neither practicable nor desirable to attempt to codify the whole of our arbitration law. Hence subsections (1) and (2) of this Clause.

312.It was suggested to us that a provision preserving the common law would enable arguments to be raised and accepted which were contrary to the spirit and intent of the Bill. We do not think that this will happen, in view of the opening words of the Clause and indeed the statements of principle in Clause 1. Equally, it seems to us to be necessary to make clear that the common law (so far as it is consistent with the Bill) will continue to make its great contribution to our arbitration law, a contribution that has done much to create and preserve the world wide popularity of arbitration in our country.

313.Subsection (3) is technically necessary to make clear that the repeal of the existing statutes does not have the effect of reviving the common law rules relating to errors on the face of the award.

**Clause 82    Minor Definitions**

**Clause 83    Index of Defined Expressions: Part I**

314.The first of these Clauses provides the definition of words and phrases which are often repeated in the body of the Bill, so that repetition of the meaning is avoided, as well as providing a ready means of discovering the meaning of certain important words and phrases. The second of these Clauses is also designed to help the reader by identifying the place where other important words are defined or explained.

**Clause 84    Transitional Provisions**

315.This Clause sets out the general proposition, namely that the Bill will apply to arbitral proceedings commenced after the legislation comes into force, whenever the arbitration agreement is made. There are respectable precedents for this, since the Arbitration Acts 1889, and 1934 contained a like provision. The 1950 Act, of course, was not a precedent, since this was a consolidating measure. We consider this to be a useful provision, since some arbitration agreements have a very long life indeed (for example, rent review arbitration agreements under leases) and it would be most unsatisfactory if the existing law and the proposed legislation were to run in parallel (if that is the right expression) indefinitely into the future.

316.Reference should also be made to Clause 111.

———————————————

**CHAPTER 3**

**PART II OF THE BILL**

**OTHER PROVISIONS RELATING TO ARBITRATION**

**Domestic Arbitration Agreements**

**Clause 85    Modification of Part I in Relation to Domestic Arbitration Agreements**

**Clause 86    Staying of Legal Proceedings**

**Clause 87    Effectiveness of Agreement to Exclude Court's Jurisdiction**

**Clause 88    Power to Repeal or Amend ss.85 to 87**

317. Under our present law, a distinction is drawn between domestic and other arbitrations for two main purposes.

318. In the first place, the rules for obtaining a stay of legal proceedings differ. The reason for this is that under international Conventions, a stay in favour of an arbitration is mandatory except in certain specified circumstances. The current Convention is the New York Convention and the rules under that Convention we have now set out in Clause 9. With an exception that we have already discussed above, Clause 9 simply re-enacts the Arbitration Act 1975 so far as it concerns this matter.

319. Section 1 of the Arbitration Act 1975 does not apply to domestic arbitrations as there defined. These continue to be governed by section 4(1) of the Arbitration Act 1950, which makes the grant of a stay discretionary.

320. It is our view that consideration should be given to abolishing this distinction and applying the New York Convention rules to all cases. It seems to us that these rules fit much more happily with the concept of party autonomy than our domestic rules, which were framed at a time when attitudes to arbitration were very different and the courts were anxious to avoid what they described as usurpation of their process.

321. For example, there are cases justifying the refusal of a stay in cases where the court considers that the party seeking to arbitrate has no defence to the claim and is merely seeking to delay the day of judgment. This has been explained on the basis that since there is no defence to the claim, there is no dispute that can be arbitrated. The difficulty with this argument is that it logically follows that only disputable matters can be arbitrated, or, in other words, that the arbitrators have no jurisdiction to deal with cases where there is no real defence. This in turn means that a claimant cannot refer a claim to arbitration where there is no real defence, since *ex hypothesi* the arbitrators would have no jurisdiction. In short, this argument leads to consequences that in our view have only to be stated to be rejected. As to delaying tactics, it has been our intention throughout the Bill to provide the means whereby an agreement to arbitrate can produce (in suitable cases) a very quick answer indeed. Indeed, if in truth there is no defence to a claim, then it should not take more than a very short time for an arbitral tribunal to deal with the matter and produce an award.

322. For these reasons, which are those discussed in *Nelson v. Hayter* [1990] 2 Lloyd's Rep. 265, we consider that this ground for preserving the distinction between domestic and other arbitrations so far as stays are concerned is highly unconvincing.

323. The domestic rules have also been used to refuse stays where the disputes are likely to involve other parties, who could not be brought into the arbitration, since the agreement to arbitrate only binds those who were party to it. Here the justification for refusing to stay legal proceedings is that it would be much better for all the concerned parties to be brought into one proceeding, so that the whole matter can be sorted out between them all.

324. This reasoning of course is in one sense supported by common sense and justice, for in certain cases it would be better and fairer for all the disputes between all the parties involved to be dealt with by one tribunal, thereby avoiding delay and the possibility of inconsistent findings by different tribunals. However, as we observed in the context of considering whether there should be a power (without the agreement of the parties) to order consolidation or concurrent hearings in arbitrations (Clause 35), to refuse a stay because other parties are involved involves tearing up the arbitration agreement that the applicant for a stay has made. In other words, with the benefit of hindsight, the court adjusts the rights and obligations of contracting parties.

325. We fully accept that for reasons of consumer protection, this on occasion can and should be done, but we are not persuaded that it should be a general rule in the context of stays of domestic arbitrations, for it sits uneasily with the principle of party autonomy and amounts to interference with rather than support for the arbitral process.

326. We should also note that the distinction drawn between domestic and other arbitrations produces odd results. An arbitration agreement between two English people is a domestic arbitration agreement, while an agreement between an English person and someone of a different nationality is not, even if that person has spent all his time in England. Furthermore, we are aware that it could be said that the distinction discriminates against European Community nationals who are not English, and is thus contrary to European law.

327. Notwithstanding the foregoing, we do not propose in this Bill to abolish the distinction. Some defend it and we have not had an opportunity to make all the soundings we would like on this subject. What we have done is to put the domestic arbitration rules in a separate part of the Bill, and provided in Clause 88 for a power of repeal through the mechanism of a positive joint resolution of each House of Parliament.

328.What we have felt able to do is to redraft the domestic rules on stays and to make two changes. Firstly we have removed the discretion and instead set out words which are wide enough to encompass the circumstances which the cases have developed as grounds for refusing a stay. Secondly and more importantly, we have reversed the existing burden of proof (and incidentally got rid of a double or perhaps treble negative in the previous legislation). It seemed to us that it was for the party seeking to litigate something which he had previously agreed to arbitrate to persuade the court that he should be allowed to go back on his agreement.

329.The second purpose served by making a distinction between domestic and other arbitrations is to prevent the parties in a domestic case from effectively agreeing to exclude the jurisdiction of the court to deal with preliminary points of law or with an appeal from an award on a point of law, until after the commencement of the arbitral proceedings. This necessarily means that until the arbitration starts such parties cannot make an effective agreement to dispense with reasons, for that is treated as an agreement to exclude the jurisdiction of the court—see, now, Clause 69(1).

330.Again we are not persuaded of the value or the validity of this, but we have preserved the existing law for the same reason as we have preserved the present position on stays. Our own view is that this distinction should disappear.

331.It should be noted that we have not preserved the "special categories" dealt with in section 4 of the Arbitration Act 1979. These were intended as a temporary measure, and the weight of the responses received persuaded us that they should now go.

## Consumer Arbitration Agreements

## Clauses 89 to 93

332.In these Clauses we have consolidated the provisions of the Consumer Arbitration Agreements Act 1988. We have suggested this in order to bring within the Bill all the current major enactments on arbitration, so as to provide as complete a code as possible.

333.We did not regard it as part of our remit to redraft this legislation, so we have not sought responses on it. However, we are aware that problems have arisen in construing this Act. For example, it has been suggested that what now appears as Clause 89 makes it far from clear whether a building contract made by a consumer falls outside the Act if the consumer has sought a number of quotes for the work.

334.We are also aware of a more fundamental problem. This country has recently implemented Council Directive 93/13 through the Unfair Terms in Consumer Contracts Regulations 1994 (S.I. 1994/3159). These Regulations came into force on 1st July 1995. Thus at the moment a situation exists where there are two parallel regimes for protecting consumer interests in the context of arbitration agreements.

335.To our minds this is an unsatisfactory state of affairs, likely to cause confusion and difficulties. Although we have not attempted to trespass into the field of consumer protection, it does seem to us that it would be unfortunate if the opportunity were not taken to clarify the position. On the face of it, the solution would seem to be to maintain the suggested repeal of the 1988 Act and to omit Clauses 89 to 92 of the Bill. If this were to be done, then we would welcome at least a cross-reference in the Bill to the Regulations, so that anyone reading the Bill will be made aware of them. As we understand it, the Regulations would not affect our international obligations regarding arbitrations (for example, the New York Convention) though doubtless those charged with the question of consumer protection will consider this aspect of the matter.

336.We would, however, emphasise that the arbitration community is extremely anxious that the Bill should not be delayed. The fact is that this country has been very slow to modernise its arbitration law and this has done us no good in our endeavour to retain our pre-eminence in the field of international arbitration, a service which brings this country very substantial amounts indeed by way of invisible earnings.

337.It is for these reasons that we have included in Clause 88 a power to amend or repeal Clauses 89 to 93. If the situation cannot be clarified or settled without delaying the progress of the Bill, then this mechanism could allow the Bill to go forward with the Consumer Arbitration Agreements Act in it, and the matter dealt with later.

## Small Claims Arbitration in the County Court

## Clause 94   Exclusion of Part 1 in Relation to Small Claims in the County Court

338. There is an entirely separate regime for the arbitration of small claims in the county court. The Bill is not intended to affect this.

339. As we observed earlier in the Report, we considered the suggestion that we should incorporate in the Bill another system for the arbitration of small claims, but for the reasons given, we have not adopted this suggestion and do not recommend it.

## Appointment of Judges as Arbitrators

## Clause 95   Appointment of Judges as Arbitrators

340. In this Clause we have set out the existing provisions for the appointment of Commercial Judges and Official Referees as arbitrators.

341. We firmly of the view that provision should be made for any judge to be appointed as an arbitrator, rather than limiting the power to the two kinds of judge presently included. It was not, however, possible to obtain agreement to this proposal from the concerned departments in time to put it in the Bill.

342. We appreciate that in view of the court commitments of judges generally, it is not possible to allow judges to act as arbitrators whenever they are asked and are willing to do so. Hence the present requirement now set out in subsections (2) and (3). We would suggest that the same or a similar provision is used for all other judges.

343. We are told that the problem is particularly acute in the field of patents and the like, where the parties are anxious to arbitrate but where the only acceptable arbitrators are judges.

## Statutory Arbitrations

## Clauses 96 to 101

344. These provisions adapt Part 1 to statutory arbitrations. This exercise is not within our remit and we have played no part in it.

_____

## CHAPTER 4

## PART III OF THE BILL

## Clauses 102 to 107

345. The purpose of Part III is to re-enact the substance of the provisions relating to the recognition and enforcement of foreign arbitral awards contained in Part II of the Arbitration Act 1950 and the Arbitration Act 1975, which gave effect to the U.K.'s treaty obligations under the Geneva and New York Conventions respectively.

346. The Geneva Convention only remains in force as between state parties to that Convention which have *not* subsequently become parties to the New York Convention. So far as the U.K. is concerned, it is believed that only a few states (*e.g.* Malta) remain in that category. Accordingly, in the interest of brevity, Clause 102 states simply

that Part II of the Arbitration Act 1950 continues to apply to Geneva Convention awards which are not also New York Convention awards rather than restating or reframing the non-user friendly language of Part II of that Act.

347. The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted by the U.N. Conference on International Arbitration on 10 June 1958 is not only the cornerstone of international dispute resolution; it is an essential ingredient more generally of world trade. If it did not exist, or even if it were not to have been widely adopted by the world's trading nations, contracting parties from different legal cultures might be reduced to resolving their disputes in the courts of a country which would be alien to either one or both of them (because of doubts as to the enforceability across national boundaries of arbitration awards made in a neutral country). Clauses 102 to 107 of the Bill restate the current implementing legislation (contained in the 1975 Act) in concise and simple language.

348. As we have indicated earlier in Chapter 2, we take the view that the definition of "in writing" is consonant with Article II.2 of the New York Convention. For clarity therefore, we consider that the Bill can be improved by including an express cross-reference to this definition in Clause 103(2). This would have the added advantage of ensuring that the enforcement of foreign awards under Clause 66 and enforcement under the New York Convention are in this respect in line with each other.

349. One intriguing question was highlighted by the decision of the House of Lords in *Hiscox v. Outhwaite* [1992] 1 A.C. 562. This concerns the case of an arbitration with its "seat" in country A and an award that states expressly that it was "made" in country B. Country A might be a New York Convention country, and B not—or vice versa. (Article I.1 of the Convention provides that it shall apply to "... *awards made in the territory of a State other than the State in which recognition and enforcement of such awards are sought* ..." (emphasis added)).

350. Distinguished authors (writing before the decision in *Hiscox*) are split on the question. Dr A.J. van den Berg in the first edition of his authoritative book on the Convention (at pp. 294/295) states: "*The award must be deemed to be made in the country which is indicated in the award as [the] place where the award was made.*" (emphasis added).

351. But the late Dr F.A. Mann Q.C. (in [1985] *Arb. Int.* 107/108) wrote, after recalling that little learning then existed on the question of where an award is made,

> "It is submitted that an award is 'made' at the place at which the arbitration is held, i.e. the arbitral seat ... admittedly the view suggested here attributes a somewhat strained meaning to the word 'made'. But for the reasons given the natural meaning of the word leads to such strange consequences that a less literal interpretation would seem to be justified".

352. In *Hiscox* the question arose as to whether, where the "seat" of the arbitration was in England and for all practical purposes it was a domestic "English" arbitration, the award became a "foreign" award for the purposes of the Convention merely because it stated expressly on its face that it was signed in Paris? According to the House of Lords, applying a literal interpretation of Article I.1 of the Convention, the answer was "Yes".

353. So far as arbitrations held in England, Wales or Northern Ireland are concerned, the "strange consequences" of this result have been removed by Clause 53 of the Bill (see above).

354. The DAC is of the view that this question should be resolved by incorporating into Part III of the proposed new legislation an equivalent provision to that contained in Clause 53—to the effect that an award shall be treated as made at the seat of the arbitration, regardless of where it was signed, despatched or delivered to any of the parties. It seems to us that this is consonant with the U.K.'s treaty obligations under the New York Convention.

---

CHAPTER 5

PART IV OF THE BILL

355.We have drawn attention to Clause 111 under Clause 84. The other Clauses in this Part we trust are self-evident, and were not within the remit of the DAC, although we do welcome the inclusion of Northern Ireland.

_____

CHAPTER 6

SUPPLEMENTARY RECOMMENDATIONS

356.The foregoing discussion is based on the text of the Bill as it was introduced in December 1995. Since that date we have had the advantage of considering the speeches made in the House of Lords on the Second Reading and some comments and suggestions from others, as well as looking once again at the text of the Bill in the course of preparing this Report. In consequence, we make the following recommendations.

## Clause 2    Scope of Application

357.A number of foreign readers have expressed the view that Clause 2(2)(a) does not sufficiently make clear that the applicable law referred to is the law applicable to the arbitration agreement, rather than the law applicable to the substantive agreement (which would have far reaching and wholly unintended consequences). For the sake of clarity, we would suggest an amendment along the following lines:

"... where the applicable law to that agreement is the law of England and Wales or Northern Ireland; and ..."

## Clause 7    Separability of Arbitration Agreement

358.In view of the definition of "agreement" in Clause 5, we suggest that the words "(whether or not in writing)" be inserted after the words "another agreement" in Clause 7, since otherwise it could be said that this Clause is only effective in relation to such other agreements as are in writing. This is not the intention.

## Clause 14(5)    Commencement of Arbitral Proceedings

359.It has been suggested that the words "gives notice" should be replaced by "serves", in conformity with Clauses 14(3) and 14(4). This is a matter for Parliamentary Counsel to consider.

## Clause 16(6)(b) and Clause 21(4)

360.The word "any" follows a negative and so could be read as meaning "all". This is not the intention. We therefore suggest that the words "one or more matters" follow the word "any" in these provisions.

## Clause 24(4)    Power of Court to Remove Arbitrator

361.We have explained in Chapter 1 above the reasoning behind Clause 29(3). Upon further reflection, it appears to us that Clause 24(4) needs to be altered for the same reason. As currently drafted, if an arbitrator resigns and is sued for his fees, he is not protected from such a breach of contract action by the immunity in Clause 29. Rather,

he can apply to the court for protection under Clause 25(3), and the court may see fit to grant this, if appropriate. However, if an arbitrator does not resign, but is removed by the court under Clause 24, it would appear that he will have the benefit of the immunity in Clause 29, come what may. In such circumstances, the parties could not sue him for breach of contract, unless they could demonstrate "bad faith". This is anomalous. The DAC therefore recommends that Clause 24(4) be amended to provide that as well as making such order as it thinks fit with respect to an arbitrator's entitlement to fees, where the court removes an arbitrator, it also be given a discretion to make such order as it thinks fit with respect to an arbitrator's immunity under Clause 29. Such wide words would enable the court, for example, to remove the immunity but impose a ceiling on the amount of any liability.

362. Arbitrators may also be removed by agreement of the parties. However, the DAC does not consider that a similar provision be made with respect to this, given that it would be contrary to the whole basis of Clause 29 for parties to be able to agree on the removal of an arbitrator's immunity.

## Clause 25(2)   Resignation of Arbitrator

363. There is a rogue "in writing" in this subsection, which should be deleted by virtue of Clause 5(1).

## Clause 38(3)   Security for Costs

364. In the draft Clauses published in July 1995, the power to order security for costs was expressed in very general terms. This elicited a number of responses which expressed concern that there were no principles or guidelines for the exercise of this power. It is certainly the case that the power to order security for costs, unless exercised with great care, can all too easily work injustice rather than justice.

365. The rules and principles applied by the courts with respect to security for costs have been carefully worked out over many years, and are contained in a large amount of case law that has developed alongside Order 23 of the Rules of the Supreme Court. Given the concerns referred to above, the DAC considered whether to set out these rules and principles in the Bill. In the end we decided that this would be simply impracticable: a codification of all the relevant case law would be extremely difficult, would result in very lengthy and complicated provisions, and may well have an unintended impact on how this area is approached by the courts.

366. Clause 38(3) of the current draft of the Bill reflects what we initially concluded was the only solution to this difficulty: it provides that arbitrators are to have power to order a party to provide security for costs "wherever the court would have power . . ." and that this power is to be exercised: "on the same principles as the court". In the light of many comments received since the Bill was introduced (including a significant number of criticisms of this subsection from foreign arbitration specialists and institutions), we have had to reconsider this area, and, after much careful thought, we have concluded that Clause 38(3) requires amendment for the following reasons:

i.   As drafted, this subsection is very far from being "user-friendly". Without referring to the Rules of the Supreme Court, and the case law referred to in the relevant part of the White Book, it would be impossible for any domestic or foreign user to determine what the nature and scope of the power conferred here is. Lay arbitrators may have difficulty locating or even, perhaps, understanding the relevant law (any error of law, of course, being a potential ground for appeal). In the case of a foreign arbitration that has its seat in this country for the sole reason that this is a neutral forum, it would be extremely undesirable for parties to have to instruct English lawyers in order to make sense of this provision. This alone could constitute a powerful disincentive to selecting this country as an arbitral seat. Indeed, throughout the Bill, we have been very careful to avoid any such express cross-references to other legal sources.

ii.  One of the grounds on which an order for security for costs may be made in court is that the plaintiff is ordinarily resident out of the jurisdiction: see Order 23, Rule 1(1)(a) of the Rules of the Supreme Court. On further consideration of the matter, we have concluded that it would be very damaging to this country's position as the leading centre for international arbitrations to make this ground available to arbitral tribunals. It would reasonably appear to those abroad who are minded to arbitrate their claims here that foreigners were being singled out for special and undeserved treatment. (Of course if the parties agree to invest their tribunal with power to order security for costs on this ground, they are free to do so).

iii. On reflection, the concerns expressed above as to the potential scope of the power conferred by Clause 38(3) and the possibilities of injustice may be overstated. The other provisions of the Bill confer very far-reaching powers on arbitrators, and it has been made clear throughout that this is tempered, for example, by the mandatory duty in Clause 33. The same would be true of the power to order security for costs: in exercising the power, the tribunal would have to comply with Clause 33, and any serious irregularity could form the basis of a challenge. In agreeing to arbitration, parties in effect agree that their disputes could be decided differently from

44

a court, although in accordance with principles of justice. The fact that arbitrators may decide an issue as to security for costs differently from a judge appears to be no more than an aspect of this. It is true that if this power is improperly exercised, a claim could, for example, be stifled without justification. It is equally true, however, that the Bill contains mechanisms for parties to challenge any such injustice or improper conduct, and sufficient warnings to arbitrators as to their mandatory duties.

367. We remain of the view that the power to order security for costs is an important one, and should be given to arbitrators, and also that some basic restrictions should be set out in this Clause, in the light of the points made above. To this end, we recommend that Clause 38(3) be deleted, and replaced with a new provision along the following lines:

"(3)  The tribunal may order a claimant to provide security for the costs of the arbitration.

Such power shall not be exercised on the grounds only that such party is—

(a)      an individual ordinarily resident in a state other than the United Kingdom,

(b)      a body corporate which was incorporated in or has its central management and control exercised in a state other than the United Kingdom."

368. Such a provision would allow arbitrators a flexibility in exercising this power, within the confines of their strict duty in Clause 33. The risk of an order on the sole ground that a party is from abroad, would be removed. Similarly, there would be no need for an arbitrator, whether domestic or foreign, to discern the English or Northern Irish law in this area, or, indeed, to instruct local lawyers in this respect. An arbitrator may well exercise this power differently from a court (as with many other powers conferred by the Bill), but any misuse could be corrected under the other provisions of the Bill.

369. It is of course the case that orders for security are not to be made automatically, but only when the justice of the case so requires. We appreciate that cases are likely to arise when deciding what is just may be very difficult. For example, a claimant may contend that he might be prevented from continuing if he has to put up security, whilst at the same time a respondent is contending that unless security is provided, he is likely to be ruined. However, to our minds, this is merely an example of the balancing of factors in order to achieve the most just result possible which is part of the essential function of arbitrators.

370. The power to award security for costs under the proposed provision could be exercised against counter-claimants as well as claimants. This we have covered in the definition Clause (see Clause 82(1)).

## Clause 66   Enforcement of Award

371. In the present Bill, we have provided that leave by a court to enforce an award may not be given if the award was so defective in form or substance that it is incapable of enforcement, if its enforcement would be contrary to public policy or if the tribunal lacked substantive jurisdiction.

372. These are what are described as "passive" defences to the enforcement of an award. The "positive" steps that may be taken are those we have set out in Clauses 67 to 69, together with the rights preserved in Clause 72 for someone who has taken no part in the arbitral proceedings.

373. In our view the way we have drafted Clause 66 sufficed to cover all the cases where enforcement should be refused. However, since the Bill was published it has been suggested to us that it would be advisable to spell out in more detail two particular cases, namely those where the arbitral tribunal has purported to decide matters which are simply not capable of resolution by arbitration, whatever the parties might have agreed (*e.g.* custody of a child) and those where the tribunal has made an award which (if enforced) would improperly affect the rights and obligations of those who were not parties to the arbitration agreement.

374. On the present wording, even if it could be said that either or both these cases fell outside the three categories where leave to enforce shall not be given, it does not follow that the Clause somehow sanctions enforcement in those cases. The reason for this is that the Clause does not require the court to order enforcement, but only gives it a discretion to do so. That discretion is only fettered in a negative way, *i.e.* by setting out certain cases where enforcement shall not be ordered. To our minds there is nothing to prevent a court from refusing to enforce an award in other appropriate cases. Unlike, for example, Clause 68, there is no closed list of cases where leave to enforce an award may be refused. However, on reflection we consider that it would be preferable to set out the two cases as further instances where the discretion of the court is negatively fettered, and we would suggest that a

further category is added to subsection (3) along the following lines:

"it purports to decide matters which are not capable of resolution by arbitration or grants relief which (if enforced as a judgment or order of the court) would improperly affect the rights of persons other than the parties to the arbitration agreement."

375.Such a provision would best appear before the catch all case of public policy. It will be noted that this wording takes advantage of the definition of parties to an arbitration agreement to be found in Clause 82(2). Furthermore, to put the matter beyond any doubt, we would suggest that it is made clear that subsection (3) is not a closed list, by inserting suitable words.

376.It is vital to include some such word as "improperly" since there is no doubt that there are many cases where third party rights and obligations are perfectly properly affected, such as guarantors or insurers who have agreed to pay the amount of an award to which they are not a party. Furthermore, it must always be borne in mind that the parties' rights and obligations may well be governed by a law other than our own, under which, for example, matters are arbitrable which would not be the case under our own law. In such cases it would not automatically follow that the court would refuse to enforce the award, unless of course public policy dictated that course.

377.Apart from the enforcement procedure set out in this clause, under our law it is possible to bring an action on an award, in much the same way as an action is brought on an agreement. This method is expressly saved in Clause 81(2)(b). There is also an oblique reference to this in Clause 66(5) in the reference to "rule of law". On reflection, it seems to us that it would make for greater clarity to add the words "or by an action on the award" at the end of this subsection.

378.There is one further point. It seems to us that there is much to be said for a suggestion that the court must be informed on an application for enforcement if the award is an agreed award (see Clause 51) if this is not apparent from the award itself, and that any enforcement order or judgment of the court should also state that it is made in respect of an agreed award, thus putting everyone concerned on notice of that fact and avoiding the risk that third parties might be misled into believing that the award was one made at arm's length. We suggest that these requirements be added to Clause 66.

## Clause 69    Appeal on Point of Law

379.It has been pointed out that Clause 69(8) sets out the two pre-conditions to an appeal to the Court of Appeal as alternatives, whereas they should be cumulative (as with the similar pre-conditions in section 1(7) of the 1979 Act). We recommend that the Clause be amended accordingly.

## Clause 70    Challenge or Appeal: Supplementary Provisions

380.We note that the power to order security or bring the money payable under the award into court only extends at present to applications under Clauses 67 or 68. This should be extended so that the court can impose these requirements as a condition of granting leave to appeal under Clause 69. This is a tool of great value, since it helps to avoid the risk that while the appeal is pending, the ability of the losing party to honour the award may (by design or otherwise) be diminished.

## Clause 74    Immunity of Arbitral Institutions, etc.

381.On reflection we consider that the wording of Clause 74(2) should be tightened so as to make clear that the institution or person concerned is not liable without more for anything done or omitted to be done by the arbitrator. Thus we suggest that the words "by reason only of" should be substituted for the word "for" in this subsection.

## Clause 79    Powers of Court to Extend Time Limits Relating to Arbitral Proceedings

382.It has been pointed out to us that Clause 79(1) as presently drafted could be said to be inapplicable to, for example, Clause 70(3) where the time stipulated is not one having effect in default of agreement between the parties. We agree with this comment and suggest that Clause 79(1) be amended along the following lines:

" . . . the court may by order extend any time limit agreed by them in relation to any matter relating to the arbitral proceedings or applicable by virtue of any provision of this Part".

## Clause 81   Saving for Certain Matters Governed by Common Law

383. We suggest that two additions should be made to the specific cases mentioned in subsection (2).

384. The first of these relates to confidentiality. For reasons we have explained, we have not included specific provisions dealing with this matter. However, it seems to us that it would be valuable to highlight the fact that our law does deal with it. Thus we suggest a further category which could perhaps be in the following words:

"confidentiality and privacy in relation to arbitrations".

385. The second addition we propose relates to arbitrability, which we have discussed in the context of Clause 66. Again there is a lot of important law on this topic. We suggest a further category which could perhaps be in the following words:

"whether a matter is capable of resolution by arbitration".

386. The title to this Clause is "Saving for certain matters governed by common law". We would prefer the expression "other rules of law" to the words "common law" as this would include legislation and be clearer to non-lawyers and those from abroad.

## Clause 82   Minor Definitions

387. The definition of "question of law" started life as part of the Clause dealing with appeals to the court; now Clause 69. The objective was to make clear that there was no question of an appeal in respect of a matter of foreign law. Our law treats questions of foreign law as questions of fact. Furthermore, we can see no good reason for allowing an appeal on foreign law, since *ex hypothesi* the court cannot give a definitive or authoritative ruling on such matters. The courts have refused to grant leave to appeal on questions of foreign law, but attempts are still made and it would be desirable to put the matter beyond doubt.

388. The definition was moved to this Clause. It had, of course, to accommodate the fact that the Bill is expressed to apply to Northern Ireland as well as England and Wales. However the present definition, while it does this, also seems to indicate that where the seat of the arbitration is in neither of these places, the meaning of "question of law" is not confined to questions of (respectively) English law or the law of Northern Ireland. We would suggest that the definition be amended, so that "question of law" means a question of law of England and Wales where the application for leave to appeal is made to a court in England and Wales, and a question of the law of Northern Ireland, where an application for leave to appeal is made to a Court in Northern Ireland.

## Clause 85   Domestic Arbitration Agreements

389. It has been pointed out to us that the way "domestic arbitration agreements" is defined (which is taken from the existing legislation) means that agreements made by sovereign states which incorporate an arbitration clause fall into this category. We are sure that this was not the intention, so that if the distinction between domestic and non-domestic arbitrations is to remain, the opportunity should be taken to correct this anomaly.

## Clause 95   Appointment of Judges as Arbitrators

390. For the reasons set out in our discussion of this Clause in Chapter 1, we recommend that this provision be extended to judges generally.

## Clauses 96–100   Statutory Arbitrations

391. Although the application of Part 1 to statutory arbitrations is not part of our remit, we note that during the Second Reading Lord Lester suggested that it might be a requirement of European law in cases of compulsory arbitration that the arbitrators should be independent as well as impartial. We can offer no view on this point, but if it is felt appropriate to include any such requirement in the context of statutory arbitrations, great care should be taken to make clear that this requirement has no application to private or other consensual arbitrations, so as to avoid any risk of this concept being imported into other cases. This, for the reasons already given, would in our view be most damaging. We understand that Lord Lester shares our view that a requirement of independence for private or other consensual arbitrations is neither necessary nor desirable.

**Clause 103    New York Convention Awards**

392.For the reasons set out in our discussion in Chapter 3, this Clause should be amended so as to cross-refer to
the definition of writing to be found in Part I of the Bill, and should also incorporate the recommendation that an
award should be treated as made at the seat of the arbitration, regardless of where it was signed, despatched or
delivered to any of the parties.

**Clause 107    Saving for Other Bases of Recognition or Enforcement**

393.It has been pointed out that, as drafted, this Clause may not save enforcement under Part II of the 1950 Act.
This is a matter for Parliamentary Counsel to consider.

————————————————

**CHAPTER 7**

**CONCLUSIONS**

394.The Arbitration Bill and this Report are the result of a long and wide-ranging process of consultation with
interested parties, probably the most comprehensive for any Bill of this kind. Our recommendations are based on
the many responses that we have received as well as our own researches and discussions. In a number of cases, of
course, we have had to make decisions on matters where more than one point of view has been expressed. What
we should emphasize, however, is that all were agreed that it is high time we had new legislation, to the extent that
many people have stated to us that for this reason they were not disposed to delay progress by stubbornly insisting
on their point of view on particular points; and have demonstrated that this is the case by being ready and willing
to reach compromise solutions. We are convinced (as all are) that further delay will do grave and probably
irretrievable damage to the cause of arbitration in this country, thus damaging our valuable international reputation
as well as the promotion here of this form of dispute resolution.

395.We have attempted to produce a draft which can be read, understood and applied by everyone, not just
lawyers learned in this branch of our law. Thus our aim has been to make the text "user-friendly" and the rules it
contains clear and readily comprehensible, so that arbitration is available to all who wish to use it. This has not
been an easy task, since in the nature of things this form of dispute resolution raises highly complex and
sophisticated matters. We have attempted it, however, in the hope that our efforts will not only encourage and
promote arbitration, but also help to achieve what we believe to be the true object of this form of dispute
resolution, namely (in the words of Clause 1 of the Bill itself) to obtain the fair resolution of disputes by an
impartial tribunal without unnecessary delay or expense.

————————————————