# EXHIBIT B



OPUS 2
INTERNATIONAL

BSG Resources Limited (In Administration) v (1) Vale S.A. (2) Filip De Ly (3) David A.R. Williams (3) Michael Hwang

Day 1

September 4, 2019

Opus 2 International - Official Court Reporters

Phone: 0203 008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

| | |
|---|---|
| 1 Wednesday, 4 September 2019 | 1 one finds at CPR 62.10 at 706. What that says is the |
| 2 (10.30 am) | 2 court may order an arbitration claim be heard either in |
| 3 Application by MR FOXTON | 3 public or in private. Rule 39.2 does not apply: |
| 4 MRS JUSTICE MOULDER: Yes, Mr Foxton. | 4 "Subject to any order made under paragraph 1, the |
| 5 MR FOXTON: My Lady, good morning. As you know I appear | 5 determination of a preliminary point of law [which does |
| 6 with Mr Willan for Vale. My learned friends, | 6 not apply here] or an appeal under section 69 will be |
| 7 Mr Gruder QC and Mr Quirk, appear for BSGR and Mr Hooker | 7 heard in public and all other arbitration claims will be |
| 8 of Boies Schiller appears for Sir David Williams and | 8 heard in private." |
| 9 Dr Michael Hwang, two of the arbitrators. | 9 So the starting point is that the section 68 which |
| 10 MRS JUSTICE MOULDER: Right. | 10 will come on in November will be heard in private, |
| 11 MR FOXTON: My Lady, there is a preliminary point of debate | 11 subject to the court's power under CPR 62.10(1). Again, |
| 12 between the parties as to whether this hearing should | 12 the starting point, and the presumption, is that the |
| 13 take place in public or in private. | 13 security for the claim application under section 70(70) |
| 14 MRS JUSTICE MOULDER: Yes. | 14 or the security for costs application again should be |
| 15 MR FOXTON: And we're currently in private pending | 15 heard in private. |
| 16 a determination of that question. | 16 The other side contend that the enforcement |
| 17 MRS JUSTICE MOULDER: Yes. | 17 proceedings -- enforcement part of this hearing, our |
| 18 MR FOXTON: My Lady, my clients' position is the hearing | 18 application to set aside or to stay the order of |
| 19 should be in public. The principal reason for that is | 19 Mr Justice Bryan presumptively should be heard in public |
| 20 the award and indeed BSGR grounds of challenge are all | 20 but in our respectful submission that is a misreading of |
| 21 already in the public domain, because, as a result of US | 21 the rules, because what one has to look at is Part 3, |
| 22 enforcement proceedings, the material can be accessed | 22 which one finds at page 711, which deals with |
| 23 from the US court e-filing system. For what it is | 23 enforcement. 62.17: |
| 24 worth, the award has also been published by | 24 "Section ... applies to all arbitration enforcement |
| 25 Global Arbitration Review on 25 April with a link to it | 25 proceedings other than a claim on the award. |
| 1 | 3 |

| | |
|---|---|
| 1 in an article by Sebastian Perry, headlined, "Award in | 1 "An application for permission under section 66 to |
| 2 Guinea bribery dispute made public". Therefore, as it | 2 enforce an award in the same manner as a judgment or |
| 3 were, the horse has left the stable in any event. | 3 an order may be made without notice in an arbitration |
| 4 In addition to that overwhelming practical argument, | 4 claim form." |
| 5 the court has a discretion. We accept that the | 5 That has already happened and the order has been |
| 6 challenge to the award would presumptively be in private | 6 granted. But 3 is important: |
| 7 but with the court having a discretion to hear it in | 7 "The parties upon whom the arbitration claim form is |
| 8 public. But we say the opposite is true of the | 8 served must acknowledge service and the enforcement |
| 9 enforcement action in which Mr Gruder's clients bring | 9 proceedings will continue as if they were an arbitration |
| 10 an application. So we have a position where the court | 10 claim under section 1 of this Part." |
| 11 as it were could start -- | 11 So our application to set aside or stay |
| 12 MRS JUSTICE MOULDER: I think Lord Mance described it as | 12 Mr Justice Bryan's order is continuing today as if it |
| 13 a starting point rather than a presumption in Bankers | 13 were an arbitration claim under section 1 of this Part. |
| 14 Trust v Moscow, so I think public is a starting point. | 14 If on that basis one then goes back to 62.10, and |
| 15 That includes arbitration, that is what he was dealing | 15 one goes to 62.10(3)(b): |
| 16 with. | 16 "All other arbitration claims will be heard in |
| 17 MR FOXTON: My Lady, one can see that in a dispute that | 17 private." |
| 18 remained entirely confidential, it might be a pretty | 18 So we say that the presumption is that all the |
| 19 significant starting point but we say in one where the | 19 applications today should be heard in private and we |
| 20 terms of the award are already in the public domain, | 20 would submit that is the right position. |
| 21 plainly it cannot be. So, my Lady, for those reasons we | 21 The fact that details have leaked out, whether by |
| 22 ask for an order it be in public. | 22 way of US court proceedings or by way of the |
| 23 MRS JUSTICE MOULDER: Yes. Thank you. | 23 Global Arbitration Review, should not mean that this |
| 24 Submissions by MR GRUDER | 24 court should subvert the confidentiality of the |
| 25 MR GRUDER: My Lady, it's necessary to go to the rules which | 25 arbitration award and the grounds of our application |
| 2 | 4 |

1    more than it has been subverted already.

2       There is a reporter waiting outside. He approached

3    us. And if my Lady says that this is in public, then

4    potentially everything we say today will be able to be

5    reported in the press, and in my respectful submission

6    that would be wrong and contrary to the position, both

7    under the rules and the authorities, that the

8    presumption is that arbitration hearings and

9    applications relating thereto should be in private.

10       In my respectful submission, supposing I'm wrong on

11    my construction of CPR 62, then in my submission the --

12    and my learned friend is right, then the enforcement

13    part of today's hearing would be potentially in public,

14    but that would, in my submission, subvert the other

15    parts of this hearing which unequivocally, and I don't

16    think it's denied, should be in private.

17       So in my respectful submission, the whole of today's

18    hearing should be in private.

19               Submissions by MR FOXTON

20  MR FOXTON: My Lady, very briefly, details have not leaked.

21    They have come into the public domain as a result of the

22    proper application of US court procedure where

23    proceedings have been commenced. So far as enforcement

24    is concerned, we do say that Mr Gruder has misunderstood

25    the effect of the section on enforcement that he was

5

1    quoting from page 711 of volume 2, which is dealing with

2    the time limits in case management steps.

3       On his argument it would appear to be that

4    an enforcement action will be public if no

5    acknowledgement of service is filed and then becomes one

6    that should be private as a matter of a starting point

7    if one is. That simply isn't what that rule is about.

8    But the overwhelming point, my lady, is that the matter

9    is in the public domain not as a result of any improper

10    behaviour or breach of confidence but as the result of

11    the application of US procedural law.

12               Submissions by MR HOOKER

13  MR HOOKER: My Lady, I find myself in the curious position

14    of endorsing many of Mr Gruder's submissions. In my

15    submission today's proceedings should be in private and

16    I only add that of course my clients, who are the

17    arbitrators are parties only to the action to set aside

18    the award, they're not parties to the action on

19    enforcement. But for the reasons that have been set out

20    in my submission the strong presumption in favour of the

21    set aside being in private should be maintained.

22  MRS JUSTICE MOULDER: Sorry, you just referred to

23    submissions. Have you put -- I'm afraid, if you've put

24    in a skeleton I haven't received one.

25  MR HOOKER: No, I haven't.

6

1  MRS JUSTICE MOULDER: I'm sorry, I just wanted to

2    double-check because it does happen that skeletons don't

3    make their way to me. All right. Thank you.

4               Judgment removed for approval

5  MR FOXTON: My Lady, I am obliged. I think the sign may

6    need to come off the door. I think the gentleman who

7    appeared was in fact a law reporter who may well come

8    back towards the day in any event but nonetheless it

9    should reflect the order that your Ladyship has just

10    made.

11  MRS JUSTICE MOULDER: Could you make the change, please?

12    Thank you. Yes.

13               Submissions by MR FOXTON

14  MR FOXTON: My Lady, there are three applications today,

15    there are my clients' applications for conditions on

16    BSGR's pursuit of its section 68 application. There's

17    BSGR's application to set aside Mr Justice Bryan's order

18    giving permission to enforce and then there is, if time

19    permits, BSGR's application for permission to amend its

20    section 68 application. I think Mr Hooker in particular

21    wants to be heard on that amendment application.

22       My Lady, what I was proposing and I discussed this

23    with Mr Gruder, is that I would open Vale's

24    applications, I would then let Mr Gruder open his own

25    applications while responding to my application and then

7

1    I would reply on mine, respond to his and he would get

2    a last word on his own applications at the end.

3  MRS JUSTICE MOULDER: All right.

4  MR FOXTON: Now, on that basis I was going to briefly take

5    the court the underlying arbitration and award, then

6    look at the principles relevant to the court's

7    discretion to impose conditions under section 77, and

8    then within that framework look at two points. Briefly,

9    the flimsy nature of BSGR's challenge and, second, why

10    we say that there is a real risk of prejudice to Vale in

11    relation to enforcement and recovery as a result of the

12    challenge that BSGR has brought to the award.

13       Then finally on security for costs the issue is

14    purely one of quantum. I'm going to be very brief on

15    that when we come to it.

16       Now, so far as the background is concerned, I think

17    the court will have seen from the skeletons that BSGR

18    had been granted certain concessions by the Government

19    of Guinea, and in 2010 my clients entered into a joint

20    venture agreement and shareholders' agreement with BSGR

21    to exploit those concessions. In April 2014 the

22    Government of Guinea revoked BSGR's concessions after

23    having determined that BSGR had obtained them by

24    bribery. Obviously that rendered the concessions

25    worthless and Vale commenced an LCIA arbitration against

8

1   BSGR in April 2014.

2       It is fair to say that the course of that

3   arbitration did not run smoothly. When the parties were

4   before Mr Justice Popplewell in 2017, I described BSGR's

5   strategy as being one of guerrilla arbitration tactics

6   and returning to the dispute two years on that

7   description remains entirely accurate. Now, the

8   procedural history is summarised in a section at the

9   beginning of the award in bundle 4, tab 16, beginning on

10  page 24.

11      My Lady, taking the matter I hope relatively

12  efficiently , one sees from paragraph 29 that in

13  October 2014 BSGR filed the first of what were three

14  applications in the event to seek to stay the first --

15  the LCIA arbitration . The first of those stay

16  applications seeking an order pending the outcome of

17  a separate arbitration , an ICSID arbitration , an

18  investment treaty arbitration between BSGR and the

19  Republic of Guinea. That application was rejected by

20  the tribunal essentially because it was too early, as

21  one can see from paragraph 30, to know how the ICSID

22  dispute would develop.

23      Notwithstanding that, the stay application was

24  renewed some five months later by BSGR on 20 May 2015.

25  One sees that from paragraph 36 at the bottom of page 25

9

1   and that application was refused because the tribunal

2   said there had been no material change of circumstances

3   since they had previously ruled on the same issue five

4   months before.

5       Now, the tribunal did order, effectively by consent,

6   subject to one exception -- and this is in

7   paragraph 37 -- that there would be record-sharing

8   between the two arbitrations so that documents and

9   productions in one, in the LCIA arbitration , would be

10  available for BSGR in the ICSID arbitration and

11  similarly material that BSGR got in the ICSID

12  arbitration would be made available in the LCIA

13  arbitration , subject to certain matters where BSGR said

14  that there was separate issues of confidentiality that

15  arose. But that was effectively ordered with the

16  consent of the parties .

17      Now, what then happens, if one goes on to

18  paragraph 66 on page 30, is that BSGR brought challenges

19  to remove all three arbitrators on five grounds. That

20  challenge was brought on 5 May 2016, less than three

21  months before the merits hearing was due to start at the

22  end of August 2016. And challenges were initially

23  brought to the LCIA court and if one jumps ahead, but

24  perhaps keeping a finger in page 30, to paragraph 82 on

25  page 33, one of those challenges succeeded. This was

10

1   a challenge to the appointment of

2   His Honour Judge Charles Brower as chairman based upon

3   remarks he had made about the arbitration at

4   a conference. None of the other challenges succeeded

5   and in particular none of the challenges to

6   Dr Michael Hwang and Sir David Williams succeeded.

7       So whilst BSGR make much of the fact that they can't

8   be said to be completely frivolous because one of their

9   challenges has been upheld, it is important to note the

10  wholesale rejection of the other grounds.

11      The removal of His Honour Judge Charles Brower

12  obviously led to the requirement that a new chairman of

13  the arbitration be appointed. BSGR raised complaints

14  about how the tribunal went about that, which at one

15  stage formed one of the grounds of the section 68 but as

16  that challenge is no longer pursued I don't say anything

17  more about it.

18      In the event the chairman was appointed by the LCIA

19  court and it was Professor Dr De Ly, and one can see

20  that, if necessary, from paragraph 96 on page 35.

21      Now, my Lady, what then happened at paragraph 100 on

22  the same page is BSGR then brought a second challenge to

23  Dr Hwang and to the other arbitrators and brought a yet

24  further stay application pending the outcome of that

25  challenge.

11

1       The LCIA court heard and rejected that challenge.

2   Their ruling is at paragraph 120 on page 39. Now,

3   I mentioned to my Lady a moment ago that the merits

4   hearing had been fixed for the end of August and

5   beginning of September 2016. In the event, what the

6   tribunal did was cancel the evidentiary hearing -- this

7   is paragraph 101 on page 36 -- but held what was to be

8   an educational hearing, the purpose of which would be to

9   bring the members of the tribunal up to speed with the

10  materials and the dispute and also to resolve various

11  outstanding procedural issues .

12      But BSGR wrote to the tribunal on 25 August saying

13  that they would not participate in the educatory hearing

14  and they would not provide written submissions,

15  including written submissions on whether the tribunal

16  should adopt decisions made by the previous constitution

17  of the tribunal at the stage when His Honour Judge

18  Charles Brower was the chair.

19      Now, the challenge that had been brought to

20  Sir David Williams and Dr Michael Hwang came before the

21  Commercial Court because it was renewed by BSGR, and it

22  was heard by Mr Justice Popplewell and was wholly

23  unsuccessful. And I do want briefly just to show your

24  Ladyship what Mr Justice Popplewell, and indeed

25  Lord Justice Christopher Clarke said about the challenge

12

1  in the context of reviewing it and for that one needs to
2  go to bundle 1, tab 7.
3      Now, the cost ruling by Popplewell J is at bundle 1,
4  tab 7, page 7, and he noted at paragraph 3 that the
5  challenges were totally without merit, that the decision
6  of the LCIA court should have put an end to the matter.
7  He noted at paragraph 6, for example, that there was
8  simply no evidence of substantial injustice. And
9  paragraph 7 is interesting because there is, I'm afraid,
10  an element of déjà vu for those of who participated in
11  that hearing when it comes to the present one, when
12  Mr Justice Popplewell noted:
13      "Serious allegations which had only been made after
14  careful consideration and should have been formulated
15  with precision were advanced, but the application was
16  conducted in an entirely inappropriate manner, with the
17  allegations shifting on a regular basis and there were
18  aspects of Mr Dale's witness statement [he was the
19  partner at Mishcon de Reya with the conduct of the case]
20  which mischaracterised the nature of some of the
21  underlying proceedings in a way which was seriously
22  misleading. For example, characterising the
23  record-sharing decision as an unprecedented decision
24  when it was, in its relevant parts, a consent order."
25      And at paragraph 9 he noted that:

13

1      "The court should mark its disapproval of the
2  conduct by ordering costs on an indemnity basis."
3      My Lady will know that those costs were never paid
4  because BSGR claim that they regarded themselves as
5  having been the victims of an injustice by the order
6  made against them and decided the appropriate response
7  to that was not to comply with it.
8      Permission to appeal were sought and refused by --
9  refused by Lord Justice Christopher Clarke, page 9 of
10  the same tab, who certified the application as totally
11  without merit, as one sees at the top. And
12  Lord Justice Christopher Clarke I think fully
13  understanding the game that was being played noted at
14  the bottom of page 10 that:
15      "The grant of permission might involve, as may be
16  intended, wholly undesirable disruption of the
17  arbitration process."
18      Now, my Lady, reverting back to the award, the
19  tribunal did confirm the decisions of the previous
20  tribunal, that was paragraph 113 on page 38. What then
21  happened was there was a dispute about when the
22  evidentiary hearing should take place. I'm going to
23  deal with that very briefly, because that is no longer
24  pursued as a live ground. BSGR said it should be fixed
25  for June 2017 because of Mr Wolfson, their desired

14

1  counsel's availability. The tribunal reserved dates, as
2  one sees from paragraph 115, in February and April 2017
3  for the hearing. That was once said to be evidence of
4  apparent bias, but that is no longer pursued.
5      It is worth noting in passing paragraph 118 and 119,
6  that BSGR also brought a challenge to the tribunal
7  hearing the ICSID dispute, a completely different
8  tribunal. That must be, I think, its third challenge to
9  tribunals in this matter but that challenge was also
10  rejected.
11      Then moving on to para 130 on page 40, it announced
12  that it would not be participating in the merits
13  hearing. So that hearing went ahead without BSGR being
14  present, albeit regular correspondence was put in by
15  BSGR to the tribunal in the course of the hearing.
16      If one goes to para 139, your Ladyship will see
17  various witnesses gave evidence and the first three of
18  those, Souaré, Condé and Nabé, are the three witnesses
19  who were later the subject of BSGR's attempt, after the
20  merits hearing had ended, to adduce evidence of the
21  transcripts of their evidence in the ICSID arbitration.
22      Now, moving forward to para 147, page 43, after the
23  tribunal had closed the record -- and my Lady will know
24  that that is a standard feature of international
25  arbitration in order to bring some finality and mark the

15

1  stage when one moves from the process of evidence to the
2  process of deliberation -- they made the standard order
3  that said no further submissions either without the
4  other side's consent or permission of the tribunal.
5      And at para 147 there were various applications.
6  Vale applied to put in exhibits relating to the recent
7  criminal conviction of a former Minister of Mines,
8  Mr Thiam. That was consented to by BSGR, as one sees
9  from para 149. BSGR agreed to Vale's request to amend
10  the submission on costs and to submit three exhibits
11  from the Thiam trial. BSGR also requested to put in
12  material relating to Mr Thiam but in addition
13  transcripts from the ICSID hearing and a forensic expert
14  report which had yet to be produced in the ICSID hearing
15  but which it intended to produce in due course.
16      Now, Vale did not object to the exhibits from
17  Mr Thiam's trial going in. So both sides, by consent
18  and with the consent of the other, put in material
19  relating to Mr Thiam, but Vale did object to the attempt
20  to put in evidence of transcripts from the ICSID
21  arbitration and indeed later to an attempt to put in the
22  closing brief filed by BSGR in the ICSID arbitration.
23      What the tribunal did, at para 152, is say that they
24  would consider that application, they stayed their
25  consideration of it pending their deliberations and

16

1    preparation of the award. Somewhat similar to the
2    process one sometimes sees where applications for fresh
3    evidence in the Court of Appeal are not actually ruled
4    upon, save as part of the final judgment, allowing
5    a tribunal to consider all of the evidence, including
6    the attempt to introduce the fresh evidence, together
7    and form a view as to its significance and what effect
8    it might have.
9        Now, Mr Gruder in his skeleton tries to say there is
10   a contrast between the tribunal allowing Vale's
11   application to adduce evidence from Mr Thiam's trial and
12   its ultimate refusal to allow BSGR to adduce transcripts
13   of the ICSID evidence. But, with respect to my learned
14   friend, that is a false point in many respects. First,
15   because BSGR consented to Vale's application the
16   tribunal did not need to rule on it at all because the
17   terms of the order closing the proceedings, as one sees
18   from para 166, on page 47, allowed either party to put
19   in further material with the consent of the other party.
20       So that, I'm afraid, is a non-point.
21       In any event, each party was allowed, with the
22   consent of the other, to put in Thiam-related material.
23       Third, because there is just a fundamental
24   difference between putting in material from a criminal
25   trial in which neither of the parties were involved,

17

1    an attempt by one party to put in transcripts of
2    cross-examination from a different arbitration to which
3    Vale were not a party before a different tribunal when
4    it had had the chance to cross-examine three of those
5    witnesses in the LCIA arbitration and had refused to
6    avail itself of that opportunity.
7        Now, in the event, the tribunal decided not to allow
8    that application to admit the additional material.
9        They were placed, by BSGR's guerrilla tactics, I'm
10   afraid in a very difficult position, but they dealt with
11   the matter professionally and fairly throughout. And
12   one gets a sense of the position they found themselves
13   in from concluding comments at paras 162 and 163 on
14   page 46, which I would invite your Ladyship to cast
15   an eye through. (Pause).
16   MRS JUSTICE MOULDER: Yes.
17   MR FOXTON: My Lady may feel that is a very measured and
18   professional response to what had been an undoubtedly
19   ongoing attempt to harass the tribunal and make its life
20   as difficult as possible.
21       Now, the tribunal's conclusions for not admitting
22   the material are set out at paras 167 to 169, and once
23   again I would invite my Lady to read through those
24   paragraphs. They begin on page 47. (Pause).
25   MRS JUSTICE MOULDER: Yes, I read it yesterday but I've

18

1    reread this morning.
2    MR FOXTON: My Lady, I'm grateful. Now, we make two points
3    in relation to that. First of all, that is, we say, on
4    its face a very clear, fair and wholly rational exercise
5    of an undoubted procedural discretion, and with respect,
6    we find it almost impossible to envisage any court or
7    tribunal having reached the contrary conclusion.
8        But, second, at paragraph 169 the tribunal are
9    absolutely clear that this material would not have
10   affected the overall outcome of the arbitration, because
11   it found multiple misrepresentations by BSGR other than
12   those that depended upon proof of actual corruption.
13       So even absent a finding of corruption, the tribunal
14   said they would have reached the same conclusion that
15   the contract could be set aside and rescinded for
16   fraudulent misrepresentation by reason of other
17   misrepresentations made fraudulently by BSGR that did
18   not depend upon proof of corruption by BSGR.
19       Now, Mr Gruder and Mr Quirk understandably seek to
20   say whether there had been actual corruption, in
21   particular in relation to Mamadie Touré, was a critical
22   and fundamental issue in the arbitration and therefore
23   if this material is relevant to that it opens the whole
24   thing up. But with respect to them, it is simply
25   impossible for them to go behind the very clear

19

1    statement of the tribunal to the contrary, and I'm not
2    going to track through at any length, but if one goes,
3    for example, to para 676, on page 186, my Lady will see
4    that there were ten findings of fraudulent
5    misrepresentations by BSGR, only the tenth of which is
6    concerned with whether BSGR had actually engaged in
7    bribery or corruption in relation to benefits granted to
8    Madame Touré.
9        So absolutely clear that this material would not
10   have changed the outcome of the arbitration and the
11   tribunal is not only better placed to make that decision
12   than anyone else, but that is the tribunal's role to
13   decide. It is for the tribunal to review the material
14   in the context of the rest of the evidence and reach
15   a view on the appropriateness of this material.
16       Now, my Lady with that run-up I then turn to the
17   principles that govern the exercise of the court's power
18   to impose conditions under section 70(7) and I don't
19   think those are substantially in dispute, not least
20   because I think Mr Quirk and I had an outing relatively
21   recently before Mr Justice Picken in a case called
22   Progas on very similar points and I think we're both
23   content to take the statement of the applicable
24   principles from there.
25       It is common ground, I think, that in contrast to

20

1    a party who attempts to impose condition on a challenge
2    on jurisdictional grounds under section 67, for
3    challenges under section 68 the party seeking the
4    imposition of a condition does not need to show the
5    challenge is flimsy, but we do say that here it is
6    flimsy and that is a matter that is relevant to and
7    informs the court's discretion.
8        Second, we accept on the basis of the current
9    authorities that the general principle is the court will
10   only order a condition of payment in of part of the
11   award when there is a risk established of prejudice to
12   the ability to enforce or recover under the award as
13   a result of the section 68 challenge.
14   MRS JUSTICE MOULDER: Sorry, I know there's a transcript
15   being taken but can you just run that by me again.
16       I note you say it was common ground, I have to say
17   there were parts of the skeletons where I wasn't clear
18   that there was common ground between you, so perhaps you
19   had better just tell me again what you say the general
20   principle is.
21   MR FOXTON: My Lady, before your Ladyship, because I think
22   there is an issue as to -- all the cases are first
23   instance cases I think on this point. Before your
24   Ladyship we accept that the general principle is that
25   a condition of payment of part of the award into court

21

1    will only be made if it can be shown that the bringing
2    of the challenge creates a risk of prejudice in
3    enforcing or recovering under the award. It is not
4    meant to be a mechanism for making enforcement easier
5    than it would have been if there had been no section 68
6    challenge.
7    MRS JUSTICE MOULDER: Right. So that's not quite the same,
8    is it, as perhaps how I read the authority?  So your --
9    I mean, Mr Justice Picken -- it might be worth looking
10   at Mr Justice Picken in Progas because he cites
11   Sir Jeremy Cooke in Erdenet, and I think it is referred
12   to in one of the skeletons.
13   MR FOXTON: My Lady, I was going to go to Progas next.
14   MRS JUSTICE MOULDER: All right, that's fine.  But as I say
15   it seems to me it is very important that we understand
16   what risk or prejudice we're talking about. I mean,
17   you've just said it creates a risk of prejudice, whereas
18   Sir Jeremy Cooke, the quotation is:
19       "If the existence of the challenge prejudices the
20   ability to enforce or diminishes ability to honour the
21   award."
22       Now, we may be dancing on the head of a pin because
23   I don't know where I'm going to come out, but it does
24   seem to me there's a difference between a risk of
25   prejudice and actual prejudice.

22

1    MR FOXTON: Save to this, that he says a risk of dissipation
2    is prejudice.
3    MRS JUSTICE MOULDER: Well, yes. As I say, it may come down
4    to the same thing but I think it is quite important that
5    I know what test you think I'm applying.
6    MR FOXTON: Certainly my Lady. Progas is at tab 40 of the
7    authorities bundle and I think, as my Lady has probably
8    seen, Mr Justice Picken quotes fairly extensively from
9    Mr Justice Flaux and indeed from Sir Jeremy Cooke, so
10   I am going to use Progas as a sort of portmanteau way
11   of picking up the position as it appears from more than
12   one authority.
13   MRS JUSTICE MOULDER: Is there some reason -- I seem to have
14   two versions of almost every case, is there a reason why
15   Progas appears twice at 40 and 41?
16   MR FOXTON: There isn't a good reason, my Lady. I think
17   what has happened is that the parties had used different
18   forms of case citation in their respective skeletons
19   when citing the same authority, and I'm afraid those who
20   prepared the bundle -- and in a sense this lies at my
21   door of those here today -- thought they were separate
22   cases when in fact they were the same case.
23   MRS JUSTICE MOULDER: All right. So I'm not looking for any
24   nuances in the headnotes?
25   MR FOXTON: No.

23

1        That does at least have the benefit that the
2    authorities bundle may be slightly less foreboding than
3    it first appeared.
4        So I was going to go to the Lloyd's report if my
5    learned friends are comfortable with that, which is at
6    tab 40.
7    MRS JUSTICE MOULDER: Right.
8    MR FOXTON: Now, in his summary of the authorities,
9    Mr Justice Picken first of all went to Mr Justice Flaux
10   in A v B, and he sets out fairly extensive quotations
11   from that judgment at para 52 of the judgment in Progas.
12   MRS JUSTICE MOULDER: Yes.
13   MR FOXTON: I don't know whether your Ladyship has had
14   a chance to read through 47 to 50 internally, as it
15   were, within para 52, the three quotations from A v B,
16   for me just to pick up various points once you've had
17   a chance to look at that. (Pause).
18   MRS JUSTICE MOULDER: Yes.
19   MR FOXTON: In para 47 we pick up the emphasis on risk of
20   dissipation. The quote from Lord Saville in the DAC
21   report, the risk of the ability of the losing party to
22   honour -- the risk that the ability of the losing party
23   to honour the award made by design or otherwise be
24   diminished, and then risk of dissipation in 50 as well.
25   There Mr Justice Flaux also noted:

24

| | |
|---|---|
| 1    "... not advisable to lay down hard and fast rules ." | 1    enforcement. |
| 2    But the general principle , and we don't object to | 2    MR FOXTON: My Lady, certainly it must be, my Lady, the |
| 3    this : | 3    existence of the 67 and 68 that creates the risk that |
| 4    "The court should not order security unless the | 4    would not exist absent those 67s and 68s. My, I hope |
| 5    applicant can demonstrate the challenge will prejudice | 5    care in using the terminology is simply to draw that |
| 6    its ability to enforce the award." | 6    distinction between when a court identifies a risk of |
| 7    Now, my Lady, the reason that I talk about the loss | 7    something happening as against when the court makes |
| 8    of opportunity or the existence of a risk might itself | 8    findings on the balance of probability that it has |
| 9    be treated as a form of prejudice and in relation to | 9    happened or will happen. I don't at all cavil with the |
| 10    risk of dissipation, that's plainly how the court treats | 10    need for the link between the risk and the challenges, |
| 11    it. It's not saying that it's not enough to show a risk | 11    but it is the risk that is the thing, as it were. |
| 12    of dissipation , you must show actual dissipation will on | 12    MRS JUSTICE MOULDER: Yes. |
| 13    the balance of probability or inevitably occur. | 13    MR FOXTON: My Lady, there's then also quotations from |
| 14    We say that similarly if there are other events that | 14    Sir Jeremy Cooke in Erdenet and once again the judge |
| 15    may diminish, in Lord Saville 's words, enforcement of | 15    quotes, I think at para 54, and then there is a summary |
| 16    the award, once again we're concerned with establishing | 16    of the facts in Erdenet at paragraph 58 and |
| 17    a risk of such prejudice, not least because the court is | 17    paragraph 59. We are more than content with that |
| 18    looking at a position prospectively where the usual | 18    formulation. We say once again the focus is on risk of |
| 19    approach, be it security for costs or freezing orders or | 19    dissipation , risk of diminishing the ability to pay |
| 20    anything else , is assessment of risk rather than | 20    resulting from the existence of the section -- in our |
| 21    retrospectively , where the court is concerned with | 21    case section 68 -- challenge. |
| 22    findings on the balance of probabilities of actual | 22    It's quite interesting , looking at the facts of |
| 23    facts . | 23    Erdenet as summarised in paragraph 58, indeed, as to why |
| 24    So it is certainly the case that I have applied the | 24    Sir Jeremy felt that the order was appropriate: |
| 25    word "risk" to prejudice. That becomes a debate without | 25    "The lack of any evidence of the claimant's |
| 25 | 27 |

| | |
|---|---|
| 1    a difference if the creation of a risk of diminishing or | 1    financial position or evidence to show security would |
| 2    dissipating is treated as itself prejudice, but I do | 2    stifle the lack of a realistic prospect of enforcement |
| 3    think it is important to note that the court is not | 3    until the challenges have been resolved ... no assets in |
| 4    requiring proof on the balance of probability that | 4    the UK ... accounting irregularities characterised as |
| 5    something will happen which would not otherwise happen. | 5    financial delinquency -..." |
| 6    The court is concerned with the existence of | 6    And coming on to para 61, quoted by |
| 7    a sufficient risk of dissipation of a kind that would | 7    Mr Justice Picken at 59, the fact that a 49% in |
| 8    justify a court acting prospectively in, for example, | 8    a shareholding in a company had been transferred, and |
| 9    a freezing order context. | 9    looking at the last -- |
| 10    So, my Lady, that's what we say about the | 10    MRS JUSTICE MOULDER: Yes, I think you're going to get |
| 11    terminological debate. | 11    limited assistance from the facts because I think if we |
| 12    MRS JUSTICE MOULDER: Yes, although I think one has to go on | 12    go into the facts of Erdenet the timing of what was at |
| 13    and read what is then said in 53, where | 13    issue there is very different from the timing here. |
| 14    Mr Justice Picken quotes Mr Justice Teare in X v Y, | 14    So -- |
| 15    because I think there are two points there. I mean, | 15    MR FOXTON: No, well -- |
| 16    firstly Mr Justice Teare makes the point that: | 16    MRS JUSTICE MOULDER: -- I'm not sure it is helpful to pick |
| 17    "Section 70 should not be used as a means of | 17    out those factors unless you want to take me through the |
| 18    assisting a party to enforce an award." | 18    facts of Erdenet because my recollection, reading it |
| 19    Then he goes on and says: | 19    yesterday, was that the timing, as I say, is rather |
| 20    "An order can only be justified if the existence of | 20    different . |
| 21    the challenges in some way prejudices the ability to | 21    MR FOXTON: There is different timing. I took your Ladyship |
| 22    enforce the award or diminishes the ability to honour | 22    to them in part because I wouldn't want to it be said |
| 23    the award." | 23    that I had glossed over those timing differences in the |
| 24    Now, I think you're saying the same thing because | 24    course of taking your Ladyship to the case. But your |
| 25    I think you're saying other events which may diminish | 25    Ladyship is plainly fully alive to those differences and |
| 26 | 28 |

1  therefore I can rest assured on that aspect.

2      Now, my Lady, what those cases don't say anything

3  specific about is what significance one attaches, in

4  this context, to a section 68 challenge that is flimsy

5  in its nature. We do say that that is a matter that is

6  relevant. It's relevant because section 70(7)

7  ultimately remains a discretionary provision, but also

8  because if a party that seeks to bring and pursue

9  an obviously weak and flimsy challenge with a low

10  prospect of success inevitably raises the issue: well,

11  what is your purpose in doing that? Now, I don't say

12  that that on its own is sufficient to raise an inference

13  that the purpose of bringing the challenge is to buy

14  time to make enforcement more difficult, but it is

15  certainly a matter which in conjunction with other

16  material we say can support that conclusion.

17      My Lady, thirdly, because it can be seen here as

18  part of a persistent course of conduct going right back

19  to the start of the arbitration in which it is clear

20  BSGR is doing everything it can to prevent Vale

21  obtaining relief for the wrong it has suffered.

22  MRS JUSTICE MOULDER: Well, we're obviously going to come on

23  to that but no doubt it's going to be said that life is

24  a very different now because the company is in

25  administration.

29

1  MR FOXTON: That is and will be said and, my Lady, alas the

2  reality on the ground is not anything like as different

3  as the formality of putting the company into

4  administration might suggest.

5      So, my Lady, I was then going to turn -- I deal very

6  briefly with this with the merits of the challenge.

7  We've got those in bundle 3 at tab 11, I think beginning

8  at page 6. My Lady, we have the fact that of the four

9  matters in that paragraph 7 initially relied upon --

10  MRS JUSTICE MOULDER: Sorry, I missed the cross reference.

11  I was just thinking about a point and got distracted.

12  MR FOXTON: Yes, it is volume 3 of the bundles, tab 11,

13  page 6. (Pause).

14      Three of those four challenges have gone, so we only

15  have number 1 left, the refusal to admit the hearing

16  transcript and post-hearing brief from the ICSID case.

17  I've in a sense taken your Ladyship to the material, we

18  do suggest that the attempt to suggest that that

19  represents apparent bias is an absolutely hopeless

20  submission. It's overwhelmingly likely that any court

21  in the same position would have reached the same

22  outcome, and in any event the test is not would the

23  court do something differently but have the arbitrators

24  acted in a sense in a way so far outside what might have

25  been expected that the very high threshold for court

30

1  intervention is triggered.

2      So we do say that that is hopeless.

3      There is also then --

4  MRS JUSTICE MOULDER: I'm sorry, what's bothering me is if

5  you have to show that there is a risk of dissipation or

6  diminution, how does the merits of the case affect that?

7  I mean, if I -- I accept I'm not applying balance of

8  probabilities , but I'm trying to work out whether or not

9  there's a risk of dissipation or diminution. How is

10  that affected by the merits of the challenge? I don't

11  think I follow that.

12  MR FOXTON: Well, my Lady, that was the point, I --

13  MRS JUSTICE MOULDER: I know you say well, there's

14  a discretion so you just throw it into the mix, but

15  I don't understand where it could affect where I am

16  setting the bar for risk.

17  MR FOXTON: The submission went a little further than that,

18  my Lady, because we make two points --

19  MRS JUSTICE MOULDER: All right, I obviously haven't grasped

20  it then.

21  MR FOXTON: The first is that a party who brings

22  an obviously hopeless application inevitably raises the

23  issue: what is the purpose of this if not to try and, as

24  it were, kick the can down the road in order to allow

25  an opportunity to make enforcement more difficult?

31

1      Now, I don't say that on its own that factor could

2  be decisive but I do say that it is a factor that can be

3  weighed in the balance with other factors when deciding

4  whether the risk of the adverse consequence flowing from

5  the section 68 application has been made out.

6      My Lady, the second ground is it evidences, we say,

7  a continued course of conduct, and this is where your

8  Ladyship came back to me and said well, it has all

9  changed with the administrators, and I will come back to

10  that. But a party who is absolutely determined to do

11  everything it can to frustrate Vale's recovery or

12  vindication of the loss it suffered as a result of the

13  fraudulent misrepresentation, and that is a mindset or

14  an attitude that does raise a greater risk of

15  dissipation and prejudice during the period in which the

16  section 68 application is live .

17      Now, my Lady, the only other matter relied upon is

18  a suggestion that the tribunal failed to deal with

19  an argument that was raised. I'm going to look over and

20  ask Mr Gruder whether this really is live as a point.

21  MR GRUDER: Do you mean the frustration argument? No.

22  MR FOXTON: So the frustration point is not live so in fact

23  now we're then down from five original complaints to

24  one, and my Lady will see why we find echoes of

25  Mr Justice Popplewell's comments back in 2017 coming

32

1   back.

2       Now, my Lady, given that, I then want to turn to why

3   we say that the threshold for identifying a risk of

4   dissipation or diminishing of the ability of BSGR to pay

5   or of Vale to recover as a result of the existence of

6   the section 68 challenge is made out here.

7       Now, my Lady, if this were an application for

8   a freezing order and that analogy is drawn as we've seen

9   in some of the cases, drawn by Mr Justice Picken in

10  Progas, for example, I start from a case in which

11  a tribunal of highly experienced arbitrators in

12  an extremely thorough award has found that BSGR made

13  repeated dishonest representations and that BSGR moved

14  companies around between different ownership chains to

15  assist in carrying out its deceptions. And also BSGR

16  went to great lengths to conceal matters from Vale.

17      So if one considers the freezing order application

18  coming to the court, we would be starting in that

19  context from an extremely strong base of a party

20  persistently found to have engaged in dishonesty and

21  manipulation of the ownership chains of assets to

22  perpetrate that dishonesty.

23      Second, BSGR has been found guilty of serious

24  corruption by the Government of Guinea and similar

25  findings by the tribunal, and BSGR's principal,

33

1   Mr Steinmetz, has been indicted in Switzerland on

2   charges of corruption and forgery.

3       In considering the suggestion it's all the

4   administrators now and not BSGR, my Lady should know

5   that BSGR's solicitors have refused to confirm whether

6   they are still in contact with Mr Steinmetz.

7       My Lady, third, the tribunal found that $500 million

8   had been paid to BSGR in 2010 as a result of fraud and

9   it rescinded the contract under which that $500 million

10  was paid. Now, the result of that is it is open to Vale

11  to seek to trace those proceeds into the hands of those

12  who receive them and, of course, if money was paid out

13  of BSGR at a stage when it had contingent exposures as

14  a result of its dishonesty, BSGR itself would have

15  remedies for the benefits of its creditors against those

16  to whom the money has been paid.

17      Now, my Lady, if one asks whether the existence of

18  the challenge application has made the vindication of

19  those rights more difficult, we would say the answer is

20  clearly yes. First of all, BSGR is using the challenge

21  application as a basis for resisting the enforcement of

22  the award in the US. It has even gone as far as to

23  argue in the US that by reason of bringing the challenge

24  the award has been suspended under the laws of the

25  United Kingdom.

34

1       Now, that I'm afraid is simply a completely false

2   statement of English law and one which Mr Gruder and

3   Mr Quirk would never have associated themselves with.

4   But the result is anyway that their application to

5   resist enforcement has led to the -- has gone off, as it

6   were, to be determined and is pending determination now,

7   so it has been successful in buying time.

8       Secondly, ~~the existence of the challenge application~~

9   ~~renders it impractical for Vale to wind up BSGR and~~

10  ~~pursue the remedies that would be available to BSGR~~

11  ~~itself against directors, shareholders and others who~~

12  ~~had received monies out of BSGR, because inevitably BSGR~~

13  ~~would contend that so long as there's a prospect of the~~

14  ~~award being set aside, no winding-up order should be~~

15  ~~made.~~

16      Now, my Lady, in addition we do say there is

17  evidence of BSGR dissipating assets. The 500 million

18  paid in 2010 was immediately moved out of BSGR to

19  a Liechtenstein family trust, who distributed it to --

20  at least to the extent we have visibility -- related

21  entities and companies.

22      Now, Mr Gruder says that happened before any

23  allegations of bribery were made but by definition it

24  happened at a stage when BSGR knew of its own conduct in

25  bribing and knew of its own conduct in giving dishonest

35

1   answers to Vale in the context of the due diligence.

2       So we say there is a strong inference that moving

3   the 500 million out at that stage was intended to make

4   enforcement more difficult, if ever these matters came

5   to light.

6       And there is no proper explanation for why this was

7   done. There's been a suggestion from Mr Libson in

8   evidence that some of these amounts were paid in

9   repayment of indirect loans from the foundation. We

10  asked for the loan documents and we were refused.

11      In addition, we say there is strong evidence that

12  during the arbitration BSGR took steps to make

13  enforcement more difficult. My Lady, for that we need

14  to go to Mr Kelly's witness statement in bundle 1 at

15  tab 3. (Pause).

16      My Lady, it's paragraph 26. So paragraph 26(a),

17  this happened in 2015, shares in BSGR's subsidiary Octea

18  were charged to a Bermudan company called Star West as

19  security for I think effectively contingent liability

20  under a guarantee for a loan. So there was a charge

21  there to Star West in 2015.

22      What is said to be a claim open to BSGR against

23  Mr George Soros has been secured in favour of a company

24  called Litigation Solutions Limited, 26(b). Now,

25  despite its name, we are not aware of any bona fide

36

1   litigation funder of that name, and my Lady will see
2   from sub-paragraph (c) that we believe these companies,
3   Litigation Solutions Limited and Star West, are
4   connected because they have common directors and there's
5   also a link between Star West and a company called
6   Global Special Opportunities, which is a shareholder in
7   Niron, a company that now stands to benefit from the
8   concessions in Guinea as a result of a settlement
9   arrangement -- I will come back to the status of it in
10  due course -- with Guinea, which was announced I think
11  at some point in the course of this year.
12      So we very much lay down the gauntlet that we
13  believe all of these companies are linked. What do we
14  get in response? Effectively there is no attempt to
15  engage in that material at all. If one goes to
16  Mr Libson on this, tab 5 of the same bundle, page 9,
17  there is in paragraph 14 simply a refusal to engage.
18      Now, my Lady, the third matter, and I would hope to
19  be able to deal with it in perhaps -- I don't know
20  whether your Ladyship would be willing to then have
21  a short break for the transcript writers?
22  MRS JUSTICE MOULDER: I think we should, yes.
23  MR FOXTON: My Lady, the third matter is covered relatively
24  extensively in the skeleton, which is the settlement of
25  the claim in the ICSID arbitration, where my Lady may

37

1   have seen that in February of this year BSGR's parent,
2   Nysco and the Government of Guinea announced the
3   settlement of their dispute. And the announcement said
4   that a new group of investors presented by and including
5   Mr Steinmetz will exploit the deposit in their place.
6      So one has there what appears to be a very
7   significant, on its own case, asset of BSGR being the
8   subject of highly relevant agreement between Nysco, its
9   parent and Guinea, Mr Steinmetz being involved in
10  relation to the so-called new investors coming in to
11  take the benefit, and that all appears to have been done
12  with no or minimal involvement from the administrators.
13      I'm just going to pick this up very briefly at
14  bundle 2, tab 10, page 104.
15  MRS JUSTICE MOULDER: I'm sorry, what was the reference
16  again?
17  MR FOXTON: Bundle 2, my Lady, tab 10, at page 104.
18  (Pause).
19      My Lady, what happened on 1 March, in the third
20  paragraph, we were told that the parties, and I think
21  that means BSGR and the Government of Guinea, although
22  clearly BSGR's shareholders were also closely involved
23  in this, provisionally agreed terms for a settlement
24  that would involve an entity known as Niron Metals being
25  granted a concession of one of the mines and then

38

1   entering into a revenue-sharing arrangement under which
2   BSGR would be paid an agreed proportion of the revenues
3   of that concession. And there's reference in that
4   paragraph to the need for due diligence to be performed
5   by the administrators, and the administrators take the
6   position that this is not a binding settlement because
7   the terms of it, as it were, are subject to contract.
8   But my Lady will see at the bottom of the page that they
9   were provided with the signed term sheet on
10  24 February --
11  MRS JUSTICE MOULDER: Sorry, I'm not sure I'm on the right
12  page. Can you give me the page reference again?
13  MR FOXTON: My Lady, it's the large number, 104, at the
14  bottom of the page. It should be the first page of
15  a letter from BDO.
16  MRS JUSTICE MOULDER: Sorry, I was out by a page. I'm
17  looking at the wrong ...
18  MR FOXTON: No, the numbers are, alas, different but very
19  close to each other, which never helps.
20  MRS JUSTICE MOULDER: Right.
21  MR FOXTON: Perhaps I could ask my Lady to read the third
22  and fourth paragraphs on page 104. (Pause).
23  MRS JUSTICE MOULDER: Yes.
24  MR FOXTON: So, my Lady, just a couple of points briefly to
25  pick up on this. The first is although apparently the

39

1   administrators have done due diligence or are going to
2   be doing due diligence on Niron, they have refused to
3   engage with our queries as to who beneficially lies
4   behind Niron and what role Mr Steinmetz has in relation
5   to it. Certainly the press releases would suggest that
6   he clearly is involved in this, and my Lady will well
7   understand our concern that the effect of this
8   settlement, leaving its legal status aside for the
9   moment, is that those against whom claims would
10  undoubtedly lie and who are very closely linked with the
11  dishonesty the tribunal has found will be benefiting
12  from the proposed deal with the Government of Guinea,
13  and as at the moment no indication at all as to how it
14  is BSGR will benefit from this arrangement.
15      My Lady, secondly, although it is said by the
16  administrators and is still said by them this is all
17  subject to contract and nothing has changed, the reality
18  is that on the ground things are changing. The
19  Government of Guinea and Nysco have announced this
20  settlement as though it is a done deal. That press
21  release is at bundle 1, tab 7, page 70. The words "done
22  deal" are not mine, they come from a Nysco statement as
23  reported by The Sunday Times.
24      And, my Lady, the Government of Guinea has already
25  launched a tender for the award of the new mining

40

1  rights.  One sees that in bundle 2, tab 10, page 94.
2  One has the tender notice and the Government of Guinea
3  saying:
4      "To reach a full amicable agreement in March 2019
5  the Republic of Guinea and BSGR finally ended their
6  dispute before the ICSID and the blocks are now in the
7  portfolio of the state free of any dispute."
8      So whatever the position may be in terms of paper,
9  the reality is that the events on the grounds are moving
10  fast and the administrators' ability to influence or
11  control them is plainly non-existent.
12      My Lady, I don't know if that would be a convenient
13  moment?
14  MRS JUSTICE MOULDER: Well, yes, I don't know to what
15      extent you're going to come back on this but it seems to
16      me that Mr Kelly -- and I'm looking at his third witness
17      statement -- makes a number of statements which indicate
18      that he doesn't seem to believe what Mr Cohen is saying,
19      and so even if you're right that practically Guinea has
20      launched a tender or things are moving on, what Mr Cohen
21      says is, "Well, we're getting something in return".
22      Now, as I say, I don't know to what extent you're
23      going to take me through this, but it seems to me that
24      I have evidence saying, "Well, yes, this may be
25      happening or is happening, we're negotiating it, but we

41

1      are the administrators and we are negotiating something
2      in return". Now, as I say, Mr Kelly makes a number of
3      quite striking assertions that he doesn't believe a word
4      of what Mr Cohen is saying and I don't know, as I say,
5      whether you intend to rely on that evidence or pursue
6      it, but I'm not sure that it's enough to say, well,
7      practically these rights are being mined if in fact
8      something is being received in return.
9  MR FOXTON: Nothing is being received now, that is not
10      Mr Cohen's evidence. He says, "We are negotiating" --
11  MRS JUSTICE MOULDER: Yes, he doesn't -- well, as I say,
12      I think we should have the break now but I don't read
13      this as Mr Cohen saying, "Oh yes, terribly sorry, we
14      seem to have given away an asset here". Mr Cohen says,
15      "We are administrators. We act in the best interests of
16      the company and the creditors", and although he doesn't
17      say, "guess what", he says, "We don't go around giving
18      away assets". In effect he says, "We are going to get
19      something back".
20      Now, as I say, Mr Kelly says effectively, "I don't
21      believe a word of it". I leave it to you as to whether
22      or not that was actually --
23  MR FOXTON: Well, my Lady, I don't accept that --
24  MRS JUSTICE MOULDER: -- the case that you're pursuing.
25  MR FOXTON: -- I don't accept that characterisation of

42

1      Mr Kelly's evidence --
2  MRS JUSTICE MOULDER: As I say perhaps we should look at
3      it -- I think we should take the break now but Mr Kelly
4      certainly seems to make --
5  MR FOXTON: -- and I will come back to that.
6  MRS JUSTICE MOULDER: -- some quite surprising statements.
7  MR FOXTON: Well, they are in response to very surprising
8      statements by Mr Cohen, my Lady.
9  MRS JUSTICE MOULDER: As I say, if you want to go there but
10      I don't think we can just ignore it.
11  MR FOXTON: No, I will certainly go there to the extent to
12      which I put the matters to your Ladyship and they do not
13      involve --
14  MRS JUSTICE MOULDER: As I say, what I'm putting to you, the
15      reason I am raising it is not that I -- it's up to you,
16      obviously how you put your case. But you are saying to
17      me this asset has gone, look at the press releases,
18      Guinea are now going out to tender. That's dissipation,
19      or risk of dissipation. What I am saying to you is you
20      cannot, I would have thought, just ignore the fact that
21      there is evidence from Mr Cohen saying this is not
22      a case of the asset just going, there is something being
23      received in return.
24  MR FOXTON: No. Well, I'm not ignoring it, my Lady, but one
25      can only make the submissions in sequence so I will come

43

1      back to that after the break.
2  MRS JUSTICE MOULDER: Fine. We will take ten minutes.
3      Thank you.
4  (11.49 am)
5                  (A short break)
6  (11.59 am)
7  MRS JUSTICE MOULDER: Yes, Mr Foxton.
8  MR FOXTON: So, my Lady, just coming back to the settlement
9      of the ICSID tribunal, the first point is of course the
10      entire structure was apparently negotiated by management
11      and Guinea without the administrators' involvement. The
12      administrator tells us that on 24 February, I think,
13      they are presented with the draft terms of settlement
14      and told, "That's it, non-negotiable".
15      Secondly, it's quite clear that the terms of any
16      revenue-sharing agreement by which BSGR would get
17      anything out of this have yet to be agreed. That was
18      the position as confirmed by the administrators on
19      27 March this year and we have had nothing through from
20      BSGR or the administrators to suggest that matters have
21      moved on in relation to revenue-sharing.
22      The problem is matters are moving on on the ground
23      in relation to the concession, and so saying, "Well, we
24      will do a deal in which we will get something back yet
25      to be determined", does not address the fundamental

44

1    difficulty that the ability to roll any of this back if
2    no acceptable deal is offered is being compromised by
3    the speed with which events are actually moving on the
4    ground in relation to the concessions.
5        My Lady, the third point is this: the structure of
6    the deal involves at least an indeterminate part, and we
7    don't know of the value of any settlement going off to
8    a different entity other than the creditors, namely the
9    new investor. And we have no knowledge, but a good deal
10   of suspicion, that part of the benefit will be going to
11   those involved in the management of the company and
12   indeed those closely involved in the matters that have
13   given rise to such serious findings by the tribunal and
14   investigations by others. The existence of the
15   administration and the administrators has been powerless
16   to prevent that state of affairs coming into existence.
17       My Lady --
18   MRS JUSTICE MOULDER: So when Mr Cohen says:
19       "No binding deal had been reached, and none would be
20   reached without the joint administrators being satisfied
21   that such a deal is overall in the best interests of
22   BSGR and its creditors."
23       You say that's not right?
24   MR FOXTON: No, I'm saying whether there is a binding deal
25   as a matter of contract or not alas does not answer the

45

1    question, because meanwhile Guinea, and indeed BSGR's
2    shareholders in their announcements and the new
3    investor, are all charging on regardless.
4    MRS JUSTICE MOULDER: Yes, but the second half of that
5    sentence states:
6        ".. none would be reached without the joint
7    administrators being satisfied that such a deal is
8    overall in the best interests of BSGR and its
9    creditors ."
10       Now, whether or not payments are going off to third
11   parties, whether or not they are connected parties, I'm
12   not sure what you say to the fact that the
13   administrators say even if we -- well, they do say,
14   "Yes, we were given this deal. No, we didn't get any
15   involvement in negotiating it, but we wouldn't have done
16   it if we weren't satisfied it was in the best
17   interests ". So are you asking me to say that the
18   administrators are mistaken?
19   MR FOXTON: Well, they haven't done the deal yet. The
20   administrators don't say they have committed themselves
21   to anything as yet. They are saying, "We will not do
22   a deal unless we are satisfied ", and I take them at
23   their word on that. The problem is their statement, "We
24   will not do a deal in the future ", does not change the
25   fact that the new investor is currently working away and

46

1    all that not doing a deal would achieve is BSGR not
2    getting any revenue share. It's not going to be able to
3    change what's actually happening on the ground at the
4    mines and who is extracting economic benefit from them
5    in Guinea.
6        The problem is the administrators' focus on the
7    status of the settlement document as regards BSGR does
8    not answer our concern that regardless of that state of
9    affairs , the people in control of the position on the
10   ground are moving on as though that is not a significant
11   threshold that needs to be crossed before anything
12   happens.
13       Now, if that's right, all that the administrators'
14   refusal to do a deal would achieve is BSGR not getting
15   the revenue share of the revenue that the new investors
16   were making from this.
17       My Lady, one suspects, although I understand why
18   they don't go into this, that the administrators would
19   far rather have been involved in all these discussions
20   with Guinea while they were going on, rather than simply
21   being presented with a term sheet at the end of February
22   and told, "That's it ".
23   MRS JUSTICE MOULDER: And the fact that they say:
24       "We would be entitled to recommence the ICSID
25   arbitration at our discretion if a binding agreement

47

1    appropriately benefiting BSGR and its creditors is not
2    reached."
3        You take no comfort from that either?
4    MR FOXTON: Well, the problem is certainly a world in which
5    the concessions might be reinstated will have been
6    fundamentally changed if someone else is in there on the
7    ground, and to the extent to which management who may be
8    crucial elements in supporting and giving evidence at
9    that hearing are in fact deriving benefits under the new
10   arrangements, it's hardly conducive to a world in which
11   that arbitration will be --
12   MR GRUDER: My learned friend is in fact mistaken. There is
13   no further evidence to be given in the ICSID
14   arbitration . The evidence has finished. All that is
15   awaited is an award but the arbitrators have been told
16   to suspend work on that pending a possible settlement.
17   MR FOXTON: Well, my Lady, if that award comes out and says,
18   "You can have the concession back", how, in practical
19   terms can that ever be accomplished if in reality new
20   investors are in on the ground exploiting the
21   concession, having been asked to tender by the
22   Government of Guinea on the basis that there's been
23   a deal done between BSGR's parent, Nysco and the
24   Government of Guinea, and these blocks are now entirely
25   free of third-party claims?

48

1   I'm afraid sometimes you cannot get the wine back in
2   the bottle, and that is the reality of the position that
3   the administrators, through no fault of their own, were
4   presented with when handed this term sheet at the end of
5   February.
6   Now, my Lady, in relation to just -- before I finish
7   there's one other matter I should pick up, and
8   Mr Gruder's rising to his feet just now reminds me of
9   it, that in the break we were told that he had misspoken
10   and in fact the failure to deal with the frustration
11   point is not being abandoned, so I'm afraid that we have
12   another flip-flop back on that point. I think the
13   fastest on record in relation to BSGR's positions to
14   date.
15   Now, my Lady, in relation to other matters on the
16   administration, first of all, the fact that they were
17   put in, in the words of one of BSGR's directors,
18   Mr Cramer, "To put sharks in the moat and make sure BSGR
19   can stay the distance on the arbitration and litigation
20   even if there are adverse awards or developments", is
21   not a particularly encouraging position for a creditor
22   of BSGR to be faced with.
23   My Lady will have seen the funding arrangements of
24   the administration give Nysco, the shareholder
25   effectively owned by Mr Steinmetz and his Liechtenstein

49

1   foundation, extensive practical control over what is
2   done because they have to approve the budget, approve
3   drawdowns and approve the purpose for which funds will
4   be used.
5   And the drawdown requests have to be sent to
6   a Mr Bonnant who is Mr Steinmetz's personal Swiss lawyer
7   and friend. So, my Lady, the result of that is the
8   terms on which the administration have been established
9   give Mr Steinmetz, give Nysco, extensive influence over
10   what will be done and the result of that is the
11   administrators are never going to be an effective means
12   of pursuing claims against the management of BSGR or
13   parties related to Mr Steinmetz or Nysco in respect of
14   any benefits that they have received. That is simply
15   an inevitable product --
16   MRS JUSTICE MOULDER: So, back to the beginning, how does
17   the fact that you say the administrators are not
18   an effective means of pursuing claims link with a risk
19   of dissipation arising from the challenge? Because it's
20   the case in all administrations that the administrators
21   can only act to the extent that they are funded, but the
22   administrators are very clear, at least in their own
23   evidence -- it appears to be challenged in yours -- that
24   they are taking the decisions and at the end of the day
25   it is their decision whether something is in the best

50

1   interests of the creditors.
2   So I'm not sure that I have followed the link
3   between what you say are the limitations on the
4   administrators and how those limitations, which, as
5   I say, appear to me to apply to all administrations,
6   mean that this challenge is giving rise to a risk of
7   diminution.
8   MR FOXTON: My Lady, for these reasons. First of all, as
9   I mentioned at the outset, but for the challenge we
10   could wind up BSGR. One could appoint receivers by way
11   of equitable execution over its assets. So instead of
12   part -- administrators being funded by and subject to
13   financial control by Mr Steinmetz and Nysco, you would
14   have parties in control of the claims of BSGR or in
15   control of its assets that would not be subject to those
16   constraints.
17   And, my Lady, secondly, the distinguishing feature
18   of the funding arrangement here is the fact that those
19   with their hands on the purse strings are very closely
20   linked, or in some cases the same as, individuals about
21   whose conduct there is very serious cause for concern.
22   In relation to Mr Steinmetz obviously the criminal
23   investigations of him. But also in relation simply to
24   the whole underlying factual strata of bribery and
25   fraudulent misrepresentation, my Lady, I would suggest

51

1   that a situation in which those funding the
2   administration are the most credible third party against
3   whom potential claims might be brought is far from
4   a routine aspect of administrations, in my experience.
5   So, my Lady, in broad terms that is why we say that
6   the section 70(7) criteria are met here. I should just
7   deal with one other point, we are not by this relief
8   seeking to leapfrog other creditors. I don't know if
9   there are any other substantial creditors, but in any
10   event we accept that it would be open to the English
11   courts to decide how any funds paid as a condition of
12   any order should be distributed to avoid Vale obtaining
13   any inappropriate advantage in the context of
14   an eventual insolvency.
15   So we are not looking to advance our position.
16   We're simply looking to preserve it from the detriment
17   that would otherwise follow.
18   My Lady, that leaves, in terms of my applications,
19   security for costs, where the issue is principally one
20   of quantum.
21   Now, our estimate is in bundle 1, tab 7, pages 86 to
22   88. (Pause).
23   My Lady, the total estimate is $885,000. It's on
24   page 88. But we have made it clear the amount of
25   security that we seek is 80% of that figure, which is

52

1   $710,000. We are not seeking 100% security.
2       Now, my Lady, the first point we make is that there
3   is a real prospect here of indemnity costs being ordered
4   if this challenge fails, and where prospect of indemnity
5   costs is reasonable rather than speculative, the
6   appropriate perspective from which to view security is
7   the amount that would be recovered when costs are
8   ordered on an indemnity basis. We do so against the
9   background of the prior history of BSGR's failed
10  challenges to many tribunals, the seriousness of the
11  challenges that have been made and abandoned and in due
12  course the fact that the frustration defence is
13  advanced, then abandoned, then advanced again within the
14  space of a few moments.
15      So we do say that the prospect of indemnity costs
16  are high. At the hearing before Mr Justice Popplewell
17  we recovered about 87% of our costs on an indemnity
18  basis.
19      BSGR suggests the appropriate figure is $511,000 or
20  about 58% of the amount claimed. Now, if we are right
21  that security should be assessed on the assumption
22  there's a reasonable prospect of indemnity costs, that
23  in itself would involve a very significant uplift to be
24  BSGR's figure. But in any event we say that this is
25  clearly a huge underlying claim, $2 billion now

53

1   including interest, a case with an incredibly lengthy
2   procedural history -- arbitrations started in 2014 --
3   numerous decisions, prior court applications that are
4   going to be part of both parties' evidence, and in those
5   circumstances it is a matter for which significant
6   solicitor time in relation to preparation and filing of
7   evidence is appropriate.
8       The rates that Mishcon de Reya are charging BSGR are
9   significantly below current market rates and, my Lady,
10  taking those matters together, and it is one of those
11  issues I think I approach with a broad brush, not with
12  any lack of respect for the points but I sometimes think
13  that courts may be more interested in the highlight
14  issues than delving into detail, but the figure of
15  security we have put forward is a reasonable one that
16  I would invite your Ladyship to order.
17      So, my Lady, that I think is all I wanted to say in
18  relation to our applications, and I will obviously
19  respond to BSGR's applications after you've heard from
20  Mr Gruder.
21  MRS JUSTICE MOULDER: Thank you.
22              Submissions by MR GRUDER
23  MR GRUDER: My Lady, I will deal with my learned friend's
24  applications in the same order he put them forward.
25      Now, my Lady has already looked at Progas and

54

1   I won't go to that again but there are a number of
2   principles which come from that, that you are looking
3   for prejudice arising from the challenge. So you're
4   only looking for prejudice from the date of the
5   challenge until the date of the hearing, which in this
6   case is from May until November of this year.
7       Secondly, it's not prejudice that the challenge may
8   delay enforcement and the purpose of the right under
9   section 77 or the court's power is not to make it easier
10  for the claimant to enforce the award or to provide
11  security for the award as a general rule. The real
12  question on the facts of the case and the way the
13  authorities go is has my learned friend been able to
14  show that there is a risk of dissipation equivalent to
15  the requirement for an asset freezing injunction? Well,
16  either from May -- it doesn't really matter -- or indeed
17  from today until November?
18      Of course, so much is made by my learned friend as
19  to the findings in the award, the so-called -- what he
20  calls "guerrilla tactics", which I will possibly deal
21  with later, and the conduct of the previous -- of the
22  management, those previously in control of the company.
23      But we say that if we are looking at a test which is
24  looking at the position from the date of the application
25  earlier this year until the end of November, when it's

55

1   the hearing, of course my Lady knows that it's not the
2   previous management who have got power to act for the
3   company, it's not the previous management who have got
4   control of the assets of the company, it is the
5   administrators and the administrators are people of
6   experience, repute and integrity who are leading
7   administrators working for one of the leading
8   accountancy firms in this country.
9       It is significant that although my learned friend
10  seeks to justify some of the imputations -- in my
11  respectful submission, scandalous imputations -- in
12  Mr Kelly's third witness statement, if one looks at what
13  they say in their skeleton argument, their skeleton
14  argument expressly disclaims any imputation as to the
15  conduct or the bona fides of the administrators, and
16  that's obviously correct.
17      Then if one just, as a brief overview, looks at the
18  two assets which Vale focus on, the first asset is the
19  settlement of the ICSID arbitration.
20      Now, if one looks at what is, if they are right, the
21  value of that claim in the arbitration, because they, of
22  course, argued in the arbitration and at the moment have
23  got an award which says that this concession was
24  obtained by bribery and corruption. And that is the
25  basis upon which the Guinea authorities stripped the

56

1    company of its concession and that is the matter which
2    was litigated or was arbitrated in the ICSID
3    arbitration.
4        If Vale are right, if the arbitration award is
5    correct, the ICSID arbitration, which is said to be
6    an asset of such value that it has been dissipated by
7    this settlement, is actually valueless, because the
8    stripping of the company of the right to the concession
9    was actually justified. Therefore, on one view of the
10   matter the settlement or the draft settlement or any
11   settlement of that ICSID arbitration which provides
12   value for the creditors of the company is not
13   a detriment to those creditors, but a benefit, because
14   on Vale's own case that claim is valueless, or virtually
15   valueless.
16       Secondly, the Soros arbitration. The Soros
17   arbitration is something which Mr Kelly makes fun of.
18   He says, and I'm not necessarily quoting directly, it's
19   a sort of hobby horse of Mr Steinmetz, where he treats
20   it slightly contemptuously. It is something which BSGR
21   asked Vale to help them finance and to co-operate in
22   that claim. Vale refused. So what BSGR have done, they
23   have a got a litigation funder to fund it on the basis
24   of a 50% recovery. Vale didn't want to finance it.
25   Vale laugh at this claim and yet for the purpose of this

57

1    application they seek to say that funding it on the
2    basis of a 50% share to the funder, whoever that funder
3    is, is stripping the company of its assets. Again, one
4    should look at what they say with a certain amount of
5    common sense, with all due respect.
6        Then they then say, "Well, why would a party seek to
7    bring a section 68 other than to provide an opportunity
8    to somehow dissipate its assets?" With due respect, any
9    commercial company, any administrators, or indeed
10   company management, if a company is not in
11   administration, who are on the receiving end of
12   a $2 billion award against them, and if they are told
13   there is a reasonable prospect of success -- even if my
14   learned friend is right, which we don't agree, there's
15   a flimsy prospect of success, where the costs will be,
16   in comparison to the 2 billion award, fairly minimal --
17   of course any sensible management would pursue
18   that avenue. In my respectful submission, my learned
19   friend is really barking up the wrong tree and really
20   making a misconceived application. So merely to make
21   the section 68 application, merely to exercise a right
22   available to you under the Arbitration Act, is itself
23   evidence of an intention to dissipate.
24       If one looks at this, the position is that we are
25   dealing with a company under the control of

58

1    administrators. A duty of an administrator, the role of
2    an administrator, is to get in the assets for the
3    purpose of the creditors, to act in a bona fide way for
4    the benefit of those creditors and the benefit of the
5    company. And in my respectful submission, this is what
6    these administrators are doing and it is paragraph 56 of
7    Vale's skeleton, where they say:
8        "The management of BSGR are the type of people who
9    will do everything in their power to prevent
10   enforcement."
11       But not the administrators.
12       So we are dealing -- it is paragraph 56 of their
13   skeleton on page 28 of their skeleton:
14       "The evidence shows that BSGR's management,
15   excluding the administrators and owners, are precisely
16   the sort of people who will do everything in their power
17   to prevent Vale obtaining the sums awarded it to by the
18   tribunal."
19       So the people who are in control of the company and
20   have the power, and have had power since 2018, to act on
21   behalf of the company are not the sort of people who
22   would do everything in their power to prevent Vale
23   obtaining the sums awarded to it by the tribunal. That
24   is their case.
25       So how can it be that they can then seek to put

59

1    forward submissions before you, and Mr Kelly can seek to
2    make those serious allegations in witness statement
3    number 3, when they themselves say that the
4    administrators are not those type of people?
5        Now, if I can come to deal with some of the other
6    points my learned friend makes, both in his skeleton and
7    orally, he talks -- a lot of play is made about the
8    conduct of the arbitration, the guerrilla tactics. With
9    due respect, whether my learned friend is right or
10   wrong, and we do not accept that that's the position, he
11   is making imputations about those who were in control
12   and had power to act on behalf of the company before the
13   administration. The administrators, including Mr Cohen,
14   only came to control the company and had power to act
15   for the company in 2018.
16       The award was not at that point out, but effectively
17   the arbitration or at least the evidential part of the
18   arbitration was over and the arbitrators were
19   deliberating, as they had for two years, over the award.
20       Then there's a reference to Mr Justice Popplewell's
21   order, the fact that the costs have not been paid.
22   Again, that is something which was done. These
23   applications were made under the control of the
24   management before the administrators were there. Again,
25   my learned friend made some play about the movement

60

Lines

Case 1:19-cv-03619-VSB Document 33-2 Filed 10/18/19 Page 18 of 47

1    upstream in 2010 of the 500 million paid by Vale to
2    BSGR. There are a number of points on that. Again,
3    that pre-dated the involvement of the administrators by
4    eight years. But we also say that, with all due
5    respect, the idea that these monies were moved
6    immediately after Vale paid the 500 million, because the
7    management of BSGR were -- could have foreseen
8    circumstances in which the President would die, then
9    there would be a new President who would then strip them
10    of their concessions and that would then lead at some
11    point in the future to Vale bringing a claim in fraud
12    against BSGR, with due respect, is very far-fetched.
13      Then one has the reference my learned friend said to
14    the shares in Octea, which owns a diamond mine in
15    Sierra Leone. They were -- and in Libson, paragraph 2,
16    the second witness statement of Libson,
17    paragraph 13(b)(i). That was a diamond mine in
18    Sierra Leone where the shares were previously charged to
19    Standard Chartered. The bank subsequently sold its debt
20    to Star West Investments. Again, this pre-dated the
21    arbitration, let alone the section 68 application.
22      Then it's then said, well, the directors still
23    control BSGR or have some involvement. Mr Cohen has
24    made absolutely clear on oath that the directors do not
25    exercise control over BSGR, and he says at A4/10:

61

1    "These amount to serious allegations against the
2    joint administrators which are entirely unsupported and
3    should not have been made."
4      Then one then has the position about the settlement.
5    Now, the settlement is not a final settlement, and that
6    is the evidence of Mr Cohen and one has a term sheet
7    which my learned friend didn't take you to at bundle 2,
8    tab 10, page 77. And on page 77 it sets out the parties
9    and at 1.3:
10    "The parties recognise that a comprehensive and
11    equitable settlement of the dispute is in the best
12    interest of all parties. Parties waive the claims
13    expressed in procedure and ... are pleased to work
14    together to enable development of a world-class mining
15    project to profit the people of Guinea. The people of
16    Guinea decides the valuation of its mineral resources,
17    in particular iron, to improve the living condition of
18    the population."
19      Then if one goes to 1.5:
20    "If the general terms and conditions presented in
21    this document are accepted, the parties will prepare
22    a transaction with a view to formalising their
23    agreement."
24      And then at 2.2:
25    "As a prior condition to any agreement, BSGR must

62

1    provide the evidence that it has the power and authority
2    required to conclude this agreement with the Republic of
3    Guinea and that the prior approval of jurisdictions of
4    Guinea or the -- Guernsey or the administrators of BSGR
5    Guinea Ltd will not be required."
6      Then 2.4:
7    "In return that the Republic of Guinea request the
8    BSGR adviser to prevent a new investor."
9      So this is a term sheet. It is not binding. It's
10    not going to be agreed to by the administrators unless
11    they regard the overall transaction, the overall
12    settlement, as in the best interests of the creditors.
13    They expressly say that there will be a -- any approval
14    will be subject to the sanction of the Royal Court of
15    Guernsey, and then my learned friend says, "ah", he
16    says, there appear to be from press releases activities
17    on the ground and it may not be -- one may not be able
18    to roll back those activities . With all due respect,
19    that's not correct because if one takes a step
20    backwards, BSGR at the moment don't have any rights to
21    any mines in Guinea. Those rights were stripped from
22    the joint venture company by the decision of the Guinea
23    government. That led to the ICSID arbitration . The
24    ICSID arbitration was then heard and the process has
25    been suspended pending the agreement.

63

1      If the agreement doesn't go ahead, the rolling back
2    will not be BSGR effectively mining the concession, it
3    will be BSGR reviving the ICSID arbitration which will
4    not really incur any cost, or minimal cost, because all
5    the evidence and the argument is over, it will just be
6    the arbitrators continuing or reviving, if I can put it
7    that way, their deliberations .
8      That would then, if BSGR's case is a good one, lead
9    to an award in their favour or, if Vale's allegations
10    are correct, lead to an award against them.
11      My learned friend then says, well, there's all these
12    potential claims against the previous management or the
13    previous controllers of BSGR and, of course, Nysco,
14    which finances the administrators, is very unlikely to
15    finance a claim against Mr Steinmetz or those who were
16    in control of the company previously.
17      Now, the funding agreement does not prevent -- does
18    not prevent the administrators getting funding from
19    other sources for other claims, and, indeed, the
20    administrators have said to Vale, "If you want us to
21    pursue claims against the previous management, are you
22    willing to fund it?" The answer was no, they were not
23    willing to fund it. So it ill lies in their mouth,
24    having been approached to and been requested as to their
25    willingness to fund these claims, to say that the

64

1   arbitrators -- sorry, the administrators can't pursue
2   these claims because they are being funded by Nysco.
3       So, again, with all due respect, we can see that
4   many of the points here are manufactured, if I can put
5   it this way, in order to justify a claim for security
6   the purpose of which is to stifle a section 68
7   application.
8       And of course any rights that there may be in the --
9   in relation to the ICSID arbitration, any settlement,
10  are not prejudiced until the agreement is actually
11  binding and approved by the court. As I've said before,
12  that will not happen -- that has not happened. That
13  will not happen unless the administrators consider the
14  agreement to be in the best interests of the company and
15  it's approved by the court.
16      Now, these administrators, some of the evidence and
17  some of the submissions seek to imply that they are
18  really patsies of the previous management.
19      Now, these are people -- a firm, BDO, who are
20  extremely well known and with all due respect people
21  like Mr Cohen and his co-administrator, with many
22  decades, probably 30 years of experience, are not going
23  to prejudice their reputation and are not going to
24  prostitute their integrity merely for the sake of
25  pleasing the previous management for the sake of

65

1   whatever fees they may have got or may possibly get for
2   this administration. With due respect, that, I would
3   submit, is not a submission which should be -- which
4   should be given credence.
5       So if one looks -- and I should show you briefly the
6   funding agreement, since I've made submissions on that.
7   That's at volume 2, at page 107. I'm sorry, I think --
8   sorry, page 26. (Pause).
9       The particular provision I would like to show you is
10  2.6:
11      "Notwithstanding the purposes of the facilities, the
12  parent is not directly engaging the administrators and
13  this agreement does not seek to replace the statutory
14  requirements or any commonly accepted industry guidance
15  relating to the conduct in administrations of this
16  nature generally. The parent hereby agrees and
17  acknowledges that nothing in this agreement or in the
18  arrangements contemplated by it shall fetter or
19  prejudice the administrators' statutory duties and
20  obligations."
21      So at the end of the day, if they decide that they
22  want to or they think it's proper to pursue the previous
23  management, then if they can get funding for that they
24  will do so.
25      Now, there are numerous points which are made in the

66

1   skeleton which Mr Foxton never necessarily adumbrated
2   orally, or at least didn't stress orally. But, for
3   example, it's then said, well, there are 268 hours in
4   the budget per year, or in the previous year -- I think
5   from 2018 to 2019 -- for meetings with the former
6   management.
7       Now, that equates to 22 hours per month and for the
8   administrators and their staff to deal with and talk to
9   and get information from the previous management who
10  have got obviously a greater familiarity with the
11  activities of the company and the background to the
12  dispute and so on is in no way excessive.
13      I think they seem to -- they put it forward as eight
14  weeks as if it is something unbelievable, but if you
15  really look at 22 hours per month, that, in my
16  submission, is entirely reasonable.
17      We say on this application that BSGR is in
18  administration. Its joint administrators' role is to
19  bring in and preserve assets for the sake of the company
20  and its creditors. That is the very opposite of
21  dissipation. And we say Mr Kelly's attempts to cast
22  aspersions on Mr Cohen are without any merit whatsoever.
23      Furthermore, we say if I'm wrong on this,
24  500 million, how is that amount justified? How do
25  they -- they say, well, it's sort of a reasonable

67

1   estimate. Surely if the purpose of security is to
2   protect a claimant who is the beneficiary of
3   an arbitration award against dissipation, the amount of
4   security should bear some relationship to the value of
5   the assets which might be dissipated.
6       So, for example, if one has a party which has
7   an award against it for $10 million but the evidence
8   shows that it doesn't have any more than $250,000, and
9   suppose the evidence shows that that asset, let's say
10  it's a sum of money in a bank account, might be
11  dissipated because the evidence shows that the people in
12  control of the company are dishonest and are the type of
13  people who might dissipate their assets, then the
14  maximum the court should actually award as security
15  should be the amount of the money which might be
16  dissipated.
17      Now, there is no evidence here that 500 million,
18  with all due respect, is in jeopardy at all. If one
19  actually looks at the assets which people have focused
20  on, there's the ICSID arbitration which -- with all due
21  respect, there really is no risk of it being dissipated
22  within the next two and a half months, and the Soros
23  claim, which Mr Kelly treats as a joke.
24      So, with due respect, there is no relationship --
25  even if there was power to grant security under

68

1  section 70(7), which in my submission there isn't, the
2  court should not do so, consistent with the authorities,
3  there is no relationship between the power and the
4  amount of money the other side want.
5     So in my submission my learned friend completely
6  fails on that ground.
7     We say that actually what is the true purpose of
8  this? Obviously, it's intended to stifle the section 68
9  application or provide security for the award, both of
10  which, on the authorities, are not legitimate purposes.
11     So then it's then said, although I see my learned
12  friend didn't pursue it orally, well, they should have
13  under section 70(7) security, well, for the Popplewell
14  costs order or the LCIA deposits which we didn't pay.
15     We say that again is a totally illegitimate
16  application. The only power given to the court is the
17  power given under section 70(7):
18     "The court may order that any money payable under
19  the award shall be brought into court or otherwise
20  secured."
21     There's no power to say, well, they have been
22  naughty boys because two years ago they didn't pay
23  a costs award on a challenge, order them to bring that
24  into court as a condition of pursuing their section 68.
25  That's not legitimate.

69

1     There is also another point about the LCIA deposits
2  which we've dealt with in our skeleton.
3     So that's what we say about that.
4     If I can just deal with perhaps one or two points on
5  the merits of the application, although I would submit
6  that -- my learned friend says it's flimsy. Well, with
7  due respect, I accept that when a party is seeking
8  security for section -- for -- security when another --
9  when the unsuccessful party in an arbitration is making
10  an application under section 68, it is not necessary for
11  him to prove that the section 68 application is flimsy.
12  It's only necessary for him to prove that a section 67
13  application is flimsy if an application is made under
14  that section.
15     But at the end of the day, whether our application
16  is flimsy or stronger than flimsy is actually
17  irrelevant, because if this were a section 67
18  application, which it is not, there would be two
19  requirements. One, for Mr Foxton to show my application
20  is flimsy and, two, to satisfy the test in Progas about
21  dissipation of assets and so on.
22     Now, if, in a section 67 application -- even though
23  a party shows the application is flimsy, he still has to
24  satisfy, if I can call it this for shorthand, the
25  dissipation test. Where does it get my learned friend

70

1  to seek to show that the application in this case is
2  flimsy? Because it's not a requirement and he's still
3  got to satisfy the dissipation test.
4     The dissipation test cannot be satisfied here for
5  all the reasons which I have put forward.
6     And in our skeleton we set out in some detail why we
7  say that this is a justified section 68 application. We
8  say that in fact if one looks -- one, it was always the
9  case that bribery and corruption was at the centre of
10  this arbitration, and I'm not going to deal with this
11  for long because it's frankly noise and prejudice which
12  the other side is seeking to put forward to obfuscate
13  the true legal test for security. But, for example, if
14  one goes to the first witness statement of Mr Kelly and
15  go at Kelly 1 at paragraph 31, which is I think
16  bundle C--- or section C, which is tab 13 at page 10.
17  I think one finds that in volume 3.
18     So it's volume 3, tab 13, page 10. Mr Kelly says
19  this, paragraph 31:
20     "The LCIA tribunal found that BSGR was liable for
21  fraudulent misrepresentation. It found that BSGR had
22  engaged in the deliberate concealment of its
23  arrangements with an entity called Pentler Holdings, of
24  which Madame Touré, the wife of a former President of
25  Guinea, President Condé, was a shareholder, because BSGR

71

1  wished to ensure that Vale remained ignorant of Pentler
2  and its dealings with the various contacts who have
3  assisted BSGR Guinea in obtaining the mining rights.
4     "Further, the LCIA tribunal found that Pentler, and
5  therefore Madame Touré, had received shares from BSGR in
6  order to secure her influence over President Condé. In
7  short, the LCIA tribunal found that BSGR had bribed
8  Madame Touré and then lied to Vale about it."
9     Now, that's how Mr Kelly, in his first witness
10  statement, sworn well after the award, summarises the
11  case.
12     Now, it's of course said now, "Ah, but we were found
13  guilty of fraudulent misrepresentation on grounds which
14  were not directly related to bribery but to indicia of
15  bribery, or red flags relating to bribery. That's what
16  it comes to.
17     But if one -- we say that the tribunal's decision as
18  to dishonesty, because it's not enough to show that we
19  made misrepresentations, but the tribunal's decision
20  as -- that they were fraudulent is effectively affected
21  be their decision on bribery and corruption.
22     Of course, the ICSID transcripts, which we wanted to
23  put in and which we were refused, are transcripts that
24  go directly -- and we've set it out in our skeleton, and
25  I'm not going to repeat it -- directly to the issue of

72

1  bribery and corruption.

2  It's one thing to say, "Ah, the Thiam evidence was

3  put in with the consent of both parties". It was. But

4  of course the Thiam evidence related to criminal

5  proceedings to which neither party was present, and the

6  tribunal never saw any problem in evaluating that in the

7  context of the evidence which they had.

8  But when we tried to put in evidence which went

9  directly to the question of bribery and corruption, they

10  never made a ruling, despite us asking them to deal with

11  it. They never made a ruling for effectively nearly two

12  years until they came out with their final award and

13  then decided not to admit the evidence.

14  Now, my learned friend's case is, ah, well it

15  doesn't matter whether you're right or wrong because you

16  would have lost anyway on other points. And we disagree

17  with that because of what I've said about dishonesty and

18  the fact that they found dishonesty based upon the fact

19  that we were the type of people who would corrupt the

20  Guinea government and therefore had something to hide.

21  Now, also I think my learned friend accepts or my

22  learned friend says, well, there is no substantial

23  injustice, he says, because the decision would be the

24  same, but on other grounds, even if you're right.

25  He does accept in his skeleton argument that if

73

1  a party -- if the tribunal is in breach of natural

2  justice, then that itself is a serious irregularity.

3  The other point I would wish to make is that in our

4  respectful submission section 68 requires the serious

5  irregularity to cause substantial injustice to the

6  applicant. Not the same test as one has under

7  section 69 that the serious -- that -- in section 69 the

8  test is does it -- does the error of law substantially

9  affect the rights of the parties? In my respectful

10  submission, there is a difference in those cases

11  because, of course, a party -- a prominent businessman

12  and company in the mining field which is found guilty of

13  bribery and corruption, because the arbitrators have not

14  allowed in evidence which would exculpate them, suffers

15  a substantial injustice. Its not enough for the other

16  side to say, "Well, you would have a lost anyway".

17  If I can give my Lady an example. Supposing a judge

18  was involved in an arbitration and there was a claim

19  made that the judge was liable on two grounds: one,

20  fraud and dishonesty and, secondly, strict contractual

21  obligation. Supposing the tribunal so misconducted

22  itself that it refused to allow in evidence which would

23  or might exculpate the judge from the charge of

24  dishonesty. Is it sufficient for the winning party to

25  say to the judge when he comes in front of the court on

74

1  a section 68 application, "Well, it doesn't matter that

2  the arbitrators didn't allow in evidence which might

3  exculpate you on a charge of dishonesty because you

4  would have lost on a strict contractual basis anyway"?

5  Now, of course we say that there would in those

6  circumstances be a substantial injustice and they, well,

7  does it substantially affect your rights? But we say

8  that's not the test.

9  But of course, our primary case is that if this

10  evidence had been allowed in -- and we say it was

11  totally wrong not to allow it in -- we might well have

12  been found innocent of bribery and corruption and that

13  would have affected their conclusion on whether we --

14  whether the misrepresentations were put forward

15  dishonestly, or at the very least would have affected

16  their decision on costs, because their decision on costs

17  was expressly -- paragraph 994 of the award expressly

18  relied upon the findings of the tribunal regarding

19  bribery, and costs were I think 16 million.

20  If I can stop there, my Lady, I've virtually

21  finished security for the claim. I'll go on to security

22  for costs and then my application under section 66.

23  MRS JUSTICE MOULDER: All right. Thank you very much.

24  We'll come back at 2 o'clock, please.

25  (1.01 pm)

75

1  (The luncheon adjournment)

2  (2.00 pm)

3  MR GRUDER: My Lady, apart from three very short points,

4  I've finished with security for the claim point and the

5  points are this. One, we are are dealing with a period

6  of two and a half months.

7  Secondly, the company doesn't have any liquid

8  assets. That's why it's got to borrow funding or the

9  administrators have got to borrow money to fund their

10  operations and the exercise all of their duties.

11  Thirdly, when it comes to the settlement, the

12  question the administrators have got to ask themselves

13  is: is the overall package in the best interests of the

14  company and its creditors? If part of the package gives

15  benefits to other parties like Niron, or Mr Foxton says

16  Mr Steinmetz, that's part of their assessment.

17  So those are my submissions on security for the

18  claim. I come to security for costs and --

19  MRS JUSTICE MOULDER: Sorry, just before you do, you say,

20  "No liquid assets". I had gathered from the skeletons

21  that you weren't running an argument that the claim

22  would be stifled and I think the point had been taken

23  that there was no evidence as to what other sources of

24  funding were there. So I'm not quite sure when you say,

25  "No liquid assets" --

76

1    MR GRUDER: Well, the administrators have got no -- there is
2       no liquid assets.  That point goes much more to the risk
3       of dissipation rather than the --
4    MRS JUSTICE MOULDER: I see.
5    MR GRUDER: -- stifling.  We don't take a stifling point,
6       because there isn't evidence before the court as to --
7    MRS JUSTICE MOULDER: Right, thank you.
8    MR GRUDER: -- the wherewithal of other people.
9       So if we can come to the question of security for
10      costs, we deal with this in paragraphs 30 and following
11      of our skeleton, and the issue really has boiled --
12      although the other side claim 880,000-odd, they now
13      claim 710,000 and we say it's 51,445 [sic].  I'm not
14      going to repeat all the submissions we have made.  My
15      Lady has obviously read them.
16      The point I would like to do is at page 17 of our
17      skeleton, paragraph 37, we break down the 885,000 which
18      the other side originally claimed and upon which the
19      710,000 is based and one sees the solicitors' estimate,
20      so estimated for the future, between now and November,
21      $347,000.
22      We comment on that in paragraph 39.  So they
23      estimate that their solicitors -- 530.5 hours of
24      solicitors' time between now and the challenge
25      application in November, for the matters we set out

77

1    there.
2       Now 530.5 hours in respect of an application where
3       the evidence is there, it's before the court, is, we
4       say, grossly excessive.  And I would just -- I know
5       perhaps it's almost an unspoken convention not to
6       comment on counsel's fees, but it has not escaped -- it
7       wouldn't escape my Lady's attention that a 45-page
8       skeleton was put in by the other side.  The first 20
9       pages of that skeleton effectively rehearsed arguments
10      which will be made by the other side on the section 68.
11      By the Commercial Court practice, they are only entitled
12      to put in a 25-page skeleton argument.
13      Now, they broke that direction and perhaps one can
14      excuse them.  We don't take a point on that at the
15      moment, but one can excuse them, because there were
16      a number of applications today, although we managed to
17      keep our skeleton within the 25 pages.
18      The point I'm really saying is they are seeking
19      a further $365,000 security for counsel's fees and one
20      asks oneself has not at least a substantial proportion
21      of that work already been done for the purpose of
22      putting in a lengthy introduction trying to persuade my
23      Lady how weak our challenge is?  That's the only point
24      I make, that there must be, with all due respect, very
25      substantial duplication between the costs that have

78

1    already been incurred for today and the costs that they
2       say will be incurred for the November hearing.  So
3       that's the points I make on the security for costs.
4                    Application by MR GRUDER
5    MR GRUDER: If I can then come to my application, which is
6       the section 66 application, and one needs to, I think,
7       go to Mr Justice Bryan's order which one finds at
8       bundle 5, tab 19.  I think it's necessary for one to
9       just put it in context, one sees the order that was
10      obtained without notice, perfectly properly, at page 1
11      of tab 19.  Then on page 2 they gave the claimant
12      permission under section 66 of the Arbitration Act to
13      enforce the award in the same manner as a judgment and
14      so on, and then 2:
15      "Permission having been granted under section 66(1)
16      as aforesaid, the claimant may later request the
17      judgment be entered into."
18      Then 3:
19      "The defendant has the right pursuant to
20      CPR 62.18(9)(a) within 14 days after service of the
21      order to apply to set it aside."
22      Which we in fact did.
23      Then 4:
24      "Pursuant to the provisions of CPR 62.18(9)(b) the
25      award must not be enforced until after the end of the

79

1    14-day period, or, if an application is made by the
2       defendant within that period, to set aside this
3       order ..."
4       And that application was set aside:
5       "... until after that application has been finally
6       disposed of."
7       Now, I would like my Lady mentally to draw a line
8       under the words, " finally disposed of ", because that's
9       important.  And those words -- what the order does is
10      track in terms the wording of CPR 62.18(9) which one
11      finds at Part 2 of the White Book, 712, and
12      effectively -- I mean, if it's easy for my Lady to look
13      at it.  But in fact the words of paragraph 4 of
14      Mr Justice Bryan's order mirror the wording of
15      CPR 18(9)(b):
16      "The award must not be in force until after the end
17      of that period --..."
18      That's the 14 days:
19      "... or any application made by the defendant within
20      that period has been finally disposed of."
21      Now, our application to set aside or stay the order
22      of Mr Justice Bryan stands and falls on exactly the same
23      grounds as our section 68 application, which will be
24      heard in November, namely those grounds which are set
25      out in the section 68 application.

80

1        If we're correct that there was a serious

2    irregularity giving rise to substantial injustice such

3    that the award should be set aside, we say the

4    enforcement order -- the order of Mr Justice Bryan has

5    got no independent existence if the award upon which it

6    is based is set aside.

7        However, by -- it is Vale's argument that they

8    should be permitted to enforce the award effectively

9    from today even if in two and a half months' time, as

10   a result of the hearing on 27/28 November, the award is

11   set aside or remitted. That's their argument.

12       Now, one asks oneself if in fact, as a final order,

13   because what this court would do today would inter

14   partes make the order or confirm the order which

15   Mr Justice Bryan made on an ex parte basis back in

16   May -- what would the court then do, if one sees -- in

17   November if we succeed on the section 68?

18       Because if the award has gone, because it's been set

19   aside, then there will be nothing to enforce and that

20   would then make a nonsense of the order which the court

21   makes today.

22       On the other hand, if my Lady sets aside

23   Mr Justice Bryan's order, that again would be a final

24   order. If it turns out we lose in November, will, by

25   some process of resurrection, the order be revived or

1    will there be another order? So we say that in fact the

2    right way of dealing with this is to stay the order

3    pending the hearing of the section 68 application,

4    because in fact the application can't be finally

5    disposed of until one knows what actually happened -- or

6    will happen to the section 68 application, because --

7  MRS JUSTICE MOULDER: Mr Gruder, if that was the case that

8    would be the position on every judgment which is sought

9    to be appealed and it's not the case.

10  MR GRUDER: No, but this is not --

11  MRS JUSTICE MOULDER: So there's no conceptual difficulty.

12    This is what happens -- I've no idea what the

13    percentages are but there's certainly no automatic stay

14    if a judgment is to be appealed; even if the court

15    grants permission there is no automatic stay.

16  MR GRUDER: Well -- but this is not -- this is not

17    an appeal, this is a challenge to the integrity of the

18    award. I quite accept that if one has a judgment and

19    there is an appeal, then of course unless there is some

20    other order, a stay of execution or something of that

21    kind, then of course the judgment stands, I accept that.

22    The appeal is not an automatic stay in itself.

23      But in fact, CPR 69 and the terms of the order

24    effectively says the order cannot be in force until, if

25    one takes the wording of the order, the application has

1    been "finally disposed of". Can you -- and I ask

2    rhetorically, how can you finally dispose of an order to

3    set aside Mr Justice Bryan's order until you know

4    whether the arbitration award upon which it's based is

5    finally going to be held to be a valid one or not? It

6    is provisionally valid, I accept it's provisionally

7    valid, of course, but in fact the application to set

8    aside the ex parte order, the without notice order, is

9    completely hand in glove with the section 68

10   application. If one -- one at the moment has got

11   an arbitration award which is prima facie valid --

12   I accept it's prima facie -- but it's subject to

13   a section 68 application. You've got an application to

14   set aside a without notice order of Mr Justice Bryan

15   which is based upon the fact our case that the -- our

16   case that the award shall be set aside under section 68.

17      Now, if you're finally going to confirm that order

18   and supposing we succeed in November, it is difficult to

19   see how you can then effectively say, well, it now

20   appears that we were wrong to grant -- to confirm the

21   order, the order of -- this is not -- what the other

22   side are seeking is not some provisional life for the

23   Bryan order, they're seeking a final order.

24      In my respectful submission, you can't do that until

25   you know that the challenge has failed or succeeded. So

1    in my respectful submission the right way of dealing

2    with it is to stay the order of Mr Justice Bryan pending

3    the section 68, where that -- where the whole issue of

4    the validity of the award, and in my respectful

5    submission the validity of the without notice order

6    under section 66, will be finally determined.

7  MRS JUSTICE MOULDER: I don't think that -- whilst

8    I understand the argument you're advancing about it

9    being provisionally valid on the wording of the section,

10   I'm not aware of any authority that would support it and

11   looking at Russell, which was included in the bundle, at

12   8/10 that doesn't appear to be the approach which

13   Russell said was the result of the language.

14  MR GRUDER: Well, there is one authority which I would want

15   to put before my Lady, which is the judgment of

16   Mr Justice Eder in Y v S at tab 28 of the authorities

17   bundle.

18  MRS JUSTICE MOULDER: I'm sorry, tab 28?

19  MR GRUDER: Tab 28.

20  MRS JUSTICE MOULDER: Thank you.

21  MR GRUDER: If I can ask -- sorry -- if I can ask my Lady

22   possibly to look at the facts in the headnote at

23   page 703. (Pause).

24  MRS JUSTICE MOULDER: Yes.

25  MR GRUDER: And then -- well, if I can go to paragraph 23 on

1   page 709 and one sees Mr Justice Eder saying:
2       "It is important to understand that the application
3   made by Mr MacLean under this head on behalf of S is
4   that the court should now make an unrestricted final
5   order granting leave to enforce the award in the same
6   manner as a judgment or order of the court, ie before
7   disposal of Y's pending section 67 challenge which,
8   following a recent directions hearing by
9   Mr Justice Flaux, is now fixed for a four-day hearing."
10      And that in a way -- well, effectively although it's
11  section 67, it is what the other side are asking for
12  today.
13      24:
14      "In essence Mr ..."
15      And then he sets out in paragraph 24 Mr Diwan's
16  arguments, and then at paragraph 25 he says:
17      "In the course of the argument relating to this
18  application there was much debate as to whether
19  CPR 62.18 provides an exclusive code for the enforcement
20  of arbitration awards. If an application is made for
21  leave to enforce an award pursuant thereto, where the
22  court is in effect inevitably bound to make an order as
23  stipulated CPR 62.18, ie prohibiting enforcement pro tem
24  where the court might be able to vary or suspend the
25  terms of the order so as to require respondent to put up

85

1   "In principle I see much force in this argument,
2   however it's not clear to me how such an argument fits
3   in with the overall scheme of CPR 62.18, including in
4   particular 62.18(9) or how the approach of the court on
5   the question of provision of security ... fits in with
6   the approach of the court under section 77 ..."
7       He refers to Konkola:
8       "Further, contrary to ...( Reading to the words ).. I
9   was not persuaded to arrive at any decisions for
10  Article 6."
11      And then he says:
12      "Sadly the time allowed for the present hearing (two
13  hours including judgment) was insufficient to permit
14  proper consideration of the argument. Unfortunate
15  because it raises a point of some considerable practical
16  importance. My tentative view is CPR 62.18(9) speaks
17  for itself , ie in principle a successful party's prima
18  facie entitled to an order nisi granting leave to
19  enforce an arbitration order as prescribed by
20  CPR 62.18(9). But if an application to set aside such
21  an order is issued, then subject possibly to
22  a counterstrike application , the award must not be
23  enforced until such application is disposed of. There's
24  nothing in CPR 62.18 that contemplates that such
25  temporary prohibition against enforcement may be made

87

1   security ..."
2       We will come to that a bit later , because that's the
3   other side's fallback position .
4       If I can then go to paragraph 30 on 709:
5       "The second point also concerns the formulation of
6   paragraph 2 of this suggested draft order. Following
7   the structure of CPR 62.18(9) the prohibition against
8   taking steps to enforce is normally linked to
9   a potential future application to set aside the order
10  for leave to enforce. Here I recognise an application
11  under section 67 has already been issued and this
12  explains the wording suggested by Mr Diwan. However, in
13  my view, and subject to any further submission from
14  counsel, appropriate wording should be as follows ..."
15      And he sets it out.
16      Then he then sets out 1, 2, 3 and says:
17      "No doubt the application to set aside may refer to
18  the existing section 67 application and/or the same
19  grounds, but it seems to me this wording is more
20  appropriate because it follows the structure of 62.18."
21      And then one goes to -- the next question is
22  security and then in 32 -- I ought to deal -- since I'm
23  on this case I ought to deal with the security point,
24  because that's, as I said, the other side's argument,
25  that even if we're right, there should be security:

86

1   subject to an order of security ."
2       So this is -- we're coming to it :
3       "As it seems to me it is also consistent with the
4   decision of this court in IPCO at paragraph 20, where an
5   enforcement order was held to be defective .
6   Section 70(7) only applies to sections 67, 68 and 69 of
7   the 1996 Act. It does not apply to any application for
8   leave to enforce under section 66 of the 1996 Act.
9   Consistent with section 70(7), it seems to me that any
10  application for an order requiring provision of security
11  of the amount in the dispute must be made in the context
12  of a discrete application under sections 67, 68 and 69."
13      Then I think probably that's where I can leave it .
14      Now, in my respectful submission, and in particular
15  that passage at the bottom of paragraph 30, where the
16  judge says:
17      "No doubt the application to set aside may refer to
18  the existing section 67 application and/or the same
19  grounds -..."
20      He is contemplating, in my submission, that the
21  matter is not -- the application cannot be finally
22  disposed of until there is final disposal of the -- in
23  that case section 67 application but in this case the
24  section 68 application . And I would respectfully submit
25  that that's the sensible matter because otherwise you

88

1    would have an order either an ex parte order set aside
2    and then revived or an ex parte order confirmed finally
3    and then two months later that order is then effectively
4    subverted by a further order setting aside the
5    arbitration award under section 68.
6        In fact Vale come close, at least to some extent, in
7    accepting this, because if one looks at paragraph 43 of
8    their application -- of their skeleton argument, they
9    say this:
10       "Fourth, where a party has a pending challenge to
11   the award the correct approach is not to set aside the
12   enforcement order but to consider whether to grant
13   a stay of enforcement pending the hearing of that
14   challenge. And, if so, on what terms. This is the
15   approach described in the leading works on arbitration
16   and applied in Socadec."
17       Now, we accept that the right way of looking at it
18   and the way to deal with this is to decide whether it
19   should be stayed, but we part company on the submission
20   that the court should order security or indeed the court
21   has any power to order security because of what
22   Mr Justice Eder said in Y v S.
23       What's more, his decision in Y v S is consistent
24   with the decision of the Supreme Court. It's not on
25   section 70(7). It's not on section 68. In IPCO

89

1    (Nigeria) v Nigerian National Petroleum Corp, which one
2    finds at tab 33 of the authorities bundle.
3        Now, this is a very -- a case with a very long
4    history and if one looks at the headnote at page 970,
5    what in fact happened was there was an arbitration in
6    Nigeria with an award of $152 million and the claimants
7    sought to enforce the award through the English courts
8    under Part 3 of the Arbitration Act:
9        "Parties agreed by consent order to adjourn the
10   English enforcement proceedings under section 103(5) of
11   the 1996 Act pending resolution of a challenge to the
12   award brought by the defendant in the Nigerian courts.
13   The defendant agreed to pay certain undisputed sums into
14   court as security. The defendant subsequently became
15   aware of evidence the claimant had secured the
16   arbitration award by way of fraud and amended its
17   pleading in Nigeria accordingly. The claimant
18   unsuccessfully applied to set aside the consent
19   agreement and force the arbitration award in England on
20   the basis that delays to the Nigerian proceedings
21   amounted to a change of circumstances. The Court of
22   Appeal allowed the claimant to appeal, holding that the
23   fraud allegation itself amounted to a change of
24   circumstances which justified lifting the stay of
25   English enforcement proceedings in order that rather

90

1    than await the outcome of Nigerian proceedings the issue
2    whether fraud was an answer to enforcement raised
3    an issue of public policy under section 103 should be
4    decided in the English courts and further enforcement
5    awards should be adjourned under section 103(5) on
6    condition the defendant provides security of
7    100 million ..."
8        That's the important part of it for our purposes.
9    And one sees the holding, if I can ask my Lady possibly
10   to read the holding at the bottom of the headnote.
11   (Pause.)
12       And if then I can make one or two submissions and
13   perhaps show my Lady perhaps one or two passages.
14   MRS JUSTICE MOULDER: Yes.
15   MR GRUDER: One sees what the Supreme Court is saying is
16   section 103(5) of the Arbitration Act provides security
17   might be ordered where there was an adjournment within
18   its terms, but there was nothing in section 103(3) which
19   provided that a court could make its decision under that
20   provision conditional upon the provision of security.
21       And effectively the reason is, we would submit,
22   analogous to Mr Justice Eder's reasoning that if there
23   is an express power to order security, as there is under
24   section 70(7), then the court can't then, when it's
25   dealing with section 66 and dealing with -- if the court

91

1    decides to stay a challenge to a without notice
2    section 66 judgment it can't then seek to order security
3    as a condition of that stay.
4        And one sees -- well, one sees section 103 quoted in
5    detail at paragraph 14 of the judgment and one -- the
6    passage I relied upon is actually a very short one.
7    It's in paragraph 24. What Lord Mance says is:
8        "In both these respects the Court of Appeal fell, in
9    my opinion, into error. First, nothing in
10   section 103(2) or 103(3) or in the underlying provisions
11   of Article 5 of the New York Convention provides that
12   an enforcing court may make the decision of an issue
13   raised under either subsection conditional upon the
14   provision of security in respect of the award. In this
15   respect, there is a marked contrast with section 103(5),
16   which specifically provides that security may be ordered
17   where there is an adjournment within its terms."
18       And we say, yes, there is an express power under
19   section 70(7) but one can't then seek to imply powers
20   which the court might have when there are provisions in
21   this -- in the Arbitration Act which provides for the
22   possibility of security in appropiate circumstances
23   where there's a challenge under section 68 or
24   section 67. But there's nothing which makes
25   an application to set aside or stay a without notice

92

1    judgment under section 66, subject to security. So in
2    our respectful submission we submit that Mr Justice Eder
3    was right and it's supported by IPCO (Nigeria).
4        Now, there are some other submissions my learned
5    friend has made and so, for example, if I can go to
6    paragraph 42.1 of his skeleton, one sees this. He says,
7    third, he says:
8        "An award debtor cannot oppose enforcement on the
9    basis that the award was tainted by a serious
10   irregularity."
11       Now, the facts that those judgments are dealing with
12   are totally different types of facts. They've got
13   nothing to do with section 66 and the terms upon which
14   the court -- whether the court should discharge or
15   should stay a without notice section 66 order. What it
16   is envisaging is somebody who is, for example, sued upon
17   an award or there's an attempt to enforce an award and
18   the party seeks to resist enforcement on the basis that
19   the arbitrators acted unfairly. One sees this from
20   section 422(1), where Lord Justice Scrutton says in the
21   Scrimaglio case:
22       "... the decisions are settled but once you have the
23   arbitrator properly appointed and the objection to the
24   award is that being properly appointed he has conducted
25   himself improperly in the arbitration the award can be

93

1    set aside on the grounds of misconduct. That cannot be
2    set up as a defence to an action upon the award, the
3    objection must be raised by a motion under the
4    Arbitration Act to set aside or remit the award."
5        Now, what's that's envisaging is of course there is
6    a section 66 procedure, but of course a party could, and
7    perhaps at the time of Lord Justice Scrutton regularly
8    might have done that, to -- can sue upon the award and
9    say that the party is -- there is a cause of action for
10   a failure to pay the sums awarded, a cause of action in
11   debt. And what is envisaged is if that -- such
12   an application -- if such an action is brought, the
13   party seeks to resist the claim based upon the award by
14   saying there was misconduct.
15       What the Court of Appeal is there saying is: I'm
16   sorry, you can't do that. If you want to raise the
17   issue of misconduct, or in our language serious
18   irregularity, the objection must be raised upon a motion
19   under the Arbitration Act to set aside or remit the
20   award. Well, that's precisely what we have done and we
21   say that that means, and I won't repeat myself, it means
22   that the court should stay the section 66 in order for
23   everything to be finally determined in November.
24       The other authorities really don't take the matter
25   further than Scrimaglio itself. So we do, in our

94

1    skeleton, put forward alternative bases for our case
2    here. We deal with public policy at paragraphs 52 and
3    following, and the courts -- paragraph 54 and following,
4    the court's inherent jurisdiction to suspend enforcement
5    pending challenge to the award.
6        We say that the court has got no power, for the
7    reasons I've said, to order security, but if the court
8    did have power to order security, the court's power
9    should be exercised consistently with its power under
10   section 70(7), because, in our submission, it would be
11   wholly anomalous for the court to award security under
12   section 66 as the price of staying the order pending the
13   hearing in November if the court would not order
14   security under section 70(7), which gives the court
15   express power to order security pending a section 68
16   challenge.
17       So unless I can assist you further on that, those
18   are my submissions on that application.
19   MRS JUSTICE MOULDER: Thank you.
20              Submissions by MR FOXTON
21   MR FOXTON: My Lady, I'm going to follow the same order as
22   Mr Gruder and deal with my reply submissions on our
23   application first and then respond to Mr Gruder.
24       Now, in relation to section 70(7) there is an issue
25   of timing: when must the prejudice occur? It cannot be

95

1    a requirement that it happens after the date of the
2    hearing of the application to impose a condition.
3    Otherwise the longer you were able to put off the
4    hearing of the other side's application for a condition,
5    a more of a free run you would get in terms of being
6    able to move assets and so forth before any matters
7    could be relied upon to support a condition.
8        I accept it runs from the date that the application
9    under section 68 is issued and it runs of course not
10   until the date of the hearing in November, but until the
11   final disposition of the section 68 application. None
12   of us know when that might be.
13       Now, in relation to the wholesale reliance upon the
14   administrators, what, with respect to Mr Gruder, that
15   does not adequately deal with is prejudice in the form
16   of the inability to recover or trace assets using rights
17   of the company from counterparties to whom they have
18   been moved.
19       That is not wholly fanciful because we know that
20   500 million was immediately moved out to the
21   Liechtenstein trust. We know that there have been other
22   movements of assets prior to the administrators'
23   appointment.
24       The administrators themselves do not control what is
25   happening in any recipients of funds from BSGR and they

96

1   do not pretend to have any control over that. So
2   nothing in relation to what the administrators can and
3   cannot do answers that prejudice.
4       Mr Gruder says, well, you should fund the current
5   administrators --
6   MRS JUSTICE MOULDER: Sorry, just on that, I seem to recall
7   in Mr Cohen's witness statement he said that your
8   clients had been asked to provide --
9   MR FOXTON: The very point I was coming to next, my Lady --
10  MRS JUSTICE MOULDER: -- details. All right.
11  MR FOXTON: -- if I may.
12      It is said by Mr Gruder, well you should fund these
13  claims yourselves. But that is a request that we fund
14  administrators who describe our complaints about the
15  conduct of BSGR management as "unsubstantiated
16  assertions" and do so notwithstanding the findings that
17  have been made by this tribunal in this award, in
18  circumstances where those administrators are acting on
19  the basis of funding from the very people against whom
20  those claims may well need to be brought.
21      We do say that the suggestion that in those
22  circumstances we should fund the administrators, while
23  they are still liaising with management and funded by
24  the shareholder to investigate claims against
25  Mr Steinmetz and others, is, with respect, unrealistic

97

1   to expect any creditor to do that.
2       The great benefit of being to enforce and liquidate
3   is that there would be no ongoing link, as it were,
4   between the potential objects of such recovery
5   litigation and those managing BSGR, and that is
6   a fundamental point of distinction.
7       The funding agreement in fact does not allow the
8   administrators to resign. It has a provision, from
9   recollection, that allows the funding entity to give
10  three months' notice to terminate, but not the
11  administrators themselves. For so long as the
12  administration continues and they are the
13  administrators, that agreement applies. So it is not as
14  if one could say, well, we would like you to sever your
15  links with the funding entity before we go into the
16  merits of claims against the funding entity.
17      There is just a practical problem here that makes
18  funding these administrators --
19  MRS JUSTICE MOULDER: Sorry, so you're saying that the
20  administrators have put themselves in a position where
21  they can't resign? That sounds a very extraordinary
22  proposition.
23  MR FOXTON: I suppose if the court removed them as
24  administrators or they went to the court to be removed,
25  but the contract itself includes a unilateral provision

98

1   for termination. I should probably take your Ladyship
2   to it in the ... (Pause).
3       It's in volume 2, tab 10, page 37 to 38. I think
4   they would have to go to court and have themselves
5   removed but there isn't a provision for service of
6   cancellation by the administrators under this, only by
7   the parent.
8       (Pause).
9   MRS JUSTICE MOULDER: I obviously don't have the opportunity
10  to read this whole thing, but flicking through it
11  clause 15 refers to administrator resigning his office
12  by giving notice of resignation so I'm not really
13  sure --
14  MR FOXTON: I accept if they cease to be administrator at
15  all then this won't apply to them.
16  MRS JUSTICE MOULDER: Sorry, I've missed the point.
17  MR FOXTON: So long as they are administrator, they are
18  administrator on the terms of this funding agreement
19  with the parent. It's not a contract of servitude which
20  requires them to carry on with that role, and it's not
21  a contract in which they can both carry on with the role
22  of being administrator and not be subject to the terms
23  of this agreement.
24  MRS JUSTICE MOULDER: What's your objection therefore then
25  to the funding agreement; just that it's connected with

99

1   the former management?
2   MR FOXTON: In the context of the specific point under
3   discussion, namely that we should be funding these
4   administrators to pursue claims or investigate claims
5   against parent companies and those behind parents
6   companies, it is the practical, deeply unattractive
7   nature of having that sort of a discussion with
8   administrators at the same time as they are tied by the
9   funding agreement to the very entities against whom the
10  claims would need to be investigated and brought.
11  MRS JUSTICE MOULDER: All right.
12  MR FOXTON: Now, my Lady, in relation to the ICSID
13  settlement, whatever merits the claims may or may not
14  have had, somehow Niron, which appears to be a vehicle
15  with which Mr Steinmetz has some connection, is somehow
16  extracting value from the proposed settlement of it and
17  on the ground, at least, Niron appears to be carrying on
18  on the basis it will indeed be the person operating this
19  concession.
20      The effect of that arrangement is that value from
21  the ICSID claim is going, not to the creditors but to
22  Niron and possibly to Mr Steinmetz. And, my Lady, we do
23  say that against the background of the findings made by
24  the tribunal, that is a deeply unattractive state of
25  affairs.

100

1    In addition, the ICSID arbitration seeks restoration
2    of the concession. That's part of the relief sought.
3    It's probably worth going to that in volume 1, tab 7, at
4    page 18. (Pause).
5        Now, this is the administrators' report of
6    7 March 2019 and at 4.1 it summarises the claim. My
7    Lady will see from the last sentence of the first
8    paragraph of 4.1:
9        "The company's claim seeks the restoration of those
10   rights --..."
11       And that is a form of relief in which changing
12   events on the ground --
13   MR GRUDER: If my learned friend could actually read the
14   next three words.
15   MR FOXTON: "... together with damages."
16       I hope Mr Gruder knows me well enough to know that
17   I would not deliberately fail to read three words.
18   MR GRUDER: Absolutely not, but you might inadvertently do
19   so.
20   MR FOXTON: Well, there we are.
21       So it is seeking that together with damages.
22   I don't know how that remotely helps Mr Gruder beyond
23   giving him an opportunity to interrupt because part of
24   the relief that is being sought is relief that
25   a changing position on the ground clearly has

                              101

1    implications for them.
2        My Lady, it's also said where does the figure come
3    from? Where is your evidence of the quantification of
4    prejudice? My Lady knows that the figure of 500 million
5    is the amount of cash fraudulently obtained at the start
6    that was immediately shut up to the Liechtenstein
7    foundation. It is, with respect, an entirely legitimate
8    inference that when someone fraudulently obtains
9    £500 million and then shoots it up to another company,
10   or indeed a foundation, straightaway, that that might be
11   done in order to prevent recovery in the event that the
12   fraud comes to light.
13       It is very difficult to try to quantify in
14   mathematical terms what -- a risk of prejudice and what
15   might or might not be recoverable. We've sought to go
16   for a figure that has objective rational connection with
17   the findings in the award, and is 25% of the amount
18   outstanding. If the court takes the view that that
19   figure is too high and in the light of the uncertainties
20   to the assets a smaller figure would be appropriate, so
21   be it. But in freezing injunctions it's not a case in
22   which it can be said, well, we can show you the maximum
23   value of assets capable of being affected by prejudice,
24   limit it to that, because we do not have disclosure of
25   the full extent of the value of BSGR's assets and, more

                              102

1    to the point, one is dealing here with prejudice in the
2    inability to recover assets from third parties to whom
3    they have been wrongfully passed by BSGR, not just
4    against BSGR itself.
5        There was a suggestion by Mr Gruder we had brought
6    this application with the intention of stifling but
7    I think he accepts that there's no evidence that the
8    application would, if granted, stifle the claim so
9    I think that point falls away.
10       Then in relation to the costs order of
11   Mr Justice Popplewell, of course the court has inherent
12   jurisdiction to make that a condition of pursuing
13   an application.
14       One of the reasons for summary assessment of costs
15   is to bring home to parties the consequences of running
16   bad points. That is a fortiori the case when the costs
17   are ordered on an indemnity basis to mark the court's
18   disapproval of the way in which the case has been run
19   and those policies would be seriously undermined if
20   a party could simply say, "Well, I'm not paying and I'm
21   carrying on litigating the same matter at a second stage
22   in the court regardless".
23   MRS JUSTICE MOULDER: You'll have to forgive me, but I'm not
24   sure I understand how your condition of payment of those
25   costs is sitting with the two applications. So on the

                              103

1    one hand we have the application for security in the
2    amount of 500 -- I hear what you say about the amount
3    but leave it at that. On the other hand, and no doubt
4    you're coming to it, we have the application for a stay
5    or set aside. So I'm not quite sure where the
6    Popplewell costs are fitting into those applications.
7    MR FOXTON: My Lady, it's not a section 70(7) or (6) and the
8    reason for that is that Mr Gruder is right to say that
9    on their own terms they deal either with in the case of
10   section 70(7) amounts awarded by the tribunal -- and
11   plainly the order of Mr Justice Popplewell is not
12   an amount awarded by the tribunal -- or with security
13   for costs of the set aside -- the section 68 application
14   and plainly those costs are not costs of the section 68
15   application.
16       So they are not capable of falling within either of
17   those two heads, but the court is itself able to impose
18   as a condition of bringing any claim a requirement that
19   prior costs orders in the same matter have been paid.
20   So it rests upon an independent juridical basis but we
21   would submit a well-established one and that it is
22   entirely appropriate to invoke in the circumstances of
23   this case.
24   MRS JUSTICE MOULDER: The problem it seems to me is that
25   raised by Mr Cohen in his evidence, where he says that

                              104

1   is a debt which was outstanding at the point of
2   administration and were the court to order it, there
3   must be an argument that you are thereby getting
4   priority for that debt.
5   MR FOXTON: There are, I think, three answers to that
6     difficulty. The first is that the administration has
7     not been recognised, despite a threatened application
8     for recognition, such that it has no status as a reason
9     not to pay debts in this jurisdiction.
10       Secondly, that the payment of the amount could come
11    not simply from BSGR but from those who stand to benefit
12    standing behind BSGR in much the same way as any order
13    for provision of security might so come.
14       Thirdly, it is open to the court, if the court is
15    concerned about this, to make the condition one of
16    payment of the amount into escrow or into court on the
17    same terms as any security, rather than outright payment
18    to my clients.
19   MRS JUSTICE MOULDER: Sorry, what would that achieve?
20   MR FOXTON: I'm sorry, my Lady.
21   MRS JUSTICE MOULDER: What would payment into court achieve?
22   MR FOXTON: Because the court then has the ability to
23    control the subsequent disposition of the payment if
24    an insolvency event occurs such that it would be argued
25    that paying it out to my clients would involve some form

105

1   of unfair advantage over other creditors. (Pause).
2       My Lady, security for costs very briefly. Mr Gruder
3   focused on counsel's fees. In fact, the counsel's fees
4   are significantly higher today on his clients' part. As
5   we're going there, Mr Gruder I think is on a £100,000
6   brief compared with my £65,000. Mr Quirk on £50,000.
7       With respect to Mr Gruder, there is a great deal
8   more work to do for the section 68 itself, not least
9   there are 3,400 pages of exhibits to his clients'
10   challenge application alone and we have not begun to
11   wade through all the footnotes in para 11 of Mr Gruder's
12   skeleton and compare the evidence said to have been
13   given in the ICSID arbitration with the evidence in the
14   LCIA arbitration and matters of that nature. So there
15   is a great deal more to be done. (Pause).
16       Now, my Lady, that brings me to the set aside
17   application and I do have to say that the submissions
18   made to you by Mr Gruder on this point are completely
19   heterodox as to -- what is implicit in there is that
20   there is no enforcement of awards while a section 68
21   challenge is pending. That is simply not and has never
22   been the law. It's not what Mr Justice Eder says
23   either.
24       Clearly, if the section 68 application succeeds
25   while enforcement is under way, it is open to the court

106

1   and the court would inevitably -- and it would not even
2   be opposed -- set aside any enforcement order that had
3   been made or any orders following on from that. Just as
4   success before the Court of Appeal leads to the setting
5   aside of a judgment and any following consequential
6   enforcement orders made on the basis of that judgment.
7   That is because the setting aside of the award is
8   a change of circumstance that allows the court to
9   revisit the issue as to the status of enforcement, and
10   that never causes any difficulties at all.
11       But the point here is the mere possibility of
12   a challenge succeeding in the future does not provide
13   a defence to enforcement in the meantime when that
14   challenge is based on section 68 because of the
15   presumptive validity of the arbitration award.
16       My Lady, there is a fundamental distinction, and
17   an important one, between challenges based on lack of
18   jurisdiction under section 67 and challenges based upon
19   serious irregularity under section 68. Because an award
20   where jurisdiction is disputed has no presumptive
21   validity, in contrast to an award where it's accepted
22   there is jurisdiction but the challenge is on the basis
23   of serious irregularity.
24       Now, if authority is required for that proposition,
25   we have it, amongst other places, in

107

1   Mr Justice Tomlinson's judgment in Peterson Farms at
2   tab 16 of the authorities bundle. My Lady, it's at
3   paragraph 26 where the judge explains the conceptual
4   difference between challenges under section 67 and
5   section 68, your Ladyship I'm sure is familiar with the
6   passage.
7       That conceptual difference is also reflected in the
8   wording of section 66 itself, because if one goes to
9   that, and it's in, I think amongst other places,
10   bundle 3, it expressly contemplates lack of jurisdiction
11   or a challenge to lack of jurisdiction as a reason to
12   set aside enforcement. That's what section 66(3) says:
13       "Leave to enforce an award will not be given where
14   or to the extent that the person against whom it is
15   sought to be enforced shows the tribunal lacked
16   substantive jurisdiction to make the award."
17       There is no similar language in section 66 about
18   challenges under section 68 or procedural irregularity.
19       One reason that that is important is when one comes
20   to Mr Justice Eder's decision in Y v S, because that, of
21   course, was a case in which there was a jurisdictional
22   challenge to the award.
23       Now, I don't know whether my Lady sufficiently
24   recollects the matter from -- I know you were taken to
25   the case a matter of moments ago, but it was

108

1    a section 67 case. Now, a party with a section 67 is
2    able, under section 66(3), to say "I am challenging the
3    jurisdiction of the tribunal over me", and therefore
4    there is a complete overlap between a legitimate defence
5    to the enforcement order and the challenge to the court.
6        There is no such overlap when the complaint brought
7    by the party is not lack of jurisdiction but serious
8    irregularity.
9        So, my Lady, the argument that this can all be set
10   aside now because there is a future section 68 is, with
11   respect, hopeless.
12       Mr Gruder did not develop beyond his skeleton
13   argument on the issue about whether this might
14   constitute a public policy defence. My Lady will know
15   that section 68 itself includes public policy as one
16   head of serious irregularity and the court may feel that
17   in a section 68 application, not noticeable for the
18   number of the narrowing on the points taken, that head
19   of challenge is not brought to the award itself.
20       So we are plainly nowhere near public policy. The
21   attempt to elevate every serious irregularity to public
22   policy would mean a section 68 would automatically
23   prevent any attempt to registration and enforce an award
24   under section 66. That, with respect, is plainly not
25   the law.

109

1        Now, of course if judgment is entered under
2    section 66 the award stands in exactly the same position
3    as a domestic judgment of this court, with the ability
4    of the court to stay execution on terms, but subject to
5    very well-known principles. It is not automatic. One
6    doesn't lightly deprive the judgment creditor of the
7    fruits of the judgment. One looks at the balance of
8    prejudice. There's no evidence of prejudice to
9    Mr Gruder's clients here. One now certainly is able to
10   take advantage of looking at the prospective merits of
11   the appeal.
12       And our suggestion that stays of execution of
13   judgments entered under section 66 are decided on
14   conventional principles by reference to CPR 83.74 is, as
15   I think my Lady has spotted, supported both by
16   Russell on Arbitration and by Merkin, both of whom make
17   it clear that once the judgment is entered it is that
18   standard CPR rule that determines the enforcement
19   regime. It is Russell para 8-008, tab 47 of the bundle,
20   and Merkin, para 19-16 at tab 48, and we do submit that
21   that is well established principle.
22       There is no reason at all why these judgments
23   entered under section 66 should somehow stand
24   differently to judgments of the court delivered
25   following proceedings in the court. With respect to

110

1    Mr Justice Eder, who heard no argument on the point, the
2    suggestion that section 70(7) guides the exercise of the
3    stay on enforcement is wrong, because there is
4    a fundamental difference between imposing a condition on
5    the right of a party to argue a point at all and
6    imposing a condition on the indulgence to that party of
7    staying the execution that normally follows inevitably
8    from the entering of a judgment against them, even if
9    under appeal.
10       My Lady, that fundamental difference is, of course,
11   reflected in the very different approach taken under the
12   CPR between stays of execution of a judgment and
13   a request to the Court of Appeal to impose a condition
14   on the right to bring an appeal at all. And because
15   imposing conditions can raise stifling arguments,
16   imposing a requirement before execution will be stayed
17   does not raise a stifling argument, it simply raises
18   an argument of where is the balance of convenience and
19   prejudice against the presumption that the fruits of
20   judgments are not lightly to be denied.
21       So my Lady, for those reasons we say, first of all,
22   the attempt to say that the section 68 provides a reason
23   not to allow the application to enter the award as
24   a judgment to stand is completely misconceived and
25   wrong. The reliance on Y v S is completely wrong

111

1    because that is a case where there was a challenge to
2    jurisdiction, which is a defence to an attempt to
3    enforce under section 66(3).
4        The relevant procedural framework for a stay of
5    execution is the standard CPR one, as the authorities
6    make clear, and the attempt to analogise between that
7    and section 70(7) is simply wrong.
8        My Lady, similarly the reference to IPCO is, with
9    respect, not on point. That was of course a case in
10   which fraud had been raised, which would be a public
11   policy defence to any attempt to enforce, and is
12   expressly preserved, I think, by section 81 of the Act.
13   In any event it came in a context in which the relevant
14   statute expressly gave a power to order security when
15   a party was relying upon a challenge in the curial court
16   but no power to order security when a party was
17   exercising its independent right to resist enforcement
18   in the enforcement court.
19       Here, by contrast, section 66(3) provides no basis
20   upon which section 68 challenges prevent enforcement and
21   one simply falls back on the standard CPR 83.7 wording.
22   And, my Lady, we do say that this is a case in which,
23   applying that well-known test, there is no way in which
24   BSGR come even close to getting the order that would
25   stay execution of a judgment. It has adduced no

112

1    evidence at all of any prejudice that might flow from
2    such an order being made. The merits of its challenge
3    are, with respect, exceedingly poor and in those
4    circumstances the starting presumption that it is a rare
5    thing to deprive a successful party of the benefits of
6    its judgment debt should also be the final point of the
7    court's decision-making.
8        So, my Lady, I've dealt with that relatively briefly
9    but your Ladyship seemed to be alive to all the various
10   points and I hope that that wasn't too summary a set of
11   submissions.
12   MRS JUSTICE MOULDER: Thank you.
13           Submissions by MR GRUDER
14   MR GRUDER: My Lady, I've got obviously the right to reply
15   on the enforcement part. I just would like to have
16   an indulgence just to give my Lady a reference which
17   I forgot to give my Lady on the security for the claim
18   part, which is bundle 2, tab 10, page 82, which is
19   the -- which I forgot to show my Lady when I was taking
20   my Lady through the draft agreement at page 82.
21   I forgot to show my Lady the signature page of that
22   memorandum of agreement or provisional agreement,
23   whatever one calls it.
24       One sees the signature page. The first signature is
25   by one of the joint administrators acting as agent

113

1    without personal liability, without giving any
2    representation:
3        "... subject to finalisation of a formal contract
4    with the entry into and execution of any such formal
5    contract being first sanctioned by an order of the Royal
6    Court of Guernsey and signed in accordance with and
7    subject to their duty as administrator on the basis that
8    this document shall be governed by the laws of the
9    Island of Guernsey."
10       Then one of the directors of BSGR signs, one of the
11   directors signing:
12       "... subject to the finalisation of the formal
13   contract and signing on the basis that this document
14   shall be governed by the laws of the Island of
15   Guernsey."
16       And then there is another director. The same basis.
17   I forgot to show my Lady to that.
18       Now, if I can come to my learned friend's argument
19   and --
20   MRS JUSTICE MOULDER: Mr Gruder, I'm not going to cut you
21   short but we are going to need a transcriber break, so
22   I don't know how long you're going to be. Is now
23   a convenient moment?
24   MR GRUDER: It is a convenient moment. Thank you my Lady.
25   MRS JUSTICE MOULDER: Let's take the transcriber break now,

114

1    as I said I didn't want to cut you off shortly.
2        Thank you.
3    (3.12 pm)
4            (A short break)
5    (3.22 pm)
6    MR GRUDER: My Lady, can I first of all deal, perhaps in
7    reverse order, with the arguments my learned friend made
8    based on CPR Order 83 to say that I am seeking a stay of
9    execution of a judgment and the court's normal powers
10   and the discretionary factors the court takes into
11   account apply.
12       My Lady, I mean, I'm obviously telling my Lady what
13   my Lady already knows, CPR 83.7 deals -- starts:
14       "At the time that a judgment or order for payment of
15   money is made or granted or any time that a debtor or
16   other party liable to execution of a writ of control or
17   warrant may apply to the court for a stay of execution."
18       That's page 2396 of the White Book.
19       There is a fundamental flaw in my learned friend's
20   argument. There is no judgment. There is no judgment
21   in this case. We're not seeking a stay of execution,
22   and I can demonstrate this to my Lady very, very easily.
23   If my Lady will come to volume 5, tab 17, one finds the
24   remedy -- the application notice for -- which Vale
25   issued which led up to the Bryan judgment. Paragraph 9:

115

1        "The court seeks permission to enforce the award in
2    the same manner as a judgment or order of the High Court
3    to the same effect pursuant to section 66 excluding the
4    post-interest award -..."
5        And the rest:
6        "It reserves the right later in its discretion to
7    seek to enter judgment in terms of the award pursuant to
8    section 66(2) of the Arbitration Act."
9        They have not done that. There is no judgment.
10       And if one goes to the Bryan order, which one finds
11   at tab 19, one sees that 1 gives them permission to
12   enforce the award in the same manner as a judgment.
13   Paragraph 2:
14       "Permission having been granted under section 66(2)
15   as aforesaid, the claimant may later request that
16   judgment be entered in terms of the award under
17   section 66(2) of the Arbitration Act."
18       So there is no judgment. They have liberty to
19   enforce the award in the same manner as a judgment, but
20   there is no judgment entered against us and therefore
21   all my learned friend's arguments based on CPR 83.7 are
22   misplaced.
23       Secondly, my Lady, if then CPR 83.7 has no
24   application, and all those authorities about it, which
25   in my submission is correct, then if you are going to

116

1  stay this order, then, in my respectful submission, the
2  order, if it's stayed, it prevents them from obtaining
3  the fruits of their award.
4      And an application under section 68 also potentially
5  challenges their right under the award. If
6  section 70(7) -- if there is a power for the court to
7  order security -- in my respectful submission there is
8  no power because Mr Justice Eder was right -- any power
9  has to be exercised consistently with the power under
10  section 70(7), and you've obviously got my submissions
11  on that.
12      If I can then come to my learned friend's argument
13  that what I'm saying is heterodox, what my learned
14  friend is seeking do here -- now, in a natural situation
15  our section 66 application would actually come on at the
16  same time as the section 68 application. I mean, it
17  makes sense, because they are two sides of the same
18  coin.
19      Now, there is a timing difference here. It was
20  managed by Mr Justice Teare in a way that our
21  application to set aside the order should -- the Bryan
22  order -- should come on at the same time as the security
23  for costs and the security for the award application and
24  not at the same time as the section 68.
25      So what my learned friend is trying to do is to take

117

1  advantage of that -- it was a management decision, but
2  to take advantage of that management decision in order
3  to effectively have the benefit of two and a half months
4  which, in my respectful submission, he shouldn't have.
5      And in my submission -- my learned friend says what
6  I say is heterodox. In my submission, it's not
7  heterodox for this reason: that one can -- if my learned
8  friend is right, it means that in every case where there
9  is a timing difference, that there is effectively -- the
10  application to set aside the ex parte order comes on
11  before the section 68 -- let's keep section 67 to one
12  side, I accept there is potentially a difference
13  there -- a section 68 application, a party can say well,
14  there are these allegations and, you know, it's all
15  going to be determined in a few months' time but the
16  award is presumptively valid, you know, and therefore
17  make the order final. And in my submission my
18  submissions are not heterodox. They are actually bound
19  up in the words "finally determined" and the fact that
20  in -- with all due respect to Mr Justice Teare, in
21  a properly managed situation the -- our application
22  under section 66 would come on at the same time as our
23  application under section 68. And that, in my
24  submission, is the long and short of it.
25      My learned friend then sort of struggled, with all

118

1  due respect, to try and get the court to order security
2  for us to pay the Popplewell costs order as somehow
3  security or a condition and he said it's -- there are,
4  I think, very established foundations and jurisprudence
5  to justify that. But I note, with all due respect, that
6  he didn't produce one rule of court, one statute, one
7  authority to substantiate the fact that the court can
8  bring in a liability to pay a costs order on a totally
9  different application, albeit an arbitration
10  application, as somehow a condition for granting a stay
11  of a section 66 order.
12      So unless I can assist you further, those are my
13  submissions. (Pause.)
14      Amendment. Yes, there is one further application,
15  which is our application to amend the application, the
16  arbitration application, which one finds at bundle 5, at
17  tab 20 -- well, effectively there are a number of tabs
18  which precede tab 28, but it's really, I think, tab 28
19  which shows the amendments.
20      And what the amendments show is that a number of, as
21  one can see in red, challenges which were made have been
22  dropped as independent challenges, but they are --
23  remain as the context which the court should take into
24  account.
25      So if one looks at page 2 of that section, one sees

119

1  instead of there being a pattern of conduct, it just
2  says "conduct" and then "apparent bias", and then
3  there's a deletion. I think it's fair to say that these
4  are substantially rowing back rather than adding things,
5  although words are put in to try and connect it.
6      So if one sees at paragraph 7, it says:
7      "BSGR relies specifically on the tribunal's refusal
8  to admit the ICSID hearing transcript and post-hearing
9  brief on to the record."
10      And that is the meat of the application.
11      Then 7(a):
12      "The context, which is of particular importance to
13  that decision, which is developed below is ..."
14      Then the matters on page 4, which were independent
15  grounds under section 68 now become context, one, two
16  and three.
17      Then one -- pages 4 onwards deal with the ICSID
18  transcript point, which is the main point, and that goes
19  on, my Lady, for a number of pages, as one sees.
20      One then really has to go on, there are no changes,
21  until one gets to 15, page 15, and then those matters
22  under 2, the refusal to reschedule the final hearing and
23  not believing what Mr Wolfson said about his
24  availability and his diary, and 3, on page 17, failure
25  to reconsider the earlier decisions, and 4 refusal, on

120

1    page 18, to reproduce the original appointment
2    procedure, become context rather than independent,
3    context in which the court should consider the failure
4    to allow us to put in the transcript, the ICSID
5    transcript, against which that should be dealt with.
6        On page 20, you see the failure to deal with the
7    frustration damages issue, which I erroneously said had
8    been dropped but has not been dropped.
9        So that's what we're doing. We drop three
10   independent grounds under section 68 but effectively
11   say, well, you can't just approach the ICSID -- I mean,
12   there is obviously a long history of this arbitration
13   and, indeed, as you see from the way the other side have
14   put their case today, they also rely upon history in
15   trying to say that there's guerrilla tactics . Well, we
16   say you can't just approach the question of the ICSID
17   transcript as if it was in a vacuum. You have to look
18   at what went on round about, either before --
19   effectively it's before then because the failure to
20   allow them in came out at the time of the award, but in
21   the immediate run-up to the application and so on.
22       So those are my submissions, and we deal with it
23   very briefly on page 23 of our skeleton argument,
24   paragraphs 55 to 58.
25

121

1                Submissions by MR FOXTON
2    MR FOXTON: My lady, like Mr Gruder, I have to crave
3    indulgence for one reference I should have given your
4    Ladyship before, Mr Justice Teare's order, bundle 5,
5    tab 5, page 4, when he made clear:
6        ".. the reason for the set aside application being
7    heard today was there is a real issue as to whether the
8    existence of a section 68 challenge is sufficient ground
9    for setting aside an enforcement order."
10       So not quite the pure case management decision,
11   something rather more --
12   MRS JUSTICE MOULDER: I'm sorry, I missed the reference.
13   Could you give me the reference again, please?
14   MR FOXTON: Certainly, my Lady, it is bundle 5, at tab 25,
15   page 4.
16   MRS JUSTICE MOULDER: Thank you.
17   MR FOXTON: My Lady, in relation to the amendment
18   application, whilst we are always delighted when bad
19   points are dropped, even sometimes when they are only
20   dropped temporarily, the idea that it's appropriate for
21   these to remain in the arbitration claim form in
22   circumstances in which they are not alleged to represent
23   legitimate section 68 complaints, we say that there is
24   no merit in that at all . This is an attempt to try and
25   keep these grievances alive but without having the

122

1    courage to strike and make the points in relation to
2    them. Their presence on the claim form is open to
3    misunderstanding, potentially , in enforcement
4    jurisdictions as to the scope of the challenge. And
5    pleading context of any kind but, a fortiori , three
6    types of context that clearly are implicit criticisms of
7    the arbitrators in a claim form, we submit, is wholly
8    inappropriate.
9        So the answer is that if they are being abandoned,
10   then they should be deleted and the costs of and
11   occasioned by them should be ordered to be paid; and, in
12   any event, abandonment should be on terms that it is not
13   open to BSGR to try and resurrect them in some
14   enforcement jurisdiction at some future point in time.
15       My Lady, the other provision that causes us concern,
16   I think this is a point that causes Mr Hooker's clients
17   concern as well, is the amendment at tab 28,
18   paragraph 41 on page 19, and in particular the last
19   sentence. If the only explanation of a decision is the
20   tribunal is biased, that amounts to an allegation of
21   actual bias. If, on the other hand, it's said the
22   tribunal are not biased but they may have appeared to
23   have been biased, then it cannot be said their refusal
24   to admit the material is inexplicable on any other basis
25   than bias.

123

1        Now, I know Mr Gruder would not be advancing
2    an allegation of actual bias here, but, once again, it
3    is important for other contexts in which this claim form
4    might fall to be read for there to be no
5    misunderstanding. So, in any event, we do invite your
6    Ladyship not to allow that last sentence.
7    MRS JUSTICE MOULDER: You're going to have to help me,
8    because I'm not sure I understand the point about "open
9    to misunderstanding in other jurisdictions ".
10   MR FOXTON: When it comes to attempts to enforce this award
11   or, indeed, ongoing attempts to enforce it in the US,
12   English materials have been deployed as grounds of
13   challenge, and allegations that appear in their content
14   to be criticisms are capable of being misunderstood as
15   live challenges -- query, live challenges not disposed
16   of -- because the attempt to relabel them in this
17   context may be lost in translation or lost elsewhere.
18   MRS JUSTICE MOULDER: But I don't understand what real
19   effect that's having. I mean, this is a pending action,
20   it's going to be pending for a another couple of months,
21   so I don't really understand what it is, therefore, that
22   causes you a problem. Why would the US courts be
23   interested in the nuances of the language in the
24   allegations .
25   MR FOXTON: All one can say at the moment, my Lady, I don't

124

1    know what other enforcement activities may be

2    contemplated, but at the moment these grounds of

3    challenge here are being relied upon as reasons to

4    resist recognition under the New York Convention in the

5    US and, presumably, elsewhere.

6        So, my Lady, it is appropriate that a claim form for

7    section 68 relief should only set out the grounds of

8    section 68 challenge, and if grounds are brought and

9    abandoned, the right thing to do is to strike them

10   through and not allow them some form of half-life

11   thereafter.

12       Perhaps that shorter point may be the real nub of

13   this.

14   MRS JUSTICE MOULDER: You see, what I'm reluctant to do is

15   to get into the merits of this. It seems to me that,

16   leaving aside whether or not there's any difference for

17   arbitrations, I would not normally be attempting to

18   draft somebody's particulars of claim or defence.

19   I would say, "Sort it out at the hearing on the merits

20   and argue it at the time". So I'm not really sure that

21   I've understood -- I understand why you don't like it,

22   but context can be relevant to disputes and so I'm

23   struggling to understand what it is that means that this

24   court should be trying to draft the dispute that you're

25   going to have in a couple of months' time.

1    MR FOXTON: Well, my Lady, Mr Gruder applies for permission

2    to amend, and the standard exercise on any permission to

3    amend is to look at the purpose and nature of the

4    amendments.

5    MRS JUSTICE MOULDER: Yes, and one would strike it out if it

6    disclosed no reasonable cause of action. I mean, there

7    are various grounds on which one might refuse

8    an application, but one doesn't normally get into the

9    niceties of, "Well, I entered into an oral contract and

10   this is the background context", for example.

11   MR FOXTON: But we're miles away from that, my Lady, because

12   these undoubtedly, when they are brought forward, are

13   brought forward as challenges to the conduct of the

14   arbitrator.

15       Now, all that is being changed here is the label.

16   They remain in their substantive content criticisms of

17   the arbitrator, and that's simply not appropriate. If

18   the points cannot properly be advanced, they should be

19   removed.

20       In terms of providing context to the court, it

21   remains open to Mr Gruder to make such submissions as he

22   wants to make on the full range of evidence, but why

23   single out these three as somehow special context to go

24   in the pleading? The answer is they haven't been. They

25   are simply there because they were wrongly pursued as

1    challenges in the first place, and that having finally

2    been recognised, the appropriate course is for them to

3    come out.

4    MR GRUDER: My Lady, can I first just come to

5    paragraph 40 --

6    MRS JUSTICE MOULDER: Sorry, Mr Gruder --

7    MR GRUDER: Oh sorry, sorry.

8                Submission by MR HOOKER

9    MR HOOKER: My Lady, on behalf of the co-arbitrators, as

10   I will call them, that's how they were described as by

11   Mr Justice Popplewell in the previous section 24, we

12   generally take the same position you've just outlined,

13   which is that we're comparatively relaxed for BSGR to

14   advance the claim in the terms that it wants to advance,

15   and although we have a lot of criticisms about how the

16   claim is now articulated, we're happy to address those

17   at the hearing in November and take the claim as it's

18   put.

19       I do think that some special considerations arise in

20   the relation to paragraph 41.

21   MRS JUSTICE MOULDER: Yes, I do understand -- yes, my

22   previous discussion was not focused on paragraph 41,

23   which I agree is a separate point.

24   MR HOOKER: I mean, if it's helpful, I think the context of

25   the arbitrators as defendants to this action is relevant

1    context to the submission I'm about to make. It's

2    comparatively unusual -- the circumstances are

3    comparatively unusual, in that the arbitrators are

4    defendant to an application that's pursued under

5    section 68 and section 24, and to date the arbitrators

6    have taken the position that they wish to assist the

7    court but they have not served evidence in the

8    proceedings. And by agreement of the parties, that was

9    sequenced in such a way that the arbitrators had the

10   opportunity to see the evidence that was introduced by

11   the parties and to make a reasoned decision as to

12   whether or not evidence from the members of the arbitral

13   tribunal would assist the court. The decision was

14   reached and explained in correspondence that they saw no

15   need to do so.

16       That's quite a coherent position in the context of

17   an allegation of apparent bias, because, essentially,

18   the record speaks for itself. So in respect of this

19   issue specifically, well, Mr Foxton took you this

20   morning to the parts of the arbitral award which set

21   out, over the course of two or more pages, the basis, as

22   explained by the tribunal, for the decision not to allow

23   records from the ICSID hearing to be admitted. That is

24   the explanation. The inexplicable explanation is set

25   out on the face of the award.

1    Now, in the context of an allegation of apparent
2    bias, that, essentially, is all anybody needs to have to
3    refer to: look at the record. Does the record make out
4    the allegation made that a reasonable observer would
5    conclude bias?
6        Now, it may well be that the line that has got us
7    animated isn't intended to change the nature of the
8    allegation, but I do say it gives rise to potential
9    prejudice two months from the trial, because if it's
10   maintained and maintained in the form that isn't further
11   clarified, then that decision that was reached by the
12   co-arbitrators will necessarily have to be revisited,
13   and they'll need to assess whether there is a different
14   form of allegation that's been advanced. It may well be
15   that this can be resolved very quickly and by agreement,
16   and we're very happy to consider any revised form of
17   drafting of this.
18       As I say, as to the remainder of the changes,
19   although we would prefer the retreat to be complete, we
20   are generally relaxed for the claim to be advanced.
21   MRS JUSTICE MOULDER: Thank you.
22   MR GRUDER: Well, if I can come to paragraph 41, I think if
23   one reads paragraph 41, before one gets to the last
24   sentence, it is quite clear that this is not
25   an allegation of actual bias, this is an allegation of

129

1    apparent bias, ie a fair-minded and informed observer
2    would conclude there was a real possibility the tribunal
3    was biased. That is a classic test, one has it in
4    Halliburton, for apparent bias The last sentence, which
5    is in red, is not intended to convert that into
6    an allegation of actual bias.
7        Now, I think probably the best way of dealing with
8    this is for us to look at that last sentence to make
9    it -- if there is any danger of misapprehension that
10   this is an allegation of actual bias, then I think we
11   possibly should look at that, because I don't believe --
12   when one looks at the heading just above paragraph 41,
13   it says, "Conclusion on apparent bias."
14       So I think the draftsman intended to say:
15       "The tribunal refusal to admit the ICSID material is
16   inexplicable on any other basis other than there was
17   a real possibility the tribunal was biased."
18       That's the intended meaning, but I think it's right
19   for us to -- if this is open to some kind of
20   misconstruction, I think the best thing is for us to
21   look at that sentence, rather than to -- because, as
22   I read it, and as I read that paragraph and indeed as
23   I read the heading above that, this is an allegation of
24   apparent, not actual bias.
25       So that's what I say about that.

130

1        As for the rest of this, we say that we're entitled
2    to look at things in context and if we set out here the
3    context that we wish the section 68 to be approached in
4    the light of, in my submission, that's not
5    objectionable.
6        I mean, in an arbitration which -- you've only had,
7    I think, a sort of soupçon of some idea of what went on,
8    one can't deal with these matters in a hermetically
9    sealed jar, and, in my submission, there's nothing
10   objectionable in the way we've sought to draft this.
11   (Pause).
12   MRS JUSTICE MOULDER: Does that cover the full gamut of
13   applications?
14   MR GRUDER: I think it does.
15   MR FOXTON: It does, my Lady.
16   MR GRUDER: It does my Lady, yes.
17   MRS JUSTICE MOULDER: All right. I propose to reserve
18   judgment. I'm conscious of the time constraints, but
19   nevertheless I think I'm not about to embark on
20   an extempore judgment at 3.50 pm, given the range of
21   applications.
22       I think I would only make one observation about that
23   last discussion. I am concerned, in particular, about
24   that last sentence. I am minded to give you 48 hours to
25   see if you can agree a form of words that you want. If

131

1    you can't agree, or if you decide, having reflected upon
2    it, that you don't need the words, perhaps between you
3    you can let me know.
4    MR GRUDER: Yes.
5    MRS JUSTICE MOULDER: Depending where you come out, I will
6    then rule as necessary.
7    MR GRUDER: So be it, my Lady, yes. I am very grateful.
8    MRS JUSTICE MOULDER: Unless there's any objection to that
9    course of action?
10   MR FOXTON: No, that sounds very sensible. I always hope
11   Mr Gruder and I will be able to agree something, my
12   Lady.
13   MRS JUSTICE MOULDER: Right.
14   MR HOOKER: Yes.
15   MRS JUSTICE MOULDER: All right. Well, I am grateful to
16   counsel for their submissions. As I say, I do
17   understand the time constraints, but, equally, I need
18   an opportunity to reflect.
19       Thank you very much.
20   (3.52 pm)
21           (The court adjourned)
22
23
24
25

132

1                    INDEX                                      135
2                                          PAGE
3    Application by MR FOXTON           ...................1
4
5    Submissions by MR GRUDER          ...................2
6
7    Submissions by MR FOXTON          ...................5
8
9    Submissions by MR HOOKER          ...................6
10
11   Judgment removed for approval     ...............7
12
13   Submissions by MR FOXTON          ...................7
14
15   Submissions by MR GRUDER          ...................54
16
17   Application by MR GRUDER          ...................79
18
19   Submissions by MR FOXTON          ...................95
20
21   Submissions by MR GRUDER          ...................113
22
23   Submissions by MR FOXTON          ...................122
24
25   Submission by MR HOOKER           ...................127

                   133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

a410 (1) 61:25
abandoned (5) 49:11
53:11,13 123:9 125:9
abandonment (1)
123:12
ability (14) 21:12
22:20,20 24:21,22
25:6 26:21,22 27:19
33:4 41:10 45:1
105:22 110:3
able (12) 5:4 37:19 47:2
55:13 63:17 85:24
90:3,6 104:17 109:2
110:9 132:11
above (2) 130:12,23
absent (2) 19:13 27:4
absolutely (6) 19:9 20:9
30:19 32:10 61:24
101:18
accept (18) 2:5 21:8,24
31:7 42:23,25 52:10
60:10 70:7 73:25
82:18,21 83:6,12
89:17 96:8 99:14
118:12
acceptable (1) 45:2
accepted (3) 62:21
66:14 107:21
accepting (1) 89:7
accepts (2) 73:21 103:7
accessed (1) 1:22
accomplished (1) 48:10
accordance (1) 114:6
accordingly (1) 90:17
account (3) 60:10
115:11 119:24
accountancy (1) 56:8
accounting (1) 28:4
accurate (1) 9:7
achieve (4) 47:1,14
105:19,21
acknowledge (1) 4:8
acknowledgement (1)
6:5
acknowledges (1) 66:17
acted (2) 30:24 93:19
acting (3) 26:8 97:18
113:25
action (12) 2:9
6:4,17,18 94:2,9,10,12
124:19 126:6 127:25
132:9
activities (4) 63:16,18
67:11 125:1
actual (11) 19:12,20
22:25 25:12,22 123:21
124:2 129:25
130:6,10,24
actually (17) 17:3 20:6
42:22 45:3 47:3 57:7,9
65:10 68:14,19 69:7
70:16 82:5 92:6
101:13 117:15 118:18
add (1) 5:16
adding (1) 120:4
addition (5) 2:4 16:12
35:16 36:11 101:1
additional (1) 18:8
address (2) 44:25
127:16
adduce (3) 15:20
17:11,12

adduced (1) 112:25
adequately (1) 66:15
adjourn (1) 90:9
adjourned (2) 91:5
132:21
adjournment (3) 76:1
91:17 92:17
administration (14)
29:25 30:4 45:15
49:16,24 50:8 52:2
58:11 60:13 66:2
67:18 98:12 105:2,6
administrations (4)
50:20 51:5 52:4 66:15
administrator (9) 44:12
59:1,2
99:11,14,17,18,22
114:7
administrators (77)
32:9 34:4 38:12 39:5,5
40:1,16 41:10 42:1,15
44:11,18,20 45:15,20
46:7,13,18,20
47:6,13,18 49:3
50:11,17,20,22
51:4,12 56:5,5,7,15
58:9 59:1,6,11,15
60:4,13,24 61:3 62:2
63:4,10 64:14,18,20
65:1,13,16 66:12,19
67:8,18 76:9,12 77:1
96:14,22,24
97:2,5,14,18,22
98:8,11,13,18,20,24
99:6 100:4,8 101:5
113:25
admit (6) 18:8 30:15
73:13 120:8 123:24
130:15
admitted (1) 128:23
admitting (1) 18:21
adopt (1) 12:16
adumbrated (1) 57:1
advance (3) 52:15
127:14,14
advanced (6) 13:15
53:13,13 126:18
129:14,20
advancing (2) 84:8
124:1
advantage (5) 52:13
106:1 110:10 118:1,2
adverse (2) 32:4 49:20
advisable (1) 25:1
adviser (1) 63:8
affairs (3) 45:16 47:9
100:25
affect (4) 31:6,15 74:9
75:7
affected (6) 19:10 31:10
72:20 75:13,15 102:23
aforesaid (2) 79:16
116:15
afraid (8) 6:23 13:9
17:20 18:10 23:19
35:1 49:1,11
after (13) 8:22 13:13
15:19,22 44:1 54:19
61:6 72:10 79:20,25
80:5,16 96:1
again (22) 3:11,14
18:23 21:15,19 25:16
27:14,18 38:16 39:12

53:13 55:1 58:3
60:22,24 61:2,20 65:3
69:15 81:23 122:13
124:2
against (33) 8:25 14:6
27:7 34:15 35:11
36:22 40:9 50:12 52:2
53:8 58:12 61:12 62:1
64:10,12,15,21 68:3,7
86:7 87:25 97:19,24
98:15 100:5,9,23
103:4 108:14 111:8,19
116:20 121:5
agent (1) 113:25
ago (3) 12:3 69:22
108:25
agree (5) 58:14 127:23
131:25 132:1,11
agreed (7) 16:9 38:23
39:2 44:17 63:10
90:9,13
agreement (29) 8:20,20
38:8 41:4 44:16 47:25
62:23,25 63:2,25
64:1,17 65:10,14
66:6,13,17 90:19
98:7,13 99:18,23,25
100:9 113:20,22,22
128:8 129:15
agrees (1) 66:15
ah (4) 63:15 72:12
73:2,14
ahead (3) 10:23 15:13
64:1
alas (3) 30:1 39:18
45:25
albeit (2) 15:14 119:9
alive (3) 28:25 113:9
122:25
allegation (13) 90:23
123:20 124:2 128:17
129:1,4,8,14,25,25
130:6,10,23
allegations (9) 13:13,17
35:23 60:2 62:1 64:9
118:14 124:13,24
alleged (1) 122:22
allow (13) 17:12 18:7
31:24 74:22 75:2,11
98:7 111:23 121:4,20
124:6 125:10 128:22
allowed (5) 17:18,21
74:14 75:10 87:12
90:22
allowing (2) 17:4,10
allows (2) 98:9 107:8
almost (3) 19:6 23:14
78:5
alone (2) 61:21 106:10
already (10) 1:21 2:20
4:5 5:1 40:24 54:25
78:21 79:1 86:11
115:13
also (23) 1:24 12:10
15:6,9 16:11 24:25
27:13 29:7 31:3 33:15
37:5 38:22 51:23 61:4
70:1 73:21 86:5 88:3
102:2 108:7 113:6
117:4 121:14
alternative (1) 95:1
although (15) 26:12
38:21 39:25 40:15

42:16 47:17 55:9
69:11 70:5 77:12
78:16 85:10 130:5
127:15 129:16
always (3) 71:8 122:18
132:10
amend (5) 7:19 16:9
119:15 126:2,3
amended (1) 90:16
amendment (4) 7:21
119:14 122:17 123:17
amendments (3)
119:19,20 126:4
amicable (1) 41:4
amongst (2) 107:25
108:9
amount (17) 52:24
53:7,20 58:4 62:1
67:24 68:3,15 69:4
88:11 102:6,17
104:2,2,12 106:10,16
amounted (2) 90:21,23
amounts (3) 36:8
104:10 123:20
analogise (1) 112:6
analogous (1) 91:22
analogy (1) 33:8
andor (2) 86:18 88:18
animated (1) 129:7
announced (4) 15:11
37:10 38:2 40:19
announcement (1) 38:3
announcements (1)
46:2
anomalous (1) 95:11
another (7) 49:12
70:1,8 82:1 102:9
114:16 124:20
answer (7) 34:19 45:25
47:8 64:22 91:2 123:9
126:24
answers (3) 36:1 97:3
105:5
anybody (1) 129:2
anyone (1) 20:12
anything (7) 11:16
25:20 29:2 30:2 44:17
46:21 47:11
anyway (4) 35:4 73:16
74:16 75:4
apart (1) 76:3
apparent (9) 15:4 30:19
120:2 128:17 129:1
130:1,4,13,24
apparently (2) 39:25
44:10
appeal (15) 3:6 14:8
17:3 82:17,19,22
90:22,22 92:8 94:15
107:4 110:11
111:9,13,14
appealed (2) 82:9,14
appear (7) 1:5,7 62:8
51:5 63:16 84:12
124:13
appeared (3) 7:7 24:3
123:22
appears (9) 1:8
23:11,15 38:6,11
50:23 83:20 100:14,17
applicable (1) 20:23
applicant (2) 25:5 74:6
application (143) 1:3

2:10 3:13,14,18
4:1,11,25 5:22 6:11
7:16,17,19,20,21,25
9:19,23 10:1 11:24
13:15 14:10 16:24
17:11,15 18:9 31:22
32:5,16 33:7,17
34:18,21 35:4,8 55:24
58:1,20,21 61:21 65:7
67:17 69:9,16
70:5,10,11,13,13,15,18,10,22,23
71:1,7 75:1,22 77:25
78:2 79:4,5,6
80:1,4,5,19,21,23,25
82:3,4,6,25
83:7,10,13,13
85:2,18,20
86:9,10,17,18
87:20,22,23
88:7,10,12,17,18,21,23,24
89:8 92:25 94:12
95:18,23 96:2,4,8,11
103:6,8,13
104:1,4,13,15 105:7
106:10,17,24 109:17
111:23 115:24 116:24
117:4,15,16,21,23
118:10,13,21,23
119:9,10,14,15,15,16
120:10 121:21
122:6,18 126:8 128:4
133:3,17
applications (22) 4:19
5:9 7:14,15,24,25 8:2
9:14,16 16:5 17:2
52:18 54:3,18,19,24
60:23 78:16 103:25
104:6 131:13,21
applied (4) 16:6 25:24
89:15 90:18
applies (4) 3:24 88:6
98:13 126:1
apply (8) 3:3,6 51:5
79:21 88:7 99:15
115:11,17
applying (3) 23:5 31:7
112:23
appoint (1) 51:10
appointed (4) 11:13,18
93:23,24
appointment (3) 11:1
96:23 121:1
approach (10) 25:19
54:11 84:12 87:4,6
89:11,15 111:11
121:11,16
approached (3) 5:2
64:24 131:3
approplate (1) 92:22
appropriate (13) 14:6
27:24 53:6,19 54:7
86:14,20 102:20
104:22 122:20 125:6
126:17 127:2
appropriately (1) 48:1
approval (4) 7:4 63:3,13
133:11
approve (3) 50:2,2,3
approved (2) 65:11,15
april (4) 1:25 8:21 9:1
15:2
arbitral (2) 128:12,20
arbitrated (1) 57:2

arbitration (95) 1:25
2:15 3:2,7,24
4:3,7,9,13,16,23,25
5:8 8:5,25
9:3,5,15,17,17,18
10:9,10,12,13 11:3,13
14:17 15:21,25
16:21,22 18:2,5
19:10,22 20:10 29:19
36:12 37:25 47:25
56:19,21,22
57:3,4,5,11,16,17
58:22 60:8,17,18
61:21 63:23,24 64:3
65:9 68:3,20 70:9
71:10 74:18 79:12
83:4,11 85:20 87:19
89:5,15 90:5,8,16,19
91:16 92:21 93:25
94:4,19 101:1
106:13,14 107:15
110:16 116:8,17
119:9,16 121:12
122:21 131:6
arbitrations (3) 10:8
54:2 125:17
arbitrator (3) 93:23
126:14,17
arbitrators (16) 1:9
6:17 10:19 11:23
30:23 33:11 48:15
60:18 64:5 65:1 74:13
75:2 93:19 123:7
127:25 128:3,5,9
argue (3) 34:23 111:5
125:20
argued (2) 56:22 105:24
argument (29) 2:4 6:3
32:19,21 56:13,14
54:5 73:25 76:21
78:12 81:7,11 84:8
85:17 86:24 87:1,2,14
89:8 105:3 109:9,13
111:1,17,18 114:18
115:20 117:12 121:23
arguments (5) 78:9
85:16 111:15 115:7
116:21
arise (1) 127:19
arising (2) 50:19 55:3
arose (1) 10:15
around (2) 33:14 42:17
arrangement (5) 37:9
39:1 40:14 51:18
100:20
arrangements (4) 48:10
49:23 66:18 71:23
arrive (1) 87:9
article (3) 2:1 87:10
92:11
articulated (1) 127:16
aside (46) 3:18 4:11
6:17,21 7:17 19:15
35:14 40:8 79:21
80:2,4,21
81:3,6,11,19,22
83:3,8,14,16 86:9,17
87:20 68:17 89:1,4,11
90:18 92:25 94:1,4,19
104:5,13 106:16
107:2,5,7 108:12
109:10 117:21 118:10

122:6,9 125:16
ask (8) 2:22 32:20
39:21 76:12 83:1
84:21,21 91:0
asked (4) 36:10 48:21
57:21 97:8
asking (3) 46:17 73:10
85:11
asks (3) 34:17 78:20
81:12
aspect (2) 29:1 52:4
aspects (1) 13:18
aspersions (1) 67:22
assertions (2) 42:3
97:16
assess (1) 129:13
assessed (1) 53:21
assessment (3) 25:20
75:16 103:14
asset (8) 38:7 42:14
43:17,22 55:15 56:18
57:6 68:9
assets (27) 28:3 33:21
35:17 42:18 51:11,15
55:4,18 58:3,8 59:2
67:19 68:5,13,19
70:21 76:8,20,25 77:2
95:6,16,22
102:20,23,25 103:2
assist (5) 33:15 95:17
119:12 128:6,13
assistance (1) 28:11
assisted (1) 72:3
assisting (1) 26:18
associated (1) 35:3
assumption (1) 53:21
assured (1) 29:1
attaches (1) 29:3
attempt (17) 15:19
16:19,21 17:6 18:1,19
30:18 37:14 93:17
100:21,23 111:22
112:2,6,11 122:24
124:16
attempting (1) 125:17
attempts (4) 21:1 67:21
124:10,11
attention (1) 78:7
attitude (1) 32:14
august (3) 10:22
12:4,12
authorities (15) 5:7
21:9 23:7 24:2,8 55:13
56:25 60:2,10 84:16
90:2 94:24 108:2
112:5 116:24
authority (8) 22:8
23:12,19 63:1
84:10,14 107:24 119:7
automatic (4)
82:13,15,22 110:5
automatically (1)
109:22
avail (1) 18:6
availability (2) 15:1
120:24
available (4) 10:10,12
35:10 58:22
avenue (1) 58:18
avoid (1) 52:12
await (1) 91:1
awaited (1) 48:15
award (116) 1:20,24

2:1,6,20 3:25 4:2,25
6:18 8:5,12 9:9 14:18
17:1 21:11,12,25
22:3,21 24:23 25:6,16
25:18,22,23 33:12
34:22,24 35:14 40:25
48:15,17 55:10,11,19
56:23 57:4 58:12,16
60:16,19 64:9,10
68:3,7,14 69:9,19,23
72:10 73:12 75:17
79:13,25 80:16
81:3,5,8,10,18 82:18
83:4,11,16 84:4
85:5,21 87:22 89:5,11
90:6,7,12,16,19 92:14
93:8,9,17,17,24,25
94:2,4,8,13,20 95:5,11
97:17 102:17
107:7,15,19,21
108:13,16,22
109:19,23 110:2
111:23
116:1,4,7,12,16,19
117:3,5,23 118:16
121:20 124:10
128:20,25
awarded (5) 59:17,23
94:10 104:10,12
awards (4) 49:20 85:20
91:5 106:20
aware (3) 36:25 84:10
90:15
away (5) 42:14,18 46:25
103:9 126:11

**B**

b (2) 24:10,15
back (26) 4:14 7:8
14:18 29:18 32:8,9,25
33:1 37:9 41:15 42:19
43:5 44:1,8,24 45:1
48:18 49:1,12 50:16
63:18 64:1 75:24
81:15 112:21 120:4
background (5) 8:16
53:9 67:11 100:23
126:10
backwards (1) 63:20
bad (2) 103:16 122:18
balance (8) 25:13,22
26:4 27:8 31:7 32:3
110:7 111:18
bank (2) 61:19 68:10
bankers (1) 2:13
bar (1) 31:16
barking (1) 58:19
base (1) 33:19
based (12) 11:2 73:18
77:10 81:6 83:4,15
94:13 107:14,17,18
115:8 116:21
bases (1) 95:1
basis (30) 4:14 8:4
13:17 14:2 21:8 34:21
48:22 53:8,18 56:25
57:23 58:2 75:4 81:15
90:20 93:9,18 97:19
100:18 103:17 104:20
107:6,22 112:19
114:7,13,16 123:24
128:21 130:16
bdo (2) 39:15 65:19

bear (1) 68:4
became (1) 60:14
become (2) 120:15
121:2
becomes (2) 6:5 25:25
before (31) 9:4 10:4,21
12:20 18:3 20:21
21:21,23 35:22 41:6
47:11 49:6 53:16
60:1,12,24 65:11
76:19 77:6 78:3 84:15
85:6 96:6 98:15 107:4
111:16 118:11
121:10,19 122:4
129:23
begin (1) 18:24
beginning (5) 9:9,9
12:5 30:7 50:16
begun (1) 106:10
behalf (4) 59:21 60:12
85:3 127:9
behaviour (1) 6:10
behind (4) 19:25 40:4
100:5 105:12
being (37) 6:21 9:5
14:13 15:13 21:15
35:14 38:7,9,24
42:7,8,9 43:22 45:2,20
46:7 47:21 49:11
51:12 53:3 65:2 68:21
84:9 93:24 96:5 98:2
99:22 101:24 102:23
113:2 114:5 120:1
122:6 123:9 124:14
125:3 126:15
believe (6) 37:2,13
41:18 42:3,21 130:11
believing (1) 120:23
below (2) 54:9 120:13
beneficially (1) 40:3
beneficiary (1) 68:2
benefit (12) 24:1 37:7
38:11 40:14 45:10
47:4 57:13 59:4,4 98:2
105:11 118:3
benefiting (2) 40:11
48:1
benefits (6) 20:7 34:15
48:9 50:14 76:15
113:5
bermudan (1) 36:18
best (11) 42:15 45:21
46:8,16 50:25 62:11
63:12 65:14 76:13
130:7,20
better (2) 20:11 21:19
between (26) 1:12 9:18
10:8 17:10,24 21:18
22:24 27:6,10 33:14
37:5 38:8 48:23 51:3
69:3 77:20,24 78:25
98:4 107:17 108:4
109:4 111:4,12 112:6
132:2
beyond (2) 101:22
109:12
bias (16) 15:4 30:19
120:2 123:21,25 124:2
128:17 129:3,5,25
130:1,4,6,10,13,24
biased (5) 123:20,22,23
130:3,17
billion (3) 53:25
29:20

58:12,16
binding (6) 39:6
45:19,24 47:25 63:9
65:11
bit (1) 85:2
blocks (2) 41:6 48:24
bolos (1) 1:8
boiled (1) 77:11
bona (3) 36:25 56:15
59:3
bonnant (1) 50:6
book (2) 80:11 115:18
borrow (2) 76:8,9
both (11) 5:6 16:17
20:22 54:4 60:6 69:9
73:3 92:8 99:21
110:15,16
bothering (1) 31:4
bottle (1) 49:2
bottom (6) 9:25 14:14
39:8,14 88:15 91:10
bound (2) 85:22 118:18
boys (1) 69:22
breach (2) 6:10 74:1
break (10) 37:21 42:12
43:3 44:1,5 49:9 77:17
114:21,25 115:4
bribed (1) 72:7
bribery (16) 2:2 8:24
20:7 35:23 51:24
58:24 71:9
72:14,15,15,21 73:1,9
74:13 75:12,19
bribing (1) 35:25
brief (6) 8:14 16:22
30:16 56:17 106:6
120:9
briefly (12) 5:20 8:4,8
12:23 14:23 30:6
38:13 30:24 66:5
106:2 113:8 121:23
bring (10) 2:9 12:9
15:25 29:8 58:7 67:19
69:23 103:15 111:14
119:8
bringing (5) 22:1 29:13
34:23 61:11 104:18
brings (2) 31:21 106:16
broad (2) 52:5 54:11
broke (1) 78:13
brought (26) 8:12
10:10,20,23 11:22,23
12:19 15:6 52:3 69:19
90:12 94:12 97:20
100:10 103:5 109:6,19
125:8 126:12,13
brower (3) 11:2,11
12:18
brush (1) 54:11
bryan (10) 3:19 80:22
81:4,15 83:14,23 84:2
115:25 116:10 117:21
bryans (6) 4:12 7:17
79:7 80:14 81:23 83:3
bsgr (109) 1:7,20
8:12,17,20,23
9:1,13,18,24
10:10,11,13,18
11:7,13,22 12:12,21
14:4,24 15:6,13,15
16:8,9,11,22 17:12,15
19:11,17,18 20:5,6
29:20

33:4,12,13,15,23
34:4,8,13,14,20
35:9,10,12,12,17,18,24
36:12,22 38:7,21 39:2
40:14 41:5 44:16,20
45:22 46:8 47:1,7,14
48:1 49:18,22 50:12
51:10,14 53:19 54:8
57:20,22 59:8
61:2,7,12,23,25 62:25
63:4,8,20 64:2,3,13
67:17 71:20,21,25
72:3,5,7 96:25 97:15
98:5 103:3,4
105:11,12 112:24
114:10 120:7 123:13
127:13
bsgrs (23) 7:16,17,19
8:9,22 9:4 15:19 18:9
33:25 34:5 36:17
38:1,22 46:1 48:23
49:13,17 53:9,24
54:19 59:14 64:8
102:25
budget (2) 50:2 67:4
bundle (27) 9:9 13:2,3
23:7,20 24:2 30:7
35:14 37:16 38:14,17
40:21 41:1 52:21 52:7
71:16 79:8 84:11,17
90:2 108:2,10 110:19
113:18 119:16
122:4,14
bundles (1) 30:12
businessman (1) 74:11
buy (1) 29:13
buying (1) 35:7

**C**

c (3) 37:2 71:16,16
call (2) 70:24 127:10
called (5) 20:21
36:18,24 37:5 71:23
calls (2) 55:20 113:23
came (7) 12:20 32:8
36:4 60:14 73:12
112:13 121:20
cancel (1) 12:6
cancellation (1) 99:6
cannot (12) 2:21 43:20
49:1 71:4 82:24 88:21
93:8 94:1 95:25 97:3
123:23 126:18
cant (13) 11:7 65:1
82:4 83:24 91:24
92:2,19 94:16 98:21
121:11,16 131:9 132:1
capable (3) 102:23
104:16 124:14
caro (1) 27:5
careful (1) 13:14
carry (2) 99:20,21
carrying (3) 33:15
100:17 103:21
cases (7) 21:22,23
23:22 29:2 33:9 51:20
74:10
cash (1) 102:5
cast (2) 18:14 67:21
cause (5) 51:21 74:5
94:9,10 126:6
causes (4) 107:10
123:15,16 124:22

cavil (1) 27:9
cease (1) 99:14
centre (1) 71:9
certain (4) 8:18 10:13
58:4 90:13
certified (1) 14:10
chains (2) 33:14,21
chair (1) 12:18
chairman (3) 11:2,12,18
challenge (70) 1:20 2:5
8:9,12 10:20
11:1,16,22,25
12:1,19,25 15:6,8,9
21:1,5,13 22:2,6,19
25:5 27:21 29:4,9,13
30:6 31:10 33:6
34:18,20,23 35:8
50:19 51:6,9 53:4
55:3,5,7 69:23 77:24
78:23 82:17 83:25
85:7 89:10,14 90:11
92:1,23 95:5,16
106:10,21
107:12,14,22
108:11,22 109:5,19
112:1,15 113:2 122:8
123:4 124:13 125:3,8
challenged (1) 50:23
challenges (26)
10:18,22,25 11:4,5,9
13:5 21:3 26:21 27:10
28:3 30:14 53:10,11
107:17,18 108:4,18
112:20 117:5
119:21,22 124:15,15
126:13 127:1
challenging (1) 109:2
chance (3) 18:4
24:14,17
change (8) 7:11 10:2
46:24 47:3 90:21,23
107:8 129:7
changed (5) 20:10 32:9
40:17 40:6 126:15
changes (2) 120:20
129:18
changing (3) 40:18
101:11,25
29:22 32:9 37:9 40:22
41:15 43:5,25 55:2
characterisation (1)
42:25
characterised (1) 28:4
characterising (1) 13:22
charge (3) 36:20 74:23
75:3
charged (2) 36:18 61:18
charges (1) 34:2
charging (2) 46:3 54:8
charlos (3) 11:2,11
12:18
chartered (1) 61:19
christopher (3) 12:25
14:9,12
circumstance (1) 107:8
circumstances (13)
10:2 54:5 61:8 75:6
90:21,24 92:22
97:18,22 104:22 113:4
122:22 128:2
citation (1) 23:18
cites (1) 22:10
citing (1) 23:19
claimant (8) 55:10 58:2
79:11,16 90:15,17,22

116:15
claimants (2) 27:25
90:6
claimed (2) 53:20 77:18
claims (22) 3:7 4:16
40:9 46:25 50:12,18
51:14 52:3 62:12
64:12,19,21,25 65:2
97:13,20,24 98:16
100:4,4,10,13
clarified (1) 129:11
clarke (3) 12:25 14:9,12
classic (1) 130:3
clause (1) 99:11
clear (15) 19:4,9,25
20:9 21:17 29:19
44:15 50:22 52:24
61:24 87:2 110:17
112:6 122:5 129:24
clearly (7) 34:20 38:22
40:6 53:25 101:25
106:24 123:6
clients (12) 1:18 2:9
6:16 7:15 8:19 97:8
105:18,25 106:4,9
110:9 123:16
close (3) 39:19 89:6
112:24
closed (1) 15:23
closely (4) 38:22 40:10
45:12 51:19
closing (2) 16:22 17:17
coadministrator (1)
65:21
coarbitrators (2) 127:9
129:12
code (1) 85:19
cohen (14) 41:18,20
42:4,13,14 43:8,21
45:18 60:13 61:23
62:6 65:21 67:22
104:25
cohens (2) 42:10 97:7
coherent (1) 126:16
coin (1) 117:18
come (36) 3:10 5:21
7:6,7 8:15 22:23 23:3
29:22 32:9 37:9 40:22
41:15 43:5,25 55:2
60:5 75:24 76:18 77:9
79:5 86:2 89:6 102:2
105:10,13 112:24
134:18 115:23
117:12,15,22 118:22
127:3,4 129:22 132:5
comes (9) 13:11 48:17
72:16 74:25 76:11
102:12 108:19 118:10
124:10
comfort (1) 48:3
comfortable (1) 24:5
coming (9) 28:6 32:25
33:18 38:10 44:8
45:16 88:2 97:9 104:4
commenced (2) 5:23
8:25
comment (2) 77:22
78:6
comments (2) 18:13
32:25
commercial (3) 12:21
58:9 78:11
committed (1) 46:20

common (5) 20:25
21:16,18 37:4 58:5
commonly (1) 56:14
companies (6) 33:14
35:21 37:2,13 100:5,6
company (36) 28:8
29:24 30:3 36:18,23
37:5,7 42:16 45:11
55:22 56:3,4 57:1,8,12
58:3,9,10,10,25
59:5,19,21
60:12,14,15 63:22
64:16 65:14 67:11,19
68:12 74:12 76:7,14
89:19 96:17 102:9
companys (1) 101:9
comparatively (3)
127:13 128:2,3
compare (1) 105:12
compared (1) 106:6
comparison (1) 58:16
complaint (1) 109:6
complaints (4) 11:13
32:23 97:14 122:23
complete (2) 109:4
120:19
completely (6) 11:8
15:7 35:1 69:8 83:9
106:18 111:24,25
comply (1) 14:7
comprehensive (1)
62:10
compromised (1) 45:2
conceal (1) 33:16
concealment (1) 71:22
conceptual (3) 82:11
108:3,7
concern (15) 40:7 47:8
51:21 123:15,17
concerned (8) 5:24 8:16
20:6 25:16,21 26:6
105:15 131:23
concerns (1) 86:5
concession (31) 38:25
39:3 44:23 48:18,21
56:23 57:1,8 64:2
100:19 101:2
concessions (8)
8:18,21,22,24 37:8
45:4 48:5 61:10
conclude (3) 63:2 129:5
130:2
concluding (1) 18:13
conclusion (5) 19:7,14
29:16 75:13 130:13
conclusions (1) 18:21
cond (3) 15:18 71:25
72:6
condition (22)
21:1,4,10,25 52:11
62:17,25 69:24 91:6
92:3 96:2,4,7
103:12,24 104:16
105:15 131:4,6,13
119:3,10
conditional (2) 91:20
92:13
conditions (5) 7:15 8:7
20:18 62:20 111:15
conducive (1) 48:10
conduct (15) 13:19
14:2 29:18 32:7
35:24,25 51:21 55:21

56:15 60:8 66:15
97:15 120:1,2 126:13
conducted (2) 13:16
93:24
conference (1) 13:4
confidence (1) 6:10
confidential (1) 2:18
confidentiality (2) 4:24
10:14
confirm (5) 14:19 34:5
81:14 83:17,20
confirmed (2) 44:18
89:2
conjunction (1) 29:15
connect (1) 120:5
connected (3) 37:4
46:11 99:25
connection (2) 100:15
102:16
conscious (1) 131:18
consent (11) 10:5,16
13:24 16:4,17,18
17:19,22 73:3 90:9,18
consented (2) 16:8
17:15
consequence (1) 32:4
consequences (1)
103:15
consequential (1) 107:5
consider (6) 16:24 17:5
65:13 89:12 121:3
129:16
considerable (1) 87:15
consideration (3) 13:14
16:25 87:14
considerations (1)
127:19
considering (1) 34:3
considers (1) 33:17
consistent (4) 60:2
88:3,9 89:23
consistently (2) 95:9
117:9
constitute (1) 109:14
constitution (1) 12:15
constraints (3) 51:16
131:18 132:17
construction (1) 5:11
contact (1) 34:6
contacts (1) 72:2
contemplated (2) 66:18
125:2
contemplates (2) 87:24
108:10
contemplating (1)
88:20
contemptuously (1)
57:20
contend (2) 3:16 35:13
content (4) 20:23 27:17
124:13 126:16
context (30) 13:1 20:14
26:9 29:4 33:19 36:1
52:13 73:7 79:9 88:11
100:2 112:13 119:23
120:12,15 121:2,3
123:5,6 124:17 125:22
126:10,20,23 127:24
128:1,16 129:1
131:2,3
contexts (1) 124:3
contingent (2) 34:13
36:19

continue (1) 4:9
continued (1) 32:7
continues (1) 98:12
continuing (2) 4:12 64:6
contract (12) 19:15
34:9 30:7 40:17 45:25
98:25 99:19,21
114:3,5,13 126:9
contractual (2) 74:20
75:4
contrary (4) 5:6 19:2
20:1 87:8
contrast (5) 17:10
20:25 92:15 107:21
112:19
control (21) 41:11 47:9
50:1 51:13,14,15
55:22 56:4 58:25
59:19 60:11,14,23
61:23,25 64:16 68:12
96:24 97:1 105:23
115:16
controllers (1) 64:13
convenience (1) 111:18
convenient (3) 43:12
114:23,24
convention (3) 78:5
92:11 125:4
conventional (1) 110:14
convert (1) 130:5
conviction (1) 16:7
cooke (4) 22:11,18 23:9
27:14
cooperate (1) 57:21
corp (1) 90:1
correct (7) 50:16 57:5
53:19 64:10 81:1
89:11 116:25
correspondence (2)
15:14 128:14
corrupt (1) 73:16
corruption (14)
19:12,13,18,20 20:7
33:24 34:2 56:24 71:9
72:21 73:1,9 74:13
75:12
cost (3) 13:3 64:4,4
costs (40) 3:14 8:13
14:2,3 16:10 25:19
52:19
53:3,5,7,15,17,22
58:15 60:21 69:14,23
75:16,16,19,22 76:18
77:10 78:25 79:1,3
103:10,14,16,25
104:6,13,14,14,19
106:2 117:23 119:2,8
123:10
counsel (2) 80:14
132:16
counsels (5) 15:1
78:6,19 106:3,3
counterparties (1)
96:17
counterstrike (1) 87:22
country (1) 56:8
couple (3) 39:24 124:20
125:25
courage (1) 123:1
course (39) 6:16 9:2
15:15 16:15 28:24
29:18 32:7 34:12
37:10,11 44:9 53:12

55:18 56:1,22 58:17
64:13 65:8 72:12,22
73:4 74:11 75:5,9
82:19,21 83:7 85:17
94:5,6 96:9 103:11
108:21 110:1 111:10
112:9 127:2 128:21
132:9
courts (17) 3:11 8:6
20:17 21:7 52:11
54:13 55:9 90:7,12
91:4 95:3,4,8 103:17
113:7 115:9 124:22
cover (1) 131:12
covered (1) 37:23
cpr (24) 3:1,11 5:11
79:20,24 80:10,15
82:23 85:19,23 86:7
87:3,16,20,24
110:14,18 111:12
112:5,21 115:8,13
116:21,23
cramer (1) 49:18
crave (1) 122:2
creates (3) 22:2,17 27:3
creation (1) 26:1
credence (1) 66:4
credible (1) 52:2
creditor (3) 49:21 98:1
110:6
creditors (18) 34:15
42:16 45:8,22 46:9
49:1 51:1 52:8,9
57:12,13 59:3,4 63:12
67:20 76:14 100:21
106:1
criminal (4) 16:7 17:24
51:22 73:4
criteria (1) 52:6
critical (1) 19:21
criticisms (4) 123:6
124:14 126:16 127:15
cross (1) 30:10
crossed (1) 47:11
crossexamination (1)
18:2
crossexamine (1) 18:4
crucial (1) 48:8
curial (1) 112:15
curious (1) 6:13
current (3) 21:8 54:9
97:4
currently (2) 1:15 46:25
cut (2) 114:20 115:1

**D**

dac (1) 24:20
dales (1) 13:18
damages (3) 101:15,21
121:7
dancing (1) 22:22
danger (1) 130:9
date (8) 49:14 55:4,5,24
95:1,8,10 128:5
dates (1) 15:1
david (3) 1:8 11:6 12:20
day (4) 7:8 50:24 66:21
70:15
days (5) 79:20 80:18
de (3) 11:19 13:19 54:8
deal (46) 14:23 30:5
32:16 37:19
40:12,20,22 44:24

45:2,6,9,19,21,24
46:7,14,19,22,24
47:1,14 48:23 49:10
52:7 54:23 55:20 60:5
67:8 70:4 71:10 73:10
77:10 86:22,23 89:18
95:2,22 95:15 104:9
106:7,15 115:6 120:17
121:6,22 131:8
dealing (12) 2:15 6:1
50:25 59:12 76:5 82:2
84:1 91:25,25 93:11
103:1 130:7
dealings (1) 72:2
deals (2) 3:22 115:13
dealt (4) 18:10 70:2
113:8 121:5
debate (4) 1:11 25:25
26:11 65:18
debt (5) 61:19 94:11
105:1,4 113:8
debtor (2) 93:8 115:15
debts (1) 105:9
decades (1) 65:22
deceptions (1) 33:15
decide (5) 20:13 52:11
66:21 89:18 132:1
decided (5) 14:6 18:7
73:13 91:4 110:13
decides (2) 62:16 92:1
deciding (1) 32:3
decision (27) 13:6,23,23
20:11 50:25 63:22
72:17,19,21 73:23
75:16,16 88:4
89:23,24 91:19 92:12
108:20 118:1,2 120:13
122:10 123:19
129:11,13,22 129:11
decisionmaking (1)
113:7
decisions (7) 12:16
14:19 50:24 54:3 87:9
93:22 120:25
decisive (1) 32:2
deeply (2) 100:6,24
defective (1) 69:5
defendant (6) 79:19
80:2,19 90:12,13,14
91:6 128:4
defendants (1) 127:25
definition (1) 35:23
delay (1) 55:8
delays (1) 90:20
deleted (1) 123:10
deletion (1) 120:3
deliberate (1) 71:22
deliberately (1) 101:17
deliberating (1) 60:19
deliberation (1) 16:2
deliberations (2) 15:25
64:7
delighted (1) 102:18
delinquency (1) 28:5
delivered (1) 110:24
delving (1) 54:14
demonstrate (2) 25:5
115:22
denied (2) 5:16 111:20
depend (1) 19:18
depended (1) 19:12
depending (1) 132:5
deployed (1) 124:12

deposit (1) 38:5
deposits (2) 60:14 70:1
deprive (2) 110:6 113:5
deriving (1) 48:9
describe (1) 97:14
described (4) 2:12 9:4
89:15 127:10
description (1) 9:7
design (1) 24:23
desired (1) 14:25
despite (3) 36:25 73:10
105:7
detail (3) 54:14 71:6
92:5
details (3) 4:21 5:20
97:10
determination (3) 1:16
3:5 35:6
determined (8) 9:23
32:10 35:6 44:25 84:6
94:23 118:15,19
determines (1) 110:18
detriment (2) 52:16
57:13
develop (2) 9:22 109:12
developed (1) 120:13
development (1) 62:14
developments (1) 49:20
diamond (2) 61:14,17
diary (1) 120:24
didnt (10) 46:14 57:24
62:7 67:2 69:12,14,22
75:2 115:1 119:6
die (1) 61:8
difference (12) 17:24
22:24 26:1 74:10
108:4,7 111:4,10
117:19 118:9,12
125:16
differences (2) 28:23,25
different (16) 15:7
18:2,3 23:17
28:13,20,21 29:24
30:2 33:14 39:18 45:8
93:12 111:11 119:9
129:13
differently (2) 30:23
110:24
difficult (9) 18:10,20
29:14 31:25 34:19
36:4,13 83:18 102:13
difficulties (1) 107:10
difficulty (3) 45:1 82:11
105:6
diligence (4) 36:1 39:4
40:1,2
diminish (2) 25:15
26:25
diminished (1) 24:24
diminishes (2) 22:20
26:22
diminishing (3) 26:1
27:19 33:4
diminution (3) 31:6,9
51:7
direction (1) 78:13
directions (1) 85:8
directly (5) 57:18 66:12
72:14,24,25 73:9
director (1) 114:16
directors (7) 35:11 37:4
49:17 61:22,24
114:10,11

disagree (1) 73:16
disapproval (2) 14:1
103:18
discharge (1) 93:14
disclaims (1) 56:14
disclosed (1) 126:6
disclosure (1) 102:24
discrete (1) 98:12
discretion (8) 2:5,7 8:7
19:5 21:7 31:14 47:25
116:6
discretionary (2) 29:7
115:10
discussed (1) 7:22
discussion (4) 100:3,7
127:22 131:23
discussions (1) 47:19
dishonest (3) 33:13
35:25 68:12
dishonestly (1) 75:15
dishonesty (10)
33:20,22 34:14 40:11
72:18 73:17,18
74:20,24 75:3
disposal (2) 65:7 88:22
dispose (1) 83:2
disposed (8) 80:6,8,20
82:5 83:1 87:23 88:22
124:15
disposition (2) 96:11
105:23
dispute (15) 2:2,17
9:6,22 12:10 14:21
15:7 20:19 38:3 41:6,7
62:11 67:12 88:11
125:24
disputed (1) 107:20
disputes (1) 125:22
disruption (1) 14:16
dissipate (3) 58:8,23
68:13
dissipated (5) 57:6
68:5,11,16,21
dissipating (2) 26:2
35:17
dissipation (23) 23:1
24:20,24 25:10,12,12
26:7 27:19 31:5,9
32:15 33:4 43:18,19
50:19 55:14 67:21
68:3 70:21,25 71:3,4
77:3
distance (1) 49:19
distinction (3) 27:6
98:6 107:16
distinguishing (1) 51:17
distracted (1) 30:11
distributed (2) 35:19
52:12
diwan (1) 85:12
diwans (1) 85:15
dj (1) 13:10
document (4) 47:7
62:21 114:8,13
documents (2) 10:8
36:10
does (33) 3:3,5 7:2 21:4
22:23 24:1 31:6 32:14
44:25 45:25 46:24
47:7 50:16 64:17,17
66:13 70:25 73:25
74:8,8 75:7 80:9 88:7
96:15 98:7 102:2

107:12 111:17 129:3
131:12,14,15,16
doesnt (13) 41:16
42:3,11,16 55:16 64:1
60:8 73:15 75:1 75:7
84:12 110:6 126:8
doing (6) 29:11,20 40:2
47:1 59:6 121:9
domain (4) 1:21 2:20
5:21 6:9
domestic (1) 110:3
done (18) 36:7 38:11
40:1,20,21 46:15,19
49:23 50:2,10 57:22
60:22 78:21 94:8,20
102:11 105:15 116:9
dont (44) 5:15 7:2
11:16 20:18 22:23
24:13 25:2 27:9
29:2,11 31:10,15 32:1
37:19 41:12,14,22
42:4,12,17,20,23,25
43:10 45:7 46:20
47:18 52:6 58:14
63:20 77:5 78:14 84:7
94:24 99:9 101:22
108:23 114:22
124:18,21,25 129:21
130:11 132:3
door (2) 7:6 23:21
doublecheck (1) 7:2
doubt (4) 29:23 85:17
88:17 104:3
down (6) 23:3 25:1
31:24 32:23 37:12
77:17
dr (5) 1:9 11:6,19,23
12:20
draft (7) 44:13 57:10
86:6 113:20 125:18,24
131:10
drafting (1) 129:17
draftsman (1) 130:14
draw (2) 27:5 80:7
drawdown (1) 50:5
drawdowns (1) 50:3
drawn (2) 33:8,9
drop (1) 121:9
dropped (5) 119:22
121:8,8 122:19,20
due (25) 10:21 16:15
30:1 37:10 39:4 40:1,2
53:11 58:5,8 60:9
61:4,12 63:10 65:3,20
56:2 68:18,20,24 70:7
78:24 118:20 119:1,5
duplication (1) 78:25
during (2) 32:15 38:12
duties (2) 66:19 76:10
duty (2) 59:1 114:7

**E**

earlier (2) 55:25 120:25
early (1) 9:20
easier (2) 22:4 55:9
easily (1) 115:22
easy (1) 80:12
echoes (1) 32:24
economic (1) 47:4
eder (7) 84:16 85:1
89:22 93:2 105:22
111:1 117:8
eders (2) 91:22 108:20

educational (1) 12:8
aducatory (1) 12:13
affect (8) 5:25 17:7
40:7 42:18 85:22
100:20 116:3 124:19
effective (2) 50:11,18
effectively (23) 10:5,15
35:19 37:14 42:20
49:25 60:16 64:2
72:20 73:11 78:9
80:12 81:8 82:24
83:19 85:10 89:3
91:21 118:3,9 119:17
121:10,19
efficiently (1) 9:12
efiling (1) 1:23
eight (2) 61:4 67:13
either (11) 3:2 16:3
17:18 48:3 55:16 89:1
92:13 104:9,16 106:23
121:18
element (1) 13:10
elements (1) 40:8
elevate (1) 109:21
else (3) 20:12 25:20
48:6
elsewhere (2) 124:17
125:5
embark (1) 131:10
emphasis (1) 24:19
enable (1) 62:14
encouraging (1) 49:21
end (13) 8:2 10:22 12:4
13:6 47:21 49:4 50:24
55:25 58:11 66:21
70:15 79:25 80:16
ended (2) 15:20 41:5
endorsing (1) 5:14
enforce (29) 4:2 7:18
21:12 22:20 25:6
26:18,22 55:10 79:13
81:8,19 85:5,21
86:8,10 87:19 88:8
90:7 93:17 98:2
108:13 109:23
112:3,11 116:1,12,19
124:10,11
enforced (3) 79:25
87:23 108:15
enforcement (57) 1:22
2:9 3:16,17,23,24 4:8
5:12,23,25 6:4,19 8:11
22:4 25:15 27:1 28:2
29:14 31:25 34:21
35:5 36:4,13 55:8
59:10 81:4 85:19,23
87:25 88:5 89:12,13
90:10,25 91:2,4
93:8,18 95:4
105:20,25
107:2,6,9,13 108:12
109:5 110:18 111:3
112:17,18,20 113:15
122:9 123:3,14 125:1
enforcing (2) 22:3 92:12
engage (3) 37:15,17
40:3
engaged (3) 20:6 33:20
71:22
engaging (1) 66:12
england (1) 90:19
english (7) 35:2 52:10
90:7,10,25 91:4

124:12
enough (5) 25:11 42:6
72:18 74:15 101:16
ensure (1) 72:1
enter (2) 111:23 116:7
entered (9) 8:19 79:17
110:1,13,17,23
116:16,20 126:9
entering (2) 39:1 111:8
entire (1) 44:10
entirely (8) 2:18 9:7
13:16 48:24 52:2
67:16 102:7 104:22
entities (2) 35:21 100:9
entitled (4) 47:24 78:11
87:18 131:1
entity (6) 38:24 45:8
71:23 98:9,15,16
entry (1) 114:4
envisage (1) 19:6
envisaged (1) 94:11
envisaging (2) 93:16
94:5
equally (1) 132:17
equates (1) 67:7
equitable (2) 51:11
62:11
equivalent (1) 55:14
erdenet (6) 22:11
27:14,16,23 28:12,18
erroneously (1) 121:7
error (2) 74:8 92:9
escape (1) 78:7
escaped (1) 78:6
escrow (1) 105:16
essence (1) 85:14
essentially (3) 9:20
128:17 129:2
established (4) 23:11
50:8 110:21 119:4
establishing (1) 25:16
estimate (5) 52:21,23
68:1 77:10,23
estimated (1) 77:20
evaluating (1) 73:6
even (16) 19:13 34:22
41:19 46:13 49:20
58:13 68:25 70:22
73:24 81:9 82:14
86:25 107:1 111:8
112:24 122:19
event (15) 2:3 7:8 9:14
11:18 12:5 17:21 18:7
30:22 52:10 53:24
102:11 105:24 112:13
123:12 124:5
events (5) 25:14 26:25
41:9 45:3 101:12
eventual (1) 52:14
over (2) 36:4 48:19
every (4) 23:14 82:8
109:21 118:8
everything (7) 5:4
29:20 32:11
59:9,16,22 94:23
evidence (63) 13:8
15:3,17,20,21 16:1,20
17:3,5,6,11,13 20:14
27:25 28:1 35:17
36:8,11 41:24 42:5,10
43:1,21 48:8,13,14
50:23 54:4,7 58:23
59:14 62:6 63:1 64:5

65:16 60:7,9,11,17
73:2,4,7,8,13 74:14,22
75:2,10 76:23 77:6
78:3 90:15 102:3
103:7 104:25
106:12,13 110:8 113:1
126:22 128:7,10,12
evidences (1) 32:6
evidential (1) 60:17
evidentiary (2) 12:6
14:22
ex (5) 81:15 83:8 89:1,2
118:10
exactly (2) 80:22 110:2
example (12) 13:7,22
20:3 26:8 33:10 67:3
68:6 71:13 74:17
93:5,16 126:10
exceedingly (1) 113:3
exception (1) 10:6
excessive (2) 67:12 78:4
excluding (2) 59:15
116:3
exclusive (1) 85:19
exculpate (3) 74:14,23
75:3
excuse (2) 78:14,15
execution (14) 51:11
82:20 110:4,12
111:7,12,16 112:5,25
114:4 115:9,16,17,21
exercise (7) 19:4 20:17
58:21 61:25 75:10
111:2 126:2
exercised (2) 95:9 117:9
exercising (1) 112:17
exhibits (4) 15:6,10,16
106:9
exist (1) 27:4
existence (13) 22:19
25:8 26:6,20 27:3,20
33:5 34:17 35:8
45:14,16 81:5 122:8
existing (2) 86:18 88:18
expect (1) 98:1
expected (1) 30:25
experience (3) 52:4
55:6 65:22
experienced (1) 33:11
export (1) 16:13
explained (2) 128:14,22
explains (2) 86:12 108:3
explanation (4) 36:6
123:19 128:24,24
exploit (2) 8:21 38:5
exploiting (1) 48:20
exposures (1) 34:13
express (3) 91:23 92:18
95:15
expressed (1) 62:13
expressly (7) 56:14
63:13 75:17,17 108:10
112:12,14
extempore (1) 131:20
extensive (3) 24:10
50:1,9
extensively (2) 23:8
37:24
extent (9) 35:20
41:15,22 43:11 48:7
50:21 89:6 102:25
108:14
extracting (2) 47:4

100:16
extraordinary (1) 98:21
extremely (3) 33:12,19
65:20
eye (1) 18:15

— F —

face (2) 19:4 128:25
faced (1) 49:22
facie (3) 83:11,12 87:18
facilities (1) 66:11
factor (2) 32:1,2
factors (3) 26:17 32:5
115:10
factual (1) 51:24
fail (1) 101:17
failed (3) 32:18 53:9
83:25
fails (2) 53:4 69:6
failure (6) 49:10 94:10
120:24 121:3,6,19
fair (3) 9:2 19:4 120:3
fairly (4) 18:11 23:8
24:10 58:16
fairminded (1) 130:1
fall (1) 124:4
fallback (1) 86:3
falling (1) 104:16
falls (3) 80:22 103:9
112:21
false (2) 17:14 35:1
familiar (1) 108:5
familiarity (1) 67:10
family (1) 35:19
fanciful (1) 96:19
far (6) 5:23 8:16 30:24
34:22 47:19 52:3
farfetched (1) 61:12
fares (1) 108:1
fast (2) 25:1 41:10
fastest (1) 49:13
fault (1) 49:3
favour (3) 6:20 35:23
64:9
feature (2) 15:24 51:17
february (6) 15:2 38:1
39:10 44:12 47:21
49:5
feel (2) 18:17 109:16
fees (5) 66:1 78:6,19
108:3,3
feet (1) 49:8
fell (1) 92:8
felt (1) 27:24
fetter (1) 66:18
few (2) 53:14 118:15
fide (2) 36:25 59:3
fides (1) 56:15
field (1) 74:12
figure (9) 52:25
53:19,24 54:14
102:2,4,16,19,20
filed (3) 6:5 9:13 16:22
filing (1) 54:6
final (12) 17:4 62:5
73:12 81:12,23 83:23
85:4 88:22 96:11
113:6 118:17 120:22
finalisation (2) 114:3,12
finality (1) 15:25
finally (16) 8:13 41:5
80:5,8,20 82:4
83:1,2,5,17 84:6 88:21

80:2 94:23 116:19
127:1
finance (3) 57:21,24
64:15
finances (1) 64:14
financial (3) 28:1,5
51:13
find (3) 6:13 19:6 32:24
finding (1) 19:13
findings (10) 20:4 25:22
27:9 33:25 45:13
55:19 75:18 97:16
100:23 102:17
finds (9) 3:1,22 71:17
79:7 80:11 90:2
115:23 116:10 119:16
fine (2) 22:14 44:2
finger (1) 10:24
finish (1) 49:6
finished (3) 40:14 75:21
76:4
firm (1) 65:19
firms (1) 56:8
first (33) 9:13,14,15
15:17 17:14 19:3
21:22 24:3,9 31:21
34:20 39:14,25 44:9
49:15 51:8 53:2 56:18
71:14 72:9 78:8 92:9
95:23 101:7 105:6
111:21 113:24 114:5
115:6 127:1,4
firstly (1) 26:16
fits (2) 87:2,5
fitting (1) 104:6
five (4) 9:24 10:3,19
32:23
fixed (3) 12:4 14:24
85:9
flags (1) 72:15
flaux (4) 23:9 24:9,25
85:9
flaw (1) 115:19
flicking (1) 99:10
flimsy (14)
8:9 21:5,6 29:4,9 58:15
70:6,11,13,16,16,20,23
71:2
flipflop (1) 49:12
flow (1) 113:1
flowing (1) 32:4
focus (3) 27:18 47:6
56:18
focused (3) 68:19 106:3
127:22
follow (3) 31:11 52:17
95:21
followed (1) 51:2
following (8) 77:10 85:8
86:6 95:3,3 107:3,5
110:25
follows (3) 86:14,20
111:7
footnotes (1) 106:11
force (4) 80:16 82:24
87:1 90:19
foreboding (1) 24:2
forensic (1) 16:13
foreseen (1) 61:7
forgery (1) 34:2
forgive (1) 103:23
forgot (4) 113:17,19,21
114:17

form (17) 4:4,7 17:7
25:9 96:15 101:1
105:25 122:21 123:2,7
124:3 125:6,10
129:10,14,16 131:25
formal (3) 114:3,4,12
formalising (1) 62:22
formality (1) 30:3
formed (1) 11:15
former (4) 16:7 67:5
73:24 100:1
forms (1) 23:16
formulated (1) 13:14
formulation (2) 27:18
86:5
forth (1) 96:6
fortiori (2) 103:16 123:5
forward (11) 15:22
54:15,24 60:1 67:13
71:5,12 75:14 95:1
126:12,13
found (15) 18:12 19:11
33:12,20,23 34:7
40:11 71:20,21
72:4,7,12 73:18 74:12
75:12
foundation (4) 36:9
50:1 102:7,10
foundations (1) 119:4
four (2) 30:8,14
fourday (1) 85:9
fourth (2) 39:22 80:10
faxton (88)
1:3,4,5,11,15,18 2:17
5:19,20 7:5,13,14 8:4
18:17 19:2 21:21
22:13 23:1,6,16,25
24:8,13,19 27:2,13
28:15,21 30:1,12
31:12,17,21 32:22
37:23 38:17
39:13,18,21,24
42:9,23,25
43:5,7,11,24 44:7,8
45:24 46:19 48:4,17
51:8 67:1 70:19 76:15
95:20,21 97:9,11
98:23 99:14,17
100:2,12 101:15,20
104:7 105:5,20,22
122:1,2,14,17
124:10,25 126:1,11
128:19 131:15 132:10
133:3,7,13,19,23
framework (2) 8:8 112:4
frankly (1) 71:11
fraud (8) 34:8 61:11
74:20 90:16,23 91:2
102:12 112:10
fraudulent (7) 19:16
20:4 32:13 51:25
71:21 72:13,20
fraudulently (3) 19:17
102:5,8
free (3) 41:7 40:25 96:5
freezing (6) 25:19 26:9
33:8,17 55:15 102:21
fresh (2) 17:2,6
friends (8) 1:6 24:5
54:23 73:14 114:10
115:19 116:21 117:12
frivolous (1) 11:8
front (1) 74:25

fruits (3) 110:7 111:19
117:3
frustrate (1) 32:11
frustration (5) 32:21,22
49:10 53:12 121:7
full (4) 41:4 102:25
126:22 131:12
fully (2) 14:12 28:25
fun (1) 57:17
fund (9) 57:23
64:22,23,25 76:9
97:4,12,13,22
fundamental (8) 17:23
19:22 44:25 98:6
107:16 111:4,10
115:19
fundamentally (1) 48:6
funded (4) 50:21 51:12
65:2 97:23
funder (4) 57:1 57:23
58:2,2
funding (20) 49:23
51:18 52:1 58:1
64:17,18 66:6,23
76:8,24 97:19
98:7,9,15,16,18
99:18,25 100:3,9
fonds (3) 50:3 52:11
96:25
furthur (16) 11:24 16:3
17:19 31:17 48:13
72:4 78:19 86:13 87:8
89:4 91:4 94:25 95:17
119:12,14 129:10
furthermore (1) 67:23
future (7) 45:24 61:11
77:20 86:9 107:12
109:10 123:14

— G —

game (1) 14:13
gamut (1) 131:12
gathered (1) 76:20
gauntlet (1) 37:12
gave (3) 15:17 79:11
112:14
general (6) 21:9,19,24
25:2 55:11 62:20
generally (3) 66:16
127:12 129:20
gentleman (1) 7:6
george (1) 36:23
get (17) 9:1 28:10 37:14
42:18 44:16,24 46:14
49:1 50:2 66:1,23 67:9
70:25 99:5 119:1
125:15 126:8
gets (3) 18:12 120:21
129:23
getting (6) 41:21
47:2,14 64:18 105:3
112:24
give (10) 39:12 49:24
50:9,9 74:17 98:9
113:16,17 122:13
131:24
given (12) 33:2 42:14
45:13 46:14 48:13
66:4 69:16,17 105:13
108:13 122:3 131:20
gives (4) 76:14 95:14
116:11 129:8

giving (9) 7:18 35:25
  42:17 48:8 51:6 81:2
  99:12 101:23 114:1
global (3) 1:25 4:23
  37:6
glossed (1) 28:23
glove (1) 83:9
goes (14) 4:14,15 10:17
  15:16 20:2 26:19
  37:15 62:19 71:14
  77:2 86:21 108:8
  116:10 120:18
going (49) 8:4,14 14:22
  16:17 20:2 22:13,23
  23:10 24:4 28:18
  29:18,22,23 30:5
  32:19 38:13 40:1
  41:15,23 42:18
  43:18,22 45:7,10
  46:10 47:2,20 50:11
  54:4 63:10 65:22,23
  71:10 72:25 77:14
  83:5,17 95:21 100:21
  101:3 106:5
  114:20,21,22 116:25
  118:15 124:7,20
  125:25
gone (5) 30:14 34:22
  35:5 43:17 81:18
good (4) 1:5 23:16 45:9
  64:8
govern (1) 20:17
governed (2) 114:8,14
government (13)
  8:18,22 33:24 38:2,21
  40:12,19,24 41:2
  48:22,24 53:23 73:20
grant (4) 14:15 68:25
  83:20 89:12
granted (8) 4:6 8:18
  20:7 38:25 79:15
  103:8 115:15 116:14
granting (3) 85:5 87:18
  119:10
grants (1) 82:15
grasped (1) 31:19
grateful (3) 19:2
  132:7,15
great (4) 33:16 98:2
  106:7,15
greater (2) 32:14 67:10
grievances (1) 122:25
grossly (1) 78:4
ground (19) 14:24
  20:25 21:16,18 30:2
  32:6 40:18 44:22 45:4
  47:3,10 48:7,20 63:17
  69:6 100:17 101:12,25
  122:8
grounds (22) 1:20 4:25
  10:19 11:10,15 21:2
  41:9 72:13 73:24
  74:19 80:23,24 86:19
  88:19 94:1 120:15
  121:10 124:12
  125:2,7,8 126:7
group (1) 38:4
gruder (68) 1:7 2:24,25
  5:24 7:23,24 17:9
  19:19 32:20,21
  35:2,22 48:12
  54:20,22,23 76:3
  77:1,5,8 79:4,5

82:7,10,16
  84:14,19,21,25 91:15
  95:22,23 96:14
  97:4,12
  101:13,16,18,22 103:5
  104:8 106:2,5,7,18
  109:12 113:13,14
  114:20,24 115:6 122:2
  124:1 126:1,21
  127:4,6,7 129:22
  131:14,15 132:4,7,11
  133:5,15,17,21
gruders (5) 2:9 6:14
  49:8 106:11 110:9
guarantee (1) 36:20
guernsey (5) 63:4,15
  114:6,9,15
guerrilla (5) 9:5 18:9
  55:20 60:8 121:15
guess (1) 42:17
guidance (1) 66:14
guides (1) 111:2
guilty (3) 33:23 72:13
  74:12
guinea (35) 2:2 8:19,22
  9:19 33:24 37:8,10
  38:2,9,21 40:12,19,24
  41:2,5,19 43:18 44:11
  46:1 47:5,20 48:22,24
  56:25 62:15,16
  63:3,4,5,7,21,22 71:25
  72:3 73:20

────────────────
                H
────────────────

half (5) 46:4 58:22 76:6
  81:9 118:3
halflife (1) 125:10
halliburton (1) 130:4
hand (5) 81:22 83:9
  104:1,3 123:21
handed (1) 49:4
hands (2) 34:11 51:19
happen (7) 7:2 25:5,5
  27:9 65:12,13 82:6
happened (12) 4:5
  11:21 14:21 23:17
  27:9 35:22,24 36:17
  38:19 65:12 82:5 90:5
happening (5) 27:7
  41:25,25 47:3 90:25
happens (4) 10:17
  47:12 82:12 96:1
happy (2) 127:16
  129:16
harass (1) 18:19
hard (1) 25:1
hardly (1) 48:10
havent (5) 6:24,25
  31:19 46:19 126:24
having (13) 2:7 8:23
  14:5 19:7 48:21 64:24
  79:15 100:7 116:14
  122:25 124:19 127:1
  132:1
head (4) 22:22 85:3
  109:16,18
heading (2) 130:12,23
headlined (1) 2:1
headnote (3) 84:22
  90:4 91:10
headnotes (1) 23:24
heads (1) 104:17
hear (2) 2:7 104:2

heard (16)
  3:2,7,8,10,15,19
  4:16,19 7:21 12:1,22
  54:19 63:24 80:24
  111:1 122:7
hearing (42) 1:12,18
  3:17 5:13,15,18 10:21
  12:4,6,8,13 13:11
  14:22
  15:3,7,13,13,15,20
  16:13,14 30:15 48:9
  53:16 55:5 56:1 79:2
  81:10 82:3 85:8,9
  87:12 09:13 95:13
  96:2,4,10 120:8,22
  125:19 127:17 128:23
hearings (1) 5:8
held (3) 12:7 83:5 80:5
help (2) 57:21 124:7
helpful (2) 28:16 127:24
helps (2) 39:19 101:22
here (26) 3:6 21:5 23:21
  28:13 29:17 33:6
  42:14 51:18 52:6 53:3
  65:4 68:17 71:4 86:10
  95:2 98:17 103:1
  107:11 110:9 112:16
  117:14,19 124:2 125:3
  126:15 131:2
hereby (1) 66:16
hermetically (1) 131:6
hes (1) 73:2
heterodox (5) 106:19
  117:13 118:9,7,18
hide (1) 73:20
high (4) 30:25 53:16
  102:19 116:2
higher (1) 106:4
highlight (1) 54:13
highly (2) 33:11 38:8
himself (1) 93:25
history (6) 9:8 53:9
  54:2 90:4 121:12,14
hobby (1) 57:19
holding (3) 90:22
  91:9,10
holdings (1) 71:23
home (1) 103:15
honour (7) 11:2,11
  12:17 22:20 24:22,23
  26:22
hooker (11) 1:7
  6:12,13,25 7:20
  127:8,9,24 132:14
  133:9,25
hookers (1) 123:16
hope (6) 9:11 27:4
  37:18 101:16 113:10
  132:10
hopeless (4) 30:19
  31:2,22 109:11
horse (2) 2:3 57:19
hours (7) 67:3,7,15
  77:23 78:2 87:13
  131:24
however (3) 81:7 86:12
  87:2
huge (1) 53:25
hwang (4) 1:9 11:6,23
  12:20

────────────────
                I
────────────────

icsid (38) 9:17,21
  10:10,11 15:7,21

15:13,14,20,22 17:13
  30:16 37:25 41:6 44:9
  47:24 48:13 56:19
  57:2,5,11 63:23,24
  64:3 65:9 68:20 72:22
  100:12,21 101:1
  106:13 120:8,17
  121:4,11,16 128:23
  130:15
idea (4) 61:5 82:12
  122:20 131:7
identifies (1) 27:6
identifying (1) 33:3
ie (4) 85:6,23 87:17
  130:1
ignorant (1) 72:1
ignore (2) 43:10,20
ignoring (1) 43:24
ill (2) 64:23 75:21
illegitimate (1) 90:15
im (65) 5:10 6:23 7:1
  8:14 13:9 14:22 17:20
  18:9 19:2 20:1 22:23
  23:5,19,23 28:16
  31:4,7,8 32:19 35:1
  38:13,15 39:11,11,16
  41:16 42:6 43:14,24
  45:24 46:11 49:1,11
  51:2 57:18 66:7 67:23
  71:10 72:25 76:24
  77:13 78:18 84:10,18
  86:22 94:15 95:21
  99:12 103:20,20,23
  104:5 105:20 108:5
  114:20 115:12 117:13
  122:12 124:8
  125:14,20,22 128:1
  131:18,19
immediate (1) 121:21
immediately (4) 35:18
  61:6 96:20 102:6
implications (1) 102:1
implicit (2) 106:19
  123:6
imply (2) 65:17 92:19
importance (2) 87:16
  120:12
important (11) 4:6 11:9
  22:15 23:4 26:3 80:9
  85:2 91:8 107:17
  108:19 124:3
impose (6) 8:7 20:16
  21:1 95:2 104:17
  111:13
imposing (4)
  111:4,6,15,16
imposition (1) 21:4
impossible (2) 19:6,25
impractical (1) 35:9
improper (1) 6:9
improperly (1) 93:25
improve (1) 62:17
imputation (1) 56:14
imputations (3)
  56:10,11 60:11
inability (2) 96:15 103:2
inadvertently (1)
  101:18
inappropriate (3) 13:16
  52:13 123:8
included (1) 84:11
includes (3) 2:15 98:25
  109:15

including (7) 12:15 17:5
  38:4 54:1 60:13
  87:3,13
incredibly (1) 54:1
incur (1) 64:4
incurred (2) 79:1,2
indemnity (8) 14:2
  53:3,4,8,15,17,22
  103:17
independent (7) 81:5
  104:20 112:17 119:22
  120:14 121:2,10
indeterminate (1) 45:6
index (1) 133:1
indicate (1) 41:17
indication (1) 40:13
indicia (1) 72:14
indicted (1) 34:1
indirect (1) 36:9
individuals (1) 51:20
indulgence (3) 111:6
  113:16 122:3
industry (1) 66:14
inevitable (1) 50:15
inevitably (7) 25:13
  29:10 31:22 35:12
  85:22 107:1 111:7
inexplicable (3) 123:24
  128:24 130:16
inference (3) 29:12 36:2
  102:8
influence (3) 41:10 50:9
  72:6
information (1) 67:9
informed (1) 130:1
informs (1) 21:7
inherent (2) 95:4
  103:11
initially (2) 10:22 30:9
injunction (1) 55:15
injunctions (1) 102:21
injustice (2) 13:8 14:5
  73:23 74:5,15 75:6
  81:2
innocent (1) 75:12
insolvency (2) 52:14
  105:24
instance (1) 21:23
instead (2) 51:11 120:1
insufficient (1) 87:13
integrity (3) 50:6 05:24
  82:17
intend (1) 42:5
intended (8) 14:16
  16:15 36:3 69:8 129:7
  130:5,14,18
intention (2) 58:23
  103:6
inter (1) 81:13
interest (2) 54:1 62:12
interested (2) 54:13
  124:23
interesting (2) 13:9
  27:22
interests (8) 42:15
  45:21 46:8,17 51:1
  63:12 65:14 76:13
internally (1) 24:14
international (1) 15:24
interrupt (1) 101:23
intervention (1) 31:1
into (26) 5:21 8:19
  21:25 28:12 30:3

31:14 34:11 39:1
  45:16 47:18 54:14
  69:19,24 79:17 90:13
  92:9 98:15 104:6
  105:16,16,21 114:4
  115:10 119:23 125:15
  126:8,9 130:5
introduce (1) 17:6
introduced (1) 128:10
introduction (1) 78:22
investigate (2) 97:24
  100:4
investigated (1) 100:10
investigations (2) 45:14
  51:23
investment (1) 9:16
investments (1) 61:20
investor (4) 45:9
  46:3,25 63:8
investors (4) 38:4,10
  47:15 48:20
invite (4) 18:14,23
  54:16 124:5
invoke (1) 104:22
involve (5) 14:15 38:24
  43:13 53:23 105:25
involved (8) 17:25
  38:9,22 40:6 45:11,12
  47:19 74:18
involvement (5) 38:12
  44:11 46:15 61:3,23
involves (1) 45:6
ipco (4) 88:4 89:25 93:3
  112:8
iron (1) 62:17
irregularities (1) 28:4
irregularity (11) 74:2,5
  81:2 93:10 94:18
  107:19,23 108:18
  109:8,16,21
irrelevant (1) 70:17
island (2) 114:9,14
iset (7) 6:7 23:16 69:1
  77:6 99:5 129:7,10
issued (4) 86:11 87:21
  96:9 115:25
issues (4) 10:14 12:11
  54:11,14
its (133) 2:25 5:16
  7:16,19 13:24 14:1
  15:8 17:7,12 18:19
  19:4 25:6,11,11 27:22
  29:5,6,12,23 30:20
  32:1 33:15 34:3,14,15
  35:24,25 36:16,25
  38:7,8 39:13 40:8 42:6
  43:15 44:15 45:22
  46:9 47:2 48:1,10
  50:19 51:11,15 52:23
  55:7,25 56:1,3 57:1,18
  58:3,8 61:19,22 62:16
  63:9 65:15 66:22
  67:3,18,10,25 68:10
  69:8,11 70:6,12
  71:2,11,18,22
  72:2,12,18 73:2 74:15
  75:8,14 77:13 78:3,5
  79:8 80:12 81:18 82:9
  83:4,6,12,12 85:10
  87:2 89:24,25 90:16
  91:18,19,24 92:7,17
  93:3 95:9
  99:3,19,20,25 101:3

102:2,21 104:7 106:22
  107:21 108:2,9 112:17
  113:2,6 116:6 117:2
  118:6,14 119:3,18
  120:3 121:19 122:20
  123:21 124:20
  127:17,24 128:1 129:9
  130:18
itself (21) 18:6 25:8
  26:2 34:14 35:11
  53:23 58:22 74:2,22
  82:22 87:17 90:23
  94:25 98:25 103:4
  104:17 106:9 108:8
  109:15,19 128:18
ive (13) 18:25 30:17
  65:11 66:5 73:17
  75:20 76:4 82:12 95:7
  99:16 113:8 14 125:21

────────────────
                J
────────────────

j (1) 13:3
jar (1) 131:9
jeopardy (1) 68:18
jeremy (5) 22:11,18
  23:9 27:14,24
joint (7) 8:19 45:20
  46:6 62:2 63:22 67:18
  113:25
joke (1) 68:23
judge (10) 11:2,11
  12:17 27:14
  74:17,19,23,25 88:16
  108:3
judgment (46) 4:7 7:4
  17:4 24:11,11
  79:13,17
  82:8,14,18,21 84:15
  85:6 87:13 92:2,5 93:1
  107:5,6 108:1
  110:1,3,6,7,17
  111:8,12,24 112:25
  113:6
  115:9,14,20,20,25
  116:2,7,9,12,16,18,19,20
  131:18,20 133:11
judgments (5) 93:11
  110:13,22,24 111:20
jumps (1) 10:23
june (1) 14:26
juridical (1) 104:20
jurisdiction (13) 95:4
  103:12 105:0
  107:18,20,22
  108:10,11,16 109:3,7
  112:2 123:14
jurisdictional (2) 21:2
  108:21
jurisdictions (3) 63:3
  123:4 124:9
jurisprudence (1) 119:4
justified (5) 26:20 57:9
  67:24 71:7 90:24
justify (4) 26:8 56:10
  65:5 119:5

────────────────
                K
────────────────

keep (3) 70:17 118:11
  122:25
keeping (1) 10:24
kelly (11) 41:15 42:2,20
  43:3 57:17 60:1 68:23
  71:14,15,18 72:9

kellys (4) 35:14 43:1 56:12 67:21
kick (1) 31:24
kind (4) 26:7 82:21 123:5 130:19
kingdom (1) 34:25
knew (2) 35:24,25
know (34) 1:5 9:21 14:3 15:23 21:14 22:23 23:5 24:13 31:13 34:4 37:19 41:12,14,22 42:4 45:7 52:8 78:4 83:3,25 96:12,19,21 101:16,22 108:23,24 109:14 114:22 118:14,16 124:1 125:1 132:3
knowledge (1) 45:9
known (2) 38:24 65:20
knows (5) 56:1 82:5 101:16 102:4 115:13
konkola (1) 87:7

**L**

label (1) 126:15
lack (7) 27:25 28:2 54:12 107:17 108:10,11 109:7
lacked (1) 108:15
lady (154) 1:5,11,18 2:17,21,25 5:3,20 6:8,13 7:5,14,22 9:11 11:21 12:3 14:3,18 15:23 18:17,23 19:2 20:3,16 21:21 22:13 23:6,7,16 25:7 26:10 27:2,2,13 29:2,17 30:1,5,8 31:12,18 32:6,17,24 33:2,7 34:4,7,17 35:16 36:13,16 37:1,18,23,25 38:17,19 39:8,13,21,24 40:6,15,24 41:12 42:23 43:8,24 44:8 45:5,17 47:17 48:17 49:6,15,23 50:7 51:8,17,25 52:5,18,23 53:2 54:9,17,23,25 56:1 74:17 75:20 76:3 77:15 78:23 80:7,12 81:22 84:15,21 91:9,13 95:21 97:9 100:12,22 101:7 102:2,4 104:7 105:20 106:2,16 107:16 108:2,23 109:9,14 110:15 111:10,21 112:8,22 113:8,14,16,17,19,20,21 114:17,24 115:6,12,12,13,22,23 116:23 120:19 122:2,14,17 123:15 124:25 125:5 126:3,11 127:4,9 131:15,16 132:7,12
ladys (1) 78:7
ladyship (20) 7:9 12:24 15:16 18:14 21:21,24 24:13 29:21,24,25 30:17 32:8 37:20

43:12 54:16 99:1 108:5 113:9 122:4 124:6
language (4) 84:13 94:17 108:17 124:23
largo (1) 30:13
last (10) 8:2 28:9 101:7 123:18 124:6 129:23 130:4,8 131:23,24
later (9) 9:24 15:19 16:21 55:21 79:16 80:2 89:3 116:6,15
laugh (1) 57:25
launched (2) 40:25 41:20
lawyer (1) 50:6
lay (2) 25:1 37:12
lcla (15) 8:25 9:15 10:9,12,23 11:18 12:1 13:6 18:5 69:14 70:1 71:20 72:4,7 106:14
lead (3) 61:10 64:8,10
leading (3) 56:6,7 89:15
loads (1) 107:4
leaked (2) 4:21 5:20
leapfrog (1) 52:8
learned (37) 1:6 5:12 17:13 24:5 48:12 54:23 55:13,18 56:9 58:14,18 60:6,9,25 61:13 62:7 63:15 64:11 66:5,11 70:6,25 73:14,21,22 93:4 101:13 114:18 115:7,19 116:21 117:12,13,25 118:5,7,25
least (13) 20:19 24:1 25:17 35:20 45:6 50:22 60:17 67:2 75:15 78:20 89:6 100:17 106:8
leave (9) 42:21 85:5,21 86:10 87:18 88:8,13 104:3 108:13
leaves (1) 52:18
leaving (2) 40:8 125:16
led (4) 11:12 35:5 63:23 115:25
left (2) 2:3 30:15
legal (2) 40:8 71:13
legitimate (5) 69:10,25 102:7 109:4 122:23
length (1) 20:2
lengths (1) 33:16
lengthy (2) 54:1 78:22
leone (2) 61:15,18
less (2) 10:20 24:2
let (3) 7:24 61:21 132:3
lets (3) 68:9 114:25 118:11
letter (1) 39:15
liability (3) 36:19 114:1 119:8
liable (3) 71:20 74:19 115:16
liaising (1) 97:23
liberty (1) 116:18
libson (4) 35:7 37:16 51:15,16
lie (1) 40:10
liechtenstein (4) 35:19 49:25 96:21 102:6

lied (1) 72:8
lies (3) 23:20 40:3 64:23
life (3) 18:19 29:23 83:22
lifting (1) 90:24
light (4) 35:5 102:12,19 131:4
lightly (2) 110:6 111:20
like (10) 30:2 65:21 66:9 76:15 77:16 80:7 98:14 113:15 122:2 125:21
likely (1) 30:20
limit (1) 102:24
limitations (2) 51:3,4
limited (3) 28:11 36:24 37:3
limits (1) 6:2
line (2) 80:7 129:6
link (6) 1:25 27:10 37:5 50:18 51:2 98:3
linked (4) 37:13 40:10 51:20 86:8
links (1) 98:15
liquid (4) 76:7,20,25 77:2
liquidate (1) 98:2
litigated (1) 57:2
litigating (1) 103:21
litigation (6) 36:24 37:1,3 49:19 57:23 98:5
little (1) 31:17
live (5) 14:24 32:16,20,22 124:15,15
living (1) 62:17
lloyds (1) 24:4
loan (2) 36:10,20
loans (1) 36:9
long (8) 35:13 71:11 90:3 98:11 99:17 114:22 118:24 121:12
longer (4) 11:16 14:23 15:4 96:3
look (18) 3:21 8:6,8 24:17 32:19 43:2,17 58:4 67:15 80:12 84:22 121:17 126:3 129:3 130:8,11,21 131:2
looked (1) 54:25
looking (16) 22:9 23:23 25:18 27:22 28:9 39:17 41:16 52:15,16 55:2,4,23,24 84:11 89:17 110:10
looks (12) 55:12,17,20 58:24 66:5 68:19 71:8 89:7 90:4 110:7 119:25 130:12
lose (1) 81:24
losing (2) 24:21,22
loss (2) 25:7 32:12
lost (5) 73:16 74:16 75:4 124:17,17
lot (2) 60:7 127:15
low (1) 29:9
ltd (1) 63:5
luncheon (1) 76:1
ly (1) 11:19

**M**

maclean (1) 85:3

madame (4) 20:8 71:24 72:5,6
main (1) 120:18
maintained (3) 5:21 129:10,10
makos (10) 26:16 27:7 41:17 42:2 57:17 60:6 81:21 92:24 98:17 117:17
making (5) 22:4 47:16 58:20 60:11 70:9
mamodio (1) 19:21
managed (3) 78:16 117:20 118:21
management (27) 6:2 44:10 45:11 48:7 50:12 55:22 56:2,3 58:10,17 59:8,14 60:24 61:7 64:12,21 65:18,25 66:23 67:6,9 97:15,23 100:1 118:1,2 122:10
managing (1) 98:5
mance (2) 2:12 92:7
manipulation (1) 33:21
manner (7) 4:2 13:16 79:13 85:6 116:2,12,19
manufactured (1) 65:4
many (5) 6:14 17:14 53:10 65:4,21
march (4) 38:19 41:4 44:19 101:6
mark (3) 14:1 15:25 103:17
marked (1) 92:15
market (1) 54:9
material (20) 1:22 10:2,11 16:12,18 17:19,22,24 18:8,22 19:9,23 20:9,13,15 29:15 30:17 37:15 123:24 130:15
materials (2) 12:10 124:12
mathematical (1) 102:14
matter (27) 6:6,8 9:11 13:6 15:9 18:11 21:6 29:5,15 32:17 37:18,23 45:25 49:7 54:5 55:16 57:1,10 73:15 75:1 88:21 25 94:24 103:21 104:19 108:24,25
matters (16) 10:13 30:9 33:16 36:4 43:12 44:20,22 45:12 49:15 54:10 77:25 96:6 105:14 120:14,21 131:8
maximum (2) 68:14 102:22
mean (16) 4:23 22:9,16 26:15 31:7 32:21 51:6 80:12 109:22 115:12 117:16 121:11 124:19 126:6 127:24 131:6
meaning (1) 130:18
means (8) 26:17 38:21 50:11,18 84:21,21 118:8 125:23
meant (1) 22:4

meantime (1) 107:13
meanwhile (1) 45:1
measured (1) 18:17
meat (1) 120:10
mechanism (1) 22:4
meetings (1) 67:5
members (2) 12:9 126:12
memorandum (1) 113:22
mentally (1) 80:7
mentioned (2) 12:3 51:9
mere (1) 107:11
merely (3) 58:20,21 65:24
merit (4) 13:5 14:11 67:22 122:24
merits (14) 10:21 12:3 15:12,20 30:6 31:6,10 70:5 98:16 100:13 110:10 113:2 125:15,19
merkin (2) 110:16,20
met (1) 52:6
metals (1) 38:24
michael (3) 1:9 11:6 12:20
might (30) 2:18 14:15 17:8 22:9 25:8 30:4,24 48:5 52:3 68:5,10,13,15 74:23 75:2,11 85:24 91:17 92:20 94:8 96:12 101:16 102:10,15,15 106:13 109:13 113:1 124:4 126:7
miles (1) 126:11
million (15) 34:7,9 35:17 36:3 61:1,6 67:24 68:7,17 73:19 90:6 91:7 95:20 102:4,6
minded (1) 131:24
mindset (1) 32:13
mine (4) 8:1 40:22 61:14,17
mined (1) 42:7
mineral (1) 62:16
mines (4) 16:7 38:25 47:4 63:21
minimal (3) 38:12 58:16 64:4
mining (5) 40:25 62:14 64:2 72:3 74:12
minister (1) 16:7
minutes (1) 44:2
mirror (1) 80:14
misapprehension (1) 130:9
mischaracterised (1) 13:20
misconceived (2) 58:20 111:24
misconduct (3) 94:1,14,17
misconducted (1) 74:21
misconstruction (1) 130:20
mishcon (2) 13:19 54:8
misleading (1) 13:22
misplaced (1) 116:22
misreading (1) 3:20

misrepresentation (5) 19:16 32:13 51:25 71:21 72:13
misrepresentations (5) 19:11,17 20:5 72:19 75:14
missed (3) 30:10 99:16 122:12
misspoken (1) 49:9
mistaken (2) 46:18 48:12
misunderstanding (3) 123:3 124:5,9
misunderstood (2) 5:24 124:14
mix (1) 31:14
moat (1) 49:10
moment (12) 12:3 40:9,13 41:13 55:22 63:20 78:15 83:10 114:23,24 124:25 125:2
moments (2) 53:14 108:25
money (8) 34:12,16 68:10,15 69:4,18 76:9 115:15
monies (2) 35:12 61:5
month (2) 67:7,15
months (13) 9:24 10:4,21 68:22 75:6 81:9 89:3 98:10 118:3,15 124:20 125:25 129:9
more (20) 5:1 11:17 23:11 27:17 29:14 31:25 34:19 36:4,13 54:13 68:8 77:2 86:19 89:23 96:5 102:25 106:8,15 122:11 128:21
morning (3) 1:5 19:1 128:20
moscow (1) 2:14
most (1) 52:2
motion (2) 94:3,18
moulder (91) 1:4,10,14,17 2:12,23 6:22 7:1,11 8:3 18:16,25 21:14 22:7,14 23:3,13,23 24:7,12,18 26:12 27:12 28:10,16 29:22 30:10 31:4,13,19 32:22 38:15 30:11,16,20,23 41:14 42:11,24 43:2,6,9,14 44:2,7 45:18 46:4 47:23 50:16 54:21 75:23 76:19 77:4,7 82:7,11 84:7,18,20,24 91:14 95:19 97:6,10 98:19 99:6,16,24 100:11 103:23 104:24 105:19,21 113:12 114:20,25 122:12,16 124:7,18 125:14 126:5 127:8,21 129:21 131:12,17 132:5,8,13,15
mouth (1) 64:23
move (1) 95:6
moved (6) 33:13 35:18

44:21 61:5 96:18,20
movement (1) 50:25
movements (1) 06:22
noves (1) 16:1
moving (8) 15:11,22 36:2 41:9,20 44:22 45:3 47:10
much (9) 11:7 37:12 55:18 75:23 77:2 85:18 87:1 105:12 132:19
multiplo (1) 19:11
must (14) 4:8 15:8 25:12 27:2 62:25 78:24 79:25 80:16 87:22 88:11 94:3,18 95:25 105:3
myself (2) 6:13 94:21

**N**

nab (1) 15:18
name (2) 36:25 37:1
namely (3) 45:6 80:24 100:3
narrowing (1) 109:18
national (1) 50:1
natural (1) 74:1
nature (8) 8:9 13:20 29:5 66:16 100:7 106:14 126:3 129:7
naughty (1) 69:22
near (1) 109:20
nearly (1) 73:11
necessarily (3) 57:16 67:1 129:12
necessary (6) 2:25 11:20 70:10,12 79:6 132:6
need (13) 7:6 17:16 21:4 27:10 36:13 39:4 97:20 100:10 114:21 128:15 129:13 132:2,17
needs (4) 13:1 47:11 79:6 129:2
negotiated (1) 44:10
negotiating (4) 41:25 42:1,10 46:15
neither (2) 17:25 73:5
never (10) 14:3 35:3 39:19 50:11 67:1 73:6,10,11 106:21 107:10
nevertheless (1) 131:19
next (5) 22:13 69:22 86:21 97:9 101:14
niceties (1) 120:9
nigeria (4) 90:1,6,17 93:3
nigerian (4) 90:1,12,20 91:1
niron (8) 37:7 38:24 40:2,4 76:15 100:14,17,22
nisi (1) 87:18
noise (1) 71:11
none (5) 11:4,5 45:19 46:6 96:11
nonetheless (1) 7:8
nonexistent (1) 41:11
nonnegotiable (1) 44:14
nonpoint (1) 17:20
nonsense (1) 81:20

normal (2) 115:9 117:14
normally (4) 86:8 111:7
125:17 126:8
note (4) 11:9 21:16
26:3 119:5
noted (6) 13:4,7,12,25
14:13 24:25
nothing (12) 40:17 42:9
44:19 66:17 81:19
87:24 91:18 92:9,24
93:13 97:2 131:9
notice (12) 4:3 41:2
79:10 83:8,14 84:5
92:1,25 93:15 98:10
99:12 115:24
noticeable (1) 109:17
noting (1) 15:5
notwithstanding (3)
9:23 66:11 97:16
november (16) 3:10
55:6,17,25 77:20,25
79:2 80:24
81:10,17,24 83:18
94:23 95:13 96:10
127:17
nowhere (1) 109:20
nuances (2) 23:24
124:23
nub (1) 125:12
number (12) 30:15
39:13 41:17 42:2 55:1
60:3 61:2 78:16
109:18 119:17,20
120:19
numbers (1) 39:18
numerous (2) 54:3
66:25
nysco (11) 38:2,8
40:19,22 48:23 49:24
50:9,13 51:13 64:13
65:2

_____
O
_____

oath (1) 61:24
obfuscate (1) 71:12
object (3) 16:16,19 25:2
objection (5) 93:23
94:3,18 99:24 132:8
objectionable (2)
131:5,10
objective (1) 102:16
objects (1) 98:4
obligation (1) 74:21
obligations (1) 66:20
obliged (1) 7:5
observation (1) 131:22
observer (2) 129:4
130:1
obtained (4) 8:23 55:24
79:10 102:5
obtaining (6) 29:21
52:12 59:17,23 72:3
117:2
obtains (1) 102:8
obviously (18) 8:24
11:12 29:9,22
31:19,22 43:16 51:22
54:18 55:16 67:10
69:8 77:15 99:9
113:14 115:12 117:10
121:12
occasioned (1) 123:11
occur (2) 25:13 95:25

occurs (1) 105:24
oclock (1) 75:24
octea (2) 36:17 61:14
october (1) 9:13
offered (1) 45:2
office (1) 99:11
oh (2) 42:13 127:7
once (9) 15:3 18:22
24:16 25:16 27:14,18
93:22 110:17 124:2
oneself (2) 78:20 81:12
ongoing (3) 18:19 98:3
124:11
onwards (1) 120:17
open (12) 7:23,24 34:10
36:22 52:10 105:14
106:25 123:2,13 124:8
126:21 130:19
opens (1) 19:23
operating (1) 100:18
operations (1) 76:10
opinion (1) 92:9
opportunities (1) 37:6
opportunity (8) 18:6
25:8 31:25 58:7 99:9
101:23 128:10 132:18
oppose (1) 93:8
opposed (1) 107:2
opposite (2) 2:8 67:20
oral (1) 126:9
orally (4) 60:7 67:2,2
69:12
order (131) 2:22
3:2,4,18 4:3,5,12
7:9,17 9:16 10:5 13:24
14:5 15:25 16:2 17:17
21:10 25:4 26:9,20
27:24 31:24 33:8,17
35:14 52:12 54:16,24
60:21 65:5
69:14,18,23 72:6
79:7,9,21 80:3,9,14,21
81:4,4,12,14,14,20,23,24,25
82:1,2,20,23,24,25
83:2,3,8,8,14,17,21,21,23,24
84:2,5 85:5,6,22,25
86:6,9 87:18,19,21
88:1,5,10
89:1,1,2,3,4,12,20,21
90:9,25 91:23 92:2
93:16 94:22
95:7,8,12,13,15,21
102:11 103:10 104:11
105:2,12 107:2 109:5
112:14,16,24 113:2
114:5 115:7,8,14
116:2,10
117:1,2,7,21,22
118:2,10,17
119:1,2,8,11 122:4,9
ordered (7) 10:15
53:3,8 91:17 92:16
103:17 123:11
ordering (1) 14:2
orders (4) 25:19 104:19
107:3,6
original (2) 32:23 121:1
originally (1) 77:18
others (3) 35:11 45:14
97:25
otherwise (6) 24:23
26:5 52:17 69:19
88:25 96:3

ought (2) 86:22,23
outcome (6) 9:16 11:24
19:10 20:10 30:22
91:1
outing (1) 20:20
outlined (1) 127:12
outright (1) 105:17
outset (1) 51:9
outside (2) 5:2 30:24
outstanding (3) 12:11
102:16 105:1
over (14) 28:23 32:19
50:1,9 51:11 60:18,19
61:25 64:5 72:6 97:1
106:1 109:3 128:21
overall (7) 19:10 45:21
46:8 63:11,11 76:13
87:3
overlap (2) 109:4,6
overview (1) 56:17
overwhelming (2) 2:4
6:8
overwhelmingly (1)
30:20
own (11) 7:24 8:2 29:12
32:1 35:24,25 38:7
49:3 50:22 57:14
104:9
owned (1) 49:25
owners (1) 59:15
ownership (2) 33:14,21
owns (1) 61:14

_____
P
_____

package (2) 76:13,14
pages (7) 52:21 78:9,17
106:9 120:17,19
128:21
paid (14) 14:3
34:8,10,12,16 35:18
36:8 39:2 52:11 60:21
61:1,6 104:19 123:11
paper (1) 41:8
para (16) 15:11,16,22
16:5,9,23 17:18 20:3
24:11,15,19 27:16
28:6 106:11 116:19,20
paragraph (63) 3:4
9:12,21,25 10:7,18,24
11:20,21 12:2,7
13:4,7,9,25 14:20
15:2,5 19:8
27:16,17,23 30:9
36:16,15 37:17 38:20
39:4 59:6,12 61:15,17
71:15,19 75:17
77:17,22 80:13 84:25
85:15,16 86:4,6
88:4,15 89:7 92:5,7
93:6 95:3 101:8 108:3
115:25 116:13 120:6
123:18 127:5,20,22
129:22,23 130:12,22
paragraphs (5) 18:24
39:22 77:10 95:2
121:24
paras (2) 18:13,22
parent (6) 38:1,9 48:23
66:12,16 99:7,19
100:5
parents (1) 100:5
part (26) 3:17,21
4:10,13 5:13 17:4

21:10,25 28:22 29:18
45:6,10 51:12 54:4
60:17 76:14,16 80:11
89:19 90:8 91:8
101:2,23 106:4
113:15,18
parte (5) 81:15 83:8
89:1,2 118:10
partes (1) 81:14
participate (1) 12:13
participated (1) 13:10
participating (1) 15:12
particular (10) 7:20
11:5 19:21 62:17 66:9
87:4 88:14 120:12
123:18 131:23
particularly (1) 40:21
particulars (1) 125:18
parties (27) 1:12 4:7
6:17,18 9:3 10:16
17:25 23:17 38:20
46:11,11 50:13 51:14
54:4 62:8,10,12,12,21
73:3 74:9 76:15 90:9
103:2,15 128:8,11
partner (1) 13:19
parts (4) 5:15 13:24
21:17 128:20
party (39) 17:18,19,21
18:1,3 21:1,3 24:21,22
26:18 29:8 31:21
32:10 33:19 52:2 58:6
68:6 70:7,9,23 73:5
74:1,11,24 89:10
93:18 94:6,9,13
103:20 109:1,7
111:5,6 112:15,16
113:5 115:16 118:13
partys (1) 87:17
passage (3) 88:15 92:6
108:6
passages (1) 61:13
passed (1) 103:3
passing (1) 15:5
patsies (1) 65:18
pattern (1) 120:1
pause (18) 18:15,24
24:17 30:13 36:15
38:18 39:22 52:22
66:8 84:23 91:11
99:2,8 101:4 108:1,15
119:13 131:11
pay (9) 27:19 33:4
69:14,22 90:13 94:10
105:9 119:2,8
payable (1) 69:18
paying (2) 103:20
105:25
payment (9) 21:10,25
103:24
105:10,16,17,21,23
115:14
payments (1) 46:10
pending (19) 1:15 9:16
11:24 16:25 35:6
48:16 53:25 82:3 84:2
85:7 89:10,13 90:11
95:5,12,15 106:21
124:19,20
pentler (3) 71:23 72:1,4
people (17) 47:9 56:5
59:8,16,19,21 60:4
62:15,15 65:19,20

68:11,13,19 73:19
77:8 97:19
per (3) 67:4,7,15
percentages (1) 82:13
perfectly (1) 79:10
performed (1) 39:4
perhaps (15) 10:24
21:18 22:8 37:19
30:21 43:2 70:4
78:5,13 91:13,13 94:7
115:6 125:12 132:2
period (5) 32:15 76:5
80:1,2,17,20
permission (14) 4:1
7:18,19 14:8,15 16:4
79:12,15 82:15
116:1,11,14 126:1,2
permit (1) 87:13
permits (1) 7:19
permitted (1) 81:8
perpetrate (1) 33:22
perry (1) 3:1
persistent (1) 29:18
persistently (1) 33:20
person (2) 100:18
108:14
personal (2) 50:6 114:1
perspective (1) 53:6
persuade (1) 78:22
persuaded (1) 87:9
peterson (1) 108:1
petroleum (1) 90:1
pick (6) 24:16,19 28:16
30:13 39:25 49:7
picken (8) 20:21
22:9,10 23:8 24:9
26:14 28:7 33:9
picking (1) 23:11
pin (1) 22:22
place (4) 1:13 14:22
38:5 127:1
placed (2) 18:9 20:11
places (2) 107:25 108:9
plainly (8) 2:21 25:10
28:25 41:11 104:11,14
109:20,24
play (2) 60:7,25
ployed (1) 14:13
pleading (3) 90:17
123:5 125:24
please (3) 7:11 75:24
122:13
pleased (1) 62:13
pleasing (1) 65:25
pm (6) 75:25 76:2
115:3,5 131:20 132:20
points (23) 8:8 19:2
20:22 24:16 26:15
31:18 39:24 54:12
60:6 61:2 65:4 68:25
70:4 73:16 76:3,5 79:5
103:16 109:18 113:10
122:19 123:1 126:18
policies (1) 103:19
policy (7) 91:3 95:3
109:14,15,20,22
112:11
poor (1) 113:3
popplewell (12) 9:4
12:22,24 13:3,12
53:16 69:13 103:11
104:6,11 119:2 127:11
popplewells (2) 32:25

60:20
population (1) 62:18
portfolio (1) 41:7
portmanteau (1) 23:10
position (30) 1:18 2:10
4:20 5:6 6:13 18:10,12
23:11 25:10 28:1
30:21 39:6 41:8 44:18
47:9 49:2,21 52:15
55:24 58:24 60:10
62:4 82:8 86:3 98:20
101:25 110:2 127:12
128:6,16
positions (1) 40:13
possibility (4) 92:22
107:11 130:2,17
possible (2) 18:20 48:16
possibly (7) 55:20 66:1
84:22 87:21 91:9
100:22 130:11
posthearing (2) 30:16
120:8
postinterest (1) 116:4
potential (5) 52:3 64:12
86:9 98:4 129:8
potentially (5) 5:4,13
117:4 118:12 123:3
power (31) 3:11 20:17
55:9 56:2
59:9,16,20,20,22
60:12,14 63:1 68:25
69:3,16,17,21 89:21
91:23 92:18
95:6,8,8,9,15
112:14,16 117:6,8,8,9
powerless (1) 45:15
powers (2) 92:19 115:9
practical (6) 2:4 48:18
50:1 87:15 98:17
100:6
practically (2) 41:19
42:7
practice (1) 78:11
precede (1) 110:18
precisely (2) 59:15
94:20
precision (1) 13:15
predated (2) 61:3,20
prefer (1) 129:19
prejudice (32) 8:10
21:11
22:2,16,17,25,25 23:2
25:5,9,17,25 26:2
32:15 55:3,4,7 65:23
66:19 71:11 95:25
96:15 97:3
102:4,14,23 103:1
110:8,8 111:19 113:1
129:9
prejudiced (1) 65:10
prejudices (2) 22:19
26:21
preliminary (2) 1:11 3:5
preparation (2) 17:1
54:6
prepare (1) 62:21
prepared (1) 23:20
prescribed (1) 87:19
presence (1) 123:2
present (4) 13:11 15:14
73:5 87:12
presented (5) 38:4
44:13 47:21 49:4

62:20
preserva (2) 52:16
67:19
preserved (1) 112:12
president (5) 61:8,9
71:24,25 72:6
press (5) 5:5 40:5,20
43:17 63:16
presumably (1) 125:5
presumption (7) 2:13
3:12 4:18 5:8 6:20
111:19 113:4
presumptive (2)
107:15,20
presumptively (3) 2:6
3:19 118:16
pretend (1) 97:1
pretty (1) 2:18
prevent (13) 29:20
45:16 50:9,17,22 63:8
64:17,18 102:11
109:23 112:20
prevents (1) 117:2
previous (5) 12:16
14:19 55:21 56:2,3
64:12,13,21 65:18,25
66:22 67:4,9
127:11,22
previously (4) 10:3
55:22 61:18 64:16
price (1) 95:12
prima (3) 83:11,12
87:17
primary (1) 75:9
principal (2) 1:19 33:25
principally (1) 52:19
principle (7) 21:9,20,24
25:2 87:1,17 110:21
principles (6) 8:6
20:17,24 55:2
110:5,14
prior (6) 53:9 54:3
62:25 63:3 96:22
104:19
priority (1) 105:4
private (15) 1:13,15 2:6
3:3,8,10,15 4:17,19
5:9,16,18 6:6,15,21
pro (1) 85:23
probabilities (2) 25:22
31:8
probability (3) 25:13
26:4 27:8
probably (6) 23:7 65:22
88:13 99:1 101:3
130:7
problem (8) 44:22
46:23 47:6 48:4 73:6
98:17 104:24 124:22
procedural (7) 6:11 9:8
12:11 19:5 54:2
108:18 112:4
procedure (4) 5:22
62:13 94:6 121:2
proceedings (16) 1:22
3:17,25 4:9,22 5:23
6:15 13:21 17:17 73:5
90:10,20,25 91:1
110:25 128:8
proceeds (1) 34:11
process (6) 14:17 16:1,2
17:2 63:24 81:25
produce (2) 16:15 119:6

produced (1) 16:14
product (1) 50:15
productions (1) 10:9
professional (1) 18:18
professionally (1) 18:11
professor (1) 11:19
profit (1) 62:15
progas (10) 20:22
  22:10,13 23:6,19,15
  24:11 33:10 54:25
  70:20
prohibiting (1) 85:23
prohibition (2) 66:7
  87:25
project (1) 62:15
prominent (1) 74:11
proof (3) 10:12,18 26:4
proper (4) 5:22 36:6
  66:22 87:14
properly (5) 79:10
  93:23,24 118:21
  126:18
proportion (2) 39:2
  78:20
propose (1) 131:17
proposed (2) 40:12
  100:16
proposing (1) 7:22
proposition (2) 98:22
  107:24
prospect (6) 28:2 29:10
  35:13 53:3,4,15,22
  58:13,15
prospective (1) 110:10
prospectively (2) 25:18
  26:8
prostitute (1) 65:24
protect (1) 68:2
prove (2) 70:11,12
provide (7) 12:14 55:10
  58:7 63:1 69:9 97:8
  107:12
provided (2) 39:9 91:19
provides (9) 51:17
  85:19 91:6,16
  92:11,16,21 111:22
  112:10
providing (1) 120:20
provision (12) 29:7 66:9
  87:5 88:10 91:20,20
  92:14 98:8,25 99:5
  106:13 123:15
provisional (2) 83:22
  113:22
provisionally (4) 38:23
  83:6,6 84:9
provisions (3) 79:24
  92:10,20
public (23) 1:13,19,21
  2:2,6,14,20,22
  3:3,7,19 5:3,13,21
  6:4,9 91:3 95:2
  109:14,15,20,21
  112:10
published (1) 1:24
pure (1) 132:10
purely (1) 8:14
purpose (13) 12:8
  29:11,13 31:23 50:3
  55:8 57:25 59:3 65:6
  68:1 69:7 78:21 126:3
purposes (3) 66:11
  69:10 91:8

purse (1) 51:19
pursuant (5) 79:19,24
  85:21 116:3,7
pursue (9) 29:6 35:10
  42:5 58:17 64:21 65:1
  66:22 69:12 100:4
pursued (5) 11:16 14:24
  15:4 126:25 128:4
pursuing (5) 42:24
  50:12,18 69:24 103:12
pursuit (1) 7:16
putting (4) 17:24 30:3
  43:14 78:22

**Q**

qc (1) 1:7
quantification (1) 102:3
quantify (1) 102:13
quantum (2) 8:14 52:20
queries (1) 40:3
query (1) 124:15
question (9) 1:16 46:1
  55:12 73:9 76:12 77:9
  86:21 87:5 121:16
quickly (1) 129:15
quirk (5) 1:7 19:19
  20:20 35:3 106:6
quite (12) 22:7 23:4
  27:22 42:3 43:6 44:15
  76:24 82:18 104:5
  122:10 128:16 129:24
quotation (1) 22:18
quotations (3) 24:10,15
  27:13
quote (1) 24:20
quoted (2) 20:6 92:4
quotes (3) 23:8 26:14
  27:15
quoting (2) 6:1 57:18

**R**

raise (5) 29:12 32:14
  94:16 111:15,17
raised (8) 11:13 32:19
  91:2 92:13 94:3,18
  104:25 112:10
raises (4) 29:10 31:22
  87:15 111:17
raising (1) 43:15
range (2) 126:22 131:20
rare (1) 113:4
rates (2) 54:8,9
rather (13) 2:13 25:20
  28:19 47:19,20 53:5
  77:3 90:25 105:17
  120:4 121:2 122:11
  130:21
rational (2) 19:4 102:16
reach (2) 20:14 41:4
reached (9) 19:7,14
  30:21 45:19,20 46:6
  48:2 128:14 129:11
read (16) 18:23,25 22:8
  24:14 26:13 39:21
  42:12 77:15 91:10
  99:10 101:13,17 124:4
  130:22,22,23
reading (2) 20:18 87:8
reads (1) 129:23
real (8) 8:10 53:3 55:11
  122:7 124:18 125:12
  130:2,17

realistic (1) 20:2
reality (5) 30:2 40:17
  41:9 48:19 49:2
really (16) 32:20 55:16
  58:19,19 64:4 65:18
  67:15 68:21 77:11
  78:18 94:24 99:12
  119:18 120:20 124:21
  125:20
reason (17) 1:19 19:16
  23:13,14,16 25:7
  34:23 43:15 61:21
  104:8 105:8 108:11,19
  110:22 111:22 118:7
  122:6
reasonable (8) 53:5,22
  54:15 58:13 67:16,25
  126:6 129:4
reasoned (1) 120:11
reasoning (1) 91:22
reasons (8) 2:21 6:19
  51:8 71:5 95:7 103:14
  111:21 125:3
recall (1) 97:6
receive (1) 34:12
received (7) 6:24 35:12
  42:8,9 43:23 50:14
  73:5
receivers (1) 51:10
receiving (1) 58:11
recent (2) 16:6 85:8
recently (1) 20:21
recipients (1) 95:25
recognise (2) 62:10
  65:10
recognised (2) 105:7
  127:2
recognition (2) 105:8
  125:4
recollection (2) 28:10
  98:9
recollects (1) 108:24
recommence (1) 47:24
reconsider (1) 120:25
record (6) 15:23 49:13
  120:9 126:18 129:3,3
records (1) 128:23
recordsharing (2) 10:7
  13:23
recover (4) 21:12 33:5
  96:16 103:2
recoverable (1) 102:15
recovered (2) 53:7,17
recovering (1) 22:3
recovery (5) 8:11 32:11
  57:24 98:4 102:11
red (3) 72:15 119:21
  130:5
refer (3) 86:17 88:17
  129:3
reference (12) 30:10
  38:15 39:3,12 60:20
  61:13 110:14 112:8
  113:16 122:3,12,13
referred (2) 6:22 22:11
refers (2) 87:7 99:11
reflect (2) 7:9 132:18
reflected (3) 108:7
  111:11 132:1
refusal (9) 17:12 30:15
  37:17 47:14
  120:7,22,25 123:23
  130:15

refuse (1) 126:7
refused (10) 10:1 14:8,9
  18:5 34:5 36:10 40:2
  57:22 72:23 74:22
regard (1) 63:11
regarded (1) 14:4
regarding (1) 75:18
regardless (3) 46:3 47:8
  103:22
regards (1) 47:7
regime (1) 110:19
registration (3) 109:23
regular (3) 13:17 15:14
regularly (1) 94:7
rehearsed (1) 78:9
reinstated (1) 48:5
rejected (3) 9:19 12:1
  15:10
rejection (1) 11:10
relabel (1) 124:16
related (4) 35:20 50:13
  72:14 73:4
relating (7) 5:9
  16:6,12,19 66:15
  72:15 85:17
relation (26) 8:11
  19:3,21 20:7 25:9
  38:10 40:4 44:21,23
  45:4 49:6,13,15
  51:22,23 54:6,16 55:9
  95:24 96:13 97:2
  100:12 103:10 122:17
  123:1 127:20
relationship (3) 68:4,24
  69:3
relatively (4) 9:11 20:20
  37:23 113:8
relaxed (2) 127:13
  129:20
release (1) 40:21
releases (3) 40:5 43:17
  63:16
relevant (11) 8:6 13:24
  19:23 21:6 29:6,6 38:8
  112:4,13 125:22
  127:25
reliance (2) 96:13
  111:25
relied (6) 30:9 32:17
  75:18 92:6 96:7 126:3
relief (7) 29:21 52:7
  101:2,11,24,24 125:7
relies (1) 120:7
reluctant (1) 125:14
rely (2) 42:5 121:14
relying (1) 112:15
remain (3) 119:23
  122:21 126:16
remainder (1) 129:18
remained (2) 2:18 72:1
remains (3) 9:7 29:7
  126:21
remarks (1) 11:3
remedies (2) 34:15
  35:10
remedy (1) 115:24
reminds (1) 49:8
remit (2) 94:4,19
remitted (1) 81:11
remotely (1) 101:22
removal (1) 11:11
remove (1) 10:19
removed (6) 7:4

90:23,24 99:5 126:19
  133:11
rendered (1) 8:24
renders (1) 35:9
renewsd (2) 9:24 12:21
repayment (1) 36:9
repeat (3) 72:25 77:14
  94:21
repeated (1) 33:13
replace (1) 66:13
reply (3) 8:1 95:22
  113:14
report (4) 16:14 24:4,21
  101:5
reported (2) 5:5 40:23
reporter (2) 5:2 7:7
represent (1) 122:22
representation (1)
  114:2
representations (1)
  33:13
represents (1) 30:19
reproduce (1) 121:1
republic (4) 9:19 41:5
  63:2,7
reputation (1) 65:23
repute (1) 56:6
request (9) 16:9 63:7
  79:15 97:13 111:13
  116:15
requested (2) 16:11
  64:24
requests (1) 50:5
require (1) 65:25
required (3) 63:2,5
  107:24
requirement (6) 11:12
  55:15 71:2 96:1
  104:18 111:16
requirements (2) 66:14
  70:19
requires (2) 74:4 99:20
requiring (2) 26:4 88:10
reread (1) 19:1
reschedule (1) 120:22
rescinded (2) 19:15
  34:9
reserve (1) 131:17
reserved (1) 15:1
reserves (1) 116:5
resign (2) 98:8,21
resignation (1) 99:12
resigning (1) 99:11
resist (5) 35:5 93:18
  94:13 112:17 125:4
resisting (1) 34:21
resolution (1) 90:11
resolve (1) 12:10
resolved (2) 28:3 129:15
resources (1) 62:16
respect (35) 17:13
  19:5,24 50:13 54:12
  58:5,8 60:9 61:5,12
  63:18 65:3,20 66:2
  68:18,21,24 70:7
  78:2,24 92:14,15
  96:14 97:25 102:7
  106:7 109:11,24
  110:25 112:9 113:3
  118:20 119:1,5 128:18
respectful (17) 3:20
  5:5,10,17 56:11 58:18
  59:5 74:4,9 83:24

84:1,4 88:14 93:2
  117:1,7 118:4
respectfully (1) 88:24
respective (1) 23:18
respects (2) 17:14 92:8
respond (3) 8:1 54:19
  95:23
respondent (1) 85:25
responding (1) 7:25
response (4) 14:6 18:18
  37:14 43:7
rest (4) 20:14 29:1
  116:5 131:1
restoration (2) 101:1,9
rests (1) 104:20

**S**

s (6) 84:16 85:3
  89:22,23 108:20
  111:25
sadly (1) 87:12
sake (3) 65:24,25 67:19
same (40) 4:2 10:3
  11:22 14:10 19:14
  22:7 23:4,19,22 26:24
  30:21,21 37:16 51:20
  54:24 73:24 74:6
  79:13 80:22 85:5
  85:18 88:18 95:21
  100:8 103:21 104:19
  105:12,17 110:2
  114:15 116:2,3,12,19
  117:15,17,22,24
  118:22 127:12
sanction (1) 63:14
sanctioned (1) 114:5
satisfied (5) 45:20
  46:7,16,22 71:4
satisfy (3) 70:20,24
  71:3
save (2) 17:4 23:1
saville (1) 24:20
savilles (1) 25:15
saw (2) 73:6 128:14
saying (22) 12:12 25:11
  26:24,25 41:3,18,24
  42:4,13 43:16,19,21
  44:23 45:24 46:21
  78:18 85:1 91:15
  94:14,15 98:19 117:13
scandalous (1) 56:11
scheme (1) 87:3
schiller (1) 1:6
scope (1) 123:4
scrimaglio (2) 93:21
  94:25
scrutton (2) 93:20 94:7
sealed (1) 131:0
sebastian (1) 2:1
second (10) 8:9 11:22
  19:8 21:8 32:6 33:23
  46:4 61:16 86:5
  103:21
secondly (10) 35:8
  40:15 44:15 51:17
  55:7 57:16 74:20 76:7
  105:10 116:23
section (168)
  3:6,9,13,24 4:1,10,13
  5:25 7:16,20 8:7 9:8
  11:15 20:18 21:2,3,13
  22:5 25:17 27:20,21
  29:4,6 32:5,16 33:6
  52:6 55:9 58:7,21
  61:21 65:6
  69:1,8,13,17,24

rules (6) 2:25 3:21 5:7
  25:1
ruling (4) 12:2 13:3
  73:10,11
run (4) 9:3 21:15 96:5
  103:18
running (2) 75:21
  103:15
runs (2) 95:8,9
runup (2) 20:16 121:21
russell (4) 84:11,13
  110:16,19

70:8,10,11,12,14,17,22
71:7,16 74:4,7,7
75:1,22 78:10
79:6,12,15 80:23,25
81:17 82:3,6
83:9,13,16 84:3,6,9
05:7,11 86:11,18 87:6
08:6,8,9,10,23,24
09:5,25,25 90:10
91:3,5,16,18,24,25
92:2,4,10,15,19,23,24
93:1,13,15,20 94:6,22
95:10,12,14,15,24
96:9,11
104:7,10,13,14
106:8,20,24
107:14,18,19
108:4,5,8,12,17,18
109:1,1,3,10,15,17,22,24
110:2,13,23 111:2,22
112:3,7,12,19,20
116:3,8,14,17
117:4,6,10,15,16,24
118:11,11,13,22,23
119:11,25 120:15
121:10 122:8,23
125:7,8 127:11
128:5,5 131:3
sections (2) 08:6,12
secure (1) 72:6
secured (3) 36:23 69:20 90:15
security (69) 3:13,14 8:13 25:4,19 28:1 36:19 52:19,25 53:1,6,21 54:15 55:11 65:5 68:1,4,14,25 69:9,13 70:8,8 71:13 75:21,21 76:4,17,18 77:9 78:19 79:3 86:1,22,23,25 87:5 88:1,10 89:20,21 90:14 91:6,16,20,23 92:2,14,16,22 93:1 95:7,8,11,14,15 104:1,12 105:13,17 106:2 112:14,16 113:17 117:7,22,23 119:1,3
see (20) 2:17 9:21 11:19 15:16 20:3 32:24 37:1 39:8 05:3 09:11 77:4 83:19 87:1 101:7 119:21 121:6,13 125:14 128:10 131:25
seek (14) 9:14 19:19 34:11 52:25 58:1,6 59:25 60:1 65:17 66:13 71:1 92:2,19 116:7
seeking (13) 9:16 21:3 52:8 53:1 70:7 71:12 76:18 83:22,23 101:21 115:8,21 117:14
seaks (7) 29:8 56:10 93:18 94:13 101:1,9 116:1
seen (6) 22:24 23:13 41:18 42:14 67:13 97:6
seemed (1) 113:9
seems (9) 22:15 41:15,23 43:4 86:19

88:3,9 104:24 125:15
seon (6) 8:17 23:8 29:17 33:18 38:1 49:23
sees (23) 9:12,25 14:11 15:2 16:8 17:2,17 41:1 77:19 79:9 81:16 85:1 91:9,15 92:4,4 93:6,19 113:24 116:11 119:25 120:6,19
sense (6) 18:12 23:20 30:17,24 58:5 117:17
sensible (3) 58:17 88:25 132:10
sent (1) 50:5
sentence (9) 46:5 101:7 123:19 124:6 129:24 130:4,8,21 131:24
separate (4) 9:17 10:14 23:21 127:23
september (2) 1:1 12:5
sequence (1) 43:25
sequenced (1) 128:9
serious (17) 13:13 33:23 45:13 51:21 60:2 62:1 74:2,4,7 81:1 93:9 94:17 107:19,23 109:7,16,21
seriously (2) 13:21 103:19
seriousness (1) 53:10
served (2) 4:8 128:7
service (4) 4:8 6:5 79:20 99:5
servitude (1) 99:19
set (51) 3:18 4:11 6:17,19,21 7:17 18:22 19:15 35:14 71:6 72:24 77:25 79:21 80:2,4,21,24 81:3,6,11,18 83:3,7,14,16 86:9,17 87:20 88:17 89:1,11 90:18 92:25 94:1,2,4,19 104:5,13 106:16 107:2 108:12 109:9 113:10 117:21 118:10 122:6 125:7 128:20,24 131:2
sets (6) 24:10 62:8 81:22 85:15 86:15,16
setting (5) 31:16 89:4 107:4,7 122:9
settled (1) 93:22
settlement (26) 37:8,24 38:3,23 39:6 40:8,20 44:8,13 45:7 47:7 48:16 56:19 57:7,10,10,11 62:4,5,5,11 63:12 65:9 76:11 100:13,16
sever (1) 98:14
shall (5) 66:18 69:19 83:16 114:8,14
share (3) 47:2,15 58:2
shareholder (4) 37:6 49:24 71:25 97:24
shareholders (4) 8:20 35:11 38:22 46:2
shareholding (1) 28:8
shares (4) 36:17 61:14,18 72:5
sharks (1) 49:18
sheet (5) 39:9 47:21

49:4 62:6 63:9
shifting (1) 13:17
shoots (1) 102:9
short (8) 37:21 44:5 72:7 76:3 92:6 114:21 115:4 118:24
shorter (1) 125:12
shorthand (1) 70:24
shortly (1) 115:1
shot (1) 102:6
should (76) 1:12,19 3:14,19 4:19,23,24 5:9,16,18 6:6,15,21 7:9 12:16 13:6,14 14:1,22,24 25:4 26:17 34:4 35:14 37:22 39:14 42:12 43:2,3 49:7 52:6,12 53:21 58:4 62:3 66:3,4,5 68:4,14,15 69:2,12 81:3,8 85:4 85:14,25 89:19,20 91:3,5 93:14,15 94:22 95:9 97:4,12,22 99:1 100:3 110:23 113:6 117:21,22 119:23
someone (2) 48:6 102:8
something (18) 26:5 27:7 30:23 41:21 42:1,8,19 43:22 44:24 50:25 57:17,20 60:22 67:14 73:20 82:20 122:11 132:11
sometimes (4) 17:2 49:1 54:12 122:19
somewhat (1) 17:1
soros (4) 36:23 57:16,16 68:22
sort (9) 23:10 57:19 59:16,21 67:25 100:7 118:25 125:19 131:7
souar (1) 15:18
sought (8) 14:8 82:8 90:7 101:2,24 102:15 108:15 131:10
sounds (2) 98:21 132:10
soupon (1) 131:7
sources (2) 64:19 76:23
space (1) 53:14
speaks (2) 87:16 128:18
special (3) 37:6 126:23 127:19
specific (2) 29:3 100:2
specifically (3) 92:16 120:7 128:19
speculative (1) 53:5
speed (2) 12:9 45:3
spotted (1) 110:15
stable (1) 2:3
staff (1) 67:8
stage (7) 11:15 12:17 16:1 34:13 35:24 36:3 103:21
stand (3) 105:11 110:23 111:24
standard (7) 15:24 16:2 61:19 110:10 112:5,21 126:2
standing (1) 105:12
stands (4) 37:7 80:22 82:21 110:2
star (5) 36:18,21 37:3,5 61:20
start (5) 2:11 10:21

skeleton (26) 6:24 17:9 37:24 56:13,13 59:7,13,13 60:6 67:1 70:2 71:6 72:24 73:25 77:11,17 78:8,9,12,17 89:8 93:6 95:1 106:12 109:12 121:23
skeletons (6) 7:2 8:17 21:17 22:12 23:18 76:20
slightly (2) 24:2 57:20
smaller (1) 102:20
smoothly (1) 9:3
socadec (1) 89:16
socalled (2) 38:10 55:19
sold (1) 61:19
solicitor (1) 54:6
solicitors (4) 34:5 77:19,23,24
solutions (2) 36:24 37:3
somebody (1) 93:16
somebodys (1) 125:18
somehow (7) 58:8 100:14,15 110:23 119:2,10 125:23
someone (2) 48:6 102:8
something (18) 26:5 27:7 30:23 41:21 42:1,8,19 43:22 44:24 50:25 57:17,20 60:22 67:14 73:20 82:20 122:11 132:11

29:19 33:10 102:5
started (1) 54:2
starting (8) 2:13,14,19 3:9,12 6:6 33:18 113:4
starts (1) 115:13
statement (14) 13:16 20:1,23 35:2 36:14 40:22 41:17 46:23 56:12 60:2 61:16 71:14 72:10 97:7
statements (3) 41:17 43:6,8
states (1) 46:5
status (5) 37:9 40:8 47:7 105:8 107:0
statute (2) 112:14 119:6
statutory (2) 66:13,19
stay (31) 3:18 4:11 9:14,15,23 11:24 49:19 80:21 82:2,13,15,20,22 84:2 89:13 90:24 92:1,3,25 93:15 94:22 104:4 110:4 111:3 112:4,25 115:8,17,21 117:1 119:10
stayed (4) 16:24 89:19 111:16 117:2
staying (2) 95:12 111:7
stays (2) 110:12 111:12
steinmetz (16) 34:1,6 38:5,9 40:4 49:25 50:9,13 51:13,22 57:19 64:15 76:16 97:25 100:15,22
steinmetzs (1) 50:6
step (1) 63:19
steps (3) 6:2 36:12 86:8
stifle (4) 28:2 65:6 69:8 103:0
stifled (1) 76:22
stifling (5) 77:5,5 103:6 111:15,17
still (6) 34:6 40:16 61:22 70:23 71:2 97:23
stipulated (1) 85:23
stop (1) 75:20
straightaway (1) 102:10
strata (1) 51:24
strategy (1) 9:5
stress (1) 57:2
strict (2) 74:20 75:4
strike (3) 123:1 125:9 126:5
striking (1) 42:3
strings (1) 51:19
strip (1) 61:9
stripped (2) 56:25 63:21
stripping (2) 57:8 58:3
strong (4) 6:20 33:19 36:2,11
stronger (1) 70:16
structure (4) 44:10 45:5 86:7,20
struggled (1) 118:25
struggling (1) 125:23
subject (21) 3:4,11 10:6,13 15:19 38:8 39:7 40:17 51:12,15 63:14 83:12 86:13 87:21 86:1 93:1 99:22

110:4 114:3,7,12
submit (10) 4:20 16:10 56:3 70:5 88:24 91:21 93:2 104:21 110:20 123:7
subparagraph (1) 37:2
subsection (1) 92:13
subsequent (1) 105:23
subsequently (2) 61:19 90:14
subsidiary (1) 36:17
substantial (9) 13:8 52:9 73:22 74:5,15 75:6 78:20,25 81:2
substantially (4) 20:19 74:8 75:7 120:4
substantiate (1) 119:7
substantive (2) 106:16 126:16
subvert (2) 4:24 5:14
subverted (2) 5:1 89:4
succeed (2) 81:17 83:18
succeeded (4) 10:25 11:4,6 83:25
succeeding (1) 107:12
succeeds (1) 106:24
success (6) 29:10 58:13,15 107:4
successful (3) 35:7 87:17 113:5
sue (1) 94:8
sued (1) 93:16
suffered (2) 29:21 32:12
suffers (1) 74:14
sufficient (4) 26:7 29:12 74:24 122:8
sufficiently (1) 108:23
suggest (6) 30:4,18,18 40:5 44:20 51:25
suggested (2) 86:6,12
suggestion (7) 32:10 34:3 36:7 97:21 103:5 110:12 111:2
suggests (1) 53:19
sum (1) 68:10
summarised (2) 9:8 27:23
summarises (2) 72:10 101:6
summary (4) 24:8 27:15 103:14 113:10
sums (4) 59:17,23 90:13 94:10
sunday (1) 40:23
support (3) 29:16 84:10 96:7
supported (2) 93:3 110:15
supporting (1) 48:8
suppose (2) 68:9 98:23
supposing (4) 5:10 74:17,21 83:18
supreme (2) 89:24 51:15
sure (13) 28:16 39:11 42:6 46:12 49:18 51:2 75:24 99:13 103:24 104:5 108:5 124:8 125:20
surely (1) 68:1
surprising (2) 43:6,7
suspects (1) 47:17
suspend (3) 49:16

85:24 95:4
suspended (2) 34:24 63:25
suspicion (1) 45:10
swiss (1) 50:6
switzerland (1) 34:1
sworn (1) 72:10
system (1) 1:23

### T

tab (38) 9:9 13:2,4 14:10 23:6 24:6 30:7,12 36:15 37:16 38:14,17 40:21 41:1 52:21 62:8 71:15,18 79:8,11 84:16,18,19 90:2 99:3 101:3 106:2 110:19,20 113:18 115:23 116:11 119:17,18,18 122:5,14 123:17
tabs (1) 119:17
tactics (5) 9:5 18:9 55:20 60:8 121:15
tainted (1) 93:9
taken (7) 21:15 30:17 76:22 108:24 109:18 111:11 128:6
takes (4) 63:19 82:25 102:16 115:10
taking (6) 9:11 28:24 50:24 54:10 86:8 113:19
talk (2) 25:7 57:8
talking (1) 22:16
talks (1) 60:7
teare (4) 26:14,16 117:20 118:20
teares (1) 122:4
telling (1) 115:12
tells (1) 44:12
tem (1) 85:23
temporarily (1) 122:20
temporary (1) 87:25
ten (2) 20:4 44:2
tender (5) 40:25 41:2,20 43:18 46:21
tentative (1) 87:16
tenth (1) 20:5
term (5) 39:9 47:21 49:4 62:6 63:9
terminate (1) 98:10
termination (1) 99:1
terminological (1) 26:11
terminology (1) 27:5
terms (31) 2:20 17:17 38:23 39:7 41:8 44:13,15 48:19 50:8 52:5,18 62:20 80:10 82:23 85:25 89:14 91:18 92:17 93:13 96:5 99:18,22 102:14 104:9 105:17 110:4 116:7,16 123:12 126:20 127:14
terribly (1) 42:13
test (13) 23:5 30:22 55:23 70:20,25 71:3,4,13 74:6,8 75:6 112:23 130:3
thaek (15) 2:23 7:3,12 44:3 54:21 75:23 77:7 84:20 95:19 113:12

114:24 115:2 122:16
129:21 132:19
**thats (45)** 22:7,14
25:10 26:10 43:18
44:14 45:23 47:13,22
56:16 60:10 63:19
66:7 69:25 70:3
72:9,15 75:6 76:8,16
78:23 79:3 80:8,18
81:11 85:2,24
88:13,25 91:8 94:5,20
101:2 108:12 115:18
121:9 124:19 126:17
127:10 129:4,16
129:14 130:18,25
131:4
**themselves (10)** 14:4
18:12 35:3 46:20 60:3
76:12 96:24 98:11,20
99:4
**thereafter (1)** 125:11
**thereby (1)** 105:3
**therefore (11)** 2:2 19:22
29:1 57:9 72:5 73:20
99:24 109:3 116:20
118:16 124:21
**theres (31)** 7:16 21:14
22:24 27:13 31:9,13
35:13 36:7 37:4 39:3
48:22 49:7 53:22
58:14 60:20 64:11
68:20 69:21 82:11,13
87:23 92:23,24 93:17
103:7 110:8 120:3
121:15 125:16 131:9
132:8
**thereto (2)** 5:9 85:21
**theyll (1)** 129:13
**theyre (2)** 6:18 83:23
**theyve (1)** 93:12
**thiam (6)** 16:8,11,12,19
73:2,4
**thiamrolated (1)** 17:22
**thiams (2)** 16:17 17:11
**thing (9)** 19:24 23:4
29:24 27:11 73:2
99:10 113:5 125:9
130:20
**thinking (1)** 30:11
**third (14)** 15:8 17:23
34:7 37:18,23 38:19
39:21 41:16 45:5
46:10 52:2 56:12 93:7
103:2
**thirdly (3)** 29:17 76:11
105:14
**thirdparty (1)** 48:25
**thorough (1)** 33:12
**though (3)** 40:20 47:10
70:22
**thought (2)** 23:21 43:20
**threatened (1)** 105:7
**three (19)** 7:14 9:13
10:19,20 15:17,18
16:10 18:4 24:15
30:14 76:3 98:10
101:14,17 105:5
120:16 121:9 123:5
126:23
**threshold (3)** 30:25
33:3 47:11
**through (13)** 18:15,23
20:2 24:14 28:17

41:23 44:19 49:3 90:7
99:10 106:11 113:20
125:10
**throughout (1)** 18:11
**throw (1)** 31:14
**tied (1)** 100:8
**time (23)** 5:2 7:18
29:14 35:7 54:5 77:24
81:9 87:12 94:7 100:8
115:14,15
117:16,22,24
118:15,22 121:20
123:14 125:20,25
131:18 132:17
**times (1)** 40:23
**tining (8)**
28:12,13,19,21,23
95:25 117:19 118:9
**today (15)** 4:12,19 5:4
7:14 23:21 55:17
78:16 79:1 81:9,13,21
85:12 106:4 121:14
122:7
**todays (3)** 5:13,17 6:15
**together (5)** 17:6 54:10
62:14 101:15,21
**told (6)** 38:20 44:14
47:22 48:15 49:9
58:12
**tomlinsons (1)** 108:1
**too (3)** 9:20 102:19
113:10
**took (3)** 28:21 36:12
128:19
**total (1)** 52:23
**totally (6)** 13:5 14:10
60:15 75:11 93:12
119:8
**tour (5)** 19:21 20:8
71:24 72:5,8
**towards (1)** 7:8
**trace (2)** 34:11 96:16
**track (2)** 20:2 60:10
**transaction (2)** 62:22
63:11
**transcriber (2)**
114:21,25
**transcript (8)** 21:14
30:16 37:21 120:8,18
121:4,5,17
**transcripts (7)** 15:21
16:13,20 17:12 18:1
72:22,23
**transferred (1)** 26:8
**translation (1)** 124:17
**treated (2)** 25:9 26:2
**treats (3)** 25:10 57:19
68:23
**treaty (1)** 9:18
**tree (1)** 58:19
**trial (5)** 16:11,17
17:11,25 129:9
**tribunal (59)** 9:20
10:1,5 11:14
12:6,9,12,15,17
14:19,20
15:1,6,8,15,23 16:4,23
17:5,10,16 18:3,7,19
19:7,8,13 20:1,11,13
32:18 33:11,25 34:7
40:11 44:9 45:13
59:18,23 71:20 72:4,7
73:6 74:1,21 75:18

97:17 100:24
104:10,12 108:15
109:3 123:20,22
128:13,22 130:2,15,17
**tribunals (7)** 15:9 18:21
20:12 53:10 72:17,19
120:7
**tried (1)** 73:8
**tries (1)** 17:9
**triggered (1)** 31:1
**true (3)** 2:8 69:7 71:13
**trust (3)** 2:14 35:19
96:21
**try (6)** 31:23 102:13
119:1 120:5 122:24
123:13
**trying (5)** 31:8 78:22
117:25 121:15 125:24
**turn (3)** 20:16 30:5 33:2
**turns (1)** 81:24
**twice (1)** 23:15
**type (4)** 59:8 60:4
68:12 73:19
**types (2)** 93:12 123:6

---

**V**

**v (10)** 2:14 24:10,15
26:14 84:15 89:22,23
90:1 108:20 111:25
**vacuum (1)** 12:17
**vale (30)** 1:6 8:10,25
16:6,15,19 18:3 29:20
33:5,15 34:10 35:9
36:1 52:12 56:18
57:4,21,22,24,25
59:17,22 61:1,6,11
64:20 72:1,8 89:6
115:24
**vales (9)** 7:23 16:9
17:10,15 32:11 57:14
59:7 64:9 81:7
**valid (6)** 83:5,6,7,11
84:9 118:16
**validity (4)** 84:4,5
107:15,21
**valuation (1)** 62:16
**value (9)** 45:7 56:21
57:6,12 68:4
100:16,20 102:23,25
**valueless (3)** 57:7,14,15
**various (7)** 12:10 15:17
16:5 24:16 72:2 113:9
126:7
**vary (1)** 85:24
**vehicle (1)** 100:14
**venture (3)** 8:20 63:22
**versions (1)** 23:14
**victims (1)** 14:5
**vindication (2)** 32:12
34:18
**virtually (2)** 57:14 75:20
**visibility (1)** 35:20
**volume (8)** 6:1 30:12
66:7 71:17,18 99:3
101:3 115:23
**vu (1)** 13:10

---

**W**

**wade (1)** 106:11
**waiting (1)** 5:2
**waive (1)** 62:12
**wants (3)** 7:21 126:22
127:14

**warrant (1)** 115:17
**wasnt (2)** 21:17 113:10
**way (28)** 4:22,22 7:3
13:21 23:10 26:21
30:24 51:10 55:12
59:3 64:7 65:5 67:12
82:2 84:1 85:10
89:17,18 90:16 103:18
105:12 106:25 112:23
117:20 121:13 126:9
130:7 131:10
**weak (2)** 29:9 78:23
**wednesday (1)** 1:1
**weeks (1)** 67:14
**weighed (1)** 32:3
**wellestablished (1)**
104:21
**wellknown (2)** 110:5
112:23
**went (9)** 11:14 15:13
24:9 31:17 33:16 73:8
98:24 121:18 131:7
**werent (2)** 46:16 76:21
**west (5)** 36:18,21
37:3,5 61:20
**weve (6)** 30:7 33:8 70:2
72:24 102:15 131:10
**whatever (4)** 41:8 66:1
100:13 113:23
**whats (5)** 31:4 47:3
89:23 94:5 99:24
**whatsoever (1)** 67:22
**whereas (1)** 22:17
**wherewithal (1)** 77:8
**whilst (3)** 11:7 84:7
122:18
**white (2)** 80:11 115:18
**whoever (1)** 58:2
**whole (5)** 5:17 19:23
51:24 84:3 99:10
**wholesale (2)** 11:10
96:13
**wholly (6)** 12:22 14:16
19:4 95:11 96:19
123:7
**whom (10)** 4:7 34:16
40:9 52:3 96:17 97:19
100:9 103:2 108:14
110:16
**whose (1)** 51:21
**wife (1)** 71:24
**willan (1)** 1:6
**williams (3)** 1:8 11:6
12:20
**willing (3)** 37:20
64:22,23
**willingness (1)** 64:25
**wind (2)** 35:9 51:10
**windingup (1)** 35:14
**wine (1)** 49:1
**winning (1)** 74:24
**wish (3)** 74:3 128:6
131:3
**wished (1)** 72:1
**witness (9)** 13:18 36:14
41:16 56:12 60:2
63:16 71:14 72:9 97:7
**witnesses (3)** 15:17,18
18:5
**wolfson (2)** 14:25
120:23
**wont (3)** 55:1 94:21
99:15

**wording (9)** 80:10,14
82:25 84:9
86:12,14,19 108:8
112:21
**work (5)** 31:8 48:16
62:13 78:21 106:8
**working (2)** 46:25 56:7
**works (1)** 89:15
**world (2)** 48:4,10
**worldclass (1)** 62:14
**worth (4)** 1:24 15:5
22:9 101:3
**worthless (1)** 8:25
**wouldnt (3)** 28:22 46:15
78:7
**writ (1)** 115:16
**writers (1)** 37:21
**written (2)** 12:14,15
**wrong (14)** 5:6,10 29:21
39:17 58:19 60:10
67:23 73:15 75:11
83:20 111:3,25,25
112:7
**wrongfully (1)** 103:3
**wrongly (1)** 126:25
**wrote (1)** 12:12

---

**X**

**x (1)** 26:14

---

**Y**

**y (6)** 26:14 84:16
89:22,23 108:20
111:25
**year (7)** 37:11 38:1
44:19 55:6,25 67:4,4
**years (6)** 9:6 60:19 61:4
65:22 69:22 73:12
**yesterday (2)** 10:25
28:19
**yet (7)** 11:23 16:14
44:17,24 46:19,21
57:25
**york (2)** 92:11 125:4
**youll (1)** 103:23
**youre (17)** 26:24,25
28:10 41:15,19,22
42:24 55:3 73:15,24
83:17 84:8 98:19
104:4 114:22 124:7
125:24
**yours (1)** 50:23
**yourselves (1)** 97:13
**youve (8)** 6:23 22:17
24:16 54:19 63:13
117:10 127:12 131:6
**ys (1)** 85:7

---

**1**

**1 (16)** 3:4 4:10,13
13:2,3 30:15 36:14
38:19 40:21 52:21
71:15 79:10 86:16
101:3 116:11 133:3
**10 (10)** 14:14 38:14,17
41:1 62:8 68:7
71:16,18 99:3 113:16
**100 (3)** 11:21 53:1 91:7
**100000 (1)** 106:5
**101 (2)** 12:7 75:25
**103 (2)** 91:3 92:4

**1030 (1)** 1:2
**1032 (1)** 92:10
**1033 (2)** 91:18 92:10
**1035 (6)** 90:10 91:5,16
92:15
**104 (4)** 38:14,17
39:13,22
**107 (1)** 56:7
**11 (3)** 30:7,12 106:11
**113 (2)** 14:20 133:21
**1149 (1)** 44:4
**115 (1)** 15:2
**1159 (1)** 44:6
**118 (1)** 15:5
**119 (1)** 15:5
**120 (1)** 12:2
**122 (1)** 133:23
**127 (1)** 133:25
**13 (3)** 62:9 71:16,18
**130 (1)** 15:11
**139 (1)** 15:16
**13bl (1)** 61:17
**14 (4)** 37:17 79:20
80:18 92:5
**147 (2)** 15:22 16:5
**149 (1)** 16:9
**14day (1)** 80:1
**15 (4)** 62:19 99:11
130:21,21
**152 (2)** 16:23 90:6
**16 (3)** 9:9 75:19 108:2
**162 (1)** 18:13
**163 (1)** 18:13
**166 (1)** 17:18
**167 (1)** 18:22
**169 (2)** 18:22 19:8
**17 (3)** 77:16 115:23
120:24
**18 (2)** 101:4 121:1
**186 (1)** 20:3
**189b (1)** 80:15
**19 (4)** 79:8,11 116:11
123:18
**1916 (1)** 110:20
**1995 (3)** 88:7,8 90:11

---

**2**

**2 (22)** 6:1 38:14,17 41:1
53:25 58:12,16 61:15
62:7 68:7 75:24
79:11,14 80:11
86:6,16 99:3 113:18
116:13 119:25 120:22
133:5
**20 (5)** 9:24 78:8 88:4
119:17 121:6
**200 (1)** 76:2
**2010 (4)** 8:19 34:8
35:18 61:1
**2014 (4)** 8:21 9:1,13
54:2
**2015 (3)** 9:24 36:17,21
**2016 (3)** 10:20,22 12:5
**2017 (4)** 9:4 14:25 15:2
32:25
**2018 (3)** 59:20 60:15
67:5
**2019 (4)** 1:1 41:4 67:5
101:6
**22 (3)** 62:24 67:7,15
**23 (2)** 84:25 121:23
**2396 (1)** 115:18

24 (9) 9:10 39:10 44:12
63:6 85:13,15 92:7
127:11 128:5
25 (7) 1:25 9:25 12:12
79:17 85:16 102:17
122:14
250000 (1) 68:6
25page (1) 78:12
26 (4) 36:16 66:8,10
108:3
268 (1) 67:3
26a (1) 36:16
26b (1) 36:24
27 (1) 44:19
2728 (1) 81:10
28 (7) 59:13
84:16,18,19 119:18,18
123:17
29 (1) 9:12

========= 3 =========

3 (14) 3:21 4:6 13:4
30:7,12 36:15 60:3
71:17,18 79:18 86:16
90:6 108:10 120:24
30 (7) 9:21 10:18,24
65:22 77:10 86:4
88:15
31 (2) 71:15,19
312 (1) 115:3
32 (1) 86:22
322 (1) 115:5
33 (2) 10:25 90:2
3400 (1) 106:9
347000 (1) 77:21
35 (1) 11:20
350 (1) 131:20
352 (1) 132:20
36 (2) 9:25 12:7
365000 (1) 78:19
37 (3) 10:7 77:17 99:3
38 (2) 14:20 99:3
39 (2) 12:2 77:22
392 (1) 3:3

========= 4 =========

4 (9) 1:1 9:9 79:23
80:13 120:14,17,25
122:5,15
40 (5) 15:11 23:6,15
24:6 127:5
41 (9) 23:15 101:6,8
123:18 127:20,22
129:22,23 130:12
421 (1) 93:6
4221 (1) 93:20
43 (2) 15:22 89:7
45page (1) 78:7
46 (1) 18:14
47 (5) 17:18 18:24
24:14,19 110:19
48 (2) 110:20 131:24
49 (1) 28:7

========= 5 =========

5 (16) 10:20 37:16 79:8
92:11 115:23 119:16
122:4,5,14 133:7
50 (4) 24:14,24 57:24
58:2

500 (12) 34:7,9 35:17
36:3 61:1,6 67:24
68:17 96:20 102:4,9
104:2
50000 (1) 106:6
511000 (1) 53:19
51445 (1) 77:13
52 (3) 24:11,15 95:2
53 (1) 26:13
5305 (2) 77:23 78:2
54 (3) 27:15 95:3
133:15
55 (1) 121:24
56 (2) 59:6,12
58 (4) 27:16,23 53:20
121:24
59 (2) 27:17 28:7

========= 6 =========

6 (6) 13:7 30:8,13 87:10
104:7 133:9
61 (1) 28:6
62 (1) 5:11
6210 (2) 3:1 4:14
62101 (1) 3:11
62103b (1) 4:15
6217 (1) 3:23
6218 (5) 85:19,23 86:20
87:3,24
62189 (5) 80:10 86:7
87:4,16,20
62189a (1) 79:20
62189b (1) 79:24
65000 (1) 106:6
66 (25) 4:1 10:18 75:22
79:6,12 84:6 88:8
91:25 92:2 93:1,13,15
94:6,22 95:12
108:8,17 109:24
110:2,13,23 116:3
117:15 118:22 119:11
661 (1) 79:15
662 (3) 116:8,14,17
663 (4) 108:12 109:2
112:3,19
67 (19) 21:2 27:3
70:12,17,22 85:7,11
86:11,18
88:6,12,18,23 92:24
107:18 108:4 109:1,1
118:11
676 (1) 20:3
67s (1) 27:4
68 (72) 3:9 7:16,20
11:15 21:3,13 22:5
27:3,21 29:4 32:5,16
33:6 58:7,21 61:21
65:6 69:8,24 70:10,11
71:7 74:4 75:1 78:10
80:23,25 81:17 82:3,6
83:9,13,16 84:3
88:6,12,24 89:5,25
92:23 95:15 96:9,11
104:13,14 106:8,20,24
107:14,19 108:5,18
109:10,15,17,22
111:22 112:20
117:4,16,24
118:11,13,23 120:15
121:10 122:8,23
125:7,8 128:5 131:3
68s (1) 27:4
69 (6) 3:6 74:7,7 82:23
88:6,12

========= 7 =========

7 (12) 13:2,4,4,9 30:6
40:21 52:21 101:3,6
120:6 133:11,13
70 (2) 26:17 40:21
703 (1) 84:23
706 (1) 3:1
707 (20) 20:18 29:6
52:6 60:1,13,17 88:6,9
89:25 91:24 92:19
95:10,14,24 104:7,10
111:2 112:7 117:6,10
7070 (1) 3:13
709 (2) 85:1 86:4
710000 (3) 53:1
77:13,19
711 (2) 3:22 6:1
712 (1) 80:11
77 (5) 8:7 55:9 62:8,8
87:6
79 (1) 133:17
7a (1) 120:11

========= 8 =========

80 (1) 52:25
8006 (1) 110:10
81 (1) 112:12
810 (1) 84:12
82 (3) 10:24 113:18,20
83 (1) 115:8
837 (4) 112:21 115:13
116:21,23
8374 (1) 110:14
86 (1) 52:21
87 (1) 53:17
88 (2) 52:22,24
880000odd (1) 77:12
885000 (2) 52:23 77:17

========= 9 =========

9 (4) 13:25 14:9 37:16
115:25
94 (1) 41:1
95 (1) 133:19
96 (1) 11:20
970 (1) 90:4
994 (1) 75:17