# EXHIBIT C-1

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-11845-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    BSG RESOURCES LIMITED (in administration) and WILLIAM

8    CALLEWAERT and MALCOM COHEN, as JOINT ADMINISTRATORS,

9

10              Debtors.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    United States Bankruptcy Court

14                    One Bowling Green

15                    New York, NY  10004

16

17                    October 3, 2019

18                    11:21 AM

19

20

21   B E F O R E :

22   HON SEAN LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   F. FERGUSON

1     HEARING re Status Conference

2

3     HEARING re Doc. #45 Letter Filed On Behalf Of William

4     Callewaert And Malcom Cohen, As Joint Administrators

5

6     HEARING re Doc. #46 Letter In Response Filed On Behalf Of

7     Vale S.A.

8

9     HEARING Re Doc. #47 Letter Seeking Court's Approval Of A

10    Protocol To Guide Disclosure Of Personal Information Under

11    The General Data Protection Regulation In Discovery Filed On

12    Behalf Of Vale S.A.

13

14    HEARING re Doc. #48 Letter In Response To The Letter Seeking

15    Court's Approval Of A Protocol To Guide Disclosure Of

16    Personal Information Under The General Data Protection

17    Regulation In Discovery, Filed On Behalf Of William

18    Callewaert and Malcom Cohen, as Joint Administrators

19

20    HEARING re Doc. #50 Letter In Response To Joint

21    Administrators Letter Filed On Behalf Of Vale S.A.

22

23    HEARING re Doc. #50 Letter In Response To Joint

24    Administrators Letter Filed On Behalf Of Vale S.A.

25

1    HEARING re Doc. #53 Letter In Response Filed On Behalf Of

2    William Callewaert And Malcom Cohen, As Joint Administrators

3

4    HEARING re Doc. #54 Letter In Response Filed On Behalf Of

5    William Callewaert and Malcom Cohen, as Joint Administrators

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4          Attorneys for Vale

 5          One Liberty Plaza

 6          New York, NY 10006

 7

 8    BY:   JEFFREY A. ROSENTHAL

 9          LISA M. SCHWEITZER

10          EMILY J. BALTER

11

12    DUANE MORRIS LLP

13          Attorneys for the Joint Administrators

14          1540 Broadway

15          New York, NY 10036

16

17    BY:   FREDERICK D. HYMAN

18          JARRET HITCHINGS

19

20    ALSO PRESENT TELEPHONICALLY:

21

22    WILLIAM CALLEWAERT

23    MALCOLM COHEN

24    PATRICK J. HOLOHAN

25
```

1                    P R O C E E D I N G S

2                    P R O C E E D I N G S

3           THE COURT:  We're here for BSG Resources Limited,

4    a Chapter 15 case.  Let me get appearances from counsel.

5           MR. HYMAN:  Good morning, Your Honor.  Fred Hyman

6    from Duane Morris on behalf of the joint administrators.  I

7    have with me my colleague, Jarret Hitchings.  I also have in

8    the courtroom, Your Honor, Stephen Peters, who joined us

9    last time, who is a forensic accounting partner at the firm

10   of BDO.

11          MR. ROSENTHAL:  Good morning, Your Honor.  Jeffrey

12   Rosenthal of Cleary Gottlieb on behalf of Vale.  I'm with my

13   partner, Lisa Schweitzer and my associates, Emily Balter and

14   Sam Levander.

15          THE COURT:  All right.  Good morning to you all.

16   So let me just set the stage.  So we're here in connection

17   with a variety of filings.  A letter -- this is not

18   exclusive.  On the one hand, we had the motion; that is, the

19   motion was filed regarding discovery, seeking a protective

20   order, responses to that, a hearing that took place July

21   30th.  There has been numerous proceedings dealing with

22   discovery since.  We got together August 29th for a

23   conference, and there's a transcript of that.

24          There are letters on August 27th, September 9th,

25   September 12th, September 13th, September 16th, September

1    17th, September 18th, September 25th that fill out the

2    ongoing discussions back and forth. And just for brevity in

3    the record, I'm not going to identify each -- each -- who

4    sent each letter and the extent of the letters. I think

5    they're all in the docket. So at a certain point, I think

6    they are the docket. So I think one's 45, one's 46, one's

7    47, one's 48, 50, 54, 58.

8                And then we had an amended notice of hearing that

9    is on Docket 60 that set today as a hearing on document

10   production and GDPR issues. We really are on everything

11   that's been filed back and forth, and that actual item ended

12   notice of hearing actually identifies the various things

13   that had been filed, I think gets all of them, but so many

14   filings, it's hard tell who was.

15               So I have read everything, and we have a variety

16   of matters to talk about. So the one thing I will not do

17   here -- I will not do today is I will not leave here without

18   an order, because the lack of an order has just led to

19   further mischief and lack of progress, and I'm not trusting

20   anybody. I will draft the order myself if necessary and

21   without input from anybody, but I'm tired of this.

22               It just -- I've never seen a case with these kind

23   of discovery problems in my nine years plus on the bench.

24   And in a Chapter 15 case, where COMI is clearly an issue and

25   what people are doing and where they're doing it is so

1    clearly an issue, I have just -- it boggles the mind.

2              So with that said, since we have a requesting

3    party and essentially an ongoing opposing party to

4    discovery, I think it makes sense from hear from Vale, who

5    is a creditor of BSGR, as they call it. I think I've been

6    calling it BSG, but they're really the same thing and just

7    occasionally, the different terms pop up in the papers.

8              So the first question is whether to do this

9    seriatim issue-by-issue. I suspect that that's the way to

10   go, because if we go through everything, who will remember

11   what we talked about at the beginning by the time we get to

12   the end.

13             MR. ROSENTHAL: I think that makes sense, Your

14   Honor. I had thought that just setting the stage for

15   ourselves, I would just lay out the issues that we expected

16   to cover today. We thought we would just start with an

17   update on the production for Your Honor.

18             THE COURT: All right, that will be helpful. I

19   know that's one of the issues.

20             MR. ROSENTHAL: And then we have three issues in

21   dispute regarding sources of production: one has been Beny

22   Steinmetz; two is from officers and directors and Onyx,

23   their back office; and three is the current directors,

24   including Mr. Cramer. And then last, we have the GDPR

25   issues, which my colleague, Ms. Balter is going to address.

1          THE COURT:  All right.  I think that's pretty much

2     how I had outlined it in my own preparation for today.

3          MR. ROSENTHAL:  So with regard to the production

4     update, Your Honor.  One of the letters that you had cited

5     was the August 27th letter by the joint administrators'

6     counsel to the Court.  It set the stage for the Court

7     conference several days later, in which the joint

8     administrators laid out kind of a tri-part type of schedule,

9     right.

10          So they had 320 documents that they were going to

11     be producing the following week.  They had 37,730 documents

12     that would be reviewed, produced on a rolling basis with a

13     target competition of September 27th, and the remainder

14     would be reviewed with -- produced on a rolling basis with a

15     target completion of October 26th.

16          We did get the 320 documents a couple of weeks

17     later than we were told we would get it, but we did get it.

18     There were actually 211 unique documents; the rest were

19     duplicates.

20          With regard to the 37,730 that would be produced

21     on a rolling basis with a competition of September 27th,

22     today is October 3rd, we haven't seen one document.

23     Needless to say, therefore, the documents that the rolling

24     completion would be done by October 26th, we have not seen a

25     document either.  We have agreed -- and this kind of helped

1    them release the first batch of 320 -- we said that until

2    the Court addresses the GDPR protocol, we'll accept

3    provisionally their protocol so that that's not an excuse to

4    delay any productions. They then released the 320. We've

5    heard no explanation at all, and in the letters to the

6    Court, there's been no explanation for the lack of those.

7              And unless the Court wants to address that before

8    the three issues in dispute.

9              THE COURT: Let's deal with the three issues in

10   dispute, and then we'll loop back to the schedule.

11             MR. ROSENTHAL: So with regard to the three

12   issues, Your Honor, the first one is Beny Steinmetz, you

13   know, the number one, the big boss, the beneficial owner of

14   BSGR. And the Court made a lot of statements that was

15   really spot on to the law back at the last conference, in

16   which Your Honor said, for example, at Page 44, if somebody

17   is conducting business and enterprise through personal

18   email, you can just read the headlines in the "New York

19   Times" to figure out it's not protected as personal email.

20   And I will -- and nobody's going to cite anything to me for

21   that.

22             If he's conducted business and he's conducted

23   business and wrote emails, and it sounds like there are

24   emails, then there are emails and is conducting business,

25   then he needs to turn over what needs to be turned over.

1    And if he's a principal, he's part of the Debtor.

2             So the Court posed several questions. We provided

3    you with some law to back up what Your Honor was saying to

4    begin with. But Your Honor was really focused on the

5    factual issues, because the law is so well settled here in

6    the Southern District. And the factual issues are: number

7    one, is he the beneficial owner, because if he is, that's

8    the end of the story; and number two, if he's not the

9    beneficial owner, was he out there negotiating the

10   settlement with Guinea? Because then if he did that, that's

11   an issue relating to COMI and acting as an agent for the

12   company. It's also subject to discovery here.

13            So we addressed those factual issues. And,

14   frankly, Your Honor, there's no dispute. We set forth the

15   evidence that we have, that Beny Steinmetz is the beneficial

16   owner, through Nysco the parent, and then that's owned by

17   the Balda Foundation, which is his family's trust to say

18   that he's the beneficial owner. There's been no engagement

19   or dispute on that issue in the papers.

20            And with regard to negotiation, we got back the

21   same response that Your Honor's been hearing. Well,

22   actually, the story has changed. We told Your Honor, since

23   June, that Mr. Steinmetz was the principal negotiator the

24   settlement with Guinea; that was denied repeatedly. In the

25   latest letter, the joint administrators have acknowledged

1    now that Mr. Steinmetz did negotiate it, but stand on the

2    idea that they still have final approval authority.

3                THE COURT:  Well, I was dismayed to see the issue

4    sort of resurface at the end of the letters back and forth.

5    The letters initially seemed to move on to some details

6    about things that we hadn't completely nailed down.  You

7    could argue that they had been discussed in sort of general

8    principals, but the devil's always in -- often in the

9    details.

10               But I was dismayed to see his questions about

11   what's appropriate for him or not still being raised, given

12   the facts that I have.  So perhaps, I mean, if there's

13   anything else that you briefly wanted to add, but I'd like

14   to hear from the foreign representative on that.

15               MR. ROSENTHAL:  Well, I mean, I would just say

16   that the law is quite clear on this, Your Honor.  And I

17   think all the Court needs to do is read the Royal Park

18   decision, in which there's five different reasons given by

19   the Court there that all apply here as to why discovery of

20   Mr. Steinmetz is appropriate.

21               And critically, what the joint administrators have

22   done is they have looked at quote, literal control -- do

23   they literally have the ability to force him to do this --

24   as opposed to the test that is in the Southern District and

25   the Second Circuit, which is practical ability.  And the

1    Court goes through what practical ability is, and it's clear

2    they have it here.   Here is -- there's a financial interest;

3    that alone is practical ability.   He was their agent; that

4    alone is practical ability.

5            The other thing, Your Honor, that isn't set forth

6    in the letters, but I think is very relevant to this, is the

7    Royal Park court talks about the fact that the subjects of

8    the requested discovery had participated in prior discovery

9    when it suited the party that was resisting it, and we have

10   that here.

11           Mr. Steinmetz and virtually everybody we're

12   seeking discovery from here produced documents in connection

13   with the arbitration, submitted witness testimony in the

14   LCIA arbitration in favor of BSGR, submitted witness

15   testimony, and came to Paris and testified on behalf of BSGR

16   in the ICSID arbitration.

17           And, you know, we even have and we can hand up to

18   the Court two items: one is an email from Mr. Steinmetz

19   confirming that he checked his files in connection with the

20   LCIA arbitration and the documents requests; and we have a

21   list of all of the custodians that were checked in the LCIA

22   that BSGR's counsel, now the joint administrators' counsel,

23   prepared for us and gave us.   Dag Cramer, we checked his

24   phone, we checked his tablet, we checked his home drive.

25   Beny Steinmetz, we checked his BlackBerry, we checked his

1    backup data.

2            So, you know, the notion that they now don't have

3    a practical ability to obtain this is preposterous, and they

4    certainly have not met their burden of proof of avoid a

5    court order here. And that's all I have to say on Mr.

6    Steinmetz for now. I'm happy to hand up these two documents

7    that I just referred to.

8            THE COURT: Good. Just make sure they're shared

9    with the other side. Thank you. All right. Let me hear

10   from the foreign administrators.

11           MR. HYMAN: Good afternoon, Your Honor. If you

12   wouldn't mind, we'd like an opportunity to address issues

13   relating to the current status of production and what we

14   anticipate going forward. We're hopeful that Mr. Peters

15   could present to Your Honor, since he is on the ground and

16   is overseeing --

17           THE COURT: I want to deal with Mr. Steinmetz

18   first.

19           MR. HYMAN: Sure, Your Honor. Your Honor, the

20   context of discovery shouldn't relate to COMI. We

21   understand the order from this Court requiring the joint

22   administrators and BSGR to seek documents back from the date

23   of 2014. Certainly, COMI itself is judged as either the

24   date of the joint administration or the date that the

25   Chapter 15 was filed. The documents that we were just

1    handed all predate the issues relating to either one of

2    those dates.

3            THE COURT:  Well, they're submitting them to show

4    his involvement in BSG.  So -- and I've yet to hear any

5    dispute of the core facts about him being the guy, for lack

6    of a more legal term.  And the foreign representatives were

7    appointed and that's nice, but they don't control him,

8    pretty clearly if the allegations in the factual proffers

9    that have been given to me, are evidence in terms of what

10   he's doing or not doing on behalf of BSG, which is, after

11   all, named for him.

12           And so, without any dispute about any of those

13   facts, why are we still talking about this having talked

14   about this at numerous prior hearings?

15           MR. HYMAN:  There is no dispute as to what is in

16   press reports.  The joint administrators themselves do not

17   know if Beny Steinmetz and his family ultimately own and

18   control Balda, but we have no reason -- they have no reason

19   to believe that he doesn't.

20           THE COURT:  That actually doesn't even necessarily

21   matter if he's out doing things for BSG holding himself out

22   and negotiating deals, which is all relevant to COMI in

23   terms of him being a central figure in the ongoing business.

24   So he could actually have sold every bit of his beneficial

25   interest.  If he is -- if he is holding himself out and

1    negotiating deals on behalf of BSG, that's just another way

2    to get to the same place.  So what is it that you are not

3    willing to do in connection with producing things relating

4    to Mr. Steinmetz?

5              MR. HYMAN:  The joint administrators do not have

6    control over Mr. Steinmetz in order to require him to

7    produce documents to this Court; they simply don't.

8              THE COURT:  So when this came up last -- the

9    problem with this, with the discussions we've been having

10   about this is, it's -- we address one thing and then

11   something else -- it's a variation on a theme -- comes up.

12   So am I understanding that you now concede, after having

13   talked about it numerous times, that Mr. Steinmetz is fair

14   game for purposes of subject matter of what he was doing or

15   not doing for purposes of the COMI in this Chapter 15?

16             MR. HYMAN:  I think that what we've provided, Your

17   Honor, in connection with our most recent letter was a

18   Declaration of William Callewaert, who happens to be on the

19   phone today listening in.  He's one of the joint

20   administrators located in Guernsey.

21             THE COURT:  Can I get an answer to my question?

22             MR. HYMAN:  Yes.  What we are focused on, Your

23   Honor, is what has happened following the administration

24   when the joint administrators were appointed, at which time,

25   nobody other than the joint administrators had any authority

1    to bind BSGR, nor to act as agent for BSGR.

2         THE COURT:  Okay.  I have heard this argument

3    numerous times, and I think I have overruled this argument

4    numerous times, saying that the foreign administrators can

5    say what they want to say in terms of administration in

6    Guernsey and in terms of getting Court approval in Guernsey

7    to act.  That clearly may or may not have any effect on what

8    Mr. Steinmetz apparently is doing in terms of negotiating

9    settlement agreements.

10        We talked about this in detail last time.  And you

11   said, but those settlement agreements can't get ultimately

12   approved without Court approval in Guernsey and that's the

13   foreign administrators job.  That's fine.  That doesn't

14   change the fact that he's involved up to his eyeballs in the

15   business of BSG.

16        So unless you have something else, I'm not looking

17   for a concession anymore.  I will just tell you, I am making

18   a ruling and it will be memorialized in an order that Mr.

19   Steinmetz, anything he has done is fair game for purposes of

20   determining COMI.  And COMI tells the relevant times

21   periods.  There's plenty of cases on that.  We'll get to

22   that.

23        But we still keep talking about the foreign

24   representatives versus Mr. Steinmetz, and he can sort of do

25   his thing, but they have the ultimate authority.  It doesn't

1    matter for purposes of COMI.  It is not a basis to restrict
2    discovery.

3              MR. HYMAN:  But it does, Your Honor, if it's COMI
4    of BSGR at the time that the joint administration was -- it
5    was connected.

6              THE COURT:  The time period for COMI is a
7    different issue, right, and I have zero briefing on that,
8    despite the voluminous things that I have here.  And this,
9    again, goes to the whack-a-mole nature of what we've had
10   with discovery.  We get through one issue and then views
11   shift, and then we go to another issue and then views shift,
12   and then we end up talking about other issues.

13             So now we're talking about COMI and timeframe.
14   I've dealt with that plenty.  I'm not alone in this
15   courthouse.  You can look, there's plenty of opinions to
16   talk about the relevant time for considering COMI.  What I'm
17   saying is that I am overruling your objection to Mr.
18   Steinmetz saying he's not -- discovery relating to him and
19   his actions is not relevant.  COMI and the cases in this
20   jurisdiction tell us what time period is relevant.  It is
21   what it is what it is.

22             What I'm saying is that I am overruling your
23   objection as to Mr. Steinmetz and his involvement and,
24   therefore, the appropriateness of discovery as to what he
25   has been doing on behalf of BSG.

1              MR. HYMAN:  And to be clear, because maybe I

2      wasn't.  I don't think, and I know that we aren't contesting

3      -- or the joint administrators are not contesting that

4      whether Beny Steinmetz was out purporting to represent BSGR

5      and other entities is not relevant for Your Honor's

6      consideration in terms of COMI.

7              THE COURT:  Well, it doesn't matter at this point.

8      I asked you whether you conceded that.  I couldn't get an

9      answer.  I've now made a ruling.  So the ruling that will be

10     memor- -- and we're going to keep track of these -- that

11     will be memorialized in the order is that discovery relating

12     to Mr. Steinmetz's activities on behalf of the Debtors are

13     relevant, period full stop, for COMI.

14             All right.  So what else do we need to talk about

15     in connection with Mr. Steinmetz?

16             MR. HYMAN:  Can I just clarify that for one

17     moment?

18             THE COURT:  No, because it's a ruling, and it's

19     not your ruling, so you don't need to clarify it.  What else

20     do you have?

21             MR. HYMAN:  Is the -- can I ask if the ruling

22     requires the joint administrators to produce documents that

23     Beny Steinmetz personally has?

24             THE COURT:  It -- okay, so now we're moving onto

25     the issue of control --

1          MR. HYMAN:  Yes.

2          THE COURT:  -- which is a separate issue and

3    separately briefed.  So the rules about control -- and

4    that's what's frustrating about this ongoing discovery

5    dispute that we've been talking about for months -- is I'm

6    only applying well-established rules, right?  So the rules

7    about COMI and timing; well established.  The rules about

8    what's fair game when somebody's acting on behalf of a

9    corporation and/or the beneficial owner; well established.

10         The rules about control are equally well

11   established.  And I have one of your articles sitting on my

12   library that talk about them, and they're 25 years old and

13   the law hasn't really changed all that much.  So if they

14   have an ability to obtain those documents through the

15   exercise of their positions -- and so, you know, I'm going

16   to flummox the actual standard, but it's all the papers.

17         So if they have the ability as a legal matter and

18   possession, custody or control.  And what's normally ignored

19   by folks is control.  You may not have it, but you have the

20   ability to get it and ask for it; that is control.  And so,

21   I can deal with that in more detail if people need, but,

22   again, I'm not reinventing the wheel.  I'm not issuing any

23   sort of decisions on an issue that is unclear out there in

24   the law.  It's -- this horse has been beaten to death in so

25   many opinions, I can scarcely count them.

1         So I'm not going to rely on what I've been hearing

2     thus far, which is a more myopic view of what the foreign

3     representatives have.  So if they have it sitting in their

4     office, that is not pro-extensive with possession, custody

5     or control for purposes of producing documents in this

6     Chapter 15.

7         The other problem I have with all of this is that

8     you need to reach your burden of proof for purposes of

9     getting recognition.  So the other way this goes is if you

10    don't produce things, and there's plenty of stuff that they

11    can raise and say we have every reason to believe X, Y and

12    Z, they haven't met their burden.  You say, well, we don't

13    have this stuff, we don't really know; you're not going to

14    satisfy the burden for recognition.

15        I've never seen a case that was filed where there

16    was such a desire to not move forward with recognition.  So

17    that's the other problem you're ultimately going to face, is

18    your ability to satisfy your burden for proving recognition,

19    which is, again, well established and applicable.  There's

20    tons of decisions, so I won't beat that horse to death.

21        So is there anything specifically on possession,

22    custody or control that we  need to address here today?

23             MR. HYMAN:  All right.  If your ruling is as it

24    stood, Your Honor, I don't believe that there is, but I

25    think that we will take Your Honor's ruling to heart.  There

1    has never, notwithstanding the appearances and the delay in
2    discovery, there has never been intend on anybody's part to
3    delay discovery.  We absolutely know what the burden is.  I
4    think you will hear --

5              THE COURT:  Well, that -- I never know what's
6    going on behind the scenes.  I only see what positions
7    people take in course and the progress of the case.  I --
8    that's a hazard of the job.  But all I can say is, this case
9    has not moved forward in the way that other Chapter 15s do;
10   it's in the statute, the need for speed in Chapter 15.  And
11   most parties come, consistent with that, and say we have
12   issues about COMI; and, therefore, what do you need, we're
13   going to get it done, we're going to come in.

14             And so, there's just been a series of positions
15   taken by the administrators that basically really don't seem
16   to have a whole lot of merit to slow discovery down and it
17   really just involved me applying in detail very well-
18   established principles of law.  And then we leave, I think
19   we have an understanding, and then people come back and say,
20   well, nothing was produced or well, Mr. Steinmetz, we
21   thought we solved it, but we didn't solve it.

22             And so, that's why this order is going to be blow-
23   by-blow-by-blow, because I think it's not -- it's just not
24   the way the system is supposed to work.  So the order should
25   contain a ruling that -- that the Petitioners are required

1       to produce documents under the possession, custody and

2       control.   Please find the most pedestrian well-traveled

3       version of this standard that I'm applying here, but that

4       you can quote it for an applicable; if not, I'll find one.

5       And, again, I'm just applying the applicable law.

6                  MR. HYMAN:   We appreciate that, Your Honor.

7                  THE COURT:   All right.   Now, before we go on to

8       the next issue, I know you did want to talk about the status

9       of documents and scheduling and where things are, and I know

10      he had addressed it, so I didn't want to leave something on

11      Mr. Steinmetz.

12                 MR. ROSENTHAL:   Just on Mr. Steinmetz, Your Honor,

13      just because, again, I'm just kind of trying to head off the

14      next roadblock, which is, you know, for them to come back

15      and say, well, we actually don't have the practical ability.

16      And there is -- there's four factors that the Royal Park

17      court cited, and they're all applicable here.   They all

18      exist here.

19                 And the Royal Park court basically then said,

20      okay, I'm entering a finding that you have a practical

21      ability; go do it.   Because I don't want them to come back

22      and say -- and the Royal Park court, in fact, said this

23      isn't a serial opportunity to kind of keep raising a new

24      roadblock each time.

25                 And the four factors are: number one, financial

1    interest.  I think the Court can find that he has a

2    financial interest based on the record; this is not

3    contested.  Number two, did things acting as agent on behalf

4    of the company.  We've put in the record; it hasn't been

5    contested.  Number three, the fact that this person has

6    participated in discovery voluntarily on behalf of the

7    corporation in the past; we've put in that record.

8            And number four -- and actually, this is what

9    really disturbed the court in Royal Park -- is they never

10   even asked prior to coming to court and saying that we don't

11   have control.  And we said, the least that you can do is,

12   before coming to court, is to show us evidence that you've

13   asked them to cooperate and they refused.

14           And I think we have all four of those factors

15   here; that just to avoid kind of a serial re-litigation of

16   this, I think it's appropriate for the Court to say, look,

17   this test is met under these circumstances.

18           MR. HYMAN:  Your Honor, Royal Park was determined

19   in the context of five directors that were currently

20   directors.  There were the economic interests; was the

21   economic interest or ability of the defendant to hire or

22   fire those directors.

23           This is, while there may be or not be an economic

24   interest on the part of Beny Steinmetz, it doesn't come

25   close to meeting the standards in Royal Park.  And to say so

1    is disingenuous.

2            THE COURT:  Well, let me ask you, does he have a

3    financial interest?  I have seen a lot of information

4    provided to me at various hearings addressing that issue and

5    going through, in detail, him being the beneficial owner

6    through various different entities; and, therefore, having a

7    financial interest would -- which would explain his

8    extensive level of involvement.  And, indeed, nobody on your

9    side has ever identified anybody else who's acting on behalf

10   of BSGR.

11           MR. HYMAN:  The joint administrators are.

12           THE COURT:  No, no.  Before the joint

13   administrators leading up to the joint administration, you

14   haven't identified anybody at the company who seems to be

15   doing anything, other than the joint administrators.  My

16   understanding of joint administrators is that they are not

17   necessarily the only people acting and so, you've never

18   named somebody else.

19           And so, but I backtrack.  So I do have information

20   that has been provided on all the four factors that are just

21   identified, do you have any information factually about the

22   financial interest question; do you have anything to say

23   factually on that?  Do you dispute he has a financial

24   interest?

25           MR. HYMAN:  Ultimately, we read the press reports.

1    He may have an ultimate financial interest in his

2    subsidiary.  However, when you look at Royal Park, the

3    financial interest went to control, and for the ability of

4    the party that was requesting those documents to exercise

5    some leverage over the party that had to comply.  Here, that

6    isn't the case.

7              THE COURT:  Are you saying, so he's involved in

8    negotiating the original deal with Guinea.  He's involved in

9    negotiating the purported settlement, which I know you say

10   the foreign representatives need to approve -- I don't

11   disagree with that for purposes of the proceeding in

12   Guernsey -- but you say somehow, he doesn't have any degree

13   of control?

14             Again, you're -- so what I'm hearing is that

15   you're telling me right now that when you say he may have a

16   financial, that you don't dispute what's been provided to me

17   that he has a beneficial financial interest in the Debtor.

18             MR. HYMAN:  We do not dispute that he may be the

19   ultimate beneficiary.

20             THE COURT:  No, may be doesn't help me.  May be is

21   -- may be is conditional.  It means nothing.  A lot of

22   things may be.  The Mets may be better next year, but I know

23   better than to actually hook my wagon to that.

24             MR. HYMAN:  So do I, Your Honor.

25             THE COURT:  So I can't work with that.  So I

1    haven't been presented with anything that disputes the

2    factual picture that's been presented to me about his

3    beneficial financial interests.

4              MR. HYMAN:  We do not know that there is anybody

5    else that owns the equity interests or beneficial interests

6    of Balda.

7              THE COURT:  And as to the second one, I'm not

8    hearing anything that disputes that he's acted as an agent

9    of BSG.

10             MR. HYMAN:  He certainly is not authorized to act

11   as an agent, and he's not authorized to act as an agent

12   today.

13             THE COURT:  Okay.  But, again, we keep having

14   these discussions, and then you bring me back to a

15   particular characterization of an issue that's where you

16   want to fight this battle, which is after the Chapter 15 was

17   filed.

18             My understanding is that you don't dispute that he

19   negotiated the ultimate deal with Guinea, that is really

20   kind of the Debtors' business, or that he is involved in

21   trying to reach a settlement of the dispute with Guinea.

22   Again, a settlement you say he cannot -- that cannot be

23   finalized without the approval of the foreign

24   representatives, but that he was doing the negotiating.

25             MR. HYMAN:  And may never be finalized.

1          THE COURT:  No, no.  I'm asking factual questions,

2     so I'm not asking for you to give me your gloss on what they

3     all mean.  I'm asking very specific factual questions.

4          MR. HYMAN:  Nobody denies that Mr. Steinmetz was

5     off negotiating a deal that he was not authorized to

6     negotiate.  That settlement ultimately needs to be approved

7     -- I know that Your Honor is aware of that -- and reviewed

8     and revised.  It may be ultimately agreed to in its current

9     form; it may never be agreed to.  It may be agreed to in an

10    alternative form.

11         THE COURT:  But he's holding himself out as BSG in

12    the context of those settlement discussions.

13         MR. HYMAN:  But not with any authorization from

14    the joint administrators or BSG.

15         THE COURT:  That's fine.  I understand that

16    position.  But it doesn't change the facts that he's holding

17    himself out, and clearly has apparent authority to anybody

18    who's talking to him, including the -- an independent

19    sovereign country.

20         So let me move on to number three.  I realize you

21    were just presented with information dealing with his

22    involvement in discovery and complying with discovery in

23    other proceedings, including the tribunal -- and I don't

24    want to misstate.  Could you remind me what the exact title

25    of the proceeding is?

1    MR. ROSENTHAL:  Sure.  So he provided documents or

2    searched for documents in connection with the LCIA

3    arbitration.  He also provided live testimony in the ICSID

4    arbitration, and he provided multiple witness statements as

5    a witness in both the LCIA and the ICSID arbitration.  I

6    think these are facts.  I can't imagine they don't know

7    because it's been so part of the history of this company for

8    the last few years.

9        THE COURT:  All right.  Do you dispute any of

10   that?

11       MR. HYMAN:  Only to point out that the dates are

12   prior to the joint administration, at which time nobody

13   other than the joint administrators have any ability to rule

14   or act on behalf of the company.

15       THE COURT:  I understand that.  All right.  But

16   it's pretty clear he participated in the past in discovery

17   on behalf of the company in other proceedings.  And so last,

18   but not least, the fourth factor: have the administrators

19   ever asked him to cooperate and provide documents that are

20   requested?

21       MR. HYMAN:  To my knowledge, the joint

22   administrators are not in contact with Beny, not in contact

23   by email or by phone.  There have been less than a handful

24   of meetings at which they have met Mr. Steinmetz, but that

25   is the full extent of the contact.

1          THE COURT:  All right.  So what I'm hearing is

2     that they have not asked him to cooperate and so -- in terms

3     of discovery sought.  And so, I think all the -- I'll make a

4     finding that all four of the factors in Royal Park are

5     satisfied here, and we'll see where that gets us or doesn't

6     get us in the future.

7          All right.  You wanted to talk about the status of

8     documents that are being produced and the schedule?

9          MR. HYMAN:  Yup.  If you wouldn't mind, Your

10    Honor, if Mr. Peters could address the Court in terms of

11    current production.

12         MR. PETERS:  Your Honor, thank you again for

13    giving me an opportunity to address the Court.  I just

14    thought it would be helpful really, just to understand where

15    we've got to in terms of the document production since the

16    hearing on the 29th of August.

17         As you'll recall, there's a lot of discussion

18    about the 321 documents at that hearing.  And subsequent to

19    that hearing, those documents were available for production.

20    There is, as Cleary mentioned, you know, there was a lot of

21    toing and froing about the protocol, which meant that the

22    production of those documents was delayed.

23         However, we had a call with Cleary on the 12th of

24    September to try and resolve the issues over protocol.  And

25    when it was clear that that wasn't going to go anywhere, and

1    it's part of the reason why we're here today, we actually

2    did agree to release the documents in conjunction with

3    authorization of the protocol, and those documents were

4    released the following day.

5              Now, subsequent to that, we've been working on

6    getting more documents to disclose.  We've now got a second

7    tranche of documents, comprising 425, that are ready to go,

8    and they've been based on a targeted search on issues that

9    we know would respond directly to the 68 requests that have

10   been put to us.  They deal with Asher Avidan, Capital

11   Markets, BSG Real Estate, and the (indiscernible)

12   investigations that we've undertaken.

13             There's also a third tranche of documents, and

14   that's a third of 516 documents that are going to be ready

15   to go in the next day or so, and they relate to the Standard

16   Charter Security.  And there are a number of invoices that

17   clearly demonstrate that COMI is guaranteed and, again, are

18   responsive.

19             Now, I suppose you ask, what about the rest?

20   Well, we've uploaded 1.2 million documents to relativity;

21   that's significantly more than the 38,000 that were referred

22   to earlier.

23             Now, we're going through each of the 68 requests,

24   line by line individually, and coming up with key words that

25   will respond to the requests to identify responsive

1   documents.   Now, that's an interesting process.   When we

2   first do that, we get thousands and thousands of hits, tens

3   of thousands of hits for each request, which clearly, it's

4   just not realistic.   And when we look behind that, there are

5   a significant portion that aren't responsive documents.   So,

6   therefore, we need to look at ways to reduce that down to

7   documents that are purely responsive.   So it's a step-by-

8   step process.

9          As things stand, we've identified documents that

10  are responsive for 35 of the 68 requests, and that's 28,000

11  documents.   So that's -- you know, some of those documents

12  can be hundreds of pages long.   We've now got a team of 15

13  specialist document reviewers going through the GDPR and

14  relevance and sorting and sifting on that basis.   These are

15  then going to Duane Morris for them to check for legal

16  privilege, before coming back to us for final QC, at which

17  point, they can be prepped and made available.

18          Now, we expect to start that flow of documents in

19  the next week.   And once it's started -- that's not the full

20  38,000 documents -- it will be a conveyor belt.   So we've

21  been releasing documents for Cleary on a daily basis.

22          Now, in parallel to that, we're also looking at

23  the remaining 30 odd document requests.   And by the time

24  that the 28,000 have been sifted, we will have uploaded

25  further documents that are responsive at the back end of

1     that, so the conveyer belt will continue.

2              And we expect to have all of those documents

3     disclosed, the relevant documents that have been reviewed

4     for GDPR that have been reviewed for relevant and have been

5     reviewed for legal privilege to be made available to Cleary

6     within 20 days of now.

7              Now, I'd just like to briefly touch on costs,

8     because, you know, it is relevant from our perspective.  In

9     terms of the work that we're currently doing, we expect our

10    own costs, excluding our attorneys, to be somewhere in the

11    region of $850,000 for this process.  Now I know that Cleary

12    has asked that redactions are done in a particular way, and

13    we've done a few tests on that to see the effect of doing

14    that.

15             And if we go down the route that they want,

16    whereby they're asking us to redact and then put on an

17    individual redaction-by-redaction basis of description,

18    we're looking at costs in excess of $2 million, and that's

19    obviously hugely significant.  And, you know, the reality is

20    that it's not going to give them any additional information

21    that's relevant to COMI.

22             THE COURT:  Well, I think we had had a discussion

23    about an attorneys-eyes-only process and order that would

24    give you an order that is important for purposes of any GDPR

25    issues and the privacy issues under the European regime, but

1  at the same time, allows a process that may be less

2  extensive and less costly.

3          And I think -- I think I had hoped, and I think I

4  said on the 29th, the parties should work on a joint

5  proposed order that would minimize regarding this process by

6  providing for attorneys-eyes-only, and hoped you would get

7  something to me in 10 days. And at the time we were

8  discussing it, I thought -- I had the sense that people

9  thought that would be useful. But, you know, that was more

10  than a month ago, and I never did get anything.

11          So my understanding is that a court order that

12  says what's necessary for purposes of the case takes things

13  out of the category 2 that we've been using as a framework

14  and would move into category 1, meaning that they've been

15  determined to be relevant for purposes of the case. And

16  essentially what it does is say that in order to deal with

17  the case efficiently, we've come up with a procedure to

18  safeguard privacy information, not make it generally

19  available and not widely disseminated.

20          And I know it's -- it probably is an American

21  concept to do attorneys-eyes/professional-eyes only, but

22  that it might be one, at least -- again, I didn't hear at

23  the time of the August 29th hearing anybody say that that

24  idea was dead in the water. But that was something I don't

25  think I've heard anything further about.

1      MR. ROSENTHAL: Your Honor, we were hopeful that

2  ultimately when we get an agreed-upon protocol, that that

3  would have the same effect. We thought we were very close.

4  We think we still are very close, with the exception of two

5  different issues. We don't think that there's an order of

6  this Court that just freely allows discovery of all GDPR

7  without some -- of all GDPR material without some

8  redactions.

9      THE COURT: No. I don't think anybody is

10  suggesting that an order resolves all GDPR issues. But I

11  think the idea was that, to the extent there was discussion

12  of different levels of redaction, that that might provide a

13  way to address that without having to redact, re-redact,

14  change redaction procedures, and provide more information so

15  as to resolve their objection without waiving your rights as

16  to how something was ultimately used or whether it was

17  ultimately made public.

18      And certainly, I don't think anybody -- and

19  certainly, I didn't and I don't think anybody took the

20  comments to mean that we're going to waive away GDPR issues

21  by virtue of that kind of an order. But rather than when

22  you began to get into very specific redaction procedures

23  that are very costly, that that's where that could be useful

24  and that the order would contain a number of very specific

25  findings about the case: involves the following parties;

1   COMI is an issue; COMI looks at the following things in
2   order to.

3           COMI, discovery in a case involving COMI would
4   include the following categories of information: the parties
5   have -- you know, there is some information that is being
6   clearly protected by GDPR that is being redacted or not
7   produced; and that this information, I think even in your
8   own papers, that said that it's less clear what's protected
9   and what's not protected.

10          And, frankly, if you're in those circumstances,
11   you really have no choice but to take the more cautious
12   route.  But that, given that circumstance, the Court finds
13   that a showing has been made, for purposes of discovery,
14   that it is necessary to produce that information, but in
15   order to minimize any privacy issues, that this is the
16   procedure.

17          So that's what I had envisioned doing.  Again, I'm
18   not trying to -- and I don't think anybody is, we've spent a
19   lot of time briefing GDPR issues, so I'm not trying to waive
20   away GDPR issues.  I understand they're significant.  I
21   appreciate counsel being here from across the pond to
22   discuss these issues, and so, I'm not -- I'm not trying to
23   waive them away.

24          But we often deal with, as you know, in Bankruptcy
25   Court, instances where there's litigation pending in many

1    forums. And so, I think what we try to be is helpful to the

2    extent that there are ways to -- that a Bankruptcy Court can

3    assist parties to not have to -- take some items off their

4    to-do list and some things that you can resolve by virtue of

5    findings in an order.

6             MR. ROSENTHAL: Your Honor, and we're going to get

7    to the protocol issues and this is one of the protocol

8    issues. What you'll find -- we think the issues with

9    respect to the protocol are relatively minor and easily

10   resolved. There are only two categories, that there is a

11   question as to whether it should be generally redacted or

12   generally unredacted; that is personal email addresses and

13   nationalities.

14            And it may be helpful in the event that Your Honor

15   rules one way or the other in respect to one of those two

16   things to include a ruling on that point. But as it relates

17   to all of the other categories, there's no dispute between

18   the parties.

19            THE COURT: All right. Because, again, I am

20   sensitive to costs. We're supposed to be in Bankruptcy

21   Court, right? People are filing for insolvency because they

22   have financial issues, whether it's an individual or a

23   company, series of companies. So certainly, I understand

24   that, and, in fact, the American discovery rules consider

25   that in terms of proportionality. And recently, that

1   concept sort of got a refresh in the rules, even though it

2   was always in the rules, just to remind folks that use of --

3   in a traditional domestic case, but I don't see why that

4   would be any different here.  So certainly, that's part and

5   parcel of a protocol that's a court order.

6           But even if there are some issues that are

7   unresolved and parties essentially say, Judge, we just want

8   to reserve our rights, an order making certain findings

9   about how discovery should -- needs to proceed in a case

10   may allow parties to ultimately reserve their rights, not

11   spend unnecessary time on redaction procedures, which are

12   enormously expensive, and give you some comfort that you're

13   not going to be sued tomorrow on the basis of GDPR.

14           So that's why I was trying to sort of pitch it.  I

15   know you're trying to, you know, trying to ultimately

16   resolve all issues of protocol and GDPR.  But my sense is

17   what an order can do is finding this necessary for purposes

18   of the case than, you know, but I'm still not trying to

19   trample on anyone's rights, that attorneys-eyes-only is a

20   way to do that.  So that's certainly the hope.

21           And I still think that would be true -- I know

22   there's a couple of categories that remain outstanding, but

23   there may be a way to produce those documents under the more

24   fulsome version, less redacted, and still preserve your

25   rights for purposes of GDPR in a finding that's saying for

1   purposes of discovery in this case, it's necessary to

2   proceed this way, consistent with Chapter 15s concerns about

3   expediting proceedings and costs, all sorts of things.

4           And, again, there are GDPR experts in the room.   I

5   am not one of them.  So you would tell me what that kind of

6   order, what it needs to look like and what's appropriate.

7   But certainly, I can think of some findings that we've

8   already gone through that would get us a lot of the way

9   there.

10          MR. PETERS:  Thank you, Your Honor.  That's really

11  helpful.  I just -- and I know that Mr. Hyman says that

12  we're going to come on to a protocol.  But the issues around

13  the protocol, you know, they're not about the

14  categorization.  The difficulty we have isn't about the

15  categorization, per se; it's more about what Vale and Cleary

16  are asking us to do in terms of the redaction.  And for

17  every single redaction, and we are talking hundreds of

18  thousands of redactions, they are asking us to put an

19  individual text box against each one to say what that

20  redaction is.

21          THE COURT:  All right.  No, I understand and we're

22  going to get there shortly.  My thought is there are some

23  things, like personal emails is one of the categories, that

24  if I find for purposes of the case that they should be

25  produced attorneys-eyes-only, then they are -- and not

1    provided generally to the clients, to the public without

2    further order of the court -- that that's a level of

3    protection and a level of finding that still allows you to

4    preserve the issue, ultimately, while also not having you

5    even redact them in the first instance. And so, if you

6    don't redact them, even under their view of the world, no

7    redaction means no text box.

8         So even before I made a ruling on that, it would

9    sort of take that issue off the table. And also, frankly,

10   even if you don't put it in an individual text box, you'd

11   have to address it in sort of a general explanation of

12   things, and it would take that part of the process off --

13   off the list of things to do.

14        MR. PETERS: We have taken that into account in

15   our assessments of the additional time involved and then

16   have a search on that basis. But we know, obviously, you

17   know, you're fully aware of the issues and we'll deal with

18   it.

19        That's all I have to say on where we are in terms

20   of discovery. I would have liked the change -- but

21   obviously, you've made no (indiscernible) -- rebut the

22   misrepresentations based on inaccurate press reports around

23   Mr. Steinmetz's role. But, unfortunately, you've made --

24        THE COURT: Well, again, I read everything that

25   was provided to me, and I take that very seriously. So,

1  again, in discovery, it's not a trial, so I'm not making a

2  finding, but I'm making -- of any particular level of

3  involvement or particular acts.  What I'm finding is that

4  there's been a basis given to me that says that Mr.

5  Steinmetz is fair game for discovery.

6          That's the way the American system works, which,

7  frankly, is different than the way a lot of other systems

8  work.  And for some systems, discovery is a lot more

9  curtailed, and I recognize that.  But for the American

10  system, essentially, you have a good-faith basis to say we

11  have a -- we want to know about this, this may be very

12  relevant.

13          And I found that that's satisfied.  So that's --

14  and the only specific findings I think I'm making to Mr.

15  Steinmetz are the ones dealing with that Royal Park case,

16  which are very specific and really aren't necessarily --

17  they're not COMI related; they're sort of a control issue in

18  terms of what's appropriate for discovery.

19          MR. PETERS:  Sure, Your Honor.  I'd just like to

20  make a point regarding the repeated statements about the

21  role that Mr. Steinmetz in negotiating a deal with Guinea.

22  That is just clearly -- that is untrue.  He may -- he may

23  have been involved in assisting discussions, but we got

24  notification from Dag Cramer --

25          THE COURT:  You're talking about the settlement.

1           MR. PETERS:   Yeah.   So we got notification from

2      Dag Cramer --

3           THE COURT:   Okay.   No, I think what I meant was in

4      the underlying transaction to begin with, right?   So there

5      was originally in a relationship, then Guinea terminated the

6      relationship, and then I know there's a settlement.   And

7      what my comment was about his role in the initial

8      transaction.

9           And just to be clear, and I know he's been --

10     again, to use an often-referenced legal principle from

11     Broadway -- in the room where it happens as to settlement;

12     he's been involved.   I'm not saying who had the pen and who

13     had ultimate authority, so I'm not casting any aspersions on

14     anything while the foreign representatives have been in

15     place.   But I don't even, again, need to go there.

16          If he's -- when I look at COMI, I need to look at

17     where has business been going on, who's been doing what,

18     sort of going back in time.   And so, that's -- I think

19     enough of a showing has been made on that.   So I'm not

20     trying to be -- to parse that too finely because, frankly, I

21     don't have enough record to do that.   I have enough record

22     to say he's involved enough that he's a fair game for

23     discovery.

24          MR. PETERS:   Okay.   Can I just ask, Your Honor,

25     please?   If the Cleary's do bring this back onto the table,

1    we would like the opportunity to respond vigorously against

2    the allegations regarding settlements.

3             THE COURT:  Well, I think what's been put on for

4    right now is a basis for discovery.  I've made a ruling.  So

5    I certainly hope, for purposes of discovery, we don't have

6    it come back on.  If it ultimately becomes an issue at

7    trial, everybody preserves their rights to present as full

8    and complete and fulsome a record as you want on those

9    issues, so I'm not making any findings on the merits of any

10   of that.  COMI is not in front of me today, and we'll get

11   there eventually.

12            MR. PETERS:  Okay.  Well, thank you for giving me

13   the opportunity to address the Court.  Thank you.

14            THE COURT:  Thank you.

15            MR. ROSENTHAL:  Your Honor, addressing the

16   document issue.  I have to say I'm extremely distressed here

17   because, you know, while Mr. Peters is not an Officer of the

18   Court, the Court has given an opportunity to address his

19   counsel rather than have him address the Court through

20   witness testimony.

21            And what we've heard today is, unfortunately,

22   quite different from what Mr. Peters stood up and told you

23   last hearing.  And it's really distressing, in light of some

24   of the representations that were made leading up to these

25   hearings.

1           THE COURT:  Well, here, I want to go through the

2    other merits issues and then loop back to production

3    schedule and where we are and all that stuff, right, because

4    I think the legal issues inform the production schedule.  So

5    everybody reserves their rights.  And, frankly, as you know,

6    judges generally are less concerned with the history of

7    discovery than they are with how do we get to the end.

8           MR. ROSENTHAL:  Absolutely, Your Honor.  I agree

9    with that complete.  Ms. Balter is going to address the GDPR

10   issues that were most of his argument.  I would address,

11   when we're done with the discovery categories, the

12   production information that we learned in some of the --

13   well, not just inconsistencies.

14          THE COURT:  And I think we also have the former

15   and current directors in Onyx and that's going to involve

16   it.  So let me ask, there are some nice folks who are in the

17   courtroom for an 11:30 matter.  I think we are going to be

18   here for a while in this case.  So my question is whether

19   now is an appropriate time to take a break or how do you

20   want to handle that, because I think we -- I mean, I'd be

21   stunned if we didn't have at least an hour.  And I think,

22   you know, what beyond that, I'm not -- I have no powers of

23   prediction.

24          MR. ROSENTHAL:  What I'd recommend, Your Honor,

25   just because I think that the former officers and the

1    current officers issues, the legal issues are really no
2    different in many respects that what you've already decided
3    with respect to Mr. Steinmetz. I think we could probably
4    move through those pretty quickly.

5              THE COURT: All right. So why don't we do those
6    then and take a break? All right, yeah. My understanding
7    is that -- and you can correct me if I'm wrong -- that you
8    want documents, to the extent that they're in the
9    possession, custody or control and deal with former or
10   current directors and officers, as well as Onyx, Nysco and
11   Balda, to the extent that they involve the business of BSG.

12             MR. ROSENTHAL: Exactly. And in terms of the
13   possession, custody and control standards, again, we're in
14   the Second Circuit, it's the practical ability standard, and
15   the case law is very clear that they have the --

16             THE COURT: I think we've sort of beaten that to
17   death. So let me hear from the other side because, again,
18   what I thought was important to just clarify for the record
19   before we have this conversation. It's to the extent that
20   they have possession, custody or control over those
21   documents to be practical matter and they relate to the
22   business of BSG.

23             So it's not -- if there is a document of a former
24   or current director, that they have possession, custody and
25   control of that, that does not deal with the business of

1  BSG, you're not asking for that.

2          MR. ROSENTHAL:  But it has to fit within one of

3  the categories that the Court has already sustained as being

4  appropriate for discovery as being relevant.

5          THE COURT:  Right.

6          MR. ROSENTHAL:  But, Your Honor, one caveat.  To

7  the extent that I think under the factual record that exists

8  before the Court and is, frankly, uncontested because

9  they've chosen to argue separate issues.  Under the factual

10 record, I think that the Court should find, as other courts

11 have done, they have the practical ability to obtain this.

12 And, therefore, it's no longer this is just round one, and

13 round two is later on when they say, sorry, Judge, we don't

14 control this.  They've already argued that control issue.

15         MR. HYMAN:  Your Honor, regarding that.  It's

16 impossible to rule on practicality unless there has been an

17 effort made to seek discovery of the docket and make a

18 request.  So I --

19         THE COURT:  Well, let me take the scope of

20 discovery, what's asked for first, and then we'll deal with

21 the control issue.  So they've asked for things that would

22 fit into the discovery request, meaning it deals with BSG,

23 the business of BSG, such that it would be relevant for

24 purposes of COMI under sort of the American standard of

25 discovery.  Do you have any quibble with that?

1          MR. HYMAN:   Not with the scope of discovery, Your

2    Honor, but, you know, we talk about the facts that are in

3    the record.   The facts that are in the record are the

4    articles that have been attached to the first letter, that

5    was a letter dated --

6          THE COURT:   But I don't need to get into the

7    articles, if everyone agrees about the appropriate scope of

8    discovery and your argument is about control.   So my thought

9    is that I've made a ruling as to Mr. Steinmetz about the

10   Royal Park factors.   Again, this is pretty well-established

11   stuff.   I don't normally make rulings about control when

12   people have discovery obligations because it's assumed, it's

13   part of the air we breathe in terms of civil cases and

14   discovery, so everyone understands what their obligation

15   are.

16         And if the foreign representative on behalf of the

17   Debtor has an ability to, as a practical matter, to get

18   documents that relate to the conduct of BSG from the former

19   directors, current directors, Onyx, Nysco and Balda, then

20   they're obligated to do that.   So that's just the way it

21   works.   So what is it that you want to talk about with that

22   context?

23         MR. HYMAN:   Because I think that we've gotten a

24   little bit twisted in terms of economic relationship.   I

25   think when you look at the cases, the economic relationship

1   is, again, the ability of the party that's requesting

2   production on a third party to exercise some leverage in an

3   economic basis over that party. Here, I think this is all

4   of the converse as it relates to the former directors.

5   There is no continuing economic relationship between BSG or

6   the joint administrators and the former -- and the former

7   directors and officers.

8            THE COURT:  But that's not the test.

9            MR. HYMAN:  That's a part of the test.

10           THE COURT:  You've made it -- you've made it very

11   clear repeatedly, even when dealing with Mr. Steinmetz, that

12   from your client's -- from the foreign representatives point

13   of view, they are in control and other folks don't matter.

14   But for purposes of COMI, I'm supposed to look at who's

15   actually done what business and how things have developed

16   and what the center of main interest is and what's actually

17   been going on, what's the economic substance.

18           And even instances talking about change of COMI

19   from one venue to another, I have to have some understanding

20   of sort of historical things to compare it to new things to

21   find out whether that purported change in COMI is legit, is

22   done for any improper purpose, what the legal standards are

23   what they are.

24           So, again, to the extent you're relying on the

25   fact that everything changes, and the only people who are

1    relevant are the foreign representatives once they're

2    approved and, therefore, that's the lens in which to

3    understand discovery, I reject that premise.

4                MR. HYMAN:  But typically, in a COMI shifting

5    case, as I understand them, Your Honor, if it's a shifting

6    of what looked like COMI in the first instance to a new

7    jurisdiction created for purposes of filing.  That's not

8    what we have here.

9                THE COURT:  No, I know.  But what I'm saying is,

10   cases -- COMI shifting cases are relevant to the extent that

11   you're talking about people talking about timeframe and

12   saying you can cut off, this is what I do right this second,

13   and I don't anyone to look beyond that.  And courts do look

14   beyond that because they look to see, well, what changed and

15   why did it change and how did it develop.

16               So, again, this is discovery.  Everybody has a

17   right to be heard on the merits when and if we ever get to

18   the merits of this case.  And so, again, I usually don't

19   have this kind of issues just come up repeatedly.  If

20   there's emails dealing with BSG and you want to talk about

21   the relevant COMI time period, we can have that discussion.

22               But, frankly, if you look up any of the cases,

23   that will tell you what the relevant time periods are.  I'm

24   not changing that; that is what it is.  So through that

25   lens, whatever exists as to these category of people dealing

1    with the business of BSG, it's fair game.

2            MR. HYMAN:   Except that we, you know -- in order

3    to establish possession, custody or control, we believe that

4    the burden is on the party seeking that discovery.

5            THE COURT:   Do you really want to go there?

6            MR. HYMAN:   No, I don't.   I don't.   But I want to

7    address, though, is some of the evidence that they've been

8    relying on which --

9            THE COURT:   I am not taking in news articles, bits

10   of information for purposes of making value judgments in

11   this life or the next.   I am looking at things to try to get

12   through discovery; that's all.   So everybody reserves their

13   rights.   I'm not -- judges are remarkably facile at saying

14   here's discovery and then they get to trial, just as we are

15   facile in separating our personal views and any frustrations

16   in the case leading up to trial.   So it is what it is.

17   We'll get there.   Everybody will get a fair shake on the

18   merits of anything they want to argue.

19            But for purposes of discovery, my ruling is just

20   what I said, which is that viewed through the lens of COMI

21   and the relevant time period -- that is well-established in

22   cases in the Southern District, and including a few that

23   I've issued, decisions on Chapter 15 cases, everybody knows

24   what the period is; that if there's information within the

25   possession, custody or control under the Second Circuit

1   standards that deals with these folks -- current and former

2   directors, officers, Onyx, Nysco, Balda -- that is relevant

3   to the business of BSG and COMI, I find that's appropriate

4   to produce and that I'm ordering to be produced.

5          And so, I'd ask that that go into the proposed

6   order that's going to be submitted after today's hearing.

7             MR. HYMAN:  Your Honor --

8             THE COURT:  So for that, given that I have less

9   information, I'm going to decline to get into Royal Park

10  issues for right now, in terms of it's a more complicated

11  web of things to figure out, but I can't imagine anybody

12  wants to have further discussions about what I think.

13  Again, we're making something overly complicated that, for

14  purposes of discovery, is just not that complicated.

15         So if a deal -- I mean, so Onyx was alleged to be

16  back office support.  My understanding of the record is that

17  they used to be called BSG Management Services, Ltd.  So, I

18  mean, some of these things are just -- I'm not sure why

19  we're fighting about them.  So, again, you view them through

20  the lens of COMI and the relevant time periods for COMI,

21  fine, but it's fair game.

22            MR. HYMAN:  Your Honor, as it relates to Onyx,

23  there is no contractual relationship with Onyx.

24            THE COURT:  I know --

25            MR. HYMAN:  If Onyx wants --

1          THE COURT:  -- because you always talk about the

2     present tense, right now.  I understand that, but, again,

3     I'm repeating myself.  There are plenty of other issues to

4     get through.  My ruling is my ruling, and it serves nobody's

5     interest to go back and forth on these things.  So you all

6     are entitled to a decision.  You may agree with it, you may

7     not agree with it -- that's what Courts of Appeals are for,

8     but we've got to move the case forward.

9          So I think with that, we've gotten through those

10    two issues that are related -- Mr. Steinmetz and the one we

11    just discussed.  We need to go through the GDPR protocol

12    issues.

13          MR. ROSENTHAL:  The third one, Your Honor, is

14    actually subsumed within the last one.  But we have an

15    additional argument, which was the current directors -- you

16    lumped the current and former together.  But there is a

17    current director, which is Mr. Cramer, who, in addition to

18    everything else is a current director of the company.

19          THE COURT:  Well, I'll say what I said to him.

20    There's -- it's well established what the relevant time

21    period is for COMI.  And so I have nothing new or, you know,

22    of value to add to what's well established in Circuit

23    precedent and in this Court's --

24          MR. ROSENTHAL:  I'll just -- if I can just note on

25    the record, Your Honor, just with respect to Onyx because

1    maybe Mr. Hyman isn't aware, but Onyx is run by Mr. Cramer,
2    their director.

3            THE COURT:  Well, I've already made a ruling.  I
4    don't think we need to go there, wo here's what I'd like to
5    do.  We do need to talk about the other issues, which I
6    think are somewhat different than the ones we've covered
7    thus far.  My thought is to talk to you nice people after
8    lunch, so why don't we come back at 2:00, rather than have
9    you come back and wait around.  And so, I think that that'll
10   work.

11           And so, unless anybody has any parting wisdom
12   where it would actually be of use to you before you go off
13   to lunch, we'll just circle back at that point.  All right.
14   Thank you very much.  All right.

15           And CourtCall Operator, I'm going to keep the line
16   open, obviously because we have another matter that's on for
17   11:30, and that matter will be done before 2:00.  And we
18   will then call back at 2:00, and anybody who is on the phone
19   for the BSG matter can call back.  You can either just stay
20   on the line or call back in at that time.  All right?

21           COURTCALL OPERATOR:  Yes, Your Honor.

22           THE COURT:  Thank you very much.

23           COURTCALL OPERATOR:  Thank you.

24           THE COURT:  I sometimes forget to give that speech
25   and there's confusion that results, so I have to remind

1    myself that that's an important thing to straighten out.

2         (Recess)

3         THE COURT:  We're back on the record in BSG

4    Resources Limited, a Chapter 15 case to continue our

5    discussion about the issues raised in discovery in

6    connection with initially the motion for a protective order

7    and then the extensive letters back and forth on a variety

8    of issues.

9         We got through a number of issues this morning and

10   so I think we were going to pick up with the GDPR protocol

11   and the issues that are identified in the letters on that.

12        MR. ROSENTHAL:  That's right, Your Honor.  And as

13   I mentioned, my colleague Ms. Balter will address that.

14        MS. BALTER:  Good morning, Your Honor.  We wrote

15   to Your Honor after an extensive back and forth because

16   we're at an impasse on several GDPR issues.  There are three

17   issues that are principally in dispute.  The first issue

18   concerns the joint administrator's responsibility to

19   identify on a specific basis the categories of personal data

20   that they've adapted.  The joint administrators have agreed

21   that where a document contains redacted personal information

22   they will provide a log and that log will identify the

23   category of personal information.

24        The issue comes up where a single document would

25   have multiple redactions.  In that case the log would

1    identify the various categories of redactions that the joint
2    administrators say that they won't identify for us which
3    category concerns which redaction. They're now saying that
4    this would add an additional million dollars to discovery.
5    Your Honor, we think that's inconceivable. This is work
6    that has to be done in the first place for them to simply
7    identify the category of data that's been redacted.

8            THE COURT: Well, let me ask you. I heard a
9    question before about text boxes and I wasn't quite sure if
10   that was the same issue or from a different angle or a
11   different issue. Because, obviously, we've all seen
12   privileged logs and privileged logs may say Page 20, Line 2,
13   this redaction -- or people can do it on documents, they can
14   do it lots of different ways. So, maybe you can help me
15   through that issue.

16           MS. BALTER: Your Honor, we'd be happy for them to
17   do it in either way. Either to specify directly on the
18   document itself that they're redacting -- you know, do the
19   redaction box and write in the category of personal data
20   that's being redacted on the document if they'd prefer to do
21   it with a log. We just want to make sure that that log does
22   identify the page and the particular redaction that
23   corresponds with that category so that we don't have to go
24   back and reinvent the wheel.

25           THE COURT: So you can see the context.

1           MS. BALTER:  Exactly.

2           THE COURT:  All right.  Would you be okay with, as

3   might be the case, certain things that if you can tell by

4   the context -- so, for example, if you have an email and you

5   have a CC, and you have a blacked out thing -- let's just

6   use that as a hypothetical for a second, you could pretty

7   much tell from the context that that's an email that's been

8   redacted and that whatever your general -- their general

9   comment about it, it would be covered by -- you know, they

10  could say all email address redacted are based on this,

11  that, and the other thing.

12          So, I would assume that if there was certain

13  circumstances where it's very clear by context.  Now, that

14  may obviously not be all circumstances but there might be a

15  limited number where that would be true.

16          MS. BALTER:  I can see that circumstance where

17  you'd have a CC box in there and numerous redactions and

18  they say we've redacted all of these because they're

19  personal emails.  That would be the category.  I think the

20  issue comes up where there's something in the CC box,

21  there's something on Page 3 of the document, there's

22  something on Page 5 of the document and it listed out two to

23  three categories of information and we have to go back and

24  reconstruct them.

25          As we say, we can figure out that one is an email

1    address but for the other two we'd have to, again, just

2    reinvent the wheel. That's information that they know when

3    they're doing the redaction itself, so it's easy enough for

4    them to just identify it for us so that we don't have the

5    burden. The burden should be on the redacting party.

6            THE COURT: All right. So, let me ask, does it

7    makes sense to go back and forth in each one of these until

8    we sort of get an answer on each rather than take them as a

9    group? What would you prefer? I don't know how long your -

10   -

11           MS. BALTER: I think that makes sense, Your Honor.

12           THE COURT: All right. I don't want to -- if your

13   whole presentation is not too long, I'm happy to take them

14   all it once. But it sounds like we'll do it one at a time.

15   So, let's talk about this issue about specific data, and

16   logs, and text boxes and all sorts of exciting things that

17   everybody loves to talk about.

18           MR. HYMAN: Absolutely, Your Honor. And in

19   advance to today, we made an example of two documents, one

20   which would be produced in the format that the joint

21   administrators have been going through and doing their

22   production to date, and another as would be produced under

23   the suggestion.

24           THE COURT: All right. Do you have a copy for

25   counsel?

1          MR. HYMAN:   I do, I do.

2          THE COURT:  All right, great.  Thank you.

3          MR. HYMAN:  May I approach?

4          THE COURT:  Thank you.  All right.  So I have the

5    documents and I just have this ticket that says Vale

6    Proposal and JA Proposal.

7          MR. HYMAN:  All right.  So, this is, Your Honor,

8    an example of just one of thousands and thousands of

9    documents that are being produced.  And you can see,

10   obviously, this is an example that has quite a bit of

11   personal data in it.

12          As those parties that are going through the

13   documents in the first instance to review them for GDPR

14   information, on their screen it shows a drop box, which is

15   what you were referring to.  The drop box allows them to

16   check a box for a specific category of personal data that

17   they are redacting.  It does not require them when they

18   redact it to go in and type specifically for each redaction

19   what that type of information is.

20          When we're talking about thousands of documents in

21   the form of the Vale proposal, that requires for each

22   redaction, rather than just hitting a box that redacts the

23   information and clicking another box that has the category

24   of information, it requires them to go in manually for each

25   one of the redactions and identify it.