# EXHIBIT C-2

1            THE COURT:  Now, let me ask you.  This is a form

2    so this may not be very illuminating for other more

3    narrative documents.  But certainly this form, to the extent

4    it has a date of birth line, and a nationality line, and a

5    column for signatures, you can tell from the context what

6    these are.  So, and that's why I ask the question.  I think

7    I'd be fine and I suspect the other side would be fine when

8    in that context it's very clear, so you don't need to

9    specify that it's somebody's date of birth because, in fact,

10   you can tell that from the context.  It's very clear.

11           I guess the harder thing is when you have a memo.

12   And so you have a memo and it has sort of an ongoing

13   narrative discussion, perhaps lengthy and it has various

14   things redacted and you can't tell what a various thing is

15   from the context.

16           MR. HYMAN:  In our proposal, in the joint

17   administrator's proposal of the redactions this would still

18   be accompanied by a log and the log would identify the

19   different types of categories -- of --

20           THE COURT:  Would it identify it by page so you

21   can actually tell what's what?  I mean, I think that that's

22   right.

23           MR. HYMAN:  It does not because that is another

24   level of expense to go through.  The way --

25           THE COURT:  But if you can't tell from the context

1    what it is that's redacted, then I think -- isn't that
2    relevant information for purposes of the privileged log when
3    you have an invocation of privilege? And we're not even
4    talking about Chapter 15, we're just talking about standard
5    -- standard privileged stuff and the local rules on that.
6    That you'd be able to identify and say, well, this is what's
7    redacted because we're telling you what it is because you
8    wouldn't know from the context and you can't...

9              So, for example, if somebody's reading a paragraph
10   in a memo and that paragraph turns out to either, on the one
11   hand, be incredibly relevant to various things that the
12   other side is interested in or not at all relevant, they
13   might say, I'm curious what it was that was redacted from
14   the paragraph.  Or given that it's not very exciting and the
15   redaction is this kind of redaction, I could care less.

16             MR. HYMAN:  For these types of documents and these
17   types of redactions, which are -- they're set forth in the
18   proposal for the protocol, right?  They're very limited
19   types of information.  It doesn't recall -- it doesn't
20   require blocks of redaction that would not otherwise be
21   relatively obvious from the context.

22             THE COURT:  My hypothetical assumes that you can't
23   figure out from the context what it is.  So, if a memo said,
24   we met with an individual, comma, redacted two words and an
25   initial, comma, at so-and-so place and whatever to

1   discuss... Well, you could tell from the context what that

2   is.  But if you had, say, two lines redacted and the lines

3   are completely redacted and you couldn't tell what they are,

4   do they contain information that's names?  Is it privileged

5   legal information?  What is it?  And you don't tie what the

6   justification is to the area of the document, then people

7   completely see as to what it is.

8            MR. HYMAN:  To the extent that it was privileged

9   information, that is absolutely included in the log and

10  identified specifically, is that correct?

11           MR. HITCHING:  Your Honor, Jarret Hitching.  To

12  the extent something's being redacted for privilege, that is

13  receiving a separate designation that says Redacted For

14  Privilege versus Redacted for GDPR.

15           THE COURT:  Right, but what I'm saying is if you

16  can't tell -- so privilege is fine, but if you can't tell

17  what the GDPR redaction is from the context, I would think

18  that it makes sense to identify that.  Again, this sample is

19  sort of the -- kind of the layup, right?  Because you can

20  tell date of birth, nationality, signature, so you know.

21           So, you had me at hello on this.  I'm fine with

22  this kind of form of redaction, your proposal with this kind

23  of document.  But I am thinking about ones that are not

24  essentially forms where the box you're filling in tells you

25  the answer of what's redacted.  And I don't know -- do you

1   have any other samples of things that are redacted that
2   might be harder calls?

3           MR. HYMAN:  I don't have any samples with me, Your
4   Honor, though.  But what would accompany our version of the
5   protocol would be a schedule, a log at the end that
6   identifies the types of personal information.  We think it's
7   unlike --

8           THE COURT:  I understand that.  But that isn't...
9   Again, what the whole point of a log is, which is often
10  overlooked, is that it gives enough information so people
11  can decide what they want to go to war over, right?  And so
12  some things they may say, well, I really don't care about
13  this.  That's what discovery is always about.  Which is
14  saying you can either write about things theoretically, in
15  which case we'd all have to quit our day jobs and just do
16  that, or you can say what is a practical matter do I really
17  care about?  And so that's why producing documents is
18  usually helpful when fighting about what's in the documents.

19          And that's why when talking about privilege, the
20  additional -- the only real point for those logs is that
21  somebody can say, well, I can gauge what that is and whether
22  I care enough to fight about it.  Or if I'm going to fight
23  about it, whether I can lump in it with other things or
24  whether it's a one-off, it informs the rest of the process.
25          So, for this stuff I'm fine.  When you can look at

1    it and say I know what's been redacted, I have no problem

2    with it.  But if -- and, again, see, the problem is without

3    some example I don't really know how this would play out.

4    But so my concern is instances where the other side can't

5    figure out what was redacted and, therefore, isn't in a

6    position to make an informed decision.  And so that'll lead

7    to further discovery in litigation.  And so that's what I'm

8    worried about.

9            Again, this doesn't bother me.  If there are forms

10   that are like this, again, I don't think -- she'll correct

11   me if I'm wrong, but I don't think that's what they're

12   worried about that.

13           MR. HYMAN:  No, I appreciate that, Your Honor.  We

14   don't think that's what they're worried about either.  I

15   think that we would argue, though, for virtually all

16   instances you should -- in matching it up with the log that

17   attends it, you should very easily be able to determine what

18   information was redacted.

19           We do include a proposal or procedure in the

20   protocol to the extent there are any disputes as to whether

21   information should have been excluded or not excluded to

22   designated certain individuals, and somebody has a direct

23   phone line to somebody and can answer a question.  I guess

24   the concern that I have is, in an effort to try to save some

25   costs and "expediate" the production --

1       THE COURT:  I understand that, I understand that.

2  But it's hard for me to evaluate what you're saying without

3  seeing the documents.  Again, if the context is clear, then

4  the context is clear.  Then nobody needs to waste the time.

5  But if the context is not clear, then the question is well,

6  would it be helpful?  And, frankly, to comply with a -- what

7  a privileged log is supposed to do, which gives you -- i.e.,

8  gives me enough information so I can assess the basis of the

9  privilege.  If you have a context that doesn't inform the

10  redaction and you might challenge it if it's certain kinds

11  of information but you might not challenge it if it's

12  others, I don't know how you'd make that decision without

13  it.

14       So, my thought is to say that where context is

15  clear, I'm fine with the way you're doing it.  But where

16  context is not clear and nobody will be able to figure out

17  what's redacted, that the log -- you can do it any way you

18  want but I would imagine it's least expensive to just have

19  the log say Page 28, personal information, you know, and

20  just identify what the personal information is just so we

21  don't have to spend -- so this isn't the opening salvo of

22  another extensive fight on discovery, which is also

23  expensive.  So, that's what...

24       Now, if you want to prepare a couple of samples

25  where you think there's some specific guidance you want from

1   the Court and say, hey, look, in this sample we can tell you

2   this is the kind of thing we don't want to do and we think

3   we can demonstrate that to you, I'm happy to look at the

4   samples. But if it can't -- again, my hypothetical assumes

5   that you can't tell by the context.

6           MR. HYMAN: Yeah, I think that what we're

7   concerned about is that we will have a dispute as to

8   judgment calls, and there will be just a continuing effort

9   to require us to go through and identify information. But I

10  take your point, Your Honor. Unfortunately, the way the

11  system works today is it would be very easy if when the log

12  was produced, the log identified the types of personal

13  information in the order in which they were redacted from

14  the document. That would eliminate all issues.

15  Unfortunately --

16          THE COURT: Listen, there's lots of ways to do

17  this. And so, for example, you don't produce a privileged

18  log that says Privileged and that's all it says. There are

19  different kinds of privilege. And so you've got to give

20  enough information to somebody to make an intelligent

21  decision to think about the issues.

22          Now, I don't know if there's any distinction

23  between what people have been talking about for Category 1

24  versus Category 2 on this and whether that distinction is --

25  let me ask Vale's counsel if that distinction is anything we

1    can use in this context to try to advance the ball.

2            MS. BALTER:  Your Honor, I don't think that

3    distinction will advance the ball here because for Category

4    1 data there's a presumption that it's relevant to the

5    dispute and that they can redact it.  For Category 2 data,

6    the presumption is the opposite.  That it is relevant to the

7    dispute and that it should not generally be redacted.  And

8    where they do redact that, they have to provide an

9    explanation.

10           So, this is largely going to be about Category 1

11   data.  And in that case, it's (indiscernible) burden to

12   raise any kind of objection.  And so as the redacting party,

13   we think that the onus should be on them to facilitate our

14   understanding and to make sure that we can raise an

15   objection where necessary.

16           THE COURT:  Well, let me ask you.  Right, there's

17   a lot of different ways judges deal with discovery and some

18   of it has to do with what parties are willing to live with

19   in terms of re-review and re-redacting, which is sort of a

20   nightmare scenario that I daily not like to be in, but

21   sometimes people are willing to assume that risk.

22           So, if Category 1 is about things that clearly are

23   covered by the GDPR and so there's not really a debate about

24   that, so from their point of view it's in a stronger

25   position, does it make sense to at least let them go ahead

1    and do some tranches that way and then we can have a further

2    conversation?  But it's caveat emptor.  This is what they're

3    suggesting.  And if it turns out it doesn't work, then it

4    doesn't work and we're going to have to go -- we're going to

5    have to take one step forward to take, you know -- I mean,

6    we're going to have to take a step back before we take

7    another step forward.

8              MS. BALTER:  I think the issue, Your Honor, is we

9    just don't want to kick the can down the road any further.

10   We've been negotiating this issue for over a month at the

11   very least now.  As you said, we're fine with this kind of

12   document but this is for layup.  We have received so few

13   documents that it's hard for us to look at a lot of

14   examples.  But we don't want to --

15             THE COURT:  Do you have anything handy that I

16   could look at?  Again, I'm putting you on the spot.  Fine if

17   you don't.  But where -- again, because the devil's in the

18   details, and I'm -- it's always -- I always talk to lawyers

19   about how it's terrible to have to fight about theoretical

20   rights rather than practical things because then you really

21   have to raise issue.  But it's the same for judges, right?

22   If I can't sort of figure out what it looks like as a

23   practicality, then I'm sort of theoretically doing

24   something.  And then my utility and my -- what I hope for is

25   accuracy in trying to figure out a just result goes down

1    considerably. So, my batting average isn't as good. So, I
2    don't know if you have anything that might inform this
3    particular discussion.

4              MS. BALTER: Your Honor, we don't right now. I
5    think that's largely a product of the fact that only 211
6    documents have been produced to us and not many of them
7    implicated GDPR issues to begin with. So, we just haven't
8    had the kind of production that gives us the insight we
9    need. But we also are concerned about a situation where
10   we'd be asking them to reproduce things, we can imagine,
11   like the joint administration will come back and complain
12   about the expense there.

13             THE COURT: Yeah. Well, but --

14             MS. BALTER: So, we want to get this resolved so
15   that we can really move forward with document production.

16             MR. HYMAN: Your Honor, the argument that they
17   made in their letter with respect to personal email
18   addresses and nationality was that it was so crucial to the
19   determination of Comey. Personal information or personal
20   email addresses and nationality could relate to numerous
21   people, whether they're connected to this case or
22   unconnected to this case.

23             THE COURT: We've segued off to a different topic,
24   right?

25             MR. HYMAN: Okay. We have. So, let's go --

1        THE COURT:  I mean, right?  Because we're talking

2   -- I think we were talking about redaction and now we're

3   going to substance, which is can we redact this stuff and

4   what's the presumption and all that sort of stuff in terms

5   of whether it's tied to the case.

6        MR. HYMAN:  Right.

7        THE COURT:  So, here let me make a suggestion and

8   you'll tell me whether you can live with it.  I'm willing to

9   go along with your proposal as an interim step but with one

10  large caveat, which is if it becomes a problem and they say

11  we can't -- so they can take a document and they can say I

12  have this letter and here are some things that are redacted,

13  and we can't figure it out, and this is exactly what we were

14  worried about, then you may have to reprocess that document

15  or categories of documents that are like that document.

16       MR. HYMAN:  Your Honor, Jarret Hitchings is more

17  than available to answer any phone calls as it relates in

18  that regard.

19       THE COURT:  No, no, no, but that -- you're not

20  answering my question.  You're answering a question I didn't

21  ask that's a better question for you.  So, I'm telling you

22  if that happens and then it turns out they say this is the

23  problem, we addressed it at the hearing, it turns out it

24  really is a problem.  This is redacted.  We don't know among

25  the laundry list of things that are identified what the

1    redaction is.  We can't make an intelligent decision.
2    Looking at this document, it implicates a lot of things we
3    care about and we can imagine a whole bunch of scenarios,
4    and this is not the only document.  We've got a couple
5    samples, and we need to go back -- we need them to go back
6    and reprocess the documents.
7            MR. HYMAN:  Absolutely.
8            THE COURT:  All right.  Because that's -- and,
9    again, that means that sometimes you can pay upfront or you
10   can pay later.  I don't know.  But that does leave you
11   vulnerable to that problem.
12           MS. BALTER:  Your Honor, just to clarify one
13   point.  That wouldn't be just for the particular documents
14   that we use.  I mean --
15           THE COURT:  Well, if you come back and you say --
16   and it's always great as a lawyer to be able to do this, by
17   the way.  So, for your own personal career moment where you
18   can say, Judge, the thing we told you was going to happen,
19   it has happened.  And so then you can make your case.  And
20   so I'm not going to preclude you from doing that.  What I'm
21   hearing is they think it's not going to be that big an issue
22   and that if you pick up the phone and there may be a stray
23   thing here or there, that you can work through it.
24           And if that's the case, that's the case.  But if
25   it's not the case, then you pick up the phone and you say,

1  I've got 200 of these documents and I can't -- it's the same
2  problem over and over again.  It's exactly what we said.
3  Then I will not hold it against you that they were already
4  processed a particular way.  Again, it's caveat emptor.  You
5  know, buyer beware.  If you make this suggestion and it
6  works out the way you want, great.  If it doesn't, then you
7  have every right to come back and say we told you this was
8  going to -- we suspected this was going to be a problem and
9  we're back.

10          So, it would not be necessarily limited to one
11  document.  It would be limited to whatever -- whatever the
12  shoe fits.  That well-known legal doctrine.

13          MS. BALTER:  We'll make sure that if it's --
14  whatever shoe fits doctrine goes to -- if this seems like
15  it's going to be a problem, that we're making sure that it's
16  applied.

17          THE COURT:  Yes, and here's --

18          MS. BALTER:  And not just twisting our document --
19  if they don't come back and say, well, we can't apply this
20  to all the rest of the documents.  We have to process all
21  the documents we processed before.

22          THE COURT:  No, you reserve all your rights.  And
23  what I would suggest is that because all of you have better
24  things to do than to sort of be mired endlessly in discovery
25  that -- I heard a mention of tranches of documents being

1    produced.  That as the documents are produced, that you all

2    talk to one another about it.  And so if this -- if you get

3    documents and say this is a really big problem, we need to

4    get in front of this, you talk to each other and you say,

5    hey, what are you going to do to fix the concern we have?

6    Maybe you fix it, maybe you don't.  If you don't and it's a

7    big problem, then you call chambers, set up a call and we'll

8    essentially continue this same discussion.

9             So, that would -- and it sounds like they can live

10   with that because they think as it goes forward it won't be

11   that kind of a problem.  You have your doubts and I,

12   frankly, don't know enough to make an intelligent decision.

13   But as long as they're willing to live with the "we need to

14   take a step back" approach and reserve your rights on that,

15   then I think we'll see how it goes.

16             MR. HYMAN:  Thank you, Your Honor.

17             THE COURT:  All right.  So, I think -- let me then

18   hear from Vale's counsel.  There were three issues.  That's

19   number one.

20             MS. BALTER:  Right.  The second issue --

21             THE COURT:  By the way, I would think we could put

22   this all -- everything in an order.  So, we could -- you

23   know, so we've addressed the things this morning, they're

24   going to go into an order.  This would go as to the

25   redaction of personal data on a specific rather than general

1    basis under GDPR protocols.  Joint administration proposes

2    the following.  The Court will provisionally -- it will use

3    -- will adopt the joint administrator's proposal with Vale

4    reserving all of its rights if the lack of more specific

5    identifying a thing for each bit of information is

6    problematic for purposes of protecting your rights to assert

7    the challenge to privilege or something else, then you

8    reserve the right and the Court will make any rulings in the

9    future on that as if the matter was raised in the first

10   instance.

11          I'm sure you can wordsmith that better than what I

12   just threw out there.  But I think, again, just so we all

13   have our own go-by going forward, I think the order will

14   sort of become, hopefully, one stop shopping so that we

15   don't end up mired endlessly in discovery, which is nobody's

16   goal.  So, all right, as to Issue Number 2?

17          MS. BALTER:  Right.  So, the second issue, Your

18   Honor, is whether personal email addresses and nationality

19   or association with country should fall under Category 1 or

20   Category 2 of personal data.  I touched on this.  Category 1

21   is data that is presumed unnecessary to resolution of the

22   dispute.  And so as a general matter that data will be

23   redacted.

24          Category 2 of personal data is data that is

25   presumed to be necessary to resolution of the issues in

1    dispute and so that data (indiscernible) will generally not
2    be redacted.  We're talking about one stop shopping and you
3    had mentioned something similar to this earlier.  I think
4    this entire issue could be resolved if Your Honor has an
5    order that says that these issues, personal email addresses
6    and nationality or association with country are relevant to
7    the resolution of the dispute, that would provide all the
8    protection that they need under GDPR and we don't even have
9    to worry about redaction in that circumstance.

10            THE COURT:  All right.  All right, anything else
11   from Vale on that issue?

12            MS. BALTER:  Yes, Your Honor.  That said, both
13   subjects are critical to Comey and they're also critical
14   subjects of discovery.  The joint administrators have, in
15   fact, not even tried to argue that nationality or
16   association with country is not relevant.  They merely say
17   that it's inconceivable that Vale wouldn't know the
18   nationality of the directors, officers, and other employees
19   of BSGR.

20            Now, Your Honor, even if that were true, which is
21   impossible for us to assess because right now the joint
22   administrators have not even provided us with documents
23   sufficient to identify the directors and officers of BSGR.
24   But even if that were true, it doesn't change the fact that
25   this is directly relevant to the Comey inquiry, and that it

1  doesn't justify presumptively redacting this data for
2  purposes of GDPR.

3          THE COURT: What about personal email? I was a
4  little less clear what the specific email is going to tell
5  you about Comey. It will tell you, I guess -- who's on the
6  email is one thing, but the precise email, I'm not sure that
7  it tells you anything about nationality or location
8  necessarily. So, what's your thinking on that?

9          MS. BALTER: So, I think there are two issues with
10  that. The first is that it will -- it is relevant to the
11  scope of discovery, as we've been discussing earlier today.
12  We do need to know the personal email addresses. Those do
13  need to be searched for for the directors and officers, and
14  we don't have that information.

15          The joint administrators have said that the
16  production of documents would be -- it would identify people
17  who are -- have little connection to the historical
18  operations of BSGR. But the only example that they've given
19  of that is an email of that redacts the email address of
20  Asher Avedon, who was actually the president and the CEO of
21  BSGR Guinea, a key subsidiary of BSGR. So, that's clearly a
22  person with a major connection to the historical operations
23  of BSGR.

24          And then I think Your Honor asked also about
25  Comey. For example, we know that personal email addresses

1    of Dag Cramer are being used from a company called Norn

2    Vernandi.  Where that's located, where he's sending that

3    from, that's information that is important and that goes

4    directly to the Comey inquiry about where a director of BSGR

5    is actually conducting his BSGR-related business through

6    this other country.  So, that kind of information is

7    actually relevant to Comey.

8            MR. HYMAN:  Mr. Kramer's email addresses or the

9    one that was just referenced are business email addresses

10   and those are not being redacted.  We are also happy to

11   stipulate to the identities of various members of the board

12   of directors at certain points of time and where they're

13   located.  What we're talking about here, though, is personal

14   email addresses of anybody that may be mentioned in any one

15   of these documents and their nationality.

16           All we are saying is that the general rule for

17   that type of information, which we really -- other than in

18   some very certain -- you know, particular circumstances

19   might be relevant, although whether somebody's Swedish or

20   not, I'm not sure that that's more relevant than where

21   they're actually operating --

22           THE COURT:  No, but it might give you some

23   indication as to where they may conduct business, right?  I

24   mean, so I don't think when you think about discovery, the

25   old test used to be reasonably calculated to lead discovery

1   of admissible evidence that's been thrown over the transom.

2   But the idea is it doesn't make sense.  Would it be helpful

3   when weighting all the costs and burdens?

4            So, I mean, the way I think of it is if you were

5   doing this in a domestic case, you'd have the email

6   addresses on there.  You might have them for attorneys' eyes

7   only because you wouldn't want to have an unwarranted

8   personal intrusion.  But otherwise, everybody's in the

9   situation where you're going to have to assess the email

10  circumstances and the address email by email, person by

11  person.  And that sounds like a bad thing for you, it sounds

12  like a bad thing for them because it's contextual -- in the

13  case it may be contextual.  In the email -- and so I don't

14  know that you...

15           So, for example, if there's a personal email of

16  somebody who's on a CC, who never shows up other documents,

17  well, in hindsight, that will turn out to not be necessary

18  for the case.  But if there are personal emails that recur

19  numerous times from folks who were involved in BSG business,

20  and there's a question for purposes of Comey as to well,

21  where are they doing things?  Are they in Israel?  Are they

22  in Guernsey?  Are they in Switzerland?  Are they somewhere

23  else?  Where are they actually doing things?  And there's

24  just where their personal residence is, and we have to put

25  together sort of a mosaic picture of things, then it would

1    be relevant.

2            And so, I think as a matter of discovery because

3    you can't figure this stuff out ahead of time, it seems in a

4    domestic case to be perfectly appropriate, but I would take

5    protections so that people's individual emails are not

6    floating around everywhere in the record of the case because

7    that would be, I would think, in appropriate.  It would be

8    our own little American domestic version of protecting

9    somebody's privacy.

10           So, but I do think that as a general matter, when

11   you have emails and they're business emails, and then

12   somebody's personal information because they have a person

13   email but it deals with BSG business, we've generally viewed

14   it as fair game.

15           MR. HYMAN: Your Honor, in virtually every context

16   we're not talking about eliminating or redacting the

17   person's name.  All we're talking about is redacting an

18   email address and references to nationality.

19           THE COURT:  No, I know, but that wouldn't happen

20   in a domestic case.

21           MR. HYMAN:  We don't have GDPR to contend with in

22   a domestic case.

23           THE COURT:  Yeah, but I can make a finding that

24   it's relevant and appropriate because I would make that

25   finding in a civil case if somebody required me to make a

1    finding one way or the other.

2            MR. HYMAN:   But is it as to somebody that has

3    nothing to do with Comey whatsoever --

4            THE COURT:   But your hypothetical picks your set

5    of facts that you want.   They can pick a hypothetical that

6    picks their set of facts and say we have somebody who's

7    doing a lot of BSG business.   It turns out they use a

8    personal email, and it turns out their location is actually

9    relevant to Comey.   I don't know.   So, that's why in

10   discovery you would permit it and you would take protection.

11           So, unless there's something I'm missing, I will

12   make that finding and then I will say (indiscernible) to

13   establish United States law despite finding that it is

14   appropriate and necessary for the case to proceed as a

15   matter of discovery, that all personal emails will be

16   treated as if they're under seal so that their private

17   information is protected, and that we will have a discussion

18   when we got to the merits to talk about how to use or not

19   use any individual.

20           Because, for example, I can't imagine that every

21   single personal email in any of the documents that are going

22   to be produced is going to turn out to be relevant.   It's

23   going to be a much smaller subset, if at all, and then we'll

24   talk about that in a context that's appropriate.

25           MR. HYMAN:   Yeah.   I think, Your Honor, our

1    position was not that we'd never produce personal email

2    addresses where they might be relevant.  What we were

3    suggesting is that it should be the exception rather than

4    the rule --

5             THE COURT:  I didn't hear a proposal that would

6    allow...  I mean, then it becomes something where you get to

7    decide where you think it's appropriate or not, and I don't

8    know how to police that.  And I don't even know, in my

9    thinking about it, how you do that ahead of time.  You can

10   look at it and say, well, it seems to be kind of an

11   important person so it's in the yes pile.  Well, this person

12   seems to be less important so it's in the no pile.  And then

13   that might be in the initial phases of review.  By the time

14   you do your later phases of the review, the person who's in

15   the yes pile turns out to be not so yes, and the person in

16   the no pile turns out to be not such a strong no.  So --

17            MR. HYMAN:  But that person will be identified in

18   the document.  Again, we're just talking about the personal

19   email addresses.

20            THE COURT:  I know but then we're talking about

21   huge amounts of money to re-review everything for reasons

22   that -- again, we wouldn't do in a domestic case because we

23   would find that to be not valuable and not an efficient use

24   of anybody's time.  So, again, I'm going to make that

25   finding that for purposes of the case, and that will go in

1    the order, and then I think that addresses the GDPR issue.

2    But notwithstanding the fact that I find it necessary for

3    the case and, therefore, to address the GDPR protocol, I

4    think it is nonetheless appropriate to treat those personal

5    emails as things under seal for purposes of the case, and

6    any request to use them in open court will require

7    permission and we'll have an appropriate vetting process

8    when we get closer to the merits.

9              All right, so that's my ruling about Dispute

10   Number 2.  And then I think we have Dispute Number 3.

11             MS. BALTER:  The third issue just has to do with

12   what the partly redacted information under Category 2, the

13   circumstances under which they provide redaction.  The joint

14   administrators have now agreed to provide an explanation

15   when a category two redaction is made, but they've objected

16   to specific language in Vale's protocol which says that such

17   redactions should only be made in limited and exceptional

18   circumstances.  (indiscernible) is perfectly appropriate and

19   necessary to define the circumstances under which Category 2

20   redactions can be made.  They haven't really articulated a

21   basis for their objection to that language.

22             THE COURT:  So, Category 2 is the one where

23   there's already been a finding of the information that's

24   relevant to the case and so -- but there's a then -- what we

25   think of as a more extraordinary or unusual invocation, say,

1    notwithstanding it's relevant to the case.  So it really
2    isn't covered by GDPR's protocol at this point because
3    there's been a finding that's necessary or a concession
4    that's necessary to the case -- that it is still nonetheless
5    appropriate to redact.

6              MS. BALTER:  Right.  And they're required to
7    provide an explanation under that kind of circumstance where
8    they think it's not relevant and necessary.  And we want to
9    just make very clear that that's a limited and exceptional
10   circumstance, and so that's why we've included that
11   language.

12             MR. HYMAN:  Your Honor, it's a subjective
13   characterization.  We're agreeing.  I don't know that we've
14   come across any instance where we've redacted Category 2
15   information.  What we're objecting to, though -- it's not
16   describing our reasons for doing so, it's just the
17   characterization of it being extraordinary...  I'm not
18   forgetting the language.  Limited and exceptional.

19             THE COURT:  I don't want to get hung up on an
20   adjective but at the same time I do think if it's necessary
21   for the case, I'll use what I think is legally appropriate.
22   The presumption is it's going to be produced.  So I'm not
23   going to call it extraordinary and unusual but that's the
24   presumption because that means that there is no GDPR issue
25   because there is a concession and, if necessary and you want

1    to put it in the order, I'll make a finding, that this is
2    appropriate and necessary for the case.
3            So, if that's the circumstance, then the
4    presumption is it should be produced.  And where the
5    presumption is something -- that means there is a burden on
6    the side who wants to rebut that presumption to come forward
7    with specific evidence and explanation as to why that's not
8    the case.
9            So, I won't require the adjective but I will have
10   described it in court as such and I think that that,
11   hopefully, should moot out that issue.  So, for purposes of
12   the order, I think what you could say is that if something
13   is in Category 2, which means it's understood to be
14   necessary for the case, there's a presumption it's going to
15   be produced.  And to the extent that the foreign
16   representatives, the joint administrators believe that it
17   should not be produced, they will justify their withholding
18   of the information.
19           MR. HYMAN:  I think that's what the protocol
20   already says, Your Honor.
21           THE COURT:  All right, so that's that.  So, what
22   else do we have to -- after going through our long list --
23   and I'm very happy that my list of things mirrored your
24   list.
25           MR. ROSENTHAL:  So, Your Honor, I think now we

```
 1    just have some miscellaneous things with regard to the
 2    productions, many of which are kind of red flags that came
 3    up when Mr. Peters was speaking that I wanted to address
 4    with the Court, and also some proposals in terms of going
 5    forward that we have by some of the things that were said.
 6            I think to start with, I was a little surprised,
 7    Your Honor, that Mr. Peters isn't here now.  He never said
 8    this morning after he spoke and we deferred it to this
 9    afternoon, that he wouldn't --
10            THE COURT:  I don't want to -- again, every side
11    gets to present their case how they want to present their
12    case.  And if I find it to be a problem that somebody's not
13    here, then it's a problem and I'm not going to stand on
14    ceremony, so I don't want to get bogged down in that.
15            MR. ROSENTHAL:  That's fine, Your Honor.  This is
16    my segue into saying what I did say this morning briefly
17    before we got into other issues, that there are some serious
18    inconsistencies with what the Court continues to be told
19    over time, you know, both in the letters, by Mr. Peters when
20    he stood up -- not as an officer of the Court but not under
21    oath.  And maybe that's something that in the future we need
22    to rectify, and today --
23            THE COURT:  Well, I will say I understand him to
24    be counsel, is that correct?
25            MR. HYMAN:  I don't think he's a lawyer.  No, Your
```

1    Honor, he is a forensic partner at BDO in the Accounting

2    Group.

3              THE COURT:   I consider that to essentially be a

4    proffer by the joint administrators as to what the truth is.

5    And so if somebody stands up in court and represents

6    something and they do so -- to the extent it turns out not

7    to be accurate, they do so at their peril.  So, I don't know

8    that I need to go crazy on the evidentiary aspect of it.

9    When we're talking about discovery, if we did that for

10   discovery we'd all be out on the ledge very, very quickly.

11             MR. ROSENTHAL:   That's totally fine.  I just

12   wanted to point out, Your Honor, that there are some things

13   and I do want to mention them now.

14             THE COURT:   Right, yeah, so let's get to the meat

15   of that.

16             MR. ROSENTHAL:   So, what Mr. Peters said is, he

17   said that there's a team of 15 people with (indiscernible)

18   for GDPR and then it goes to Duane Morris after that for

19   privilege.  And Your Honor may recall that at our last

20   hearing, before I had a chance to raise some concern, the

21   Court sua sponte expressed concern that documents were

22   having a GDPR cut or redaction before counsel was looking at

23   them.

24             And Your Honor said on Page 14 -- you said, "Let

25   me back up for a second.  So, does that mean for the

1  categories of documents that Duane Morris does not have yet,

2  that they are going to eventually obtain possession of those

3  in un-redacted form?  I mean, then there's no falter between

4  what exists and what Duane Morris will eventually have

5  access to." And Mr. Hyman said, "That's absolutely correct,

6  Your Honor."

7          But now we're being told that the GDPR review is

8  coming before the Duane Morris review, so it seems exactly

9  what the Court was concerned about we were concerned about

10 last time, and that we were all assured was not happening.

11         The second and related thing --

12         THE COURT:  Well, let me sort of see if I can

13 drill down on that.  So, the idea is that there's counsel in

14 the case and counsel is in a position to do things like make

15 proffers and make representations to officers of the Court.

16 And my comment notwithstanding about not standing on

17 ceremony as to evidence in discovery disputes, we did talk

18 about what Duane Morris is going to see as counsel and what

19 that looked like and how it was going to work so that they

20 basically were in a position to make representations because

21 they really had knowledge of things from sort of the

22 beginning to the end.  So, what can you tell me about that?

23         MR. HITCHING:  Your Honor, Jarret Hitching.  Just

24 to address the first point.  Documents that are coming to

25 Duane Morris for purposes are -- we can see what is flagged

1    for redaction.  So, the text -- the redaction text is

2    shaded, we can see the underlying information that is being

3    masked.

4              THE COURT:  So, you know what's been flagged but

5    you can see what's been flagged?

6              MR. HITCHING:  Correct.  Correct.  And, in fact,

7    we have the ability to take that designation away if we deem

8    it inappropriate.

9              MR. ROSENTHAL:  So, that's obviously reassuring,

10   but then the other thing is, Your Honor -- and I saw it

11   again last time we tried to drill down and get a sense of

12   the sequencing -- it seems to me like if it's already being

13   redacted from GDPR with the shading and not the full blacked

14   out redaction and then they're looking at it for whatever

15   purposes, that -- who's doing the review?  Because it's

16   inconceivable --

17             THE COURT:  You don't get to tell him how to do

18   things.  I want to make sure that counsel in the case has

19   enough information, they can make their appropriate

20   representations and that there's not any sort of wall that

21   means that they're sort of all buying sort of

22   representations and nobody's sort of checked them.

23             But I am not going to micromanage how they do

24   this.  It's not a good place for a court to be.  It's not,

25   frankly, something that... What I care about is the

1   results.  And so I think as to the substantive issues we've
2   talked about, you've raised a number of issues, I've agreed
3   with, frankly, most of it, and so that's what I'm going to
4   worry about.  I'm going to worry generally about that I have
5   counsel on the case who can speak authoritatively.  I'm
6   satisfied with the statement that's been made.  If there's a
7   specific cause or reason in the future to revisit that,
8   we'll take a look at it.  But I have no desire to start
9   finding out in what sequence they're doing things.  That's
10  not -- it's just not a productive conversation.  We have
11  enough things to get through.

12          MR. ROSENTHAL:  My apologies, Your Honor.  I think
13  I was unclear in the way I spoke then.  Because my
14  understanding from what was being said is that therefore
15  counsel is only being given the documents that BDO has
16  already decided are relevant to be shown to counsel.  That's
17  where my concern lies, because --

18          THE COURT:  My understanding is that -- is,
19  listen, people hire out folks to review documents and
20  there's also AI that goes on these days as opposed to
21  associates or contract attorneys sitting in large warehouse
22  for months on end.  And so that is what it is.  And, again,
23  when you are -- the way that discovery responses are
24  supposed to be done -- there's a certification and the
25  person who certifies is the person who steps up to the plate

1    as to the process.  And so I assume that the discovery

2    responses here will be no different.  Somebody will have to

3    certify what those responses are.  If it's a BDO person or

4    it's a BSG, whoever the person is, and then there are fair

5    questions in discovery, in depositions, if you want to go

6    that route, need to go that route about the process.

7              But, again, I don't think now is the time to --

8    you can talk offline but I don't think now is the time in

9    court to have sort of an open inquiry about well, how are

10   you complying with your discovery obligations?  It sort of

11   echoes some of whatever I said before, which is, you know,

12   there are things that are the backdrop there and the very

13   air we breathe and the world we live in about how -- what

14   people's obligations are.  And so that is what it is, and if

15   people don't behave accordingly then things go badly.

16   Eventually.  Maybe not now, but that's how it goes.

17             MR. ROSENTHAL:  Well put, Your Honor.  And I just

18   think that it just caught us by surprise in light of

19   representations made last time, but we'll move on.

20             THE COURT:  All right.

21             MR. ROSENTHAL:  The other thing that concerned us

22   with regards to what Mr. Peters said when we were first told

23   there would be 37,000 documents reviewed and then produced

24   by a week ago, and now they have 425 ready now, in a week

25   another 516.  And then he said that as they're reviewing the

1    next 28,000 they'll start uploading the next batch of it,
2    was what he said.

3              And, again, it just concerns us that this is being
4    drawn out.  We're going to have production going on to next
5    year.  Because last time, on Page 71, we were specifically
6    told it's all uploaded and the review's underway, and just,
7    you know --

8              THE COURT:  Well, I have the language of the
9    letter on August 27th saying it will then be reviewed and
10   gathered.  Here's my concern.  My concern was profound when
11   I read that things were going to be produced next week and
12   then things weren't produced.  Because the purest -- the
13   surest way to make progress in a discovery dispute is to
14   start producing things so we can actually have substantive
15   discussions.  It's like the surest way to deal with a
16   secured creditor is to start paying them.  They don't want
17   to talk to you until you start paying them.

18             And so my thought is -- I'm not naïve enough to
19   think this is the last discovery conference we're going to
20   have, but that I want to see production and that should also
21   go in the order which is that what was said about what was
22   going to be produced is actually in the order.  Because,
23   frankly, there were things that were said last time and it
24   didn't happen, and we need to have these things in an order
25   because I don't want to -- it can't be a moving target.

1        And so my goal is to get documents produced,

2   reviewed and produced so that we can get to the end.   So,

3   there has still been a very, very modest production.   We're

4   talking about 211 new documents.  So, and then other

5   conversations you're talking about 1.2 million, 28,000,

6   37,000, all sorts of very -- much larger numbers that,

7   frankly, are hard to even fathom given that we have 211

8   documents thus far.  So, substantial production needs to

9   happen soon, it needs to happen now.  Nothing seems to be

10  done on a rolling basis, which is what was represented was

11  going to happen.  I have representations from BDO today that

12  they were start producing things daily.  You know, the

13  representations are there so that courts don't have to be

14  make rulings, but then if the representations are made and

15  they aren't followed through on, then courts need to make

16  rulings.

17        So, rolling production is so ordered.  It is

18  required and must occur.  And it will occur on the schedule

19  that was represented in open court by BDO, who's working for

20  the joint administrators, and that's what the order will

21  reflect.

22        And so I understand you're understandably nervous

23  about this and I don't know how to square what's gone on in

24  this case with the notion of a Chapter 15 proceeding

25  expeditiously, but Chapter 15 cases I'm discovering are much

1    like Chapter 11 cases.  They all have their own

2    personalities and we deal with what we -- what the case

3    presents.

4         And so the elephant in the room that has not yet

5    been mentioned today is what happens with the District Court

6    and the request to -- that's been made that hasn't been

7    ruled on, presumably, and the agreement to stay that through

8    August -- through October 31st?  And the answer is I don't

9    know.  And everybody preserves all their rights as to make

10   any arguments based on everything that's gone on.  And so

11   the only thing I assume is that if the October 31st date

12   comes and goes, that you all will figure out how you want to

13   handle it so we can have some sort of -- we know what the

14   process looks like.  Are people running here?  Are they

15   running to District Court?  How are we doing it?  And to

16   work that all out.  That's so -- that -- we need to talk

17   about that.  Maybe now is as good a time as any, or maybe we

18   need to get together towards the end of the month.

19        MR. ROSENTHAL:  Well, I mean, on that issue Vale's

20   position is clear, given all that's transpired or the lack

21   of transpiring.  We don't consent and we think that there's

22   not anywhere near a basis for the Court to enter any kind of

23   injunctive relief.

24        But on the subject of the productions, we actually

25   have a proposal, Your Honor, that hopefully removes as much

Case 1:19-cv-03619-VSB Document 33-4 Filed 10/18/19 Page 36 of 56

Page 92

1    of this as possible from the Court.

2              THE COURT:  Well, before we segue from the

3    injunction issue --

4              MR. ROSENTHAL:  Yeah.

5              THE COURT:  -- their -- right, so everything that

6    is sent to this Court is sent to us from the District Court

7    on an order of reference.  So, here you have a live District

8    Court proceeding, a live proceeding in the Bankruptcy Court,

9    which begs the question where should the issue of injunctive

10   relief be addressed if it needs to be addressed?  And so we

11   need to work our way through that.  So, my desire is to

12   certainly -- if the District Court -- the District Court

13   will no doubt be familiar with the dispute based on the fact

14   that it has things presented to it.  It doesn't have the

15   discovery issues that we've been dealing with here, but

16   there's plenty of record of that.

17             If it's choosing to not recognize things, well,

18   then we're in one world.  If it chooses to recognize the

19   judgment, it would seem, since that would -- that the

20   District Court should decide the first instance, whether it

21   wants to refer that -- any injunctive request down here or

22   certainly address it itself.

23             And so my thought is that when you -- that that

24   probably is something to tee up with the District Court when

25   you hear from the District Court as to how to address that.

1   That would be my -- that's sort of my -- been my assumption,

2   but I realize the only person I had expressed that to is

3   myself internally, not out loud, and that I should share

4   that with you.   I think I've sort of hinted at that in the

5   past, just because that's kind of the way it sort of makes

6   sense in terms of -- we're a court that really gets our

7   jurisdiction from the District Court, and if the District

8   Court has a live case.

9           And I think Judge Glenn has done a similar thing.

10  He said you should go to the District Court.   I think it was

11  another Chapter 15 where there -- and I don't remember the

12  name of the case, where there was a question about

13  injunctive relief pending something that the District Court

14  was doing.   And he said, well, the District Court would know

15  I have the case.   They are well-versed, so we don't have

16  some of the -- necessarily all of the time saving economies

17  where a District Court is sort of -- you're trying to

18  withdraw the reference and they say, listen, you've been

19  dealing with this forever.   I just met you people and it

20  makes sense to stay in Bankruptcy Court.   But even then, the

21  District Court gets to decide when there's a motion to

22  withdraw the reference.

23          So, my -- again, this is my default, which is

24  almost treated like a motion to withdraw the reference.   You

25  mentioned that the District Court -- if the District Court

1    thinks it would be helpful for the Bankruptcy Court to do

2    it, I'm happy to do it.  But at the same time the District

3    Court will have its own independent basis of knowledge, and

4    then there'll be other things you would talk about.  But,

5    frankly, it may work the other way, too -- is if I dealt

6    with it, you may be telling me something about what the

7    district Court's decision and various things.

8              So, that's my default.  If somebody wants to make

9    a run at it, you can let me know but --

10             MR. HYMAN:  Your Honor, the status in the District

11   Court action has not changed.  There has never been a

12   hearing before Judge Broderick.  He has --

13             THE COURT:  But I don't know that he's required to

14   have a hearing.

15             MR. HYMAN:  And he may not be, but I'm not sure

16   that there's a real venue to seek injunctive relief there.

17   I suppose -- I suppose we could but --

18             THE COURT:  Well, but there's no venue to seek it

19   here because there's nothing right now for you to...  I

20   mean, this is all going to come up when the District Court

21   issues a decision if the decision is to recognize a judgment

22   which allows them to move forward.  At that point, you'd

23   have to run somewhere.  You'd have to run here or you'd have

24   to run there.

25             And so what I want to avoid is the unnecessary

1    process related fire drill where -- well, we're going to run
2    to both courts and we'll see what happens, or we're going to
3    make a guess and we don't really know what Judge Lane may
4    think or what Judge Broderick may think.  And so I'm trying
5    to avoid that kind of inefficiency by telling you what my
6    default is and to say that if you get a decision from Judge
7    Broderick that would trigger a need to file such a motion,
8    that I would think that you would -- whatever his procedures
9    are -- find a way to tee that up and ask him and say, we'd
10   like to seek.  Right?  Because you can do that in a civil
11   case.  We want to seek a stay.

12          And so it's not something the District Court is
13   unfamiliar with.  And just say, we -- just to fill out the
14   picture, we've been doing these things in Bankruptcy Court,
15   and the bankruptcy judge said he'd certainly be happy to
16   help but certainly recognized that in the first instance the
17   District Court should get to decide if it wants to address
18   the injunctive piece itself.

19          And there's certainly -- there's a civil
20   injunction piece to any judgment.  There's also a -- you
21   know, there's an injunctive piece to Chapter 15.  There's a
22   couple ways to do this.  So, but again, all my jurisdiction
23   flows from up the street.  And so respectful of that fact,
24   and trying to -- I want to raise it now because I don't want
25   to impose on the parties or Judge Broderick in -- if we

1    don't talk about it and then we all find ourselves in a

2    moment of panic running around figuring out what are we

3    doing and where are we doing it? That doesn't serve

4    anybody's interests.

5              MR. HYMAN: Yeah. I think the only concern that

6    we have, Your Honor, is just given the lack of attention

7    that we've gotten from Judge Broderick, I don't know that

8    we're going to get a response. We can certainly try and --

9              THE COURT: Well, I don't know that they -- for

10   them to respond to at this point. The matter's briefed and

11   he's going to get to it, and he may be in the middle of a

12   large criminal trial, he could be doing any number of

13   things. And so I'm unaware of any pending request, and I'm

14   sure he'll deal with it completely appropriately. And so,

15   you know, you may want to write all your letters and have

16   them ready to go for whenever -- if that eventuality comes

17   up.

18             You also -- again, I won't tell you how to

19   practice, you know what you're doing. But, you know, I can

20   imagine a circumstance where if he permits letters to

21   chambers to say, Judge, we want to make you aware of -- and

22   give you a refresh on where we were. We've already told you

23   we had an original deadline of an agreement. We updated

24   that and we told you about that too. And now we're telling

25   you that we don't have an agreement as of October 31st. If

1    this happens, then the Debtor is going to seek a stay, Vale

2    will seek to oppose it.  There's a question about what

3    appropriate forums that should all be heard.  This is what

4    we can tell you about that.  And you want to do that to be a

5    snowplow and clear the way for the eventual discussion on

6    the merits.

7              And, again, I'm happy to be -- to address things

8    as is appropriate.  But, again, I'm very respectful of where

9    my jurisdiction comes from and the fact that he has a case

10   between these two parties on the merits and has the ability

11   to grant a stay or not grant a stay based on his considered

12   judgment and looking at issues.  So, that's why.  And so

13   I'll let you address that as you think appropriate.

14             MS. SCHWEITZER:  Your Honor, I appreciate you

15   raising it ahead of time and we particularly would want to

16   avoid a TRO type situation given we all know (indiscernible)

17   looming.  I think the one thing just to put out there, and I

18   completely respect your view of looking toward the District

19   Court, is that there is a lot of history here.  And the

20   original stay that we sought was a TRO pending

21   (indiscernible) commission hearing, things like balance of

22   the equities and uproot merits and all of that to flow into

23   it.

24             And to go to this forum, I think the one thing

25   that I would not want to be perceived is that you were

1   neutral or had no view on those types of positions.

2            THE COURT:  No, I think you can safely represent -

3   - and there's a transcript -- that if called upon to make a

4   ruling, I would make a ruling.  I'd be happy to do so.  And

5   certainly if the District Court thinks it would be of

6   assistance for me to do so, I'd be happy to have that matter

7   added to my calendar.

8            And so -- but at the same time, my -- I wouldn't

9   say reluctance but my raising it now is to express my sort

10  of respect for sort of the different overlapping

11  jurisdictions and, again, where the Bankruptcy Court

12  jurisdiction comes from.  So, my thought is the appropriate

13  -- and I am putting something in a sense on Judge

14  Broderick's plate in the sense of then you're going to go

15  ask Judge Broderick, presumably, how he wants to handle it.

16  But I think -- that, I think, is appropriate in the sense of

17  -- given all the facts and circumstances.

18           But, no, I'm not reluctant.  I'm just trying to be

19  respectful.  And, again, I think it's in everyone's interest

20  to know what the process looks like because it seems pretty

21  clear based on things that have been said over the last

22  couple of hearings, that if something happens after October

23  31st, there's going to be a bit of a fire drill on this

24  particular issue and people want to know what forum, where

25  they should go and how to handle that.

1          So, I think I'll trust you all on your considered

2     professional judgment to tee that up as you think

3     appropriate, whether it's a letter or something else, or

4     your request for a status conference. And, again, that goes

5     to Judge Broderick's ways of doing business and I'm not

6     familiar with his local rules and his procedures for his

7     chambers.

8          MR. ROSENTHAL:  Ultimately, Your Honor, it's the

9     joint administrators' decision on whether to file any kind

10    of motion and how they would want to proceed. You know, we

11    would just file an opposition and go from there to wherever

12    it is, because, frankly, there's been a history.

13          THE COURT:  No, no, but what I'm trying to do is

14    I'm trying to give you the speech that I would give you if

15    somebody filed that motion here, and then I got you all on

16    the phone and I said, well, here's my issue. And so this is

17    my -- I have very few powers of prophecy, but this is my

18    prediction as to what exactly that speech would look like.

19    And so then you would not only -- they would have that

20    motion, but then you would all be running to the District

21    Court to say the Bankruptcy Court says, what would you like

22    to do? And so I'm trying to cut that off and essentially

23    tell you where I'm going to be, because I can predict that

24    with almost -- almost certainly at this point, just given

25    the circumstances.

1           MR. ROSENTHAL:  I mean, ultimately, Your Honor, if

2    they wind up filing somewhere, that would probably put them

3    on a clock that they haven't put themselves on so far.

4           THE COURT:  Well, again, we'll get to it.  I'm

5    just -- you all do what you think is appropriate but I don't

6    want anyone to be surprised if a motion gets filed here and

7    nobody's talked to the District Court, you pretty much know

8    exactly what I'm going to say.  And so that was my reason

9    for raising it.  All right, so --

10          MR. ROSENTHAL:  I have a proposal now, Your Honor.

11          THE COURT:  Sure.

12          MR. ROSENTHAL:  Because I do think that it is

13   probably not the most exciting part of the Court's calendar

14   to have monthly check-ins whereby things happen.

15          THE COURT:  We do whatever walks in the door.  But

16   listen, I recognize it's also not, frankly, what you want to

17   be spending your time on either.

18          MR. ROSENTHAL:  And it also shouldn't be where we

19   get those through documents briefed out to us the week after

20   the hearing and we get maybe a (indiscernible) for the three

21   weeks subsequent, and we kind of are wondering when's the

22   rest coming?

23          So, what I would propose and I think this is

24   pretty low-hanging fruit, Your Honor, is if the joint

25   administrators at the end of every week give us a weekly

1    report on where things are in discovery. What's been done

2    so far, what's in progress, what hasn't been started, and

3    what their estimate is on the completion date of discovery.

4            So, that way we are not kept in the dark. We

5    don't have to wait and write a letter to the Court and say

6    we've heard nothing over the past month. So, that's kind of

7    low-hanging fruit number one that I would suggest, just to

8    keep the trains moving and communications open.

9            THE COURT:  All right. Any thoughts?

10           MR. ROSENTHAL:  I can read those again if you want

11   that list of four.

12           MR. HYMAN:  Your Honor, I think that you were

13   clear in what you were ordering when you were ordering

14   rolling production.

15           THE COURT:  I know but things haven't happened

16   that way.

17           MR. HYMAN:  And I understand that.

18           THE COURT:  So --

19           MR. HYMAN:  And we will now have an order --

20           THE COURT:  Well, I know, but I thought we had an

21   order before. So, it was from the bench but it was still an

22   order and it didn't seem to get the trick done.

23           In a former life, I was involved in a Freedom of

24   Information Act case that was enormous. And while the judge

25   was incredibly patient in the case, he also didn't want to

1   have dealings every day with the parties.  And so status

2   reports were a useful thing to do, so that hearings didn't

3   trigger the exchange of information that should've otherwise

4   been occurring.

5            So, I'm inclined to think that a short letter that

6   refreshes what we've been talking about -- we essentially

7   have three categories that are in the August 27th letter.

8   You sort of gave a refresh today as to that.  And Category

9   1, presumably, is done and then we're on to Categories 2 and

10  3.  I've seen different -- I've heard different numbers, but

11  I would think that that makes sense and is not a big...

12  Frankly, it'll save as much attorney time as it'll cost in

13  terms of requests for updates.

14           I mean, I've gotten plenty of letters in this

15  case.  And so my thought is that this is a letter that

16  actually may save the need to write future letters.  So, I'm

17  inclined to do that.  But I realize this is the first of

18  several proposals.  So, maybe -- hear them all so we can

19  figure out where we are.

20           MR. ROSENTHAL:  So, Proposal Number 1 was the

21  weekly status reports that, hopefully, just opens a line of

22  communications.  The second thing was, because I don't want

23  to have a dispute down the road that leads to, you know,

24  requiring court intervention and be assured of well, we're

25  far along on this process -- is there should be an exchange

1    with us, as happens in a lot of cases, of what are the

2    search terms that they're using, given that Mr. Peters

3    mentioned that they're using search terms and they're trying

4    to figure out how to tweak the search terms to get the right

5    number of documents to review.

6              I just think within a week, let's get a list of

7    those search terms so that we can have a dialogue if there

8    are any concerns or things that we'd like to propose before

9    we wind up in a dispute in two months when we first find out

10   them.  So, I think that, again, is just relatively low-

11   hanging fruit that's not uncommonly done.

12             THE COURT:  So, that's two.  What's three?

13             MR. ROSENTHAL:  And then the third thing is, and I

14   recognize this won't be a weekly thing given that now

15   they're going to have go back and gather the documents from

16   the other custodians that they had not started to gather

17   from.  But I think let's say three weeks from today, I think

18   that weekly update should have a status support on where

19   they are with gathering the documents from these other

20   custodians so we don't, in two months, have to go to the

21   Court and find out that they're nowhere yet, especially if

22   we might be hit with a TRL in a month.  So, again, just

23   trying to anticipate things.

24             I think these are all pretty low-grade, low-impact

25   requests that just, hopefully, avoids disputes that have to

1  come to the Court while waiting for a Court dispute to find
2  out information.

3        THE COURT:  All right.  And did you have three or
4  four?  I thought I heard four.  I'm not soliciting a fourth
5  if you don't have a fourth currently.

6        MR. ROSENTHAL:  Well, those are the only three.
7  The only fourth suggestion that I have is in the event that,
8  you know, next time we're met with new factual claims that
9  somehow affect what the discovery obligations should be.
10  They put in affidavits this time from Mr. Callewart.  And I
11  think next time --

12        THE COURT:  I'm not going to micromanage future
13  disputes.  So, it's hard enough to manage present disputes.
14  So, we'll see how it goes.

15        But as to the first three, those sound reasonable.
16  After all, people in discovery, if you have -- after you get
17  your document discoveries, you wait to take your deposition
18  and introduce your civil case, and then you depose the
19  person who signed the discovery responses and you say, when
20  you looked, how did you look?  Where did you look?  What
21  search terms did you look?  So, that seems to be fair game
22  for purposes of civil discovery.

23        And the other one seems to me just -- we're going
24  to end up having that conversation at some point.  And as
25  part of the ongoing meet and confer obligation under the

1    Federal Rules of Civil Procedure that really come into play

2    for any contested matter, which this pretty clear is -- that

3    seems to be consistent with that. But let me hear anything

4    from the --

5             MR. HYMAN: I don't think we have any objection,

6    Your Honor. You know, we will provide weekly updates. I

7    don't know whether a less formal email is acceptable rather

8    than a formal letter but --

9             THE COURT: Yeah, I think it's exchange of

10   information.

11            MR. HYMAN: We're happy to provide an update. We

12   will -- in those weekly updates, we'll provide updates on

13   what the joint administrators have done to request and seek

14   and produce documents from all the other parties that we

15   spoke to today. As it relates to search terms, we've got to

16   speak to the client but I don't anticipate a problem. I

17   don't know that we can get that done by tomorrow. Mr.

18   Rosenthal mentioned the end of the week...

19            THE COURT: It's designed to prevent a possible

20   redo down the road, which is a disaster for everyone.

21            MR. HYMAN: That's not something we've ever tried

22   -- we're not trying to hide that from anybody. That isn't

23   an issue.

24            One clarification, though, I might ask Your Honor.

25   You made the ruling earlier related to personal email

1    addresses and nationality.  There have been a lot of

2    discovery that had been undertaken and redactions that had

3    been undertaken as -- through today, which were on reliance

4    of the last set of documents that they had agreed to do.

5              THE COURT:  Yeah, but you decided to produce it

6    while they had their argument pending, and that's what

7    people did to move past it.  I'll let you try to work the

8    practicalities of that out and you'll come to me if you

9    can't figure it out.  But that's a practical problem that

10   involves, you know, numbers, how many documents, how many

11   redactions, can you give them what they need in a narrative

12   description as opposed to going back and re-redacting?

13   There's lots of ways to skin that cat, so I'm going to let

14   you have that conversation in the first instance.

15             I'm not going to -- I'm not going to sit here

16   today and say you need to go back and re-redact.  That's the

17   traditional method of doing it.  But I'm going to require

18   you to meet and confer and propose suggestions on how for

19   anything you've produced that implicates that ruling, how

20   you're going to sort of true up the knowledge involved so

21   that they have what I think is -- what's appropriate and

22   consistent with the ruling.

23             So, re-redaction is one way to do that.  It may or

24   may not be the exclusive way to do that, depending on how

25   things work and what the documents are.  So, I'll ask you to

1    meet and confer on that, and everybody reserves their rights

2    if, in fact, the true up process is not something that

3    people can agree upon.

4              MR. ROSENTHAL:  Your Honor, two more hopefully

5    very quick issues.  One is, in this first batch of 211

6    documents that we got, there are a number of redactions not

7    for GDPR but just simply redacted commercially sensitive and

8    confidential information.

9              THE COURT:  It's subject to the usual -- I mean,

10   you know -- I don't know what to tell you.  I don't have any

11   briefing on it.  You should meet and confer and, again, I

12   don't -- I don't know what to tell you.  There obviously

13   needs to be a basis for it.  If it's the business dealings

14   of BSG, I don't know how it's not relevant, even if it needs

15   to be subject to a protective order because it's

16   confidential.

17             MR. ROSENTHAL:  So, Your Honor, we resolved this I

18   thought months ago when they were able to designate

19   sensitive documents as AEO.  And if there's not a privilege

20   and there's not a GDPR issue, I don't know why anything is

21   being -- it's just the confidentiality order doesn't

22   contemplate it at all.

23             MR. HYMAN:  Your Honor, we're happy to meet and

24   confer with Cleary with respect to anything that's been

25   redacted for those types of purposes.

1        THE COURT:  I know, but this is -- the idea is

2    that -- what are the rules of the road, right?  So, if the

3    rules of the road are flawed, then you're going to have to

4    meet and confer about everything and then we're going to

5    have 8 million more of these hearings.  That's actually not

6    the way the rules of the road are supposed to work.

7        So, if the rules of the road is that there's no

8    appropriate basis to redact it, then there's no appropriate

9    basis to redact it.  So, that sounds like it's subject to

10   potentially the bankruptcy rule that allows for sealing of

11   confidential business information.  But you file motions to

12   address that and then we have discussions.

13       I'm not aware of any privilege, and I think we've

14   already talked about an attorneys' eyes only procedure.  So,

15   I don't know why that wouldn't be used for that.  That just

16   seems to be a stubborn refusal to conform conduct to what

17   we've already been talking about.

18       MR. HYMAN:  We will go back and we'll take a look

19   at those documents and we'll meet and confer.

20       THE COURT:  All right.  Well, you're going to go

21   back and you're going to produce them attorneys' eyes only

22   with that information un-redacted.

23       MR. ROSENTHAL:  So, the last issue, Your Honor, is

24   just to give the Court a heads up on something that I fully

25   expect that we will have a productive conversation with

1    counsel for from the joint administrators.  But I think last
2    week, we got served with document requests and contention
3    interrogatories asking for our evidentiary basis essentially
4    for what we intend to present to the Court probably many
5    months from now in our ultimate opposition, and for
6    contention of interrogatories that are incredibly premature
7    and ultimately will be revealed in our objection that we
8    file.  I've got to talk to him about timing but --
9            THE COURT:  I'm not -- A, you're going to meet and
10   confer.  I don't have any -- listen, I prepare for hearings
11   just the way everybody else prepares for hearings.  I have
12   numerous pages of notes and notes on notes.  I'm not going
13   to go on the fly.  So, we're going to have to deal with it.
14   You should talk to each other.  But this is what happens
15   with discovery, is -- is if there are real problems in
16   discovery, and there have been real problems with discovery
17   here, people are -- there's not the level of cooperation and
18   ability to work effectively past these issues.
19           So, again, I'm not telling you what you have to
20   do.  I'm saying you need to meet and confer.  But --
21           MR. ROSENTHAL:  Absolutely.  We plan to.  I just
22   wanted to give the Court a heads up in case we have to file
23   a Protective Order Motion next week.
24           THE COURT:  I know.  It's just that since we've
25   gone through a lot of things, there's only so much we can

1   really do without a more developed record.

2          MR. ROSENTHAL:  I'm not expecting any guidance or

3   any decisions.  I'm just -- I don't want the Court to be

4   surprised if we file a Protective Order Motion.  But,

5   hopefully, they recognize that contention interrogatories

6   are premature and we agree to a date in the future.

7          THE COURT:  I thought there's some authority about

8   when in the process that should happen, but I don't have

9   sort of the sort of Black's Law Dictionary kind of rule

10  handy rattling around in my brain.  But I mean, the practice

11  is generally to have those things come later after

12  discovery.  But, again, you all will fill me in as I need to

13  be.

14          So, I want to make sure I understand what's coming

15  out of today's proceedings.  So, there's going to be an

16  order that's going to be a discovery order, and it's going

17  to go through the rulings that were made on each of the -- I

18  think it was four but perhaps it was five issues that were

19  addressed starting with Mister... Starting with production

20  of documents going to Mr. Steinmetz, going to other former

21  and current directors and officers, as well as other

22  companies that were identified, going to the GDP protocol,

23  and also going to the issue -- I guess it's with Mr.

24  Steinmetz, but maybe it's with others, about control --

25  possession, custody, and control and how that's interpreted.

1          So, those are my rulings.  So, I will get that

2     order, proposed order that should be served on the other

3     side.  If there's any comments, they need to be provided

4     promptly.  Obviously, you should share it, try to reach an

5     agreement.  I'm not hopeful that there will be an agreement

6     but it's my ruling so I will -- I'm happy to take comments,

7     but as it's ultimately my ruling, I will just -- I have the

8     pen.  So, that's -- so, while you may make comments, you may

9     not necessarily hear from me as to have any further

10    discussion because a ruling is a ruling.

11         As to that order and rationale, I don't think the

12    rationale needs to really be in there.  I think you can say

13    for the reasons set forth in detail on the record of today.

14    That way it prevents you from having to characterize things.

15    But in terms of the practicalities, that's really what the

16    order should be addressed.  The Court rules this and this is

17    what is required to be done.

18         MR. ROSENTHAL:  Your Honor, in terms of timing,

19    we'd like to wait for the transcript to (indiscernible) that

20    way we can be sure that it conforms.

21         THE COURT:  Yeah, that's fine.  That's fine.  I'm

22    going to so order it from the bench so that we have a go-by

23    going forward.  But that's fine.

24         The thing that's sort of a bit of a hanging chad

25    is the issue about attorneys' eyes only.  Right?  And so the

1  order is going to address that in some context, which is

2  things that need to be produced, but notwithstanding the

3  fact that they're necessary for the case, there are privacy

4  protections which we will accord to individuals and we will

5  treat them as attorneys' eyes only. And I think that came

6  up in the context of personal emails.

7      You may want to fold in the confidential business

8  information as well into that, that an issue was also

9  raised, I made a ruling. It sort of didn't come up in the

10 context of what was briefed but it came up. So, maybe that

11 also goes into the order as to confidential business

12 information that it's shared attorneys' eyes only and/or

13 under seal. I'll let you work out the details of that. And

14 that it can't be used publically without further order of

15 the Court.

16     And I'm trying to figure out if there's anything

17 else where the attorneys' eyes only protocol could be of use

18 or that should be contained in the order.

19          MS. SCHWEITZER: There are only ministerial things

20 that we'll obviously attach to the GDPR protocol itself so

21 that you can so order and approve the protocol as part of

22 that.

23          THE COURT: All right. Yeah, anything obviously

24 that you agree to I'm 1,000 percent behind. So, that's

25 fine. And so just to make it very clear on the record, it's