| | Duane Morris® | |
|---|---|---|
| NEW YORK | | SHANGHAI |
| LONDON | | ATLANTA |
| SINGAPORE | | BALTIMORE |
| PHILADELPHIA | *FIRM and AFFILIATE OFFICES* | WILMINGTON |
| CHICAGO | | MIAMI |
| WASHINGTON, DC | | BOCA RATON |
| SAN FRANCISCO | FREDERICK D. (RICK) HYMAN | PITTSBURGH |
| SILICON VALLEY | DIRECT DIAL: +1 212 692 1063 | NEWARK |
| SAN DIEGO | PERSONAL FAX: +1 212 208 4521 | LAS VEGAS |
| LOS ANGELES | *E-MAIL:* RHyman@duanemorris.com | CHERRY HILL |
| TAIWAN | | LAKE TAHOE |
| BOSTON | *www.duanemorris.com* | MYANMAR |
| HOUSTON | | OMAN |
| AUSTIN | | *A GCC REPRESENTATIVE OFFICE* |
| HANOI | | *OF DUANE MORRIS* |
| HO CHI MINH CITY | | |
| | | ALLIANCES IN MEXICO |
| | | AND SRI LANKA |

February 17, 2020

*VIA ELECTRONIC MAIL AND CM/ECF*

The Honorable Vernon S. Broderick
United States District Court for the
Southern District of New York
40 Foley Square
New York, NY 10007
BroderickNYSDChambers@nysb.uscourts.gov

   Re:  *Vale S.A. v. BSG Resources Limited*, No. 19-cv-3619

Dear Judge Broderick:

  We collectively write on behalf of William Callewaert and Malcolm Cohen (together, the "Joint Administrators"), in their capacity as court-appointed joint administrators for BSG Resources Limited (in administration) ("BSGR"), and Vale S.A. ("Vale"), in response to the questions raised in the Court's order dated January 23, 2020 (the "Order"). By the Order, the United States District Court for the Southern District of New York (the "District Court") requested that the parties set forth their joint or separate positions concerning the following topics in respect of a request to be made by the Joint Administrators for certain injunctive relief (the "Application"):

DUANE MORRIS LLP

1540 BROADWAY  NEW YORK, NY 10036-4086    PHONE: +1 212 692 1000  FAX: +1 212 692 1020



The Honorable Vernon S. Broderick
February 17, 2020
Page 2

1. **What is the procedural posture of Defendant's Chapter 15 bankruptcy? What is the procedural posture of the Guernsey Administration?**

   A. <u>The Guernsey Administration</u>. On March 6, 2018, the Joint Administrators were appointed as administrators of BSGR in a proceeding (the "<u>Guernsey Administration</u>") under Part XXI of the Companies (Guernsey) Law, 2008 (the "<u>Guernsey Companies Law</u>"), by the Royal Court of Guernsey (Ordinary Division) (the "<u>Guernsey Court</u>"). The Guernsey Administration is ongoing and will continue until the Guernsey Court orders that the administration order should be discharged.

   The Joint Administrators are required to provide biannual updates on the status of the Guernsey Administration to creditors, which they have done on September 6, 2018, March 7, 2019, and September 6, 2019. The next report is due to be provided on March 6, 2020.

   B. <u>The Chapter 15 Case</u>. On June 3, 2019, the Joint Administrators filed a verified petition (the "<u>Chapter 15 Petition</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") seeking recognition of the Guernsey Administration as a "foreign main proceeding" under chapter 15 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The proceeding before the Bankruptcy Court is styled *In re BSG Resources Limited (in administration)*, Case No. 19-11845 (SHL) (Bankr. S.D.N.Y. Jun. 3, 2019) (the "<u>Chapter 15 Case</u>"). Vale filed its initial objection to the Joint Administrators' Chapter 15 Petition on July 10, 2019.

   The Chapter 15 Case is currently in the discovery stage. On June 6, 2019, Vale submitted informal document requests to the Joint Administrators, and on June 14, 2019, Vale submitted formal document requests, interrogatories, and noticed depositions for certain key witnesses. Discovery remains ongoing, and the dates for depositions have not yet been set.[1] The next status conference before the Honorable Sean H. Lane is currently scheduled for February 20, 2020. A hearing to consider recognition of the Guernsey Administration pursuant to chapter 15 of the Bankruptcy Code (the "<u>Recognition Hearing</u>") has not yet been scheduled. The Joint Administrators anticipate that the Recognition Hearing can be held no later than the end of June 2020. Vale contends that the Recognition Hearing cannot occur until the outstanding written discovery tasks have been completed and depositions have been held.[2]

---

[1] Vale's formal document requests seek documents concerning sixty-eight (68) topics. To date, the Joint Administrators have produced over 18,000 documents in response to these requests. The Joint Administrators believe their obligation to produce documents is substantially complete. Vale disagrees. On November 12, 2019, the Bankruptcy Court appointed the Honorable Allan J. Gropper (ret.) as a discovery neutral to mediate and provide recommendations concerning ongoing discovery disputes between the parties. The parties continue to work on a path to resolving the open discovery issues.

[2] For example, Vale contends that the outstanding written discovery tasks include (1) the production of (a) documents from certain additional custodians, including Beny Steinmetz; (b) documents related to the proposed settlement of BSGR's ICSID claim against the Government of Guinea; (c) foreign language documents; and (d) privilege logs, as

The Honorable Vernon S. Broderick
February 17, 2020
Page 3



2. **What effect would a judgment in this case have on the Chapter 15 bankruptcy, the Guernsey Administration, or any other proceeding?**

A. <u>Vale's Position</u>. The entry of a judgment in this case would have no effect whatsoever on the Chapter 15 bankruptcy, the Guernsey Administration, or any other proceeding. Vale anticipated that this would be an uncontroversial proposition, but as discussed below, the Joint Administrators have insisted on submitting their own lengthy section arguing the effect of *enforcement* and the merits of their forthcoming post-judgment injunction request, rather than addressing the Court's inquiry about the effect of a *judgment*.

Both the Joint Administrators and the English courts have acknowledged Vale's status as a judgment creditor in England, and therefore, the mere entry of a corresponding judgment in the United States will not prejudice BSGR in the Guernsey Administration or the Chapter 15 Case. Specifically, on May 9, 2019, the English High Court of Justice entered an order (the "<u>UK Enforcement Order</u>") recognizing the Award and granting Vale "permission under section 66(1) of the [English] Arbitration Act of 1996 to enforce the Award in the same manner as a judgment or order of the High Court to the same effect."[3] Accordingly, already being a judgment creditor in the amount of more than $2 billion (corresponding to more than 99% of BSGR's liabilities[4]), the entry of a decision by this Court recognizing and enforcing the Award in the United States will in no way alter Vale's status in either the Guernsey Administration or the Chapter 15 Case.

By its *Petition for Recognition and Enforcement of a Foreign Arbitration Award*, ECF No. 1 (the "<u>Petition</u>"), Vale seeks to reduce the Award to a U.S. judgment through the process of recognition and enforcement.[5] The Federal Arbitration Act, 9 U.S.C. § 207, provides that a "court shall confirm [an arbitral] award unless it finds one of the grounds for refusal or deferral of

---

well as (2) the resolution of disputes between the parties on certain search terms. The Joint Administrators contend that they expect the discovery tasks within their control will be completed in time to allow for a Recognition Hearing in June.

[3] *See* May 9, 2019 Order in the Matter of the Arbitration Act 1996 in an Arbitration Claim Between: Vale S.A. and BSG Resources Limited ¶ 1. The UK Enforcement Order also granted BSGR an opportunity to apply to have it set aside, but BSGR's subsequent challenge application was finally dismissed on December 6, 2019. *See* Dec. 6, 2019 Order in the Matter Between BSG Resources Limited and (1) Vale S.A.; (2) Filip De Ly; (3) David A.R. Williams; and (4) Michael Hwang (the "<u>UK Challenge Application Order</u>") ¶ 1.

[4] The Joint Administrators now call this percentage into question, but do not provide an alternative percentage and do not contest that Vale is BSGR's largest creditor. Including both secured and unsecured debts reported in the Joint Administrators' own September 6, 2019 progress report, Vale's award, even before accounting for post-award interest accruals, represents 98.9% of all of BSGR's outstanding debts.

[5] *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71-72 (2d Cir. 2017) ("'The goal of the [New York] Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)).

DuaneMorris

The Honorable Vernon S. Broderick
February 17, 2020
Page 4

recognition or enforcement of the award specified in" the New York Convention.[6] With the English challenge to the UK Enforcement Order having been denied on December 19, 2019, even the Joint Administrators admit that the only arguments raised in opposition to the Petition have been rendered moot.[7]

With respect to the Joint Administrators' Chapter 15 Petition before the Bankruptcy Court seeking to have the Guernsey Administration recognized "as a foreign main proceeding under sections 1515, 1517 and 1520 of the Bankruptcy Code" and, in the alternative, for discretionary relief pursuant to 11 U.S.C. §§ 1507 and 1521,[8] the Joint Administrators purportedly seek to prevent Vale from taking control over, and potentially settling or otherwise interfering with, BSGR's pending lawsuit against George Soros.[9] Confirmation of the Award itself by Your Honor will not impact either the Chapter 15 Petition or the Joint Administrators' efforts to enjoin Vale from taking control over the Soros litigation. This, therefore, completely answers the Court's question.

The hypothetical parade of horribles and aspersions cast on Vale's motives by the Joint Administrators below, all of which Vale vigorously disputes, actually have *nothing* to do with the entry of the judgment itself. There is no defense to entry of judgment, and the Joint Administrators do not contend that their arguments are either directed at the entry of judgment (the question asked by the Court) or are cognizable to delay or deny confirmation under the Federal Arbitration Act. Rather, despite the Court's admonition against the parties arguing the merits of any request for injunctive relief, the Joint Administrators' arguments are focused exclusively on one aspect of such request – the alleged harm they would suffer were Vale to take certain measures to *enforce* its judgment. While Vale disagrees with such claimed harm – or that the Joint Administrators allegations are sufficient to meet the standards for injunctive relief – Vale will not respond at this time given the Court's directive.[10] All that matters for present purposes is that the mere entry of a

---

[6] New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517.

[7] *Letter from the Joint Administrators to the Honorable Vernon S. Broderick* at 2, ECF No. 39.

[8] *See Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief*, In re BSG Resources Limited, No. 19-11845 (SHL) (Bankr. S.D.N.Y. June 3, 2019), ECF No. 5 ¶¶ 38-40.

[9] Vale is actively contesting the Chapter 15 Petition and the Joint Administrators' grounds for recognition and additional relief. *See Vale S.A.'s Initial Objection to the Joint Administrators' Verified Petition for Recognition of Foreign Proceedings Under Chapter 15 of the United States Bankruptcy Code*, In re BSG Resources Limited, No. 19-11845 (SHL) (Bankr. S.D.N.Y. July 10, 2019, ECF No. 29.

[10] Without engaging the Joint Administrators in its effort to plead the merits of their future request for injunctive relief (*after* judgment is entered) – which the Joint Administrators do *ad nauseam* throughout their section, including in new portions first produced to Vale at noon today after Vale advised them of this impropriety (such as their paragraph beginning with "Even discovery…") – Vale notes that the Joint Administrators do not (1) identify any irreparable harm associated with having to respond to asset discovery following entry of judgment; (2) explain how Vale could leapfrog over existing secured creditors in priority by seeking liens on the Soros Claim; or (3) articulate any legal mechanism by which Vale could wrest control over the Soros Claim given that another party already purportedly holds a security interest in the claim.



The Honorable Vernon S. Broderick
February 17, 2020
Page 5

judgment itself would have no effect on the Guernsey Administration or Chapter 15 Case and thus Vale urges the Court to enter judgment forthwith. Notwithstanding their protestations about the impact of entry of Vale's judgment, it is noteworthy that the Joint Administrators did not seek recognition of the Guernsey Administration in England to avoid entry of a judgment in Vale's favor there.

The Joint Administrators simply fail to point to any prejudice that would occur merely from entry of a judgment in this case, the question posed by the Court. Nor could they – as noted above, the UK Enforcement Order has been in place for nearly three months, but that order has had no impact at all on the Joint Administrators' ability to manage the Chapter 15 bankruptcy or the Guernsey Administration. Indeed, there is no clearer demonstration that the Joint Administrators are improperly conflating entry of judgment with enforcement of that judgment than that fact that the Joint Administrators have made clear that they will seek to stay enforcement *after* judgment is entered.[11]

### B. The Joint Administrators' Position.[12]

The Joint Administrators vigorously disagree with Vale's position. To be sure, entry of a judgment in this Case will have significant, if not fatal, effect on the Chapter 15 Case and the Guernsey Administration, and potentially other proceedings. Most directly, entry of judgement in this case will allow Vale to take additional steps which are likely to have the effect of circumventing the priority scheme established by the Guernsey Companies Law to its own benefit and the severe detriment to all of BSGR's other creditors.

The impact entry of a judgment will have in this Case is not hypothetical. Likewise, the harm that will occur to BSGR and the Guernsey Administration is real. Vale attempts to distinguish the effect caused by entry of the judgment and the subsequent enforcement of that judgment, but these are two sides of the same coin. In both respects, BSGR and the Guernsey Administration

---

[11] In the process of finalizing this letter, the Joint Administrators for the first time disagreed that Vale was BSGR's 99% creditor. As the Joint Administrators have not offered any support for their contentions, Vale is unable to respond on short notice except to note its disagreement and point to the Joint Administrators' own progress report. Vale does note that, to the extent that BSGR has contracted to give 50% of the future proceeds of any recovery on the Soros Claim (to a potential related party), that would not alter Vale's status as 99% creditor.

[12] Throughout this submission, Vale attempts to characterize the positions of the Joint Administrators as shifting and belatedly made. Vale has also insisted on commenting on certain settlement discussions between the parties, notwithstanding the Joint Administrators' objection. Vale maintain that these discussions were "on the record." Without further comment on the tactics employed by Vale during the drafting process, the Joint Administrators must note that the final exchange of drafts occurred well past midnight local time for the Joint Administrators. Consequently, the Joint Administrators have not had an opportunity to review and approve the final edits to this joint submission before it was filed and reserve all of their rights to seek leave to supplement this submission in writing or at any hearing before the District Court as may be necessary and appropriate.

The Honorable Vernon S. Broderick
February 17, 2020
Page 6

DuaneMorris

will be subject to immediate, tangible threat to achievement of the purpose of the Guernsey Administration.[13]

An administration under the Guernsey Companies Law is a collective process, designed to benefit all unsecured creditors of the relevant company equally and achieve the specific purpose set out for such company by the Guernsey Court when making the administration order. The statutory purpose of the Guernsey Administration, as ordered by the Guernsey Court, is the survival of BSGR and the whole or any part of its undertaking as a going concern (section 374(3) of the Guernsey Companies Law).[14] Accordingly, the Joint Administrators' ability to fulfill this purpose rests on their ability to realize BSGR's assets in sufficient amounts that will allow them to pay off all of BSGR's creditors either in full, or by way of compromise, in accordance with their respective priorities, and thereafter return the management and control of BSGR to its board of directors. If the Joint Administrators determine at any point that the purpose cannot be achieved, or that it is otherwise expedient or desirable to do otherwise, they may apply to the Guernsey Court under section 382 of the Guernsey Companies Law to vary the purpose of the Guernsey Administration or request that it be discharged. No such application has been made and the Joint Administrators remain committed to achieving the court-ordered purpose of the Guernsey Administration.

The Joint Administrators were compelled to commence the Chapter 15 Case in furtherance of such efforts. Although the process has been extremely costly and time consuming, distracting the Joint Administrators from more important, value-maximizing, activities, they must take all reasonable measures to protect BSGR's only asset located in the United States. Indeed, if they are to retain any meaningful opportunity to rehabilitate BSGR and return it to solvency for the benefit of its creditors and other stakeholders, the Joint Administrators must preserve the value of BSGR's interest in the "Soros Action". This litigation, commenced by BSGR and two of its wholly-owned subsidiaries (collectively, the "BSGR Plaintiffs") against George Soros and certain affiliate defendants, seeks damages in excess of $10 billion (BSGR's interests in the Soros Action, the "Soros Claim"). *See BSG Resources Limited v. Soros*, Case No. 17-cv-02726-JFK-OTW

---

[13] Vale makes much of the fact that the Joint Administrators did not seek recognition of the Guernsey Administration in England. Yet BSGR has no assets in England that would require the Joint Administrators to seek recognition there. Moreover, the fact that proceedings before the English courts have not extended to the Guernsey Administration is unsurprising. BSGR is insolvent. This means that the company lacks sufficient funds presently to meet Vale's claim. The role of the Joint Administrators is to work towards the statutory purpose of ensuring the survival of all or part of the company, which would provide for the payment of Vale's claim. That the English court has confirmed the amount awarded to Vale is immaterial since BSGR has no assets in England which could be charged to pay Vale's award. This is the key difference with the United State, where there is a vitally important asset which the Joint Administrators must protect.

[14] On March 6, 2018, the Guernsey Court entered a *Court Order* commencing the Guernsey Administration and, among other things, appointing the Joint Administrators. On March 21, 2018, the Guernsey Court issued a *Court Order* whereby it confirmed that it had administered to each of the Joint Administrators the affirmation of Joint Administrator, each with the power to act alone. The March 6 and March 21, 2018 orders are collectively referred to as the "Guernsey Administration Order".

DuaneMorris

The Honorable Vernon S. Broderick
February 17, 2020
Page 7

(S.D.N.Y. Apr. 14, 2017).  BSGR's direct interest in the Soros Action (the "Soros Claim") remains one of BSGR's most important assets (the other being a pending arbitration against the Republic of Guinea). Maximizing the value of the Soros Claim, whether by prosecution to judgment or by settlement, remains a crucial step in the Joint Administrators' effort to fulfill their mandate under the Guernsey Administration Order and achieve its purpose. Any execution or exercise of remedies by Vale in respect of the Soros Claim, regardless of the form, will threaten the Joint Administrators' ability to achieve the stated purpose of the Guernsey Administration and recover potentially significant value for distribution to creditors in accordance with the payment priorities set forth in the Guernsey Companies Law.

The entry of a US Enforcement Order will set the stage for Vale to exercise certain enforcement actions with respect to BSGR's assets and may further allow Vale to seek further discovery in aid of enforcement against BSGR, the Joint Administrators and certain third parties. It remains unclear to the Joint Administrators what actions Vale intends to take specifically with respect to the Soros Claim. In a June 2019 pleading in the District Court, Vale expressed doubts regarding the Soros Claim, stating that it is based on a "fanciful allegation that Mr. Soros is somehow responsible for the Republic of Guinea's revocation of BSGR's mining rights…" [ECF No. 36 at 15].  Vale went on to explain that "[e]nforcement would effectively grant Vale a lien over a fraction (roughly 20%) of BSGR's $10 billion claim, providing it with a vested interest in BSGR's successful resolution of that dispute, however unlikely any recovery may be." *Id*. at 16.[15]  In an October 2019 letter to the District Court, Vale's counsel countered the Joint Administrators' mention of the need for equitable relief, explaining that "quite apart from this contested 'asset,' if the Court enters judgment against BSGR, Vale will be entitled to seek discovery in aid of execution of the Award against BSGR and its potential alter egos, and BSGR could hardly claim irreparable harm from that" implying that the Joint Administrators' concerns were unfounded.  [ECF No. 36 at 3].

BSGR's other creditors will suffer irreparably if Vale, an unsecured creditor, improves its priority position by securing its claim in respect of the Award.  Under Guernsey insolvency law, Vale is entitled to repayment of its claim *pro rata* with other unsecured creditors, and junior to secured creditors. The principle that the claims of a company's unsecured creditors rank *pari passu* is a fundamental element of Guernsey insolvency law, and Guernsey administrators accordingly

---

[15] Vale's assertion that it comprises 99.7% of claims is untrue. At a minimum, Vale's figure ignores secured claims and administration expenses, both of which are significant. It also ignores potential unknown or unrecorded claims that may exist and have yet to be asserted. Indeed, the potential claims of other creditors exceed $250 million. Thus Vale's unsecured claim comprises less than 90% of the potential claim against BSGR. If successful in the Soros litigation, BSGR's litigation funder will have a claim to 50% of that award. In that event, Vale's claim against BSGR would comprise less than 50% of all potential claims against the company.  Likewise, the characterization of Vale as a "predominant" creditor of BSGR overstates Vale's position. The Joint Administrators owe duties to all creditors equally consistent with the priorities established by the Guernsey insolvency law. Vale routinely ignores the fact that there are secured claims that rank ahead of Vale's unsecured claim. Finally, Vale ignores that BSGR is one of three plaintiffs in the Soros litigation, along with BSG Resources (Guinea) SÀRL, and BSG Resources (Guinea) Limited, and may only receive a fractional share of any proceeds. The Joint Administrators do not dispute that Vale is BSGR's largest *unsecured* creditor holding a claim against the company that is junior in priority to the significant claims of BSGR's secured creditors.

owe their duties to all of the company's creditors equally. If allowed a security interest, long after the commencement of the Guernsey Administration, Vale could greatly improve its position vis-à-vis other creditors, whether secured or unsecured.  BSGR's largest secured creditor, Standard Chartered Bank, could find its secured claim suddenly subordinated or impaired in respect of a multi-billion dollar claim (in respect of the proceeds of the Soros Claim).  Further, the third party which has funded BSGR's costs and expenses of pursuing the Soros Claim could be subordinated or impaired, making it highly likely that the funder will cease to provide further funding. Other unsecured creditors would find their claims subordinated, unfairly depriving them of *pari passu* treatment, which, as stated above, is a fundamental element of Guernsey insolvency law.

New York law may also provide a mechanism whereby Vale can obtain an assignment of the Soros Claim. Once in possession, Vale might seek to intervene in the Soros Action as of right or substitute itself as a plaintiff, replacing BSGR. *See* Fed. R. Civ. P. 24(a), (c).  If successful, the end-result would be that Vale would control the Soros Claim, and perhaps the Soros Action entirely.  If allowed to do so, BSGR's creditors may suffer a worse fate than imposition of a senior lien on the proceeds.  Unlike the Joint Administrators, Vale owes no duty to BSGR's other creditors or shareholders. Vale would have no incentive to prosecute the Soros Claim beyond the value of the Award and could attempt to satisfy itself by settling BSGR's portion of the Soros Claim alone. While beneficial to Vale, that would likely extinguish the Soros Claim, and perhaps the value of the Soros Action, for all other creditors. Those creditors might seek to take remedial action against Vale or the Joint Administrators to seek to recover any losses suffered by them as a result of such actions (which would be likely to be incredibly disruptive and costly).

Vale may also have a different motive.  Vale may seek control of the Soros Claim in an effort to dismantle and discharge it.  If indeed Vale believes that the action is based on a "fanciful allegation," Vale may seek dismissal of the Soros Claim as first step in a greater effort to undermine the Court-ordered purpose of the Guernsey Administration, making it impossible to fulfil.

Whether Vale seeks a lien on proceeds or to pursue (or dismantle) the Soros Claim, the results would be devastating for the Guernsey Administration and would significantly diminish the likelihood of the purpose of the Guernsey Administration being achieved. As mentioned above, the Joint Administrators fear that the third-party providing funding for the prosecution of the Soros Action may terminate its financing agreement.  Without continued funding from this third-party, the BSGR Plaintiffs will not have the resources to fund the costs necessary to pursue the Soros Action and any future recoveries will most certainly be lost. If Vale is prevented from taking control of the Soros Claim, and the action instead remains in the control of the Joint Administrators, Vale should receive a distribution from BSGR's estate in due course pursuant to the Guernsey Companies Law.  BSGR's creditors will be disadvantaged should Vale take control of the Soros Claim. In that event, the timescale and economic outcome of the Soros Claim will likely be negatively affected as Vale may be in a position to abandon the Soros Claim entirely or resolve it for much less than the Joint Administrators would seek to recover through prosecution of the action. In sum, if Vale is permitted to take control the asset, it and the United States courts

The Honorable Vernon S. Broderick
February 17, 2020
Page 9



will be ignoring the Guernsey Administration process and the collective nature of the insolvency proceedings that BSGR commenced in March 2018.

Even discovery in aid of execution by Vale may impose immediate and irreparable harm on the Joint Administrators and BSGR. As the Joint Administrators are acutely aware, discovery in connection with this matter has been costly. Indeed, BSGR has spent over $2 million in responding to Vale's written discovery on what are supposedly limited topics to be considered at the Recognition Hearing. Should judgment be entered in this Case, the Joint Administrators expect Vale will seek even more expansive discovery from the Joint Administrators and BSGR. Such discovery will necessarily divert the attention of the Joint Administrators away from the tasks necessary to reach a timely Recognition Hearing, as well as from duties necessary to fulfil the purpose of the Guernsey Administration. BSGR has minimal current assets. As a result, BSGR is reliant on external funding to meet its costs and expenses. In addition to the diverted attention of the Joint Administrators, expanded discovery following entry of any judgment in this Case will also further drain BSGR's already depleted economic resources. In both ways, discovery in aid of execution following entry of a judgment in this Case will prose a very real and imminent threat to the Joint Administrators, BSGR and the Guernsey Administration.

3. **What effect would the Chapter 15 bankruptcy, the Guernsey Administration, or any other proceeding have on enforcement of a judgment in this case?**

A. **The Guernsey Administration**. The Joint Administrators' administration filing in Guernsey triggered automatically a statutory moratorium under section 377 of the Guernsey Companies Law in respect of all claims and enforcement actions by BSGR's unsecured creditors in Guernsey,[16] other than with respect to rights of set-off.[17] The moratorium stays actions in Guernsey against BSGR and its assets except with the consent of the Joint Administrators or the permission of the Guernsey Court. The purpose of the moratorium is to provide administrators with an opportunity to manage the affairs of an insolvent company without the distraction and cost of dealing with enforcement action taken by unsecured creditors.

The Joint Administrators contend that the extent to which the moratorium has extra-territorial effect has not been tested in the Guernsey Court,[18] while Vale's position is that a foreign stay must be recognized through the recognition of the foreign proceeding in chapter 15 as a

---

[16] In the absence of any Guernsey authority on the extra-territorial effect of the statutory moratorium, the parties disagree as to whether the statutory moratorium would have any effect on enforcement actions brought outside of Guernsey. *See infra* n.15, 16.

[17] Secured creditors are not affected by the moratorium under section 377 of the Guernsey Companies Law.

[18] The Joint Administrators are aware of English precedent (Guernsey courts often look to judgments of the English courts for guidance) for the proposition that a trust exists over the assets of a company in administration, allowing courts the discretion to prohibit or restrict certain enforcement actions with respect to assets located in foreign jurisdictions. *See Harms Offshore AHT "Taurus" GmbH & Co KG v Bloom* [2009] EWCA Civ 632; [2010] BCC 822. The Joint Administrators anticipate addressing this point at the appropriate time.

DuaneMorris

The Honorable Vernon S. Broderick
February 17, 2020
Page 10

foreign main proceeding.[19]  Both parties agree that it is reasonably accepted that, while the moratorium prevents enforcement by Vale and other unsecured creditors against BSGR's assets which are located in Guernsey, those assets located outside of Guernsey (*e.g.*, the Soros Claim) are not similarly protected absent recognition of the Guernsey Administration in the relevant jurisdiction.  Nonetheless, the Joint Administrators' position is that they are subject to a duty to ensure that BSGR's assets, irrespective of where they are located, are protected, and that the Joint Administrators are therefore required to, where appropriate, seek recognition of the Guernsey Administration in any foreign jurisdiction where valuable assets are threatened in order to fulfil their duties to protect BSGR's assets from execution and enforcement by unsecured creditors.

      **B.**      **The Chapter 15 Case**.  The Chapter 15 Case has had no compulsory effect on Vale's ability to enforce the Award.[20]  Unlike cases filed under chapter 11 of the Bankruptcy Code, cases filed under chapter 15 do not automatically stay litigation or collection efforts against the debtor.  Rather, in a chapter 15 case, an automatic stay enjoins such proceedings if and when a Bankruptcy Court grants recognition of the case as a "foreign main proceeding," 11 U.S.C. § 1520(a), which Vale opposes in the instant matter.  If the Bankruptcy Court recognizes the Guernsey Administration as a "foreign main proceeding," Vale's ability to enforce the Award in the United States will be stayed absent relief from the automatic stay.[21]  Until such time, Vale's ability to enforce the Award in the United States is not affected by either the Chapter 15 Case or the Guernsey Administration.

---

[19] Vale contends that the legislative history to chapter 15 provides that chapter 15 is intended to be the exclusive pathway to obtain assistance in furtherance of foreign proceedings. *See* H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 110 (2005) ("[C]hapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings. The goal is to concentrate control of these questions in one court. That goal is important in a Federal system like that of the United States with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property."); *see also* Collier on Bankruptcy ¶ 1509.03 (16th ed. 2018).  To the extent the Joint Administrators have not obtained recognition of their Guernsey Administration in the Chapter 15 Case, they are not entitled to any automatic recognition of or deference to any moratorium associated with that case.  Moreover, prior to submission of this joint letter, the Joint Administrators have never suggested to this Court, the Bankruptcy Court, the Guernsey Court or the English Court that denied the Challenge Application that there was a statutory moratorium that could be applicable to their proceedings.

[20] The Joint Administrators sought a temporary restraining order ("<u>TRO</u>") and preliminary injunction in the Bankruptcy Court against Vale's ability to have the Award to the extent recognized by the District Court.  *See* Chapter 15 Case, ECF No. 7.  The Bankruptcy Court declined to issue a TRO and the parties resolved the Joint Administrators' request for a preliminary injunction through stipulated orders pursuant to which Vale agreed not to seek a ruling on the merits of this case through October 31, 2019.  *See* Chapter 15 Case, ECF Nos. 26 and 33.  Those stipulated orders expired on October 31, 2019. Given the pending status of this case, the Joint Administrators determined that they did not need to renew the request at that time.

[21] Section 1520(a) provides that the court may nonetheless grant relief from the automatic stay "for cause."  In its Initial Objection, Vale has put the Joint Administrators on notice of its position that such cause exists and that it would seek relief from stay under such circumstances.



The Honorable Vernon S. Broderick
February 17, 2020
Page 11

    **4.**    **Leaving aside any arguments about the merits of any contemplated request for injunctive relief, if judgment is entered against Defendant in this case and Defendant wished to make an application for a stay of enforcement:**

        **a.**    **Under what statute or other source of law would Defendant bring that application?**

The Joint Administrators may determine to bring an application pursuant to either Rule 62 or Rule 65 of the Federal Rules of Civil Procedure, or Section 1519 of the Bankruptcy Code, and may also seek to rely on the inherent authority of either the District Court or the Bankruptcy Court to issue a stay. The District Court's authority lies in the Federal Rules of Civil Procedure. Rule 62 was recently amended to automatically stay judgment enforcement actions for thirty days "unless the court orders otherwise." Fed. R. Civ. P. 62(a). Hence, a court may alter the thirty-day period either to "dissolve the automatic stay," for example when there "may be a risk that the judgment debtor's assets will be dissipated," or to order "a stay that lasts longer."[22] Fed. R. Civ. P. 62 advisory committee's notes; *see* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice And Procedure* § 2902 (3d ed. 2019) ("Amendments to Rule 62(a) in 2018 now expressly recognize the court's authority to extend an automatic stay as well as to dissolve it."); *Druding v. Care Alternatives*, No. 1:08-CV-2126-NLH-AMD, 2019 WL 5957403, at *3 (D.N.J. Nov. 13, 2019) (extending stay "in the interest of practicality").

The Bankruptcy Court also has authority to enjoin enforcement actions. In a chapter 15 case, an automatic stay enjoins such proceedings once the Bankruptcy Court recognizes the case as a "foreign main proceeding." 11 U.S.C. § 1520(a). If, as here, the Bankruptcy Court has yet to rule on recognition, the Bankruptcy Court may "grant relief of a provisional nature" to "protect the assets of the debtor or the interests of the creditors . . . ." 11 U.S.C. § 1519(a). Provisional relief includes "staying execution against the debtor's assets . . . ." 11 U.S.C. § 1519(a)(1).

In addition, both the District Court and the Bankruptcy Court have inherent authority to issue a stay. The District Court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). Bankruptcy courts, like all federal courts, possess inherent powers. *In re Sanchez*, 941 F.3d 625, 628 (2d Cir. 2019). Further, the Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Such authority allows bankruptcy courts to enjoin, temporarily, actions interfering with the debtor's reorganization. *In*

---

[22] The Advisory Committee Note accompanying the December 31, 2018 amendment to Rule 62(a) primarily addresses the possibility that a stay would be dissolved in order to protect the interests of a judgment creditor when concerns exist surrounding asset dissipation or the illiquidity of certain assets, rather than the possibility of an extended stay. *See Deutsche Bank Nat'l Trust Co. as Trustee for GSAA Home Equity Trust 2006-18 v. Cornish*, 759 F. App'x 503, 510 (7th Cir. 2019) ("[T]he amended rule no longer provides [for] completely automatic stays.").

The Honorable Vernon S. Broderick
February 17, 2020
Page 12



*re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992). Thus, both the District Court and the Bankruptcy Court may stay enforcement of the judgment.

   **b.**  **Which court or courts would have jurisdiction to hear the application?**

Both the District Court and Bankruptcy Court have jurisdiction to hear any application for a stay of enforcement.

The District Court's jurisdiction arises from the Federal Arbitration Act, which grants district courts original jurisdiction over any "action or proceeding falling under the [New York] Convention,"[23] Rule 62 of the Federal Rules of Civil Procedure, which authorizes district courts to modify the thirty-day automatic stay imposed after a judgment, and Rule 65 of the Federal Rules of Civil Procedure, which authorizes district courts to issue preliminary injunctions in matters pending before them.

The Bankruptcy Court has jurisdiction over a request for injunctive relief in light of the Joint Administrators' commencement of the Chapter 15 Case. Pending determination of their Chapter 15 Petition for recognition of the Guernsey Administration, the Joint Administrators may seek relief in the form of a preliminary injunction pursuant to 11 U.S.C. §§ 105(a) and 1519(a).

Thus, the District Court has discretion to either hear the Joint Administrators' application or to allow the Bankruptcy Court to make a final determination on the merits.

   **c.**  **If both the district court and the bankruptcy court would have jurisdiction, which court would be the proper or preferred forum to hear the application?**

   **A.**  **Vale's Position**. While either court has jurisdiction to hear a post-judgment application to enjoin Vale from taking control of the Soros Action, Vale respectfully suggests that for several reasons, the Bankruptcy Court is better situated to hear such Application in the first instance.

*First*, any application for injunctive relief requires a showing that the movant has a "likelihood of success on the merits." Here, that prong would require the Joint Administrators, *inter alia*, to establish that their Chapter 15 Petition will succeed. This issue is squarely within the expertise of the Bankruptcy Court and has been pending before the Bankruptcy Court for the past eight and a half months; during that time, the parties have appeared before Judge Lane nine times, generated several hundred pages of transcripts, filed a number of substantive submissions, and received several decisions (including on the Joint Administrators' prior request for a temporary restraining order). As a result, Judge Lane is intimately familiar not only with the legal standards

---

[23] 9 U.S.C. § 203.


The Honorable Vernon S. Broderick
February 17, 2020
Page 13

for Chapter 15 recognition and the procedural posture of the Chapter 15 proceedings, but also the complex and extensive factual record against which the applicable legal standards will be applied.

*Second*, the Bankruptcy Court is most familiar with the alleged exigent circumstances underlying the Joint Administrators' request for injunctive relief and the extent to which the Joint Administrators bear the blame for such circumstances, also a critical factor in the consideration of any motion for injunctive relief. Judge Lane has commented on numerous occasions about the unprecedented duration of these Chapter 15 proceedings, and his astonishment at the lack of effort by the Joint Administrators to proceed toward a recognition hearing.[24] Stated another way, the Bankruptcy Court is best positioned to evaluate whether, but for the Joint Administrators' conduct, the recognition hearing would have already occurred and therefore, Vale should not bear the consequences of Joint Administrators-caused delay.

*Third*, the Bankruptcy Court is well situated to evaluate whether the balance of hardships tips decidedly toward the Joint Administrators as the party requesting injunctive relief. The balance of hardships determination rests on the factual background of the parties' dispute, with which the Bankruptcy Court has had time and occasion to develop familiarity. In particular, the parties have discussed before the Bankruptcy Court on multiple occasions Vale's concerns about the dissipation of BSGR's assets during the Joint Administrators' tenure, as well as the *de facto* control still being exercised by the ultimate shareholder of BSGR (Beny Steinmetz, the "BS" in "BSGR," who was found to have been a key player behind the fraud committed against Vale) for his own benefit.[25]

Judge Lane has advised the parties of his willingness to adjudicate an application for injunctive relief pending consideration of Chapter 15 recognition, noting that he would defer to the District Court on which court should hear the stay motion but that he was "not reluctant" to make a ruling and "if called upon to make a ruling, [he] would make a ruling."[26] Vale therefore

---

[24] *See, e.g.*, Hr'g Tr. Oct. 3, 2019 at 20:15-16 ("I've never seen a case that was filed where there was such a desire to not move forward with recognition."); Hr'g Tr. Nov. 4, 2019 at 7:14-16 ("I've had some interesting Chapter 15 cases, but I've never had one that has been this slow developing.").

[25] Contrary to the Joint Administrators' assertions, Vale has presented considerable evidence related to asset dissipation and Beny Steinmetz's *de facto* control of BSGR. *See* Vale S.A.'s Sept. 9, 2019 Letter to the Honorable Sean H. Lane, *In re BSG Resources Limited*, No. 19-11845 (SHL) (Bankr. S.D.N.Y. Sept. 9, 2019), ECF No. 46. Presented with this evidence, the Bankruptcy Court found that "Beny Steinmetz holds a financial interest in BSGR" and that "Beny Steinmetz has acted on behalf of BSGR and continues to hold himself out as BSGR in connection with settlement negotiations with the Government of Guinea," rejecting the Joint Administrators' arguments to the contrary. Discovery Order, *In re BSG Resources Limited*, No. 19-11845 (SHL) (Bankr. S.D.N.Y. Oct. 21, 2019), ECF No. 69. The documents produced in discovery in the Chapter 15 case during the Chapter 15 discovery process have provided significant further evidence of BSGR's asset dissipation and Steinmetz's efforts to extract value from the company at the expense of its creditors (with the greatest effect on its 98.9% creditor Vale).

[26] Hr'g. Tr. Oct. 3, 2019 at 98:18.



The Honorable Vernon S. Broderick
February 17, 2020
Page 14

proposes that these issues may be better suited to a hearing by the Bankruptcy Court in the first instance.

Notably, the Joint Administrators previously sought a temporary restraining order and preliminary injunction before the Bankruptcy Court at the time the Chapter 15 Petition was originally filed, seeking largely the same relief contemplated by the pending injunction request.[27] The Bankruptcy Court denied the TRO at a hearing dated June 4, 2019, and the Joint Administrators did not further pursue their request for injunctive relief. Since that time, the Bankruptcy Court's familiarity with this Case has grown exponentially; the fact that the Joint Administrators are now loath to have the Bankruptcy Court reconsider their application speaks volumes.

To be clear, Vale has no doubt that the District Court is more than capable of learning the extensive factual record and evaluating that record under the appropriate legal standards for injunctive relief. But the Joint Administrators are wrong to suggest that this Court today has the same familiarity with that factual record as the Bankruptcy Court and is better suited to learn and apply that record on an emergency basis than a court that has seen the parties at lengthy hearings nine times over the past nine months.

Vale disagrees with the Joint Administrators' contention that judicial economy weighs in favor of the District Court hearing the Application. We are unaware of authority providing that the Bankruptcy Court's denial of a stay would be appealable as of right, and the Joint Administrators have offered no such authority; should they provide us with such authority prior to the February 26, 2020 conference with the Court, we would be pleased to address it at that time.

Finally, this letter is the first time the Joint Administrators have expressed an interest in moving under Rule 62. To the extent that the Joint Administrators suggest that the standards under Rule 62 are more lenient than must be satisfied for injunctive relief (which their motion would essentially seek), this is a new position that is contrary to every statement made by the Joint Administrators to Vale, the Bankruptcy Court, and the District Court prior to last Wednesday, when the parties exchanged initial drafts of this joint letter. Indeed, in their letter to this Court on December 23, 2019, the Joint Administrators explicitly "request[ed] that this Court include in any order addressing Vale's petition an order directing that any request *for injunctive relief* be brought either in this Court or in the Bankruptcy Court, as Your Honor deems appropriate."[28] The Joint Administrators concede that Vale is entitled to entry of a judgment in this proceeding. If Vale is to be enjoined from further action in enforcing that judgment (where the Joint Administrators presumably will not appeal the judgment now that they concede they have no basis on which to

---

[27] *See* Ex Parte *Application for Temporary Restraining Order and Relief Pursuant to Sections 1519 and 105(a) of the Bankruptcy Code*, In re BSG Resources Limited, No. 19-11845 (SHL) (Bankr. S.D.N.Y. June 3, 2019), ECF No. 7.

[28] BSGR's December 23, 2019 Letter, ECF No. 39 at 4 (emphasis added). *See also* Hr'g. Tr. Nov. 4, 2019 at 49:10-13 ("We included in that a reference to a request for some guidance from Judge Broderick on to the extent that we need some additional injunctive relief, where we should go to request that relief.").



The Honorable Vernon S. Broderick
February 17, 2020
Page 15

oppose it), the Joint Administrators should be required to satisfy the requirements for injunctive relief and be held to proof on the questions of whether the Joint Administrators are likely to prevail in their Chapter 15 Petition, are blameless in the unprecedented delays in scheduling a recognition hearing, and that the balance of the harms and equities favor the Joint Administrators rather than requesting that the Court simply stay its judgment without any such record having been made, and where such issues are in dispute and have been the subject of substantial litigation in the Chapter 15 Case.[29]  We are not aware of any instance in which a court has ever extended a Rule 62 stay in similar circumstances.

> B.   **The Joint Administrators' Position**.[30]

While both the District Court and the Bankruptcy Court have jurisdiction to hear the Application, the District Court is the proper forum under these circumstances given its ongoing consideration of the US Enforcement Order. To the extent that the District Court determines that it is best suited to hear the relief, the Joint Administrators will determine the appropriate Federal Rule (or Rules) of Civil Procedure under which to seek such relief.[31]

Vale chose to seek the recognition and enforcement of the Award from the District Court, the granting of which will afford Vale the ability to execute against BSGR's only asset in the United States, the Soros Claim (also pending in the District Court).  Of course, the District Court also has the ability to stay such execution as may be appropriate.  As noted above, the Joint Administrators will contend that such a stay against execution against the Soros Claim pending the conclusion of a Recognition Hearing is critical if they are to maintain hope of fulfilling the

---

[29] Prior to this month, the Joint Administrators argued their concern was not a global stay against execution of the judgment, but rather a purported concern that Vale would take control over the Soros litigation pending in this District. For example, even in their December 23, 2019 letter to the Court, the Joint Administrators' only complaint about the prospect that Vale might obtain a lien over the Soros Claim was that "the Joint Administrators expect that Vale will not rest with a lien on proceeds, and will instead take actions to interfere with, and perhaps undermine the good faith efforts of, the Joint Administrators to monetize the Soros Action for the benefit of all creditors."  BSGR's December 23, 2019 Letter, ECF No. 39 at 3.  It was only after Vale recently made an "on the record" offer to refrain from taking control of the Soros Claim for an initial three month period after judgment was entered by this Court – similar to interim limited stays consented to by Vale earlier in the Chapter 15 Case in the hope that the Joint Administrators would make progress in their discovery obligations during such period and a recognition hearing could be scheduled – in which context Vale's counsel pointed out that the Joint Administrators could not establish irreparable harm from a lien or asset discovery, that the Joint Administrators pivoted for the first time to an avenue that they hope will enable them to avoid satisfying the requirements for injunctive relief.

[30] In compliance with the Order, the Joint Administrators will leave "aside any arguments about the merits of any contemplated request for injunctive relief…."  The Joint Administrators will also avoid any unproductive recitation of the back and forth of discussions that the parties may have had regarding any offers by Vale of interim stays and the considerable limitations thereon. Such discussions are irrelevant to the matter at hand before the District Court.

[31] Vale finds reason to object that the Joint Administrators have not expressly referred to potential relief under Rule 62 of the Federal Rules of Civil Procedure to them privately or in public filings.  Of course, the Joint Administrators are not obligated to express all of their concerns and considered legal strategies to Vale. That Vale is surprised at the mention in this letter is of no consequence.



The Honorable Vernon S. Broderick
February 17, 2020
Page 16

mandate from the Guernsey Court. The District Court is best suited to determine when, and the extent to which its own order (*i.e.*, an order granting recognition of the Award) becomes effective and enforceable. Moreover, addressing injunctive relief in this Court would serve judicial economy. Given the importance of the issues at hand, it is reasonable to expect that the Joint Administrators would seek leave to appeal any adverse ruling regarding injunctive relief from the Bankruptcy Court to this Court. If granted, this Court will be asked eventually to determine these issues.

The Joint Administrators disagree that the Bankruptcy Court is better suited to consider any request for preliminary injunction. *First*, the District Court has equal ability to determine the likelihood that the Joint Administrators will succeed on the merits of their Chapter 15 Petition. The District Court is also familiar with the legal standards for Chapter 15 recognition and understands the salient facts to which such standards must be applied. The fact that the Bankruptcy Court might be more familiar with the procedural posture of the Chapter 15 Case since its filing is of no moment. This history is not a factor a court should consider in determining whether chapter 15 recognition of the Guernsey Administration is warranted.

*Second*, the District Court is keenly aware of the exigent circumstances that require the injunctive relief sought in the Application. Indeed, this Joint Submission provides a thorough recitation of those circumstances and highlights the importance of the relief the Joint Administrators will be required to seek. Vale suggests that the Bankruptcy Court is better suited to decide the Application because it has previously commented on the pace of the Chapter 15 Case and raised questions about the Joint Administrators' progress in discovery. Again, such issues are not significant factors in determining whether the Joint Administrators are entitled to injunctive relief on a go-forward basis. There is no dispute that discovery in the Chapter 15 Case has taken a significant amount of time – at significant cost to BSGR. Vale argues that the resulting delay is reason enough to deny any Application. Vale's arguments make plain its expectation that the Bankruptcy Court will deny any Application. This is all the more reason the District Court should consider any Application in the first instance.

*Finally*, the District Court is best situated to evaluate the hardships that could result directly from the entry of its own order and to determine whether the balance of such hardships between the parties tips in favor of the Joint Administrators[32]. As noted above, any Application will seek to stay or otherwise enjoin enforcement of an order emanating from the District Court. The District Court is therefore the logical authority to determine whether such injunction is appropriate.

---

[32] Vale does not meaningfully contest this point. Rather, Vale makes an unsupported allegation that the Joint Administrators have allowed BSGR's assets to dissipate during the course of their tenure. This allegation is patently untrue.

DuaneMorris

The Honorable Vernon S. Broderick
February 17, 2020
Page 17

    Thank you for Your Honor's consideration.

                                        Respectfully submitted,

                                        */s/ Frederick D. Hyman*
                                        Frederick D. Hyman
                                        DUANE MORRIS LLP
                                        1540 Broadway
                                        New York, New York  10036
                                        T: 212-692-1000
                                        F: 212-692-1020
                                        RHyman@duanemorris.com

                                        *Attorneys for BSG Resources Limited*
                                        *(in administration)*

                                        -and-

                                        */s/ Jeffrey A. Rosenthal*
                                        Jeffrey A. Rosenthal
                                        Lisa M. Schweitzer
                                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                        One Liberty Plaza
                                        New York, New York  10006
                                        T: 212-225-2000
                                        F: 212-225-3999
                                        jrosenthal@cgsh.com
                                        lschweitzer@cgsh.com

                                        *Attorneys for Vale S.A.*