**<u>Affidavit</u>**

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**IN THE MATTER OF BSG RESOURCES LIMITED (IN ADMINISTRATION) (THE "COMPANY")**

**AND**

**IN THE MATTER OF THE COMPANIES (GUERNSEY) LAW, 2008**

---

**AFFIDAVIT OF MALCOLM COHEN IN SUPPORT
OF THE JOINT ADMINISTRATORS' APPLICATION
DATED 23 JULY 2020**

---

I, **MALCOLM COHEN,** of BDO LLP of 55 Baker Street, London, W1U 7EU having been duly affirmed, being over 18 years of age, having personal knowledge of the facts affirmed herein and being competent to testify as a witness hereby **AFFIRM AND SAY AS FOLLOWS:**

1    I am one of the two joint administrators of BSG Resources Limited (in administration) (**Company**), which company's registered office address is West Wing, Frances House, Sir William Place, St Peter Port, Guernsey GY1 1GX.  The other joint administrator of the Company is William Callewaert of BDO Limited, P O Box 180, Place Du Pre, Rue Du Pre, St Peter Port, GUERNSEY, GY1 3LL (together with myself, the **Joint Administrators**).

2    I make this affidavit on behalf of the Joint Administrators in support of our application pursuant to sections 382 and subsequent provisions of the Companies (Guernsey) Law, 2008 (**Companies Law**) dated 23 July 2020 (**Application**), for directions and orders from the Royal Court of Guernsey (**Court**), as set out in the Application and as considered in detail in this affidavit.

3    In so far as the content of this affidavit is within my personal knowledge it is true, and in so far as it is not within my personal knowledge, it is true to the best of my information, knowledge and belief.

4    There is now produced and shown to me marked "**Exhibit MC1**" a bundle of true copy documents.  References to page numbers are references to that Exhibit.

5       Nothing in this affidavit is intended to waive any form of legal privilege or analogous rights belonging to the Joint Administrators or the Company anywhere in the world.

**Brief Introduction**

6       In brief, and as I discuss in detail below, the Application seeks to discharge the Administration Order (as defined below), such discharge to take effect from the time when the Company is placed into liquidation by way of an application for winding up (**Winding Up Application**) brought by the Company's majority creditor, Vale S.A. (**Vale**).

7       As I shall come on to consider in detail in this affidavit, to ensure that the Joint Administrators were funded to conduct the administration of the Company, they entered into a funding agreement with Nysco Management Corporation (**Nysco**) (the Company's 100% shareholder) dated 18 December 2018 (**Funding Agreement**).

8       The terms of the arrangements under the Funding Agreement with Nysco provide that BSGR is able to submit requests to draw down funds in order to pay the costs and expenses of the Administration, which requests Nysco has, for the past eight months, failed to meet, which point I discuss in further detail below.

9       It is instructive first to rehearse some of the background to the administration and the affairs of the Company, before returning to the funding problems.

**Background Information**

10      The Company is a non-cellular limited liability company incorporated in Guernsey with registered number 46565.  A copy of a Statement of the Register in respect of the Company, dated 11 May 2020 (which states that the Company is in administration), is at pages 10 to 13 and a copy of the Company's Memorandum and Articles of Incorporation are at pages 14 to 43.

11      The Company's subsidiaries (and similar where the context requires) are engaged in the exploration, development, extraction, refinement and marketing of natural resource products, specifically rough diamonds in Sierra Leone and also has a minority interest in an electricity generation business in Nigeria.  These activities are overseen by the Joint Administrators acting as agent of the Company in its role as a shareholder of the subsidiaries.  The Company, again through the oversight of its subsidiaries, previously also engaged in the iron ore and ferronickel sectors.  The trading of the Company itself is now limited to advisory and technical services provided to its Sierra Leone subsidiaries and managing various litigation matters arising out of its former operations.  The Company is not (and never has been) regulated by the Guernsey Financial Services Commission.

12      The Company made an application for an administration order dated 27 February 2018 (**Administration Application**), which was heard *in camera* by J.R. Finch OBE, Judge of the Royal Court (as he then was), on 6 March 2018.  A copy of the Administration Application is at pages 44 and 45 and a copy of the Court Order made by Judge Finch dated 6 March 2018 is at pages 46 and 47 (**Administration Order**).

13      The purpose of the Administration Order was the survival of the Company, or the whole or any part of its undertaking, as a going concern (**Purpose**).  In the Joint Administrators' view,

this means, in effect, returning the Company to solvency by realising its assets which, at the time that the Administration Order was obtained had the potential to be greater in value than the Company's actual and potential/contingent (at the time) liabilities.

**Summary of the Company's Affairs at this Time**

14     The Company continues to act as a vehicle to provide technical and administrative support and oversight to its subsidiary undertakings, one of which is engaged in diamond mining in Sierra Leone.

15     The assets of the Company comprise investments in and loans to subsidiary undertakings and companies under common ownership and control, debtors, expected future litigation proceeds and a limited amount of cash.  The majority of the Company's assets are charged under security agreements to various third parties.

16     By way of assistance, a copy of the Company's group structure is exhibited at page 48, which also identifies the Company's sole shareholder as Nysco (which is a company incorporated in the British Virgin Islands).

17     The primary activities of the Company at this time are not only the oversight of the subsidiary company activities noted above, but also the active management of a number of pieces of litgation where the Company is either the claimant or respondent, which it will be helpful briefly to summarise in this affidavit.  I note in passing that the Company is party to a number of other minor litigation matters, not described in detail here, but rather I have focussed on the most material matters.

18     At pages 49 to 103 are copies of regular bi-annual reports (four in total) to creditors which set out progress in respect of the matters set out below in order to seek to achieve the Purpose.

*ICSID / Republic of Guinea*

19     The Company is the claimant to an arbitration proceeding against the Republic of Guinea, for sums amounting to potentially billions of dollars, conducted through the International Centre for Settlement of Investment Disputes (**ICSID Arbitration**).

20     In summary, the claim relates to expropriated exploration and mining rights previously awarded to the Company by the Republic of Guinea.

21     As I refer to further below, the Joint Administrators have been working with the Republic of Guinea with a view to settling the ICSID Arbitration.  However, the actions of the Republic of Guinea in recent months in awarding mining rights over certain disputed blocks in the Simandou region to a new consortium and failing to engage with the Joint Administrators' attempts to reopen discussions has caused us to have severe doubts as to the likelihood of consummating a settlement.  We have been (and still are) giving serious consideration to abandonning the present settlement framework and remitting the matter back to ICSID for a determination of the claim.

*LCIA / Vale SA*

22      The Company has been the respondent to an abritration proceeding, conducted through the London Court of International Arbitration (**LCIA**), brought against it by Vale SA (**Vale**).

23      The proceeding, held on a private basis, relates to a discontinued joint venture previously established between Vale and the Company whereby Vale sought to recover c. US$1.3bn from the Company for funds invested in the joint venture that it lost as a result of alleged misrepresentations made by the Company to induce Vale to invest in the joint venture. Those alleged misrepresentations concerned the failure to disclose to Vale that the mining licences forming the subject matter of the joint venture had allegedly been obtained by bribery and corruption and that this had led to the Republic of Guinea revoking the licences.

24      On 4 April 2019, an arbitration award (**LCIA Award**) was made by the LCIA tribunal against the Company and in favour of Vale in the amount of approximately US$2bn including interest up to that time, upholding the allegations of bribery and corruption against the Company and several individuals associated with it.  Whilst the Company challenged this award (on advice from the Company's English lawyers in respect of the LCIA proceedings, Mishcon de Reya and a leading QC) that challenge ultimately failed.

*George Soros*

25      The Company filed a complaint against George Soros and related parties in the United States District Court for the Southern District of New York) in 2017 (**Soros Litigation**).

26      The complaint asserts various claims against George Soros and his Open Society Foundations and related entities arising out of or related to their alleged actions intentionally to deprive the Company of its iron ore mining interests in the Simandou region of the Republic of Guinea.  The allegations assert that Mr Soros was instrumental in causing the Republic of Guinea to revoke the licences on the basis of the alleged corruption on the part of the Company and thus caused the chain of events which led to the Company being wrongly deprived of its licences and becoming subject to the claim by Vale.  The complaint seeks not less than US$10 billion in damages.

27      In November 2017, the presiding judge in the US District Court granted a request for a stay of the litigation pending resolution of the ICSID Arbitration.  As a result, the action has been stayed since that time.  A further hearing to determine the next steps in the case has been scheduled for 28 July 2020.  The Company has requested the Court to lift the stay to enable the claim to proceed.  However, it appears likely that a new funder will need to be found for this claim and the Court was requested to defer the lifting of the stay for a period of 90 days in order to allow for sufficient time to secure an alternative source of funding.

**Utilisation Requests under the Funding Agreement**

28      Having set the scene, I shall now return to the reason for the Application.

29      As I have stated above, the Joint Administrators have experienced great difficulty in respect of the funding arrangements that it entered into, namely that Nysco has consistently failed to provide funding in a timely manner in accordance with the terms of the Funding Agreement.

30      Funding has on several occasions only been provided after the Joint Administrators had agreed to give a further discount and/or deferral on their fees, in addition to the discount on Joint Administrators' fees that had already been negotiated and agreed at the outset of the Administration.   We had been told consistently that Nysco was experiencing funding problems and that it was simply unable to meet its contractual commitments to the Joint Administrators on time.

31      The existing funding difficulties were further exacerbated when Vale obtained a Worldwide Freezing order over the assets of Nysco and other related parties.   This has had the practical effect of choking off the sources of funding which had previously been used by Nysco to fund the administration.

32      The difficulties that the Joint Administrators have experienced in this regard have now become unmanageable, with the amount of costs and expenses in respect of which requests for funding have gone unanswered now amounting to £2,225,701 including legal fees and disbursements.   In addition amounts in excess of £1.2m are owed by Nysco to advisors retained by the Joint Administrators for which work Nysco has agreed to pay direct.

33      Despite the Joint Administrators' repeated requests for funding, Nysco has failed to provide funds in relation to any of these requests, with the exception of monies paid on account of the November 2019 funding request leaving a total of £126,076 outstanding in respect of that month.

34      By way of summary, a table showing the unpaid fees and costs is set out below:

|  |  | JAs' time costs £ | JAs' Disbursements £ | Lawyers Fees £ | Total _ £ |
|---|---|---|---|---|---|
| Nov 2019 |  | 126,076 | - | - | 126,076 |
| Dec 2019 |  | 200,407 | 81,037 | 82,333 | 363,778 |
| Jan 2020 |  | 203,030 | 16,331 | 48,836 | 268,197 |
| Feb 2020 |  | 269,996 | 7,056 | 86,118 | 363,170 |
| March 2020 |  | 192,636 | 13,387 | 54,038 | 260,061 |
| April  2020 |  | 296,501 | 7,087 | 49,705 | 353,293 |
| May 2020 |  | 218,948 | 6,430.75 | 40,219 | 265,597 |
| June 2020 |  | 169,610 | 6,188 | 49,731 | 225,529 |
|  |  | 1,677,204 | 137,517 | 410,980 | 2,225,701 |

35      Nysco has not raised any detailed queries with regard to any of the regular updates given in respect of the costs and expenses that are the subject of the utilisation requests which remain unpaid.

36      In addition to the above, by agreement with Nysco, fees and expenses incurred by the Company's US legal advisors have been settled direct by Nysco. Costs and expenses incurred which have been requested but not yet settled more than US$1,476,162 up to 29 June 2020. In addition, further unbilled costs for July 2020 have been incurred.

**Joint Administrators unable to fulfil duties without funding**

37      Understandably the Joint Administrators can no longer continue with their appointments in the circumstances and cannot see any way in which the Purpose can be achieved in those circumstances.  The situation is particularly critical as all of the main professional advisors to the Joint Administrators also remain unpaid and they also cannot be expected to continue working without their outstanding invoices being settled.

*Chapter 15 proceedings*

38      Of particular importance is the continued progress of the chapter 15 filing made by the Joint Administrators in the US (**Chapter 15 Proceedings**).    The purpose of the Chapter 15 Proceedings is to seek to recognise the administration of the Company in the United States which would then give protection to the Company's assets located or otherwise existing in that jurisdiction.  The Joint Administrators commenced those recognition proceedings on the advice of their professional advisors, in order to protect the Soros Litigation against the enforcement by attachment by Vale of their LCIA arbitration award as above under the New York Convention.  Successful prosecution of the Soros Litigation is likely to be crucial to fulfilling the purpose of the administration of the Company, as set out in the evidence lodged in support of the administration application itself back in March 2018.  The Chapter 15 Proceedings are of utmost and critical importance to the successful outcome of the administration order.

39      There has been a very significant amount of work that has been required of the Joint Administrators, and their BDO colleagues, in the Chapter 15 Proceedings, most notably in respect of document production, preparation for depositions and attendance at court in New York.  These costs were, and continue to be, unavoidable to preserve the Soros Litigation from enforcement by Vale.  Discovery obligations in US proceedings can be very extensive, as they have proven to be in the Chapter 15 Proceedings, and non-compliance would likely result in dismissal by the US Bankruptcy Court of the Joint Administrators' application for Chapter 15 relief.  I have been advised that the very wide extent of the discovery which the Joint Administrators have been ordered by the US Bankruptcy Court to give to Vale is very unusual in Chapter 15 proceedings.

40      The next hearing in the Chapter 15 Proceedings is scheduled for 6 August, which will need to be adjourned under the circumstances of this application.  Other urgent matters will also need to be deferred.

*Settlement of ICSID Arbitration proceedings*

41      In addition to the Chapter 15 Proceedings, an ongoing aspect of the administration has been seeking to conclude a non-binding settlement of the ICSID Arbitration proceedings with Guinea.  The proceedings have been stayed pending the finalisation of a definitive settlement.  As currently envisaged, the deal contemplates the granting of a licence over certain mining blocks to Niron Metals plc (**Niron**), a company set up by Sir Mick Davis, a well-known and respected mining entrepreneur, in return for the Company becoming entitled to a revenue stream from those blocks.  The Joint Administrators' due diligence on the Niron deal would therefore be central to consummating any settlement with Guinea.

42      A critical aspect of the Joint Administrators' due diligence in respect of Niron's proposal would be to undertake robust enquiries on the feasibility of Niron's approach and the likelihood of future revenue streams being realised. Therefore, the Joint Administrators would need to appoint mining specialist advisors to review mining feasibility reports that have been or would be provided to the Joint Administrators, to advise the Joint Administrators on the commercial aspects of the proposed Niron deal.  The advisors would need to carry out a site visit to enable this.  Whilst a fee has been agreed for this advice in the amount of approximately £141,000 plus local taxes, the necessary funding  was not provided by Nysco.  The consequence of this is that the commercial due diligence could not proceed.

43      In the light of the difficulties in finalising the non-binding settlement with the Republic of Guinea and in response to the lack of engagement by the Republic of Guinea in the process, as well as in view of additional favourable evidence which may be able to be introduced by the Company, the Joint Administrators are now minded to abandon the non-binding settlement and allow the arbitration to be decided by the tribunal.  However, we do not have the funding which would be required to pursue this course of action.

44      It can be seen from the preceding paragraphs that the proper conduct of the administration is complicated, time-consuming and necessarily costly and without any funding to progress those matters, the Purpose is incapable of being achieved.

**Ending the Administration**

45      In the light of the facts that I have set out in this affidavit, I trust that the Court will appreciate the untenable and unsustainable position that the Joint Administrators find themselves in.

46      Despite numerous requests by the Joint Administrators pursuant to and in accordance with the terms of the Funding Agreement, monies have not been forthcoming and the situation now is that the Joint Administrators are owed well over £2 million in respect of their unpaid costs and expenses/legal costs (including unbilled work in progress and amounts to which they need to commit), as well as at least £1.2m owed by Nysco to advisors retained by the Joint Administrators'.

47      The purpose of this Application is to seek to discharge the administration order in circumstances where it is clear that, solely because of the lack of funding, the Purpose clearly cannot be achieved.  The Joint Administrators consider that it is not appropriate or good practice to hand control of the Company back to the directors even for a short space of time, and consequently it has been agreed that Vale will apply to the Court for an order to place the Company into liquidation, to take effect at the same time as the Administration Order is discharged.  It is understood that experienced insolvency practitioners at Alvarez & Marsal in London are on stand-by to take the appointment as liquidators and I confirm that the Joint Administrators have no objections to this course of action.

48      Ancillary orders are also sought as to the release of the Joint Administrators from liability and an order that their fees be paid in priority to other claims against the Company.  I understand that legal submissions in respect of both of these points will be made at the hearing of the Application.

**No party served**

49    The Application has not been served on any party.  Vale are obviously aware of it because the Application is being brought in tandem with the Winding Up Application, but the Joint Administrators have been expressly asked by Vale not to give notice to any other party including other creditors.  Those other creditors include Standard Chartered Bank (**SCB**) (which is a secured creditor in respect of certain prospective assets of the Company) and Nysco itself.  I confirm that the Joint Administrators have abided by that request.  However we intend to advise Nysco and SCB that the funding position is no longer sustainable and that we intend to make an application to discharge the administration order.

**Conclusion**

It is with regret that the Application is being made.  However the lack of any funding, or indeed any constructive engagement by Nysco on the question of fees, has put the Joint Administrators in an untenable position and they have made the difficult decision to seek to bring the Administration Order to an end in favour of a liquidation of the Company which will be driven forward by the Company's majority creditor.

**AFFIRMED by the said**      )
**MALCOLM COHEN**       )
**At …………………..**         )
**This 23 day of July 2020**    )


Before me


………………………………………………………………………………..

**Solicitor**

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**IN THE MATTER OF BSG RESOURCES LIMITED (IN ADMINISTRATION) (THE "COMPANY")**

**AND**

**IN THE MATTER OF THE COMPANIES (GUERNSEY) LAW, 2008**

_____

**EXHIBIT MC1**

_____

This is the Exhibit MC1 to the First Affidavit of Malcolm Cohen sworn on 23July 2020.

**Before me**

……………………………………………………………………………..

**Solicitor**



# Guernsey Registry

**Guernsey Registry**

Market Building
PO Box 451, Fountain Street
St. Peter Port, Guernsey,
GY1 3GX
Tel: +44 1481 743800
Fax: +44 1481 743801
Email: enquiries@guernseyregistry.com

www.guernseyregistry.com

# Statement of the Register

## BSG RESOURCES LIMITED

---

## ENTITY DETAILS

| | | | | |
|---|---|---|---|---|
| **Registered Number:** | 46565 | **Registered Date** | 09-Mar-2007 | **Status** Administration |
| **Registered Name** | BSG RESOURCES LIMITED | | | **Effective Date** 09-Mar-2007 |
| **Alternative Name** | N/A | | | |

| | | |
|---|---|---|
| **Registered Address** | West Wing<br>Frances House<br>Sir William Place<br>St Peter Port<br>Guernsey<br>GY1 1GX | **Effective Date** 02-Jul-2007 |

| | | | |
|---|---|---|---|
| **Entity Type** | Non Cellular Company | **Liability Type** | Limited by Shares |
| **Economic Activity** | Active equity holding company (excluding  intellectual property, real estate and transport) with significant shareholder control over another entity | | |

---

I hereby certify that the attached statement of the register for  BSG RESOURCES LIMITED, registration number 46565 provides a full extract of all publicly available information presently held on the electronic Register maintained at the Guernsey Registry.

*[signature]*

Mat Desforges
Registrar

Monday, May 11, 2020

*cutting edge technology with historic integrity*

Printed:     11-May-2020     11:21

Statement of the Register:

## PREVIOUS NAMES

**Effective Date**   **Previous Name**

## CURRENT AND PREVIOUS DIRECTORS

Please note: in some cases the director appointment dates may reflect the company re-registration date (after 1 July 2008-the date on which the new Companies Law came into force) rather than the actual appointment date of the director.

| Start Date | End Date | Director Type | Name | Service Address |
|---|---|---|---|---|
| 28-Nov-2008 | 18-Oct-2013 | Director | Kevin  McAuliffe | |
| 28-Nov-2008 | 14-Apr-2014 | Director | David Michael Clark | |
| 28-Nov-2008 | | Director | Dag Lars Cramer | West Wing Frances House Sir William Place  St Peter Port Guernsey GY1 1GX |
| 28-Nov-2008 | 31-Jan-2016 | Director | Sandra  Merloni-Horemans | |
| 28-Nov-2008 | 18-Mar-2010 | Director | David  Granot | |
| 28-Nov-2008 | 31-May-2012 | Director | Stephen Douglas Oke | |
| 01-Jun-2013 | 28-Feb-2015 | Director | David Jeremy Mallory Trafford | |
| 14-Apr-2014 | | Director | Peter Harold Driver | West Wing Frances House Sir William Place  St Peter Port Guernsey GY1 1GX |
| 01-May-2016 | 1-Sep-2018 | Director | Gustaf Fredrik Bodin | |

## CURRENT AND PREVIOUS RESIDENT AGENTS

| Start Date | End Date | Agent Type | Name | Service Address |
|---|---|---|---|---|
| 28-Nov-2008 | 14-Apr-2014 | Resident Agent | David Michael Clark | |
| 14-Apr-2014 | | Resident Agent | Peter Harold Driver | |

## FILED DOCUMENTS

Please note: not all documents that were filed with the Registry before 1 July 2008 will show on the electronic record.

| Ref | Received | Status | Submission / Document Type | Registered | Scanned Pages |
|---|---|---|---|---|---|
| DM652004 | 07-Jan-2008 | Registered | Annual Return/Annual Return | 07-Jan-2008 | 2 |
| DM9773 | 10-Jul-2007 | Registered | Allotments/Allotments | 10-Jul-2007 | 1 |
| 148978 | 08-Jan-2009 | Registered | AV Non Regulated Companies/Annual Validation Form | 08-Jan-2009 | 5 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Migration Documents | 26-Mar-2007 | 49 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Memorandum of Association | 26-Mar-2007 | 16 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Articles of Association | 26-Mar-2007 | 30 |

*cutting edge technology with historic integrity*

Printed:      11-May-2020     11:21

Statement of the Register:

| 246567 | 04-Jan-2010 | Registered | AV Non Regulated Companies/Annual Validation Form | 04-Jan-2010 | 5 |
|---|---|---|---|---|---|
| 257741 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Form | 19-Jan-2010 | 2 |
| 257741 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Attachment | 19-Jan-2010 | 1 |
| 257747 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Form | 19-Jan-2010 | 2 |
| 257747 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Attachment | 19-Jan-2010 | 1 |
| 257781 | 19-Jan-2010 | Registered | AV Amendment/AV Amendment | 19-Jan-2010 | 5 |
| 276078 | 18-Mar-2010 | Registered | Change Director/Change of Director Form | 18-Mar-2010 | 2 |
| 277356 | 01-Apr-2010 | Registered | Res - Alter Articles/Resolution Form | 01-Apr-2010 | 2 |
| 277356 | 01-Apr-2010 | Registered | Res - Alter Articles/Resolution Attachment | 01-Apr-2010 | 21 |
| 319467 | 04-Jan-2011 | Registered | AV Non Regulated Companies/Annual Validation Form | 04-Jan-2011 | 5 |
| 384872 | 03-Jan-2012 | Registered | AV Non Regulated Companies/Annual Validation Form | 03-Jan-2012 | 5 |
| 421000 | 31-May-2012 | Registered | Change Director/Change of Director Form | 31-May-2012 | 2 |
| 446903 | 02-Jan-2013 | Registered | AV Non Regulated Companies/Annual Validation Form | 02-Jan-2013 | 4 |
| 482160 | 06-Jun-2013 | Registered | Change Director/Change of Director Form | 06-Jun-2013 | 2 |
| 493553 | 18-Oct-2013 | Registered | Change Director/Change of Director Form | 18-Oct-2013 | 2 |
| 504432 | 02-Jan-2014 | Registered | AV Non Regulated Companies/Annual Validation Form | 02-Jan-2014 | 4 |
| 535098 | 14-Apr-2014 | Registered | Change Director/Change of Director Form | 14-Apr-2014 | 2 |
| 561058 | 08-Jan-2015 | Registered | AV Non Regulated Companies/Annual Validation Form | 08-Jan-2015 | 4 |
| 584086 | 05-Mar-2015 | Registered | Change Director/Change of Director Form | 05-Mar-2015 | 2 |
| 586929 | 02-Jul-2007 | Registered | Change Address/Change of Reg Office Address Form | 02-Jul-2007 | 1 |
| 606652 | 05-Oct-2015 | Registered | Res - Audit Exempt - Indefinite/Resolution Form | 05-Oct-2015 | 2 |
| 606652 | 05-Oct-2015 | Registered | Res - Audit Exempt - Indefinite/Resolution Attachment | 05-Oct-2015 | 1 |
| 624270 | 15-Jan-2016 | Registered | AV Non Regulated Companies/Annual Validation Form | 15-Jan-2016 | 4 |
| 633948 | 28-Jan-2016 | Registered | Change Director/Change of Director Form | 28-Jan-2016 | 2 |
| 645371 | 03-May-2016 | Registered | Change Director/Change of Director Form | 03-May-2016 | 2 |

*cutting edge technology with historic integrity*

Printed:   11-May-2020   11:21

Statement of the Register:

| 671715 | 10-Jan-2017 | Registered | AV Non Regulated Companies/Annual Validation Form | 10-Jan-2017 | 4 |
| 726613 | 16-Jan-2018 | Registered | AV Non Regulated Companies/Annual Validation Form | 16-Jan-2018 | 4 |
| 762036 | 07-Mar-2018 | Registered | Court Order/Notice/Court Order | 07-Mar-2018 | 2 |
| 781782 | 18-Sep-2018 | Registered | Change Director/Change of Director Form | 18-Sep-2018 | 2 |
| 806132 | 06-Feb-2019 | Registered | AV Non Regulated Companies/Annual Validation Form | 06-Feb-2019 | 4 |
| 864111 | 12-Feb-2020 | Registered | Change Company Details/Change Company Details Form | 12-Feb-2020 | 2 |
| 867456 | 19-Feb-2020 | Registered | AV Non Regulated Companies/Annual Validation Form | 19-Feb-2020 | 4 |

## DISCLAIMER

This 'Statement of The Register' reflects the information held on the Register at the date and time of production of the Statement. It should be noted that legislation governing registered entities requires certain actions and events to be notified, and in some cases certain documents to be delivered, to the Registry within prescribed time frames. It is possible that actions or events affecting the information provided in this Statement have taken place that have not yet been notified to, or in the case of paper submissions processed by the Registry. This "Statement of The Register" therefore only reflects actions and events of which the Registry has been notified in the appropriate form, and in the case of paper submissions those which have been processed, at the date and time of production of this Statement.

*cutting edge technology with historic integrity*

Printed:    11-May-2020    11:21

46565

THE COMPANIES (GUERNSEY) LAWS, 1994, AS AMENDED

GREFFE
ROYAL COURT
- 9 MAR 2007
GUERNSEY



1042720

COMPANY LIMITED BY SHARES

| Company Fees | | |
|---|---|---|
| Duty | £ | 50:00 |
| Reg. | £ | 200:00 |
| Deposit | £ | : |
| Exempt | | |
| Status | £ | : |
| | | £250:00 |

MEMORANDUM

and

ARTICLES OF ASSOCIATION

of

**BSG RESOURCES LIMITED**

Registered in Guernsey this          day of                    2007

**Carey Olsen**
P O Box 98,
7 New Street , St. Peter Port
Guernsey, Channel Islands. GY1 4BZ
Tel: +44 (0)1481 727272 Fax: +44 (0)1481 711052
www.careyolsen.com

1005789/0085/G1438183v1

12-03-07  1          *250.00#1

THE COMPANIES (GUERNSEY) LAWS, 1994, AS AMENDED

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

of

**BSG RESOURCES LIMITED**

1.   The name of the Company is "**BSG RESOURCES LIMITED**".

2.   The Registered Office of the Company will be situate in Guernsey.

3.   The objects for which the Company is established are:-

3.1   To carry on the business of an investment holding company and for that purpose to invest the capital and other moneys of the Company in the purchase or upon the security of shares, stocks, debentures, debenture stocks, bonds, mortgages, obligations and securities of any kind issued by any company, corporation or undertaking of whatever nature and wheresoever constituted or issued or guaranteed by any government, sovereign, ruler, commissioners, trust, authority or other body of whatever nature, whether at home or abroad.

3.2   To acquire such shares, stocks, debentures, debenture stocks, bonds, mortgages, certificates of deposit, treasury bills, monetary instruments, obligations and other securities by original subscription, syndicate participation, tender, purchase, exchange or otherwise, and to guarantee the subscription thereof; and to exercise and enforce all rights and powers conferred by or incidental to the ownership thereof.

3.3   To invest the capital and other moneys of the Company in the purchase of land or any interest in land, buildings or hereditaments of any tenure and to develop and turn the same to account in any manner that may seem expedient.

3.4   Either with or without the Company receiving any consideration, benefit or advantage, direct or indirect, and so as to be an independent object of the Company, to loan money to any person, to give or enter into any guarantees, indemnities or other financial assurances against loss in respect of the performance of obligations of any kind and the payment or repayment of money (including, but not limited to,

1

principal, premium, dividends and interest) by any person (whether connected in any way with the Company or not) and to create securities of any kind (including, but not limited to, mortgages and charges) upon all or any of the property of the Company (both present and future and including, but not limited to, its uncalled capital) in support of those guarantees or indemnities and to enter into contracts of any kind in connection with those guarantees, indemnities or securities.

3.5    To carry on business as a general commercial company.

4.    The Company shall have power to do anything which is incidental or conducive to the carrying on of any of the above objects, including but without prejudice to the generality of the foregoing, the power to borrow and raise money in any currency and to secure or discharge any debt or obligation of the Company by mortgaging or charging the undertaking and all or any of the property and assets (present and future) and the uncalled capital of the Company.

5.    The liability of the Members is limited to the amount for the time being remaining unpaid on the shares held by each of them respectively.

6.    The authorised share capital of the Company is US$10,000 divided into 10,000 shares of US$1 each.

7.    The Company has power to increase or reduce its capital and to attach to any shares in the initial or increased or reduced capital any preferential, deferred, qualified or special rights, privileges or conditions or to subject the same to any restrictions or limitations.

8.    Furthermore, the rights for the time being attached to the shares in the initial capital and/or to any shares having preferential, deferred, qualified or special rights, privileges or conditions attached thereto, may be altered or dealt with in accordance with the Articles of Association for the time being.

9.    The shares shall be paid for according to the terms of allotment or otherwise by calls as the Directors shall think fit.

10.    Any shares in the capital of the Company may be issued in payment or part payment of the purchase consideration for any property purchased by the Company or in consideration of any services rendered or to be rendered to the Company by any person or company in assisting the Company to carry out any of its objects and for shares so issued no money payment shall be made or required, save in so far as by the terms or provisions under which any of such shares may be issued, a cash payment therefor may be required.

2

11. The common signature of the Company may be either:-

11.1 **"BSG RESOURCES LIMITED"**

with the addition of the signature(s) of one or more officer(s) of the Company authorised generally or specifically by the Directors for such purpose, or such other person or persons as the Directors may from time to time appoint; or

11.2 if the Directors resolve that the Company shall have a common seal, the common seal of the Company affixed in such manner as the Articles of Association of the Company may from time to time provide;

as the Directors may from time to time determine either generally or in any particular case.

IN THE ROYAL COURT OF GUERNSEY

ORDINARY DIVISION

In the matter of an application by **BSG RESOURCES LIMITED** under Section 6 of the Migration of Companies Ordinance, 1997 for the consent of the Court for the registration of the Company as a Guernsey company with the name "**BSG RESOURCES LIMITED**".

---

**EXHIBIT "PCR4"**

---

This the Exhibit "PCR4" mentioned and referred to in the annexed Affidavit of **PHILIP CHARLES RETZ** sworn this ⁶ᵗʰ day of March, 2007

NOTARY PUBLIC

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

# BSG RESOURCES LIMITED

(the "**Company**")

Minutes of an Extraordinary General Meeting of the Company held at 22 Smith Street, St Peter Port, Guernsey GY1 2JQ on 5th day of December 2006 at 2.30pm (the "**Meeting**")

| | |
|---|---|
| **Present:** | Mr Kevin McAuliffe representing NYSCO Management Limited and Galtoney Resources Limited (Chairman) |
| | Mr Philip Retz representing C.L. Nominees Limited |
| **In attendance:** | Mrs Alison Moullin representing C.L. Secretaries Limited |

1. **CHAIRMAN OF THE MEETING**

   Mr Kevin McAuliffe was appointed Chairman of the Meeting.

2. **NOTICE**

   A copy of the Notice of the Meeting and Consent to Short Notice signed by a majority of members having the right to attend and vote at the Meeting and, being a majority, together holding not less than 95 per cent of the total voting rights of the members who have that right were produced to the Meeting. The Notice of the Meeting was taken as read.

   The Chairman confirmed that as required by the Companies (Jersey) Law 1991 due notice had been given to the Company's auditors.

3. **QUORUM**

   It was noted that a quorum was present at the Meeting as at least two members entitled to vote were present in person.

4. **PURPOSE**

   The Chairman noted that the purpose of the Meeting was to consider and if thought fit approve a proposed application by the Company for continuance in Guernsey.

5.   **SPECIAL RESOLUTION**

It was unanimously resolved to pass the following resolution which was proposed as a special resolution of the Company:

"**THAT**:

(a)   the proposed application by the Company for continuance in Guernsey (the "**Application**") be and is hereby approved; and

(b)   any director of the Company or the Company Secretary be and is hereby authorised to make the Application either on the terms set out in the form of application attached to the notice of EGM or on such other terms as such director or Company Secretary in his or her absolute discretion may consider necessary or desirable, and to do all such acts and things and execute such documents and instruments, or to authorise others to do such acts or things or to execute such documents and instruments, as such director or Company Secretary considers in his or her absolute discretion necessary or desirable in connection with the Application."

6.   **CLOSE OF MEETING**

There being no further business the Meeting was closed.

..................................................
**Chairman**

IN THE ROYAL COURT OF GUERNSEY

ORDINARY DIVISION

In the matter of an application by **BSG RESOURCES LIMITED** under Section 6 of the Migration of Companies Ordinance, 1997 for the consent of the Court for the registration of the Company as a Guernsey company with the name "**BSG RESOURCES LIMITED**".

---

**EXHIBIT "PCR5"**

---

This the Exhibit "PCR5" mentioned and referred to in the annexed Affidavit of **PHILIP CHARLES RETZ** sworn this 6th day of March, 2007

NOTARY PUBLIC

Davey G Le Marquand
Notary Public
7 New Street
St Peter Port
Guernsey GY1 4BZ

◢CAREY OLSEN

Your Ref:

Our Ref:       MGJ/CJD/1005073/0714/J1650265v33

Guernsey Financial Services Commission
La Plaiderie Chambers
La Plaiderie
St Peter Port
Guernsey
GY1 1WG

19 February 2007

Dear Sirs

**BSG Resources Limited (the "Company")**

1.     We have acted as legal counsel in Jersey to the Company in connection with its proposed continuance as a body corporate incorporated in Guernsey.  As such counsel, we have been requested to opine on certain matters relating to such continuance.

2.     For the purposes of this Opinion we have examined and reviewed copies of:

   (a)     the Certificate of Incorporation and Memorandum and Articles of Association of the Company;

   (b)     the consent(s) granted to the Company under the Control of Borrowing (Jersey) Order 1958;

   (c)     minutes of a meeting of the directors of the Company held on 5 December 2006 at which the continuance of the Company as a body corporate incorporated in Guernsey was approved;

   (d)     minutes of an extraordinary general meeting of the shareholders of the Company held on 5 December 2006 at which the continuance of the Company as a body corporate incorporated in Guernsey was approved, together with a copy of the notice given of such meeting and a consent to short notice in respect of the short notice of such meeting;

   (e)     a certificate of a Director of the Company relating to certain factual matters;

OFFICES: JERSEY ● GUERNSEY ● LONDON

PARTNERS: Nicholas Crocker ● William Grace ● Michael Jeffrey
Nicolas Journeaux ● John Kelleher ● Eve Kosofsky ● Nicole Langlois
Robert MacRae ● Paul Matthams ● Alexander Ohlsson ● Anthony Olsen
Edward Quinn ● Paul Sugden

47 Esplanade
St Helier
Jersey
JE1 0BD

Telephone:   +44(0) 1534 888900
Facsimile:    +44(0) 1534 887744
E-mail:        info@careyolsen.com
Website:      www.careyolsen.com

Guernsey Financial Services Commission
19 February 2007
Page 2

 (f)  form C101 application by the Company for continuance as a body corporate in Guernsey;

 (g)  certificates given by the present and/or intended directors of the Company (as the case may be) pursuant to Articles 127I(3), 127S, 127W(2) and 127W(3) of the Companies (Jersey) Law 1991 as amended (the "**Law**");

 (h)  a certificate from the Jersey Financial Services Commission (the "**JFSC**") advising that they consent to the continuance of the Company as a body corporate in Guernsey, subject to certain condition(s) set out therein (the "**Authorisation**");

 (i)  a legal opinion given by legal counsel in Guernsey to the Company in connection with its proposed continuance as a body corporate incorporated in Guernsey; and

 (j)  such other corporate documents of the Company of which we are aware and which we consider relevant for the purposes of giving our opinion.

3. For the purposes of this Opinion we have also considered such questions of Jersey law as we consider relevant and necessary based on our understanding of this transaction and, in particular, have considered Part 18C (Continuance) of the Law.

4. For the purposes of giving this Opinion we have assumed (and relied on these assumptions):

 (a)  that the laws of Guernsey permit a continuance of the Company as a body corporate in Guernsey, and that such laws provide that following such continuance:-

  (i)  all property and rights of the Company will become the property and rights of such body corporate;

  (ii)  such body corporate will become subject to all criminal and civil liabilities, and all contracts, debts and other obligations to which the Company is subject; and

  (iii)  all actions and other legal proceedings which are pending by or against the

Guernsey Financial Services Commission
19 February 2007
Page 3

Company may be continued by or against the body corporate;

(b)     the accuracy and completeness of the documents referred to in paragraph 2 above, and of all
        statements of fact or opinion contained in such documents, as at the date of this Opinion;

(c)     where we have examined draft documents, the final documents do not differ in any respect
        from such drafts;

(d)     the genuineness and authenticity of all signatures and seals on all documents and the
        completeness and conformity to original documents of all copies submitted to us;

(e)     that there is no provision of the law or regulation of any jurisdiction other than Jersey which
        would have any adverse implication in relation to the opinion expressed hereunder;

(f)     that we have been provided with copies or originals of all documents which are relevant to
        or which might affect the opinions expressed in this Opinion and that there is nothing in any
        documents of which we have not had sight which might affect the opinions expressed in this
        Opinion;

(g)     that the proposed continuance of the Company as a body corporate incorporated in Guernsey
        and all other arrangements in connection with the same do not result in the breach of or
        otherwise infringe any agreement, deed or document (excluding the Company's
        Memorandum and Articles of Association) entered into or binding on the Company; and

(h)     that in resolving that the Company seek continuance in Guernsey the directors of the
        Company were acting with a view to the best interests of the Company and were otherwise
        exercising their powers in accordance with their duties under all applicable laws.

We have not independently verified the above assumptions.

5.   On the basis of and subject to the above and subject to matters not disclosed to us we are of the
     following opinion:

*ML*

Guernsey Financial Services Commission
19 February 2007
Page 4

     (a)     the laws of Jersey permit the Company to seek continuance as a body corporate incorporated in Guernsey;

     (b)     the Company has taken all corporate action required by it to seek continuance as a body corporate incorporated in Guernsey; and

     (c)     when the Company is, in accordance with the terms of (and subject to the conditions set out in) the Authorisation, continued as a body corporate under the laws of Guernsey the Company thereupon ceases to be a company incorporated under the Law.

6.     We note that it is a condition of the consent of the JFSC given in the Authorisation that a copy of the Instrument of Continuance in Guernsey, certified to be a true copy, is delivered to the Registrar of Companies in Jersey on completion of the migration.

7.     This opinion shall be governed by and construed in accordance with the laws of Jersey and is limited to the matters expressly stated herein. This opinion is limited to matters of Jersey law and practice as at the date hereof and we have made no investigation and express no opinion with respect to the laws or practice of any other jurisdiction. This opinion is addressed only to you and is solely for your benefit and except with our prior written consent it may not be disclosed to or relied upon by any other person or used for any purpose or referred to or made public in any way.

Yours faithfully

**CAREY OLSEN**



**GUERNSEY
FINANCIAL
SERVICES
COMMISSION**

Your ref: PAK/1005789/0085/G1437711-1
Our ref:  Y793/KJB/MS/BSG Resources Limited

Mr P.A Kiddy
Carey Olsen
PO Box 98
7 New Street
St Peter Port
Guernsey
GY1 4BZ

28 February 2007

Dear Mr Kiddy

**The Migration of Companies Ordinance, 1997**
**BSG Resources Limited**

I refer to your letter of 20 February 2007 applying for consent for the registration of the above-named Jersey registered company as a Guernsey company in accordance with The Migration of Companies Ordinance, 1997.   The Commission hereby consents, pursuant to section 5 of the said Ordinance, to the registration of BSG Resources Limited as a Guernsey company provided that there is no objection from the Law Officers of the Crown.

Yours sincerely

Kevin Bown
**Assistant Director**
**Fiduciary and Intelligence Services Division**

F:\Docs\MSavage\Company Migrations\Migrations In\BSG Resources - Migration In - leter to Adv or Administr to consent.DOC

THE COMPANIES (GUERNSEY) LAW, 2008

NON-CELLULAR COMPANY LIMITED BY SHARES

ARTICLES OF INCORPORATION

of

**BSG RESOURCES LIMITED**

Registered in Guernsey 9 March, 2007
As amended by a special resolution dated 30 March, 2010

# Standard Articles of Incorporation

# Non-Cellular Company limited by shares with unlimited objects that is not publicly traded

Pursuant to section 16(2) of the *Companies (Guernsey), Law* 2008 ("the Companies Law"), the Department of Commerce and Employment hereby prescribes the following standard articles that shall apply to non-cellular companies limited by shares with unlimited objects formed in Guernsey subject to any specific dis-application or modification made by the members of the company under the Companies Law.

# ARTICLES OF INCORPORATION

## OF

## BSG RESOURCES LIMITED

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | Interpretation | 4 |
| 2 | Power of the board to issue shares | 5 |
| 3 | Share capital | 6 |
| 4 | Trusts not recognised | 6 |
| 5 | Company's lien on shares | 6 |
| 6 | Enforcing lien by sale | 6 |
| 7 | Calls on shares | 7 |
| 8 | Forfeiture of shares | 7 |
| 9 | Transfers and registration of shares | 8 |
| 10 | Suspension of share transfers by the board | 9 |
| 11 | Share certificates | 9 |
| 12 | Transmission of shares | 9 |
| 13 | Dividends and distributions | 10 |
| 14 | Appointment and removal of directors | 10 |
| 15 | Remuneration and expenses | 11 |
| 16 | Delegation of powers | 11 |
| 17 | Appointment of agent | 11 |
| 18 | Power of attorney | 11 |
| 19 | Secretary | 12 |
| 20 | Indemnity | 12 |
| 21 | Board meetings | 12 |
| 22 | Notice | 13 |
| 23 | Extraordinary general meetings | 13 |
| 24 | General Meetings | 13 |
| 25 | Election and powers of chairman | 14 |
| 26 | Right of directors to speak | 14 |
| 27 | Voting and polls | 14 |
| 28 | Proxies | 15 |
| 29 | Bodies corporate acting by representatives | 16 |
| 30 | Omission or non-receipt of notice | 16 |
| 31 | Common signature | 16 |
| 32 | Seal | 16 |

**Interpretation**

1.1     In these articles –

"**articles**" means these articles of incorporation as altered from time to time.

"**board**" means the board of directors of the company, or the board of directors present at a meeting of the board at which a quorum is present, or present at a meeting of a committee of the board of directors.

"**circulating resolution**" has the meaning set out in article 21.5.

"**clear days**" in relation to the period of notice means that period excluding the day when notice is given or deemed to be given and the day for which it is given or on which it is to take effect.

"**date of forfeiture**" has the meaning set out in article 8.3.

"**extraordinary general meeting**" has the meaning set out in article 23.1.

"**member**" means the registered holder of a share in the company as recorded in the register.

"**person**" includes an individual and a body corporate.

"**register**" means the register of members kept by the company as required by section 123 of the Law.

"**the Law**" means the *Companies (Guernsey) Law, 2008*.

"**the company**" means the company formed under the memorandum of incorporation dated  9 March 2007 with the name  BSG RESOURCES LIMITED bearing Registry reference 46565.

"**the memorandum**" means the memorandum of incorporation of the company.

Unless the context otherwise requires, words or expressions contained in these articles bear the same meaning as in the Law.

1.2     In these articles:

(a)     words in the singular include words in the plural and vice versa, and

(b)     words imparting a gender include every other gender.

1.3     These articles must be read in conjunction with and subject to the provisions of the Law.

1.4     Headings and subheadings are included only for convenience and do not affect the meaning of these articles.

1.5     References to enactments are to such enactments as from time to time modified, re-enacted or consolidated and shall include any enactments made in substitution for an enactment which is repealed and any Ordinances or Regulations made under those enactments.

2      **Power of the board to issue shares**

2.1    Subject to the provisions of the Law, on such terms and conditions as it sees fit, the board may:

    (a)    exercise the power of the company to issue shares or grant rights to subscribe for, or convert any security into shares, in accordance with section 292 of the Law,

    (b)    issue shares of different types within the meaning of section 277 of the Law or shares of different classes, and the creation or issuance of any such shares or any additional shares ranking equally with an existing type of class of share is deemed not to vary the rights of any existing member,

    (c)    subject to sections 342 and 348 of the Law, convert all or any classes of its shares into redeemable shares,

    (d)    issue shares which have a nominal or par value,

    (e)    issue shares of no par value,

    (f)    issue any number of shares they see fit,

    (g)    issue fractions of a share within the meaning of section 280 of the Law,

    (h)    make arrangements on the issue of shares to distinguish between shareholders as to the amounts and times of payments of calls on their shares,

    (i)    pay dividends in proportion to the amount paid up on each share where a larger amount is paid up on some shares than on others, and

    (j)    pay commissions in such manner and in such amounts as the board may determine.

2.2    Where the company has issued only a single class of shares the board may issue shares in accordance with section 293 of the Law.

2.3    Where the board has resolved to issue different classes of shares, the board has the authority to issue an unlimited number of shares subject to the following:

    (a)    the authority of the board to issue shares under this article 2.3 shall expire on the 5th anniversary of the incorporation of the company unless the members, by ordinary resolution, revoke that authority,

    (b)    at or before the expiry of the 5th anniversary of incorporation, the members may, by ordinary resolution, extend the power of the board to issue shares under this article 2.3 for further periods. Each period of extension may be for no more than 5 years, and

2.4    The company may hold treasury shares in accordance with the provisions of the Law.

2.5    Subject to the provisions of the Law the company may purchase its own shares and with respect to those shares, cancel them or hold them as treasury shares.

3        **Share capital**

3.1      The members may, by ordinary resolution alter the company's share capital in accordance with section 287 of the Law.


4        **Trusts not recognised**

4.1      No person is to be recognised by the company as holding any share upon any trust (either express, implied or constructive) and the company is not obliged to recognise any interest in any share except an absolute right to the registered holder of that share.


5        **Company's lien on shares**

5.1      The company shall have a first and paramount lien on every share (not being a fully paid share) for all money (whether presently payable or not) called or payable at a fixed time in respect of that share, and the company shall have a first lien on all shares (other than fully paid shares) standing registered in the name of a single person for all money payable by him or his estate to the company.  The company's lien on a share shall extend to all dividends payable thereon.

5.2      Subject to the provisions of the Law with respect to distributions, the board may at any time either generally or in any particular case waive any lien that has arisen or declare any share to be wholly or in part exempt from the provisions of article 5.1.


6        **Enforcing lien by sale**

6.1      The company may sell, in such manner as the board thinks fit, any share on which the company has a lien provided that a sum in respect of which the lien exists is presently payable and is not paid within fourteen clear days of notice being given to the member in accordance with article 6.2.

6.2      Before exercising any right of sale under a lien the company must:

         (a)     serve on the member a notice in writing demanding payment of any outstanding amount due and payable on the share within 14 clear days of the date of the notice, and

         (b)     the notice must state that if the notice is not complied with the shares may be sold at the discretion of the board.

6.3      To give effect to any such sale the board may authorise some person to execute an instrument of transfer of the shares sold to or in accordance with the directions of the purchaser.  The purchaser shall be registered as the holder of the shares comprised in any such transfer, and he shall not be bound to see to the application of the purchase money, nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

6.4      The net proceeds of the sale under article 6.3 shall be applied by the company in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue, if any, shall (subject to a like lien for sums not presently payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of sale.

7       **Calls on shares**

7.1     Subject to the terms of issue of the shares:

    (a)     the board may make calls upon the members in respect of any money unpaid on the shares held by the members and each member shall pay to the company as required by the notice the amount called upon his shares,

    (b)     a call is only valid if the board gives the members at least 14 clear days notice specifying when and where payment is to be made,

    (c)     at the absolute discretion of the board a call may be postponed in whole or in part, and

    (d)     a member on whom a call is made shall remain liable for calls made upon him regardless of any subsequent transfer of his shares.

7.2     A call is deemed to have been made at the time when the resolution of the board authorising the call was passed.

7.3     The board may on an issue of shares differentiate between holders as to the amounts and times of payment of calls on their shares.

7.4     Joint holders of shares are jointly and severally liable to pay all calls in respect of those shares.

7.5     The company may charge interest on any amount that remains unpaid from the day the call became due and payable until such time as the call is paid. That interest may be fixed by the terms of the issue of the share but if no amount is fixed then it shall be 10% per annum. The company may also charge the person obliged to pay the call any costs or expenses that have been incurred by the company due to that non-payment. The board may, at their absolute discretion, waive payment of any interest or charges under this article 7.5.

7.6     The company may receive from any member in advance any amount uncalled and unpaid upon any shares held by that member and may, until the date on which the amount becomes payable pursuant to a call, pay interest on the amount at a rate agreed between the board and the member.

7.7     Where a call has not been paid within the time for payment, all rights and privileges attaching to that share, including the right to vote at any general meeting, are suspended until such time as the call and any interest and expenses (if any) are paid. The board may, in its absolute discretion, waive any suspension of rights under this article 7.7.


8       **Forfeiture of shares**

8.1     If a call remains unpaid after it has become due and payable the board may exercise their right to declare the share forfeit.

8.2     Before exercising any right of forfeiture the board must:

    (a)     serve on the member a notice in writing (a "**forfeiture notice**") demanding payment of any outstanding amount due and payable on the share,

(b)  the notice must name a date not less than 14 clear days after the date of the notice at which time the call must be paid, and

(c)  the notice must contain a statement that if the call is not paid by the date specified in forfeiture notice, the board may exercise a right to declare the share forfeit.

(d)  the notice must state the place where payment is to be made and the accepted payment methods.

8.3   If the member does not comply with the forfeiture notice the board may, by resolution, declare that the share is forfeit.  That forfeiture shall include all dividends, distributions or other money payable in respect of the forfeited share (include any interest which may have accrued and any expenses which may have been incurred by the company in respect thereof).  The forfeiture takes effect at the time of the declaration ("**the date of forfeiture**").

8.4   Subject to the requirements of the Law a forfeited share may be:

(a)  sold, re-allotted, or transferred to such person and on such terms and in such manner as the board may determine,

(b)  cancelled, or

(c)  held as a treasury share.

8.5   The holder of a share that has been forfeited ceases to be a member in respect of that share and the member's name is deemed to have been removed from the register on the date of forfeiture. The holder of the share remains liable to the company for any calls made or payable on such shares on the date of forfeiture and associated interest and expenses.

8.6   A declaration in writing by a director or the secretary that a share has been duly forfeited or surrendered on the date stated in the declaration shall be conclusive evidence of the facts therein against all persons claiming to be entitled to the shares and the declaration shall (subject to the execution of an instrument of transfer if necessary) constitute a good title to the share and the person to whom the share is disposed of shall not be bound to see the application of the consideration, if any, nor shall his title to the share be affected by any irregularity in, or invalidity of, the proceedings in reference to the forfeiture or disposal of the share.

## 9       Transfers and registration of shares

9.1   A transfer of shares shall be made in any form which the board may approve and shall be executed by or on behalf of the transferor and, unless the share is fully paid, by or on behalf of the transferee.

9.2   Every instrument of transfer shall be left at the registered office of the company, or such other place as the board may prescribe, with the certificate (if any) of every share to be transferred and such other evidence as the board may reasonably require to prove the title of the transferor or his right to transfer the shares.

9.3     The board may refuse to register a transfer of shares or may refuse to register a transfer until such information as the board may require has been provided.  The board is not obliged to provide any reasons for a refusal under this article.

9.4     If the board refuses to register a transfer of shares they shall, within a period of 2 months after the date on which the board resolved to refuse the transfer, send to the transferor a written notice of the refusal and return the instrument of transfer to the transferor.

9.5     The person transferring the shares remains the holder of the shares until the transfer is registered and the name of the person to whom they are being transferred is entered in the register in respect of the shares.

9.6     These articles are subject to, and do not limit or restrict the company's powers to transfer shares in accordance with, the *Uncertificated Securities (Enabling Provisions) (Guernsey) Law, 2005*.


10      **Suspension of share transfers by the board**

10.1    The registration of transfers of shares may be suspended at such times and for such a period (not exceeding in aggregate 30 days in any calendar year) as the board may determine.


11      **Share certificates**

11.1    If the board elects to issue share certificates, within 2 months after allotment or lodgement of transfer (or within such other period as the conditions of issue shall provide), every member shall be entitled to receive one certificate for all of his shares or, if the member so requests, several certificates each for one or more of his shares.

11.2    Every such certificate shall be signed in accordance with the common signature, shall specify the shares to which it relates, and the amount paid up thereon, provided that in respect of a share or shares jointly held by several persons the company shall not be bound to issue more than one certificate, and delivery of a certificate to one of several joint holders shall be sufficient delivery to all such holders.

11.3    If a share certificate is defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and the payment of the expenses of the company in connection with the matter and generally upon such terms as the board shall think fit.


12      **Transmission of shares**

12.1    Subject to the provisions of section 290 of the Law, where a member dies and that member does not own shares jointly, then the company will recognise only the personal representative of the deceased shareholder as being entitled to the deceased member's interest in the shares. Where a member dies and that member owned shares jointly, the company will recognise only the surviving joint holder or holders as being entitled to the deceased members' interest in the shares.

12.2 Where a member become has his affairs declared *en désastre* or has a preliminary vesting order made against his Guernsey realty, becomes bankrupt, suspends payments or compounds with creditors, or is adjudged insolvent the board shall not be obliged to register the transfer of the share to the person entitled to the shares until that person provides to the board such information as the board may reasonably require to establish that person's entitlement to the shares. The person so entitled may:

(a) elect to be registered as the holder of the shares, or

(b) subject to the Law and these articles, choose to transfer the shares to another person by giving a completed transfer form to the company.


13 **Dividends and distributions**

13.1 Subject to the rights attaching to each share, the company is not liable to pay interest or any other penalty on any dividends or distributions paid by the company.

13.2 The board may deduct from any dividend or distribution any sum of money which may be due from that member as a result of any unpaid call on the share, or any other debt due and owing from the member to the company.

13.3 Any dividend or distribution which has remained unclaimed for 10 years from the date when it became due for payment shall, if the directors so resolve, be forfeited and cease to remain owing by the company.

13.4 The board may issue shares in lieu of dividends in accordance with section 306 of the Law.


14 **Appointment and removal of directors**

14.1 The company shall have at least one director and may have as many directors as the shareholders by ordinary resolution approve.

14.2 If for any reason whatsoever including death, resignation, removal or unavailability, the board may appoint a person who is willing to act as a director and, in the opinion of the board is an appropriate person to be appointed as a director.

14.3 The office of a director shall be deemed vacant if:

(a) he has been absent, without permission, from board meetings for more than 6 months,

(b) he becomes otherwise ineligible or incapable of continuing to act as a director for whatever reason,

(c) he has had his affairs declared *en désastre* or has a preliminary vesting order made against his Guernsey realty, becomes bankrupt, suspends payments or compounds with creditors, or is adjudged insolvent,

(d)  he is requested to resign in writing signed by all the other directors of the company (being not less that two in number), or

(e)  the members by ordinary resolution declare that he shall cease to be a director.

14.4  A director (other than an alternate director) may appoint an alternate to exercise some or all of his powers as a director for a specified period.  The appointment of an alternate director must be in writing and a copy of the appointment must be given to the company. The appointment may be terminated at any time by instrument in writing signed by the appointing director a copy of which must be given to the company.  The company shall give the alternate director notice of board meetings if requested to do so by the appointing director.  Where an alternate director exercises the appointing director's powers the exercise is as effective as if the powers were exercised by the director.  An alternate director shall cease to be an alternate if the director who appointed him ceases to be a director.

## 15    Remuneration and expenses

15.1  The members shall by ordinary resolution specify the directors' (and where appointed the secretary's) remuneration.

15.2  Each director may be paid all expenses properly incurred in connection with the discharge of his duties as a director.

15.3  An alternate director is entitled to be paid any expenses properly incurred in connection with the discharge of his duties as an alternate director including any fees agreed to be paid.  An alternate director is not entitled to be otherwise remunerated unless the members approve such remuneration by ordinary resolution.

## 16    Delegation of powers

16.1  The board may delegate to a committee consisting of one or more directors, any managing director, or any person holding an executive office of the company, such of their powers as the board considers appropriate and desirable to be exercised by such committee or officer.  Any such delegation may be made on such conditions, revoked, altered, or otherwise varied as the board think fit.

## 17    Appointment of agent

17.1  The board may appoint any person (including any officer or employee of the company) to act as the agent of the company for such purpose and on such conditions as they determine, including the authority for the agent to execute documents on behalf of the company or delegate all or any of his powers.

## 18    Power of attorney

18.1  Subject to the Law, the board may from time to time (and at any time) by power of attorney

appoint any person, firm, or body of persons, whether nominated directly or indirectly by the board, to be the attorney of the company for such purpose and with such of the board's powers, authorities and discretion and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection or convenience of persons dealing with any such attorney as the board may think fit and may also authorise any such attorney to delegate all or any of the powers, authorities and discretion vested in him.

18.2   A power of attorney given by the company shall be valid if executed by the company under the common signature of the company.

19     **Secretary**

19.1   The members may (but are not obliged to) appoint a company secretary by ordinary resolution. For the avoidance of doubt, the members may appoint one of the directors as company secretary or appoint a person who is not a director as the company secretary.

19.2   Where the members do not choose to appoint a secretary the directors may (but are not obliged to) appoint one of their number to act as both a director and company secretary.

19.3   The company secretary shall carry out the duties and functions contained in section 171 of the Law.

19.4   The company secretary may be removed in accordance with article 14.3 as if the company secretary were a director.

20     **Indemnity**

20.1   The directors, secretary and other officers or employees of the company shall be indemnified out of the assets of the company to the fullest extent permitted by the Law from and against all actions, costs, charges, losses, damages and expenses which they or any of them may incur or sustain by reason of any contract entered into or any act done, concurred in or omitted, in or about the execution of their duty or supposed duty or in relation thereto.

20.2   An alternate director is entitled to be indemnified under this clause as if he were a director.

20.3   The directors may without the sanction of the company in general meeting authorise the purchase or maintenance by the company for any officer or former officer of the company of any insurance which is permitted by the Law in respect of any liability which would otherwise attach to such officer or former officer.

21     **Board meetings**

21.1   The directors may regulate their proceedings as they think fit and may determine amongst themselves any matter relating to the proceedings of board meetings including:

       (a) the number and frequency of meetings,

       (b) the quorum required for the holding of meetings,

(c)  the appointment and removal of a chairman of the board, and

(d)  the establishment of committees of the board.

21.2    Unless the directors otherwise resolve under paragraph 20.1(b) the quorum for a board meeting shall be two directors unless the company has a single director.  In that case the single director alone is deemed to be a quorum.

21.3    Where a director and his alternate director are present, the alternate director shall not be counted as part of any quorum nor shall he be entitled to vote.

21.4    Questions arising at any board meeting shall be decided by a majority of votes.  Each director is entitled to cast a single vote.  In the case of an equality of votes the chairman shall have a second or casting vote.

21.5    The board may pass a resolution without convening a board meeting if all directors entitled to vote on the resolution sign and date a document containing a statement that they are in favour of the resolution set out in the document (a "**circulating resolution**").  The circulating resolution may be executed by each director in counterpart.  The circulating resolution is passed when the last director entitled to vote signs the circulating resolution.


22    **Notice**

22.1    All members are deemed to have agreed to accept communication from the company by electronic means unless the members notify the company otherwise.  Notice under this article 22.1 must be in writing and signed by the member and delivered to the company's registered office or such other place as the board directs.

22.2    A member present, either in person or by proxy, at any meeting of the company or of the holders of any class of shares in the company is deemed to have received notice of the meeting and, where requisite, of the purpose for which it was called.

22.3    Every person who becomes entitled to a share shall be bound by any notice in respect of that share which, before his name is entered in the register or members, has been duly given to a person from which he derives his title.


23    **Extraordinary general meetings**

23.1    All General Meetings save those called under section 199 of the Law shall be called "Extraordinary General Meetings".


24    **General Meetings**

24.1    No business shall be transacted at any meeting unless a quorum is present in accordance with the Law and these articles.

24.2    If such a quorum is not present within half an hour from the time appointed for the meeting, or if during a meeting such a quorum ceases to be present, the meeting, if convened by or upon the requisition of members, shall be dissolved.  If otherwise convened, it shall stand adjourned to the same day in the next week at the same time and place, or such day, time and place as the chairman may determine and, if at such adjourned meeting a quorum is not present within five minutes from the time appointed for the holding of the meeting, those members present in person or by proxy shall be a quorum.

## 25      Election and powers of chairman

25.1    The chairman of any general meeting shall be either:

(a)     the chairman of the board,

(b)     in the absence of the chairman, or if the board has no chairman, then the board shall nominate one of their number to preside as chairman,

(c)     if neither the chairman of the board nor the nominated director are present at the meeting then the directors present at the meeting shall elect one of their number to be the chairman,

(d)     if only one director is present at the meeting then he shall be chairman of the general meeting, or

(e)     if no directors are present at the meeting then the members present shall elect a chairman for the meeting by an ordinary resolution.

25.2    The chairman of the general meeting shall conduct the meeting in such a manner as he thinks fit and may adjourn the meeting from time to time from place to place, but no business shall be transacted at an adjourned meeting other than business which might properly have been transacted at the meeting had the adjournment not taken place.  In addition the chairman may limit the time for members to speak.

## 26      Right of directors to speak

26.1    A director of the company shall be entitled to attend and speak at any general meeting and at any separate meeting of the holders of any class of shares in the company regardless of whether that director is a member of the company or of the relevant class of shares.

## 27      Voting and polls

27.1    A quorum of members shall be that number or members set out in section 213 of the Law.

27.2    Unless the board directs otherwise, the rights of a member to vote at a general meeting are suspended if that member has failed to pay any sum due and owing on his share whether that sum is due as a result of a failure to pay a call or otherwise.

27.3    Voting on any resolution proposed at a general meeting shall be done on the basis of a show of hands unless a poll is demanded.  Where a member is participating in a general meeting under section 217 of the Law, the chairman shall determine how that members' vote on a show of hands shall be counted.

27.4    A poll may be demanded in accordance with section 216 and may be demanded by:

(a)    the chairman,

(b)    at least two members having the right to vote on the resolution, or

(c)    a member or members representing not less than 10% of the total voting rights of all members having the right to vote on the resolution.

27.5    Subject to the provisions of the Law and a poll shall be taken as the chairman directs and he may:

(a)    appoint scrutineers (who need not be members),

(b)    fix a time and place for the poll and for the declaration of the results of the poll provided that neither shall take place any later than 30 days following the general meeting, and

(c)    if necessary adjourn the general meeting to enable a poll to be organised.

27.6    A poll demanded on the election of a chairman or on a question of adjournment shall be taken immediately.  A poll demanded on any other questions shall be taken either immediately or at such day, time and place as the chairman directs, not being more than 30 days after the poll is demanded.  The demand for a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which the poll was demanded.  If a poll is demanded before the declaration of the result of a show of hands and the demand is withdrawn, the meeting shall continue as if the demand had not been made.

27.7    No notice need be given of a poll not taken immediately if the day, time and place at which it is to be taken are announced at the meeting at which it is demanded.  In any other case at least seven clear days notice shall be given specifying the day time and place at which the poll is to be taken.


28      **Proxies**

28.1    An instrument appointing a proxy shall be in writing, executed by or on behalf of the member and shall be in the form approved by the board.  The board may resolve to permit instruments appointing proxies to be received by facsimile or email.

28.2    An instrument appointing a proxy is only valid if it is:

(a)    sent to the company's registered office, or

(b)    sent by facsimile to the telephone number nominated by the board of the company if the board resolves to accept proxy appointments by facsimile, or

(c)     sent by email to the email address nominated by the company if the board resolves to accept proxy appointments by email.

28.3    If the board resolves under paragraph 28.2(b) or (c) to accept proxy appointments by facsimile or email then the notice of general meeting must contain the nominated facsimile number and email address.

## 29    Bodies corporate acting by representatives

29.1    Any body corporate which is a member of a company may appoint such other person as it thinks fit to act as its representative at any meeting of the company or of any class of members of the company and exercise the member's powers accordingly.

## 30    Omission or non-receipt of notice

30.1    The accidental failure to provide notice of a meeting, or to send any other document, to a person entitled to received such notice or document shall not invalidate the proceedings at that meeting or call into question the validity of any actions, resolutions or decisions taken.

## 31    Common signature

31.1    The common signature of the company may be either:

(a)     BSG RESOURCES LIMITED with the addition of the signature(s) of one or more officer(s) of the company authorised generally or specifically by the board for such purpose, or such other person or persons as the board may from time to time appoint, or

(b)     if the board resolves that the company shall have a common seal, the common seal of the company affixed in such manner as these articles may from time to time provide.

## 32    Seal

32.1    If the board elects to have a common seal, the board shall provide for the safe custody of the seal which shall only be used pursuant to a resolution passed at a meeting of the board and every instrument to which the seal is affixed shall be signed in accordance with part (a) of the common signature as set out in article 31.1.

OGIER
2 March 2018

## *IN CAMERA*

### IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

IN THE MATTER OF BSG RESOURCES LIMITED

AND

IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008

---

### APPLICATION BY THE COMPANY
### FOR AN ADMINISTRATION ORDER

---

**BSG RESOURCES LIMITED**, a company registered in Guernsey with registered number 46565 (the "**Company**"), whose registered office is West Wing, Frances House, St William Place, St Peter Port, Guernsey GY1 1GX and whose address for service in Guernsey is at Redwood House, St Julian's Avenue, St Peter Port, GY1 1WA,

### APPLIES

to the Royal Court pursuant to part XXI of The Companies (Guernsey) Law, 2008 (as amended) (the "**Companies Law**") and the inherent jurisdiction of the Royal Court in the circumstances set out in the First Affidavit of Peter Harold Driver sworn on 27 February 2018 (the "**Driver Affidavit**") and lodged in support of this Application,

**FOR ORDERS THAT:**

1      The hearing of this matter be *in camera* and the Court file be sealed;

2      Notwithstanding that the matter is heard *in camera* and the Court file is sealed, the fact of any orders made and copies of any Act of Court in this matter can be disclosed to third parties by the Joint Administrators (as such term is defined in paragraph 5 of this Application) as they see fit;

3      The hearing of this Application shall take place before a judge sitting alone pursuant to section 13(1) of The Royal Court (Reform) (Guernsey) Law, 2008;

37

4      An administration order be made in relation to the Company pursuant to section 374(1) of the Companies Law for the purpose of the survival of the Company, and the whole or any part of its undertaking, as a going concern;

5      Pursuant to sections 374(2) and 383(3) of the Companies Law, Malcolm Cohen of BDO LLP of 55 Baker Street, London W1U 7EU and William Callewaert of BDO Limited, Rue du Pre, St Peter Port, Guernsey GY1 3QG be appointed and sworn in as joint administrators (the "**Joint Administrators**") of the Company to manage the affairs, business and property of the Company;

6      The Joint Administrators have the power for each to act alone or jointly together and with all of the powers set out at schedule 1 to the Companies Law;

7      The Joint Administrators' remuneration and all fees and expenses properly incurred by the Joint Administrators be payable in priority to all other claims from the assets of the Company pursuant to section 383(1) of the Companies Law;

8      Pursuant to section 383(2) of the Companies Law, the Joint Administrators' fees in relation to the administration of the Company be fixed in accordance with the schedule of hourly rates and the description of tasks and estimates of fees specified in the Driver Affidavit;

9      The costs of and incidental to this Application be paid from the Company's assets as a cost of the administration of the Company pursuant to section 383(1) of the Companies Law;

10     The Joint Administrators shall report to the creditors of the Company giving detailed information to the creditors regarding the progress of the administration at least once every six months; and

11     Such other order as the Court thinks fit.

Dated: This 27th day of February 2018

**Mathew Newman**
**Advocate for the Applicant**

38

*IN CAMERA*

**IN THE ROYAL COURT OF GUERNSEY**

**(ORDINARY DIVISION)**

**IN THE MATTER OF BSG RESOURCES LIMITED**

**AND**

**IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008**

---

**COURT ORDER**

---

**UPON** the Application dated 27th February 2018 (the "**Application**") of BSG RESOURCES LIMITED (the "**Company**"), whose registered office is at West Wing, Frances House, St William Place, St Peter Port, Guernsey GY1 1GX and whose address for service is at Ogier, Redwood House, St Julian's Avenue, St Peter Port;

**AND UPON** reading the First Affidavit of Peter Harold Driver sworn on 27 February 2018;

**AND UPON** confirmation that administration proceedings under part XXI of The Companies (Guernsey) Law, 2008 (the "**Companies Law**") are "proceedings" within the meaning of Article 2(a), and any administrators appointed in those proceedings (being administrators of the Company) shall be deemed foreign representatives within the meaning of Article 2(d), of the UNCITRAL Model Law on Cross Border Insolvency;

**AND UPON** hearing Advocate M. C. Newman for the Applicant;

**IT IS ORDERED THAT**:

1      The hearing of this matter be *in camera* and the Court file be sealed;

2      Notwithstanding that the matter is heard *in camera* and the Court file is sealed, the fact of any orders made and copies of any Act of Court in this matter can be disclosed to third parties by the Joint Administrators (as such term is defined in paragraph 5 of this Order) as they see fit;

3       The hearing of this Application shall take place before a judge sitting alone pursuant to section 13(1) of The Royal Court (Reform) (Guernsey) Law, 2008;

4       An administration order be made in relation to the Company pursuant to section 374(1) of the Companies Law for the purpose of the survival of the Company, and the whole or any part of its undertaking, as a going concern;

5       Pursuant to sections 374(2) and 383(3) of the Companies Law, William Callewaert of BDO Limited, Rue du Pré, St Peter Port, Guernsey GY1 3QG and Malcolm Cohen of BDO LLP of 55 Baker Street, London W1U 7EU be appointed and sworn in as joint administrators (the "**Joint Administrators**") of the Company to manage the affairs, business and property of the Company;

6       The Joint Administrators have the power for each to act alone or jointly together and with all of the powers set out at schedule 1 to the Companies Law;

7       The Joint Administrators' remuneration and all fees and expenses properly incurred by the Joint Administrators be payable in priority to all other claims from the assets of the Company pursuant to section 383(1) of the Companies Law;

8       Pursuant to section 383(2) of the Companies Law, the Joint Administrators' remuneration in relation to the administration of the Company be fixed in accordance with the schedule of hourly rates and the description of tasks and estimates of fees specified in the Driver Affidavit;

9       The costs of and incidental to this Application be paid from the Company's assets as a cost of the administration of the Company pursuant to section 383(1) of the Companies Law; and

10     The Joint Administrators shall report to the creditors of the Company giving detailed information to the creditors regarding the progress of the administration at least once every six months from the date hereof.

**AND THE COURT ADMINISTERED** the oath of Joint Administrator with the power to act alone to the said WILLIAM CALLEWAERT, the said MALCOLM COHEN not being present to be sworn into office at a later date.



....................................................

**J. R. Finch OBE**

**Judge of the Royal Court**

6th MARCH, 2018.

