# Exhibit 10

Claim No.

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

(1) BSG RESOURCES LIMITED

(2) BENY STEINMETZ

Claimants

-and-

(1) FTI CONSULTING LLP

(2) LORD MARK MALLOCH-BROWN

Defendants

---

**PARTICULARS OF CLAIM**

---

## A. SUMMARY OF CLAIM

1. In summary:

(1) The First Claimant (**"BSGR"**) (of which the Second Claimant, **"Mr Steinmetz"**, is ultimately a beneficiary) was a client of the First Defendant (**"FTI"**), which provided business communications consultancy services. In particular, BSGR was facing untrue and damaging allegations regarding an investment in a mining project in Guinea (latterly held in a joint venture called VBG) – and FTI was instructed to defend and protect its interests. The Second Defendant (**"MMB"**), a former British Government Minister and a man of considerable power and influence, joined FTI in September 2010 as Chairman EMEA and remains so.

(2) As is now clear, from the moment MMB joined FTI, FTI was in serious breach of its contractual and fiduciary duties to BSGR, including to act in its best interests. MMB had

1

numerous opposing interests in Africa and, most concerning, he was and still is closely involved with George Soros and NGOs funded by him who were (and remain) engaged in a smear campaign against BSGR. MMB's relationship with Mr Soros was so close that MMB was in charge of funding the very NGOs which were building a case against BSGR.

(3) In the end (but not until more than two years after he had joined FTI), MMB forced FTI to resign the account, against the wishes of the account team. He did so, as members of the account team have disclosed to BSGR, because Mr Soros told him to. The same members of that account team said that Mr Soros has a *"personal obsession about BSGR and is determined to ensure that VBG's mining licence was withdrawn/cancelled by the GOG [Government of Guinea]"*. The fact that Mr Soros has (if FTI's account team are to be believed) forced the termination of BSGR's advisors is of very serious concern. The timing also coincided with a time when it would inflict most damage, because (a) it was only weeks after a Government Committee in Guinea (funded by Mr Soros) (the "**Committee**") had issued a series of questions (based on an investigation also funded by Mr Soros) regarding the mine (and which had been leaked to the media even before they had been received by BSGR), and to which BSGR had to respond; and (b) it was directly following an article published in the Financial Times on 8 November 2012, which questioned BSGR's business in Guinea.

(4) The fact that since September 2010 FTI continued to act for BSGR and did not disclose to BSGR those very serious conflicts of interest, was from that time a breach of contract and fiduciary duty.

(5) In further breach of their obligations to BSGR, (a) MMB internally (and without knowledge to BSGR) instructed FTI's account team to limit its activities for BSGR, because of his conflicts; and (b) MMB and FTI (having discussed between them) decided deliberately to withhold disclosure of the conflicts of interest.

(6) Furthermore, MMB disclosed BSGR's confidential information to third parties. At this stage, it is clear that MMB disclosed such information to (a) Mr Soros and (b) to at least one of the NGOs funded by Mr Soros, which was engaged in a campaign against BSGR. Indeed, the very fact that MMB had any communications at all with Mr Soros and the NGOs about BSGR is extraordinary and it is difficult to see what legitimate purpose was served by them, in

circumstances where (a) MMB has insisted in correspondence with his solicitors that he was not on the BSGR account; (b) Mr Soros and those NGOs were known to be engaged in a smear campaign against BSGR; and (c) FTI and MMB (either directly or via his colleagues at FTI) were in possession of confidential information regarding BSGR.

(7) In addition, MMB made a series of defamatory remarks about BSGR and/or Mr Steinmetz which have now come to BSGR's knowledge, including that Mr Steinmetz was "corrupt". In circumstances where FTI, and MMB as its Chairman, were subject to duties to act in the best interests of BSGR and were engaged specifically to protect and defend its interests, these defamatory remarks are even more astonishing and there can be no justification for them.

(8) Investigations into BSGR's activities in Guinea were coordinated and managed by the law firm DLA Piper and funded by Mr Soros. The resulting conclusions and allegations were apparently transposed into a letter BSGR received in October 2012 from the Committee. This letter and its allegations were further leaked to the *Financial Times*.

2. BSGR's investigations are on-going and further information is likely to emerge. Given the nature of the conduct of FTI and MMB, which was to withhold from BSGR the very serious conflicts of interest and MMB's activities, it is suspected that these particulars will be supplemented in due course as the full details of the activities of MMB and FTI emerge.

## B. THE PARTIES

### The Claimants

3. The First Claimant (**"BSGR"**) is a company incorporated in Guernsey. It is an international diversified mining company with operations in fourteen countries across metals and mining operations in Africa and Eastern Europe, including ferro-nickel, diamonds, copper, iron ore and gold. BSGR is also active in the production and exploration of oil and gas, and in power generation in Nigeria. BSGR has a fifteen-year track record of providing risk capital for developing and executing mining operations in challenging environments. It employs over eight thousand people and has African stakeholders in South Africa, Zambia, Botswana, Tanzania, Nigeria, Sierra Leone, the Democratic Republic of Congo, and Guinea.

4. BSGR is a fully owned subsidiary of BSG, a foundation with interests across the world in natural resources, real estate, capital markets and the diamond industry. The business activities of the

3

various BSG companies, of which BSGR is one, are managed by various entities owned (directly or indirectly) by the Balda and Vessna Foundations, of which Mr Steinmetz and his issue are members of the class of beneficiaries. Operationally this is generally known and referred to (in a non-legal manner) as "The Beny Steinmetz Group" or "BSG".

5.  BSGR was from time to time represented by its management and administration company, Onyx Financial Advisors UK (**"Onyx"**).

6.  The Second Claimant (**"Mr Steinmetz"**) is a beneficiary of BSG.

### The Defendants

7.  The First Defendant (**"FTI"**) is the London branch of a global and NYSE listed business advisory firm whose activities include business communications consultancy. The Strategic Communications practice of FTI was formerly called Financial Dynamics Limited.

8.  The Second Defendant (**"MMB"**) is the Chairman of Europe, Middle East and Africa of FTI. He joined FTI in September 2010. MMB was previously a Cabinet Minister in Gordon Brown's Government and worked under Kofi Annan in the United Nations as Administrator of the United Nations Development Programme; Chef de Cabinet to Mr Annan; and, briefly, as the UN's Deputy Secretary-General.

9.  MMB is a close friend of George Soros, the financier, and has been for around 25 years. It is believed that MMB rented and lived in accommodation owned by Mr Soros when MMB was working for the World Bank and United Nations in New York, for which he was criticised at the time. In addition MMB was Deputy Chairman of George Soros Asset Management and sits on the board of several of the NGOs sponsored by Mr Soros.

### C. BACKGROUND

10. BSGR owns the rights to 49% of an iron ore project in Guinea known as Simandou and Zogota. It applied for and was granted those rights by the Government of Guinea in 2006, and between 2006 and 2009 spent US$150 million on feasibility studies and the exploration of the area. BSGR discovered that a commercially operational deposit existed in Simandou and Zogota. In accordance with its licences and the mining code, BSGR produced the required progress reports to the Government of Guinea throughout the work, and, on renewal of its licences in February

4

2009, retroceded 50% of Simandou North and 50% of Simandou South to the Guinean Government. In April 2010, and with the knowledge and approval of the Guinean government, BSGR entered into a joint venture with Vale SA in respect of the Simandou and Zogota project. That joint venture has now spent a further US$700 million in developing the project, which is now a world class prospect.

11. Financial Dynamics Limited, a public relations firm, was originally engaged by BSGR in May 2009 in relation to a dispute between BSGR and Rio Tinto relating to BSGR's position in Guinea and in particular, the Simandou and Zogota project.

12. In or around May 2009, BSGR approached FTI with regard to its communication requirements relating to its interests in Simandou and Zogota. This included the preparation of plans and strategies so as to best defend and protect BSGR's interests.

13. BSGR and FTI entered into a contract dated 18 May 2009 for the provision of those services ("the 2009 Contract").

14. In April 2010, BSGR sold 51% of its interest in Simandou and Zogota to Vale, a Brazilian mining company. Together, BSGR and Vale formed a joint venture called VBG.

15. In around December 2010, the new Guinean government appointed the Committee. The Committee was funded by Mr George Soros. Mr Soros also funded the services of DLA Piper, which wrote the material, in the name of the Committee, that formed the basis of the Committee's allegations against BSGR. The Committee has also been supported by Tony Blair's African Governance Initiative ("AGI"), with the head of the mission, Shruti Mehrotra, working closely with the President of Guinea, Alpha Conde. Ms Mehrotra is responsible for the training of the Committee members, and for the Committee's media releases. She is also a former employee of Global Witness, an NGO funded by Mr Soros.

## D.  THE 2011 CONTRACT

16. On 6 April 2011, BSGR and FTI entered into a new contract ("the 2011 Contract"), which replaced the 2009 Contract. The 2011 Contract was comprised of an engagement letter and FTI's standard terms of business.

5

17. In relevant part, the engagement letter from FTI provided that:

> *"We will provide business communications services as agreed with you"* (paragraph 2)

> *"Our appointment commenced on 19 May 2009 ("Start Date") and will continue until terminated in accordance with the Terms of Business."* (paragraph 4)

18. The engagement letter also provided that the FTI account team for BSGR was headed by Ben Brewerton, a Managing Director of FTI.

19. FTI's standard terms of business, which formed part of the 2011 Contract, provided in relevant part as follows:

(1) In relation to the appointment:

> *"2.    APPOINTMENT*
>
> > *The Client hereby appoints the Company as its business communications consultant and the Company accepts the Appointment to provide the Services with effect from the Start Date and thereafter...unless terminated by either Party in accordance with either of clauses eight or nine of this Agreement."*

(2) In relation to the services to be provided:

> *"3.    SUPPLY OF SERVICES*
>
> *3.1    The Company will provide the Services to the Client subject to the terms of this Agreement."*

(3) "Services" was in turn defined in Clause 12, as *"the provision of business communication services as agreed with the Client"*

(4) In relation to confidentiality obligations:

> *"6.    CONFIDENTIALITY*

6.1     Both Parties shall procure that any Confidential Information which the disclosing Party (the "Disclosing Party") discloses to the other Party (the "Receiving Party") or which the Receiving Party may gain access to in connection with the Appointment shall be held in confidence and shall not be used for any purposes other than those permitted by this Agreement.

...

6.3     The obligations of confidentiality contained in clause 6.1 shall subsist for the duration of the Appointment and a period of one year following the termination of the Appointment."

(5) "Confidential Information" was in turn defined in Clause 12, as:

"all information relating to either Party's customers and prospective customers, current and projected financial or trading situations, business plans, business strategies, developments and all other information disclosed or made available under this Agreement."

(6) An obligation on FTI to use all reasonable skill and care:

"7.1    The Company warrants that the Services will be provided using all reasonable care and skill..."

(7) As regards termination:

"8.1    Either Party will be entitled to terminate a Retainer Appointment at any time by giving written notice to the other of not less than three months..."

20. As far as Services were concerned, those were a continuation of the services provided under the 2009 Contract but broadened to include reputational assistance in relation to all of BSGR's projects. Mr Brewerton described this in an email on 30 March 2011 as follows: "The original brief was to support the company with media relations around the Simandou project and the subsequent deal with Vale. This has now been broadened to incorporate media relations and

7

*reputational support across all of BSGR's projects/companies as well as for the parent company itself."*

21. Further and/or alternatively, there were implied terms of the 2011 Contract to be implied as the obvious but unexpressed intention of the parties and/or because such terms are necessary to give business efficacy to the contract. Those implied terms were in the same terms as the fiduciary duties set out below at paragraph 22.

## E. FIDUCIARY DUTIES AND DUTIES OF CONFIDENCE

22. FTI were in a position of trust and confidence and thereby owed fiduciary duties to BSGR. Such duties included:

   (1) a duty to act in good faith;

   (2) a duty to act at all times in the best interests of BSGR;

   (3) a duty not to let their own interests conflict with those of BSGR;

   (4) a duty to disclose all potential conflicts of interest to BSGR as soon as practicable; and

   (5) a duty of confidence.

23. Furthermore, MMB owed a duty of confidence in tort to BSGR, in that:

   (1) MMB was a recipient of confidential information from BSGR, such information being provided by BSGR or on its behalf. Further and/or alternatively, MMB received and/or had access to BSGR's confidential information through FTI and his colleagues at FTI.

   (2) Such information came to the knowledge of MMB in circumstances where:

      (a) he had notice, or is taken to have had notice, that the information was confidential; and/or

8

(b) he knew or ought to have known that BSGR could reasonably expect the confidentiality of its information to be protected.

(3) By reason of those matters, MMB was bound by a duty, arising in tort, to protect and keep confidential BSGR's confidential information.

## F.   TERMINATON OF THE 2011 CONTRACT, AND BSGR's INVESTIGATION

24. On 14 November 2012, FTI terminated the 2011 Contract with immediate effect. It wrote a very short letter, giving no reasons for termination, save the last sentence which read *"circumstances have created a business conflict which cannot be allowed to continue."*

25. The first that BSGR had heard of that alleged conflict was on 12 November 2012, at a meeting between Mr Dag Cramer of Onyx, Mr Brewerton and Mr Waples, Senior Managing Director & UK Head of Strategic Communications and Mr Brewerton's manager.

26. At this stage, the exact circumstances of the events leading up to termination remain unclear and the story incomplete, but BSGR's investigations following the termination of the 2011 Contract have established a number of matters which are set out below.

## G.   THE FINDINGS OF BSGR's INVESTIGATION TO DATE

27. BSGR's investigation to date has established the following:

   (1) A very serious conflict of interest existed within FTI from September 2010, when MMB joined as Chairman EMEA, which had been deliberately withheld from BSGR.

   (2) MMB had (and still has) a close relationship with Mr Soros and the NGOs funded by him, who were the very parties engaged in a smear campaign against BSGR. Indeed, MMB was involved in funding those very same NGOs. Furthermore, the foundation of the allegations by the Guinean Committee against BSGR was an investigation funded by Mr Soros and carried out by DLA Piper.

   (3) MMB had been in contact with Mr Soros, the NGOs funded by Mr Soros, and journalists with information confidential to BSGR and FTI.

9

(4) During the existence of the Contract, MMB was disseminating completely untrue, defamatory and highly prejudicial allegations regarding Mr Steinmetz and/or BSGR, despite the fact that he and FTI were bound to act in BSGR's best interests.

(5) The 2011 Contract was terminated because Mr Soros had exerted pressure on MMB to do so, including by making further highly defamatory and untrue allegations that BSGR had been involved in an assassination attempt on the President of Guinea. Needless to say, the FTI account team did not agree with MMB's decision to terminate the relationship, which was made for his own personal interests.

28. Those points are developed in turn below.

**(1) A very serious conflict of interest had existed from September 2010, which had been deliberately withheld from BSGR**

29. MMB joined FTI as Chairman EMEA in September 2010, and from that time there was a very serious conflict of interest. At the time of termination of the Contract, MMB himself described this as a *"web of conflicts"*, and said FTI were as result *"too conflicted on this to do it properly for you"*.

30. That conflict of interest was deliberately withheld from BSGR in that:

(1) Some time prior to the termination, MMB warned the FTI account team that they must try and stick to capital markets activity on the BSGR account and not get into what happened in Guinea, because (in MMB's words on 19 November 2012) *"it would end up being a conflict for us, and a conflict at several levels"*. This internal limitation on FTI's activities for BSGR was not disclosed to BSGR, and conflicted with the services that FTI had agreed to perform for BSGR. Indeed, the only 'capital markets' work that FTI had done for BSGR had been through its Hong Kong office, and had ceased in July 2012.

(2) A year prior to the termination, MMB and/or FTI had considered whether MMB should have volunteered to both the NGOs/Mr Soros, and BSGR, that he would try and sort out the situation between them. But instead he decided to stand back. Once again, that was not

10

disclosed to BSGR, but demonstrates that MMB was directly aware of the conflict from that time but chose not to disclose it to BSGR.

(3) On 30 March 2012, MMB sent an email to Mr Brewerton, copying Raoul Bhavnani (the Global Practice Leader of FTI's Strategy Consulting and Research team, based in New York) saying *"I think we should stay out of it and let Steinmetz waste his money if he wants to"*. FTI have refused to provide the full email, and instead only this extract. On the basis of the extract disclosed, it appears that MMB was suggesting that FTI should limit their activities for BSGR (presumably for the reasons set out above, namely that he had instructed the FTI account team not to get into representing BSGR in relation to events in Guinea). It appears also that MMB, together with FTI, believed that Mr Steinmetz and/or BSGR were wasting their money. Without full sight of the entire email, it is not clear whether this was a reference to the fact that paying FTI in these circumstances was a waste of Mr Steinmetz and/or BSGR's money. However, given the existence of the conflict of interest, MMB's express instruction to the FTI account team to limit its activities for BSGR, and the failure to disclose any of those matters to BSGR, it plainly was (at the very least) a waste of money to be making continued retainer payments to FTI, which BSGR (and Mr Steinmetz) considered to be a trusted advisor and acting wholly in their interests.

(4) During further work done through FTI's Hong Kong office commencing in December 2011, the conflict again came to MMB's attention. He and FTI apparently agreed rules of engagement internally. This led to FTI doing work on things which, MMB said, *"that we were just, frankly, not in a position to support you on, such as the rights and wrongs of the Guinea contract"*. Once again, this was not disclosed to BSGR at the time.

(5) MMB admitted at a meeting with Dag Cramer on 19 November 2012 that *"to the extent that defending BSG required, you know, throwing blows back, some punches back at the Soros funded effort, that is a problem"*. Given that Mr Soros and/or the NGOs funded by him were building a case against BSGR and/or Mr Steinmetz (see further below), defending BSGR plainly involved FTI and MMB standing up for BSGR against Mr Soros and those NGOs. It was not disclosed to BSGR that this had been a problem, or that FTI and/or MMB's activities were limited in this way.

11

(6) It was not until 19 November 2012, after the termination of the Contract, that MMB admitted (a) that he had a personal conflict and (b) that he had not been able to let FTI do what it should do in defence of BSGR, because of the relationships he had. At a meeting on that date with Mr Cramer of Onyx, he said:

*"I've been part of the funding decision by which we fund Global Witness* [one of the NGO's funded by Mr Soros, which has orchestrated a campaign against BSGR]. *I, you know, have been, you know also approved the funding for, you know, the other transparency organisations of which there are Revenue Watch* [another organisation funded by Mr Soros]. *There are two or three of them that have been involved in this Guinea issue and because, you know, I'm in that sense, have, you know, fiduciary interest in the reputation and management of those institutions, I do see it as in conflict with this, so yeah if you want to call it personal conflict it is a personal conflict."*

No explanation was given as to why that personal conflict had not been disclosed to BSGR in September 2010, when MMB first joined FTI. Instead, it was deliberately withheld from them.

**(2) MMB had a close relationship with Mr Soros, and the NGOs, who were the parties engaged in a smear campaign against BSGR**

31. As FTI explained after the termination, Mr Soros and the NGOs funded by him were engaged in a smear campaign against BSGR and/or Mr Steinmetz, and Mr Soros' aim was to ensure that VBG's mining license was withdrawn. In support of those matters, BSGR relies on the following:

(1) On 12 November 2012, Mr Waples of FTI said that Mr Soros *"had a personal obsession about BSGR and is determined to ensure that VBG's mining license is withdrawn/cancelled by the GOG* [Government of Guinea]".

(2) Earlier the same day, Mr Brewerton of FTI said that FTI was *"defending BSGR from a smearing campaign that is orchestrated by George Soros and NGOs associated with him."*

(3) On 19 November 2012, MMB said that what Mr Soros's NGOs and his supporters had done was to *"key this thing up* [i.e. the investigation of BSGR] *for the committee to review"*. This

was a reference to the Committee in Guinea, and it was clear that MMB knew that Mr Soros and the NGOs funded by him had been engaged in encouraging the investigation against BSGR.

32. Unknown to BSGR, MMB and Mr Soros were close friends and business associates and had been for some 25 years. Not only had MMB made funding decisions in favour of those NGOs building the campaign against BSGR, but he had also spoken to Mr Soros about BSGR. In particular, in a meeting with Mr Cramer of Onyx on 19 November 2012, after the termination of the 2011 Contract, MMB admitted that:

  (1) Mr Soros was funding a lot of the NGOs who were making allegations against BSGR.

  (2) MMB was a board member of Mr Soros' Foundation, but also a member of most of the key executive committees of Mr Soros's funds and foundation. He is the former vice chairman of his asset management operations and of his foundation.

  (3) The foundation of which MMB was on the board was funding a lot of the NGOs who were making these allegations against BSGR.

  (4) Mr Soros had spoken to MMB about the situation. Indeed MMB admitted that, whilst there were other factors at play, Mr Waples' comment on 12 November 2012 that because of this relationship with Mr Soros, FTI had had to resign the account was the *"shorthand of a lot longer issue."*

33. Notwithstanding those obvious conflicts: (a) FTI continued to act for BSGR; (b) neither FTI nor MMB disclosed the existence of the conflict to BSGR; and (c) even worse, MMB actively discussed BSGR with both Mr Soros and the NGOs conspiring against BSGR and Mr Steinmetz (see paragraphs 34-35 below). There is no legitimate reason why MMB should have been discussing BSGR's affairs with Mr Soros and his NGOs and no adequate explanation has been given to date.

  **(3) MMB had been in contact with Mr Soros, the NGOs and journalists with information confidential to BSGR**

13

34. Notwithstanding the obvious conflict of interest and risk of disclosure of confidential information, MMB had spoken to Mr Soros specifically about BSGR:

    (1) MMB admitted on 19 November 2012, after the termination, that he had spoken to Mr Soros about BSGR.

    (2) Mr Soros subsequently put pressure on MMB, including by frequent telephone calls, to cancel the retainer with BSGR (see paragraphs 41 to 46 below).

    (3) As Mr Waples and Mr Brewerton made clear on 12 November 2012, MMB's discussions with Mr Soros about BSGR included confidential matters such as:

        (a) BSGR's contractual arrangements with FTI;

        (b) the potential termination of the 2011 Contract and the reasons for it, even before that had been discussed with, or even mentioned to, BSGR; and

        (c) BSGR's business practices, of which FTI and/or MMB had gained a great deal of confidential insight by reason of the retainer.

    (4) Furthermore, there was no legitimate reason for MMB to be discussing BSGR's affairs with Mr Soros given that (a) MMB was not (as explained by his solicitors in recent correspondence) on the BSGR account; and (b) MMB was fully aware that Mr Soros was involved in the campaign being conducted against BSGR. In the circumstances, it is to be inferred that MMB disclosed other confidential information to Mr Soros and/or disclosed information which was detrimental to BSGR's interests.

35. MMB had provided information to one of Mr Soros's NGOs about BSGR's retainer with FTI. In particular, MMB had disclosed to the Open Society Institute that FTI had terminated its retainer with BSGR, even before that issue had been discussed with BSGR itself. That information was not in the public domain and was confidential, especially given the potential harm it could cause to BSGR, and even more so given that the Open Society Institute was engaged in a campaign against BSGR. On 2 November 2012, MMB sent an email to Kim Forepaugh of the Open Society

14

Institute withdrawing what he had previously said to Ms Forepaugh and expressing regret that BSGR remained a client of FTI.

36. MMB or Mr Soros (having gained the information from MMB) had also provided information to a journalist at the Financial Times, Helen Thomas, regarding BSGR's retainer. Ms Thomas had been a main collaborator on articles making allegations against the Claimant. Ms Thomas was aware of FTI's intention to cancel the Contract, and had been aware of that as at 5 November 2012 (when FTI had released a press statement on behalf of the Claimant), as she had responded to the press statement from FTI that day to say that she was surprised that the Claimant was releasing this statement as she had been told that FTI would no longer be working for the Claimant. This was explained by Mr Brewerton to Mr Cramer in a meeting on the evening of 12 November, and Mr Brewerton said that in his opinion that information can only have come from Mr Soros.

**(4) MMB was making completely untrue, defamatory and highly prejudicial allegations regarding Mr Steinmetz and/or BSGR, despite the fact that he and FTI were bound to act in BSGR's best interests**

37. On 4 April 2012, MMB stated in an email to Ray Bashford (a senior Managing Director of FTI Strategic Communications practice based in Hong Kong, and who serves as President of the practice in Hong Kong), John Waples, Edward Reilly (global chief executive officer of the FTI Strategic Communications practice) and Geoffrey Pelham-Lane (then president of FTI Consulting's global strategic communications practice) that:

Mr Steinmetz's and/or BSGR's *"inside Africa transactions"* are "*corrupt*".

38. On 2 November 2012, in an email to Kim Forepaugh (Assistant to George Soros at the Open Society Institute), MMB stated that he was:

*"sorry to say on checking"* that FTI were still working for Mr Steinmetz.

This was plainly intended to mean that to act for Mr Steinmetz and/or BSGR was something to regret and/or be ashamed of.

15

39. On 7 November 2012, in an email to Mr Reilly, the CEO of FTI's Strategic Communications practice and an extremely influential man both inside and outside FTI, MMB stated that:

   *"The reputation of BS [Beny Steinmetz] among policy, MGO [sic] and media circles is so bad that that is condemnation for many in its own right."*

40. Statements such as those were defamatory and should not have been made at all. Of even greater concern is that they were made by the Chairman EMEA of BSGR's trusted advisor, and which was retained to defend BSGR's interests.

   **(5) The Contract was cancelled because Mr Soros had exerted pressure on MMB to do so, contrary to the wishes of the FTI account team**

41. As regards the decision to terminate the 2011 Contract:

   (1) that decision was made by MMB, contrary to the wishes of the FTI account team;

   (2) MMB decided that FTI should terminate the 2011 Contract because Mr Soros had exerted pressure on MMB to do so;

   (3) in his attempts to exert pressure on MMB, Mr Soros had alleged that BSGR had organised the assassination attempt of the President of Guinea, Mr Alpha Conde. That allegation is absolutely denied, and should never have been made, let alone repeated by MMB.

42. On 29 October 2012, Mr Brewerton told Mr Cramer of Onyx that:

   *(1) "George Soros had personally requested directly of [MMB] that Financial Dynamics cancel its contractual arrangements with BSGR."*

   (2) The reason for this request by Mr Soros was *"based on several unspecified allegations put forward to MMB about the integrity of BSGR's business practices but also a specific claim by George Soros that BSGR had organised the assassination attempt of the President of Guinea Alpha Conde which took place in July 2011".*

43. On 12 November 2012, Mr Waples told Mr Cramer that:

   (1) Mr Soros had over the month prior to termination of the Contract frequently called to exert pressure on MMB to cancel the Contract.

   (2) Mr Soros had informed MMB that if he did not get FTI to act in accordance with his request, MMB ran the risk of "becoming the story". In particular, on the morning of 12 November 2012, FTI had been approached by a news blog called Home Politics asking questions about MMB specifically regarding FTI's relationship with BSGR. Mr Waples, who was also at the meeting, said that FTI was giving notice of cancellation so that it could tell the Home Politics blog that they had cancelled the Contract with the Claimant.

   (3) MMB had become agitated by having his personal reputation subject to media speculation. MMB expected that had FTI continued to stay involved there would have been questions about "*how come, you know, Malloch-Brown's firm*" is involved.

   (4) He believed that perhaps MMB's decision to terminate the Contract was based on his own personal economics and bias.

44. Contrary to Mr Brewerton's account, on 19 November 2012 in a meeting with Mr Cramer, MMB denied that Mr Soros had put pressure on MMB to cancel the account, and denied that Mr Soros told him that BSGR had been involved in an assassination attempt on the President of Guinea (instead suggesting that this information had come from "*old spies*" who were not reliable). However, he did nevertheless admit that it was "*partly about*" Mr Soros and that he had repeated the rumours regarding the assassination attempt internally at FTI. The inconsistent accounts by MMB and his FTI colleagues of Mr Soros's involvement suggest that MMB is seeking to hide the true extent of Mr Soros's involvement, including that Mr Soros had made very serious and untrue allegations regarding BSGR in order to force a cancellation of its retainer with FTI.

45. Mr Brewerton and Mr Waples did not agree with MMB's decision to cancel the Contract, but they had no choice since it was a direct instruction from MMB. FTI's team on the BSGR account were unhappy about the decision to resign.

17

46. Furthermore, the termination of the account left BSGR in the lurch at a crucial time. Even MMB admitted on 19 November 2012 that *"we've left you up a creek without a paddle."*

## H. CLAIMS AGAINST FTI

### (1) Breach of Fiduciary Duty and/or Implied Terms

47. By reason of the matters set out above, FTI acted in breach of its fiduciary duties in that it:

    (1) failed to act in good faith;

    (2) failed to act at all times in the best interests of BSGR;

    (3) allowed its own interests to conflict with those of BSGR;

    (4) failed to disclose all potential conflicts of interest to BSGR as soon as practicable; and

    (5) failed to prevent the disclosure by MMB of confidential information.

48. Without prejudice to the matters set out above, BSGR relies on the following particulars of breach:

### PARTICULARS OF BREACH OF FIDUCIARY DUTY

    (1) From September 2010, when MMB joined FTI, a serious conflict of interest arose. That conflict of interest was that MMB had a close relationship with Mr Soros, and was involved with the NGOs funded by Mr Soros, including the decisions regarding funding of those NGOs. As FTI knew, Mr Soros and the NGOs funded by him were engaged in a smear campaign against BSGR. Furthermore, Mr Soros had a personal obsession with ensuring that VBG's mining licence was withdrawn or cancelled, which plainly gave rise to a considerable risk that Mr Soros may seek to exercise improper pressure over MMB in order to achieve his aims. FTI should not have allowed that conflict of interest to arise, and it amounted to a serious breach of its fiduciary duties since plainly it was not in the best interests of BSGR.

    (2) FTI failed to disclose that conflict of interest to BSGR until 12 November 2012, more than two years after it arose.

18

(3) MMB had held discussions with the FTI team on BSGR's account prior to 12 November 2012, when his involvement with Mr Soros and the NGOs had been discussed. MMB had consciously realised that there was a conflict for some time. For example, he had known that at the time of the work done through the FTI Hong Kong office from December 2011, if not before. Despite those discussions between MMB and the FTI team, still that conflict of interest had not been disclosed.

(4) Following the termination of the Contract, MMB admitted that there had been a conflict of interest, which he referred to as a *"web of conflicts"*.

(5) FTI knew, or at least ought to have known, that a risk existed that MMB would disclose confidential information of BSGR to Mr Soros and/or the NGOs funded by Mr Soros, given his close association with Mr Soros and the NGOs, and the duties owed by MMB to those NGOs (which he himself referred to as "fiduciary duties"). Such risk was plainly not in the best interests of BSGR.

(6) FTI terminated the 2011 Contract at the insistence of MMB, despite knowing that (a) this was as a result of improper pressure placed on MMB by Mr Soros, and (b) Mr Soros had made allegations about BSGR, including its alleged involvement in an assassination attempt, which were not true and not believed by FTI to be true, and (c) the FTI account team did not agree with the decision to terminate the Contract. In those circumstances, the summary termination of the 2011 Contract was contrary to FTI's fiduciary duties.

49. Further and/or alternatively, the above matters amounted to a breach of the implied terms of the 2011 Contract referred to at paragraph 21 above.

## (2) Breach of Contract

50. In breach of Clause 7.1 of the 2011 Contact, FTI failed to use all reasonable care and skill in providing the services, in that FTI:

PARTICULARS OF BREACH OF CLAUSE 7.1

(1) Failed to inform BSGR that there was a potential or actual conflict situation involving FTI's Chairman of EMEA.

(2) Placed limitations on the services that it provided to BSGR, because of MMB's instructions that FTI could not act in matters where he perceived a conflict of interest; and failed to disclose the fact of such limitations to BSGR. Paragraph 30(1) above repeated.

(3) Could have provided more expertise but chose not to. Considering MMB's expertise in the precise area of Africa that FTI was involved in, it appears that it was deprived of FTI's skill in this area because MMB apparently refused to provide his services to a client with whom he believed himself to be in conflict, or potential conflict.

(4) Terminated the 2011 Contract at a crucial time, and left BSGR exposed to further attack and without press advice. Furthermore, it exposed BSGR to speculation as to the reason for FTI's sudden withdrawal, the broad consensus being that FTI was prevented from defending BSGR because of the truth of the allegations made against it.

51. In breach of clause 6.1 of the 2011 Contract, FTI failed to procure that BSGR's information was held in confidence. BSGR relies on the following matters:

PARTICULARS OF BREACH OF CLAUSE 6.1

(1) FTI permitted MMB access to Confidential Information of BSGR, including regarding the possible termination of its retainer with FTI, notwithstanding that MMB was known to be a position of conflict with regular contact with Mr Soros and the NGOs funded by him.

(2) FTI failed to prevent MMB disclosing and/or discussing BSGR's Confidential Information with Mr Soros, the NGOs funded by Mr Soros and/or journalists. Paragraphs 34-36 above are repeated.

52. In breach of Clause 8.1 of the 2011 Contract, FTI failed to give three months' notice of termination.

20

### I.  CLAIMS AGAINST MMB

#### (1)  Breach of tortious duty of confidence

53.  MMB acted in breach of his tortious duty of confidence owed to BSGR. The following matters are relied on:

PARTICULARS OF BREACH OF TORTIOUS DUTY OF CONFIDENCE

(1)  MMB spoke to Mr Soros about BSGR, and disclosed confidential information to him. Paragraph 34 above is repeated.

(2)  MMB contacted the Open Society Institute, one of the NGOs acting against BSGR, about termination of the 2011 Contract, even before this was discussed with BSGR. Paragraph 35 above is repeated

(3)  MMB spoke to a journalist at the FT about termination of the 2011 Contract, even before this had been discussed with BSGR. Paragraph 36 above is repeated.

(4)  That information was confidential. The fact that FTI and/or MMB was considering termination of the 2011 Contract was not public information, and was information which was potentially harmful to BSGR.

(5)  The information was imparted to MMB in circumstances which imported an obligation of confidence, not least because all dealings between FTI and BSGR were pursuant to a contract with express confidentiality restrictions.

(6)  The use of that information by MMB was an unauthorised use or disclosure of that information. There was no legitimate reason for MMB to contact Mr Soros, or the Open Society Institute regarding BSGR's affairs at all because (a) MMB's solicitors have said that he was not on the BSGR account and (b) Mr Soros and the Open Society Institute were engaged in activities contrary to the interests of BSGR.

#### (2)  Procuring/inducing breach of Contract

54.  MMB procured and/or induced the breaches by FTI of the 2011 Contract set out at paragraphs 50-52 above:

PARTICULARS OF INDUCEMENT OF BREACH OF CONTRACT

(1) MMB procured and/or induced a breach of Clause 7.1 of the 2011 Contract, in that:

   (a) Despite having full knowledge of the conflicts of interest, MMB failed to disclose his conflicts of interest to BSGR or require FTI to do so.

   (b) MMB agreed with FTI to withhold disclosure of his conflicts of interest from BSGR.

   (c) MMB told the FTI account team to limit the areas that it acted in for BSGR, notwithstanding that the terms of engagement for BSGR were not so limited.

   (d) MMB instructed FTI to terminate the 2011 Contract.

   (e) Despite the fact that MMB had highly specialised knowledge of Africa, MMB failed to provide his expertise to the FTI team working on the BSGR account (because he believed himself to be in conflict or potential conflict).

(2) MMB procured and/or induced a breach of Clause 6.1 of the 2011 Contract, in that (with knowledge and understanding of FTI's obligations of confidentiality towards BSGR) MMB nevertheless disclosed and/or discussed BSGR's confidential information with Mr Soros, the NGOs funded by Mr Soros and/or journalists. Paragraphs 34-36 above are repeated.

(3) MMB procured and/or induced a breach of Clause 8.1 of the 2011 Contract, in that MMB caused FTI to terminate the Contract immediately, rather than providing 3 months' notice.

## (3) Defamation

55. MMB published the following words defamatory of Mr Steinmetz and/or BSGR:

   (1) The three matters set out at paragraphs 37-39 above.

(2) Furthermore, in or around November 2012 MMB said to Mr Waples and/or Mr Brewerton of FTI that BSGR had organised the assassination attempt of the President of Alpha Conde in July 2011 (thereby repeating the same allegation made by Mr Soros to MMB).

56. In their natural and ordinary meaning the said words meant and were understood to mean, respectively, that:

(1) Mr Steinmetz and/or BSGR's business dealings in Africa are corrupt;

(2) to act for Mr Steinmetz and/or BSGR was something to regret and/or be ashamed of;

(3) Mr Steinmetz has an extremely bad reputation amongst those who claim to be the moral conscience of the world and that because of the weight of moral judgment of the NGO community, Mr Steinmetz is to be regarded as some sort of pariah; and

(4) BSGR and/or Mr Steinmetz was involved in the assassination attempt on the President of Guinea. The said words were calculated to disparage BSGR and/or Mr Steinmetz in their business.

57. In consequence Mr Steinmetz and/or BSGR's reputation has been seriously damaged, and Mr Steinmetz has suffered distress and embarrassment.

## J.  UNLAWFUL MEANS CONSPIRACY

58. In around September 2010 and thereafter, MMB and FTI:

(1) entered into a combination or understanding with each other, or formed and pursued a common design; and/or

(2) reached an understanding to embark upon concerted action,

with an intention to use unlawful means to injure BSGR and/or Mr Steinmetz through the deliberate non-disclosure of MMB's conflict of interest. Paragraph 30 above is repeated.

59. The said unlawful means were or included (in each case as further particularised above):

PARTICULARS OF UNLAWFUL MEANS

(1) the breach of fiduciary duties by FTI;

(2) the breach of contract by FTI;

(3) the procuring and/or inducement of breaches of contract by MMB.

## K. RELIEF

60. By reason of the matters aforesaid BSGR and Mr Steinmetz are entitled to and claim the following relief:

From FTI:

(1) An account of profits and/or equitable compensation, arising from the breach of fiduciary duty by FTI; such damages and/or account to include the fees received by FTI from BSGR from September 2010.

(2) Damages for breach of contract, including by reason of the failure to disclose the existence of a conflict of interest in September 2010. Had that conflict been disclosed, BSGR would not have paid fees from that time.

(3) Damages for the failure to give three months' notice, such damages to be particularised in due course. The impact of the failure to give proper notice was exacerbated because the termination of the 2011 Contract came, as FTI well knew, at a crucial time and left FTI without representation when it was most needed.

From MMB:

(4) Damages arising from the breach of MMB's tortious duty of confidence.

24

(5) Damages arising from MMB's procuring and/or inducing of FTI's breach of contract, including by reason of the failure to disclose the existence of a conflict of interest in September 2010. Had that conflict been disclosed, BSGR would not have paid fees from that time.

(6) Damages for libel and/or slander.

From both FTI and MMB

(7) Damages arising from the conspiracy between FTI and MMB to withhold disclosure of the conflict of interest from BSGR. Such damages to be particularised in due course, but to include damages to reflect the harm to BSGR's interests in Guinea, if Mr Soros and/or the NGOs sponsored by him thereby gained an improper advantage arising from material disclosed to them by MMB, or the restrictions placed on FTI's ability to act for BSGR.

61. Furthermore, BSGR and/or Mr Steinmetz claim injunctions and declarations, as follows:

(1) An injunction restraining FTI and/or MMB from disclosing confidential information of BSGR to Mr Soros or at all.

(2) An injunction restraining MMB, whether by himself, his servants, or agents or otherwise, from further publishing or causing to be published the said words referred to at paragraph 55 above or similar words defamatory of Mr Steinmetz and/or BSGR.

(3) Declarations that:

(a) FTI's termination of the 2011 Contract was in breach of contract and fiduciary duty, and was unlawfully procured by MMB, under pressure from Mr Soros;

(b) MMB's defamatory statements regarding Mr Steinmetz and/or BSGR, referred to at paragraph 55 above, were untrue.

(c) FTI and MMB engaged in an unlawful means conspiracy against BSGR.

(d) FTI and MMB disclosed and/or permitted to be disclosed confidential information of BSGR, including to Mr Soros, the NGOs and journalists, in breach of the duties they owed to BSGR.

62. Furthermore, the Claimant is entitled to and claims compound, alternatively simple interest pursuant to Section 35A of the Senior Courts Act 1981 at such rate and for such period as the court thinks fit.

AND THE CLAIMANT CLAIMS:

(1) Damages

(2) An account of profits and/or equitable compensation

(3) Injunctions as aforesaid

(4) Declarations as aforesaid

(5) Interest

(6) Costs

(7) Such further relief as the court thinks fit

VERNON FLYNN QC

IAIN QUIRK