# Exhibit 15

Witness Statement of Benjamin Steinmetz

## IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE LONDON INTERNATIONAL COURT OF ARBITRATION

### CASE NO 142683

### BETWEEN

### VALE S.A.

### (Claimant)

and

### BSG RESOURCES LIMITED

### (Respondent)

_____

### Witness Statement

### BENJAMIN STEINMETZ

_____

I, **BENJAMIN STEINMETZ,** will say as follows:

1.      I want to make a number of matters clear at the beginning of this statement, which I will expand upon later.

2.      **First,** neither I nor any of the businesses with which I am associated have, to my knowledge, or at my direction been involved in any corruption, bribery or other criminal activities.

Witness Statement of Benjamin Steinmetz

3.       As to the Guinea/Simandou project, however, I can be absolutely certain.  Neither I nor anyone associated with BSG Resources Limited (BSGR) is, was or has been involved in any type of unlawful or criminal activity.  The reasons I can say this with such confidence are:

   a.   Insofar as any of the allegations concern things I am supposed to have done, they are untrue.

   b.   Insofar as the allegations concern matters others are said to have done, the Balda Foundation and BSGR have instigated the widest possible enquiries within the BSG businesses by leading investigators who have had the fullest access to every document and person in the organisation and who have concluded that there has been no wrongdoing. I have fully supported these investigations.

   c.   In contrast with the manufactured evidence used to deprive VBG of its rights, what really happened – a conspiracy to extort money from BSGR or to steal VBG's rights, based on the obligations created during President Condé's election campaign in 2010 – has been fully and convincingly established, without rebuttal.

4.       **Second,** the certification I signed on 9 April 2010 was true when I signed and remains true today.

5.       **Third,** when Mr Cilins travelled to the United States in 2012 to meet with Mamadie Touré, he was not travelling at my or BSGR's behest, with either of our authority or on either of our behalves.

## A. BACKGROUND

6.       I am a beneficiary of a Lichtenstein foundation called Balda.  Balda indirectly owns a group of companies whose businesses focus on resources, diamonds and real estate. BSGR is the part of that group of companies and owns all the resources projects. Whilst there is no legal entity called the 'BSG group', or indeed any group of companies which share BSG in their names, for the purposes of this statement when referring to the overall business interests of the group I shall refer to the 'BSG group'. I have no role on the board or as an employee of any of the BSG companies or of the Balda Foundation. I am, however, contracted to advise the individual companies that make up the BSG group, and it is in this capacity that I am involved in their businesses: every action I took in relation to the Guinean project which is the focus of this statement, I took in my role as adviser to BSGR. I deal with my role in BSGR in more detail below.

Witness Statement of Benjamin Steinmetz

7.      I have been in business for many years. After my national service in Israel, instead of going to university, I immediately went into the diamond business, living in Antwerp and built a business into an international global leader in the diamond business. It became the largest De Beers siteholder and one of the biggest multinational diamond companies in the world. Since then I have been involved in a many different businesses, both large and small. At the beginning of the 1990s I developed an interest in real estate. In the mid 1990s we co-founded a hedge fund called Hermitage as part of a joint venture with Republic National Bank (later HSBC) and Bill Browder which was focussed on investing in Russian companies. Hermitage became a big foreign investor in Russia and performed remarkably well. We also started to become interested in the mining industry and became the major shareholder in Anglovaal Mining in South Africa. We soon expanded to other mining projects, investing across Africa and in exploration projects throughout the world in a variety of commodities including copper, cobalt, gold, iron ore, manganese, nickel and diamonds. In 2003, these natural resource projects were consolidated into one company, BSGR. BSGR acquired Bateman Engineering, a South African engineering company, which later split into two: Bateman Engineering and Bateman Litwin. Following a successful turnaround and increased revenue, Bateman Engineering was listed on AIM in 2005 followed by Bateman Litwin in 2006, both raising millions of dollars.

8.      In 2004, BSGR further expanded its business to mining and upstream production facilities in Macedonia and Kosovo through the purchase of Cunico Resources ("Cunico") and the refurbishment of ferro-nickel production facilities. Cunico is now one of the largest ferro-nickel manufacturers in the world. BSGR also invested in steel production in Azerbaijan, oil and power plants in Russia and Nigeria and solar renewable energy in South Africa. During the same period the BSG group of companies expanded to include real estate investment and other private equity investment companies. The BSG group now operates in more than 20 countries worldwide.

9.      In addition to advising the BSG group companies, I also own Scorpio (BSG) Limited which is a company with a group of subsidiaries whose businesses are in real estate ("Scorpio"). I acquired Scorpio in the late 1990s and the group has been active as a developer in the Central and Eastern European markets ever since. Scorpio specialises in mid to large real-estate development projects for residential, office and retail use. The business has suffered recently in the global downturn and continues to face difficulties caused by the lack of liquidity for East European real estate.

Witness Statement of Benjamin Steinmetz

10.     I also chair, jointly with my wife, the Agnes & Beny Steinmetz Foundation (the "Foundation"), which is one of the largest philanthropic organisations in Israel. The Foundation was founded in 2006 and specialises in youth education, welfare programmes, and health care. Since it has been in operation it has given thousands of children a chance of a better life. My wife and I believe that the primary years are critical to the development and health of each child and, accordingly, the Foundation's main focus is the improvement of early childhood services in Israel. The Foundation works in partnership with municipalities in the establishment and operation of about 20 early childhood centres nationwide. To date, more than 50,000 children and their parents have benefitted from the professional services in these centres. In addition, the work of these centres has become a model for the government and other municipalities in how to structure services for early childhood. The Foundation also annually supports 25 organisations that work with youth at risk, as result of which more than 8,000 young people have had the opportunity to enjoy a variety of activities and gained a chance to return to a more normal life.

11.     For many years the Foundation has supported after-school activities for young children in the city of Netanya. Every year, over 150 children enjoy a hot meal, help with their homework and enrichment activities after school. The Foundation also grants 125 scholarships each year to students at Netanya College. To date, over 1,000 students have received these scholarships, which also require the students to take part in volunteering activities and to give back to their community. Since its establishment the Foundation has also supported many other organisations and programs in the areas of health, welfare, culture and education.

12.     The University of Netanya awarded my wife and me honorary doctorates for our charity work. In addition, I am a director and supporter of the Tel Aviv Museum of Art. We also support many causes elsewhere in the world, especially in Africa where the focus is also on youth education and health particularly through BSGR's projects.

13.     I have always tried to keep a low profile.  I am driven and work very hard but I value my privacy and have never in any of my business or philanthropic endeavours sought to draw attention to myself.  That is why, before the issues that are the subject of this case came to light, there was very little written about me on the internet or elsewhere. I and the BSG companies I advise have enjoyed flawless reputations, the businesses have always been courted by banks and financial institutions and the companies have a list of partners that any organisation would be proud of.

14.     For these reasons, the events of the last few years have been especially difficult. Not only have I disliked the attention immensely, but the extent of the false reporting and accusations has been shocking to me. In a well-orchestrated smear campaign, I have been accused of corruption, of funding attempted coups, of paying bribes to government ministers and even of contributing to the outbreak of Ebola. As well as being upsetting for my family and those who work in the BSG group, the effect of this campaign has been to rob some of the poorest people on the planet of an opportunity to transform their lives – an opportunity that may not return in the foreseeable future or ever. It is a terrible pity that Vale decided to jump on the bandwagon.

15.     The BSG group is a privately owned group of companies with interests across the globe in natural resources, real estate and the diamond industry. Over the last 35 years the group has established an impeccable reputation and impressive track record, operating in a fully transparent manner, working hand in hand with host governments at both the national and local level. The BSG group takes pride in its ability to build strong relationships with local communities and stakeholders in areas benefiting from its investments and operations.

16.     BSGR, BSG group's natural resources company, is an international diversified mining company which has had operations in 14 countries across metals and mining operations in Africa and Eastern Europe, including ferro-nickel, diamonds, copper, iron ore and gold. The group has also been active in the production and exploration of oil and gas and power and engineering. BSGR has a 15 year track record of developing (as well as executing) mining operations, and has employed over 8,000 people whilst creating value and prosperity for its stakeholders and host countries.

17.     It has been suggested that BSGR did not have the experience or pedigree to have undertaken the Simandou project. This is simply not the case. Below I set out a non-exhaustive summary of BSGR's very extensive mining experience:

            (a)     Since 2002, BSGR has invested more than USD 300 million in Sierra Leone developing the "Octea Diamond group". The group's flagship Koidu Diamond Mine includes a processing plant producing over 45,000 carats per month at end 2012, having effectively doubled diamond exports from Sierra Leone for the next 15 years while having concluded an exclusive off-take agreement with Tiffany & Co. The Octea Group employs 1,700 permanent staff, of whom 90% are Sierra Leoneans. Octea's social commitments in Sierra Leone include a community plan building 1,400 houses including a school for 3,000 pupils,

Witness Statement of Benjamin Steinmetz

cultural, sport and religious facilities.  BSGR is also the largest private investor and one of the largest taxpayers in Sierra Leone.

(b)     BSGR, through a joint venture Cunico, owns an international ferro-nickel mining and metals company, specializing in the exploration, mining and manufacture of ferro-nickel.    Cunico is the largest ferro-nickel manufacturer in Europe and the fourth largest in the world.  BSGR has continuously invested in equipment, technology and production at Cunico's two plants raising capacity to a combined output of 30,000 tonnes of ferro-nickel per year.    Cunico employs 2,500 people throughout its mining and production operations and over 3,000 people including its contractors. In Kosovo and Macedonia, Cunico is proudly one of the country's largest employers and taxpayers.

(c)     Through its subsidiary, Arctic Resources, BSGR held a controlling stake in Anglovaal Mining, a public company and one of the pillars of the South African mining industry. Anglovaal Mining held extensive precious metal, base metal, ferrous metal and diamond interests across Southern Africa. In 2003, BSGR sold its interest to a leading African mining group.

(d)     In 2000, BSGR took a 20% strategic stake in the iron ore asset Kumba and the steel producer Iscor, in South Africa. BSGR, as the single biggest shareholder, was the catalyst for the company being split in two. BSGR was also both financially and technically involved in the development stages of Kumba's iron ore, which laid the foundation for steady production growth, which later peaked at 36 million tonnes per annum. BSGR sold its 20% strategic stake in Kumba to Anglo American in 2003.

(e)     Between 2003 and 2007 BSGR held 13% of the capital of Danae Resources, a listed Australian company focusing primarily on the development and exploration of gold projects.

(f)     BSGR was a minority shareholder in Shore Gold, a Canadian diamond mining project.

(g)     Between 2003 and 2011, BSGR owned a steel plant in Baku, Azerbaijan as part of a joint venture.

Witness Statement of Benjamin Steinmetz

(h)     Between 2003 and 2009, BSGR owned and operated (through a joint venture) Luanshya Copper Mines, which included the Baluba and Luanshya copper mines, and Chambishi Metals, comprising a large cobalt and copper smelter and solvent extraction located in the Zambian copperbelt. The mines and smelter together employed a total of 6,000 people. BSGR applied its technical expertise through Bateman Engineering to rehabilitate Chambishi Metals to become one of the largest producers of cobalt in the world.

(i)     BSGR invested in the copper mining industry in the Democratic Republic of Congo in 2003 and 2004, and was one of the pioneering investors at that time. It founded Nikanor Plc, which focused on exploration and production of copper and cobalt. BSGR completed a definitive feasibility study and subsequently listed Nikanor on the Alternative Investment Market (AIM) in London in late 2006, achieving what was then the largest capital raise on AIM. In 2008 Nikanor merged with Katanga Mining. Katanga Mining is now controlled by Glencore and is one of the largest scalable copper projects in the world, producing over 250,000 tonnes of copper cathode.

(j)     Between 2007 and 2009, BSGR held a controlling stake in DEM Mining, a mining contractor company in the DRC. DEM Mining operated a fleet of more than 200 vehicles, consisting of loaders, shovels, excavators, haul trucks, water bowsers and fuel trucks. The company employed over 800 people and had the capacity to excavate over 2 million tonnes per annum.

(k)     BSGR also had strong engineering capabilities through its acquisition of Bateman Engineering in 2002. As explained above, BSGR split the company into Bateman Litwin and Bateman Engineering shortly after the acquisition. Bateman Engineering was an engineering firm founded in 1919 in South Africa, which expanded globally over the last century and specialized in processing solutions and engineering, procurement and construction contracting for the mining, minerals and metals, oil and gas and chemicals industries.  The companies' expertise included state-of-the-art engineering, lump-sum turnkey and engineering, procurement, construction and management services over the complete project lifecycle to convert natural resources such as iron ore, gold, copper and diamonds

Witness Statement of Benjamin Steinmetz

as well as oil and gas into marketable products.   Furthermore, the company tailored services for new process plants and brownfield upgrades, covering a wide range of commodities.   Those companies together employed over 3,000 employees and were focused on Africa and developing countries.   Bateman was active in over 25 countries and in 2012 was purchased by Tenova.   It remains one of the most prominent engineering companies in Africa.

18.     In addition BSGR has evaluated and considered more than 120 prospective deals on four continents over the last decade, which has significantly increased its technical expertise in the mining and commodities industry. These included iron ore exploration projects in Liberia, Gabon, South Africa, Senegal, Zambia, Brazil and Chile. Through this, BSGR has built very strong in-house technical and execution teams which have a strong reputation for their capacity to execute and to live up to their commitments. It is this reputation that has attracted such a large deal flow and has meant that BSGR has dealt with, and continues to deal with, multinational companies, junior miners, investment banks and sovereign governments, some of whom have approached us direct.

19.     I have no formal role in the BSG group.  I am not a director of any company.  I am not a shareholder.  The foundation was created in 1980 for family succession and governance reasons. I understand that this type of organisation is very common in similar businesses and I adhere to the formalities very strictly.  My only role is as an adviser, for which I am paid a flat rate advisory fee.  While, therefore, I take an interest in the operations of BSGR, I do not sit on its board; I do not involve myself in the day to day minutiae of its operations; and I do not make any decisions on its behalf.  I am regularly consulted and I equally regularly offer my advice.  On most occasions, the giving of advice is a collaborative exercise and my comments are taken on board as part of a decision making exercise. Equally, on many occasions, what I have to say is listened to and then ignored.  Sometimes, I am not consulted at all. The board of BSGR has independent obligations and takes those duties seriously.  While not relevant to this dispute, the same system works in relation to the other businesses in the BSG group.

20.     In my role as adviser, I concentrate on my strengths, one of which is the sourcing of transactions.  I like a "deal" and am adept at finding opportunities that may be attractive to the group and following through on the processes that need to be undertaken from the inception of a possible deal to its completion. I am also involved in high level strategy discussions and one of my main contributions is in business development: I am able to play

an ambassadorial role for the BSG group companies by making high level connections with people and organisations that the BSG companies might work with. These are time consuming exercises and it means that, while I can work on several projects at any one time, many aspects of the operation of the group will take place without any input from me at all.

21.     That was the case with Guinea.  The group had no presence there at all until the second half of 2005/early 2006 and, whilst I would have occasionally spoken to Roy Oron about what was going on, I had no real involvement once we had started there until 2008. Many, probably the majority, of opportunities that the group looks at never emerge from the exploratory stage and I will have had little or no involvement with them at all.

22.     So in the early days, therefore, I had virtually nothing to do with Guinea.

### B.  BSGR'S INTRODUCTION TO GUINEA

23.     Roy Oron, who was the Chief Executive Officer as well as a minority shareholder of BSGR, had been introduced to the country by Michael Noy and Avraham Lev Ran.  Mr Oron was a talented, hands-on and focussed CEO and thought the Guinea opportunity was worthy of further exploration. He organised the infrastructure required to take the project to the stage where we would have to decide whether it was wise to invest and commit further.

24.     I now know that Mr Oron was introduced to Guinea by Mr Noy and Mr Lev Ran.  Whether I knew at the time, I can no longer recall.  What I do know is that I never met any of the three shareholders in Pentler Holdings Limited ("Pentler") until 2008.  They are not friends or long time business associates.  The only connection at the time was that Mr Oron's and Mr Lev Ran's families knew each other and when they (Pentler had not even been formed at the time, so it was the three men as individuals) wanted to introduce the Guinea opportunity to a group with mining experience, Mr Lev Ran contacted Mr Oron.  All of this happened without any input from me.

25.     As did the start-up processes in Guinea.  So, for example, Asher Avidan and Marcus Struik were recruited by Mr Oron without my knowledge and without significant involvement from me – as was completely normal.  I cannot now remember but it is likely that I would have known at the time that BSGR had applied for and received exploration licences for Simandou North and South.  The progress of the project was left to the people on the ground in Guinea. I believe I learned about BSGR's bauxite permits in the latter half of 2007 or in 2008. These were unsuccessful and were eventually relinquished. I personally never liked bauxite as a commodity and I also never liked these permits as an opportunity: I

thought they were too geographically remote, would never be economically viable and therefore were not worth spending money on. I argued this point strongly, but the BSGR board and the company on the ground had made their own decisions in relation to these and the work went ahead.

26.     The first time I visited Guinea was in February 2008. (I will return to this later as it is part of the evidence that fundamentally and fatally undermines the material supplied by Ms Touré on which Vale still relies). I am a very frequent traveller.  I have access to the Balda Foundation's jet in the performance of my role as an adviser, and I operate by ensuring I have face to face meetings and visit the physical locations of the various operations in executing my role as ambassador.  I am "on the road" for well over half the year.  Guinea was so far down the list of priorities until the beginning of 2008 that it did not merit a visit.

27.     I am aware that Ahmed Tidiane Souaré, who was Minister of Mines at the time, has said that he had a meeting with me in 2006 at which Simandou blocks 1 and 2 were discussed, and that Vale relies on Mr Souaré's account in its Statement of Case.[1] As above, I did not visit Guinea until 2008. I never met Mr Souaré (or anyone else in Guinea) nor was I in touch with him in 2006 as he alleges. I may have met Mr Souaré when I visited Guinea in 2008, but have no recollection of this now.

28.     During the latter half of 2007 I was more regularly kept updated with what was going on on the ground in Guinea by Mr Avidan and Mr Struik. Although I have no recollection of this now, I can see from reviewing contemporaneous documents that I knew at the time that Rio Tinto was in danger of losing its rights over Simandou blocks 1 and 2, and that BSGR was working hard to put itself in the best position to apply for those rights should they have become available. Mr Avidan and Mr Struik were doing what they could to improve BSGR's position, including having discussions with relevant people about BSGR, its track record and experience. I believe, from my memory of what was being told to me at the time by those on the ground, that the GoG was encouraging BSGR towards these blocks because they were keen to get a company into them which was both capable of, and likely to do, the work on the ground. As BSGR had completed a very significant amount of work in relation to Simandou North and South and thus proven its abilities and appetite for getting the work done, the GoG was keen to try and replicate that with blocks 1 and 2. Indeed, I remember that when I did meet with President Conté, which must have been sometime after February 2008, he said to me that very thing – that the GoG was keen to replicate the work on Zogota in blocks 1 and 2.

---

[1] Statement of Case, dated 30 January 2015, para 143.

Witness Statement of Benjamin Steinmetz

29.     By the beginning of 2008 the area that has become known as Zogota and which had been a speculative investment (it was early stage exploration which is known as greenfield exploration) now looked as if it may be real and merited my involvement. At the same time the project was beginning to get very expensive.  It was eating money and the directors of BSGR asked me to become more involved and to provide advice on the geopolitics of the country as well as the economics of the project.

30.     Accordingly, I started visiting Guinea more often. I do not have a clear memory of this time because it was a long time ago, but I do remember having one, maybe two meetings with President Conté. I certainly remember meeting the President once at his Presidential Palace – the meeting took place outside, under a tree and Mr Avidan was also present. There were around 10 other people there, but I did not know any of them. President Conté made a great play about not being interested in money about which I think he was sincere.  He looked sick and tired.  He chain smoked and had terribly swollen legs. (Later, I was told he was a diabetic). He told me that he was old and dying and that he wanted to do the best for his country.  He said that he wanted us to invest in the country and not behave like the other big companies which talked big but did nothing.

31.     As explained above, I very often perform an ambassadorial role for the group and this was the case in relation to Guinea too.  As well, therefore, as giving advice on commercial aspects of the deal from 2008 onwards I made myself available to meet senior stakeholders in the project in Guinea.  This was entirely natural.  My commercial instincts told me that there was potential for a world class project with BSGR acting as the catalyst for its development.  There were many precedents for such a deal: for instance, a company called Fortescue in Australia had shown that an entrepreneurial approach by a smaller company could yield outstanding results with the right asset.  The project was important on both sides.  For BSGR it represented a very significant investment into which it was committing more and more money and corporate effort For Guinea it was potentially one of the largest mining and infrastructure projects in its history: a project that had the potential, after decades of being unable to exploit its resources for the benefit of its people, to transform the fortunes of the nation.  In any environment, whether it be a developing economy or in an advanced European nation, close contact between investor and government is to be expected and welcomed.

32.     It was in this context that, after his appointment as Minister of Mines in early 2009, I struck up a working relationship with Mahmoud Thiam.  The allegations that Mr Thiam received preferential treatment or gifts or other financial benefit in exchange for promoting BSGR's

interests in Guinea are nonsense.  He was scrupulous in ensuring that flights and hospitality (either that we paid for or that he took on the BSGR plane) were only accepted in appropriate circumstances.  He did attend my daughter's wedding in Israel.  He was one of at least 500 guests.  The invitation, out of courtesy, had been made to the President.  He could not attend but sent Mr Thiam in his place.  The notion that Mr Thiam received money that would allow him to pay for properties in New York is similarly nonsense.  He did not receive this money or any money at all from BSGR or from me or from any entity associated with either me or BSGR.

33.    Immediately after President Conté died, he was replaced by Captain Moussa Dadis Camara. I understand from Mr Avidan that he, keen to ensure that the new government stood by the issue of the exploration permits for blocks 1 and 2 which had just been awarded to BSGR, arranged to meet with Captain Camara after he took power, and that he introduced BSGR to Captain Camara and explained the good work BSGR had done and planned to continue doing. Mr Avidan contacted me after his meeting with Captain Camara, and said that the new President had specifically requested that I go to Guinea to attend a big meeting.

34.    I therefore flew to Guinea for the meeting, even though I had been there only two days beforehand. The meeting was held in a large auditorium in Guinea. During it, Captain Camara unexpectedly asked me to speak to the large crowd, which I accordingly did in French. I told them of the good work that BSGR had done so far in Guinea with its mining rights and that it intended to continue this work. Captain Camara asked me, in front of the crowd, whether BSGR would build a trans-Guinean railway. I answered that it would. In fact it was our idea and we were very sincere about, and committed, to it.

## C. PENTLER

35.    At the beginning of 2008, as I became more involved, I became aware that there was an issue between BSGR Steel Holdings Limited ("BSGR Steel") and Pentler. I learnt that Pentler had introduced BSGR to Guinea and helped set up the operations on the ground in 2006. In return for this, Pentler had been given a free shareholding in BSG Resources (Guinea) Limited, which was a BVI company ("BSGR Guinea (BVI)"). I considered this all to be completely normal. (Carried interests of this type for people or organisations that had introduced opportunities to BSGR or other companies in the BSG group were common). The issue arose, however, because Pentler seemed to be under the impression that it would not have to contribute to the, now significant, capital requirements of the Guinea project. BSGR Steel obviously disagreed: it was not fair that Pentler should own a share of a

project that BSGR Steel alone was required to fund. I therefore turned my attention to the terms of the agreement BSGR had made with Pentler in 2006 under which it had been awarded a carry in the Simandou project.

36. I recall that the commitment for Pentler to participate in the funding of the project arises in the shareholders agreement that was entered into between BSGR Steel and Pentler to put into effect the earlier agreed carry arrangements in BSGR Guinea (BVI).[2] Clause 6.2 governs further funding and, under it, if the Company could not be funded by external borrowing, the shareholders had to fund it in the same proportions as their shareholdings. I remember that I spoke to the BSGR directors on this point, and they fully supported my view that Pentler needed to contribute.

37. Given the significant increase in commitment the project now required, I thought Pentler should begin to contribute its share. It would not be fair for it to keep its full carry otherwise. Pentler had been under the impression that they would not have to fund their share of the project and were clearly annoyed at what they saw as BSGR's change of position in this respect.

38. Until this time I did not know the Pentler people at all. They had been "silent" partners after they had introduced BSGR to Guinea and helped it set up the offices and all dealings with them had been conducted by others. I anticipated, however, that they would be reluctant to give up their shareholding as they thought they had a very significant interest in a substantial project for which, up until then, they had had to pay or risk nothing. I was right, but, in the end, Pentler did not have the resources required to meet their contractual obligations to contribute and I led the negotiation of the buy out of their shares in BSGR Guinea (BVI) in March 2008. We conducted the negotiation with Mr Noy. It was the first occasion on which I met with Mr Noy and we established a decent working relationship. Mr Lev Ran was also involved in the negotiations to a limited extent. David Barnett was supporting me on the BSG side.

39. In the end, the agreement was to buy out Pentler's interest for US$22 million in four instalments: US$3 million on 15 April 2008; US$1 million on 15 June 2008; US$9 million on 15 April 2009; and US$9 million on 15 April 2010 (the "Pentler Share Purchase Agreement").[3] The reason for this structure was that BSGR wanted to load the deal for the latter part of the payment schedule when the project may have been revenue-generating, or

---

[2] Shareholders Agreement between BSGR Steel, Pentler and BSGR (Guinea), dated 19 July 2007, (Exhibit R-24).

[3] Share Purchase Agreement between BSGR Steel and Pentler, dated 24 March 2008, (Exhibit R-28).

at least closer to revenue-generating, or we may have secured third party investment. Indeed, the agreement contemplates a third party investor which would have two possible effects. First, if that investment covered the investment BSGR had made in the project, it would accelerate the payments agreed with Pentler. Second, if BSGR realised a profit of US$1 billion Pentler would receive an additional payment of US$8 million, bringing the total payment to US$30 million. It is important to note that, if the project ceased operation for any reason, no payment, or further payment if any had been made already, would be due to Pentler.

40.     This was a fair deal for both parties. Although Pentler had had a 17.65% interest in the project, it could not afford to fund its stake. While it had performed an important and valuable initial task for BSGR in introducing it to the country it was not fair that it enjoyed a free ride – potentially benefitting enormously without any contribution other than the original introduction to the country. If a deal were done at US$1 billion Pentler would have received 3% of the enterprise value for no financial investment against the anticipated investment by BSGR which, at the time, it was clear was going to have to be well over US$100 million.

41.     It has been drawn to my attention that clause 6 of the Pentler Share Purchase Agreement says that Pentler's shareholders would "*continue to advise and act as consultant for the period of 5 years from signing date hereof*".[4] The situation as I understood it was that Pentler had never been a consultant for BSGR in Guinea – it introduced the company to the country in 2005 and 2006 and then conducted no further work. The only time during which they did perform what could be described as a consultancy or intermediary role for BSGR was from 2011 onwards, when they facilitated an introduction between BSGR and a gentleman called François de Combret, who then sought to mediate between BSGR and the GoG over what was then a developing dispute. I believe, from memory, however, that we wanted to keep Pentler with us, as potentially future business opportunities might have come up that we would want to work with them on, and this clause was seen as a way to keep them onside. It is also common in business to want to tie your former partners or operators to you and preventing them from competing against you and I believe this clause may have been trying to achieve that. I do not, however, believe we ever had any intention of them doing any work, and my understanding was that they had not done any work for BSGR since the initial introduction to Guinea and assistance in setting up BSGR's office anyway.

---

[4] *Ibid.,* p2

Witness Statement of Benjamin Steinmetz

42.     In reality I do not think Pentler had any real choice but to sell their shareholding, although at the time they were obviously reluctant. I remember I was told by Mr Noy that Frederic Cilins was very much against doing the deal and felt strongly that Pentler should remain a shareholder. As it was, following this agreement the world went into recession and the price of commodities, including iron ore, dropped very significantly. It looked for a while like we may have made the wrong decision in buying Pentler out because it was difficult to imagine the potential for the project to actually make any money in that economic environment. Indeed, in 2008 and 2009, when the iron ore price was ruinously low and many mining companies found themselves on the brink of bankruptcy, the economic situation made the deal that Pentler had done look very attractive for them.

43.     During the global financial crisis real estate prices fell dramatically along with stocks and shares and prices of commodities were similarly significantly reduced – at one point, the price of iron ore fell to around $50/metric tonne. There was a serious liquidity crisis globally. Lemans Brothers collapsed. BSGR was certainly not immune to any of this, and nor were other mining companies: Rio Tinto, for example, was on the verge of bankruptcy. The two 2008 payments to Pentler were made, but BSGR was facing liquidity issues. On 15 April 2009, BSGR did not pay the next payment of US$9 million.  Pentler threatened to sue and even to treat the previous arrangements as "cancelled" and deal in the shares it had transferred to BSGR the previous year.

44.     At around the same time, I understand from having reviewed contemporaneous documents, that BSGR had received a blackmail attempt from someone called Aboubacar Bah. I do not now have any clear memory of this, but I do not think that I had heard of Mr Bah before this.   Indeed, if his name was brought to my attention at the time, then I have no recollection of that now.  I can see from the file that David Barnett was dealing with the issue internally and had instructed Skadden - principally to deal with Pentler, but an ancillary part of which seems to have been the Bah issue.

45.     Pentler instructed lawyers too in relation to the dispute over the unpaid instalments and there was an exchange of correspondence with Skadden. It became very heated.  I remember one very bad meeting and another call when I became extremely angry with Mr Noy and we were involved in a shouted exchange to the extent that my family remarked on my agitation after I had come off the phone.  In the end matters were resolved in a settlement agreement between BSGR and Pentler on 25 July 2009 (the "Settlement

Witness Statement of Benjamin Steinmetz

> Agreement").[5] On the same day Pentler entered into an indemnity, indemnifying BSGR against any claim or complaint from Mr Bah for which it assumed complete responsibility.[6]

46. The settlement agreement recited the fact that the parties had agreed the price of US$22 million for Pentler's shares and that the first US$4 million had been paid. It then set out new dates for payment of the balancing instalments of US$18 million. For its forbearance Pentler was, in effect, guaranteed payment of the first US$9 million of the indebtedness. The second US$9 million was, however, still subject to BSGR's operations in Guinea continuing.

47. Under the terms of the settlement agreement US$4 million was due to be paid within 3 business days and it was duly paid. The balancing payments of US$14 million were not paid in accordance with the settlement agreement. By the time the next payment was due (31 December 2009) it looked possible that a deal could be done with a third party to take a stake in the project. BSGR therefore served notice on Pentler that it was relying on the grace period set out in clause 4 of the Settlement Agreement, under which Pentler would not enforce non-payment of the 31 December 2009 tranche until 15 April 2010.[7]

48. In the end, after the Vale deal and after much discussion between me and Mr Noy it was agreed that Pentler would receive another US$22 million (representing the balance of $14 million plus the US$8 million bonus envisaged by clause 5 of the Pentler Share Purchase Agreement dated 24 March 2008), taking the entire amount it received to US$30 million. There was an argument as to whether the additional US$8 million due under clause 5 of the Pentler Share Purchase Agreement was payable, because BSGR had not yet realised a profit in excess of US$1 billion. That said, BSGR had done well out of the Vale deal and it was my recommendation to BSGR that Pentler be treated generously for its contribution. Although it was BSGR that had taken the very significant risk and invested a large amount, Pentler had introduced BSGR to the country and had been patient. Had it been able to hold onto its 17.65%, it would have earned far more. Further, an additional US$8 million was a relatively small amount considering the deal BSGR had just done with Vale. It agreed on 10 May 2010 to accept the US$22 million in full and final settlement of BSGR's obligations to it and this sum was paid on 17 May 2010.

49. Pentler did not, however, feel that the total of US$30 million was, in fact, fair despite having agreed to it.

---

[5] Settlement Agreement between BSGR Steel and Pentler, dated 25 July 2009, (Exhibit R-33).

[6] Indemnity from Pentler to BSGR, dated 25 July 2009, (Exhibit R-34).

[7] Letter from David Clark to Michael Noy and Avraham Lev Ran, dated 31 December 2009, (Exhibit R-46).

Witness Statement of Benjamin Steinmetz

50.     Mr Noy came back to me shortly afterwards. I recall Mr Noy being extremely upset and arguing that BSGR had taken advantage of Pentler by buying back its shareholding for US$22 million when in fact he said on the basis that the project as a whole was worth US$5 billion, Pentler's 17% was worth US$800 million. He asked for an additional payment of around US$20 million to settle the issue – which would give them a total of US$50 million which Mr Noy said was still a fraction of what they should have got. I believe he argued that this was based on the full amount of the original milestone agreement being due as well as the buyout of the shares. I regarded this request as ridiculous as Pentler had long before given up any rights to payment under the milestone agreement. (In fact, this was the first time I was ever even aware of there having been any type of milestone arrangement considered originally).  We argued for a long time about it. I told him very clearly that the buy out had been negotiated fairly at the time, that throughout the economic crisis it was BSGR that looked like it had done a terrible deal and that Pentler had not been complaining then. They had never invested any money and had not taken the exploration risks we had. Now the situation had turned around but that was life. We had a tough and long negotiation over it.

51.     I have reviewed the marked up milestone agreement that Mr Noy and I negotiated over, which is dated 16 July 2010.[8] From reviewing this, Mr Noy was initially asking for an additional payment of US$19.5 million and that we eventually agreed on a further payment of US$4.5 million based on the milestones that had actually been achieved on each project. We agreed that the ringed milestones had been reached. In relation to the Simandou blocks 1 and 2, I remember that Mr Noy wanted the payment relating to the feasibility study to be included, despite that the feasibility study had not yet been completed. We negotiated over this point for some time, and eventually agreed that half the milestone amount of US$1 million would be paid. I noted on the same piece of paper: "*to be paid 3m – 2010 1.5m – 2011 = 4.5m$ final*", initialled it and made a note that this agreement remained subject to the BSGR board's approval. Further to this agreement, two further payments were made to Pentler: US$3 million on 5 August 2010 and US$1.5 million on 22 March 2011.

## D. DEMANDS FOR MONEY

52.     From my review of the contemporaneous documents and of the witness evidence in this case, it appears that Mr Bah had not ceased his blackmail attempts as at May 2010. I have no memory of this from the time. Like others, he had probably read about the Vale deal (which was very high profile and had received extensive coverage all over Africa and Europe) and thought he would be able to extort money from BSGR.  It seems that, for this reason,

---

[8] Annotated milestone agreement, dated 16 July 2010, (Exhibit R-113).

Witness Statement of Benjamin Steinmetz

BSGR insisted on the indemnity in relation to Mr Bah, this time from Mr Noy and Mr Lev Ran personally.[9]

53.     I now understand from reviewing contemporaneous documentation and from discussing this case with BSGR's lawyers and employees that Mr Bah and Ms Touré had each sought to blackmail BSGR previously. I do not have any recollection of these blackmail attempts at all, although it is likely that I would have been told of Mr Bah's approach in 2009 at the time. It is not uncommon in this sort of project to receive blackmail attempts and, regrettably, very common in Africa, so it is not surprising to me that we received them, or that I do not now remember them. I either would not have been informed of them at the time, or, if I had, would have been dismissive of them.

54.     It appears from the documents I have seen that Ms Touré attempted to blackmail BSGR on 8 June 2010 – shortly after the Vale deal was announced. I have no recollection of this from the time and feel certain that I did not deal with it. I now know that Ms Touré irrevocably withdrew her claims at the time and agreed to destroy the "invented" documents attached to her blackmail attempt, only later to withdraw her withdrawal. I expect that it was not considered by Mr Avidan or Mr Struik at the time to have the credibility to warrant a conversation with me.

55.     So, I do not recall having heard of Ms Touré until much later, in March 2012 when Mr Avidan reported to me about the meetings he had had with Walter Hennig. This seemed to me to be quite a serious matter: what we considered to be a blackmail attempt had happened in London, had come from a South African businessman and as a result of a meeting that had been set up through Lloyd Pengilly, of J.P.Morgan, who was one of the leading natural resources investment bankers at the time. He was therefore a man of great influence in mining in Africa. I knew him well because BSGR had a strong banking relationship with J.P.Morgan. I conferred with the BSGR directors and we agreed first, that BSGR should undertake an internal investigation into the allegations. I was aware that if there had been any wrongdoing at all it would potentially jeopardise the project. BSGR had operated and does operate to the highest standards of governance for a private company and I was confident that no one amongst the senior personnel would have endangered the deal or the company's reputation. I could not guarantee, however, that something untoward had not happened somewhere in the system and therefore agreed with the BSGR directors that a thorough investigation should take place and that Pentler should be included in the enquiries. This investigation was undertaken by Daniel Pollak and did not

---

[9] Indemnity from Michael Noy and Avraham Lev Ran to BSGR Steel, dated 10 May 2010, (Exhibit R-52).

uncover any wrongdoing. As described below, by this time, we had re-engaged with Pentler who were assisting us in introducing intermediaries for our discussions with the Government of Guinea. When Mr Hennig produced the forged contracts Pentler accepted responsibility for the issue and arranged for another withdrawal of the allegations by Ms Touré in May 2012[10], which I thought at the time would be the end of the matter.

56. It was also agreed that BSGR should seek legal advice as to whether Mr Hennig's attempts to blackmail BSGR should be reported to the criminal authorities. We went to see Ken Macdonald QC, the former Director of Public Prosecutions in the UK.

57. The background to these efforts by Mr Hennig is set out in the witness evidence in support of BSGR's challenge of the UK's Serious Fraud Office's (SFO) decision to serve section 2 notices on BSGR.[11] In particular, in February 2011, BSGR decided that it should not accede to President Condé's attempts to obtain significant payments relating to the project. The reaction to that refusal is also set out in Mr Cramer's statement and led, in the end, to the commencement of the Comité Technique process in October 2012. Again Mr Cramer's SFO statement deals with all of the flaws and weaknesses in the DLA and Veracity reports and the evidence the Comité Technique relied upon. Other than to deal with specific items that relate to me I am not going to add anything further.

### E. MS TOURÉ

58. Before I address any of the specific allegations made about me including in the various statements of Ms Touré, I should give some overall context. If I have ever met Ms Touré, I can only recall one occasion when it may have happened, which was at a meeting with the President (Conté) which I describe at paragraph 30 above. There were two or three younger women with him, one of whom (not Ms Touré, as I recall) was introduced as a wife: the others were mistresses. If she was there (and I am far from certain that she was) that was the only time I ever met her. As I say above, the first time I can recall having heard her name was in relation to Mr Avidan's meetings with Mr Hennig in 2012. I cannot remember knowing of her before that – even if I had heard her name, it would not have meant anything to me.

59. Turning now to some of the specific allegations that Ms Touré has made and that Vale has repeated in its Statement of Case. First it is said that there was meeting with Ms Touré and others in Guinea in 2006, at which I was supposed to have offered her 5% of BSGR's Guinea

---

[10] Affidavit of Mamadie Touré, dated 27 April 2012, (Exhibit R-114).
[11] Witness Statement of Dag Cramer in support of BSGR's Judicial Review Application, dated 25 November 2014, (Exhibit C-78).

company's assets.[12]  This is not true.  I did not travel to Guinea until 2008.  Vale describes this as an assertion.  It is fact. [13] It follows, therefore that everything Ms Touré says about the meeting that was supposed to have taken place and all of the events and promises that followed it are completely made up by her. On top of that, however, as I have already said, I did not know Ms Touré, I had not heard of her and it is clear that BSGR did not have and never has had any commercial or contractual relationship with her.

60.    Ms Touré refers to another meeting that was supposed to have taken place on 20 June 2007.[14]  This is another lie.  There was no such meeting.  I had still not visited Guinea by this time.  There was no deal of the nature described or at all.

61.    Ms Touré describes a meeting that was supposed to have taken place with President Conté in Dubreka.[15]  She does not put a date on the meeting.  For some reason, Vale says the meeting took place between February and July 2008.[16]  The meeting did not take place. I do not even know where Dubreka is.  It is alleged that I gave the President a diamond encrusted car.  I did not – on this occasion (which did not happen) or on any other.  BSGR did produce a small model car with industrial diamonds in it as a corporate gift. The wooden base of the car has BSGR's name engraved in it.  It is worth little – they cost a few hundred dollars to make - and was, in fact, a marketing device. They categorically were not, and have never been to my knowledge, used as an attempt to bribe anyone. It would be interesting for any company to try to bribe people using a relatively cheap marketing device that has the company's name stamped all over it. I will produce one of these cars for the Tribunal at the hearing.  The car was not given to President Conté or Ms Touré.  One had been given in 2006 to the Ministry of Mines at a public event.

62.    As well as this, Ms Touré's description of my conduct at this alleged meeting also illustrates the falsity of her account.  She says I offered the President money.[17]  I pride myself on the propriety with which I conduct myself. I also frequently meet with very many presidents, prime ministers, heads of state and senior government officials in my ambassadorial role. I know how to conduct myself and I have never offered money to any head of state, president, prime minister or government official that I have met. Ms Touré's account bears no relation to any conversation I have ever had, or would dream of having, with any public

---

[12] SoC, para 145 and Exhibit C-6 p. 37, para 14.
[13] Benjamin Steinmetz passport and flight documents, (Exhibit R-115).
[14] SoC, para 158 and Exhibit C-6 p39. para 17.
[15] Exhibit C-6 p. 39, paras 22 to 23.
[16] SoC, para 161.
[17] Exhibit C-6 p. 39, para 23.

official. For the avoidance of any doubt, I never offered President Conté money, whether at this meeting or at all.

63. Ms Touré also says I arranged for her to be given two Land Cruisers, a necklace and a white gold chain.[18] Each of these allegations is also untrue.

64. Once we had received Ms Touré's statement to the US authorities from the Comité Technique, it was clear that BSGR would need to rebut the contents of her statement. Advice was taken and a line by line analysis was conducted, the relevant results of which form part of this statement. For example, in order to show that many of the meetings she referred to were made up, it was necessary to demonstrate that I had not travelled to Guinea until 2008. We analysed my passports and the travel records of the plane I use.[19] They showed that I had not been to Guinea until 2008 and that when the plane had been used to go to Guinea on previous occasions I had been in London as shown from hotel receipts or in Israel as shown by records obtained from the Israeli Interior Ministry.

65. It did not occur to me or anyone at BSGR that we should seek to speak to Ms Touré. Not only did we have no contact and no relationship with her, it was plain to us that there was little point in contacting Ms Touré and it would have been extremely dangerous to have done so. In any event, Pentler had a relationship with Ms Touré, but BSGR did not. Pentler saw that a problem that was entirely their issue was threatening adversely to affect BSGR's business. Mr Noy spoke to me and told me that Pentler would make efforts to seek to persuade Ms Touré to tell the truth and withdraw, as she had done before, the untrue allegations she was making. Even then, I hardly knew Mr Cilins and had no real relationship with him. All my dealings with Pentler had been with Mr Noy. I had met Mr Cilins on perhaps four or five occasions, including during meetings with an intermediary that Pentler had introduced us to - Francois de Combret - through whom we were trying to explore whether a settlement with President Condé would be possible. Mr Cilins brought us three different people, each of whom he suggested would be able to assist in brokering a deal – M. de Combret, Gaby Peretz and Michel Billard de la Motte. It is clear that Mr Cilins thought that if he could help us broker a deal he would be able to ask us for a significant fee. I never met Mr Cilins alone. Had Pentler's efforts through M. de Combret led to the project getting back on track I would have advised BSGR to pay a fee. It would have been a very valuable contribution. Nothing, however, was properly discussed, let alone agreed. It was acknowledged there would be a discussion if and when there was a solution.

---

[18] *Ibid.*, p. 39, paras 26 and 27.
[19] Exhibit R-115.

66.     So while I was aware that Pentler was going to try to ask Ms Touré to restate the falsity of the allegations she had made and get her to withdraw them again, I never assumed that they would be able get her to withdraw the statements, or that such a withdrawal would lead to the end of the Comité Technique process. I accordingly advised BSGR that it needed to carry on dealing with the allegations contained in the Comité Technique letter.

67.     I did not offer money, through Mr Cilins or in any other way, for Ms Touré to sign a further statement or destroy documents. Mr Cilins did not travel to America on my or BSGR's instructions – or with our authority. He was not authorised by me or BSGR in any capacity whatsoever. When I found out about his arrest I was as shocked and surprised as anyone.

68.     As to the transcripts of Mr Cilins conversations with Ms Touré, I would say just one thing. (There is much more to say about the transcripts, but I will leave that to submissions from BSGR's lawyers). It is a very common thing for people to speak as if they have my authority, when they do not. I have experienced it many times. People seek to improve their position in a negotiation by saying they know me, or have access to me or speak with my authority. In truth, no one does. I can't bind any company or organisation and only make recommendations or provide my advice. This is not a form of arrogance, it is just a statement of what often happens. I recognise that I have influence and people may seek to improve their position by claiming an association they do not have. This happens regularly when someone approaches me and says that someone else has said something in my name. There is little I can do about it – except to make it very clear when I do give authority to speak in my name. This was not one of those occasions. I repeat. Mr Cilins did not travel to speak to Ms Touré with my authority, on my behalf or on behalf of BSGR or anyone associated with BSGR.

## F.  THE NEGOTIATIONS WITH VALE

69.     Turning now to the deal with Vale, there was plenty of interest in the Simandou project. BSGR was engaged in talks with various third parties about the project, including Chinalco. Once we had ceased discussions with the Libyan Investment Authority and Chinalco, we were in active discussions with Baosteel. Although I now know that there had been some emails a little earlier, for me, Vale's interest came following the Indaba conference in February 2010, after which Vale conducted a site visit of Simandou blocks 1 and 2. After the site visit, although I am not sure exactly when, Eduardo Ledsham met with me and Mr Cramer in London and suggested a deal. I now cannot recall the details of what he suggested, but I do remember that I countered with a proposal similar to the deal which was eventually done. Mr Ledsham said he would have to discuss it with the Vale

management. He came back the next day and said that Vale was indeed interested in a deal on those terms.

70.　From that expression of interest until completion BSGR and Vale worked at great speed to get the deal done.  As can be seen from the deal that was done, it suited both parties.  BSGR was not desperate to sell and would have found other counterparties if the Vale deal had not come off, but, all the same, we were more than happy to partner with Vale who had the balance sheet and experience to take the project forward.  In fact, the negotiations went very well.  Although intense, they were conducted in a cooperative and constructive spirit. The deal meant much more to us than the $500 million payment: we also saw it as a deal to secure the project in the long term. Only a large corporate with a strong balance sheet had the financial capability to commit the US$10 billion plus and complete the project. Accordingly, the greatest success of the deal for BSGR was that Vale committed to providing the funds, even though the cost of that funding was so high at 16%.

71.　I was involved in the headline commercial negotiations, although my contributions, as always, remained subject to the board's approval and I made that clear to Vale several times.  The deal was very intensive and the BSGR team spent many hours and days in meetings with Vale and with the two teams of lawyers first in Brazil and then in London. Negotiating and getting deals done is one of the areas where I am able to provide real value for the BSG group and I accordingly played a role in these negotiations with Vale. BSGR board members, such as Mr Cramer, were fully involved and the board was kept updated constantly.  The BSGR "team" was split and different people were involved in different strands.  Mr Struik, for example, was dealing with all of the technical issues while Yossie Tchelet dealt with the financial due diligence.  I would have had nothing to add to these conversations and was not involved with them.

72.　I attended the initial meetings with Vale in Rio de Janeiro in March 2010.  Daniella Chimosso dos Santos, Vale's senior lawyer, was in all of the meetings but the focus was always commercial.  As one would expect, these meetings were cordial and concentrated on the business opportunity. The impression Vale gives of them in their statement of case, that the sole or main content of the discussions surrounded how BSGR obtained its licences and FCPA type enquiries, is entirely false. Had that been the principal topic of conversation it is unlikely that negotiations would have progressed very far given the tone that that would have set. Instead we spoke about the opportunity. Vale was as keen to impress as BSGR was, if not more so. They took every opportunity to tell us about their operating and marketing capacities and wanted to give the impression that they were the

best in the world. They were also keen to explain that they were knowledgeable about the geology of the Simandou region because of the geological similarity to its Carajás mine in Brazil – which the BSGR team, at Vale's invitation, went to visit.

73.     In addition I met with Roger Agnelli, then Vale's CEO, several times. We got on well and discussed this deal as well as several other possible deals between Vale and BSGR. Mr Agnelli, José Martins, Clovis Torres and other senior managers were all very complimentary about the work BSGR had done on the ground in Guinea. They told us that we had done a world class job in a very short time. Shortly after we had completed the Vale deal, Mr Agnelli, Mr Etchart, Mr Cramer and I took a trip to Panama together where we dined with the President in order to discuss a possible Panamanian copper project that BSGR had sourced previously and had already spent time and money looking into. I had suggested it to Mr Agnelli as another deal BSGR and Vale could do together. Mr Agnelli told me that he had looked at the mine twice already and rejected it each time. However, he said that because I had asked he would look at it again, and make the effort to come to Panama with Mr Etchard to have dinner with the Panamanian President. We got as far as signing a memorandum of understanding with Vale in relation to this deal, although it then did not go ahead because there was, if I remember correctly, some kind of land rights dispute with local people around the mine. I was also invited to the opening of Vale's coal mine in Mozambique where I was presented to the President of Mozambique as Vale's esteemed partner in its Guinea project and BSGR brought to their attention other possible deals, including, for example, in Africa, Russia and Kazakhstan. Relations between me and Mr Agnelli, and between Vale and BSGR more generally, were very friendly and cooperative and there was plenty of goodwill. Indeed the collaboration between a very large corporation and a smaller company with an entrepreneurial spirit was a great combination.

74.     Later, once the Government of Guinea started its campaign against us and before he was replaced, Mr Agnelli called me to tell me that George Soros had just called him. It was soon after Rio Tinto had paid US\$700 million to stay in Guinea. Mr Soros asked Mr Agnelli to meet him and Mr Agnelli wondered whether I should go with him but, in the end, went alone. He reported back to me that Mr Soros had told him that the Simandou project was in jeopardy but that the issue could be solved by paying the government US\$500 million. Mr Agnelli wanted to know what I thought. I told him that I would recommend refusing that deal – or anything like that. BSGR had done nothing wrong. Rio Tinto, on the other hand, did not have a licence and had behaved terribly while they were in Guinea which were reasons why they had no choice but to pay if they wanted to stay in or return to the country. Not only had we acquired all our rights properly, we were committed to investing

US$1 billion into the country in respect of the Trans-Guinean railway, as well a further US$10 billion in the project itself. We should not be extorted to pay any more.

75.    Vale refers to rumours about my reputation in the diamond business in Africa.[20]  They do not substantiate the allegations.  I believe I and our diamond business have an excellent reputation and know of nothing that would suggest otherwise.  In any case, this was not mentioned to us at the time and I can only imagine Vale refer to it now simply to attempt to discredit BSGR.

76.    The FCPA/ABL due diligence was an important strand of a deal that contained many strands of work.  It was no more prominent than normal in this type of deal.  In any case, BSGR and I were only too happy to answer the questions and provide the information and comfort required.

77.    As to my involvement in this aspect of the deal, I remember, of course, being asked to sign and signing the anti-bribery certificate that was required by Vale.  I do not specifically remember signing the document itself but am confident that I read it at the time as I would have realised it was an important document. I also would have taken advice on its contents from our lawyers on the deal, Skadden.  Looking at it again now, I was quite correct to sign it.  Based on my knowledge both then and now, it is true.

78.    The only other aspect of the negotiations that related to the FCPA issues that I recall was a short deliberation that I participated in about whether the Pentler relationship should be disclosed. I cannot remember if it was someone from the BSGR side or Skadden themselves who mentioned it first.  Skadden knew the relationship we had with Pentler because they had advised on the dispute I refer to above.  I was ambivalent as to whether Pentler should be disclosed, and listened to the advice that was given. The advice was that we did not have to disclose the relationship. They were our former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere. As to Ms Touré or Ibrahima Touré or the Pentler owners as individuals, that question did not even occur to us. There was never a relationship with Ms Touré. The only relationship with Mr Touré was as an employee (and this was disclosed). And there was no relationship with the Pentler owners as individuals – only with Pentler itself. In any case, had the advice been to disclose the relationship with Pentler, that is what would have been done.

## G.  VALE AND THE GOVERNMENT OF LIBERIA

---

[20] SoC, para 55 and Witness Statement of Alex Monteiro, dated 29 January 2015, paras 36 and 37.

79.     The negotiations between VBG and the Government of Liberia ("GoL"), and Vale's unilateral withdrawal from those negotiations in the summer of 2011, is explained in detail in Mr Pollak's witness statement. I remember that I went to one meeting with the Liberian President and Vale early on in the negotiations. We spent the day together and had a very good discussion. Later on, Mr Martins told everyone that Vale wanted to gain control over the global reserves of the high quality iron ore that had been discovered in Simandou and said that the worst thing that could happen for the mining industry would be if the Chinese obtained control. He explained that even if the iron ore market dropped significantly the higher quality iron ore would still have a profitable market in China. This was because for every two tonnes of the Australian low grade ore that was sold to China, the Chinese also had to buy one tonne of the high grade ore for their blending processes. Mr Martins was extremely bullish on price and said that this type of ore would not drop below $100/metric tonne in the future.

80.     I was later asked to get involved in the issue of the negotiations with the GoL in August 2011, when it was clear that Vale had withdrawn from the negotiations and the BSGR board was keen to find a way to bring them back to the table. The route through Liberia was absolutely key to the commercial and practical success of the project, and Vale seemed to be jeopardising it by refusing to engage with the GoL for no apparent reason. BSGR speculated that the reason that Vale was refusing to engage with it was because, had the Liberian route been formally agreed, it would have had to pay BSGR the next tranche of US$500,000,000 under the joint venture agreement. I believed that assessment to be correct. I now wonder whether Vale intended at this time to go ahead with the project at all, or if their main motivation was to keep the iron ore in the ground and prevent any other company from gaining control of it.

81.     Once I looked at the situation I concluded Vale were not acting in the best interests of VBG and the project and that Vale's CEO had adopted a new strategy of burying the project by refusing to take any steps to progress it.   Vale were acting in bad faith and had effectively "killed" the project for reasons that had nothing to do with the project's underlying viability, but everything to do with a corporate change of heart and a pressure from within Brazil. It was bizarre to me.

82.     I have seen paragraph 38 of Ricardo Saad's witness statement, in which he says that President Condé refused to allow me to sit at his table during the ground-breaking ceremony regarding the start of VBG's work on repairing the KanKan railway, and that I

was angry about this.[21] I am surprised that Mr Saad has sought to bring up such a petty incident. In any event, this is not an accurate description of what happened at that event. Vale organised the event and I believe that it may have been Mr Saad himself who organised the seating arrangements. Vale positioned their key people, including Mr Saad and Mr Agnelli, at the table with the President and seated BSGR, including me, at another table. I expect that this was reflective of Vale's wish to position itself as the leaders of VBG in Guinea, and to show that BSGR, as the junior partner, was less important. This is classic behaviour in the big companies and the dominant partners in joint ventures: they do not want small companies or junior partners running around asking questions and making suggestions about how to do things better, more efficiently or cheaper. I do remember that Mr Avidan was upset by the incident and told Vale so. I was not that upset at all – I do not mind where I sit as long as the project is taking place. Mr Agnelli afterwards apologised to me for the seating, which he also thought was of Vale's doing. Vale later said that the instruction for it came from the Guineans. I do not know whether that was true or not. Even if that was the case, it is clear from what came later that President Condé intended to remove BSGR from Guinea at any cost, and had done an illicit deal with South African business interests to that effect, so it is of no consequence whether he refused to sit with us or not.

## H. CONCLUSION

83.  As I said at the beginning of this statement, the allegations of wrongdoing against BSGR are entirely false. They have been drawn from a deeply unreliable woman, who has embellished and in many cases simply created entire stories about BSGR which are entirely wrong. President Condé, keen to remove VBG from its rights in Simandou so that he could distribute them in satisfaction of his various illegal election debts, has seized upon Ms Touré's claims, saying that they evidence a prima facie case against BSGR. They do not.

84.  For its part, following a change of management in the wake of Mr Agnelli's departure, Vale changed its mind and decided that a US$10 billion investment in a risky region was one they could ill afford. They started trying to withdraw from the deal, initially by refusing to complete the agreement with Liberia for the only transport route available that would make the project economically viable, and then cooperating with the government of Guinea's review procedure which was patently unfair and obviously predetermined. I expect they had decided by this time that it was better to cut their losses and try to maintain a relationship with the Guinean government than it was to stand by their joint venture partner and fight

---

[21] Witness Statement of Ricardo Saad, dated 29 January 2015, para 38.

expropriation. This was brought home to me by the fact that Vale filed its request for arbitration less than a week after the withdrawal of our rights.

85.     The result of all this is not only that seven years of hard work and investment has been wasted, and that VBG's assets in Simandou have been expropriated, but also that President Condé's campaign against me and against BSGR has catastrophically damaged both our reputations to the enormous detriment of his own people.

I confirm this statement is true to the best of my knowledge and belief.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Benjamin Steinmetz

29 June 2015