# Exhibit 45

**IN THE ROYAL COURT OF GUERNSEY**  
**ORDINARY COURT**

The Royal Court House  
St Peter Port  
GY1 2NZ

<u>Tuesday, 6th March 2018</u>

Before:

**JUDGE JOHN RUSSELL FINCH, ESQUIRE, OBE**  
**JUDGE OF THE ROYAL COURT**  
(Sitting alone)

**IN THE MATTER OF BSG RESOURCES LIMITED**

and

**IN THE MATTER OF THE COMPANIES (GUERNSEY) LAW, 2008**  
**APPLICATION FOR AN ADMINISTRATION ORDER**

_____

Counsel for the Applicant:                                        ADVOCATE M C NEWMAN

_____

**TRANSCRIPT OF PROCEEDINGS**  
**IN CAMERA**

Transcribed from the Official Tape Recording by  
Apple Transcription Limited  
Suite 204, Kingfisher Business Centre, Burnley Road, Rawtenstall, Lancashire BB4 8ES  
DX: 26258 Rawtenstall – Telephone: 0845 604 5642 – Fax: 01706 870838

Number of Folios: 5,538  
Number of Words: 77

Apple Transcription Limited                                        344-721-090120-288/dl  
0845 604 5642                                                              v.5

CONFIDENTIAL                                                                                         JA0135204

INDEX TO TRANSCRIPT

Page

Submissions by ADVOCATE NEWMAN ................................................................................1

Decision..........................................................................................................................................8

Further submissions on peripheral matters by ADVOCATE NEWMAN .................................9

Apple Transcription Limited                                                  344-721-090120-288/dl
0845 604 5642

A

(2.53pm - Court in session)

**Sitting *in camera***

JUDGE FINCH:  All right, Advocate Newman, I have had the opportunity to go over what I think is helpful in these three bulky volumes that you have kindly provided—

B

ADVOCATE NEWMAN:  Thank you, sir.

JUDGE FINCH:  —mainly the Affidavit and the Skeleton Argument and one or two of the authorities.  How would you like to proceed?  You can take those as read.

C

ADVOCATE NEWMAN:  Thank you, sir.  That is really helpful actually.  Perhaps can I just address the first order of business which is paragraphs 1 and 2 of the Application, privacy, the fact that we are *in camera* today.

JUDGE FINCH:  Yes.  I have seen the authorities.  They go back to *Scott & Anor v Scott* [1913] UKHL 2—

ADVOCATE NEWMAN:  Indeed.

D

E

JUDGE FINCH:  —which we are all familiar with and for practical terms they have been applied in Guernsey in the helpful judgment that you cite of Lieutenant Bailiff Day so in the circumstances there is some very sensitive information here and although the public interest in obtaining information normally prevails, this is one of those unusual situations where, considering all the facts of the case, I am satisfied it will be very deleterious at this stage for any information to go out so I agree with that and I also, for the record, consider this is a matter of law and procedure so it is right that I should sit on my own and I exercise my discretion accordingly under the Royal Court Law.

F

G

ADVOCATE NEWMAN:  Thank you, sir.  The next point I would like to deal with just before we get to the Administration Application, and I think it is right because I am here *ex parte* in effect and unopposed, one of the provisions in the Companies Law states that we have to give notice to a variety of people and actually in this case it is the company making the Application so the only one which is relevant to us is at the very end of section 375.  It states that the Court may direct that we serve the Application on any other person including any creditor and I think it is right that in the interests of full and frank disclosure that I talk you through why we have chosen not to serve anybody and why effectively I am here unopposed today on what you may have read is a fairly... could be a fairly contentious matter.

JUDGE FINCH:  Yes, it looks a bit contentious.  I have one or two observations later which you will not be able to answer but which I am just going to make for the record but do carry on on that.

H

ADVOCATE NEWMAN:  Thank you, sir.  The creditor I am talking about is Vale which is the—

JUDGE FINCH:  Yes, may be a creditor.

A | ADVOCATE NEWMAN:  Vaguely a creditor although I think at the moment I would call it a contingent creditor and you will have seen from the evidence that it is likely that judgment will be handed down in its favour relatively imminently.

JUDGE FINCH:  Yes, and that is in London, that one, is it?

B | ADVOCATE NEWMAN:  That is in… Is it in London?  Yes, it is in London, yes, sir.

JUDGE FINCH:  Is that the arbitration?

ADVOCATE NEWMAN:  That is an arbitration in London, sir.

C | JUDGE FINCH:  Yes, that is the bit that puzzled me because there is a bit of a procedural cloud over that objecting, I think, to one of the arbitrator or one of the panel.

ADVOCATE NEWMAN:  Yes.

JUDGE FINCH:  They are not participating in the arbitration.

D | ADVOCATE NEWMAN:  No, sir.  They are not participating in the arbitration because they—

JUDGE FINCH:  Experience shows - forgive me - if they want to [cross?] the arbitration, that is not a good start when you are with the High Court, is it, if you are not participating.

ADVOCATE NEWMAN:  No.

E | JUDGE FINCH:  It is not something which is directly in issue today but it would worry me because the High Court would say, "Why did you not go there and run it and ventilate it fully and participate?"

F | ADVOCATE NEWMAN:  Yes, and that point, sir, is one which in my submission is something the administrators, if they are appointed, would have to consider but at the moment the advice that the company has had from its own lawyers is effectively, "Do not participate but you run a very likely risk of judgment being handed down against you," which is what is happening.

JUDGE FINCH:  And not being impeachable.

ADVOCATE NEWMAN:  Indeed.

G | JUDGE FINCH:  I only mention this, not for a cheap display of knowledge but when I was younger and up and coming, which was a long time ago, I did the Chartered Institute of Arbitrators exams and although I have never obviously been able to practise in view of my work, I did have to write a judgment and do an intensive course on it and I am familiar with the provisions of the Arbitration Act in England tolerably so it would just

H | worry me from the point… It does not affect this but it is a cloud on the horizon—

ADVOCATE NEWMAN:  It may something in the future.

JUDGE FINCH:  —which could be quite a big one in my view.

A     ADVOCATE NEWMAN:  I agree, sir, yes.  It is something which I think the administrators will definitely have to consider and work out once and if that event does happen.

JUDGE FINCH:  Yes, indeed.  Sorry to interrupt your flow.  Please carry on.

B

ADVOCATE NEWMAN:  No, it is all right, sir.  The very simple point I wanted to make actually, sir, is that you may have read Mr Cohen's signed report at the end of the evidence where he sets out why he thinks the purpose may be achieved and he sets out things to do with the proposed administrators' remuneration, et cetera, but he also says in there that he is informed by the Board that if Vale does obtain its judgment against the company, it is not interested in prosecuting the two causes of action that the company has.  In my submission that would simply destroy the value of the company because what Vale will presumably seek to do is try and enforce its judgment as

C     quickly as possible.  It will probably then force the company into liquidation.  That would destroy any value the company has because obviously if it goes into liquidation it is going to be more difficult to prosecute those claims and the whole purpose of this exercise is to ultimately return the company to solvency.

D

That is what Mr Cohen says in his report and that is what we are pleading in our Administration Application so what we do not want is for Vale to come along and disrupt that process.  They will obviously have plenty of say during the administration itself and, of course, as a contingent creditor and then probably as a creditor but the point is that at the moment we do not want them disrupting this particular Application because the Board very firmly believes that it is in the company's best interests and indeed all of the creditors' best interests, not just Vale, that the company is put into administration.  That is why we have not served Vale and I wanted to point that out to

E     you now, sir, in the interests of full and frank disclosure.

JUDGE FINCH:  An unusual set of circumstances throughout, this one.

ADVOCATE NEWMAN:  It is indeed, sir, yes.

JUDGE FINCH:  But in practical terms if you did that we might as well not be here.

F

ADVOCATE NEWMAN:  Yes, exactly.  So, that is the point I wanted to make there, sir.  In relation to the substantive Application itself, I am grateful for the indication that you have read the papers.  As you know, sir, the test for administration is a two-stage process or three stages, in effect, if you take your discretion into account at the end.  The first stage is that you have to be satisfied that the company is or is likely to

G     become insolvent, ie it fails the solvency test, and the second stage is that the purpose of administration may be achieved or is likely to be achieved under section 374 of the Companies Law.

Dealing with the insolvency element first, sir, can I please just take you to volume 3, which is my Skeleton Argument bundle.  I just wanted to take you to the law, sir, if I

H     May.

JUDGE FINCH:  Certainly.

CONFIDENTIAL     JA0135208

A

ADVOCATE NEWMAN: If we start with 374, which is on page 428 of that extract at tab 1, you will see that 374(1) says:

> "Subject to the provisions of this section, if the Court –
>
> (a) is satisfied that a company... does not satisfy or is likely to become unable to satisfy the solvency test..."

B

That is the first part of this test I am talking about now and then we have the second part in (b) that the Court may make the order. So we have to look at the solvency test, sir, and that is at 527 which is on page 567 of the extract towards the back of that same tab which says:

> "For the purposes of this Law a company satisfies the solvency test if –
>
> (a) the company is able to pay its debts as they become due,
>
> (b) the value of the company's assets is greater than the value of its liabilities."

C

D

We do not need to concern ourselves with (c) because that concerns supervised companies which this company is not. So, we have in effect a cash flow test and a balance sheet test. If the company fails either one of those, then it fails the solvency test.

There are two cases in the bundle which we have put in, both English cases but I would say they have been applied here a number of times already and are persuasive in Guernsey. There is <u>Re Cheyne Finance plc (No 2)</u> [2008] Bus LR 1562 at tab 9 and <u>BNY Corporate Trustees Services Ltd v Eurosail</u> [2013] UKSC 28 at tab 10. <u>Cheyne Finance</u>, if I can take you to that first, that deals with cash flow insolvency.

E

JUDGE FINCH: I think - and I do not want to appear to be over pedantic, you know I am not like that—

F

ADVOCATE NEWMAN: No, sir.

JUDGE FINCH: —probably say <u>Cheyne</u> **(pronounced "Chainee")**—

ADVOCATE NEWMAN: I do not know how you pronounce it, sir. I have always said <u>Cheyne</u> **(pronounced "Cheen")**.

G

JUDGE FINCH: —like Cheyne Row in Chelsea.

ADVOCATE NEWMAN: All right.

JUDGE FINCH: The sort of place we could not afford, Advocate Newman.

H

ADVOCATE NEWMAN: I am northern, sir, so I would not know about that.

JUDGE FINCH: I come from Portsmouth so I have got even less culture.

CONFIDENTIAL                                                                                                           JA0135209

A

ADVOCATE NEWMAN: I will call it *Cheyne Finance* **(pronounced "Chainee")** instead. Paragraph 56 is really the nub of this case, sir, which is on page 1572 and here Briggs J is talking about the alterations to the test in England. You will see at paragraph 56 he refers to section 123(1)(e). That is the equivalent of the cash flow test in section 527. It is exactly the same wording. I think it may say "debts fall due" rather than "become due" but that is the same. If you look at paragraph 53 just above, it says that "fall due" is synonymous with "become due." What Briggs J says is that

B

the effect of the replacement was that you have an ability of the Court now:

> "...to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase 'as they fall due'."

C

So really what you can do, sir, is be very flexible in your approach to cash flow insolvency, look at all the facts which surround this case and determine, given all the facts that you know, whether the company is cash flow insolvent or not. There is no straitjacket which binds you to determining that.

D

With *Eurosail*, which is in tab 10, that goes to balance sheet insolvency. Again, I do not want to labour the point particularly but paragraph 42 in tab 10 on page 1426, this is Lord Walker in the Supreme Court, and what he is doing here is he is approving what Toulson LJ said in the Court below in relation to the balance sheet test, which in England is section 123(2) of the Insolvency Act. What Toulson LJ said was it:

E

> "...requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowance for its prospective and contingent liabilities, it cannot reasonably be expected to be able to meet those liabilities. If so, it will be deemed insolvent although it is currently able to pay its debts as they fall due. The more distant the liabilities, the harder this will be to establish."

F

That, sir, I think in a nub is the balance sheet test which I would say applies in Guernsey equally. It is looking at the assets but also then looking at the prospective and contingent liabilities and obviously the further away those liabilities may be, then the less you need to take those into account when determining whether the company is balance sheet insolvent.

G

Just to apply that to the facts of this case now, sir, I am going to try and not take you too much through Mr [Driver's?] Affidavit if I can help it and, having taken it as read, I will just refer you to paragraph numbers and the like. We know, sir, from what Mr Driver says that the company has today actual net assets of US$ 132 million and I think it is safe to say that as of today the company probably does satisfy the solvency test because, of course, we do not have the Vale claim that has not crystallised yet but according to the evidence it is imminent and it is going to be over US$ 500 million,

H

potentially up to US$ 1.3 billion. There is also, you may have read, a guarantee liability owed to Starwest, which is probably contingent liability at the moment because it is a guarantee, and that is up to US$ 150 million as well.

So, we have got net assets of US$ 132 million. We know from the evidence that the company has these two claims against the Republic of Guinea and against George

A

Soros and associated entities but what Mr Driver says is that the Board has attributed nil value to those two claims and the reason for that is because although I am going to be saying to you later on that these two claims are really the nub of the administration and that is what Mr Cohen is saying will return the company to solvency, we are in a position today that the Board has to take a very prudent approach to these claims. Obviously, it has got to prosecute them, it has got to get through presumably numerous appeals and various other things which have to go on in these two pieces of litigation. It has got to enforce any judgments it obtains as well so the Board is taking a very

B

prudent approach and has valued the claims at nil for the purposes of accounting. On that basis, we would say that given the impending Vale claim, the company is likely to be balance sheet insolvent once that claim crystallises against the company.

C

On the cash flow test, this is possibly slightly easier in that we know from the evidence that Standard Chartered have this assignment over the company's cash so the company effectively has no free cash. The cash that it has is subject to security which goes to Standard Chartered and that is why you may have read that the administrators have put a funding arrangement in place with the company's parent company, Nysco, to fund the administration to keep that money outside the company's estate so that Standard Chartered do not get it.

D

E

You will have also read that there is a litigation funding arrangement which funds the Guinea and the Soros claims. What this effectively means, as Mr Driver says, is there is about US$ 15,000, I think, left in the company at the moment and if Vale do obtain their judgment for US$ 500 million, and I accept your point they have got to convert it, they have got to do all sorts of things with it to enforce it, but it is very clear that the company has no cash to satisfy that judgment now or in the short or probably medium-term future. We have got to wait much longer-term for the two claims against Guinea and George Soros to actually bear any fruit and at the moment, as I say, sir, for the short to medium-term the company does not have any cash. So, in my submission, the company is likely to be cash flow insolvent once that judgment hits the company which, as I say, we say is soon.

F

In my submission, the company fails both limbs of the solvency test. If you are not with me on one or the other, we say that it certainly does fail the cash flow test because... certainly, sorry, it is likely to fail the cash flow test because of the judgment which will leave it with no cash to do anything at all, let alone pay a half a billion dollar judgment.

G

H

The next part of the threshold test is whether the administration achieves the purpose of the administration and you will have seen, sir, that we are only seeking one of the statutory purposes. There are two in the law but we are only seeking one and that is the survival of the company in the whole or any part of its undertaking as a going concern. Mr Cohen in his report, if I could take you to that, sir, which is in volume 2 at page 1010, as I said before the object of the administration order which is being sought is to ultimately return the company to solvency, to hand back management and control to the directors and, of course, by solvency, by definition that means that we will be able to pay all our creditors so that is the whole object of this administration and that is what Mr Cohen says in his report at paragraphs 12 to 15 and crucially in paragraph 15 itself actually where he says:

A

> "The insolvency of BSGR as described above may be a temporary phenomenon but if it does not receive the protection offered under the administration process of its major contingent creditor, Vale, the potential value of BSGR may be significantly damaged, probably irretrievably."

B

So his strategy, which he sets out at paragraphs 17 to 24, is effectively to take control and to engage with the litigation and try and effectively win those two pieces of litigation eventually and I say the word "eventually" because that is important for your consideration of the solvency test issues, which we went through earlier, and eventually return the company to solvency by winning those two claims, paying off creditors and returning the control to the directors of the company. The intention, and it is being deliberately thought about, that we did not want to plead as an alternative that the second purpose of administration might be a better realisation and not a liquidation because that would defeat the point of this whole exercise.

C

D

The idea is that this company should return to solvency and that is the entire strategy. If we were to give up now almost and say, "Well, actually, it could go into liquidation or we can achieve a better result on a liquidation," we have sort of almost given up on the entire strategy which the proposed administrators have settled upon so Mr Cohen has asserted and the Board has accepted his advice that he thinks there is a possibility of doing this. He says at paragraph 14:

> "There is sufficient evidence to support the possibility that if successful in either or both of the outstanding litigation, the details of which are set out in the Driver Affidavit, BSGR will return to solvency."

E

So he very much believes that the purpose may well be achieved and he says that there. That, in my submission, sir, is all you need to be satisfied of under the test under section 374. It is that it may achieve the purpose on the balance of probabilities in my submission and that is what Mr Cohen is saying at paragraph 14 of his report.

F

The last point I just want to make, sir, in relation to the substantive Application is that obviously you do have a discretion under section 374. We have made a point in the Skeleton Argument about <u>Propinvest Group Limited - Application for an Administration Order</u> (Guernsey Judgment 34/2011) and about how, if the Court finds that the company is actually insolvent or fails the solvency test, then the submission is that your discretion really can only be exercised one way.

G

I would possibly go further than that, sir, and say that if you are satisfied that the purpose of administration may be achieved, then I would ask that you exercise your discretion in the way that we ask because this is very clearly in the best interests of not just the company but all of its creditors together, not just one creditor, and if it does return the company to solvency ultimately, then that can only be for the benefit of all the stakeholders in this entity so I would ask that you exercise your discretion in that particular way.

H

In relation to the substantive Application, sir, there are lots of ancillary orders if you grant the administration order but perhaps I can leave those until you have made your decision.

A   JUDGE FINCH: Thank you very much. Anything else on the main issue?

ADVOCATE NEWMAN: Nothing, sir, no.

JUDGE FINCH: All right.

### Decision

B

1.  I have already dealt with the question of the constitution of the Court and the fact this is a hearing *in camera* and the Greffier will note that the proceedings are to be sealed until further order. That also covers the record that the Greffier is keeping so that limited input and access to that even here.

C

2.  I am grateful for the well-constructed Application and the very thorough way it has been put forward on paper and, as I would expect from you, Advocate Newman, orally. I note in respect of the balance sheet and the cash flow matters, first of all the cash, the <u>Cheyne Finance</u> case, paragraph 56 and the headnote are consistent. I will not read paragraph 56. It has been referred to. It obviously includes contingent and prospective liabilities. That is a decision from a Chancery Division. Then I go to the balance sheet right up to the Supreme Court and although it is a far more limited test, the observations of Lord Walker, particularly in relation to paragraph 42 and, to an extent, paragraph 41, seem in this particular case to meet the situation. It is a heavier test and it says:

D

> *"The court should proceed with the greatest caution in deciding that the company is in a state of balance-sheet insolvency under* [the English legislation]*."*

E

But on the facts put forward here, the scenario is such that there can be no alternative but to [construe?] that it was so those tests are met.

3.  The exercise of discretion is well dealt with in the Skeleton Argument and there is Guernsey authority there. I refer to that. Paragraph 38 of the Skeleton refers to the Royal Court judgment in November 2011 (34/2012), in the <u>Propinvest</u> case. Once the Court had determined the company failed the solvency test:

F

> *"...there was no other reason to prevent them* [the Jurats, who are not sitting today - it is just me] *from exercising their discretion in favour of making the order sought."*

G

It is submitted that this is also the case here and it is a matter less complex on the facts and in the <u>Propinvest</u> case so there is no reason for me to not exercise my discretion on the circumstances put forward. It is an unusual situation and I have recorded my peripheral concern about the strategy on the arbitration but that is not a matter which directly affects the exercise of my discretion today. It is for other people to think about.

H

4.  It would seem to me to be a laudable aim to try and preserve the company. There does not seem to me to be on the face of the papers any improper motive. It seems to me to head off a destructive piece of litigation or action by those who would want to bring the company down should they obtain judgment and I have carefully considered Mr Cohen's argument and I find on the facts put forward before me that is a

CONFIDENTIAL                                                                                                    JA0135213

A

reasonable and sensible argument and for the reasons given by him and in the Skeleton Argument I accord with the Application.

You can deal with your peripheral matters. It is an exercise of discretion and I am satisfied, though it is a bit odd, this case, I am putting it bluntly, I cannot see anything that smells like a rotting fish which occasionally does come up in these cases so I am quite happy to go ahead.

B

ADVOCATE NEWMAN: Thank you, sir. I am grateful. The peripheral matters are at basically paragraphs 5 to 10 of the Application dated 27th February so it is the appointment of Mr Cohen and Mr Callewaert both of different entities within the BDO network to be appointed and sworn. Mr Callewaert is here in Court to be sworn today. Mr Cohen could not get over from London unfortunately today but we will apply to have him sworn in at a later time.

C

JUDGE FINCH: Are you going to ask - again, I do not wish to appear over pedantic - for the survivor to act if anything happens to either of those esteemed gentlemen or do you want them just to be joint?

ADVOCATE NEWMAN: Just as joint, sir. That is the normal—

D

JUDGE FINCH: All right. That is fine. Just in case there is a lightning strike, you know.

ADVOCATE NEWMAN: I would hope not, sir, during this case.

JUDGE FINCH: All right.

E

ADVOCATE NEWMAN: Quite important, sir, are paragraphs 7 and 8 of the Application which is about the Joint Administrators' remuneration. You will be aware of Practice Direction 3 of 2015.

JUDGE FINCH: I am, yes.

F

ADVOCATE NEWMAN: In my submission, sir, first of all Mr Cohen's report sets out all the elements.

JUDGE FINCH: I have seen the figures. He charges almost as much as you, Advocate Newman, as a partner of Ogier.

G

ADVOCATE NEWMAN: Nearly, sir. They are rivalling my charge out rates there.

JUDGE FINCH: Yes.

H

ADVOCATE NEWMAN: I think the point to make is that it is very unlikely there is going to be any free cash within the company itself so we have the funding arrangement with the parent company, Nysco, and in any event all the requirements of Practice Direction 3 are met in Mr Cohen's report. He has set out charge out rates, he has provided a description of the work to be done but he has not been able to and, indeed, my firm has not been able to set out what we think we might be charging because we have no idea what we are going to do at the moment and that is envisaged as well in the Practice Direction. In those terms, I would submit that the Practice Direction has been complied with and the Court should fix those fees accordingly to be charged on a

A

time spent basis. Also, we ask for the costs - this is a standard order - of this Application to be paid as an expense or a cost of the administration.

Finally, to preserve the transparency of this and to show that there is definitely nothing fishy going on or, indeed, that the administrators are going to try and do something dodgy with their fees in relation to creditors, they are proposing - and this is not a standard order - that they report to creditors at least once every six months and that will at least give creditors the opportunity (and by creditors I mean Vale as well as everybody else) to air their views as to not only strategy but also remuneration and anything else to do with the administration. That is the proposal. As I say, that is not a standard order the Court makes but this is something which the Joint Administrators consider to be prudent and reasonable in this particular case.

B

C

JUDGE FINCH: Yes, that is an additional thing and the others are pretty standard. I am quite prepared that that should go in the order.

ADVOCATE NEWMAN: Thank you, sir. In relation to the order itself, and this is a little bit unusual, we have prepared one for you to sign rather than an Act of Court. The reason for that, sir, is that it is very likely that the Joint Administrators will need to start handing this order around quite quickly but also one of the things that we have been advised that they may need to do is apply for reciprocal relief in the United States because of the litigation against George Soros.

D

JUDGE FINCH: He is going to have some pretty high-powered lawyers acting for him.

E

ADVOCATE NEWMAN: I imagine he probably does have a number of them, yes, and so in order to do that, sir, they are going to need an order of this Court, probably signed by you, but also when I hand this up you will see there is a recital there which I just want to take you to because it will aid the reciprocal enforcement process.

F

JUDGE FINCH: Certainly, yes. I will have a look at that if you kindly pass it to the Greffier. Thank you, Greffier. If you just give me a moment. **(Handed)**. **(Pause)**. In (4), should an administration order…? Yes, that is fine. I was just thinking aloud. That is fine, going over it. No problem.

ADVOCATE NEWMAN: Thank you, sir.

JUDGE FINCH: All right. I am content with the wording on this. I will sign it and affix my rubber stamp because the foreign courts like that, do they not?

G

ADVOCATE NEWMAN: They do indeed, sir, yes. Are you satisfied with the third recital, just to make sure? It is to do with the UNCITRAL Model Law on Cross-Border Insolvency.

H

JUDGE FINCH: Yes, the UNCITRAL Model Law, yes, that is necessary to keep a foreign jurisdiction happy, is it not? They will know about that in America.

ADVOCATE NEWMAN: It is. It is to satisfy them that this process fits in within that.

JUDGE FINCH: Yes, and we are all satisfied about that.

| | |
|---|---|
| A | ADVOCATE NEWMAN: I have got some copies here if you have not got them already, sir, and I am perfectly satisfied that that is the case, yes, sir. |
| | JUDGE FINCH: Good. Yes, all right. There is no need for any formalities. I will just nip out very quickly, put my rubber stamp on and come back in. All right? |
| B | ADVOCATE NEWMAN: Thank you, sir, and then you will need to swear Mr Callewaert in, I think, after that. |
| | JUDGE FINCH: Yes. I will swear Mr Callewaert. I will just pop out. As I say, no formalities— |
| | ADVOCATE NEWMAN: Thank you, sir. |
| C | JUDGE FINCH: —and I will come straight back. |
| | **(The Judge briefly leaves the Courtroom and returns).** |
| | JUDGE FINCH: One for you and one for us, Advocate Newman. |
| D | ADVOCATE NEWMAN: Thank you, sir, yes. |
| | JUDGE FINCH: Thank you, Greffier. Where is the oath? |
| | THE GREFFIER: I have got it here, sir. |
| | JUDGE FINCH: Much obliged. Thank you very much. |
| E | **(Mr Callewaert affirmed as Administrator of BSG Resources Limited)** |
| | JUDGE FINCH: Thank you very much. Thank you, Greffier. Anything else on this? |
| | ADVOCATE NEWMAN: No, sir. Thank you very much. I am obliged. |
| F | JUDGE FINCH: Much obliged. Thank you. |
| | **(3.28pm - Court adjourns)** |
| G | |
| H | |

CONFIDENTIAL                                                                          JA0135216